—1—

1               IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                        WACO DIVISION

3   ACQIS LLC                    *
                                 *     March 18, 2024
4   VS.                          *
                                 * CIVIL ACTION NO. 6:20-CV-966
5   ASUSTEK COMPUTER, INC.   *
    ASUS GLOBAL PTE. LTD.    *
6
             BEFORE THE HONORABLE ALAN D ALBRIGHT
7                  JURY TRIAL PROCEEDINGS
                     Volume 1 of 5
8
    APPEARANCES:
9
    For the Plaintiff:   Case L. Collard, Esq.
10                       Gregory S. Tamkin, Esq.
                         Dorsey & Whitney LLP
11                       1400 Wewatta Street, Suite 400
                         Denver, CO 80202
12
                         Madeline Hepler, Esq.
13                       Dorsey & Whitney LLP
                         701 5th Ave, Suite 6100
14                       Seattle, WA 98104

15                       Elliot J. Hales, Esq.
                         Dorsey & Whitney LLP
16                       111 S. Main Street, Suite 2100
                         Salt Lake City, UT 84111
17
                         Paige Arnette Amstutz, Esq.
18                       Scott, Douglass & McConnico, LLP
                         303 Colorado Street, Suite 2400
19                       Austin, TX 78701

20  For the Defendants:  Eric A Buresh, Esq.
                         Mark C. Lang, Esq.
21                       Michelle L. Marriott, Esq.
                         Erise IP, PA
22                       7015 College Boulevard
                         Overland Park, KS 66211
23
                         James Travis Underwood, Esq.
24                       Gillam & Smith
                         102 N. College, Suite 800
25                       Tyler, TX 75702

2

1    Court Reporter:        Kristie M. Davis, CRR, RMR
                            PO Box 20994
2                           Waco, Texas 76702-0994
                            (254) 340-6114
3

4       Proceedings recorded by mechanical stenography,

08:30  5    transcript produced by computer-aided transcription.

08:30  6

08:30  7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08:50  1                    (Hearing begins.)

08:50  2                    THE BAILIFF:  All rise.

08:50  3                    THE COURT:  Good morning, everyone.  You

08:50  4    may be seated.

08:50  5                    I understand we have a couple of issues

08:50  6    to take up.  Happy to do it.

08:50  7                    MR. COLLARD:  Thank you, Your Honor.

08:50  8    Case Collard for ACQIS.  And we sent a joint e-mail in

08:50  9    to Mr. Shultz.

08:50  10                    The first issue is one I think -- I hope

08:50  11   we can dispose of pretty quickly.  And that would be,

08:51  12   there is disagreement about the claim construction

08:51  13   document that will go in the juror notebook and that

08:51  14   also we'll use in our slides.

08:51  15                    I don't think -- and I'm certainly happy

08:51  16   to let ASUSTeK and ASGL speak for themselves.  But I

08:51  17   think the issue is they just want to preserve their

08:51  18   objection to your construction, but they recognize that

08:51  19   the construction applies in this case.

08:51  20                    And so I'll let Ms. Marriott speak on

08:51  21   that.

08:51  22                    MS. MARRIOTT:  Your Honor, may I approach

08:51  23   the...

08:51  24                    THE COURT:  Sure.

08:51  25                    MS. MARRIOTT:  Your Honor, the question

08:51  1    here is the "PCI bus transaction" term that's been

08:51  2    construed by the Court.

08:51  3              The Court in construing that term said:

08:51  4    I'm going to adopt the Federal Circuit's construction

08:51  5    of a transaction in accordance with the industry

08:51  6    standard PCI local bus specification for communication

08:51  7    with interconnected peripheral component.

08:51  8              That's the construction that defendants

08:52  9    believe should go in the jury notebook.  That is the

08:52  10   Federal Circuit's construction.  And we believe that

08:52  11   that is the construction that the Court adopted.

08:52  12             The issue comes with the next sentence

08:52  13   from the claim construction transcript where Your Honor

08:52  14   said:  But I'm also putting on the record, and we'll

08:52  15   get an order out as quickly as possible, we agree with

08:52  16   plaintiff that "in accordance with" includes backwards

08:52  17   compatibility and that adding backwards compatibility

08:52  18   does not expand the scope.

08:52  19             So the question is whether that last part

08:52  20   of Your Honor's statement is part of the construction

08:52  21   or not.  And defendants' position is that's not in the

08:52  22   Federal Circuit's construction and should not be

08:52  23   submitted to the jury.

08:52  24             THE COURT:  Could I see what it is that

08:52  25   plaintiff wants to submit?

08:52  1            MS. MARRIOTT:  Absolutely, Your Honor.

08:52  2  Can I pass this up?  This is from our joint jury

08:52  3  instruction, so it has -- defendants blue and ACQIS is

08:52  4  red.

08:53  5            THE COURT:  And I'll hear from the

08:54  6  plaintiff.

08:54  7            MR. COLLARD:  Your Honor, you -- I think

08:54  8  Ms. Marriott admits and the defendants admit the key

08:54  9  point, which is your construction said that in

08:54 10  accordance with includes backwards compatibility.  That

08:54 11  was an additional part of your construction.

08:54 12            You've construed the same term in the

08:54 13  same patents and issued an order in the Sony case in

08:54 14  which the -- this same counsel, that also says

08:54 15  backwards compatible.

08:54 16            There's no dispute that backwards

08:54 17  compatible is a part of the construction the jury

08:54 18  should be instructed on.  The idea to keep it out now

08:54 19  would really just be going back and changing your

08:54 20  construction.

08:55 21            THE COURT:  Okay.  So for the record, I'm

08:55 22  going to go with what the plaintiff is suggesting.

08:55 23            What is the next issue?

08:55 24            MR. COLLARD:  Thank you, Your Honor.

08:55 25            The next issue is an objection to -- the

08:55  1   content is really the same on these issues, Your Honor.

08:55  2   It's our discussion, our use, and our admission of

08:55  3   licenses that the defendants claim are not comparable.

08:55  4           The issue is that ACQIS has about 21

08:55  5   licenses that to -- that include the patents-in-suit.

08:55  6   The way the evidence is likely to come in is that I'm

08:55  7   going to talk with Dr. Chu, who's the CEO of ACQIS, and

08:55  8   talk about his overall approach to licensing and

08:55  9   negotiation, what kind of -- you know, royalty versus

08:55  10  lump sum, whether there's additional compensation

08:56  11  considered, and how that affects the amounts, all of

08:56  12  those issues.

08:56  13          Our expert, that's exactly the sort of

08:56  14  thing he talks about in his expert report, what is

08:56  15  ACQIS' approach to negotiation.  He then says:  I

08:56  16  looked at all -- and analyzed all 21 of those licenses.

08:56  17  And here are the, I think, 13 or so that I found most

08:56  18  comparable for purposes of calculating my royalty rate.

08:56  19          What defendants want is that the -- they

08:56  20  want to take the fact or the moment where the expert

08:56  21  says, well, I found these are comparable for purposes

08:56  22  of calculating my royalty rate, and then say, now those

08:56  23  other licenses are excluded from the case as if they

08:56  24  didn't happen.

08:56  25          The plaintiff and CEO who signed those

7

08:56  1   licenses --

08:56  2               THE COURT:  Are they in your expert's

08:56  3   report?

08:56  4               MR. COLLARD:  Yes.

08:56  5               THE COURT:  I'm not sure what the

08:56  6   objection is.

08:56  7               MS. MARRIOTT:  Your Honor, the licenses

08:56  8   that -- so the context is there's a summary chart that

08:57  9   lists a lot of licenses with a lot of amounts.

08:57  10              All of the licenses that we're objecting

08:57  11  to are ones that our expert has found to be

08:57  12  noncomparable and the plaintiff's expert has found to

08:57  13  be noncomparable.

08:57  14              So the issue here is, one, they're not

08:57  15  relevant to any issue in this case.  They're not being

08:57  16  used by either expert.  And, two, it's prejudicial.

08:57  17              THE COURT:  Well, it's not prejudicial.

08:57  18  But if -- your expert's welcome to explain that, and

08:57  19  this is just argument.

08:57  20              I'm going to overrule the objection.

08:57  21              What do we have next?

08:57  22              MR. COLLARD:  Your Honor, I think to be

08:57  23  clear on the chart is to --

08:57  24              THE COURT:  Now, if the plaintiff says

08:57  25  something in opening that's inconsistent with what the

08:57  1    evidence shows, you can point that out as well.

08:57  2              I mean, whatever -- just so you know,

08:57  3    this past week...

08:57  4              MR. COLLARD:  Your Honor --

08:57  5              THE COURT:  I cut something out last week

08:57  6    in a trial in a motion in limine, and the person who'd

08:57  7    asked me to keep it out brought it up during opening

08:58  8    and then was unaware that opening counted in terms of

08:58  9    what's said to the jury and that it -- you could open

08:58  10   the door during openings.

08:58  11             So that -- just in case you're wondering,

08:58  12   what you say in opening, while it's only argument, the

08:58  13   other side still gets to use it.  So...

08:58  14             MR. COLLARD:  Understood, Your Honor.  I

08:58  15   appreciate the reminder.

08:58  16             THE COURT:  I'm having such a hard time

08:58  17   with your counsel sitting at the plaintiff's table that

08:58  18   I may be confused occasionally seeing her over at

08:58  19   counsel -- on the plaintiff's side.  It's just -- I'm

08:58  20   having a little bit of PTSD over that, but I guess

08:58  21   I'll...

08:58  22             And not that -- you're -- the defense

08:58  23   local counsel isn't usually on the other side as well.

08:58  24   So maybe -- I'll just have to do my best to remember

08:58  25   which sides they're representing when they're up here.

9

08:58  1                    MR. COLLARD:  We don't have a little

08:58  2    sign, I guess.

08:58  3                    Your Honor, I think it is fair to take up

08:59  4    the tail end of this dispute, then, which is actually

08:59  5    over this Rule 1006 summary exhibit --

08:59  6                    THE COURT:  Okay.

08:59  7                    MR. COLLARD:  -- which was objected to by

08:59  8    plaintiffs.

08:59  9                    I don't know if you have any -- in light

08:59  10   of this ruling, do you have remaining objections to the

08:59  11   summary exhibit?

08:59  12                    MS. MARRIOTT:  Just a few.

08:59  13                    Your Honor, on the summary, so 1006

08:59  14   allows for a summary of the evidence.  This has a few

08:59  15   issues here.

08:59  16                    One is it has a column for effective

08:59  17   royalty rate, which is really just calculations their

08:59  18   expert is doing, not necessarily terms of the licenses

08:59  19   themselves.

08:59  20                    So we would ask that that be not

08:59  21   submitted to the jury because that's really -- an

08:59  22   effective royalty rate is by definition expert

08:59  23   calculations.

08:59  24                    THE COURT:  That's overruled.

08:59  25                    What else do you have?

08:59  1                    MS. MARRIOTT:  The last column here is

08:59  2    additional compensation to ACQIS, and it has things

08:59  3    like 5 percent of future sales, stop making infringing

08:59  4    product.  I don't know that that's necessarily

08:59  5    compensation to ACQIS, so I would just say additional

09:00  6    terms.

09:00  7                    THE COURT:  That's overruled.

09:00  8                    Anything else?

09:00  9                    MS. MARRIOTT:  Thank you, Your Honor.

09:00  10   Nothing else.

09:00  11                    THE COURT:  Yes, sir.

09:00  12                    MR. COLLARD:  The last issue, Your Honor,

09:00  13   is on Exhibit P-50.  It's the May 15, 2018 letter to

09:00  14   ASUS from ACQIS.

09:00  15                    We discussed this at the motion in limine

09:00  16   hearing.  They have asked for additional redactions to

09:00  17   that letter that refer to a prior litigation against

09:00  18   IBM in the Eastern District of Texas.

09:00  19                    In short, our position is we asked ASUS

09:00  20   if they would -- they would agree that the letter is

09:00  21   adequate for purposes of notice, and then they can

09:00  22   argue about whether they received it or not, notice of

09:00  23   infringement.

09:00  24                    They won't agree to that.  And so in

09:00  25   light of that, we really need to have the full

09:00  1    discussion.  Because the way -- Dr. Chu wrote a letter
09:00  2    that they have characterized as essentially too soft to
09:01  3    say it doesn't really allege infringement.
09:01  4                    But having a paragraph saying, I'm -- you
09:01  5    know, essentially, I'm so serious about this that I
09:01  6    litigated through trial with another defendant on other
09:01  7    of my patents is certainly relevant to the strength of
09:01  8    the notice letter.
09:01  9                    THE COURT:  A response?
09:01  10                   MR. UNDERWOOD:  Thank you, Your Honor.
09:01  11                   And I've got a copy of the letter if that
09:01  12   would be helpful for the Court.
09:01  13                   THE COURT:  Sure.
09:01  14                   MR. UNDERWOOD:  Travis Underwood on
09:01  15   behalf of the defendants.
09:01  16                   So as Mr. Collard pointed out, there's
09:01  17   actually three separate sections of this letter that
09:01  18   we're asking to be redacted.  The first is the second
09:01  19   to last paragraph, and I put some annotations on the
09:01  20   exhibit so the Court can follow.
09:01  21                   This is the IBM litigation in the Eastern
09:01  22   District of Texas.  It's different patents.  It's
09:02  23   different products.
09:02  24                   THE COURT:  I'm going to exclude that
09:02  25   paragraph.

09:02  1               MR. UNDERWOOD:  Thank you, Your Honor.

09:02  2               The next paragraph we're asking to be

09:02  3    redacted is the last paragraph.

09:02  4               THE COURT:  Well, let me start over.  I'm

09:02  5    excluding it for now.  I'm going to listen to the

09:02  6    testimony.  If the plaintiff at some point wants to

09:02  7    argue based on -- I don't know how you're going to

09:02  8    cross the -- their witness.  I'll see how you cross

09:02  9    them to determine.

09:02  10              Right now I don't think it's necessary to

09:02  11   have the fact that they were successful against IBM in,

09:02  12   but I'll hear what -- how you cross their witnesses to

09:02  13   determine whether or not that becomes admissible.

09:02  14              MR. UNDERWOOD:  Thank you, Your Honor.

09:02  15   That's all we're asking for.

09:02  16              And then the -- with respect to that

09:02  17   paragraph, the last paragraph addresses a bunch of

09:02  18   IPRs.  Under the Court's standard motion in limine, we

09:02  19   don't think IPR practice should come into the case.

09:02  20   It's a sideshow.

09:03  21              And I'll also point out for the record

09:03  22   the IPRs that are referenced in this paragraph, they

09:03  23   also are on different patents, Your Honor.

09:03  24              THE COURT:  Okay.  I'm going to keep that

09:03  25   out.

09:03   1                    MR. UNDERWOOD:  And then finally, if we

09:03   2    turn to the last page, Your Honor, on the very top

09:03   3    paragraph, the final line says, and I quote:  HP had

09:03   4    invested in our company and is a shareholder.

09:03   5                    And we think, Your Honor, what the

09:03   6    plaintiffs are intending to do is to use this to sort

09:03   7    of bolster their technology and their credibility.  The

09:03   8    problem with that, Your Honor, is that one month ago --

09:03   9                    MR. COLLARD:  Your Honor, we can agree to

09:03   10   redact that line if we're redacting the others.

09:03   11                   THE COURT:  Okay.

09:03   12                   MR. UNDERWOOD:  Thank you, Your Honor.

09:03   13                   THE COURT:  Anything else we need to take

09:03   14   up?

09:03   15                   MR. UNDERWOOD:  Not from defendants, Your

09:03   16   Honor.

09:03   17                   MR. COLLARD:  Your Honor -- sorry.  Maybe

09:03   18   you have something else.

09:03   19                   MR. UNDERWOOD:  Your Honor, may I ask

09:03   20   Mr. Collard for a clarification on something?

09:03   21                   (Conference between counsel.)

09:04   22                   MR. UNDERWOOD:  Your Honor, may I

09:04   23   approach with the exhibit at issue?  And I apologize.

09:04   24   There is a related issue that I was not perceiving.

09:04   25                   THE COURT:  Okay.

| | | |
|---|---|---|
| 09:04 | 1 | MR. UNDERWOOD: So on this exhibit, Your |
| 09:04 | 2 | Honor, the Court just heard argument about, you know, |
| 09:04 | 3 | whether or not experts discuss comparability, things of |
| 09:04 | 4 | that nature, but there are three licensees and licenses |
| 09:04 | 5 | listed on this exhibit. |
| 09:04 | 6 | For the record, they're the HP license, |
| 09:04 | 7 | the Oracle license, and the IBM license that are |
| 09:05 | 8 | problematic and have their own baggage for other |
| 09:05 | 9 | reasons, and they are all structured similarly. |
| 09:05 | 10 | As we were just talking about in the |
| 09:05 | 11 | letter, the plaintiff was telling the world that HP had |
| 09:05 | 12 | invested in the company. And that's the way that these |
| 09:05 | 13 | were structured. They were structured as investments |
| 09:05 | 14 | rather than licenses. |
| 09:05 | 15 | And the issue, Your Honor, is that one |
| 09:05 | 16 | month ago, the United States Tax Court issued a |
| 09:05 | 17 | decision. And in this decision, these three |
| 09:05 | 18 | arrangements were at issue: HP, Oracle, and IBM. |
| 09:05 | 19 | And what that decision did is it upheld |
| 09:05 | 20 | income tax penalties. I'm not going to go through the |
| 09:05 | 21 | whole thing because it's lengthy, but this is in sum |
| 09:05 | 22 | what the United States Tax Court had to say about these |
| 09:05 | 23 | agreements: The transaction before us lacks both |
| 09:05 | 24 | business purpose and economic substance and is a sham. |
| 09:05 | 25 | Accordingly, the transaction will be disregarded. |

09:06    1              And so, Your Honor, we've got a court

09:06    2    decision, the United States Tax Court declaring that

09:06    3    these transactions are a sham.  And so we think on the

09:06    4    one hand, if the plaintiff wants to get into these and

09:06    5    use them as evidence of licensing arrangements, that

09:06    6    the whole story should come in.  And we think that

09:06    7    evidence should come in as well, what the tax court has

09:06    8    said about these arrangements.

09:06    9              Now, I think it would be much easier to

09:06    10   keep all of it out altogether because I think it's just

09:06    11   going to be a sideshow, and we don't need this coming

09:06    12   into a patent case.  But if they are going to use these

09:06    13   licenses with the jury, we think the tax court decision

09:06    14   necessarily is implicated, Your Honor.

09:06    15              THE COURT:  Response?

09:06    16              MR. COLLARD:  Right.  Your Honor, I'm

09:06    17   going to come up to the lectern.

09:06    18              Your Honor, there's a little bit of --

09:06    19   lack of full disclosure I think on what that really

09:06    20   said and what is going on in the tax court.

09:07    21              First of all, that decision's not final.

09:07    22   There's ongoing litigation in the tax court.  There's

09:07    23   no final ruling.  ACQIS has filed additional motions

09:07    24   just last week on those issues.

09:07    25              Second of all, we're not going to talk

09:07  1    about the structure of the licenses, especially now

09:07  2    that we are able to admit the summary exhibit,

09:07  3    Exhibit 920, because there's no reason to.

09:07  4                  The -- there is no dispute, and ASUS

09:07  5    knows this, that HP paid ████████, Oracle paid ██

09:07  6    ████████ and IBM paid █████████  And that's pretty

09:07  7    much the extent of the testimony we're going to go

09:07  8    into.

09:07  9                  What they're talking about is what bucket

09:07  10   and how it got tax -- what the tax treatment was on the

09:07  11   back end.  We're not going to talk about the tax

09:07  12   treatment of any of this revenue.

09:07  13                  THE COURT:  I'm going to keep the tax

09:07  14   court decision out.

09:07  15                  MR. COLLARD:  Thank you.

09:07  16                  THE COURT:  Anything else we need to take

09:07  17   up?

09:08  18                  MR. UNDERWOOD:  Nothing from defendants,

09:08  19   Your Honor.

09:08  20                  THE COURT:  Okay.  I'll go back and get

09:08  21   the jury organized, and we'll come back out.

09:08  22                  MR. COLLARD:  We'd like to invoke the

09:08  23   rule, Your Honor.

       24                  THE COURT:  Thank you.

09:08  25                  MR. COLLARD:  And there's one wrinkle in

09:08  1    that we think that Ajay Bhatt, one of the witnesses

09:08  2    from ASUS, should be subject to the rule in light of

09:08  3    your prior motion in limine clarification that he can

09:08  4    only testify about things he has factual information

09:08  5    on.

09:08  6                    THE COURT:  I have no idea who that is.

09:08  7    Who is defendants' corporate representative?

09:08  8                    MR. BURESH:  This is Barbara Chen and

09:08  9    Emma Ou from the two defendants.

09:08 10                    THE COURT:  Okay.  So why would --

09:08 11    whoever the other gentleman is, why would he not be

09:08 12    subject to the rule?

09:08 13                    MR. BURESH:  He submitted an expert

09:08 14    report, Your Honor.  He'll be testifying about a

09:08 15    substantial amount of technical information, but he

09:08 16    won't be offering opinions in this case.  So --

09:08 17                    THE COURT:  If he's not offering

09:08 18    opinions, then he wouldn't get to rely on what he heard

09:08 19    in court and, therefore, he doesn't need to hear it.

09:09 20    So I'm going to exclude him under the rule.

09:09 21                    MR. BURESH:  That's fine, Your Honor.

09:09 22    Thank you.

09:09 23                    THE COURT:  Anything else?

09:09 24                    MR. COLLARD:  No, Your Honor.  Thank you.

09:09 25                    THE COURT:  Okay.

—18—

| | | |
|---|---|---|
| 09:09 | 1 | THE BAILIFF:  All rise. |
| 09:09 | 2 | (Recess taken.) |
| 09:14 | 3 | THE BAILIFF:  All rise. |
| 09:14 | 4 | THE COURT:  Please remain standing for |
| 09:15 | 5 | the jury. |
| 09:15 | 6 | (Jury entered the courtroom.) |
| 09:15 | 7 | THE COURT:  Thank you.  You may be |
| | 8 | seated. |
| 09:15 | 9 | Jen, would you call the case, please? |
| 09:15 | 10 | DEPUTY CLERK:  A civil action in Case |
| 09:15 | 11 | 6:20-CV-966, ACQIS LLC versus ASUSTeK Computer, |
| 09:15 | 12 | Incorporated, et al.  Case called for a jury trial |
| 09:15 | 13 | proceeding. |
| 09:15 | 14 | THE COURT:  Counsel, if you would please |
| 09:15 | 15 | announce -- tell me who is at your counsel table and |
| 09:15 | 16 | introduce yourselves again to the jury, please. |
| 09:16 | 17 | MR. COLLARD:  Thank you, Your Honor. |
| 09:16 | 18 | My name is Case Collard.  I'm with the |
| 09:16 | 19 | law firm Dorsey & Whitney, and this is Dr. Bill Chu, |
| 09:16 | 20 | the CEO of ACQIS.  And we represent ACQIS.  And also |
| 09:16 | 21 | with me at counsel table is Paige Amstutz.  She's from |
| 09:16 | 22 | the Austin law firm Scott, Douglass & McConnico. |
| 09:16 | 23 | Good morning. |
| 09:16 | 24 | MR. BURESH:  Good morning, ladies and |
| 09:16 | 25 | gentlemen.  My name is Eric Buresh, and I represent the |

09:16  1   defendants in this case, ASUSTeK and ASGL, which you

09:16  2   all heard about on Thursday morning.

09:16  3              With me at counsel table is Ms. Kathleen

09:16  4   Fitterling who will be working with me on this case.

09:16  5   And our corporate representatives, this is Ms. Barbara

09:16  6   Chen from ASUSTeK and Ms. Emma Ou from ASGL.

09:16  7              Thank you.

09:16  8              THE COURT:  Thank you all.

09:16  9              Ladies and gentlemen of the jury, let me

09:16  10  introduce myself to you now on the record.  My name is

09:16  11  Alan Albright.  I'm the United States district judge

09:16  12  for the Waco Division of the Western District of Texas.

09:17  13             Last week I was in Del Rio helping out,

09:17  14  and I'm very happy to be home and back with you all

09:17  15  again.

09:17  16             You're about to hear a patent trial.  I

09:17  17  don't know what your level of enthusiasm was when you

09:17  18  got invited to come here and serve on the jury or if it

09:17  19  went up or down when you actually got selected to serve

09:17  20  on the jury, but I can assure you after having over --

09:17  21  a lot of trials now, I talk to juries in the end and

09:17  22  they're always very grateful that they got to serve.  I

09:17  23  think you're actually going to find that this is a very

09:17  24  rewarding experience.

09:17  25             You're also very lucky to have very

~20

09:17  1    talented lawyers who are going to be doing the trial

09:17  2    this week.  That isn't always true.  But I know these

09:17  3    lawyers pretty well, and you have great good fortune

09:17  4    this week.

09:17  5                So having said that, do you intend to do

09:17  6    your opening argument at the beginning as well?

09:17  7                MR. BURESH:  Yes.  We do, Your Honor.

09:18  8    Thank you.

09:18  9                THE COURT:  Counsel, if you'd like to

09:18  10   give the opening argument for the plaintiff.

09:18  11               A very short reminder.  Ladies and

09:18  12   gentlemen of the jury, this is just argument from

09:18  13   counsel.  They intend probably to give you a blueprint

09:18  14   of where they anticipate the evidence will go.  The

09:18  15   evidence will not begin until they call their first

09:18  16   witness.  That doesn't mean that the opening arguments

09:18  17   aren't important.  They are.  But they are just their

09:18  18   arguments of counsel.

09:18  19               Yes, sir.  Would you like any warning?

09:18  20               MR. COLLARD:  Yes, Your Honor.  A

09:18  21   five-minute warning and maybe a one-minute when I'm

09:18  22   really there would be fantastic.

09:18  23               Thank you, sir.

09:18  24               THE COURT:  Sure.

09:18  25   <u>OPENING STATEMENT ON BEHALF OF THE PLAINTIFF</u>

09:18  1            MR. COLLARD:  This case is about holding

09:18  2  ASUSTeK and ASGL accountable for their unauthorized use

09:18  3  of Dr. Bill Chu's and ACQIS' intellectual property.

09:18  4  The evidence will show that Dr. Bill Chu invented and

09:19  5  patented a new computer bus.

09:19  6            Now, I promise I'm going to come back to

09:19  7  what a computer bus is.  But this computer bus was so

09:19  8  ahead of its time that almost the entire computer

09:19  9  industry got on board and took a license and paid to

09:19  10  use Dr. Chu's patented technology.  But not ASUS.

09:19  11            And even though over 20 computer

09:19  12  companies have taken licenses to pay for the ACQIS

09:19  13  patents, ASUS still refuses.

09:19  14            Now, ASUS has many subsidiaries, and they

09:19  15  will try to hide behind its corporate structure.  But

09:19  16  make no mistake, ASUSTeK is in charge and needs to pay

09:19  17  for its use of ACQIS' property.

09:19  18            Now, we got to talk just a little bit

09:20  19  during jury selection last week.  And my name is Case

09:20  20  Collard --

09:20  21            I can start anyway.

09:20  22            My name is Case Collard, as I said, and

09:20  23  I'm really honored to be here with you.  I know Judge

09:20  24  Albright has done a lot of these trials, but we don't

09:20  25  get to do them all that often and it's really exciting

| | | |
|---|---|---|
| 09:20 | 1 | for us to be here and having this trial with you.  This |
| 09:20 | 2 | isn't something we get to do every week. |
| 09:20 | 3 | And I'm honored to be here representing |
| 09:20 | 4 | ACQIS and Bill Chu. |
| 09:20 | 5 | As the Judge said, this is the opening |
| 09:20 | 6 | statement of ACQIS, and my job here is really to give |
| 09:20 | 7 | you a roadmap, to tell you the kind of evidence that we |
| 09:20 | 8 | want to bring in to prove our case over the rest of |
| 09:20 | 9 | this week. |
| 09:20 | 10 | And we'll show what I already talked |
| 09:20 | 11 | about, that the defendants infringed Dr. Bill Chu's |
| 09:21 | 12 | patents and that their infringement was willful.  We'll |
| 09:21 | 13 | talk about that a little more too.  And that because of |
| 09:21 | 14 | that, they owe him damages. |
| 09:21 | 15 | But first, I want to thank you again.  I |
| 09:21 | 16 | thanked you last week, but I want to thank you for your |
| 09:21 | 17 | service.  You're taking time out of your whole week. |
| 09:21 | 18 | And in every case I've been a part of, the jury really |
| 09:21 | 19 | takes this so seriously.  We really appreciate that. |
| 09:21 | 20 | The lawyers, the clients appreciate that. |
| 09:21 | 21 | This is a really unique part of our |
| 09:21 | 22 | system.  The idea that people from our community decide |
| 09:21 | 23 | disputes is a really unique and American |
| 09:21 | 24 | characteristic.  And it's in the Bill of Rights.  It's |
| 09:21 | 25 | Amendment No. 7, the right to a jury trial. |

09:21   1          So even for high-tech patent cases, this

09:21   2   system works.  And it's uniquely American.

09:21   3          So we'll aim to be as efficient as we can

09:21   4   giving you the information that you need and hopefully

09:21   5   making everything as clear as possible.  That's our

09:22   6   job.  And we're going to try and do our job.

09:22   7          We have some great teachers who will be

09:22   8   witnesses, including Dr. Chu, who you'll meet today.

09:22   9   And I'm excited for you to talk with him -- or hear

09:22   10  from him.

09:22   11         I know you watched the video about

09:22   12  patents that we talked about, the 17 minutes.  I

09:22   13  watched it over the weekend again, and it does a good

09:22   14  job.  But I want to talk just a little more about

09:22   15  patents to kind of set the stage.

09:22   16         Now, this was in the video, this

09:22   17  discussing how patents are property, intellectual

09:22   18  property.  Not real estate, but there are some

09:22   19  parallels.  And so we cleaned that graphic up a bit.

09:22   20         And there are fences or boundaries to

09:22   21  property.  And in a patent, there are boundaries too.

09:22   22  And they're called the claims, and they describe what

09:22   23  was invented.  And that's kind of like the description

09:22   24  of the property in a deed.

09:22   25         Now, Texans know about property.  I told

09:22   1   you I was a Kansan.  Kansans know about it too.  One of
09:22   2   the things that we know about property is that there
09:23   3   are rules.  You have to ask permission to enter
09:23   4   someone's property.  Maybe you have to use a gate.
09:23   5           And we're going to prove that the ASUS
09:23   6   defendants used Dr. Chu's property without permission.
09:23   7   And the patents in this company, now they're owned by
09:23   8   Dr. Chu's company.  It's called ACQIS.  And ACQIS was
09:23   9   founded by Dr. Chu.
09:23  10           Now, patents are a unique type of
09:23  11   property.  They're intellectual property.  They're not
09:23  12   real estate.  And as you saw in the video, they're
09:23  13   unique in one way because they're protected in the
09:23  14   Constitution.
09:23  15           Article I, Section 8, I think it's Clause
09:23  16   8, but:  The Congress shall have the power to promote
09:23  17   the progress and science of the useful arts by securing
09:23  18   for limited times to authors and inventors the
09:23  19   exclusive right to their respective writings and
09:23  20   discoveries.
09:23  21           Dr. Chu is the inventor.  He and ACQIS
09:24  22   have the exclusive right to the patents.  And I'm so
09:24  23   excited, as I said, to introduce you to Dr. Chu.  I've
09:24  24   known him for 15 years, and his story is uniquely
09:24  25   American.

09:24  1          He was born in China.  His family fled

09:24  2   the communist takeover of China and went to Hong Kong.

09:24  3   They lived in Hong Kong, and he went to -- grew up

09:24  4   there.  He came to the United States to go to college

09:24  5   at one of our top universities, the University of

09:24  6   California at Berkeley.  He received a Ph.D. in

09:24  7   electrical engineering at the young age of 25.

09:24  8          He spent his career living and working in

09:24  9   Silicon Valley improving computers throughout the 1980s

09:24  10  and 1990s, helping lay the foundation for the computers

09:24  11  that we use today, the tiny computers that we often

09:24  12  have in our pockets or -- I don't know if you guys got

09:24  13  to bring them in -- or out in your cars.

09:24  14          And after decades in the computing

09:24  15  business, he was building companies.  He was overseeing

09:25  16  giant teams of engineers.  In the late 1990s, Dr. Chu

09:25  17  made a breakthrough.  He'd just left his position at a

09:25  18  company called Cirrus Logic, and he had an idea for a

09:25  19  new product and a new company.

09:25  20          And I'm going to talk about a new product

09:25  21  and a new company, but before I do, I got to take you

09:25  22  back to 1998.  Because it's important not to think

09:25  23  about computers as they are now in 2024 but about how

09:25  24  things were in 1998.

09:25  25          George W. Bush was still governor of

09:25  1    Texas.  The iPhone wouldn't come out for another ten

09:25  2    years.  Even the iPod didn't come out for another

09:25  3    couple of years in 2001.  Computers in 1998, they were

09:25  4    bigger.  They were slower.  The Internet existed, but

09:25  5    it wasn't wireless, and it wasn't as fast or available

09:25  6    everywhere like it is now.  That's what computing was

09:25  7    like back then.

09:26  8         Now, now that we're back in 1998, I want

09:26  9    to tell you about the new product.  And it was a new

09:26  10    computer system, and I have one here.  It's called the

09:26  11    Interputer and the iMod.

09:26  12         So we all know laptops and desktops,

09:26  13    computers.  And this was a new idea.  Dr. Chu thought

09:26  14    to put all the key parts of the computer, the guts, the

09:26  15    processor, which is the brain of the computer, the

09:26  16    memory, in this one module and have other parts in a

09:26  17    console.

09:26  18         And if you were at work and you had this

09:26  19    in the console at work and you wanted to go home, you

09:26  20    took this out, take this home, you have another one of

09:26  21    these at home, you plug it in, you're working on the

09:26  22    exact same computer.

09:26  23         It's kind of a cool idea, because this is

09:26  24    smaller than my laptop is today.  It's barely as big as

09:26  25    a tablet.  And this was 26 -- 25, 26 years ago.

—27—

09:26  1              But for this to work, it had to be small
09:27  2    and it had to be fast.  And not just as fast as the
09:27  3    desktops and laptops existed at that time because it
09:27  4    has to keep working as the processor and the computer
09:27  5    gets faster and faster.
09:27  6              So Dr. Chu didn't just come up with
09:27  7    this -- this new form -- this new form for a computer.
09:27  8    Not -- that's a little different.  This is the inside
09:27  9    of this.  He redesigned the inside too.
09:27  10             Now, I'm to the part where I said I would
09:27  11   explain.  I'm to the computer bus.  A computer bus is a
09:27  12   communication pathway.  It's a way for communication
09:27  13   and data to travel between different components inside
09:27  14   a computer.
09:27  15             If a computer is like a city, the bus is
09:27  16   a little bit like a road connecting those different
09:28  17   parts of the city.  So this is a little bit of an
09:28  18   example that we made, a diagram of a computer bus where
09:28  19   we put a little road to show you that that's the
09:28  20   connection.
09:28  21             Now, a computer bus is made of wire.
09:28  22   It's really a little wire or a little trace of wire on
09:28  23   this -- this is called a circuit board.  That's what --
09:28  24   a computer bus is connecting these different parts.
09:28  25             And there are a lot of -- there's a lot

09:28  1    of data, a lot of information that needs to move around

09:28  2    on the computer.  And there can be traffic jams and

09:28  3    slowdowns.

09:28  4              And the computer buses at the time that

09:28  5    Dr. Chu came up with his invention in the late '90s,

09:28  6    they had some problems.  Too slow, too many wires so

09:28  7    they take up too much space, too many errors.

09:28  8              And so he invented a new computer bus.

09:29  9    That's how he addressed the problem.  He said, I'm just

09:29 10    going to invent a whole new computer bus for my

09:29 11    product.  And he made some key improvements.  This is a

09:29 12    little bit of the technical stuff, but I'm going to

09:29 13    explain it a little bit.  And then like I said, we have

09:29 14    other experts that are going to explain it even more.

09:29 15              He made changes to those wires and those

09:29 16    communication pathways.  That's what he really did.  He

09:29 17    said, I'm not going to use this old kind.  I'm going to

09:29 18    use a new kind when I'm designing my product.

09:29 19              The first thing he did was chose a

09:29 20    low-voltage channel.  Voltage is the amount of energy

09:29 21    basically.  Using a lower voltage means it's less power

09:29 22    hungry.  It means, if it uses a battery, it can have a

09:29 23    longer battery.  And it's actually even faster because,

09:29 24    if you don't have to charge up to a high voltage, it

09:29 25    can charge up a little faster.

09:29   1                       So that's the low-voltage piece.

09:29   2                       Then differential signal, I think this is

09:30   3    cool.  The differential signal is a way to avoid

09:30   4    errors.  And on a computer -- have you ever taken your

09:30   5    phone and, like, if you turn on the microwave, you hear

09:30   6    a weird sound on your phone, or you hear -- if you're

09:30   7    next to a speaker or something, you get a little

09:30   8    feedback with your phone?

09:30   9                       That's electrical interference.  And all

09:30   10   of these components use electricity.  And so they

09:30   11   create just little bits of electrical interference,

09:30   12   which doesn't matter, you know, if you're this far away

09:30   13   from the computer.  But if everything's this close

09:30   14   together, then that interference can matter.  The

09:30   15   differential signal, it cancels out that interference

09:30   16   and reduces errors.

09:30   17                      The next one on my list is

09:30   18   unidirectional.  This is a computer engineer thing.

09:30   19   Why did they say unidirectional?  They could have said

09:30   20   one way, because it means the same thing.  It's one-way

09:30   21   communication.  We had some stop lights on our diagram,

09:30   22   and some buses were like an intersection where if you

09:31   23   want to send information but when you got a red light

09:31   24   when you pull up to the intersection, then you have to

09:31   25   wait.

09:31   1                     Dr. Chu's bus was like a highway.  One

09:31   2   lane going eastbound, one lane going westbound, and you

09:31   3   don't have to stop.  So that was a unidirectional

09:31   4   channel.

09:31   5                     Now, another new aspect of Dr. Chu's new

09:31   6   bus was that it was serial, not parallel.  So what does

09:31   7   that mean?

09:31   8                     So this is the old bus.  This is

09:31   9   parallel.  Parallel means those -- all those little

09:31   10  ones and zeroes, that's data.  Those are bits.  And

09:31   11  look at them, side by side, just walking side by side

09:31   12  across all of those lines.  So that's parallel

09:31   13  communication.

09:31   14                    The new bus was serial communication.

09:31   15  Follow the leader.  The data can just follow the

09:31   16  leader, and you need fewer lines for this type of

09:31   17  serial communication.  So it takes up less space.  And

09:31   18  as you can see, space is at a premium inside a

09:32   19  computer.  So this had some key benefits.

09:32   20                    Dr. Chu was the first one to design a

09:32   21  computer bus that was unidirectional, low voltage,

09:32   22  differential signal, and serial.

09:32   23                    This was genius.  I know you may not, you

09:32   24  know, know that because we don't know a lot about

09:32   25  computer buses, but this was the genius part.  That --

09:32    1    and these benefits, smaller, faster, lower power, these

09:32    2    are the gold standards of computers.  This is what

09:32    3    consumers and computer companies want in a computer.

09:32    4    Just like phones, they want to make it more powerful,

09:32    5    smaller, and faster.

09:32    6                And, oh, there's one more.  I forgot.

09:32    7                It was backwards compatible.  So his

09:32    8    changes were to those physical wires and the design of

09:32    9    everything inside the computer, but he wanted to make

09:32   10    sure that it would still work with older components,

09:33   11    even if they weren't necessarily expecting to have his

09:33   12    new bus in the mix.  So these changes were to the

09:33   13    hardware, to the physical wires and design of the

09:33   14    computer.

09:33   15                And one of the cool parts about this and

09:33   16    a pretty important part for us today is that this new

09:33   17    bus, it didn't just work with his modular computer.  It

09:33   18    worked with any type of computer.  With a server, with

09:33   19    a laptop, with any type of computer.  And so that is

09:33   20    part of why we're here today.

09:33   21                So that is the new product.  This is the

09:33   22    new company.  The new company was ACQIS.  It was

09:33   23    founded to work on his new computer and his new

09:33   24    computer bus.

09:33   25                And there was initial buzz and sales, you

09:33   1   can see.  It was written up in magazines.  Then at the
09:33   2   time, people got hard copy magazines like WIRED and PC
        3   World.
09:34   4              And he sought patent protection over all
09:34   5   the parts of his invention, including his new computer
09:34   6   bus.
09:34   7              Now, why did he seek patent protection?
09:34   8   He thought his new invention would be important.  And
09:34   9   he wanted to strike that deal that you heard about in
09:34   10  the video, where you tell the Patent Office how your
09:34   11  new invention works, and you get the exclusive right to
09:34   12  develop and use it just like it says in the
09:34   13  Constitution.
09:34   14             So Dr. Chu, he received the patents that
09:34   15  we're here about today.  Got all five of them.
09:34   16             Now, you may be asking yourself,
09:34   17  Mr. Collard, why are there five patents?  And we're
09:34   18  going to talk about seven claims in these five patents.
09:34   19  Why not just one?  I will tell you.
09:35   20             We were talking about how do you design
09:35   21  the inside of a computer.  Well, there are lots of
09:35   22  different ways to do this.  And Dr. Chu was thoughtful
09:35   23  about all of those different ways that his new bus
09:35   24  might be useful, and he wanted to disclose different
09:35   25  configurations that showed all the different ways that

09:35  1    his new bus could be used.

09:35  2                    And so Dr. Chu did this work on his bus,

09:35  3    remember, in the late 1990s.  And then those magazines

09:35  4    were from 2001.  And he started applying for patents

09:35  5    back in the late '90s as well.

09:35  6                    But in the mid 2000s, as computers were

09:35  7    getting faster, other computer companies, other people

09:35  8    in the computer industry started running into the exact

09:35  9    same problems that Dr. Chu had run into when he was

09:35  10   designing his new computer, and he anticipated those

09:36  11   problems.

09:36  12                    So as other people's computers were

09:36  13   getting faster, there were bottlenecks and traffic jams

09:36  14   and interference and running out of space for more

09:36  15   wires, so computer companies started making some

09:36  16   changes to how they designed their own computer buses

09:36  17   to overcome those problems.  And they started adopting

09:36  18   the same solutions, unidirectional, low voltage,

09:36  19   differential signal, serial, the same solutions that

09:36  20   Dr. Chu had thought of, written down, and submitted to

09:36  21   the Patent Office years earlier.

09:36  22                    Here are two examples that you're going

09:36  23   to hear about:  PCI Express and USB 3.0.

09:36  24                    Okay.  Now I want to talk to you about

09:36  25   something important about patent law.  Dr. Chu was

09:36  1    first.  It's really important.  He was first.  He was

09:36  2    the first one that designed a computer bus with all of

09:36  3    the elements that we're talking about and received

09:36  4    patent protection on it, ultimately.

09:37  5              So anyone that did it after Dr. Chu and

09:37  6    ACQIS needs a license if the technology in their

09:37  7    product is covered by ACQIS' patents.  And this is

09:37  8    regardless of whether they actually knew about the

09:37  9    invention in the patents or not.  They didn't have to

09:37  10   actually know.

09:37  11             Now, Dr. Chu did tell ASUS about his

09:37  12   patents, and we're going to get to that in a second.

09:37  13   And after he did, ASUS still did not take a license,

09:37  14   which is wrong.

09:37  15             But Dr. Chu kept an eye on the computer

09:37  16   industry, and he saw that they were adopting these same

09:37  17   improvements to their bus that was covered by the

09:37  18   claims of his patents.  So he informed a lot of

09:37  19   computer companies about his patents and that they were

09:37  20   using ACQIS' intellectual property, and a lot of

09:37  21   computer companies agreed to get permission to use

09:37  22   ACQIS' technology.

09:37  23             They paid for licenses.  And it's a lot

09:38  24   of companies you know.

09:38  25             A license is permission to practice

09:38  1    what's in ACQIS' patents in exchange for money or other

09:38  2    compensation.  It's just like if somebody wants to use

09:38  3    your land to hunt or drill or put up a wind turbine,

09:38  4    they have to pay -- they have to compensate you to use

09:38  5    your property.

09:38  6                  And imagine if they didn't.  Imagine if

09:38  7    they just came on your land without permission.  And if

09:38  8    you told them to leave or pay, they said, no.  I'm just

09:38  9    staying.

09:38  10                 In other words, computer companies that

09:38  11   paid money to ACQIS have the right to sell computer

09:38  12   products that work or made in the way that's described

09:38  13   in those claims of ACQIS' patents.  It's really a lot

09:38  14   of companies that have paid ACQIS to use its property:

09:38  15   Dell, Samsung, Microsoft.  But ASUS has not.

09:38  16                 And that brings me to the ASUS group.

09:39  17   And like a lot of multinational companies, the ASUS

09:39  18   group is made up of a parent company and lots of

09:39  19   subsidiaries.  We're going to talk about two

09:39  20   subsidiaries.  But a parent company and lots of

09:39  21   subsidiaries.

09:39  22                 Now, ASUSTeK Computer, Inc. is the parent

09:39  23   company that owns ASGL.  ASGL is the company, it's the

09:39  24   shipping company, essentially, that ASUSTeK uses to

09:39  25   make sure their products get to the U.S.

36

09:39  1    And ASUSTeK also owns another subsidiary

09:39  2  called ACI, and that's the company that ASUSTeK uses to

09:39  3  sell computers in the United States.

09:39  4    Now, ASUSTeK will try to hide behind ACI

09:39  5  and maybe ASGL, but let there be no mistake, ASUSTeK is

09:39  6  running the show.

09:39  7    So the patents in this case, the patents

09:39  8  that we're going to talk about in this case, these

09:39  9  patents, they are on this slide, and they issued

09:40  10  between December 2013 and December 2016.  That's these

09:40  11  five patents.

09:40  12    And Dr. Chu sent a letter to ASUSTeK in

09:40  13  May 2018 telling them about his patents and that other

09:40  14  companies had already paid for licenses, and he asked

09:40  15  ASUS to take one too.

09:40  16    He told them specifically about these

09:40  17  five patents.  He put these five patent numbers in the

09:40  18  letter.  He told them about the types of products at

09:40  19  ASUS that he thought were relevant to the patents, and

09:40  20  he told them about the type of technology, the serial

09:40  21  bus technology that he thought was relevant to the

09:40  22  patents.

09:40  23    And he sent the letter via FedEx.  And he

09:40  24  got delivery confirmation, and he addressed it to the

09:40  25  CEO of ASUS.

09:40  1              Now, you may hear ASUS claim they don't

09:40  2  have a record of receiving it, but Dr. Chu has a

09:40  3  record.  FedEx has a record.

09:41  4              Now, ASUS ignored him.  They kept selling

09:41  5  products with his intellectual property.  And after he

09:41  6  sent this letter, that is when ASUS' infringement

09:41  7  became willful.  I mentioned that word before, and it

09:41  8  means they knew what it was doing.  And you may be

09:41  9  asked to decide that issue later.

09:41  10             And Dr. Chu's only option to enforce his

09:41  11  patents and protect his property at that point is to

09:41  12  come to court.  That's what you have to do if someone

09:41  13  won't agree to take a license.  And that's why he

09:41  14  started this case back in 2020.

09:41  15             Since 2018, when he sent the letter,

09:41  16  since 2020, when he started this case, ASUS has not

09:41  17  agreed to pay for their use of ACQIS' property.

09:41  18             So we're here this week to ask you to

09:41  19  require the defendants to do what's right, to pay what

09:41  20  they owe just like all the other major computer

09:41  21  companies.  You know, it isn't fair to ACQIS, and it

09:42  22  isn't fair to all the other companies that did the

09:42  23  right thing and paid ACQIS for permission.

09:42  24             Now, I want to explain to you just a

09:42  25  little bit -- just a little bit more detail about

09:42   1   infringement and what it means to show infringement and

09:42   2   how we're going to do that so you know what to expect

09:42   3   when we get to that part of our case.

09:42   4            So we hired an expert.  And he's a

09:42   5   professor of computer engineering.  His name is

09:42   6   Dr. Nabil Sarhan.  And he analyzes the ASUS products,

09:42   7   and he compares them to the patents to determine if

09:42   8   they infringe.  He analyzed more than 500 accused

09:42   9   products in this case.

09:42   10           And what you see here, you'll see

09:42   11   something like this later, and it's a checklist.  This

09:42   12   is the claim.  This is those boundaries of the

09:42   13   invention.

09:42   14           And so you'll see something like this.

09:42   15   He'll walk through, and he will tell you why, in his

09:43   16   expert opinion, this claim is met for this or that

09:43   17   product.

09:43   18           It would be really hard to do that for

09:43   19   500 products in a week.  We don't have to do that.  We

09:43   20   have agreed on two representative products.  So these

09:43   21   products represent all the accused products in this

09:43   22   case, and the parties have agreed on that.  And so

09:43   23   he'll do his analysis for these products.

09:43   24           Now, a tiny bit about damages and how we

09:43   25   intend to show damages in this trial.

09:43   1           As a jury, your power to -- your tool,

09:43   2   your power to address this dispute, to address the use

09:43   3   of ACQIS' intellectual property without permission, is

09:43   4   to award damages.  And there's a whole specific method

09:43   5   that we will go through to show you what we think the

09:43   6   damages should be.  Give you a very brief preview of

09:43   7   that.

09:43   8           It centers around something called a

09:44   9   "hypothetical negotiation."  You literally imagine the

09:44   10  parties going through a negotiation and say, what do

09:44   11  you think, in this hypothetical imaginary negotiation,

09:44   12  where would the parties have ended up?

09:44   13          That's kind of how the whole thing works,

09:44   14  but there's a lot more specifics to it.  And you'll

09:44   15  hear from -- we have an expert that does this kind of

09:44   16  analysis.  His name is Justin Lewis.  You'll hear from

09:44   17  him.  He's been doing this for a long time.

09:44   18          THE COURT:  Counsel.

09:44   19          MR. COLLARD:  Thank you, Your Honor.

09:44   20          He starts by looking at the parties' past

09:44   21  activity in licensing, like what did ACQIS do, what did

09:44   22  ASUS do.  That's kind of the first thing.  That's how

09:44   23  they approach real negotiations, and that's a good clue

09:44   24  on how they would approach a hypothetical negotiation.

09:44   25          And then he does a calculation.  And I've

09:44  1   got kind of a simplified version of the calculation.

09:44  2   So the calculation starts with the number -- the sales

09:45  3   number for products that we contend have infringed the

09:45  4   patent in the -- in the time period of infringement.

09:45  5            And I actually want to point out to you

09:45  6   the patents are expired, but you really shouldn't let

09:45  7   that concern you.  They expired in -- the last ones

09:45  8   expired in 2020.  But we wouldn't be here today if that

09:45  9   meant that we couldn't have a suit about the patents.

09:45  10           You can go back in some cases six years,

09:45  11  but you can certainly go back to the notice letter.  So

09:45  12  you'll hear some discussion about that, patents being

09:45  13  expired, but I don't think you should let that concern

09:45  14  you.

09:45  15           So he looks at the sales during the key

09:45  16  period, and that number, we'll get -- he'll get a

09:45  17  specific number, but that number is over 4 billion.

09:45  18  And then he does something to that number.  It's called

09:45  19  the "apportionment factor."  Again, I'm not going to

09:45  20  delve into that too much during opening.

09:45  21           But he doesn't take the whole amount.  He

09:45  22  focuses on the parts of the product that benefit from

09:45  23  Dr. Chu's invention.  So there are parts that maybe

09:46  24  aren't really related, and they try to factor those

09:46  25  out.  So that's -- the number goes down.  This reduces

09:46  1    the number.  And that's your base.  It's still over 3

09:46  2    billion.

09:46  3              And then he comes up with a royalty rate,

09:46  4    and that's a percentage.  And it's a percentage of

09:46  5    sales that, in his expert opinion, ASUSTeK would have

09:46  6    agreed to in that imaginary negotiation to pay ACQIS in

09:46  7    order to continue to have the right to sell -- to sell

09:46  8    products that benefit from ACQIS' invention.  At least

09:46  9    the right to sell during that period.

09:46  10             Now, that number is 1 percent,

09:46  11   1.15 percent.  Just a little over 1 percent.  And that

09:46  12   is in line with what other companies -- we saw that

09:46  13   slide -- that's in line with what the other companies

09:46  14   have agreed to pay ACQIS to benefit from ACQIS'

09:46  15   property, its patents.

09:46  16             And so then you multiply that percent

09:47  17   times the base and that comes to 39.5 million.  Just a

09:47  18   little bit over that.  And that number is based on

09:47  19   actual prior sales of computers in the United States,

09:47  20   and it's a small percentage of the 4 billion that ASUS

09:47  21   has made on those sales.

09:47  22             And that amount, that 39.5 million,

09:47  23   previewed this last week, is the amount that ASUS

09:47  24   should be required to pay to ACQIS in this case.

09:47  25             So why won't ASUS do what's right?  ASUS

—42—

09:47  1    is going to have some excuses to try to justify their
09:47  2    actions.  This might stick in your memory.  I hope it
09:47  3    does.
09:47  4                I once heard a senior lawyer, his name is
09:47  5    George Chandler, and he is a graduate of Baylor law,
09:47  6    actually.  And he described a dog bite case that he
09:47  7    had, something he calls the Fido defense.  And if you
09:47  8    come into a courtroom and you say you've been bitten by
09:47  9    a dog, the other side, the side that's the dog owner,
09:47  10   might say, it's not my dog.  I don't own a dog.  That
09:47  11   might be the first thing they say.
09:48  12               Well, then you prove that they own the
09:48  13   dog.  And the next thing they say, well, okay.  It's my
09:48  14   dog, but it didn't bite you.
09:48  15               And then the -- if you prove that the dog
09:48  16   bit you, then the next thing they say, well, it didn't
09:48  17   hurt you very much.  And --
09:48  18               THE COURT:  Counsel.
09:48  19               MR. COLLARD:  Thank you.
09:48  20               I think you're going to hear the Fido
09:48  21   defense from ASUS.  I think you're going to hear, you
09:48  22   got the wrong company.
09:48  23               I think you're going to hear, those
09:48  24   patents, they're not even valid.  And even if they're
09:48  25   valid, they're not infringed.

09:48  1                And remember from last week when you

09:48  2   heard the jury instructions, validity is a very high

09:48  3   bar.  They have to prove by clear and convincing

09:48  4   evidence.  That means you can have no hesitation.

09:48  5                So if you don't go for that, then they're

09:48  6   going to say, well, that's minimal damages.

09:48  7                The Fido defense is a lighthearted

09:48  8   example, but it stuck with me for a long time, so I

09:49  9   thought it might help you.

09:49  10                Dr. Chu has a right to protect his

09:49  11   property.  His intellectual property is protected in

09:49  12   his patents as required by the United States

09:49  13   Constitution.  The ASUS defendants cannot use Dr. Chu's

09:49  14   property without paying for it.  And intellectual

09:49  15   property and patents, it represents our ideas.

09:49  16                This is Dr. Chu's genius, his ideas, his

09:49  17   decades of hard work.  He invented new computer bus

09:49  18   technology that ASUS benefits from.  He told them about

09:49  19   it, but ASUS imported and sold computer products in the

09:49  20   U.S. for years without his permission.

09:49  21                Now, we come to you as a jury to make the

09:49  22   final decision on how to handle this dispute.  And at

09:49  23   the end of our case, we will be asking you to find that

09:49  24   the ACQIS patents are valid, that they are infringed by

09:49  25   the defendants, that that infringement was willful, and

09:50  1   that the appropriate damage amount for ASUS -- the ASUS

09:50  2   defendants to pay ACQIS is 39.5 million to account for

09:50  3   that infringement.

09:50  4              We trust you'll do what's fair.  Thank

09:50  5   you very much.

09:50  6              THE COURT:  Thank you, sir.

09:50  7              Counsel?

09:50  8   OPENING STATEMENT ON BEHALF OF THE DEFENDANT

09:50  9              MR. BURESH:  Good morning again, ladies

09:50  10  and gentlemen.  And I know you heard my name on

09:50  11  Thursday, and I just mentioned it again.  But I want to

09:50  12  make sure we are all on equal footing.  I know you've

09:50  13  sent in your questionnaires and you told us about

09:50  14  yourselves, so I want you to know who I am too.

09:50  15             I am a lawyer from Kansas City.  I grew

09:50  16  up further west in Kansas.  I have been married to my

09:50  17  wife Terah, which is a name out of the Old Testament

09:51  18  from Abraham's family, been married to her for 28 years

09:51  19  now.  We have four boys.  They're not boys anymore.

09:51  20             My oldest, Ethan, is married and out of

09:51  21  the house.  My second oldest, Noah, is married and out

09:51  22  of the house.  My third son, Grant, is not married, but

09:51  23  he's actually living here in Waco and is out of the

09:51  24  house.

09:51  25             And then we had a little bit of a

09:51  1  surprise.  His name was Hudson, and he's a junior in

09:51  2  high school, so he's running a little bit behind the

09:51  3  rest of them.  We actually nicknamed him the closer

09:51  4  when he came through because, well, he's the closer.

09:51  5           So that's me.

09:51  6           I also know, as you sit here in the jury

09:51  7  box, a lot of times you can be looking around the room

09:51  8  and wondering what everybody's doing.  Like, what role

09:51  9  do they play?  So I want to introduce the rest of my

09:51  10  team as well.

09:51  11           You met Travis Underwood.  He's on my

09:51  12  team from here in Texas.

09:51  13           Some other folks you'll hear from is

09:51  14  Michelle Marriott, who's with me up in Kansas City.

09:52  15           Mark Lang, you won't hear from him, but

09:52  16  he runs everything for us behind the scenes and keeps

09:52  17  us going smooth.  So he has a very important job.

09:52  18           Ms. Kathleen Fitterling, who I introduced

09:52  19  a moment ago.  She is the brains behind me, candidly.

09:52  20  She's the smartest one at my table that works with me.

       21           Ann Marie is --

09:52  22           Could you raise your hand, Ann Marie?

09:52  23           She's our paralegal.  She keeps

09:52  24  everything organized, which we wouldn't be able to do

09:52  25  anything without her.

09:52  1                And then Mr. Derek Palisoul, sitting back

09:52  2    there behind the computer screens.  He makes all the

09:52  3    magic happen on the screens in front of you.  And I'll

09:52  4    just tell you upfront, if I get off track and

09:52  5    something's not appearing and I'm mixed up, it's not

09:52  6    Derek's fault.  That's my fault.  I've gone somewhere

09:52  7    astray.  So don't blame him.

09:52  8                That's our team, and we are happy to be

09:52  9    here.  We -- really, it is our pleasure to both appear

09:53  10   before this Court, to appear before you all, and it's

09:53  11   our pleasure to represent ASUSTeK and ASGL.

09:53  12               And we are here to tell you that all the

09:53  13   somewhat nasty things that are being said about these

09:53  14   companies, they're not true.  We deny all of them.

09:53  15               And as you all know, when you came on

09:53  16   Thursday morning and -- one of the things you raised

09:53  17   your paddles to, if you remember, is that companies

09:53  18   that are accused -- that are wrongly accused, they get

09:53  19   to come into court and they get to defend themselves.

09:53  20   That's what we're doing.

09:53  21               I want to introduce a couple of important

09:53  22   folks.  These are the witnesses, the representatives of

09:53  23   the companies.

09:53  24               So the first company that we're hearing

09:53  25   about is ASUSTeK.  Now, they are located on a small

—47—

```
09:53   1   island off the coast of China that I'm sure many of you
09:53   2   have heard of called Taiwan, okay?
09:53   3               And from ASUSTeK --
09:53   4               If you could wave.
09:54   5               -- is Ms. Barbara Chen.  All right.  And
09:54   6   she'll be testifying to you in a few days when it's our
09:54   7   turn.  All right.
09:54   8               Another island in Asia where ASGL is
09:54   9   located, this is called Singapore.  All right.
09:54   10              And, Ms. Emma Ou, if you could wave.
09:54   11              Ms. Emma Ou is from Singapore.
09:54   12              Now, these ladies get the blue ribbon for
09:54   13  having traveled the longest distance to be here.  And
09:54   14  they have come here to be with you, to talk to you
09:54   15  because they want to raise their paddles.  They want to
09:54   16  say exactly what I've said.  The allegations against
09:54   17  them are wrong.  That's why they're here.
09:54   18              One company you've also heard about --
09:54   19              Is that red dot working for you all when
09:54   20  I put it on the screen?
09:54   21              Okay.  Thank you.
09:54   22              ACI.  Now, we're being accused of hiding
09:55   23  behind ACI.  We're not the ones talking about ACI.
09:55   24  Okay.  We're not -- we claim the puppy.  It was a cute
09:55   25  puppy by the way.  We claim that puppy.  We're not
```

—48—

09:55  1   hiding behind anything.  It's the plaintiffs that are
09:55  2   talking about ACI.
09:55  3               And this is weird.  I want you to watch
09:55  4   out for this, okay?
09:55  5               So here's the deal.  When you look at one
09:55  6   of your patents in your notebooks, you're going to see
09:55  7   on it:  United States patent.  United States patent.
09:55  8   That's because it deals with United States activity.
09:55  9   That's what they're designed to protect.
09:55  10              Now, these two companies -- and you will
09:55  11  hear this from Ms. -- from my clients.  You will hear
09:55  12  that they don't do anything in the U.S.  You will hear
09:55  13  from plaintiffs that ACI does activity in the U.S.  But
09:55  14  ACI isn't here.
09:55  15              And one of the questions I want you to
09:56  16  ask is:  With a company sitting here in California, why
09:56  17  did the plaintiffs choose to drag people from clear
09:56  18  around the world and not sue ACI?
09:56  19              Maybe they'll explain that to you; maybe
09:56  20  they won't.  I don't know.  But it's a question.
09:56  21  That's all a side dish, okay?
09:56  22              The main course, the ribeye, if you will,
09:56  23  is a patent infringement case.  And questions before
09:56  24  you are going to be:  Did ASUSTeK and ASGL use the
09:56  25  patents?  Did they use Dr. Chu's technology?

| | | |
|---|---|---|
| 09:56 | 1 | And the answer is unequivocally no. |
| 09:56 | 2 | We're going to have to walk through that |
| 09:56 | 3 | over the course of a week.  I'm not going to try and |
| 09:56 | 4 | firehose you all this morning, okay?  There's no |
| 09:56 | 5 | possible way that I'm going to explain computer buses |
| 09:56 | 6 | in 30 minutes. |
| 09:56 | 7 | So we're going to spend the week doing |
| 09:56 | 8 | that.  And at the end of it, you're going to see we |
| 09:56 | 9 | don't use their technology, period.  Hard stop.  We |
| 09:57 | 10 | don't do it.  Okay? |
| 09:57 | 11 | But before we get into all that, look |
| 09:57 | 12 | around this courtroom.  It's kind of an impressive |
| 09:57 | 13 | place, isn't it?  You've got the high bench for the |
| 09:57 | 14 | Judge, which is symbolic.  His authority. |
| 09:57 | 15 | I'll also tell you that the power in this |
| 09:57 | 16 | case, in this jury trial, it rests right here in the |
| 09:57 | 17 | jury box.  The Judge ain't going to be deciding this |
| 09:57 | 18 | case.  You guys will be, okay? |
| 09:57 | 19 | You're the power in this room.  Not to |
| 09:57 | 20 | disrespect His Honor's authority; he runs the case. |
| 09:57 | 21 | This big beam running across the room |
| 09:57 | 22 | here with the little gate in it, you see that?  That's |
| 09:57 | 23 | called the bar. |
| 09:57 | 24 | Now, what does that symbolize? |
| 09:57 | 25 | That symbolizes that this whole area on |

09:57  1    this side of the room is set apart from the other area.

09:57  2    See, out there's the public, and in here is the sacred

09:58  3    place, the set apart place.

09:58  4                    Why is it sacred?  Why is your job

09:58  5    important?

09:58  6                    It's because this is where, in this

09:58  7    sacred area, we find truth.  In this sacred area is

09:58  8    where we do justice.  Just -- in a patent case, just

09:58  9    like any other case, we seek truth and we do justice.

09:58  10   That's important.

09:58  11                   Now, y'all might be sitting there -- I do

09:58  12   this a little bit, so I know the juries will sit here

09:58  13   and you folks are saying, how in the world am I

09:58  14   supposed to do justice when we're talking about

09:58  15   patents, because I don't know anything about patents?

09:58  16   How am I supposed to do justice when we're talking

09:58  17   about computer buses and technology and all that when I

09:58  18   don't know anything about those?

09:58  19                   Let me tell you how, okay?

09:58  20                   This is why the jury system works.  Each

09:58  21   one of you have your life stories, right?  You've had

09:58  22   your ups; you've had your downs.  You've had your bumps

09:59  23   and bruises.  You've had your successes.  You've seen

09:59  24   some good people, and you've seen some bad people.

09:59  25                   All those stories come together to give

| | | |
|---|---|---|
| 09:59 | 1 | you each individually what we call common sense.  Y'all |
| 09:59 | 2 | agree with that, you have some common sense? |
| 09:59 | 3 | Now, when you get in the room and there's |
| 09:59 | 4 | seven of you all coming from your different angles with |
| 09:59 | 5 | your own common sense, it is powerful.  It's a powerful |
| 09:59 | 6 | thing.  And what it enables you to do is smell the |
| 09:59 | 7 | truth, to sense it.  You will know who's right.  You |
| 09:59 | 8 | will know where justice lies.  You will know where the |
| 09:59 | 9 | truth is because of your common sense. |
| 09:59 | 10 | Now, one of the -- as I look at a case, I |
| 09:59 | 11 | like to kind of take a step back, look at it and say, |
| 09:59 | 12 | what's the thread?  Okay.  What's the thing that ties |
| 09:59 | 13 | this all together? |
| 09:59 | 14 | And in this case, the thread of common |
| 09:59 | 15 | sense that ties it all together is this:  You only get |
| 10:00 | 16 | credit for the work that you actually do. |
| 10:00 | 17 | Let me say that again:  You only get |
| 10:00 | 18 | credit for the work that you actually do. |
| 10:00 | 19 | You spin it around.  You don't get credit |
| 10:00 | 20 | for the work that you don't do. |
| 10:00 | 21 | Is that common sense? |
| 10:00 | 22 | Okay.  Keep that thread in mind.  It's |
| 10:00 | 23 | really important in this case. |
| 10:00 | 24 | This is a -- the same basic timeline.  It |
| 10:00 | 25 | looks a little different, but we're going to talk about |

| | | |
|---|---|---|
| 10:00 | 1 | the same dates here. |
| 10:00 | 2 | In January of 1998, Dr. Chu came up with |
| 10:00 | 3 | an idea, and he wrote it down on something called |
| 10:00 | 4 | "white papers."  That process took him three weeks to |
| 10:00 | 5 | do, okay, just write his ideas down.  White papers. |
| 10:00 | 6 | We're going to see them.  Watch for those as they come. |
| 10:00 | 7 | This early time frame is really |
| 10:00 | 8 | important.  All right. |
| 10:00 | 9 | After that he filed some patent |
| 10:01 | 10 | applications.  The first one was in May of 1998 and |
| 10:01 | 11 | then May 1999 and May of 2000, through that window. |
| 10:01 | 12 | Patent applications.  We will spend a lot of time |
| 10:01 | 13 | looking in that time window because what he actually |
| 10:01 | 14 | did, the work that he actually did is really important. |
| 10:01 | 15 | Why?  You remember the barbed wire fence |
| 10:01 | 16 | from Mr. Collard's opening statement?  The barbed wire? |
| 10:01 | 17 | That barbed wire don't get to move as time goes on. |
| 10:01 | 18 | Okay?  Keep that in mind.  Those fences, once you've |
| 10:01 | 19 | stunk -- once you have -- not stunk them -- once you |
| 10:01 | 20 | have sunk them in the ground, they need to stay put. |
| 10:01 | 21 | Keep that in mind. |
| 10:01 | 22 | So what work did Dr. Chu actually do in |
| 10:01 | 23 | this early time?  I have this pretty picture.  We'll |
| 10:01 | 24 | see this out of the document, but -- |
| 10:01 | 25 | May I borrow this, Dr. Chu? |

```
10:01   1            This is it.  It's called an "attached
10:01   2   computer module," okay, that you would slide into a
10:01   3   console.  Okay?  And then they would need to talk to
10:02   4   each other.  We're not talking about computer buses
10:02   5   inside of here.  We're talking about how this talks to
10:02   6   this once they're put together.
10:02   7            Dr. Chu called that ability to talk, that
10:02   8   channel, if you will, he called it an "XP Bus."  XP
10:02   9   Bus.  Stood for cross peripheral, between this and
10:02  10   this.  Okay?
10:02  11            You're not going to see anything like
10:02  12   that from my clients.  You're not going to see anything
10:02  13   remotely resembling that from my clients.
10:02  14            That was the work that he actually did.
10:02  15   And we'll get into this XP Bus as we go forward.
10:02  16            Again, lots of details.  Look for that as
10:02  17   we move through the case.
10:02  18            Why is it important to keep the fence
10:02  19   posts in the same place?  Because technology moves
10:03  20   quick.  Do y'all remember what technology was like back
10:03  21   in 1998?  Did anybody have a phone in their pocket back
10:03  22   then?
10:03  23            Where are we today?  It's an eternity.
10:03  24            I mean, you know, going back to our
10:03  25   puppy, you know dog years, 7 to 1 or whatever.
```

| | |
|---|---|
| 10:03 | 1 |
| 10:03 | 2 |
| 10:03 | 3 |
| 10:03 | 4 |
| 10:03 | 5 |

Computers are like 50 to 1.  They go so fast.

What was happening in the industry?

So as Dr. Chu was messing around with this thing, the Interputer, the rest of the computer industry had come together to develop the technology that we're actually using today in all of our computers.  Okay?  They're called "standards."

Why are they called standards?  It's not mysterious.  It's because they're standard.  They're in everything.  Okay?

You all know USB.  I'm going to talk about that first because it's more comfortable.

USB is -- you have them everywhere.  You can plug a USB cord in and charge your phone in your car.  If you go to a hotel room, you can plug it into a lamp to get power to charge your cell phone.

You plug, you know, a mouse into your desktop computer with USB, a keyboard USB, a monitor USB.  You use a USB for everything.  It's prolific.

PCI Express is inside of computers, and it's the way a processor will talk to memory or a processor will talk to another piece of your computer.  Okay?  So it's inside.

The industry came together over a number of years.  These projects take on average three years,

—55—

10:04  1    and they involve 50 different companies, hundreds of

10:04  2    different engineers from those companies.  And they're

10:04  3    the brightest minds.

10:04  4                You get the very best to come together to

10:04  5    do these standards because they're going to be in

10:04  6    everything.  And you want to know something?  They give

10:05  7    those standards away for free.  They give them away for

10:05  8    free so that we all can enjoy them.

10:05  9                I'm doing terrible with this microphone.

10:05  10               So that they -- we all can enjoy them.

10:05  11   They're in all of our computers.  That's why.

10:05  12               I want to introduce somebody who's not

10:05  13   going to be in court with us until he testifies.

10:05  14               This is Mr. Ajay Bhatt.  He used to work

10:05  15   for Intel.  And Ajay Bhatt invented USB.  He developed

10:05  16   the USB 3 that we're going to be talking about in this

10:05  17   case, along with a team of about 200 other people.

10:05  18               He also -- after he was done working on

10:05  19   USB, he developed PCI Express, another three-year

10:05  20   project.

10:05  21               His mom is elderly.  They live in

10:05  22   Portland.  He's the primary caregiver to his mother, so

10:05  23   he's not going to be with us the whole time.  He will

10:05  24   just come in, he'll testify, and he'll leave.

10:05  25               But I'm looking forward to his testimony.

| | |
|---|---|
| 10:06 | 1 | He's done the work. Okay? He has done the work on |
| 10:06 | 2 | these standards. He's brought us this technology, he |
| 10:06 | 3 | and a lot of other people. |
| 10:06 | 4 | Among those companies that were involved |
| 10:06 | 5 | in doing this, ASUSTeK, in developing this new |
| 10:06 | 6 | technology that we're actually using in our computers. |
| 10:06 | 7 | So I look forward to meeting him. I look |
| 10:06 | 8 | forward to sharing his testimony with you. |
| 10:06 | 9 | Now, let's close out some more of the |
| 10:06 | 10 | story. |
| 10:06 | 11 | After the industry has developed PCI |
| 10:06 | 12 | Express and the industry has developed USB, we need to |
| 10:06 | 13 | jump ahead from May of 1999 to May of 2018. Okay? |
| 10:06 | 14 | That's approximately a 20-year jump. |
| 10:06 | 15 | And what does Dr. Chu do? |
| 10:06 | 16 | In May of 2018, he sends a letter to |
| 10:06 | 17 | ASUSTeK. And he's looking back in the rearview mirror |
| 10:06 | 18 | across time. And he says, PCI Express and USB are |
| 10:06 | 19 | pretty cool. They're in everything. I did that. |
| 10:07 | 20 | Okay? |
| 10:07 | 21 | From Interputer to -- I've changed the |
| 10:07 | 22 | computer industry with brand new technology that is |
| 10:07 | 23 | amazing and works for everyone. I did all that work. |
| 10:07 | 24 | That's a big claim. That's a massive |
| 10:07 | 25 | claim. And it's not true. He didn't do that work. |

| | | |
|---|---|---|
| 10:07 | 1 | Y'all ever hear of a fisherman's tale?  Like I caught a |
| 10:07 | 2 | fish and three years later, it's twice the size of the |
| 10:07 | 3 | one I actually caught?  That's happening here too. |
| 10:07 | 4 | Let me tell you a story.  I was -- this |
| 10:07 | 5 | is in high school.  Now, up in Kansas, we have bass, |
| 10:07 | 6 | crappie, channel cat.  I think that's the same stuff |
| 10:07 | 7 | you're going to have around here in Lake Waco or |
| 10:07 | 8 | whatever, but correct me if I'm wrong. |
| 10:08 | 9 | We were fishing for crappie, a buddy of |
| 10:08 | 10 | my mine named Andy and me.  We were going from brush |
| 10:08 | 11 | pile to brush pile.  Hit this one brush pile that had |
| 10:08 | 12 | crappie stacked in it like pancakes at the IHOP.  I |
| 10:08 | 13 | mean, they were thick in this brush pile. |
| 10:08 | 14 | We're jigging.  All of a sudden, we start |
| 10:08 | 15 | hitting the fish.  We caught 32 fish in about |
| 10:08 | 16 | 25 minutes.  It was intense.  I know how many fish we |
| 10:08 | 17 | caught because we took them back to my truck.  We laid |
| 10:08 | 18 | them out in the bed. |
| 10:08 | 19 | And I had one of those portable throwaway |
| 10:08 | 20 | cameras that used to be around in the day before we had |
| 10:08 | 21 | phones that took pictures.  I snapped a photo.  I have |
| 10:08 | 22 | that photo. |
| 10:08 | 23 | Now, my buddy Andy, he's an excitable |
| 10:08 | 24 | fellow.  About two years later, we're still fishing. |
| 10:08 | 25 | He's talking about that day.  He said, I bet we caught |

10:08  1    40 fish that day.  That's okay.

10:08  2              I saw him ten years later.  We were

10:08  3    recounting that story.  It was 50 fish.

10:08  4              Just last year I was with him.  We went

10:09  5    fishing again.  And he goes, you remember that day

10:09  6    on -- it was Lake Perry.  He goes, you remember that

10:09  7    day on Lake Perry?

10:09  8              I said, yeah.  What's he going to say?

10:09  9    What's he going to say?

10:09  10             My buddy Andy says, we must have caught

10:09  11   100 fish that day.

10:09  12             Okay?  That's ten years after the -- that

10:09  13   was 15, 20 years after the fact.  The story got bigger,

10:09  14   and so is Dr. Chu's.

10:09  15             That's why we got to look at those early

10:09  16   days and say, what was the work that he actually did?

10:09  17   Okay?  What did he actually do?  We don't get to wait

10:09  18   20 years later and then listen to his story.  We got to

10:09  19   go back and see what it actually was.

10:09  20             I want to ask you a few commonsense

10:09  21   questions now.  Okay?  Looking at this timeline, we

10:09  22   have three weeks worth of writing white papers in

10:10  23   January of 1998.

10:10  24             Does it make sense that three weeks worth

10:10  25   of thinking is the same as all of the industry experts

```
10:10   1    coming together, 200 of them, over the course of not
10:10   2    one three-year period but two three-year periods and
10:10   3    developing brand new technology?  So six years worth of
10:10   4    work for the whole industry or three weeks?  Does that
10:10   5    make sense that he's doing the same work?
10:10   6              Let's try this from a different angle.
10:10   7    Does it make sense -- let's go back.
10:10   8              Barbed wire, you just heard about that.
10:10   9    Barbed wire.  Man, my clients got out their snippers
10:10   10   and they cut through that barbed wire.  That's the
10:10   11   allegation, right?
10:10   12             Now, does anybody own property?  I think
10:10   13   you said you did.  Yeah.  If you have barbed wire up
10:10   14   and somebody's going to come traipsing through your
10:11   15   property and they cut your barbed wire down and start,
10:11   16   you know, laying pipes or cutting timber or whatever it
10:11   17   is they're doing that you don't want them doing on
10:11   18   property, what do you do?
10:11   19             Well, I know what Dr. Chu did.  He waited
10:11   20   for 18 years to say something.
10:11   21             Now, let me be more accurate.  More
10:11   22   accurate.  PCI Express came out in 2003, and this isn't
10:11   23   a secret document.  It's an industry standard.  It's
10:11   24   free to everyone.  Everybody knows what's going on.
10:11   25             ASUSTeK starts using it in their
```

```
10:11   1    computers in 2004.  Okay?  So let's assume that's when
10:11   2    they cut the barbed wire.
10:11   3               Now, does it make sense -- if there's a
10:11   4    legitimate claim from Dr. Chu, does it make sense that
10:11   5    he sits on his hands for 14 years from that point?
10:11   6    That's hard to fathom.  If somebody's jumping on your
10:11   7    property and doing something you don't want them to do,
10:12   8    you stand up and say something.  You don't wait for
10:12   9    14 years.
10:12  10               But I'll tell you what he waited until.
10:12  11    If you look closely at this slide here, you see
10:12  12    May 15th of 2019.  That's when his patents started
10:12  13    expiring.  He sent his letter one year to the day
10:12  14    before his patents started expiring because he was
10:12  15    running out of window to do all the stuff he wants to
10:12  16    do, which is sue.
10:12  17               That's why he sent a letter.  Not because
10:12  18    he had the legitimate claim; because his windows closed
10:12  19    after 14 years.  Does that make sense?
10:12  20               Let me give you another fact.  Now, I've
10:12  21    added a data point on this screen here.  November 1998
10:12  22    to April 2000.  You see that one?  Here, I can use
10:12  23    my -- right there.  That's when Dr. Chu was working on
10:12  24    his Interputer, trying to get this module to talk to
10:12  25    the console.
```

| | |
|---|---|
| 10:12 | 1 |

And remember the XP Bus that I mentioned earlier?  I'll give you another fact.  It never worked.  The XP Bus didn't work.  Dr. Chu, with his impressive education, couldn't get it to work.  He tried.  Hired other engineers and tried.  It didn't work.

Does it make sense that his XP Bus that didn't work, that he couldn't get to work, is the same technology that all of the best minds in the industry came up with over the next eight or nine years?

Does it make sense that the best minds in the industry somehow decided to use the technology that Dr. Chu couldn't even get to work?

None of that makes sense.  Because the reality is what he's saying isn't right.  The work that he did has nothing to do with these standards that we're talking about here today.

Let me introduce another gentleman.

Dr. Edwards, could you stand up?  And sit back down.  Thank you.

Dr. Edwards is a professor at Columbia University.  He has been what I would call monkeying around with computers since he was 12 years old.  Okay?  He loves computers.  He's a professor talking about computers.  He teaches classes on all this stuff.  He has a love for computers that I don't personally share,

| | |
|---|---|
| 10:14 | 1 | but I'm happy to talk about it with him.  Okay? |
| 10:14 | 2 | He will come and teach you everything you |
| 10:14 | 3 | need to know about the details here.  He'll walk you |
| 10:14 | 4 | through this early time frame.  He'll walk you through |
| 10:14 | 5 | these standards, talk about the things that Mr. Bhatt |
| 10:14 | 6 | developed.  And he will show you that they're totally |
| 10:14 | 7 | different.  So wait for that testimony as well. |
| 10:14 | 8 | What Dr. Chu is doing is ignoring the |
| 10:15 | 9 | context of his work.  He's growing the number of fish. |
| 10:15 | 10 | Let me give you another example.  I'm a |
| 10:15 | 11 | littler boy now, okay?  I'm talking five, six years |
| 10:15 | 12 | old, and we lived in a small town. |
| 10:15 | 13 | Now, when I would do my chores well |
| 10:15 | 14 | during the week, my dad would sometimes take me to this |
| 10:15 | 15 | little five and dime in the downtown.  It was called |
| 10:15 | 16 | Woolworth.  Y'all ever heard of that store? |
| 10:15 | 17 | Woolworth was -- it was great.  They |
| 10:15 | 18 | actually had a fountain where you could get soda -- |
| 10:15 | 19 | sodas.  And anyway, that's neither here nor there, and |
| 10:15 | 20 | I'm not focused on that. |
| 10:15 | 21 | But the idea was we'd go in there and |
| 10:15 | 22 | there is this little toy aisle, and my dad would say, |
| 10:15 | 23 | you can get whatever toy you want off of this.  Now, |
| 10:15 | 24 | they were not fancy toys.  They were about -- I think |
| 10:15 | 25 | the most expensive one was maybe a buck 50, but I could |

| | | |
|---|---|---|
| 10:15 | 1 | choose whatever I wanted off there.  And -- |
| 10:15 | 2 | THE COURT:  Counsel, you have five |
| 10:15 | 3 | minutes. |
| 10:15 | 4 | MR. BURESH:  Thank you, Your Honor. |
| 10:15 | 5 | Three times I chose this toy airplane. |
| 10:16 | 6 | They're in this plastic bag.  This toy airplane was |
| 10:16 | 7 | made out of light wood, balsa, if anybody knows what |
| 10:16 | 8 | that is.  And they had a propeller and a rubber band, |
| 10:16 | 9 | so you could spin it up and the rubber band would act |
| 10:16 | 10 | as the motor.  All right. |
| 10:16 | 11 | Now, I'd go home with this toy airplane, |
| 10:16 | 12 | I'd wind it up, and I'd let that thing go.  In my mind, |
| 10:16 | 13 | it was going to do loops and fly around for five |
| 10:16 | 14 | minutes and be beautiful.  Any guesses on what |
| 10:16 | 15 | happened? |
| 10:16 | 16 | I'd spin it up, throw it, (indicating). |
| 10:16 | 17 | Every time.  I was so disappointed.  That plane didn't |
| 10:16 | 18 | work worth a diddle, all right? |
| 10:16 | 19 | But here's the thing:  How does that |
| 10:16 | 20 | apply to what we're talking about? |
| 10:16 | 21 | Let's say I was the inventor of that toy |
| 10:16 | 22 | airplane, so I get my papers out, I write it down, I |
| 10:16 | 23 | say I'm inventing a toy airplane.  It's made of light |
| 10:17 | 24 | wood.  It's got wings.  It's for flying.  It's got a |
| 10:17 | 25 | motor with a rubber band.  Okay.  That's my work. |

10:17  1    That's what I'm entitled to credit to.

10:17  2              Now, let's say I wait for 18 years.  I

10:17  3    let 18 years pass.  And then I think, man, that toy

10:17  4    airplane isn't doing very good.  But I see that the Air

10:17  5    Force has come out with some pretty cool stuff.  The

10:17  6    Air Force has come out with their F-35 stealth fighter

10:17  7    plane.  It's amazing technology.

10:17  8              Now, what I think I really invented was

10:17  9    an airplane.  Let's don't worry about the toy.  Now, it

10:17  10   has wings.  It's got a motor.  Let's not worry about

10:17  11   the rubber band.  And suddenly, the Air Force gets a

10:17  12   letter that says I invented the F-35 stealth fighter.

10:18  13             Does that all make sense?  Does that

10:18  14   work?

10:18  15             No.  It doesn't.  That's not right.  It's

10:18  16   not right because in the patent law we have this thing

10:18  17   called a bargain.  The bargain is you tell -- inventor

10:18  18   tells the public, all of us, here's what my invention

10:18  19   is in 1998, 1999.  Here's what it is.  I'm going to

10:18  20   write it down.

10:18  21             Those fence posts have to stick because I

10:18  22   don't get to move them over time to see the good stuff

10:18  23   that came out after me and claim that I invented that.

10:18  24   I don't get to claim other people's work.

10:18  25             If I invented a toy airplane of balsa

10:18   1   wood with a rubber band, I get that.  I don't get the
10:18   2   stealth fighter.  It has to stay put, okay?  That's the
10:18   3   bargain.  That's the handshake.
10:19   4              And in exchange for disclosing that, for
10:19   5   nailing your fence posts down, what do you get in
10:19   6   return?  Patent rights.
10:19   7              Now, if you can break that bargain and
10:19   8   you come in later and you say, I invented the stealth
10:19   9   fighter, here's the deal.  You have broken the bargain.
10:19  10   At the very foundation of the patent system, you've
10:19  11   broken it.  Split the foundation.
10:19  12              And that is why when someone does that,
10:19  13   their patent is held invalid.  That's why.  They broke
10:19  14   the bargain.
10:19  15              And that is what should happen in this
10:19  16   case because Dr. Chu is claiming work that he didn't
10:19  17   do.
10:19  18              Why's he doing that?  Why would he do
10:19  19   that?
10:19  20              You've already heard it.  It's 40 million
10:19  21   reasons.  It's money.  Y'all heard the saying:  The
10:20  22   love of money is what?  It's the root of all kinds of
10:20  23   problems, okay?
10:20  24              That's what it's about.  That's why he's
10:20  25   doing this.

| | | |
|---|---|---|
| 10:20 | 1 | On that point, Mr. Newell, Mike Newell, |
| 10:20 | 2 | could you stand up? |
| 10:20 | 3 | Mr. Newell's going to be our last |
| 10:20 | 4 | witness.  The point of his testimony will be that the |
| 10:20 | 5 | credit that Dr. Chu is seeking in this case is not |
| 10:20 | 6 | remotely real world.  It's a bunch of hooey, okay? |
| 10:20 | 7 | They're going to talk about all these |
| 10:20 | 8 | licenses, and what they're implying to you is because |
| 10:20 | 9 | other people have settled, that ASUSTeK has to also, |
| 10:20 | 10 | okay? |
| 10:20 | 11 | That's the little secret.  All these, |
| 10:20 | 12 | they've paid us for our technology.  They lined up |
| 10:20 | 13 | because we had such an awesome XP Bus that didn't work. |
| 10:20 | 14 | No.  No.  No.  Dr. Chu has sued everyone under the sun |
| 10:21 | 15 | in the computer industry.  Dr. Chu has gotten people to |
| 10:21 | 16 | settle to get out of their lawsuits.  That's it. |
| 10:21 | 17 | Does that mean that ASUSTeK doesn't get |
| 10:21 | 18 | to raise their paddle and defend themselves when they |
| 10:21 | 19 | choose to do so? |
| 10:21 | 20 | No.  That's their right.  It doesn't |
| 10:21 | 21 | matter if other companies choose to settle. |
| 10:21 | 22 | At the end of this week, I'm going to |
| 10:21 | 23 | come back up and ask you that commonsense question |
| 10:21 | 24 | again.  Remember, we only get credit for the work that |
| 10:21 | 25 | we actually do.  And I'm going to ask you guys to give |

10:21  1  credit where the credit is due.

10:21  2              Mr. Bhatt, he did the work.  ASUSTeK, the

10:21  3  rest of the computer industry, they did the work.  They

10:21  4  get the credit.

10:21  5              I'm going to ask you to give Dr. Chu the

10:21  6  credit that he is due also, and that's zero.  That's

10:21  7  nothing.  He didn't do the work he's claiming.

10:22  8              I really do appreciate your attention.

10:22  9  There will be some slogs as we go through this case.

10:22  10  There will be some technical information.  Bear with

10:22  11  it, okay?  You'll get there in the end.

10:22  12              But I do appreciate your attention, and

10:22  13  thank you very much for your time.

10:22  14              THE COURT:  Counsel, you may call your

10:22  15  first witness.

10:22  16              MR. COLLARD:  Thank you, Your Honor.

10:22  17              We call Dr. Bill Chu.

10:22  18              Your Honor, we have a couple of physical

10:22  19  items that I'm going to move up to the witness stand if

10:22  20  that's okay.

10:22  21              THE COURT:  Sure.

10:22  22              (The witness was sworn.)

10:23  23              MR. COLLARD:  Your Honor, I want to be

10:23  24  sensitive, if you're thinking of a morning break, do

10:23  25  you want me to look for a spot in a certain period of

10:23  1    time to take a break?

10:23  2                    THE COURT:  Why don't we -- yeah.  Why

10:24  3    don't you go ahead and get started, and then I'll find

10:24  4    a place to break?

10:24  5                    Thank you.

10:24  6                    MR. COLLARD:  Thank you, Your Honor.

10:24  7                         DIRECT EXAMINATION

10:24  8    BY MR. COLLARD:

10:24  9        Q.    Good morning, Dr. Chu.

10:24  10       A.    Good morning.

10:24  11       Q.    Can you please state your full name for the

10:24  12   jury?

10:24  13       A.    My name is William Wing Yen Chu.  Wing spells

10:24  14   W-i-n-g.  Yen spells Y-e-n.

10:24  15       Q.    So let's just make sure you're speaking into

10:24  16   the microphone.  Let's move it up a little bit, I

10:24  17   think, and then maybe you can scoot right up to it.

10:24  18       A.    I have a soft voice.

10:24  19       Q.    Can you say your name again just so we can

10:24  20   test the --

10:24  21       A.    It's William Wing Yen Chu.  Wing spells

10:24  22   W-i-n-g.  Yen spells Y-e-n.

10:24  23                    MR. COLLARD:  Kristie, are we doing okay?

10:24  24   BY MR. COLLARD:

10:24  25       Q.    Okay.  That middle name, is that a Chinese

| | | |
|---|---|---|
| 10:24 | 1 | name, sir? |
| 10:24 | 2 | A.    Yes, sir. |
| 10:24 | 3 | Q.    Does it have a meaning in English? |
| 10:24 | 4 | A.    Yes.  It does.  It means "forever kind." |
| 10:25 | 5 | Q.    Thank you, Dr. Chu. |
| 10:25 | 6 | Where do you currently live? |
| 10:25 | 7 | A.    I live in Los Altos, California, in the |
| 10:25 | 8 | Silicon Valley. |
| 10:25 | 9 | Q.    And how long have you lived in Silicon Valley, |
| 10:25 | 10 | sir? |
| 10:25 | 11 | A.    Probably over 50 years. |
| 10:25 | 12 | Q.    And are you married? |
| 10:25 | 13 | A.    Yes. |
| 10:25 | 14 | Q.    What's your wife's name? |
| 10:25 | 15 | A.    Teresa Chu. |
| 10:25 | 16 | Q.    And where did you meet Teresa? |
| 10:25 | 17 | A.    I met her at University of California |
| 10:25 | 18 | Berkeley. |
| 10:25 | 19 | Q.    What was she studying when you met her at the |
| 10:25 | 20 | University of California Berkeley? |
| 10:25 | 21 | A.    She was getting a business degree. |
| 10:25 | 22 | Q.    And so does she have any university degrees? |
| 10:25 | 23 | A.    Yeah.  She got her business degree from UC |
| 10:25 | 24 | Berkeley, and then she got an MBA from University of |
| 10:25 | 25 | Illinois Urbana. |

—70—

10:25   1        Q.    And what does she do today, your wife, Teresa

10:25   2   Chu?

10:25   3        A.    She work for ACQIS in handling the accounting

10:26   4   and finance.

10:26   5        Q.    And is she also a part owner of ACQIS?

10:26   6        A.    Yes.

10:26   7        Q.    And then I recall you and Teresa have two

10:26   8   kids; is that right?

10:26   9        A.    Two daughters, yes.

10:26  10        Q.    And is it Tiffany and Amanda?

10:26  11        A.    Yes.

10:26  12        Q.    What does Tiffany do for a living, Dr. Chu?

10:26  13        A.    My older daughter Tiffany lives in San

10:26  14   Francisco.  She is a finance director at a company, and

10:26  15   the company provides free financial advice to

10:26  16   consumers.

10:26  17        Q.    And what about Amanda, what does Amanda do for

10:26  18   a living?

10:26  19        A.    Amanda is my younger daughter.  She lives in

10:26  20   New York.  She is an OB/GYN surgeon, and she helps

10:26  21   patients that suffer from very severe endometriosis.

10:26  22        Q.    Thank you, Dr. Chu.  I appreciate you sharing

10:26  23   about your family.  And I'd like to talk a little bit

10:26  24   about your personal background.

10:26  25              Where were you born?

10:27   1      A.    I was born in Shanghai, China.

10:27   2      Q.    And did you grow up there?

10:27   3      A.    No.

10:27   4      Q.    Where did you grow up?

10:27   5      A.    We fled -- the family fled communism.  I left

10:27   6   China when I was four years old and went to Hong Kong.

10:27   7      Q.    Hong Kong.

10:27   8            Can you explain to the jury, why did it help

10:27   9   at that time to move to Hong Kong, which is now a part

10:27   10  of China?

10:27   11     A.    Well, at the time when I was there, Hong Kong

10:27   12  was a British colony.  So of course, it's not a

10:27   13  communist place and...

10:27   14     Q.    Did you become a British citizen when you

10:27   15  moved to Hong Kong?

10:27   16     A.    No.  I was subject to a colony, so I'm not a

10:27   17  citizen.

10:27   18     Q.    What schools did you attend as a boy in Hong

10:27   19  Kong?

10:27   20     A.    I attended a Jesuit high school, Wah Yan, for

10:27   21  my high school.  Yes.

10:27   22     Q.    All right.  And did you have brothers and

10:27   23  sisters?

10:27   24     A.    Yes.  I do.

10:27   25     Q.    All right.

10:28    1                    MR. COLLARD:  Let's take a look at

10:28    2    Demonstrative Exhibit PDX-2.1.

         3    BY MR. COLLARD:

10:28    4        Q.    Is this a picture of your family, Dr. Chu?

10:28    5        A.    Yes.  Long time ago.

10:28    6        Q.    All right.  Which one are you?

10:28    7        A.    I'm the chubby one in the middle.

10:28    8        Q.    And then for your siblings in this picture,

10:28    9    can you briefly tell the jury their names and what they

10:28    10   do and perhaps where they live?

10:28    11       A.    On my left is my older brother Tom.  He lives

10:28    12   in the Los Angeles area.  He was -- he was a

10:28    13   pharmacist.  And my younger brother David, he lives in

10:28    14   Hong Kong.  He was a Baptist priest.  And my sister

10:28    15   Carrie, she lives in New York, and she is in real

10:28    16   estate.

10:28    17       Q.    Okay.  Thank you, Dr. Chu.

10:28    18             When you were a boy, did you have dreams about

10:29    19   moving to the United States?

10:29    20       A.    Yes.  I did.

10:29    21       Q.    Why?

10:29    22       A.    I love science and engineering, and U.S. has

10:29    23   the best university for science and engineering.

10:29    24       Q.    And when did you come to the United States?

10:29    25       A.    I came in September of 1969.

10:29  1       Q.    And how old were you then?

10:29  2       A.    18.

10:29  3       Q.    And how'd you feel when you came to the U.S.?

10:29  4       A.    Of course this was exciting.  The environment

10:29  5  is completely different, and I was pretty eager to

10:29  6  learn.

10:29  7       Q.    Now, your older brother Tom, was he already in

10:29  8  the United States at that time?

10:29  9       A.    He was.

10:29  10      Q.    All right.

10:29  11            MR. COLLARD:  Let's look at PDX-2.2.

       12  BY MR. COLLARD:

10:30  13      Q.    And I want to talk about this picture, so

10:30  14  we'll wait for it to come up.  There we go.

10:30  15            Oh, there we go.

10:30  16            Can you tell us about -- tell the jury about

10:30  17  this picture, please.

10:30  18      A.    I took this picture with my older brother Tom

10:30  19  at the Santa Clara University.  It's very close to the

10:30  20  cannery that we worked at in the summer.

10:30  21      Q.    So you worked at a cannery?

10:30  22      A.    Yes.  I did.

10:30  23      Q.    How long did you work at this cannery?

10:30  24      A.    I worked for three summers.

10:30  25      Q.    Can you briefly describe for the jury what it

—74—

| | | |
|--|--|--|
| 10:30 | 1 | was like working in a cannery during the summers? |
| 10:30 | 2 | A.   Well, it was boring.  It's hard labor.  And I |
| 10:30 | 3 | was unclogging sorting machines for peaches, and also I |
| 10:31 | 4 | took buckets of bad peaches to the dumpster. |
| 10:31 | 5 | Q.   Okay.  So in the -- in the fall of 1969 -- do |
| 10:31 | 6 | I have my timing right?  And is that when you entered |
| 10:31 | 7 | the four-year undergraduate program in electrical |
| 10:31 | 8 | engineering? |
| 10:31 | 9 | A.   At UC Berkeley.  Yes. |
| 10:31 | 10 | Q.   Okay.  And so what was it like for you |
| 10:31 | 11 | starting college at the University of California |
| 10:31 | 12 | Berkeley?  In that -- is that in Oakland? |
| 10:31 | 13 | A.   No.  It's in Berkeley. |
| 10:31 | 14 | Q.   In Berkeley. |
| | 15 | A.   Close to Oakland. |
| 10:31 | 16 | Q.   Close to Oakland. |
| 10:31 | 17 | And in 1969, what was that like? |
| 10:31 | 18 | A.   When I went to the school, to the university, |
| 10:31 | 19 | there was riots there at the time.  So I stay in my |
| 10:31 | 20 | room and study.  So there's a lot to learn. |
| 10:31 | 21 | Q.   And what is the focus of your study? |
| 10:31 | 22 | A.   Undergrad is fairly general.  You have liberal |
| 10:31 | 23 | arts stuff, and you have science, of course, physics -- |
| 10:32 | 24 | there's physics, mathematics, and stuff.  And of |
| 10:32 | 25 | course, I was electrical engineering.  A lot of |

10:32   1   electrical engineering courses.

10:32   2       Q.   Can you describe just a little more for the

10:32   3   jury what you're studying really when you're studying

10:32   4   electrical engineering?

10:32   5       A.   Pretty much everything.  You study the -- how

10:32   6   they are made -- how transistors are made, how they

10:32   7   function in circuits, how you design circuits.

10:32   8       Q.   Computers?  Are you studying how computers

10:32   9   work?

10:32   10      A.   Sure.  Of course.  Yes.  Uh-huh.

10:32   11      Q.   And did you continue to work all the way

10:32   12   through your undergraduate education?

10:32   13      A.   Yes.  I worked at the cannery for three

10:32   14   summers.  I needed money.  And I also worked at a co-op

10:32   15   to save money too.

10:32   16      Q.   And how long did it take you to get your

10:32   17   bachelor's degree?

10:32   18      A.   I got my bachelor in three years.

10:32   19      Q.   And how did you finish this four-year program

10:33   20   in only three years?

10:33   21      A.   Well, when you don't have money, I have to

10:33   22   take more courses.  So I want to save money to finish

10:33   23   the four year in three years.

10:33   24      Q.   Okay.  What did you do after you graduated,

10:33   25   Dr. Chu?

—76—

```
10:33   1         A.    I continue to the master program at Berkeley.

10:33   2         Q.    And what did you study in your master's

10:33   3   program at Berkeley?

10:33   4         A.    Integrated circuits.

10:33   5         Q.    Can you tell the jury, what is an integrated

10:33   6   circuit?

10:33   7         A.    It's what I said, that you take a large number

10:33   8   of transistors and design it and put it on a piece of

10:33   9   silicon for computer use.

10:33  10         Q.    And how did you pay for graduate school?

10:33  11         A.    I was a teaching assistant, and also I got a

10:33  12   scholarship.

10:33  13         Q.    Who -- let's talk about the teaching assistant

10:33  14   part.

10:33  15               Who were you teaching?

10:33  16         A.    Undergraduate students.

10:34  17         Q.    Undergrad students at Berkeley?

10:34  18         A.    Yes.  Uh-huh.

10:34  19         Q.    And then was that scholarship based on merit?

10:34  20         A.    Yes.

10:34  21         Q.    And did you receive a master's degree at the

10:34  22   end of that program?

10:34  23         A.    Yeah, in two years.

10:34  24         Q.    And did you immediately after that continue on

10:34  25   to pursue your doctorate?
```

10:34  1    A.    Yes.  Yes.  I did.

10:34  2    Q.    And where did you do your doctoral research?

10:34  3    A.    UC Berkeley has a fairly unique program.  They

10:34  4    partner with the industry to -- for certain doctorate

10:34  5    degrees, and I joined that program.  So I went to Bell

10:34  6    Labs in New Jersey to do my research.

10:34  7    Q.    Can you tell the jury a little bit about Bell

10:34  8    Labs, please, and what that is?

10:34  9    A.    At the time it was a really renowned research

10:34  10   lab, very large one, that was -- basically belongs to

10:34  11   the Bell Telephone systems.

10:34  12   Q.    And was it exciting to be able to do research

10:34  13   there at Bell Labs?

10:35  14   A.    Yeah.  It was fun.

10:35  15   Q.    Can you briefly describe the type of research

10:35  16   that you did while you were at Bell Labs?

10:35  17   A.    I was designing and building a special device.

10:35  18   It's called high voltage DMOS driver circuit for plasma

10:35  19   panels.

10:35  20   Q.    Did that research have any applicability in

10:35  21   the future?

10:35  22   A.    It actually was commercialized, and it became

10:35  23   like plasma TVs and displays.

10:35  24              MR. COLLARD:  Let's take a look at

10:35  25   PDX-2.3, please.

| | | |
|---|---|---|
| 10:35 | 1 | Thank you. |
| 10:35 | 2 | BY MR. COLLARD: |
| 10:35 | 3 | Q.   What is in this picture? |
| 10:35 | 4 | A.   My advisor, I guess, awarded me my doctorate |
| 10:35 | 5 | degree. |
| 10:35 | 6 | Q.   This is you getting your doctorate? |
| 10:35 | 7 | A.   Yes. |
| 10:35 | 8 | Q.   How old were you here? |
| 10:35 | 9 | A.   I think I was 25. |
| 10:35 | 10 | Q.   25.  Thank you. |
| 10:35 | 11 | So you mentioned you were not a British |
| 10:35 | 12 | citizen when you grew up in Hong Kong. |
| 10:35 | 13 | Were you a citizen of any country? |
| 10:36 | 14 | A.   No.  I was not. |
| 10:36 | 15 | Q.   Did you want to become a citizen of the United |
| 10:36 | 16 | States? |
| 10:36 | 17 | A.   Yes.  Very much. |
| 10:36 | 18 | Q.   Why? |
| 10:36 | 19 | A.   Well, many reasons.  I mean, I -- I obviously |
| 10:36 | 20 | believe in democracy.  I know in this country, you have |
| 10:36 | 21 | freedom.  You have justice.  Justice to protect |
| 10:36 | 22 | yourself.  So -- and I didn't belong anywhere, so I |
| 10:36 | 23 | want to belong here. |
| 10:36 | 24 | Q.   Did that happen?  Did you become a U.S. |
| 10:36 | 25 | citizen? |

10:36  1      A.    Yes.  I did.

10:36  2      Q.    Approximately when did that happen, Dr. Chu?

10:36  3      A.    I think it's 1984.

10:36  4      Q.    Could you briefly share with us what you

10:36  5    remember about the day you finally became a U.S.

10:36  6    citizen in 1984?

10:36  7      A.    Well, as I said, I finally belong somewhere,

10:36  8    and it's a wonderful place to build my family.  I

10:36  9    already started my first company at the time.  I

10:36  10   started my first company in 1982.  So this would be a

10:37  11   wonderful place for me to build my business and career.

10:37  12     Q.    Dr. Chu, we're actually going to get into your

10:37  13   work history here in a second, but before I do that,

10:37  14   how do you spend your time today?

10:37  15     A.    I spend my time between ACQIS and my

10:37  16   nonprofit.

10:37  17     Q.    And what is your nonprofit?

10:37  18     A.    The name of my nonprofit is called Hearts to

10:37  19   Humanity Eternal.  Our mission is to build a lasting

10:37  20   community of scientists and engineers who cares about

10:37  21   humanity and who do research to advance humanity.

10:37  22     Q.    And who does your nonprofit support?

10:37  23     A.    We provide research grants to UC Berkeley,

10:37  24   mostly graduate students, and we support a large number

10:37  25   of community activities among these student

| | | |
|---|---|---|
| 10:37 | 1 | researchers. |
| 10:37 | 2 | Q.    Thank you, Dr. Chu. |
| 10:37 | 3 | Now, I do want to turn and talk a little bit |
| 10:37 | 4 | about your work history, and we'll just kind of focus |
| 10:37 | 5 | on some key jobs in your work history.  Okay? |
| 10:38 | 6 | A.    Okay. |
| 10:38 | 7 | Q.    The first one is -- I want to talk about is |
| 10:38 | 8 | Verticom. |
| 10:38 | 9 | What is Verticom? |
| 10:38 | 10 | A.    It's the first company I founded in 1982. |
| 10:38 | 11 | Q.    And what did that company do? |
| 10:38 | 12 | A.    We provided graphics products for the |
| 10:38 | 13 | computer-aided design market. |
| 10:38 | 14 | Q.    And were you also VP of engineering at |
| 10:38 | 15 | Verticom? |
| 10:38 | 16 | A.    Yes.  I was. |
| 10:38 | 17 | Q.    Did Verticom go public? |
| 10:38 | 18 | A.    It went public in 1986. |
| 10:38 | 19 | Q.    And can you explain to the jury just briefly |
| 10:38 | 20 | what it means to go public? |
| 10:38 | 21 | A.    We were listed on NASDAQ so that we can raise |
| 10:38 | 22 | funds from the public. |
| 10:38 | 23 | Q.    Is being listed on the NASDAQ Stock Exchange |
| 10:38 | 24 | and going public, is that a marker of success for a |
| 10:38 | 25 | company? |

10:38  1        A.    Yes.  I guess so.  I guess.

10:38  2        Q.    And what happened to Verticom?

10:38  3        A.    We were acquired two years later by a company

10:38  4    called Western Digital.

10:38  5        Q.    When that happened, did you also join Western

10:39  6    Digital?

10:39  7        A.    Yes.

10:39  8        Q.    And what was your position?

10:39  9        A.    I was VP of engineering for the whole graphics

10:39  10   division.

10:39  11       Q.    Okay.  And was Western Digital, at that time,

10:39  12   was it a large company?

10:39  13       A.    It was a Fortune 500 company.  Yes.

10:39  14       Q.    And what type of products did Western Digital

10:39  15   offer?

10:39  16       A.    They built all kinds of computer products in

10:39  17   the storage area, in communication, in audio, and in my

10:39  18   division, the graphics products.

10:39  19       Q.    You talked about your division.

10:39  20             Did you manage a team while you were at

10:39  21   Western Digital?

10:39  22       A.    Yes.

10:39  23       Q.    How many -- how big was your team?

10:39  24       A.    My team, I had about 150 engineers.

10:39  25       Q.    Okay.  And what -- what was your role as

—82—

10:39  1    manager of those engineers?

10:39  2        A.    Well, of course I have to manage the teams.  I

10:39  3    decided what product to build, and I talked to

10:40  4    customers.

10:40  5        Q.    And were any of the products that you oversaw

10:40  6    during your time at Western Digital, were any of those

10:40  7    successful?

10:40  8        A.    Yeah.  We had two products in particular.  We

10:40  9    launched the first Microsoft Window -- we call it

10:40  10   accelerated chip, graphics chip, so that we can take

10:40  11   full advantage of speed for Microsoft Window.  That's

10:40  12   in the desktop chip area.

10:40  13         And we were the first one to launch in the

10:40  14   laptop product a chip that integrated back an analog

10:40  15   circuitry into the same chip.  Doesn't sound like too

10:40  16   much, but nobody was able to do that and we were able

10:40  17   to do that.

10:40  18       Q.    Did you leave Western Digital?

10:40  19       A.    Yes.

10:40  20       Q.    And where did you go next?

10:40  21       A.    I went to company called AcuMOS.

10:40  22       Q.    And what type of job did you do at AcuMOS?

10:40  23       A.    I was also the VP of engineering.

10:40  24       Q.    And then was AcuMOS acquired by another

10:40  25   company?

10:40    1        A.    It was acquired by Cirrus Logic.

10:41    2        Q.    And did you go to work for Cirrus Logic?

10:41    3        A.    Yes.  I did.

10:41    4        Q.    Is Cirrus Logic a large company?

10:41    5        A.    Not as large as Western Digital, but was quite

10:41    6    large.  It's hundreds of millions of dollars in

10:41    7    revenue.  Yeah.

10:41    8        Q.    Okay.  And what was your role at Cirrus Logic?

10:41    9        A.    I was the general manager for the desktop

10:41   10    graphics division.

10:41   11        Q.    And so how many people were you managing at

10:41   12    Cirrus Logic?

10:41   13        A.    At the peak, I had actually about 300

10:41   14    engineers.

10:41   15        Q.    And what kind of work were you doing there?

10:41   16        A.    Same work, managing the teams, deciding what

10:41   17    product to build, and also talking to customers.

10:41   18        Q.    So I want to dig into a little more about your

10:41   19    work at Cirrus Logic in the 1990s.

10:41   20              THE COURT:  This seems like a good

10:41   21    transition.

10:41   22              Ladies and gentlemen of the jury, we're

10:41   23    going to take our morning recess.  We'll take a recess

10:41   24    in the morning and a recess in the afternoon, and of

10:42   25    course we'll get a lunch break.

—84—

10:42  1          I'll have a couple of instructions for

10:42  2   you while we are not together and while you're with the

10:42  3   other jurors or when you go home.

10:42  4          First is:  You are not permitted to talk

10:42  5   about anything you've heard during the case until the

10:42  6   end of the trial when you begin your deliberations.

10:42  7          So I've never served on a jury.  I don't

10:42  8   know what it is y'all talk about back there.  You're

10:42  9   welcome -- one of the jurors has a nice cowboy hat.

10:42  10  You're obviously -- that's fair game or anything else,

10:42  11  but please don't talk about anything during the trial.

10:42  12         Second is:  Please, if you are on social

10:42  13  media, whatever that is, I don't -- I'm not, but please

10:42  14  don't post anything about the trial while you are

10:42  15  serving as a juror.

10:42  16         And finally, please do not do any

10:42  17  independent research about anything that might happen

10:42  18  during the trial.  The lawyers have worked very hard to

10:42  19  prepare the case and to present the evidence that they

10:43  20  intend to have you consider.  Please don't do any

10:43  21  additional research about the parties or the lawyers or

10:43  22  anything else.

10:43  23         Going forward I'll just say, please

10:43  24  remember my instructions.  Those are the instructions.

10:43  25  So we'll be in recess for 10 or 15 minutes.

85

| | | |
|---|---|---|
| 10:43 | 1 | THE BAILIFF:  All rise. |
| 10:43 | 2 | (Jury exited the courtroom.) |
| 10:43 | 3 | THE COURT:  You may step down, sir. |
| 10:43 | 4 | You may be seated. |
| 10:43 | 5 | Is there anything we need to take up? |
| 10:43 | 6 | MR. COLLARD:  Very briefly, Your Honor. |
| 10:43 | 7 | I'm concerned that the opening statement, |
| 10:43 | 8 | and this may come up again, is -- violated Motion in |
| 10:44 | 9 | Limine No. 7.  I, of course, didn't want to object |
| 10:44 | 10 | during the statement. |
| 10:44 | 11 | But argument suggesting there's anything |
| 10:44 | 12 | legally improper in filing a patent application or |
| 10:44 | 13 | writing patent claims to cover an adverse party's |
| 10:44 | 14 | product was said explicitly by Mr. Buresh.  My notes |
| 10:44 | 15 | were that:  You don't get to look back at their work |
| 10:44 | 16 | and claim that. |
| 10:44 | 17 | And that is exactly what's prohibited by |
| 10:44 | 18 | Motion in Limine No. 7. |
| 10:44 | 19 | THE COURT:  Counsel? |
| 10:44 | 20 | MR. BURESH:  Your Honor, we're making a |
| 10:44 | 21 | written description and enablement defense.  All my |
| 10:44 | 22 | argument was going toward is the notion that you can't |
| 10:44 | 23 | move the fence post as you move forward. |
| 10:44 | 24 | THE COURT:  Well, I think you need to be |
| 10:44 | 25 | more careful.  I agree with counsel that you should not |

| | | |
|---|---|---|
| 10:44 | 1 | be intimating anything that indicates that -- for |
| 10:44 | 2 | example, that he, during the prosecution process, did |
| 10:44 | 3 | anything improper by -- anything improper.  I'll limit |
| 10:45 | 4 | it to that, whatever that might be. |
| 10:45 | 5 | And so I don't know that that statement |
| 10:45 | 6 | does much to support your defenses, and so I would be |
| 10:45 | 7 | more careful going forward. |
| 10:45 | 8 | MR. BURESH:  Understood, Your Honor. |
| 10:45 | 9 | THE COURT:  Anything else? |
| 10:45 | 10 | MR. COLLARD:  That was all, Your Honor. |
| 10:45 | 11 | Thank you. |
| 10:45 | 12 | THE COURT:  Who comes after -- what |
| 10:45 | 13 | witness will be next? |
| 10:45 | 14 | MR. COLLARD:  It's our infringement |
| 10:45 | 15 | expert, Dr. Sarhan. |
| 10:45 | 16 | THE COURT:  Okay.  So we'll go from |
| 10:45 | 17 | him -- and -- so I have a phone call I have to take at |
| 10:45 | 18 | 1:00.  My plan is to go a little bit past noon, and |
| 10:45 | 19 | then break when we break.  And we'll see when we get to |
| 10:45 | 20 | about that time, what we may do is just have you |
| 10:45 | 21 | introduce your expert, prove him up, and then break at |
| 10:45 | 22 | that point.  But we'll figure it out. |
| 10:45 | 23 | How -- |
| 10:45 | 24 | MR. COLLARD:  I'm sorry.  I'm going to |
| 10:45 | 25 | really try to get done with Dr. Chu before lunch, a |

```
10:45   1    little after noon, but I'm not sure --
10:46   2                    THE COURT:  Oh, no.  I thought you were
10:46   3    going to get done.  So if he's going to go through
10:46   4    noon, we'll -- if it helps you, we'll go till maybe
10:46   5    12:30 then.
10:46   6                    MR. COLLARD:  Okay.
10:46   7                    THE COURT:  And not -- I'm not pushing
10:46   8    you.  I don't care how he's presented.  I just want to
10:46   9    make sure that the jury isn't sitting around too long
10:46   10   waiting for us.
10:46   11                   And if I haven't told you all, I know you
10:46   12   all's -- the folks you've hired who are from here I'm
10:46   13   sure have told you this, but to make clear if you don't
10:46   14   know, as long as a witness is on direct, you may speak
10:46   15   to the witness.
10:46   16                   Once the witness is on cross, then you
10:46   17   may not with one exception per side or I think maybe
10:46   18   two on the defense side per side, which is:  You have
10:46   19   your client; they have the two clients.  And I don't
10:46   20   know if your two clients are going to be testifying or
10:46   21   not.  So doesn't matter --
10:46   22                   MR. BURESH:  They will be, Your Honor.
10:46   23                   THE COURT:  They will be?  Both?
10:46   24                   Okay.  So regardless of when they are
10:47   25   testifying, you can still talk to them.  Otherwise, the
```

10:47  1    rule about direct and cross applies.

10:47  2                    So anything else?

10:47  3                    MR. COLLARD:  Nothing from us, Your

10:47  4    Honor.

10:47  5                    THE COURT:  Okay.

10:47  6                    (Recess taken.)

11:00  7                    THE BAILIFF:  All rise.

11:00  8                    THE COURT:  Please remain standing for

11:00  9    the jury.

11:00  10                   MR. COLLARD:  Your Honor, I have a brief

11:00  11   issue, very brief, before we bring the jury in.  I'm

11:00  12   sorry.

11:00  13                   THE COURT:  Yes, sir.

11:00  14                   MR. COLLARD:  You said that you would pay

11:00  15   attention to and revisit potentially the paragraph that

11:00  16   we had to redact out of the notice letter on the IBM

11:00  17   litigation.

11:00  18                   THE COURT:  Yes.

11:00  19                   MR. COLLARD:  In my notes from the

11:00  20   opening, it was Mr. Buresh saying that:  Dr. Chu sued

11:00  21   everyone under the sun.

11:00  22                   It seems like if he can say that, that I

11:00  23   shouldn't have to take out the --

11:00  24                   THE COURT:  No.  No.  I'm not going to --

11:00  25   I -- it's very -- it's a very high hill for you to

| | | |
|---|---|---|
| 11:00 | 1 | climb to allow any other lawsuit in here. |
| 11:00 | 2 | MR. COLLARD:  Understood. |
| 11:00 | 3 | THE COURT:  So I'm not going to permit |
| 11:00 | 4 | that. |
| 11:00 | 5 | MR. COLLARD:  That's all.  Thank you, |
| 11:00 | 6 | sir. |
| 11:01 | 7 | (Jury entered the courtroom.) |
| 11:01 | 8 | THE COURT:  Thank you.  You may be |
| 11:01 | 9 | seated. |
| 11:01 | 10 | Counsel, you may continue, please. |
| 11:01 | 11 | MR. COLLARD:  Thank you, Your Honor. |
| 11:01 | 12 | BY MR. COLLARD: |
| 11:01 | 13 | Q.    Dr. Chu, to kind of put everybody back on the |
| 11:01 | 14 | timeline, we have been talking about your work history. |
| 11:01 | 15 | We were talking about your work at Cirrus in the 1990s, |
| 11:01 | 16 | and I want to dig in a little more into your work that |
| 11:01 | 17 | you were -- what you were doing at Cirrus in the 1990s. |
| 11:01 | 18 | Is that okay? |
| 11:01 | 19 | A.    Yes. |
| 11:01 | 20 | Q.    Great. |
| 11:01 | 21 | Was the increasing speeds of computers |
| 11:01 | 22 | something that you had to monitor while you were |
| 11:01 | 23 | working at Cirrus? |
| 11:01 | 24 | A.    Yes. |
| 11:01 | 25 | Q.    Why? |

11:01  1          A.    Computer rate is getting faster every year,

11:02  2    because that's what consumer wants, and companies

11:02  3    dealing with faster processor after each generation.

11:02  4    So the graphics device has to keep up with that.

11:02  5          Q.    So was part of your job at Cirrus making sure

11:02  6    that the products that Cirrus was making would keep up

11:02  7    as computers get faster?

11:02  8          A.    Yes.  The graphics chip that we built has to

11:02  9    interface to the processor.  So as that interface gets

11:02  10   faster, we have to get faster.

11:02  11         Q.    And can you explain to the jury sort of why

11:02  12   are computers always getting faster?

11:02  13         A.    Very few people want to buy slow computer, so

11:02  14   everybody wants to buy faster computer.  And Intel

11:02  15   every year comes out with faster computers and faster

11:02  16   logic.  So we have to keep up.

11:02  17         Q.    Is that the processor?

11:02  18         A.    The processor is the brain of the computer.

11:03  19         Q.    Okay.  And are there other parts inside of the

11:03  20   computer that communicate with that processor, that

11:03  21   brain?

11:03  22         A.    Yeah.  You will have the brain, and you will

11:03  23   have, you know, memory.  You will have storage devices.

11:03  24   You will have audio, communication devices, of course

11:03  25   graphics, audio device, all surrounding the processor.

| | | |
|---|---|---|
| 11:03 | 1 | Q.    Okay.  Now, how are those devices, those |
| 11:03 | 2 | components that you just mentioned, what connects them |
| 11:03 | 3 | to the processor? |
| 11:03 | 4 | A.    Through a computer bus. |
| 11:03 | 5 | Q.    Computer bus.  Great. |
| 11:03 | 6 | Now, this is where I'm hoping you can help the |
| 11:03 | 7 | jury start to understand this. |
| 11:03 | 8 | What is a computer bus? |
| 11:03 | 9 | A.    Kind of briefly mentioned that.  It's |
| 11:03 | 10 | basically wires on the circuit board mostly, and you |
| 11:03 | 11 | will have what we call interface drivers on each side. |
| 11:03 | 12 | They're pretty much controllers that control the flow |
| 11:04 | 13 | of information between the devices. |
| 11:04 | 14 | Q.    Thank you, Dr. Chu. |
| 11:04 | 15 | And I just want to ask this one too:  Is a |
| 11:04 | 16 | computer bus, is it inside the computer or outside the |
| 11:04 | 17 | computer? |
| 11:04 | 18 | A.    There are buses inside, but there are also |
| 11:04 | 19 | buses that goes to connectors in a computer, like USB, |
| 11:04 | 20 | so you will go to external components.  Both types are |
| 11:04 | 21 | out there. |
| 11:04 | 22 | Q.    Both types.  Thank you. |
| 11:04 | 23 | Do you have a comparison that can help us |
| 11:04 | 24 | think about a computer bus? |
| 11:04 | 25 | A.    Yes.  Kind of.  But you are -- computer bus is |

11:04  1    like roads depending on the arrangement.  It could --

11:04  2    that could connect the people between buildings and

11:04  3    things.

11:04  4        Q.    Okay.  And were there different types of

11:04  5    computer buses that were being used around this time?

11:04  6              And on the timeline, we're still in the 1990s.

11:05  7              So were there different types of computer

11:05  8    buses being used around then?

11:05  9        A.    Quite a few.  Yes.  Uh-huh.

11:05 10        Q.    What is PCI?

11:05 11        A.    PCI stands for Peripheral Component

11:05 12    Interconnect.  It's a type of bus that the -- the

11:05 13    graphics device also interface to but also other

11:05 14    devices.  It's one of the main primary bus for

11:05 15    communicating the internal peripheral device to the

11:05 16    processor.

11:05 17        Q.    And what about USB?  Was that one of the buses

11:05 18    that was being used in the 1990s?

11:05 19        A.    At the time of my invention, it was a very

11:05 20    slow bus.  People probably use it for maybe keyboard

11:05 21    and mouse.  Not too much.

11:05 22        Q.    Okay.  We mentioned two specific types, and we

11:05 23    don't have to go into all the other types, but I want

11:05 24    to know, were there other types of buses that were

11:05 25    being used in the 1990s?

11:05   1        A.    Yeah.   There was some more advanced buses.   We

11:05   2   call it 3094 or there's some ISA bus.   So it's -- there

11:06   3   are quite a few.   Yes.

11:06   4        Q.    Okay.   So we're talking about computer buses

11:06   5   now.

11:06   6              Does the computer bus have to improve to keep

11:06   7   up with faster processors?

11:06   8        A.    Yes.   You have to.

11:06   9        Q.    What if it doesn't?

11:06  10        A.    Well, if it doesn't, then you will -- the

11:06  11   information cannot flow.   If the processor runs faster,

11:06  12   it can process more information.   So you need to talk

11:06  13   to the rest of the system.   So you'll get -- you know,

11:06  14   like in the intersection, you get roadblocks, and then

11:06  15   a computer basically cannot do anything.   So you will

11:06  16   not be able to fully take advantage of the speed of the

11:06  17   processor.

11:06  18        Q.    Thank you, Dr. Chu.

11:06  19              Now, we'll go a little bit back into your work

11:06  20   history.

11:06  21              You decided to leave Cirrus Logic when?

11:06  22        A.    Around November of 1997.

11:06  23        Q.    Why did you decide to leave Cirrus?

11:06  24        A.    Cirrus decided to get out of the graphics

11:07  25   business.

11:07   1       Q.    Was its graphics business doing poorly?

11:07   2       A.    Not at that time.

11:07   3       Q.    Then why did Cirrus decide to get out of the

11:07   4   graphics business?

11:07   5       A.    Intel is a monopoly on most with the

11:07   6   processor, and they also control what we call the

11:07   7   "system logic."  The system logic, we can only at the

11:07   8   time mostly buy from Intel.  So they decided to take

11:07   9   the graphics device and put it inside the system logic.

11:07  10           So when you do that, you basically cannot

11:07  11   compete in that business.  So it is not -- wasn't my

11:07  12   decision to -- Cirrus Logic said, you know, we can't

11:07  13   compete in this situation, so we have to get off of the

11:07  14   business.

11:07  15       Q.    Thank you, Dr. Chu.

11:07  16           So after you left Cirrus in late 1997, what

11:07  17   did you do professionally?

11:07  18       A.    I took a small break.  My mother was here in

11:07  19   U.S. to treat her cancer, so I took a break.  And after

11:08  20   that, around Christmas of 1997, I decided to start

11:08  21   working on my invention.

11:08  22       Q.    Okay.  And are you referring to the inventions

11:08  23   that ultimately, somewhere down the road, are in the

11:08  24   patents that were awarded to you by the U.S. Patent

11:08  25   Office?

11:08  1      A.    Yes.

11:08  2      Q.    Okay.  So we'll come back to the patents, but

11:08  3  I want to be clear on the timing.

11:08  4            When was this that you started work on your

11:08  5  inventions?

11:08  6      A.    Well, I started around Christmas 1997.

11:08  7      Q.    And what was -- can you tell the jury a little

11:08  8  bit about what computing and computers were like back

11:08  9  in the very end of 1997 and the beginning of 1998?

11:08  10     A.    At the time I saw the problem in that

11:08  11  computers were large and not very portable.  The laptop

11:08  12  in those days weighed about 6 pounds.  And so I was

11:09  13  trying to solve a problem to help consumer deal with

11:09  14  mobile -- to get that more mobility of the computer.

11:09  15     Q.    Were computers in 1998 as fast as they are

11:09  16  now?

11:09  17     A.    No.  Of course not.

11:09  18     Q.    Okay.  Were they as portable as they are now?

11:09  19     A.    No.  They were not.

11:09  20     Q.    Were computers -- what was the Internet like

11:09  21  in 1998?

11:09  22     A.    If you're lucky to get one; otherwise, you

11:09  23  don't have it.  It's slow.

11:09  24     Q.    So let's talk about your work on the

11:09  25  inventions.

| | | |
|---|---|---|
| 11:09 | 1 | MR. COLLARD:  Move to admit J-22, J-23, |
| 11:09 | 2 | and J-24, which are the white papers. |
| 11:09 | 3 | MR. BURESH:  No objection. |
| 11:09 | 4 | THE COURT:  Admitted. |
| 11:09 | 5 | BY MR. COLLARD: |
| 11:09 | 6 | Q.    Did you make a record of your inventions that |
| 11:09 | 7 | you worked on around that time? |
| 11:09 | 8 | A.    Yes.  I sat down and really dedicate all my |
| 11:09 | 9 | time to detail -- to do a detail description of my |
| 11:09 | 10 | invention.  I wrote basically three white papers to do |
| 11:10 | 11 | that. |
| 11:10 | 12 | Q.    So what are white papers? |
| 11:10 | 13 | A.    It just -- it's the way that you have a |
| 11:10 | 14 | detailed documentation of something.  We just call it |
| 11:10 | 15 | "white paper." |
| 11:10 | 16 | Q.    Okay.  And when did you write these white |
| 11:10 | 17 | papers? |
| 11:10 | 18 | A.    Between Christmas of 1997 to about middle of |
| 11:10 | 19 | January of 1998. |
| 11:10 | 20 | Q.    All right.  And we're going to look at them |
| 11:10 | 21 | more closely here in a minute, but before we do that, |
| 11:10 | 22 | can you please name how you see the invention or |
| 11:10 | 23 | inventions in these white papers? |
| 11:10 | 24 | A.    There were two key inventions.  There -- we |
| 11:10 | 25 | talked about the modular computer invention.  At the |

11:10   1    time I thought it was, you know, very unique.  But in

11:10   2    order to implement that, I have to create a new

11:10   3    computer bus.

11:10   4        Q.   So were those the two inventions, the new

11:10   5    modular computer and a new computer bus?

11:10   6        A.   Yeah.  Those were the primary invention.

11:10   7    Correct.

11:10   8        Q.   Let's take it one at a time.

11:10   9             Can you please explain to the jury the modular

11:11   10   computer systems that you described in your white

11:11   11   papers?

11:11   12       A.   This was a long time ago, 24 years ago.  We --

11:11   13   we tried to put everything that's important in the --

11:11   14   for computer, the processor, the storage, the memory,

11:11   15   the graphics, the communication device, all in a single

11:11   16   box that's really small.  This weighs about a pound in

11:11   17   those days.  And so --

11:11   18       Q.   Thank you, Dr. Chu.  We're going to come back,

11:11   19   and we'll actually look at those quite a bit.

11:11   20       A.   Okay.

11:11   21       Q.   But for now, I want to stick to the white

11:11   22   papers.

11:11   23            And so what sort of problems did you hope to

11:11   24   solve with a new modular computer system?

11:11   25       A.   Two problems.  One was to -- as I said, to

98

11:11  1    build the actual modular computer to help consumer

11:11  2    having a more affordable system.  The -- in order to

11:11  3    implement this computer system --

11:12  4        Q.    Well, hold on.  Let's do this one at a time.

11:12  5              So now I do want to talk about the computer

11:12  6    bus.

11:12  7              Why did you invent a new computer bus in these

11:12  8    white papers?

11:12  9        A.    To build a computer module for multiple

11:12  10   generations.  The interconnect between the computer and

11:12  11   the consoles really cannot change.  So we want -- I

11:12  12   wanted to build what I call a universal bus.  I want to

11:12  13   build a universal bus that when the inside of the

11:12  14   computer, as we said, gets faster and faster, as we all

11:12  15   know it will happen, we don't have to change that bus.

11:12  16   We'll be able to send the data for a current generation

11:12  17   of bus or to later generation of bus, go through this

11:12  18   high-speed universal bus so that the system will be

11:12  19   future-proof.

11:12  20       Q.    Okay.  So do all three of the white papers

11:12  21   describe parts of the new bus that you were designing?

11:12  22       A.    Yes.

11:12  23       Q.    Great.

11:12  24             MR. COLLARD:  Let's look at the front

11:13  25   cover of J-22.  And let's blow up the title in the top

11:13   1   bit, please.

       2   BY MR. COLLARD:

11:13   3        Q.    And what is this document?

11:13   4        A.    It was my first white paper talking mostly

11:13   5   about the modular computer console.

11:13   6        Q.    All right.  And I want to look in this white

11:13   7   paper -- oh.  And sorry.  I just want to point out --

11:13   8   is this -- up here on the top left, is that the date

11:13   9   that you finished this -- drafting this white paper?

11:13  10        A.    Yes.  That's the day I finish.

11:13  11        Q.    Okay.

11:13  12             MR. COLLARD:  And let's look at Page 15

11:13  13   of this document.  It's Figure 5.

11:13  14             And we'll blow up the image here, please.

11:13  15             Thank you.

11:13  16   BY MR. COLLARD:

11:13  17        Q.    What does this show, Dr. Chu?

11:13  18        A.    So I talked earlier about I want to build a

11:13  19   universal bus that's high performance.  I named that

11:14  20   the XP Bus.  So I mentioned earlier that I wanted that

11:14  21   bus not to change regardless of what's happening with

11:14  22   the PC technology at the time.

11:14  23             So there are many types of peripheral bus.  I

11:14  24   name here the PCI bus, the USB bus.  ACLink is also a

11:14  25   bus.  LPC was also a bus.  1394 is potentially also a

| 11:14 | 1 | bus. |
| 11:14 | 2 | Q.    Thank you, Dr. Chu. |
| 11:14 | 3 | And what technology did you suggest to create |
| 11:14 | 4 | or implement your new computer bus at a high level? |
| 11:14 | 5 | A.    I use a existing technology that was fairly |
| 11:14 | 6 | new at the time.  It's called a "low voltage |
| 11:14 | 7 | differential signal" technology.  It's short for LVDS. |
| 11:14 | 8 | I chose to use that technology. |
| 11:14 | 9 | Q.    Let's look at that.  Let's look at a different |
| 11:14 | 10 | white paper.  It's J-23.  And let's just look at the |
| 11:15 | 11 | cover first before we -- and get the date on this. |
| 11:15 | 12 | So the title of this is Two separate PCI or |
| 11:15 | 13 | PCI-like Busses Bridged by a pair of Interface Devices |
| 11:15 | 14 | through a High Speed Bus. |
| 11:15 | 15 | And is this date in the corner, January 15th, |
| 11:15 | 16 | 1998, is that the date that you finished drafting this? |
| 11:15 | 17 | A.    Yes.  It was. |
| 11:15 | 18 | Q.    Okay.  So I want to now go to Page 5 of this |
| 11:15 | 19 | document, and we're going to look at Paragraph 1, |
| 11:15 | 20 | Summary of the invention. |
| 11:15 | 21 | MR. COLLARD:  And I want to call out the |
| 11:15 | 22 | last line, please. |
| | 23 | BY MR. COLLARD: |
| 11:15 | 24 | Q.    Is this one of the places in your white paper |
| 11:15 | 25 | where you describe the technology of the new bus? |

11:15  1        A.    Yes.  As I mentioned earlier, I use a new

11:15  2   technology here at the time called LVDS, differential

11:16  3   signal pair, to use as the connection for my bus.

11:16  4        Q.    So let's start talking about the LVDS

11:16  5   technology.

11:16  6              Can we start with the LV?  What does that

11:16  7   stand for?

11:16  8        A.    It stands for low voltage.

11:16  9        Q.    Okay.  And why is low voltage -- I'm sorry.

11:16  10             Was having low voltage important to the design

11:16  11  of your computer bus?

11:16  12        A.    It was very important.

11:16  13        Q.    Can you --

11:16  14        A.    In 1998, the typical bus, like PCI bus was

11:16  15  using 3 volt to 5 volt for signal.  The signal that I

11:16  16  can use with this LVDS technology was around .4 volts.

11:16  17  So when you consider the speed of the signal, if you

11:16  18  have to charge a wire up to 3 volts or 5 volts, it

11:17  19  takes a much longer time.  So with .4 volt, you spend

11:17  20  much less time bring the signal up.  So it's much

11:17  21  faster.

11:17  22        Q.    So it was much faster.

11:17  23             Did it have any changes in how much power was

11:17  24  used by the bus?

11:17  25        A.    A huge amount, because power is calculated by

| | | |
|---|---|---|
| 11:17 | 1 | the square of the voltage.  So if it's 5 volts, if you |
| 11:17 | 2 | square, it's 25 -- it's put at the 25 unit.  But when |
| 11:17 | 3 | you square a .4-volt signal, it's only .16.  So you're |
| 11:17 | 4 | talking about almost 100 times reduction in power. |
| 11:17 | 5 | Q.    Thank you, Dr. Chu. |
| 11:17 | 6 | What about -- let's talk about the DS part, |
| 11:17 | 7 | that differential signal. |
| 11:17 | 8 | Was it important to use a -- was it important |
| 11:17 | 9 | to you to use a differential signal in your new |
| 11:17 | 10 | computer bus design? |
| 11:17 | 11 | A.    Very important. |
| 11:17 | 12 | Q.    Why? |
| 11:17 | 13 | A.    When you lower a voltage to .4 volts, all the |
| 11:17 | 14 | surrounding noise, sometimes they can get to be, you |
| 11:18 | 15 | know, a volt.  So you will obscure the signal if you |
| 11:18 | 16 | don't do something about it -- |
| 11:18 | 17 | Q.    Wait.  Before you go on, Dr. Chu -- I'm |
| 11:18 | 18 | sorry -- can you explain to the jury, please, what you |
| 11:18 | 19 | mean when you say "noise"? |
| 11:18 | 20 | A.    Noise is -- any circuit that moves in your |
| 11:18 | 21 | computer generates electrical emission.  So it's kind |
| 11:18 | 22 | of interference that you cannot stop because it comes |
| 11:18 | 23 | from every circuit.  So that's electrical interference |
| 11:18 | 24 | that can affect your integrity of your signal. |
| 11:18 | 25 | Q.    So can you explain to the jury how using a |

11:18  1    differential signal helps with the problem of common

11:18  2    noise in the computer?

11:18  3        A.    Yes.    You send a signal down two wires instead

11:18  4    of one, and the way we can arrange it is such that you

11:18  5    will cancel out all the noise in that surrounding so

11:18  6    that your .4 volt will be able to be sent over those

11:19  7    wires.

11:19  8        Q.    Was it common to use LVDS in a computer bus

11:19  9    when you had the idea and wrote it down in your white

11:19  10   papers?

11:19  11       A.    That was my primary invention because nobody

11:19  12   else was using LVDS for computer bus at that time.

11:19  13       Q.    So in addition to being LVDS, was there

11:19  14   another attribute of the type of channel that was

11:19  15   important and written down in your white papers?

11:19  16       A.    Well, to gain high performance further, I use

11:19  17   this concept of, you know, dedicated lane so you can

11:19  18   send --

11:19  19       Q.    Let's look in your white paper at it.

11:19  20             Is it the unidirectional part, Dr. Chu, when

11:19  21   you say a "dedicated lane"?

11:19  22       A.    Yes.    Unidirectional is the technical term

11:19  23   basically.

11:19  24       Q.    All right.    We'll take it one piece at a time

11:19  25   here.

11:19   1                    MR. COLLARD:  We'll go to Page 5 -- oh,

11:19   2   we're on Page 5.  Sorry.  We'll go to the third

11:20   3   paragraph, please.

11:20   4                    And then it's the very middle of this

11:20   5   paragraph, towards the right side.

        6   BY MR. COLLARD:

11:20   7        Q.    It says:  LVDS data transmission is only in

11:20   8   one direction at a time.

11:20   9                    Is that what you were referring to about

11:20   10  dedicated lanes?

11:20   11       A.    Yes.

11:20   12       Q.    Was this a key attribute of your new computer

11:20   13  bus?

11:20   14       A.    Yes.  It gives you faster performance.

11:20   15       Q.    Can you explain how it gives -- it provides --

11:20   16  how sending data in one direction at a time provides

11:20   17  faster performance?

11:20   18       A.    Well, we use the analogy before.  The old bus

11:20   19  was like an intersection -- a road intersection where

11:20   20  you have four-way traffic.  So you have a signal light,

11:20   21  so they have to wait for the lane -- the channel to be

11:20   22  free before you can cross.

11:20   23                   So by using this one direction at a time, it's

11:20   24  a bit like highway.  You don't have to wait.  You

11:21   25  basically can have data going north and south at the

11:21  1    same time.

11:21  2        Q.    Thank you, Dr. Chu.

11:21  3              I want you to talk a little bit -- well, let

11:21  4    me just ask it this way:  Was the bus that you

11:21  5    designed -- the new bus that you designed in the white

11:21  6    papers, did you have it -- did you design a serial bus

11:21  7    or a parallel bus?

11:21  8        A.    Serial bus.

11:21  9        Q.    What was the old bus design?

11:21  10       A.    It was a parallel bus.

11:21  11       Q.    Can you please describe for the jury how data

11:21  12   moves on a parallel bus or in parallel transmission?

11:21  13       A.    The old bus has a large number of pins, so

11:21  14   datas get sent across at the same time.  And in serial

11:21  15   bus, you have much fewer wires, sometimes down to just

11:21  16   two wires.  So you can go -- two pairs of wires.

11:21  17             You can go basically sequentially.  The data

11:21  18   goes sequentially.  I think you used the term "follow

11:21  19   the leader."  So it basically goes sequentially in

11:22  20   either direction, much fewer wires.

11:22  21       Q.    So follow the leader on serial.

11:22  22             And then parallel, is that sort of side by

11:22  23   side across many wires at once?

11:22  24       A.    Yes.

11:22  25       Q.    Thank you.

106

11:22    1          And why did you choose a serial design for

11:22    2    your bus when at that time the existing bus was a

11:22    3    parallel design?

11:22    4        A.    Quite a few reasons.  Because the less lines

11:22    5    you have, it's an easier design, and it gives you

11:22    6    ability to scale it easier.  You know, if I end up

11:22    7    using 10 lines instead of 50 lines, I can add another

11:22    8    line -- another group to improve performance.

11:22    9          That's kind of -- that came with advantage of

11:22   10    using less lines.

11:22   11        Q.    Did it do anything with the connectors?  Did

11:22   12    it have any impact on connectors?

11:22   13        A.    Yes.  You know, it's -- a connector is a big

11:22   14    cost, and you want to have the smallest connector

11:22   15    possible.

11:22   16        Q.    Thank you.

11:22   17          So the bus that you created with these

11:23   18    attributes, did that mean -- did your bus have a new

11:23   19    physical form?

11:23   20        A.    Yes.  Uh-huh.

11:23   21        Q.    And then did your computer bus design preserve

11:23   22    information so that that would be compatible with

11:23   23    existing bus standards?

11:23   24        A.    For us in the hardware industry, it's very

11:23   25    important to not affect the software in the system, the

11:23  1    operating system, and in the peripheral situation where

11:23  2    you have many, many kinds of peripheral you can put

11:23  3    into the system -- they are the -- like what we call

11:23  4    device drivers -- for those to communicate with the

11:23  5    operating system.

11:23  6           So you have -- it's impossible for whoever

11:23  7    doing this to affect so many companies to change your

11:23  8    software.  So the only way you can do it is what we

11:23  9    call backwards compatible.  You build the system, and

11:24  10   the software people doesn't need to know about it.  It

11:24  11   still works.

11:24  12       Q.   So that's a "yes."  It was backwards

11:24  13   compatible?

11:24  14       A.   Yeah.  That's a lengthy yes.

11:24  15       Q.   Yes.  Okay.

11:24  16           And were there any specific standards that you

11:24  17   wanted to ensure that you remained backwards compatible

11:24  18   with in your bus design?

11:24  19       A.   It has to because, as I said, otherwise you

11:24  20   can't sell your computer.

11:24  21       Q.   Can you name any specific standards?

11:24  22       A.   Oh, okay.  PCI bus was one of them.

11:24  23       Q.   Yes.

11:24  24       A.   And USB 3.0 -- USB was one of them.

11:24  25       Q.   Okay.  And what kind of computer systems did

11:24  1    you envision using this computer bus in?

11:24  2        A.    It's really all computers.

11:24  3            I think this may be a misunderstanding that

11:24  4    you tie the two inventions together, the modular

11:24  5    computer and the computer bus.

11:24  6            If you think about modular computer, it's

11:24  7    really just a form factor.  If you plug in your

11:25  8    computer into a notebook console, that whole system is

11:25  9    a laptop computer.  If you plug it into a desktop, the

11:25  10   whole system's a desktop computer.

11:25  11           So the thinking is really that -- think about

11:25  12   it like this, the computer bus is no use unless the

11:25  13   system is functional.  So the only way the computer bus

11:25  14   can be valid is that when it's operating within a whole

11:25  15   computer.

11:25  16           So computer bus is not tied to the modular

11:25  17   architecture.  It's tied to how the whole system works.

11:25  18       Q.    Thank you, Dr. Chu.

11:25  19           Could you tell the jury what you would think

11:25  20   and what you would call the top three, let's say,

11:25  21   advantages of your new computer bus over the old bus

11:25  22   technology as it existed in that time, 1998?

11:25  23       A.    Well, we talk about high performance.  That's

11:25  24   essential.

11:25  25       Q.    Does that mean faster?

11:25    1        A.    Faster.  You have to be.

11:25    2            Lower power.  If that doesn't happen, you

11:25    3    won't have your phone today.  The power is one of the

11:26    4    most important thing.

11:26    5            And then, ultimately, it's the sense of

11:26    6    backward compatibility, the sense that you want to

11:26    7    reduce the number of errors in a system.

11:26    8        Q.    Okay.  What about space?  Was the space one of

11:26    9    the key advantages?

11:26    10       A.    Space.  If your bus takes -- when you build a

11:26    11   board, there's so many traces.  If you have less of

11:26    12   those wires, it's easier to build.

11:26    13       Q.    Okay.  So we've talked about and looked at

11:26    14   some parts of your white papers, and I want to kind of

11:26    15   talk about what happened next.

11:26    16           What did you do after you wrote your white

11:26    17   papers?

11:26    18       A.    I did it specifically to give it to patent

11:26    19   attorneys to file the patents.

11:26    20       Q.    And did you do that?  Did you take your white

11:26    21   papers to a patent attorney?

11:26    22       A.    Yes.

11:26    23       Q.    And did they file patent applications?

11:26    24       A.    Yes.

11:26    25           MR. COLLARD:  Move to admit J-35 and

11:26  1    P-150, which are two patent applications.

11:27  2                    MR. BURESH:  No objection, Your Honor.

11:27  3                    THE COURT:  They'll be admitted.

11:27  4                    MR. COLLARD:  Let's look at J-35, Page 3.

11:27  5                    And we'll zoom in on the top bit here.

       6    BY MR. COLLARD:

11:27  7        Q.    What is this document, Dr. Chu?

11:27  8        A.    It's the first application the lawyers filed

11:27  9    for -- on my behalf.  So it's filed on May 1st, 1998.

11:27  10       Q.    Great.

11:27  11                   MR. COLLARD:  And then let's do the same

11:27  12   for P-150 and look at Page 3.

       13   BY MR. COLLARD:

11:27  14       Q.    Same question.  What is this document,

11:27  15   Dr. Chu?

11:27  16       A.    It's a second application filed July 14th,

11:27  17   1998.

11:27  18       Q.    Thank you.

11:27  19                   I would like to talk about your company ACQIS

11:27  20   Technology.

11:27  21                   Was it -- well, when did you start ACQIS?

11:28  22       A.    July of 1998.

11:28  23       Q.    That same month we were just looking at; is

11:28  24   that right?

11:28  25       A.    Yes.

11:28    1        Q.    Okay.

11:28    2                    MR. COLLARD:  And let's look at PDX-2.5.

         3    BY MR. COLLARD:

11:28    4        Q.    Where'd you take this, Dr. Chu?

11:28    5        A.    It was -- I was at a trade show trying to show

11:28    6    a mockup of the computer.  Actually, that one didn't

11:28    7    work, so I was showing the modular function.

11:28    8        Q.    Okay.  When -- why did you found ACQIS

11:28    9    Technology?

11:28    10       A.    First, I want to build computer systems that's

11:28    11   better for consumers, I mean, because they were buying

11:28    12   desktop, laptop.  And this is alternative way of giving

11:28    13   mobility to a user.

11:28    14             So unfortunately, computer company didn't like

11:29    15   the idea because now they get to sell one computer

11:29    16   versus two.  And Intel didn't like it, they could have

11:29    17   sold two CPU versus one.  So it didn't -- I was not

11:29    18   accepted in the computer industry.

11:29    19       Q.    Dr. Chu, was part of founding ACQIS also to

11:29    20   develop your new computer bus?

11:29    21       A.    Well, you have to.  When I was developing

11:29    22   this, that was something we need to do for future

11:29    23   proving the design.

11:29    24       Q.    Great.

11:29    25             And then how many employees did you have at

112

11:29  1    ACQIS?

11:29  2         A.    At the peak, we maybe have nine engine- --

11:29  3    nine employees, not engineers.  Sorry.

11:29  4         Q.    How many engineers then?

11:29  5         A.    Maybe five.

11:29  6         Q.    Is that a smaller engineering team than you

11:29  7    were used to working with at your prior jobs?

11:29  8         A.    Yes.  That's all I can afford at the time, and

11:29  9    I used to work with tens of engineers on our chips.

11:29  10        Q.    Tens of engineers?

11:29  11        A.    Yes.

11:29  12        Q.    Okay.  And why name the company ACQIS?

11:29  13        A.    It actually is -- it's an acronym for Access

11:30  14    to Quality Information System.

11:30  15        Q.    So can you describe during the time -- at your

11:30  16    time at ACQIS or the time when ACQIS was doing this

11:30  17    work, what were the ACQIS engineering efforts focused

11:30  18    on?

11:30  19        A.    Well, we -- you know, it was an ambitious

11:30  20    plan.  I mean, we were building whole computer system

11:30  21    and the chips -- a special chip for doing the serial

11:30  22    interface.

11:30  23        Q.    So let's take those one at a time.

11:30  24             You had one team working on a chip and one

11:30  25    team working on the modular computer system?

11:30    1    A.    Yeah.  We have two and a half engineer on the

11:30    2    chip and two and a half engineer on the system.

11:30    3    Q.    Great.  Okay.  Let's talk about the chip

11:30    4    first.

11:30    5         What was that -- what was their goal?

11:30    6    A.    Their goal is to build what I have described

11:30    7    in my white paper and the subsequent patent to take the

11:30    8    PCI bus, which is a parallel bus, and convert it to --

11:31    9    onto the high-speed serial channel that we were --

11:31    10   Q.    Okay.  And when you say that one team was

11:31    11   working on the modular computer, what was -- what was

11:31    12   their goal?

11:31    13   A.    The modular computer is what you kind of see

11:31    14   here because it takes a lot of work to build a new

11:31    15   computer system, enclosures, circuits, everything.

11:31    16   Q.    All right.  And while we're on the topic, I

11:31    17   just want to ask you:  What's the relationship between

11:31    18   ACQIS Technology and ACQIS LLC?

11:31    19   A.    ACQIS LLC is a wholly-owned subsidiary of

11:31    20   ACQIS Technology.

11:31    21   Q.    So at this time, was ACQIS also filing

11:31    22   additional patent applications?

11:31    23   A.    Yes.

11:31    24   Q.    All right.

11:31    25         MR. COLLARD:  Move to admit D-25, which

—114—

11:31  1    is the May '99 application.

11:31  2                    MR. BURESH:  No objection.

11:31  3                    THE COURT:  Admitted.

11:31  4                    MR. COLLARD:  And then let's look at

11:31  5    Exhibit D-25, please.  And we can get the top part that

11:31  6    has that date.

       7    BY MR. COLLARD:

11:31  8    Q.    What is the -- what is this document, Dr. Chu?

11:32  9    A.    At some later point, I realized that when you

11:32  10   have this -- almost a computer blank, then you can put

11:32  11   a whole array of them together into a server.  So I

11:32  12   filed this early provisional to kind of capture that

11:32  13   idea.

11:32  14   Q.    Great.

11:32  15         Did -- around this time, did ACQIS

11:32  16   encounter -- and where are we here, around the year

11:32  17   2000?

11:32  18   A.    Well, at this time was in 2000.  Yes.

11:32  19   Q.    Okay.  So around the year 2000, did ACQIS

11:32  20   encounter some funding trouble?

11:32  21   A.    Yes.  It -- actually, it was very difficult

11:32  22   for me to find funding.  I got my money from my family,

11:32  23   my relatives, my friends, and some individual

11:32  24   investors.  And the reason is because the big companies

11:32  25   won't adopt this concept.  So I ran into a fairly tight

115

11:32  1    funding situation.

11:32  2    Q.    And what happened at that time with respect to

11:33  3    the development of the computer system and the chip

11:33  4    that would use the serial bus?

11:33  5    A.    The -- we got the chip back from Taiwan, our

11:33  6    manufacturing company.  So unfortunately, the first

11:33  7    chip did not work.

11:33  8    Q.    And did you have any experience in your work

11:33  9    with the first chip -- when you're designing your chip

11:33  10    with first version not working?

11:33  11    A.    Yeah.  That does happen.  First chip doesn't

11:33  12    work, then you try to find a problem and go through

11:33  13    another -- what we call "tapeout."  So you go to the

11:33  14    second chip, and sometimes you have to go to third

11:33  15    time.

11:33  16    Q.    And is that something you had experience with

11:33  17    in your prior roles at Cirrus or Western Digital or

11:33  18    Verticom?

11:33  19    A.    Yeah.  You're going with big teams.  That can

11:33  20    happen.  Yes.

11:33  21    Q.    Did you have a big team on this project?

11:33  22    A.    A very small team.

11:33  23    Q.    Okay.  What about the computer system?  Did

11:34  24    you complete a first generation of the modular computer

11:34  25    system?

11:34  1     A.    We did.  That included the chip in it because

11:34  2  that was what we were trying to build.

11:34  3     Q.    The first generation did have the chip with

11:34  4  the serial?

11:34  5     A.    Yes.  The first generation is merely the first

11:34  6  planned product that we're building.  That includes the

11:34  7  chip on this system, but when the chip didn't work,

11:34  8  what we have to do is we basically have nothing to

11:34  9  sell.  So we have to take off the chip, rebuild the

11:34  10  system, and at least now we have a modular computer to

11:34  11  sell.  So that was a very difficult time.

11:34  12     Q.    Okay.  So the first generation that you

11:34  13  actually released did not have the chip with the serial

11:34  14  bus; is that correct?

11:34  15     A.    Yeah.  This file doesn't really -- doesn't --

11:34  16  is not protected by my invention for the serial bus.

11:34  17  No.

11:34  18     Q.    Okay.  Thank you.

11:34  19           What was it called?  I do want to talk about

11:34  20  that.

11:34  21     A.    We call it the iMod, and the whole array of

11:35  22  console stuff we called Interputer system.

11:35  23     Q.    So why don't you pick up the iMod, and please

11:35  24  explain to the jury what the iMod is.

11:35  25     A.    Well, this is the outside.  I can't show you

11:35  1    the inside.  This is the processor we put in.  This is

11:35  2    the hard drive at the time.  These are the memory.  It

11:35  3    has system logic chips.  It has graphics chips because

11:35  4    it has to have that.

       5        Q.    So --

11:35  6        A.    This is everything.

11:35  7        Q.    To use a very technical term, Dr. Chu, is that

11:35  8    the guts of the computer?

11:35  9        A.    Yes.

11:35  10       Q.    Okay.  And then can you please explain to us

11:35  11   how this works?  And we have an Interputer over here,

11:35  12   and I'll try and show.

11:35  13       A.    Yeah.  This is a desktop console.  It's fairly

11:35  14   inexpensive because it doesn't have too much circuitry

11:36  15   in it.  So if you open up the latch.  And then you can

11:36  16   stick the computer module inside.  Close the latch.  So

11:36  17   that's your desktop computer.

11:36  18            And you can open the latch again, take this

11:36  19   computer module, bring it home, where if you have

11:36  20   another console like that, you just use it.  It's the

11:36  21   same computer.  There's no change.

11:36  22            MR. COLLARD:  Your Honor, I request

11:36  23   permission to pass this, let the jury take a look at

11:36  24   this if they'd like?

11:36  25            THE COURT:  Sure.

118

11:36  1    BY MR. COLLARD:

11:36  2        Q.    So you mentioned that this version did not

11:36  3    have the serial bus chip.

11:36  4              Were you planning to come back to that chip

11:36  5    and use the serial bus in future versions of the

11:36  6    Interputer?

11:37  7        A.    We sort of have to because as I said, this is

11:37  8    not a protected design, and it's not future-proof

11:37  9    because these are using the old buses.  So if I keep

11:37  10   using this, if it becomes a very good idea, anybody can

11:37  11   use it.

11:37  12             But the serial computer bus that I created,

11:37  13   it's protected by patents and also future-proof for

11:37  14   multiple generations of these products.

11:37  15       Q.    Did ACQIS need more funds to try to do a

11:37  16   second generation of the Interputer with the serial

11:37  17   bus?

11:37  18       A.    Yes.

11:37  19       Q.    Did ACQIS get more funds to try to do the

11:37  20   second generation of the Interputer?

11:37  21       A.    I think I tap out my family and relatives and

11:37  22   friends, so they don't give me more money.

11:37  23       Q.    If you had the funding and the engineers, did

11:37  24   you have any concerns about being able to successfully

11:37  25   develop and use a chip with the serial bus in the

11:38  1  second generation of the Interputer?

11:38  2      A.    Absolutely.

11:38  3      Q.    Absolutely you had concerns or no concerns?

11:38  4      A.    I can develop a chip of this complexity

11:38  5  because I've done much more complex chips also.

11:38  6      Q.    Okay.  So you were not concerned about being

11:38  7  able to do that from a technical perspective?

11:38  8      A.    Not technical.

11:38  9      Q.    Okay.  Was there industry recognition of the

11:38 10  new ACQIS product?

11:38 11      A.    Yes.  They like the modular aspect of this

11:38 12  design.  It was unique at the time.

11:38 13          MR. COLLARD:  Let's look at PD-10,

11:38 14  please.  And perfect.  There we go.

11:38 15  BY MR. COLLARD:

11:38 16      Q.    This is WIRED Magazine.

11:38 17          And what did they say about your iMod?

11:38 18      A.    It highlights the fact that this is one part.

11:39 19  We were trying to sell the system now.  And so this --

11:39 20  they also list how much it cost and where you can get

11:39 21  it.

11:39 22      Q.    Great.

11:39 23          MR. COLLARD:  And then let's look at

11:39 24  PD-11, which I think is the PC World magazine.  Great.

11:39 25  Thank you.

11:39   1    BY MR. COLLARD:

11:39   2        Q.    And what did PC World say about your modular

11:39   3    computer design?

11:39   4        A.    Well, the editor actually like the system,

11:39   5    so -- but they are a pretty reputable company.  So they

11:39   6    said, send us the system.  We need to test it, whether

11:39   7    it works or not.

11:39   8              So they did.  And then it worked.  So they

11:39   9    wrote it up.

11:39   10       Q.    Okay.  And they say in here that -- do you see

11:39   11   where they say it's "a 1-pound module slightly larger

11:39   12   than a VHS tape"?

11:39   13             That's how they described it back then.

11:39   14       A.    Yeah.

11:39   15       Q.    I want to talk a little bit about the chip,

11:40   16   just so -- a little more about the chip.

11:40   17             And can you explain to the jury -- do you have

11:40   18   any of the chips that you -- you were working on at

11:40   19   that time?  Do you have any of those with you?

11:40   20       A.    Yeah.  We kept it even though it's not a

11:40   21   working chip.  So these are chips that we get packaged

11:40   22   from the silicon we built.

11:40   23       Q.    Make sure you stay by the microphone, Dr. Chu.

11:40   24       A.    Oh, sorry.

11:40   25             Yeah.  These are chips that were supposed to

—121—

11:40   1    be our interface controller to control the serial bus,

11:40   2    but it didn't work.

11:40   3        Q.    Okay.  And let's look at the wafer that you

11:40   4    brought with you.

11:40   5            What is a wafer?

11:40   6        A.    Well, you put -- I mentioned earlier for

11:40   7    integrated circuits, you put it on a silicon wafer.  I

11:40   8    have one here to show you.

11:41   9            That's a silicon wafer.

11:41   10       Q.    So what is a silicon wafer?

11:41   11       A.    So you print your chip a tiny square on here,

11:41   12   and then you replicate it so that on this wafer you

11:41   13   have, you know, a few -- you have a couple hundred

11:41   14   devices for cost reason, of course.

11:41   15       Q.    So are there more than one -- does that item

11:41   16   get cut up?

11:41   17       A.    Yes.  You go to another company, they cut it

11:41   18   up, and then you won't see it, but there are pads on

11:41   19   the chip that you then bond it to the external package

11:41   20   device so that it becomes a working device.

11:41   21       Q.    Okay.  Were any of ACQIS' suppliers in Texas,

11:41   22   Dr. Chu?

11:41   23       A.    Yes.

11:41   24       Q.    Who?

11:41   25       A.    A company called PS Solution.  They're the

11:42  1    company to work with.  They built the aluminum casing.

11:42  2    They help us design.  And they also did injection mold

11:42  3    for these front and back.

11:42  4         Q.    And is there any relationship with PS

11:42  5    Solutions today?

11:42  6         A.    Yes.  They are a shareholder.

11:42  7         Q.    A shareholder?

11:42  8         A.    Yes.

11:42  9         Q.    Did you sell any of these iMods and

11:42  10   Interputers?

11:42  11        A.    We sold mostly these small computers to --

11:42  12   couple hundred of them.

11:42  13        Q.    And did ACQIS make money off of those sales?

11:42  14        A.    Yes.  We did.

11:42  15        Q.    Did ACQIS make enough money to keep its

11:42  16   business going?

11:42  17        A.    No.

11:42  18        Q.    So what happened then?

11:42  19        A.    I -- so, as I said, we didn't have a lot of

11:42  20   money.  So we have -- I decided that we had to sell the

11:42  21   hardware business to a company called Multivision.

11:42  22   They are NVIDIA surveillance.  They're one of our

11:43  23   customers.  So they agreed to buy our hardware

11:43  24   business.

11:43  25              What we were very careful of was this

11:43  1    product --

11:43  2        Q.    Well, so you sold the hardware business?

11:43  3        A.    Yes.

11:43  4        Q.    And then what?

11:43  5        A.    And then I -- I was able to spend time working

11:43  6    on protecting my invention.

11:43  7        Q.    Okay.  So even though ACQIS didn't have enough

11:43  8    funding to continue its computer and chip business, why

11:43  9    did you continue to pursue your patents and your

11:43  10   protection of your invention?

11:43  11       A.    Because that's really, in some sense, the

11:43  12   essence of the company.

11:43  13       Q.    And was ACQIS awarded patents as a result of

11:43  14   those efforts?

11:43  15       A.    Yes.  We ultimately had about 30 patents.

11:43  16       Q.    So about 30 patents total?

11:43  17       A.    Yes.

11:43  18       Q.    Okay.  And do you remember roughly when ACQIS

11:43  19   got its first patent?

11:43  20       A.    The first one was probably 2001.

11:44  21       Q.    All right.  Let's -- well, what are these,

11:44  22   Dr. Chu?

11:44  23             And I'm looking at --

11:44  24             MR. COLLARD:  Well, let me, before I do

11:44  25   that, move to admit J-1 through 5, the patents.

11:44   1              MR. BURESH:  No objection.

11:44   2              THE COURT:  Admitted.

11:44   3              MR. COLLARD:  Thank you.

        4    BY MR. COLLARD:

11:44   5      Q.    Dr. Chu, what are these that I'm holding up

11:44   6    here?

11:44   7      A.    These are five of my 30 patents.

11:44   8      Q.    Okay.  And who put this ribbon and this seal

11:44   9    on these patents?

11:44  10      A.    We received this from the U.S. Patent Office.

11:44  11    They -- this is the -- they have only one original of

11:44  12    the patent.  So this is -- they put their gold seal on

11:44  13    there.

11:44  14      Q.    Okay.  Let's look at one.

11:44  15              MR. COLLARD:  Let's look at J-1, and

11:44  16    we'll do that on the screen so we can look at some

11:44  17    parts a little more closely.

11:44  18              So let's kind of look at the top thirdish

11:45  19    of this.

       20    BY MR. COLLARD:

11:45  21      Q.    Who is the inventor listed on these patents?

11:45  22      A.    Yeah.  It's me.

11:45  23      Q.    All right.  So in all -- is that true for all

11:45  24    the patents?  Are you a named inventor on all of the

11:45  25    patents that are asserted in this case?

11:45    1        A.    It's -- I'm the only inventor.

11:45    2        Q.    All right.  And what is this information at

11:45    3    the top over on the right?

11:45    4        A.    Once they examine your disclosure and your

11:45    5    claims, when they give you the rights to this patent,

11:45    6    they give you a unique name, a unique number.  In this

11:45    7    case, it's 9,529,768.

11:45    8              And then they tell you when your patent is

11:45    9    granted, which is the date below that.

11:45   10        Q.    So this date is 2016.  And we're not going to

11:45   11    flip through, but all the dates on the patents are

11:46   12    from, I think, December 2013 to December 2016 for the

11:46   13    patents in this case.

11:46   14              But as we've been talking about today, we

11:46   15    talked about a lot of the work that was done, and it

11:46   16    was done in the early 2000s.

11:46   17              Can you explain why the date on these patents

11:46   18    is later even if the work we were talking about was

11:46   19    done in the early 2000s?

11:46   20        A.    Yes.  You know, I filed 30 patents.  Each

11:46   21    patent I have to do credible work.  I actually wrote

11:46   22    most of the claims in the patent.

11:46   23              So in the early days when I was writing the

11:46   24    patent, I was writing the -- I was trying to put down

11:46   25    the invention both for modular system in this case and

| 11:46 | 1 | the computer bus.  So it's a -- those -- most of those |
| 11:46 | 2 | patents has this modular aspect in the invention. |
| 11:46 | 3 | Then what I realized after that is that the |
| 11:47 | 4 | modular aspect is actually not quite too important.  In |
| 11:47 | 5 | fact, it restricted what I can claim because basically |
| 11:47 | 6 | if it's not a modular computer, you really -- if your |
| 11:47 | 7 | claim says it's a modular computer, then you don't have |
| 11:47 | 8 | any rights to non-modular computer. |
| 11:47 | 9 | So I started a whole group of patents that |
| 11:47 | 10 | only focuses on the various way of using the computer |
| 11:47 | 11 | bus for different types of computers.  So "computer" |
| 11:47 | 12 | would encompass really -- pretty much everything.  It |
| 11:47 | 13 | encompass desktop, notebook, servers, smartphone, and |
| 11:47 | 14 | even game consoles. |
| 11:47 | 15 | So in order to cover that breadth of products, |
| 11:47 | 16 | I have to come up with all the possible configuration |
| 11:47 | 17 | that they can use my computer bus. |
| 11:47 | 18 | So these are purely -- the later patents are |
| 11:48 | 19 | purely focused on computer bus.  It has nothing to do |
| 11:48 | 20 | really with the modular computer.  So you will see in |
| 11:48 | 21 | the claims there's no word mentioned as "modular."  So |
| 11:48 | 22 | it's a different thing.  It's a separate type of |
| 11:48 | 23 | invention. |
| 11:48 | 24 | Q.   Do all the inventions that are in these later |
| 11:48 | 25 | patents still relate back to the work that you did in |

11:48  1   the late '90s and early 2000s and the white papers that

11:48  2   we looked at?

11:48  3       A.   Absolutely.  The Patent Office would never

11:48  4   give you a patent if you were not disclosed properly.

11:48  5   And the later patents is actually -- there's a history

11:48  6   that they are a continuation of the invention that I

11:48  7   have, so everything being traced back to the

11:48  8   provisional patent you saw that we were -- was filed in

11:48  9   1998.

11:48  10      Q.   We'll go back -- we'll look at that, Dr. Chu,

11:48  11  in a second.

11:48  12      A.   Okay.

11:48  13      Q.   Who is the owner of the patents today?

11:49  14      A.   ACQIS LLC, which is the subsidiary of ACQIS

11:49  15  Technology.

11:49  16      Q.   Okay.  Let's go to exactly what you were

11:49  17  saying.

11:49  18              MR. COLLARD:  Let's look at Page 2.

11:49  19              At the top, it says:  U.S. -- related

11:49  20  U.S. application data.  Let's call that out.

11:49  21              And can we get that bottom part there

11:49  22  too, please?

11:49  23              The line -- that 60.  That Line 60.

11:49  24              Perfect.

       25  BY MR. COLLARD:

128

11:49  1      Q.    What is this, Dr. Chu?

11:49  2      A.    As I said, it traces the history of this

11:49  3  particular patent that was issued.  And it goes back

11:49  4  to -- if you look at the bottom, it trace back to the

11:49  5  application that I filed in May 14, 1999.

11:49  6      Q.    Great.

11:49  7            Now, I want to look at another part of this

11:49  8  page, Page 2.  And where it says:  References cited.

11:49  9            Do you see that?

11:49  10      A.    Yes.  Yes.

11:49  11      Q.    Dr. Chu, can you describe for the jury, what

11:49  12  is prior art?

11:49  13      A.    When you want to file a patent, you have to

11:50  14  tell the Patent Office everything you know prior to my

11:50  15  invention date.  Meaning, anything that is published in

11:50  16  public or patents that were filed before my invention

11:50  17  date, anything we know, we have to tell the patent

11:50  18  examiner those information.

11:50  19            MR. COLLARD:  So, Vicki, if you would

11:50  20  please kind of slowly flip through Pages 2 through 14?

11:50  21  BY MR. COLLARD:

11:50  22      Q.    What is -- does this all show prior art that

11:50  23  you cited to -- that ACQIS cited to the Patent Office,

11:50  24  Dr. Chu?

11:50  25      A.    Yes.

| | | |
|---|---|---|
| 11:50 | 1 | Q.    Okay.  And in your experience with patents, is |
| 11:50 | 2 | this a lot of prior art? |
| 11:50 | 3 | A.    It's really a lot because on the first couple |
| 11:50 | 4 | of applications, we made -- we had less than ten prior |
| 11:50 | 5 | art.  But because these patents has been challenged by |
| 11:50 | 6 | many companies, and each time they challenge them, we |
| 11:50 | 7 | tell the Patent Office more prior art, we have to |
| 11:51 | 8 | include everything into this application. |
| 11:51 | 9 | Q.    Dr. Chu, what is the duty of candor as it |
| 11:51 | 10 | relates to patents?  Do you know? |
| 11:51 | 11 | A.    Well, we take it very seriously.  If you know |
| 11:51 | 12 | about -- if you know about the prior art and you don't |
| 11:51 | 13 | tell the Patent Office, you loses your patent. |
| 11:51 | 14 | Q.    I want to be clear about when in the process |
| 11:51 | 15 | this information was disclosed to the Patent Office. |
| 11:51 | 16 | Was it before the patent was issued, or was it |
| 11:51 | 17 | after the patent was issued? |
| 11:51 | 18 | A.    Of course before. |
| 11:51 | 19 | Q.    Before. |
| 11:51 | 20 | And so even though ACQIS disclosed all this |
| 11:51 | 21 | information, did the patents still issue? |
| 11:51 | 22 | A.    Yes. |
| 11:51 | 23 | Q.    Now, Dr. Chu, were you paying attention to |
| 11:51 | 24 | developments in the computer industry during the 2000s? |
| 11:51 | 25 | A.    Yes.  I was. |

11:51  1       Q.    Was there a shift in the computer industry

11:51  2  during the 2000s?

11:51  3       A.    Yes.  There was.

11:51  4       Q.    Can you please describe for the jury what that

11:51  5  shift was as it related to computer buses?

11:52  6       A.    I think you've heard about this standard

11:52  7  called PCI Express and USB 3.0.  So when I saw the

11:52  8  standard, it uses -- before PCI was a parallel bus.

11:52  9  Now they start to use LVDS unidirectional channel for

11:52  10 transmitting PCI.

11:52  11      Q.    So what was -- we'll talk about that a little

11:52  12 more.

11:52  13            For -- and was there a USB standard that was

11:52  14 adopted that you were paying attention to in the mid

11:52  15 2000s?

11:52  16      A.    Yeah.  It happened, I think, to ACQIS like ten

11:52  17 years after my invention.  Yes.

11:52  18      Q.    Okay.  And I want to be clear for the jury,

11:52  19 were you involved, you personally or ACQIS, in any way

11:52  20 in the creation of the PCI Express standard or the USB

11:52  21 3.0 standard?

11:52  22      A.    No.  I wasn't involved.  Our company wasn't

11:52  23 involved.  No.

11:52  24      Q.    Do you claim that you invented PCI Express or

11:53  25 USB 3.0?

11:53  1    A.    No.  Of course not.

11:53  2    Q.    Okay.  Were these buses -- did they use serial

11:53  3  communication like your bus that you designed?

11:53  4    A.    Yes.  The serial bus, the way I used it, yes.

11:53  5    Q.    Okay.  So were you aware that computer

11:53  6  companies were starting to move to these serial buses?

11:53  7    A.    Yeah.  Like, I think like counsel mentioned,

11:53  8  you know, there are many companies involved in creating

11:53  9  the full bus.  A lot of them are licensees.  Yeah.

11:53  10    Q.    So here's my question about that:  Do these

11:53  11  bus standards, these PCI Express and the USB 3.0, do

11:53  12  they share any common elements with the serial bus that

11:53  13  you invented?

11:53  14    A.    Yes.

11:53  15    Q.    Can you please tell the jury what elements --

11:54  16  what common elements that they share?

11:54  17    A.    Remember when I was developing my universal

11:54  18  bus, I choose to use LVDS technology.  I choose to use

11:54  19  this concept of unidirectional so the data can only --

11:54  20  can go both ways without interfering with each other.

11:54  21  That's really the fundamental concept that's being used

11:54  22  by PCI Express and USB 3.0.

11:54  23    Q.    Do your patent claims, the claims in these

11:54  24  patents that we're going to talk about this week, do

11:54  25  these patent claims require everything that's required

—132—

11:54  1   by PCI Express and USB 3.0?

11:54  2       A.    Not at all.  I think it's misleading to say.

11:54  3   PCI Express, the standard is 200, 300 pages.  It has so

11:55  4   many things to see how it works.

11:55  5           All we're claiming is that they're using LVDS

11:55  6   signaling, which I used, and the unidirectional

11:55  7   approach.  That's all I'm claiming.  In fact,

11:55  8   everything relies on that fact.  That's the invention I

11:55  9   had.

11:55  10          But if they did not have that, if they did not

11:55  11  use that, the two standards could not exist.

11:55  12      Q.    Did you contact any of the computer companies

11:55  13  that sold products that adopted these new serial bus

11:55  14  standards?

11:55  15      A.    Yes.

11:55  16      Q.    And why did you do that?

11:55  17      A.    Given the patent rights that this has for me,

11:55  18  I'd like to talk to them about licensing.

11:55  19      Q.    Okay.  And I'm jumping ahead a bit here.

11:55  20          But did any of those companies actually pay

11:55  21  ACQIS for a license to the ACQIS patents?

11:55  22      A.    We have, I believe, 21 companies to pay us.

11:55  23      Q.    All right.  And how are licenses usually

11:56  24  documented?

11:56  25      A.    It's -- it's -- you do a license agreement.

133

11:56  1    It's a patent license agreement with each company

11:56  2    signed by both sides.

11:56  3        Q.    Okay.  And so there's a contract?

11:56  4        A.    Oh, absolutely.  Yes.

11:56  5        Q.    All right.

11:56  6              MR. COLLARD:  Move to admit Exhibit

11:56  7    P-920, which is the summary of the licenses that we

11:56  8    discussed previously.

11:56  9              MR. BURESH:  Just the existing objections

11:56  10   from this morning, Your Honor.  Nothing further.

11:56  11             THE COURT:  They'll be admitted.

11:56  12             MR. COLLARD:  All right.  Let's take a

11:56  13   look at Exhibit 920, please.

       14   BY MR. COLLARD:

11:56  15       Q.    Dr. Chu, this is a two-page document.  We're

11:56  16   going to take it one page at a time.  And I want to

11:56  17   make sure, have you personally confirmed that the

11:56  18   information in this summary matches the information in

11:57  19   the underlying contracts that you signed?

11:57  20       A.    I did verify it.  Yes.

11:57  21       Q.    All right.  Great.

11:57  22             Let's talk about this first column, Licensee.

11:57  23             What does that mean?

11:57  24       A.    These are the companies that agreed to license

11:57  25   our patent rights.

11:57   1          Q.    Okay.  And what about the third column, Date?

11:57   2          A.    The third column, yeah, the date is when we

11:57   3   signed an agreement.

11:57   4          Q.    And so when did these companies begin taking

11:57   5   licenses?

11:57   6          A.    We essentially have two groups of time frame.

11:57   7   I mention earlier that when -- where I was developing

11:57   8   my patent, the first group I was focus on modular

11:57   9   computer and the computer bus.

11:57   10         So this first group of company was building

11:58   11   modular computer and also using the computer bus.  So I

11:58   12   talk to them.

11:58   13         Q.    Thank you, Dr. Chu.

11:58   14         And I want to talk about how ACQIS approached

11:58   15   negotiations with these companies.

11:58   16         What was ACQIS hoping to receive in return for

11:58   17   granting a license?

11:58   18         A.    In the early days, we were asking for 3 to

11:58   19   5 percent of the royalty.  Yes.

11:58   20         Q.    But you were seeking money, a payment?

11:58   21         A.    Yes.

11:58   22         Q.    And let's talk about this Effective Royalty

11:58   23   Rate column.  And I think you said you were seeking 3

11:58   24   to 5 percent.

11:58   25         But before we get into that, can you please

| | | |
|---|---|---|
| 11:58 | 1 | tell the jury -- can you just kind of start with what |
| 11:58 | 2 | is a royalty rate? |
| 11:58 | 3 | A.    Your royalty rate is really just you take the |
| 11:58 | 4 | revenue of infringing product, and you ask for a |
| 11:58 | 5 | certain percentage of that, and that is the royalty |
| 11:58 | 6 | rate. |
| 11:58 | 7 | Q.    Thank you. |
| 11:58 | 8 | And do you know what a lump-sum license |
| 11:59 | 9 | payment is? |
| 11:59 | 10 | A.    Yes.  Uh-huh. |
| 11:59 | 11 | Q.    Can you explain to the jury what a lump-sum |
| 11:59 | 12 | license payment is? |
| 11:59 | 13 | A.    Well, a lot of times we cannot agree on the |
| 11:59 | 14 | royalty rate because we just -- in the negotiation, |
| 11:59 | 15 | they won't agree to a number.  So -- but instead what |
| 11:59 | 16 | they will say -- licensee will say, I'm willing to pay |
| 11:59 | 17 | you a fixed amount of money so that you don't come |
| 11:59 | 18 | bother us anymore. |
| 11:59 | 19 | So that's kind of the lump-sum agreement, that |
| 11:59 | 20 | we said, fine.  We'll take that money and that's it. |
| 11:59 | 21 | Q.    So if there's no effective royalty rate |
| 11:59 | 22 | listed, does that mean that it was a lump-sum payment? |
| 11:59 | 23 | A.    Yes. |
| 11:59 | 24 | Q.    All right.  And what about this column that's |
| 11:59 | 25 | called Additional Compensation to ACQIS? |

| | | |
|---|---|---|
| 11:59 | 1 | Do you see that? |
| 11:59 | 2 | A.    Yes.  Uh-huh. |
| 11:59 | 3 | Q.    Why was ACQIS accepting other types of |
| 11:59 | 4 | compensation in some of these contracts? |
| 11:59 | 5 | A.    It's a small part of the negotiation. |
| 11:59 | 6 | Sometimes they want to have a lower -- they want to pay |
| 11:59 | 7 | less.  So you put in some -- some cases they, for |
| 12:00 | 8 | instance, exchanged patents with us, which allows them |
| 12:00 | 9 | to maybe pay less. |
| 12:00 | 10 | MR. COLLARD:  Okay.  Before I leave this |
| 12:00 | 11 | slide, I'd like to move to admit the joint exhibits |
| 12:00 | 12 | here.  So J-34, J-32, J-27, J-28, and J-31. |
| 12:00 | 13 | MR. BURESH:  No objection. |
| 12:00 | 14 | THE COURT:  Admitted. |
| 12:00 | 15 | MR. COLLARD:  Thank you. |
| 12:00 | 16 | All right.  Let's go to the next slide, |
| 12:00 | 17 | please. |
| 12:00 | 18 | BY MR. COLLARD: |
| 12:00 | 19 | Q.    So what are the dates for this range of |
| 12:00 | 20 | licenses? |
| 12:00 | 21 | A.    Well, you have IBM roughly the same time frame |
| 12:00 | 22 | as the earlier companies that licensed our patents, and |
| 12:00 | 23 | the rest, it's later. |
| 12:00 | 24 | Q.    Okay.  So for this effective royalty rate |
| 12:00 | 25 | column, is this the same as the previous slide, where |

—137—

12:00  1    if you had an effective royalty rate, you've listed it

12:01  2    here, but otherwise, these were lump-sum settlement

12:01  3    payments -- or lump-sum license payments?

12:01  4        A.    Yes.  It's the same.

12:01  5        Q.    Okay.  And these effective royalty rates are

12:01  6    closer to 1 percent than the 3 to 5 percent we saw on

12:01  7    the previous slide?

12:01  8        A.    Yes.

12:01  9        Q.    Was there a time where ACQIS' approach to

12:01  10   licensing changed?

12:01  11       A.    Yes.  There was.

12:01  12       Q.    Which license did it change in respect to?

12:01  13       A.    You know, licensing experience with IBM, it's

12:01  14   such that we find out that it's publicly more

12:01  15   appropriate for us to ask for 1 percent per invention.

12:01  16   We should not be asking for 3 to 5 percent.

12:01  17       Q.    Okay.

12:01  18       A.    So since then, we changed our position.

12:01  19       Q.    Is that still the approach that ACQIS uses

12:01  20   today of 1 percent per invention?

12:02  21       A.    Yes.

12:02  22       Q.    In your view, how many inventions are issued

12:02  23   in this case?

12:02  24       A.    Broadly speaking, we -- since we only focus on

12:02  25   computer bus, we are talking about a one invention for

```
12:02   1    the PCI Express standard, one invention for the USB
12:02   2    3.0, and in some sense it covers -- mainly it's those
12:02   3    two.
12:02   4        Q.    Okay.  You said you think it's two.  Is that
12:02   5    what you said?
12:02   6        A.    Yes.
12:02   7        Q.    Two.  Okay.
12:02   8              MR. COLLARD:  And before we leave this
12:02   9    slide, I'll move to admit J-29, J-33, J-30, J-38, J-39,
12:02  10    J-40, J-21, and J-52.
12:02  11              MR. BURESH:  No objection.
12:02  12              THE COURT:  Admitted.
12:02  13    BY MR. COLLARD:
12:02  14        Q.    So if a company ACQIS was negotiating with --
12:03  15    and I want to talk a little more about the negotiation
12:03  16    approach.
12:03  17              If they have -- if that company has products
12:03  18    that don't use the ACQIS technology, is that something
12:03  19    that ACQIS would want to include in the negotiation?
12:03  20        A.    No.  Absolutely not.
12:03  21        Q.    Why not?
12:03  22        A.    Well, if you don't have the patent rights, you
12:03  23    shouldn't ask for -- anybody for anything.
12:03  24        Q.    Okay.  What about within an individual
12:03  25    product?  If there are parts of an individual product
```

12:03  1    that don't use the ACQIS technology, how does ACQIS

12:03  2    approach that in negotiations?

12:03  3         A.    We don't normally try to put pieces that are

12:03  4    not infringed as part of the calculation, but it's not

12:03  5    that straightforward.  A lot of times it's up to the

12:03  6    damage expert to determine whether that part is

12:03  7    necessary in order to infringe the patent.  So it's a

12:03  8    judgment.

12:03  9         Q.    Do you have any examples of something that

12:03  10   ACQIS would not seek to include in the negotiation for

12:03  11   a product?

12:03  12        A.    Yes.  Like in the laptop computer, we do not

12:04  13   include the display as part of the invention because

12:04  14   our invention relates to the computer itself.

12:04  15        Q.    What about software?

12:04  16        A.    Oh, no.  No software.

12:04  17        Q.    Okay.

12:04  18        A.    No software.

12:04  19        Q.    Okay.  At some point did you become aware of

12:04  20   ASUS computer products that were using serial bus

12:04  21   technology?

12:04  22        A.    Yes.

12:04  23        Q.    And what did you do?

12:04  24        A.    I sent them a letter.

12:04  25                   MR. COLLARD:  Okay.  Move to admit P-50,

| | | |
|---|---|---|
| 12:04 | 1 | as discussed before. |
| 12:04 | 2 | I stopped the video.  So can you pull it |
| 12:04 | 3 | up, please, Vicki?  I just want to check it. |
| 12:04 | 4 | And then Page 2. |
| 12:04 | 5 | Okay.  Move to admit P-50 as it's shown. |
| 12:04 | 6 | MR. BURESH:  No objection. |
| 12:04 | 7 | THE COURT:  Be admitted. |
| 12:05 | 8 | BY MR. COLLARD: |
| 12:05 | 9 | Q.   So let's take a look at the first page of |
| 12:05 | 10 | P-50. |
| 12:05 | 11 | What is this document? |
| 12:05 | 12 | A.   It's a letter I wrote, and I sent it to the |
| 12:05 | 13 | CEO of ASUS. |
| 12:05 | 14 | Q.   And when did you -- did you write this letter? |
| 12:05 | 15 | A.   Yes. |
| 12:05 | 16 | Q.   And when did you send it? |
| 12:05 | 17 | A.   May 15, 2018. |
| 12:05 | 18 | Q.   Okay.  Why did you list the recipient here as |
| 12:05 | 19 | ASUS? |
| 12:05 | 20 | A.   If you -- if I -- I look into the company, and |
| 12:05 | 21 | actually it's all of course information from the web -- |
| 12:05 | 22 | website.  So ASUS.com is the -- is the website I go |
| 12:05 | 23 | into.  It details all their product as ASUS product. |
| 12:05 | 24 | It has also any report that shows the |
| 12:05 | 25 | structure of the company, and I certainly want to |

12:06 1  notify the controlling party, which is the top of the

12:06 2  chain -- and in this case, it would be Jerry Shen.  He

12:06 3  is head of the whole ASUS group -- so that he's aware

12:06 4  of the infringement since he controls the whole

12:06 5  organization.

12:06 6      Q.   Okay.  And why did you choose to put

12:06 7  Partnering, Licensing, and Collaboration Opportunity in

12:06 8  the subject line?  What did that mean to you?

12:06 9      A.   It means we are flexible.  We like to talk.

12:06 10 And we just don't want to sound too threatening at that

12:06 11 point.

12:06 12     Q.   So you also mentioned opportunities to partner

12:06 13 in the first paragraph.

12:06 14          Have you partnered with other licensees in

12:06 15 previous licenses?  And it would be beyond just money.

12:06 16     A.   We did.  I mean, I mentioned exchange of

12:06 17 patent rights.  Actually, one company, we had a joint

12:07 18 development agreement.  But yes.

12:07 19     Q.   Okay.  And then let's go down to the next

12:07 20 paragraph.

12:07 21          Did you mention in this letter which serial

12:07 22 bus technologies ASUS might be using that this letter

12:07 23 would apply to?

12:07 24     A.   Yes.  I did.

12:07 25     Q.   Where was that?

12:07  1        A.    You know, you see PCI Express and USB 3.0

12:07  2   mentioned.

12:07  3        Q.    Okay.  Where you say it's relevant to PCI

12:07  4   Express and USB 3.0?

12:07  5        A.    Yes.  We want to make their job easier to look

12:07  6   for where potentially there's infringement.  So we tell

12:07  7   them, these are the technologies you should look at.

12:07  8        Q.    Okay.  Why did you determine that PCI Express

12:07  9   and USB 3.0 were relevant to your invention?

12:07  10       A.    Remember I said earlier, my invention and my

12:07  11  only invention in the computer bus is using this LVDS

12:08  12  channel, the unidirectional channel, to communicate

12:08  13  data.  And in both of these cases, that's what they

12:08  14  use.

12:08  15       Q.    Thank you.

12:08  16            So based on your experiencing monitoring --

12:08  17  your experience and your monitoring of the computer

12:08  18  industry, did you believe that using these

12:08  19  technologies, these -- the low voltage differential

12:08  20  unidirectional serial channel, did you believe that was

12:08  21  benefitting ASUS?

12:08  22       A.    Yes.  Absolutely.

12:08  23       Q.    How?

12:08  24       A.    Well, if they don't support these standards,

12:08  25  they cannot sell any computer.

12:08    1      Q.    Okay.

12:08    2                MR. COLLARD:  Let's look at the next

12:08    3    paragraph, please.

         4    BY MR. COLLARD:

12:08    5      Q.    So you said you were trying to start with the

12:08    6    appropriate tone, but did you do anything in your

12:08    7    letter to try to convey a seriousness of the -- what

12:09    8    you were saying in the letter?

12:09    9      A.    We tried to tell them that our patent has been

12:09   10    tested by the U.S. Patent Office multiple times.  It's

12:09   11    not just a issuing of the patent.

12:09   12      Q.    Okay.

12:09   13      A.    So it's -- it's to say that our patent is

12:09   14    pretty solid.

12:09   15      Q.    And did you mention prior licensees in this

12:09   16    paragraph as well?

12:09   17      A.    Yeah.  I mentioned like four Fortune Global

12:09   18    200 companies.  A company like Dell would be one of

12:09   19    them.

12:09   20      Q.    What were you trying to convey to ASUS by

12:09   21    mentioning this in the letter that you wrote and sent

12:09   22    to them?

12:09   23      A.    Of course I want to impress them that even the

12:09   24    big companies is willing to license our patents.  So

12:09   25    they should really consider that.

12:09    1          Q.    Great.

12:09    2                MR. COLLARD:  Let's go on to the second

12:09    3    page, please.

12:09    4                And maybe we can get -- I think all we

12:10    5    need is starting with "to assist."

12:10    6    BY MR. COLLARD:

12:10    7          Q.    You list -- did you choose which patents to

12:10    8    list here?

12:10    9          A.    Yes.  I did.

12:10   10          Q.    How did you choose which ACQIS patents to

12:10   11    identify?

12:10   12          A.    Well, since I wrote all the claims, I know

12:10   13    what these patents were.  And the claims covers really,

12:10   14    as I said, any way of using the invention in the

12:10   15    computer system.  So to be thorough, I put down all the

12:10   16    patents that could potentially infringe.

12:10   17          Q.    Are the five patents that are asserted this

12:10   18    week, are these patents listed in your letter here?

12:10   19          A.    Yes.

12:10   20          Q.    Okay.  Do you agree that some of these patents

12:10   21    expired or all of -- the last of these patents expired

12:10   22    in -- around May 2020?

12:10   23          A.    Yes.

12:10   24          Q.    Does that concern you that the patents were

12:10   25    getting close to expiration when you sent your letter?

12:11   1          A.    No.  No.

12:11   2          Q.    Can you explain to the jury why that wasn't a

12:11   3   concern for you?

12:11   4          A.    The way you can seek damage is that the damage

12:11   5   starts when you send them the notification letter.

12:11   6   They need to know that they have infringed.  Otherwise,

12:11   7   it doesn't mean anything.

12:11   8                That's one part of the patent.  What we call

        9   apparatus patent, where you just describe the computer.

12:11  10                There's another type of patent we call method

12:11  11   claims, what describes the manufacturing of those

12:11  12   products, which you really do not need to mark the

12:11  13   product, maybe.

12:11  14                And the patent system allows you to -- at the

12:11  15   time when you file a patent, it goes back six years.

12:11  16          Q.    At the time you file your patent or the time

12:11  17   you file a patent lawsuit?

12:11  18          A.    So when you file your lawsuit, you will go

12:11  19   back six years --

12:11  20          Q.    Okay.

12:11  21          A.    -- to cover the infringement period.

12:11  22          Q.    Thank you, Dr. Chu.

12:11  23                You also have a section here where you

12:12  24   identified some ASUS products.

12:12  25                Do you see that?

146

12:12  1        A.    Yes.

12:12  2        Q.    How did you choose what ASUS products to

12:12  3   identify?

12:12  4        A.    So I go on the website, look at ASUS.com.  I

12:12  5   look at their products.  So two things would tell me

12:12  6   whether they infringe.  They will a lot of times say,

12:12  7   we support PCI Express and USB 3.0.  Of course that's

12:12  8   one of the indication.  But actually, it's more than

12:12  9   that.

12:12  10       I mention Intel has a monopoly in the computer

12:12  11  business.  Everybody uses their processors and logic

12:12  12  chips.  So I have knowledge of how Intel requires their

12:12  13  customers to build their system.  So if you use this

12:12  14  CPU, you have to use this system logic.

12:12  15       And they've clearly showed that if you use

12:12  16  this system logic, you will have -- you'll be

12:12  17  supporting PCI Express or USB 3.0.

12:12  18       So given the two combination knowledge, it's

12:12  19  not hard for me since I know computer very well to

12:13  20  determine that, oh, this product uses Intel CPU, in

12:13  21  some cases also AMD.  And then they also say that they

12:13  22  support PCI Express.

12:13  23       So it's not hard for me to look through their

12:13  24  website, see what product they sell to say that they

12:13  25  infringe.

12:13  1       Q.    Thank you, Dr. Chu.

12:13  2             You listed four categories here:  Portable

12:13  3  computers, desktop computers, server products, and

12:13  4  something called motherboard product.

12:13  5             Do you see where I am?

12:13  6       A.    Yes.  Uh-huh.

12:13  7       Q.    Are all four categories of ASUS products still

12:13  8  being accused of infringement today in this suit?

12:13  9       A.    Yes.

12:13  10       Q.    All right.  I want to go back a little bit to

12:13  11  your unidirectional LVDS serial bus.

12:13  12             Did your analysis tell you that you just

12:13  13  described -- you described the things you looked at.

12:13  14  You looked at the processor, and you looked at some

12:13  15  information about the products online.

12:13  16             Did your analysis tell you whether these ASUS

12:14  17  products listed here used -- and I'm going to take this

12:14  18  in pieces.

12:14  19             Did it tell you whether they used a serial

12:14  20  bus?

12:14  21       A.    Yes.  Uh-huh.

12:14  22       Q.    Okay.  And did they use a serial bus?

12:14  23       A.    Yes.

12:14  24       Q.    Did your analysis tell you whether they used

12:14  25  unidirectional LVDS channels?

12:14  1        A.    Yes.

12:14  2        Q.    And beyond what you've already described, was

12:14  3   there any other way that you knew that?

12:14  4              And maybe not.  I just -- you already

12:14  5   described looking online and looking at the type of

12:14  6   processor that they were using.

12:14  7              Was that enough to tell you that information?

12:14  8        A.    It tells me 100 percent they use it.  Yes.

12:14  9        Q.    And was that relevant to your patents?

12:14  10       A.    That -- those are my patents.

12:14  11       Q.    Did ACQIS retain an independent expert to

12:14  12  review any material that ASUS produced about its

12:14  13  products and do a detailed analysis of infringement for

12:14  14  this case?

12:14  15       A.    Yeah.  We have a very nice gentleman,

12:15  16  Dr. Sarhan, to do that analysis.  Yes.

12:15  17       Q.    Okay.  When you sent this letter, how did you

12:15  18  send it?

12:15  19       A.    I sent it by FedEx and request a confirmation

12:15  20  of delivery.

12:15  21       Q.    Did you get a delivery confirmation?

12:15  22       A.    Yeah.  They send me an e-mail to say it was

12:15  23  delivered.  Yes.

12:15  24              MR. COLLARD:  Move to admit P-51.

12:15  25              MR. BURESH:  No objection.

149

12:15  1                    THE COURT:  Admitted.

12:15  2                    MR. COLLARD:  Let's take a look at that.

12:15  3                    Let's look at the top half first.

       4    BY MR. COLLARD:

12:15  5        Q.    What is this showing?

12:15  6        A.    Well, it's this e-mail I got.  I think if

12:15  7    you're familiar with FedEx, you can ask for a tracking

12:15  8    update.  So they told me that it was delivered to

12:15  9    ASUSTeK Computer on May 18th.

12:15 10        Q.    Okay.

12:15 11                    MR. COLLARD:  And let's look at the

12:15 12    bottom half.

      13    BY MR. COLLARD:

12:15 14        Q.    What does -- what does that show?

12:15 15        A.    It shows somebody signed for it, a Mr. Lee,

12:16 16    who's the receptionist/front desk person.  And the time

12:16 17    of, I guess, delivery, 3:30.

12:16 18        Q.    Did ACQIS reach out to FedEx to see if FedEx

12:16 19    had any evidence of delivering the letter to ASUS?

12:16 20        A.    Yes.  We did.

12:16 21        Q.    All right.

12:16 22                    MR. COLLARD:  Move to admit exhibits

12:16 23    P-837 and 838.

12:16 24                    MR. BURESH:  No objection.

12:16 25                    THE COURT:  Admitted.

150

12:16   1                    MR. COLLARD:  Let's start with 838,

12:16   2   please.

        3   BY MR. COLLARD:

12:16   4        Q.    Did ACQIS get a response from FedEx?

12:16   5              Sorry.  I'm not sure if I asked that.

12:16   6              Did ACQIS get a response from FedEx when they

12:16   7   reached out to see if FedEx had a record?

12:16   8        A.    Yes.

12:16   9        Q.    What is this document?  This is P-838.

12:16   10       A.    This is a FedEx internal document that

12:16   11  basically documents the shipping information and

12:16   12  basically says who signed for the letter.

12:17   13       Q.    And in a general sense, is the information

12:17   14  that FedEx has consistent with information on the

12:17   15  exhibit we just looked at, P-51?

12:17   16       A.    Yes.  It was.

12:17   17       Q.    Okay.  But there's something new here, the

12:17   18  signature image.

12:17   19                    MR. COLLARD:  Can you blow that up for

12:17   20  me, please, Vicki?

12:17   21  BY MR. COLLARD:

12:17   22       Q.    Dr. Chu, can you read that stamp?

12:17   23       A.    Yeah.  I can read Chinese.

12:17   24       Q.    Okay.  What does it say?

12:17   25       A.    It says Lee Yen Gee.  So what that means is,

12:17  1   Lee is Lee.  And that is the same name that was shared

12:17  2   in the e-mail confirmation I got.  Yen Gee is just the

12:17  3   rest of his name.

12:17  4       Q.    Okay.  And what about this -- it looks like

12:17  5   maybe it says 15:30.

12:17  6             Do you know what that might be?

12:17  7       A.    That's the -- I think the time that probably

12:17  8   Mr. Lee put down.  It's basically 3:30 p.m.

12:17  9             MR. COLLARD:  Can we just look at this in

12:17  10  this record, please?

12:18  11             There we go.

12:18  12             And then, now let's look very briefly at

12:18  13  Exhibit 837.

12:18  14             And we'll blow up the content in the

12:18  15  middle here.

       16  BY MR. COLLARD:

12:18  17      Q.    And what is this document, Dr. Chu?

12:18  18      A.    As you can see, it comes from the legal

12:18  19  department.  We asked for confirmation.  So they

12:18  20  actually have notarized a document that says:  This our

12:18  21  internal document that represents delivery of the

12:18  22  letter.

12:18  23      Q.    Okay.  So even though you got delivery

12:18  24  confirmation at the time and FedEx confirmed that ASUS

12:18  25  received the letter, did you receive a response from

12:18  1    anyone at ASUS after sending this?

12:18  2        A.    No.

12:18  3        Q.    Dr. Chu, has ASUS ever offered to pay for a

12:18  4    license to your patents at any price?

12:18  5        A.    No.

12:18  6        Q.    If a company like ASUS is using your patents

12:18  7    without a license, how does that help them?

12:18  8        A.    It's very unfair to all my other licensees who

12:19  9    are their competitors.  And they get to, you know, ship

12:19  10   their product into U.S. and -- which the products

12:19  11   infringes our patent rights, and they don't want to pay

12:19  12   anything.

12:19  13       Q.    Okay.  If a company like ASUS is using the

12:19  14   technology in your patents and refuses to pay for a

12:19  15   license, what options do you have?

12:19  16       A.    The only option is to come here.

12:19  17       Q.    Okay.  Dr. Chu, why did you bring this lawsuit

12:19  18   to protect your patent rights?

12:19  19       A.    I owe it to my licensees and also my

12:19  20   shareholders, which includes my family and my friends.

12:19  21       Q.    Thank you.

12:19  22             MR. COLLARD:  Pass the witness, Your

12:19  23   Honor.

12:19  24             THE COURT:  Would now be a good time for

12:19  25   a break?

153

| | | |
|---|---|---|
| 12:19 | 1 | MR. BURESH:  It would, Your Honor. |
| 12:19 | 2 | THE COURT:  Okay.  Ladies and gentlemen |
| 12:19 | 3 | of the jury, we are going to take our recess.  If you |
| 12:19 | 4 | all would be back by about 1:00 -- about 1:30, 1:35, |
| 12:20 | 5 | we'll get started pretty shortly after that. |
| 12:20 | 6 | I have a -- I'm the -- we have two other |
| 12:20 | 7 | phenomenal magistrate judges in the courthouse, but we |
| 12:20 | 8 | only have one of me, one district judge, and I have |
| 12:20 | 9 | something I have to do at 1:00.  And so I think it'll |
| 12:20 | 10 | take about a half hour, not much longer, and I just |
| 12:20 | 11 | hate to keep y'all waiting. |
| 12:20 | 12 | So let's take -- come back at 1:45 |
| 12:20 | 13 | because I hate keeping you all here.  And we'll get |
| 12:20 | 14 | started as soon after that as I can get... |
| 12:20 | 15 | THE BAILIFF:  All rise. |
| 12:20 | 16 | THE COURT:  And please remember my |
| 12:20 | 17 | instructions I gave you this morning. |
| 12:20 | 18 | (Jury exited the courtroom.) |
| 12:20 | 19 | THE COURT:  You may step down. |
| 12:21 | 20 | Thank you.  You may be seated. |
| 12:21 | 21 | So we'll have -- after this gentleman |
| 12:21 | 22 | finishes, we'll have your infringement expert.  Who |
| 12:21 | 23 | will come after that? |
| 12:21 | 24 | MR. COLLARD:  After that we will have -- |
| 12:21 | 25 | go ahead. |

154

| | | |
|---|---|---|
| 12:21 | 1 | MS. AMSTUTZ: After that we're going to |
| 12:21 | 2 | call -- we will call Barbara Chen, who's the corporate |
| 12:21 | 3 | representative for ASUSTeK. |
| 12:21 | 4 | THE COURT: Okay. I don't mean to insult |
| 12:21 | 5 | anyone here. Will there be a translator? Will they be |
| 12:21 | 6 | speaking without a translator? |
| 12:21 | 7 | MR. BURESH: No translator, Your Honor. |
| 12:21 | 8 | THE COURT: Okay. And so how far -- will |
| 12:21 | 9 | that get us through the end of the day, do we think? |
| 12:21 | 10 | We'll probably go till 5:30 or 6:00. |
| 12:21 | 11 | MS. AMSTUTZ: Most certainly. |
| 12:21 | 12 | THE COURT: Okay. Very good. |
| 12:21 | 13 | You all have a good lunch. If you'll be |
| 12:21 | 14 | back around 1:30, as soon as we -- or 1:45 -- I think |
| 12:21 | 15 | that's what I said to them -- we'll get started just as |
| 12:21 | 16 | soon as I'm done with my 1 o'clock matter. |
| 12:21 | 17 | THE BAILIFF: All rise. |
| 12:22 | 18 | (Recess taken.) |
| 01:47 | 19 | THE BAILIFF: All rise. |
| 01:47 | 20 | THE COURT: Please remain standing for |
| 01:47 | 21 | the jury. |
| 01:47 | 22 | (Jury entered the courtroom.) |
| 01:48 | 23 | THE COURT: Thank you. You may be |
| 01:48 | 24 | seated. |
| 01:48 | 25 | Counsel? |

155

|       |    |                                                    |
|-------|----|----------------------------------------------------|
| 01:48 | 1  | CROSS-EXAMINATION                                   |
| 01:48 | 2  | BY MR. BURESH:                                      |
| 01:48 | 3  | Q.    Good afternoon, Dr. Chu.                      |
| 01:48 | 4  | A.    Good afternoon.                               |
| 01:48 | 5  | Q.    How are you doing?                            |
| 01:48 | 6  | A.    Good.                                         |
| 01:48 | 7  | Q.    Did you have a nice lunch?                    |
| 01:48 | 8  | A.    Yes.                                          |
| 01:48 | 9  | Q.    Okay.  Good.                                  |
| 01:48 | 10 | I'd like to start out -- I believe you said        |
| 01:48 | 11 | during your direct testimony -- do you still have the |
| 01:48 | 12 | little module up with you?                          |
| 01:48 | 13 | A.    You mean this iMod?                           |
| 01:49 | 14 | Q.    Yes, the iMod.                                |
| 01:49 | 15 | Now, that iMod, is that the one you actually        |
| 01:49 | 16 | sold 200 of?                                        |
| 01:49 | 17 | A.    Yes.                                          |
| 01:49 | 18 | Q.    Yes?  Okay.                                   |
| 01:49 | 19 | And that iMod never had your LVDS invention in      |
| 01:49 | 20 | it, correct?                                        |
| 01:49 | 21 | A.    It did not.                                   |
| 01:49 | 22 | Q.    Because your LVDS invention, you couldn't get |
| 01:49 | 23 | it to work?                                         |
| 01:49 | 24 | A.    Correct.                                      |
| 01:49 | 25 | Q.    So what you have in this iMod you sold was the |

156

01:49  1    old PCI local bus standard, correct?

01:49  2        A.    Correct.

01:49  3        Q.    Okay.  I believe you said you started working

01:49  4    on your invention around Christmas of 1997; is that

01:49  5    correct?

01:49  6        A.    Correct.

01:49  7        Q.    And you wrote a series of three white papers?

01:49  8        A.    Yes.

01:49  9        Q.    Now, your first white paper, which we've seen

01:49  10   already, it was Joint Exhibit 22, it was dated

01:50  11   January 1st of 1998, correct?

01:50  12       A.    Yes.

01:50  13       Q.    And that paper took you a week to ten days to

01:50  14   write, between Christmas and January 1st?

01:50  15       A.    Yes.  It did.

01:50  16       Q.    The next week you wrote your second white

01:50  17   paper.  That was dated January 7th of 1998, correct?

01:50  18       A.    Correct.

01:50  19       Q.    So that one took you one week to write?

01:50  20       A.    Yes.

01:50  21       Q.    And after that, you wrote a third white paper

01:50  22   that was dated January 15th of 1998; is that correct?

01:50  23       A.    Correct.

01:50  24       Q.    So in total, are those three all the white

01:50  25   papers you wrote for this invention?

01:50  1    A.    Those are the three white papers.

01:50  2    Q.    Okay.  So all told, you spent approximately

01:50  3  three weeks writing down your invention in your white

01:50  4  papers; is that correct?

01:50  5    A.    In those white papers, yes.

01:51  6          MR. BURESH:  Mr. Palisoul, if we could

01:51  7  pull up J-22, please.

01:51  8  BY MR. BURESH:

01:51  9    Q.    This is previously admitted.  So I want to

01:51  10  look at the title of your first white paper.  It is A

01:51  11  Personal Computer with Attached Computer Module inside

01:51  12  a Computer Bay within a Peripheral Console.

01:51  13          Do you see that?

01:51  14    A.    Yes.

01:51  15    Q.    So that piece that's in front of you there is

01:51  16  what you were calling the "attached computer module";

01:51  17  is that correct?

01:51  18    A.    Correct.

01:51  19    Q.    And this piece over here would be the

01:51  20  peripheral console, correct?

01:51  21    A.    Correct.

01:51  22    Q.    And that slot there is called the bay,

01:51  23  correct?

01:51  24    A.    Yes.  Uh-huh.

01:51  25          MR. BURESH:  If we could go to the

01:51   1   abstract, Bates No. 8129.

01:52   2   BY MR. BURESH:

01:52   3       Q.    You were calling this:  A new type of personal

01:52   4   computer referred to as the Attached Personal Computer,

01:52   5   AttachPC; is that correct?

01:52   6       A.    Yes.  Uh-huh.

01:52   7       Q.    That's what you invented?

01:52   8       A.    Yes.

01:52   9       Q.    Okay.  And again, the AttachPC is made up of a

01:52   10  removable computer module called the "ACM," correct?

01:52   11      A.    Yes.  Uh-huh.

01:52   12      Q.    And that would go inside of the peripheral

01:52   13  console using the bay we just discussed?

01:52   14      A.    Correct.

01:52   15              MR. BURESH:  If we could go to Figure 1,

01:52   16  please.

01:52   17  BY MR. BURESH:

01:52   18      Q.    Figure 1 from your first white paper, J-22, is

01:52   19  an example of a desktop attached personal computer,

01:52   20  correct?

01:52   21      A.    Yes.

01:52   22      Q.    And that shows an attached computer module

01:52   23  that would be inserted into a peripheral console,

01:52   24  correct?

01:52   25      A.    Correct.

01:53    1                    MR. BURESH:  If we can go to Figure 2,

01:53    2    please.

01:53    3    BY MR. BURESH:

01:53    4        Q.    Figure 2 shows an example of a portable

01:53    5    attached personal computer, correct?

01:53    6        A.    Correct.

01:53    7        Q.    Okay.  And here you have an attached computer

01:53    8    module that, again, go into a portable peripheral

01:53    9    console, correct?

01:53   10        A.    Correct.

01:53   11        Q.    Now, this is not a laptop, is it?

01:53   12        A.    Of course it is.

01:53   13        Q.    Okay.  Now, when my clients' laptops are sold,

01:53   14    is there any module that comes out of them?

01:53   15        A.    A modular computer and laptop are two separate

01:53   16    things.

01:53   17        Q.    Okay.  A laptop is not a modular computer?

01:53   18        A.    Laptop does not need to be a modular computer.

01:53   19    Correct.

01:54   20                    MR. BURESH:  Okay.  If we could pull up

01:54   21    DX-63, please.

01:54   22    BY MR. BURESH:

01:54   23        Q.    Do you recognize the document that's on the

01:54   24    screen in front of you?

01:54   25        A.    Yes.

160

01:54  1        Q.    What is it?

01:54  2        A.    It's a presentation I made.

01:54  3        Q.    To Compaq Computer?

01:54  4        A.    Yes.

      5        Q.    Okay.

01:54  6                MR. BURESH:  Your Honor, I move to admit

01:54  7    Defendant's Exhibit 63.

01:54  8                MR. COLLARD:  No objection.

01:54  9                THE COURT:  Admitted.

01:54 10    BY MR. BURESH:

01:55 11        Q.    Okay.  Again, this is a June 1998 presentation

01:55 12    that you gave to Compaq; is that fair?

01:55 13        A.    Yes.  Uh-huh.

      14       Q.    Okay.

01:55 15                MR. BURESH:  If we could go to the

01:55 16    Meeting Purpose, please.

01:55 17    BY MR. BURESH:

01:55 18        Q.    A purpose of your meeting with Compaq was,

01:55 19    according to the first bullet, to disclose your

01:55 20    invention, benefits, technology, and market analysis,

01:55 21    correct?

01:55 22        A.    Yes.  Uh-huh.

01:55 23        Q.    And you wanted to discuss business

01:55 24    opportunities, correct?

01:55 25        A.    Yes.

01:55  1      Q.    Or partnership?

01:55  2      A.    Yes.

01:55  3      Q.    Okay.  On the next page --

01:55  4            MR. BURESH:  Turn to the next page,

01:55  5  please.

01:55  6  BY MR. BURESH:

01:55  7      Q.    -- here you describe your invention as the

01:55  8  attached computer module; is that correct?

01:55  9      A.    Yes.

01:55  10      Q.    And the ACM, as we heard during your direct

01:55  11  testimony, is what you would consider the guts of a

01:55  12  computer system, correct?

01:55  13      A.    Yes.

01:55  14      Q.    By "guts," it would include a CPU, correct?

01:56  15      A.    Uh-huh.  Yes.

01:56  16      Q.    Main memory?

01:56  17      A.    Yes.

01:56  18      Q.    Graphics subsystems?

01:56  19      A.    Yes.

01:56  20      Q.    Those sorts of things, correct?

01:56  21      A.    Correct.

01:56  22      Q.    And again, this is a small device, about the

01:56  23  size of a VHS tape that you have in front of you here

01:56  24  today?

01:56  25      A.    Correct.

162

01:56    1                    MR. BURESH:  If we could go to the next

01:56    2    page, please.

01:56    3    BY MR. BURESH:

01:56    4        Q.    As we see here, you can transport your ACM

01:56    5    from home to office, but you have to have a console in

01:56    6    both places, correct?

01:56    7        A.    Yes.

01:56    8                    MR. BURESH:  If you'd go to the next

01:56    9    page.

01:56   10    BY MR. BURESH:

01:56   11        Q.    You describe to Compaq in this presentation a

01:56   12    variety of console options.  Is that fair to say?

01:56   13        A.    Yes.  Uh-huh.

01:56   14        Q.    Okay.  Including a minimal portable console,

01:56   15    you called it?

01:56   16        A.    Yes.

01:56   17        Q.    Okay.  And you're referring here to Desktop

01:57   18    ACM Mobility versus Notebook at the title of that

01:57   19    slide.

01:57   20              Do you see that?

01:57   21        A.    Yes.

01:57   22        Q.    So again, you're distinguishing your invention

01:57   23    from a notebook computer, correct?

01:57   24        A.    From a pure notebook.  Yes.  Uh-huh.

01:57   25        Q.    Okay.  And the notebook would be synonymous

163

01:57  1    with a laptop?

01:57  2        A.    Yes.

01:57  3        Q.    So you weren't telling Compaq or anyone else

01:57  4    that you developed a laptop computer, correct?

01:57  5        A.    It was developing a modular system can be used

01:57  6    as a laptop.

01:57  7        Q.    But it was not a laptop, correct?

01:57  8        A.    I guess it's wording.  If it's used as a

01:57  9    laptop, it is not constructed as a regular laptop.

10    Q.    Okay.

01:57  11             MR. BURESH:  Let's go back to the first

01:57  12   white paper, Joint Exhibit 22, please.

01:57  13   BY MR. BURESH:

01:58  14       Q.    Now, in this paper, you also described your

01:58  15   idea for communicating between the ACM and the

01:58  16   peripheral console, correct?

01:58  17       A.    Correct.

01:58  18       Q.    Okay.

01:58  19             MR. BURESH:  If we could go -- let's

01:58  20   see -- Page 6, please.  J-22-6.

01:58  21   BY MR. BURESH:

01:58  22       Q.    Now, the mechanism you described in this paper

01:58  23   for handling the communication between your ACM and the

01:58  24   peripheral console was called an XP Bus; is that

01:58  25   correct?

01:58   1          A.    Correct.

01:58   2          Q.    Okay.  And the XP Bus is an abbreviation for

01:58   3    cross peripheral bus; is that correct?

01:58   4          A.    Yes.  Uh-huh.

01:58   5          Q.    Okay.  And you see in the first sentence on

01:58   6    Page 6 from J-22, the XP Bus is also referred to as a

01:59   7    peripheral bridge bus.

01:59   8                Do you see that?

01:59   9          A.    Yes.

01:59   10         Q.    So the XP Bus is a peripheral bridge bus

01:59   11   between the ACM module and the peripheral console,

01:59   12   correct?

01:59   13         A.    Correct.

01:59   14         Q.    I believe you talked about Figure 5 during

01:59   15   your direct testimony?

01:59   16                    MR. BURESH:  If we could pull that up,

01:59   17   please.

        18   BY MR. BURESH:

01:59   19         Q.    Now, here we see the attached computer module

01:59   20   on the left, correct?

01:59   21         A.    Correct.

01:59   22         Q.    And a peripheral console on the right,

01:59   23   correct?

01:59   24         A.    Correct.

01:59   25         Q.    And your XP Bus is bridging those two,

01:59  1    correct?

01:59  2        A.    Correct.

01:59  3        Q.    Now, there is only one XP Bus in your

01:59  4    invention, correct?

01:59  5        A.    I want to understand your question.  What do

02:00  6    you mean, there is one XP Bus?

02:00  7        Q.    Sure.

02:00  8              You have one XP Bus depicted -- I'll narrow it

02:00  9    down for you.

02:00  10             In Figure 5, there's just one XP Bus, correct?

02:00  11       A.    Yes.  Uh-huh.

02:00  12       Q.    And in any of your disclosures, I'm broadening

02:00  13   it out, there is no embodiment with more than one XP

02:00  14   Bus; is that correct?

02:00  15       A.    That's a broad statement.  In all the

02:00  16   embodiment you mention, there is no bus that's more

02:00  17   than one XP Bus?

02:00  18       Q.    Yeah.  Let me say the question again.  Maybe

02:00  19   slightly rephrase it, okay?

02:00  20             You would agree with me that you don't have a

02:00  21   specific disclosure of an embodiment with two XP Buses;

02:00  22   isn't that correct?

02:00  23       A.    No.  Not correct.

02:01  24       Q.    Okay.

02:01  25             MR. BURESH:  Mr. Palisoul, could you pull

02:01  1    up the 2/13/2024 transcript?

2    BY MR. BURESH:

02:01  3        Q.    Were you deposed on February 13th of 2024 in a

02:01  4    proceeding, Dr. Chu?

02:01  5        A.    Yes.  Uh-huh.

02:01  6        Q.    Okay.

02:01  7              MR. BURESH:  Could you turn to Page 225

02:01  8    in the area around Line 9 through 15, please?

02:01  9    BY MR. BURESH:

02:01  10       Q.    Now, during a deposition, you are under oath,

02:01  11   correct?

02:01  12       A.    Yes.  I was.

02:01  13       Q.    Now, I'll ask you to read the transcript in

02:01  14   front of you.

02:01  15             Does that refresh your recollection?

02:01  16       A.    Okay.  Yes.

02:01  17       Q.    And I'll ask you the question again.

02:02  18             Would you agree with me that you don't have a

02:02  19   specific disclosure of an embodiment with two XP Buses;

02:02  20   is that correct?

02:02  21       A.    That's correct.  The answer was correct.

02:02  22       Q.    Thank you.

02:02  23             Coming back to Figure 5, Dr. Chu, you have

02:02  24   what's called interface controllers on both sides.  One

02:02  25   on the attached computer modular, and one on the

167

02:02  1    peripheral console; is that correct?

02:02  2        A.   Correct.

02:02  3        Q.   Now, in Figure 5, there's multiple different

02:02  4    peripheral buses being depicted coming into and out of

02:02  5    your interface controllers, correct?

02:02  6        A.   Yes.

02:02  7        Q.   I'm sorry.

02:03  8             MR. BURESH:  Back to J-22.  Thank you for

02:03  9    the note.  Now we're all together.

02:03  10   BY MR. BURESH:

02:03  11       Q.   Back to Figure 5.

02:03  12            All right.  Coming into and out of your

02:03  13   interface controllers are a number of peripheral buses,

02:03  14   correct?

02:03  15       A.   Correct.

02:03  16       Q.   Okay.  Now, we've talked about PCI before, so

02:03  17   I'll start there.  It's the second line down on the

02:03  18   left on the attached computer module.

02:03  19            Do you see that?

02:03  20       A.   Yes.

02:03  21       Q.   Now, that is the PCI local bus, correct?

02:03  22       A.   Correct.

02:03  23       Q.   That was a standard that had been around for

02:03  24   eight or nine years prior to your invention, correct?

02:03  25       A.   Correct.

168

02:03  1      Q.    Okay.  The next one down is USB.

02:03  2            Do you see that?

02:03  3      A.    Yes.

02:04  4      Q.    And that's a standard that had been around

02:04  5   since around 1993; is that correct?

02:04  6      A.    Yeah.  Probably.  Uh-huh.

02:04  7      Q.    Okay.  So those bus standards are being sent

02:04  8   into your host interface controller, correct?

02:04  9      A.    Yes.

02:04  10     Q.    Okay.  And then inside of your host interface

02:04  11  controller, you are converting and merging all of those

02:04  12  peripheral bus signals onto your XP Bus; is that fair?

02:04  13     A.    Yes.

02:04  14     Q.    And you'll carry those across the XP Bus to a

02:04  15  peripheral interface controller, correct?

02:04  16     A.    Yes.

02:04  17     Q.    And your peripheral interface controller will

02:04  18  reconvert those signals back into their original

02:04  19  standards, correct?

02:04  20     A.    Correct.  Uh-huh.

02:04  21     Q.    So you have industry standard buses on both

02:04  22  sides, on the ACM and on the peripheral console,

02:04  23  correct?

02:04  24     A.    Correct.

02:04  25     Q.    And you convert those and reconvert them to

02:05  1    get them across your XP Bus, correct?

02:05  2        A.    Uh-huh.

02:05  3        Q.    Now, you talked a fair amount about the PCI

02:05  4    local bus.  It was the parallel one, right?

02:05  5        A.    Correct.  Uh-huh.

02:05  6        Q.    Yeah.  USB was serial, correct?

02:05  7        A.    It was.

02:05  8        Q.    Yeah.  And it was using differential

02:05  9    signaling, correct?

02:05  10       A.    Yes.

02:05  11       Q.    And that preexisted your invention by multiple

02:05  12   years, correct?

02:05  13       A.    The serial part of it, yes.

02:05  14       Q.    And the differential signaling part of it?

02:05  15       A.    That part of it, I think that was later for

02:05  16   USB 2.0.

02:05  17       Q.    How long has differential signaling been

02:05  18   around, Dr. Chu?

02:05  19       A.    I can't answer that.  It has been there a long

02:05  20   time.  Yes.

02:06  21       Q.    Long time.  Like, 50, 60, maybe even 70 years,

02:06  22   right?

02:06  23       A.    Okay.  Yes.

02:06  24       Q.    So nothing new about differential signaling?

02:06  25       A.    What I referred to is USB 2.0 uses low-voltage

170

02:06   1   differential signal.  1.0 uses high-voltage.

02:06   2       Q.   Okay.  Now, in this white paper --

02:06   3            MR. BURESH:  If we could back up to

02:06   4   Figure 4, please.

02:06   5   BY MR. BURESH:

02:06   6       Q.   This is a slightly more detailed depiction of

02:06   7   your attached computer module, correct?

02:06   8       A.   Yes.

02:06   9       Q.   We're still seeing our peripheral buses, the

02:06  10   PCI to USB, et cetera.  We're still seeing the host

02:06  11   interface controller, correct?

02:06  12       A.   Correct.  Uh-huh.

02:06  13       Q.   But now you have a lot more stuff in this

02:06  14   particular figure, correct?

02:06  15       A.   Yes.  Uh-huh.

02:06  16       Q.   Okay.  So we have a separate host interface

02:07  17   controller.  There's something called a south bridge.

02:07  18   There's a north bridge, graphics accelerator, CPU.

02:07  19            There's all those components that are the guts

02:07  20   of the computer system, correct?

02:07  21       A.   Correct.

02:07  22       Q.   Now, in your white paper --

02:07  23            MR. BURESH:  If we can go to Page 7,

02:07  24   please.  22-7.

02:07  25            Thank you.

02:07  1    BY MR. BURESH:

02:07  2        Q.    Here you talk about:  The continuous drive

02:07  3    towards chip integration can merge individual devices

02:07  4    within the ACM.

02:07  5            Do you see that?

02:07  6        A.    Yes.

02:07  7        Q.    The host interface controller can be

02:07  8    successively integrated with more and more of the rest

02:07  9    of the system devices, correct?

02:07  10       A.    Correct.

02:07  11       Q.    Now, integration is just talking about taking

02:07  12   two things and merging it into one?

02:07  13       A.    Yes.  Uh-huh.

02:07  14       Q.    Okay.  Or taking four things and merging them

02:07  15   into three.  That would be a form of integration?

02:07  16       A.    It's extending it, but it's true also, a form

02:08  17   of integration.

02:08  18       Q.    Four down to one, now that'd be an

02:08  19   integration?

02:08  20       A.    I would call that a reduction.  Four to one is

02:08  21   an integration.  Yes.

02:08  22       Q.    Okay.  Now, it says here:  A small step in

02:08  23   integration is combining south bridge and host

02:08  24   interface controller.

02:08  25            Do you see that?

02:08  1      A.    Yes.

02:08  2              MR. BURESH:  Can we go to Figure 12 of

02:08  3  the J-22, please?

02:08  4  BY MR. BURESH:

02:08  5      Q.    So this is another depiction of your

02:08  6  invention, correct?

02:08  7      A.    Correct.  Uh-huh.

02:08  8      Q.    And in this one, you've brought the integrated

02:08  9  south bridge and the host interface controller into one

02:08  10  box, right?

02:08  11      A.    Right.  Uh-huh.

02:08  12      Q.    That's a small step in integration?

02:08  13      A.    Yes.

02:08  14              MR. BURESH:  If we go to Figure 13.

       15  BY MR. BURESH:

02:09  16      Q.    Now we'll see another step of integration

02:09  17  because here we've combined the CPU with the north

02:09  18  bridge and the graphics accelerator, right?

02:09  19      A.    That's a separate integration.  Yes.

02:09  20      Q.    And then you still have the same south bridge

02:09  21  and host interface integration as well, correct?

02:09  22      A.    Yeah.  In this embodiment, yes.

02:09  23      Q.    Okay.

02:09  24              MR. BURESH:  Now, if we go to 13,

02:09  25  Figure 13 -- I'm sorry.  Let's go to Figure 14 since

173

02:09    1    we're already on 13.

        2    BY MR. BURESH:

02:09    3        Q.    Figure 14, still from J-22, now we see what

02:09    4    you call the biggest step of integration, which is to

02:09    5    bring all of that into one box.  Integrated CPU, core

02:09    6    logic, graphics accelerator, and the interface

02:09    7    controller, correct?

02:09    8        A.    Yes.  Uh-huh.

02:09    9        Q.    Now, just to be clear, the core logic there

02:09   10    was what was previously called the north bridge and the

02:09   11    south bridge?

02:09   12        A.    Yes.

02:10   13                MR. BURESH:  If we could go back to

02:10   14    Page 7 now.

02:10   15    BY MR. BURESH:

02:10   16        Q.    In the final sentence you say:  These advances

02:10   17    in integration do not change the fundamental invention

02:10   18    of repartitioning of a personal computer system into

02:10   19    ACM and a peripheral console.

02:10   20            Correct?

02:10   21        A.    Yes.  That's what I said.  Uh-huh.

02:10   22        Q.    So the various integrations we've just talked

02:10   23    about, they don't change the fundamental concept of

02:10   24    your invention, correct?

02:10   25        A.    What this implies, I believe, is talking about

—174—

02:10  1    a modular aspect of the invention, about integrating a

02:10  2    different function together inside ACM.  It doesn't

02:10  3    change the modular form factor invention that I was

02:10  4    referring to here.

02:10  5        Q.    Yeah.  That's right.  Thank you.

02:10  6            MR. BURESH:  Okay.  If we could go to

02:10  7    Exhibit J-23 now.

02:11  8    BY MR. BURESH:

02:11  9        Q.    This, I believe, is your third white paper,

02:11  10   the January 15, 1998 white paper?

02:11  11       A.    Yes.  It is.

02:11  12       Q.    And in this paper, you're talking about two

02:11  13   separate PCI or PCI-like buses bridged by a pair of

02:11  14   interface devices through a high-speed bus, correct?

02:11  15       A.    Correct.

02:11  16       Q.    So we're seeing the bridging concept that we

02:11  17   talked about earlier in this white paper as well?

02:11  18       A.    Yes.  Uh-huh.

02:11  19           MR. BURESH:  Could we go to the summary

02:11  20   on Page 4, please?

02:11  21           Back up one page.  Or just find the

02:11  22   summary.

02:11  23   BY MR. BURESH:

02:12  24       Q.    I'll come back to that because as I said in

02:12  25   opening, when we're lost, it's usually just me.  And

02:12  1   I'm lost at this point.  So I'm going to go on to the

02:12  2   next exhibit.

02:12  3                  MR. BURESH:  If we could go to Joint

02:12  4   Exhibit 35, please.  Next page.

02:12  5                  Okay.  If you could zoom in on the

02:12  6   provisional number up at the top, please.

02:12  7   BY MR. BURESH:

02:12  8        Q.    Dr. Chu, what are we looking at here?

02:12  9        A.    I think we saw this before.  It was an

02:12  10  application by my patent attorneys to submit this

02:12  11  invention on May 1st, 1998.

02:12  12       Q.    So this was the provisional application filed

02:13  13  on May 1st, 1998; is that correct?

02:13  14       A.    Correct.  Yeah.

02:13  15       Q.    Okay.  Now, in the '886 provisional patent

02:13  16  application from May 1st, 1998, you described the XP

02:13  17  Bus in the same way that we just looked at in your

02:13  18  white papers; is that fair to say?

02:13  19       A.    I believe after I wrote my white paper, I

02:13  20  continued to supply some of the engineering drawings

02:13  21  and such, and then I think some of them was

02:13  22  incorporated into the provisional.

02:13  23                  So the provisional includes part of the white

02:13  24  paper or -- not all of it, of course, but it also

02:13  25  includes additional disclosure I gave to the patent

—176—

02:13   1    attorney to put in there.

02:13   2        Q.    Okay.  Let me be more specific with my

02:13   3    question.

02:13   4              MR. BURESH:  If we could go to J-35-10.

02:13   5    First paragraph.

02:13   6    BY MR. BURESH:

02:14   7        Q.    Now, we've seen this paragraph previously from

02:14   8    one of the white papers, correct?

02:14   9        A.    Yes.  Uh-huh.

02:14   10       Q.    And here you're describing again your XP Bus

02:14   11   as a cross peripheral bus, correct?

02:14   12       A.    Yes.

02:14   13       Q.    And you're referring to it as a peripheral

02:14   14   bridge bus in your patent filing, correct?

02:14   15       A.    Yes.  Uh-huh.

02:14   16       Q.    If we go to Figure 1 of your provisional, '886

02:14   17   provisional.

02:14   18             You see the same figure describing your

02:14   19   desktop peripheral console with an ACM, correct?

02:14   20       A.    Correct.  Yes.

02:14   21             MR. BURESH:  If we go to Figure 3.

02:14   22   BY MR. BURESH:

02:14   23       Q.    We will see the same portable peripheral

02:14   24   console with an ACM, correct?

02:14   25       A.    Correct.  Uh-huh.

02:14  1                    MR. BURESH:  Okay.  If we go to Figure 6

02:14  2  on J-35-16.

02:14  3  BY MR. BURESH:

02:14  4     Q.    This is the same depiction of the host

02:15  5  interface controller with all the peripheral buses

02:15  6  coming into it, correct?

02:15  7     A.    Yes.  Attorney took my white paper diagrams on

02:15  8  here.

02:15  9                    MR. BURESH:  Okay.  Go to Figure 11,

02:15  10  please.

02:15  11  BY MR. BURESH:

02:15  12     Q.    Now, Figure 11 of the provisional patent

02:15  13  application adds in the peripheral console, correct?

02:15  14     A.    Correct.  Uh-huh.

02:15  15                    MR. BURESH:  If we could back up to

02:15  16  Figures -- start with Figure 7, please.

02:15  17  BY MR. BURESH:

02:15  18     Q.    We're also going to see the same stages of

02:15  19  potential integration, correct, in Figure 7?

02:15  20     A.    Correct.

02:15  21                    MR. BURESH:  And turn to Figure 8.

02:15  22  BY MR. BURESH:

02:15  23     Q.    This is the middle level of integration?

02:15  24     A.    Correct.

02:15  25                    MR. BURESH:  If we go to Figure 9.

178

02:15  1    BY MR. BURESH:

02:16  2        Q.    This is the biggest level of integration that

02:16  3    you depicted, correct?

02:16  4        A.    Yes.  Uh-huh.

02:16  5        Q.    Same as in the white papers?

02:16  6        A.    Correct.

02:16  7        Q.    Now, this '886 provisional patent application

02:16  8    that we're looking at here, it's fully incorporated in

02:16  9    the asserted patents, correct?

02:16  10       A.    Yes.  Uh-huh.

02:16  11       Q.    That means that the full contents of this

02:16  12   provisional application are explicitly contained in

02:16  13   each of the asserted patents?

02:16  14       A.    Yes.  Uh-huh.

02:16  15                 MR. BURESH:  If we could turn to J-1,

02:16  16   please, which is the '786 patent.

       17   BY MR. BURESH:

02:16  18       Q.    That's one of the patents you're asserting in

02:16  19   this case, correct?

02:16  20       A.    Correct.

02:16  21       Q.    And in these asserted -- in this asserted

02:16  22   patent, the '768 patent, we're going to find the same

02:16  23   bridging concept for the XP Bus that we've been talking

02:16  24   about; is that correct?

02:16  25       A.    Yes.  Uh-huh.

179

| | | |
|---|---|---|
| 02:16 | 1 | MR. BURESH:  Okay.  If we could turn to |
| 02:17 | 2 | Column 5, Lines 19 through 21. |
| 02:17 | 3 | BY MR. BURESH: |
| 02:17 | 4 | Q.   Okay.  There's a little more highlighting than |
| 02:17 | 5 | I need here, but if we go down to Line 19, do you see |
| 02:17 | 6 | that, Dr. Chu? |
| 02:17 | 7 | A.   Yes. |
| 02:17 | 8 | Q.   It says:  The present invention encompasses an |
| 02:17 | 9 | apparatus for bridging a first computer interface bus |
| 02:17 | 10 | and a second computer interface bus. |
| 02:17 | 11 | Do you see that? |
| 02:17 | 12 | A.   I do.  Uh-huh. |
| 02:17 | 13 | Q.   Do you agree that that's the present invention |
| 02:17 | 14 | in the '768 patent? |
| 02:17 | 15 | A.   You -- the present invention is what that |
| 02:18 | 16 | says.  Yes.  Uh-huh. |
| 02:18 | 17 | Q.   Okay.  Now, if we go down to -- this is just |
| 02:18 | 18 | talking about an apparatus for bridging. |
| 02:18 | 19 | MR. BURESH:  If we go down to Line 25, |
| 02:18 | 20 | please.  26.  Thank you. |
| 02:18 | 21 | BY MR. BURESH: |
| 02:18 | 22 | Q.   The apparatus comprises an interface channel. |
| 02:18 | 23 | Do you see that? |
| 02:18 | 24 | A.   Uh-huh. |
| 02:18 | 25 | MR. BURESH:  Now, if we go to Column 15, |

180

02:18  1   Line 65, and on to Column 16, please.  One more line,
02:19  2   please.
02:19  3   BY MR. BURESH:
02:19  4       Q.    So previously, we saw that the apparatus that
02:19  5   was doing the bridging was called an interface channel,
02:19  6   and here we're seeing that the XP Bus is referred to
02:19  7   herein as an interface channel.
02:19  8             Do you see that?
02:19  9       A.    Yes.  Uh-huh.
02:19  10      Q.    So bringing that all together, the XP Bus
02:19  11  described in this '768 patent is bridging two other
02:19  12  buses, correct?
02:19  13      A.    Can you restate your question?
02:19  14      Q.    Sure.
02:19  15            In the '768 patent, the XP Bus is serving the
02:19  16  function of bridging two other peripheral buses; isn't
02:20  17  that correct?
02:20  18      A.    In this particular sentence, it doesn't say
02:20  19  that.  But I thought you were referring to the
02:20  20  previous --
02:20  21      Q.    The previous two sections we've looked at?
02:20  22      A.    Yes.  That's one of its use.  Yes.
02:20  23      Q.    Okay.  Thank you.
02:20  24            You also repeated some of the figures from the
02:20  25  '886 provisional patent into this '768 patent; isn't

—181—

02:20    1    that correct?

02:20    2        A.    Yes.  Uh-huh.

02:20    3                MR. BURESH:  If we could go to, for

02:20    4    example, Figure 8A of the '768 patent.

         5    BY MR. BURESH:

02:20    6        Q.    Okay.  Now, this is the same Figure 8 that we

02:20    7    saw on the provisional patent application, correct?

02:21    8        A.    Yes.  Uh-huh.

02:21    9                MR. BURESH:  Okay.  If we look at

02:21   10    Figure 8B in the '768 patent.

        11    BY MR. BURESH:

02:21   12        Q.    Now, this is the same as Figure 9 that we saw

02:21   13    in the provisional application, correct?

02:21   14        A.    Yes.

02:21   15        Q.    Now, if we focus on the '768 patent, which is

02:21   16    on the left-hand side of your screen, the caption of

02:21   17    that figure says:  Attached computer module with single

02:21   18    chip fully integrated:  CPU, cache, core logic,

02:21   19    graphics controller, and interface controller, correct?

02:21   20        A.    Correct.

02:21   21        Q.    That's the same language as the caption of

02:21   22    Figure 9 in the '886 provisional, correct?

02:21   23        A.    Yeah.  It has to be the same.

02:21   24        Q.    Okay.  Now, if we go to Column 8 of the '768

02:21   25    patent, and this is at Lines 24 to 26, it looks like.

02:22  1          Here it uses the exact same caption language

02:22  2   to describe Figure 8B, correct?

02:22  3      A.   Correct.

02:22  4      Q.   And if we go to Column 16, Lines 29 to 31, we

02:22  5   see the exact same caption language for Figure 8B

02:22  6   again, correct?

02:22  7      A.   Correct.

02:22  8      Q.   And repeating that caption once in the figures

02:22  9   and twice in the written description is the only

02:22  10  discussion in this patent relating to this integrated

02:22  11  chip scenario in the entire '768 patent, correct?

02:22  12     A.   If you say so, yes.  Uh-huh.

02:22  13     Q.   You don't know of anything different?

02:22  14     A.   Probably not.  Uh-huh.

02:22  15     Q.   And you'll agree with me that this is not a

02:22  16  very detailed description of the integrated chip; is

02:23  17  that fair?

02:23  18     A.   Which integrated chip?

02:23  19     Q.   This one depicted in Figure 8B.

02:23  20     A.   Yes.  It's not a detailed description.

02:23  21          MR. BURESH:  Could we go back to Figure 5

02:23  22  of the first white paper, J-22?

02:23  23  BY MR. BURESH:

02:23  24     Q.   During your direct, you said that your -- the

02:23  25  second part of your invention was this LVDS concept,

183

| | | |
|---|---|---|
| 02:23 | 1 | right? |
| 02:23 | 2 | A. Yes. Uh-huh. |
| 02:23 | 3 | Q. So you had the modular computer on the one |
| 02:23 | 4 | hand and the LVDS interface on the -- as a second part? |
| 02:23 | 5 | A. Yes. |
| 02:23 | 6 | Q. Okay. And your XP Bus that we've been talking |
| 02:23 | 7 | about for the last 20 minutes or so, that's based on |
| 02:23 | 8 | LVDS technology, correct? |
| 02:23 | 9 | A. Yes. Correct. |
| 02:23 | 10 | Q. You didn't invent LVDS technology, did you? |
| 02:24 | 11 | A. I did not. |
| 02:24 | 12 | Q. At the time of your invention, LVDS technology |
| 02:24 | 13 | was already a well-known technology that was being used |
| 02:24 | 14 | and promoted by a company called National |
| 02:24 | 15 | Semiconductor; isn't that correct? |
| 02:24 | 16 | A. Yes. They sold a chip for that. Yes. |
| 02:24 | 17 | Q. Yes. Right. It's commercially available. |
| 02:24 | 18 | You could buy LVDS chips off the shelf, right? |
| 02:24 | 19 | A. Right. |
| 02:24 | 20 | Q. And you learned about LVDS technology during |
| 02:24 | 21 | the approximately three weeks that you were writing |
| 02:24 | 22 | white papers for your invention, correct? |
| 02:24 | 23 | A. Yes. |
| 02:24 | 24 | Q. In fact, you cited a National Semiconductor |
| 02:24 | 25 | owner's manual in one of your white papers as a |

184

| | | |
|---|---|---|
| 02:24 | 1 | reference, correct? |
| 02:24 | 2 | A.    Correct. |
| 02:24 | 3 | MR. BURESH:  Could you pull up D-950, |
| 02:24 | 4 | please? |
| 02:24 | 5 | BY MR. BURESH: |
| 02:25 | 6 | Q.    Do you recognize this document, Dr. Chu? |
| 02:25 | 7 | A.    I think so.  Yes. |
| 02:25 | 8 | Q.    What is it? |
| 02:25 | 9 | A.    It's a National Semiconductor document.  It |
| 02:25 | 10 | says:  Design Guide.  So it talks about LVDS. |
| 02:25 | 11 | MR. BURESH:  Your Honor, I move to admit |
| 02:25 | 12 | D-950 into evidence. |
| 02:25 | 13 | MR. COLLARD:  No objection. |
| 02:25 | 14 | THE COURT:  It'll come into evidence. |
| 02:25 | 15 | BY MR. BURESH: |
| 02:25 | 16 | Q.    All right.  And, Dr. Chu, Exhibit D-950 is |
| 02:25 | 17 | titled an LVDS Owner's Manual, correct? |
| 02:25 | 18 | A.    Yes.  Uh-huh. |
| 02:25 | 19 | Q.    Dated spring of 1997? |
| 02:26 | 20 | A.    Yes. |
| 02:26 | 21 | Q.    And just so we're keeping our time frame in |
| 02:26 | 22 | order, spring of 1997 was before you started your work |
| 02:26 | 23 | in Christmas of -- actually, Christmas of 1997, |
| 02:26 | 24 | correct? |
| 02:26 | 25 | A.    Yes. |

185

02:26  1       Q.    I had to get it straight in my mind.

02:26  2       A.    Yes.

02:26  3       Q.    Okay.  But this came before?

02:26  4       A.    Yes.  Uh-huh.

02:26  5       Q.    And you were in possession of this LVDS

02:26  6   owner's manual when you were writing your white papers?

02:26  7       A.    I think so.

02:26  8       Q.    In fact, you principally gained your knowledge

02:26  9   of LVDS from this owner's manual, correct?

02:26 10       A.    That's probably one of the documents.  Yes.

02:26 11       Q.    I'm sorry?

02:26 12       A.    That's one of the documents.  Yes.

02:26 13       Q.    Now, the image on the front of the LVDS

02:26 14   owner's manual from National Semiconductor shows

02:26 15   something called TTL data being merged onto LVDS

02:27 16   channels, correct?

02:27 17       A.    Yes.  Uh-huh.

02:27 18       Q.    And then on the other side, that data's being

02:27 19   converted back out to TTL, correct?

02:27 20       A.    Correct.

02:27 21       Q.    So they're taking in TTL data, converting it

02:27 22   into a LVDS channel, and reconverting it, correct?

02:27 23       A.    Correct.  Uh-huh.

02:27 24             MR. BURESH:  If we could go to Page 5 of

02:27 25   this document, please.

02:27  1    BY MR. BURESH:

02:27  2        Q.    Now, these LVDS --

02:27  3              MR. BURESH:  If we could blow up the

02:27  4    "Save Money Too" section.

02:28  5              Thank you.

02:28  6    BY MR. BURESH:

02:28  7        Q.    Now, this LVDS owner's manual is describing

02:28  8    its LVDS technology, and one of the things it says on

02:28  9    No. 2 there is high performance, correct?

02:28  10       A.    Yes.

02:28  11       Q.    That would mean faster in the computer space?

02:28  12       A.    Yeah.  Uh-huh.  Of course.

02:28  13       Q.    Yeah.  So LVDS is -- National's LVDS

02:28  14   technology provided for faster data transfer, correct?

02:28  15       A.    Yes.

02:28  16       Q.    No. 3:  LVDS consumes very little power,

02:28  17   correct?

02:28  18       A.    Yes.

02:28  19       Q.    So lower power consumption was a benefit of

02:28  20   National's LVDS technology, correct?

02:28  21       A.    Yes.

02:28  22       Q.    Let's go to No. 4.  Low noise was another

02:28  23   benefit of National's LVDS technology, correct?

02:28  24       A.    Correct.

02:28  25       Q.    And those are the same benefits you described

02:29    1    during your opening testimony, correct?

02:29    2        A.    Correct.

02:29    3        Q.    So the benefits of your invention are the very

02:29    4    same benefits that were provided by a technology that

02:29    5    was put out by another company, National, called LVDS

02:29    6    technology.

02:29    7            Same exact benefits, right?

02:29    8        A.    I think your statement is wrong.  I believe I

02:29    9    never said I invented LVDS.

02:29    10            MR. BURESH:  Could we go to the top of

02:29    11    Page 6, please?

         12    BY MR. BURESH:

02:29    13        Q.    Here, we have another depiction of National's

02:29    14    LVDS chip technology, correct?

02:29    15        A.    Correct.

02:29    16        Q.    And again, it's TTL on the left, but we see

02:29    17    that it has 21 or 28 channels, correct?

02:29    18        A.    Yes.

02:29    19        Q.    And then that is merged down to four or five

02:30    20    LVDS channels, correct?

02:30    21        A.    Correct.

02:30    22        Q.    And then it is back to 21 to 28 channels on

02:30    23    the other side, right?

02:30    24        A.    Correct.

02:30    25        Q.    So National's LVDS chips would be more cable

188

02:30  1    friendly because they require less wires, right?

02:30  2        A.    Yes.

02:30  3        Q.    So that benefit of your invention was

02:30  4    described by National as well, correct?

02:30  5        A.    Again, that's common to any interconnect that

02:30  6    uses LVDS technology.  Correct.

02:30  7        Q.    And anybody that was using National's LVDS

02:30  8    chips would enjoy that benefit, right?

02:30  9        A.    Correct.

02:30  10       Q.    Now, if we look at this figure from the

02:30  11   National owner's manual, it's got data going in one

02:30  12   direction, right, which is that arrow in between?

02:30  13       A.    Yes.  Uh-huh.

02:30  14       Q.    But it was well-known that if you wanted to go

02:31  15   in both directions, you just buy a second set of chips

02:31  16   and send the data the other way, right?

02:31  17       A.    Yeah.  That's, of course, correct.  Uh-huh.

02:31  18       Q.    And you'd have unidirectional data, right?

02:31  19       A.    Yes.

02:31  20       Q.    So National's LVDS technology also provided

02:31  21   for unidirectional data transfer, didn't it?

02:31  22       A.    Yes.  Of course.  You can use it for that in

02:31  23   that fashion.  Yes.

02:31  24       Q.    So you weren't the first to come up with the

02:31  25   idea of using what National called LVDS.  Having two

189

02:31  1    unidirectional data channels to transmit data in

02:31  2    opposite directions, that wasn't your invention either?

02:31  3        A.    That is not my invention.

02:31  4                MR. BURESH:    Could we go back to J-22,

02:31  5    Figure 5?

02:31  6    BY MR. BURESH:

02:32  7        Q.    Now, you actually tried to build a chip for

02:32  8    the host interface controller to connect your XP Bus

02:32  9    up, correct?

02:32  10       A.    Yes.  Uh-huh.

02:32  11       Q.    And that interface controller, you intended it

02:32  12   to practice your invention, correct?

02:32  13       A.    Yes.

02:32  14       Q.    The idea of the chip you tried to build -- the

02:32  15   one you tried to build would have PCI local bus on one

02:32  16   side and XP Bus or LVDS on the other, correct?

02:32  17       A.    Yes.

02:32  18       Q.    I believe you hired four engineers to help you

02:32  19   build your chip?

02:32  20       A.    Two and a half for the chip.

02:32  21       Q.    You ever tell me previously it was four?

02:32  22       A.    Did I tell you previously it was four?

02:32  23             Well, I guess I count myself as an engineer.

02:33  24   I was part of the design.

02:33  25       Q.    So you would make three and a half?

02:33  1    A.    Well, I say half because one of them was a

02:33  2    consultant, was not full time.

02:33  3    Q.    So somewhere -- two and a half, three, you

02:33  4    hired some engineers to help you build this chip,

02:33  5    correct?

02:33  6    A.    Sure.  Sure.

02:33  7    Q.    And they worked on it for over a year?

02:33  8    A.    Over a year.  Uh-huh.

02:33  9    Q.    After your design work on your chip, you sent

02:33  10   the design off to a chip fabricator to help you build

02:33  11   the chip, correct?

02:33  12   A.    Correct.

02:33  13   Q.    And I believe you have some of the results

02:33  14   remaining back.  It was the wafer you were showing us?

02:33  15   A.    Yes.

02:33  16   Q.    And there's nothing on that wafer that works,

02:33  17   right?

02:33  18   A.    Yes.

02:33  19   Q.    Have you just kept them as a memento?

02:33  20   A.    It's something that we spent a lot of time on.

02:33  21   I keep it for memento.  Yeah.  I can say that.

02:33  22   Q.    And so once you got the mementos back from

02:34  23   TSMC, they did not work, just to be clear, correct?

02:34  24   A.    Yes.  I said that.  Yes.

02:34  25   Q.    There were no working signals, correct?

191

| 02:34 | 1 | A.    Correct. |

02:34    1        A.    Correct.

02:34    2        Q.    And you didn't know why it wasn't working?

02:34    3        A.    We could not debug it properly.  Yes.

02:34    4        Q.    I'm sorry?  You said --

02:34    5        A.    We could not -- we don't have the capability

02:34    6    to debug it properly.

02:34    7        Q.    So you didn't know why it wasn't working?

02:34    8        A.    Okay.  We did not.

02:34    9             MR. BURESH:  Mr. Palisoul, could you pull

02:34    10    up D-1625, please?

02:34    11    BY MR. BURESH:

02:34    12        Q.    Dr. Chu, do you recognize this document?

02:34    13        A.    Yes.  I do.

02:34    14        Q.    Okay.  And what is it?

02:35    15        A.    It's a presentation presented for the board

02:35    16    meeting on July 26, 2000.

02:35    17        Q.    Okay.  And this was a board meeting that you

02:35    18    gave to -- on behalf of ACQIS, correct?

02:35    19        A.    Oh, yes.  Of course.  Uh-huh.

02:35    20             MR. BURESH:  Your Honor, I would move

02:35    21    D-1625 into evidence.

02:35    22             MR. COLLARD:  No objection.

02:35    23             THE COURT:  Admitted.

02:35    24             MR. BURESH:  If we could go to Slide 6,

02:35    25    please.

192

```
02:35   1    BY MR. BURESH:
02:35   2         Q.    So here you were in a board meeting, you were
02:35   3    describing that the ASIC development would be
02:35   4    discontinued, correct?
02:36   5         A.    Yes.
02:36   6         Q.    And just to be clear, the ASIC was another
02:36   7    name for your interface controller, correct?
02:36   8         A.    Correct.
02:36   9         Q.    Now, you told the board that the ASIC, your
02:36  10    invention, is "inefficient in power and performance."
02:36  11              Do you see that?
02:36  12         A.    Yes.
02:36  13         Q.    You mentioned below that bullet point that the
02:36  14    ASIC had "long PCI latency delay," correct?
02:36  15         A.    Yes.  I did.
02:36  16         Q.    You believe that your interface controller
02:36  17    chip, your design of it, would actually cause delay in
02:36  18    the transmission, correct?
02:36  19         A.    It would cause delay.  Yes.
02:36  20         Q.    Because any time you introduce a device that's
02:36  21    doing conversions between two buses, you're going to
02:36  22    increase latency or delay, aren't you?
02:36  23         A.    Yes.
02:36  24         Q.    Now, you didn't say anything about here that
02:36  25    you didn't have money to continue your development.
```

193

02:37   1           That wasn't what you told the board of
02:37   2   directors, correct?
02:37   3       A.    It's not on this slide, but certainly they
02:37   4   know.
02:37   5       Q.    But it's not on this slide?
02:37   6       A.    Well, but it's part of the presentation.
02:37   7       Q.    You're talking about technical problems,
02:37   8   aren't you?
02:37   9       A.    Here, yes.  Of course.  Uh-huh.
02:37  10       Q.    Now, you never went back and tried to figure
02:37  11   out how to get your chip for your XP Bus working; isn't
02:37  12   that correct?
02:37  13       A.    We didn't have the funding I mentioned.
02:37  14       Q.    I mean, at no time in the future.  We've seen
02:37  15   some big numbers floating around about settlements
02:37  16   you've taken.
02:37  17           You never went back and tried to get it to
02:37  18   work even after you had money, did you?
02:37  19       A.    You're talking about a huge time difference.
02:37  20   This was in 2000.
02:37  21       Q.    I'm just asking a question.
02:37  22           You never went back and tried to get your XP
02:37  23   Bus to work, did you?
02:37  24       A.    At that point in time, there was industry
02:37  25   standard.  It was not for me to actually change that

194

02:37  1   anymore.

02:37  2       Q.    So the answer is no.  You didn't try to get

02:38  3   your XP Bus to work ever at any point in the future,

02:38  4   correct?

02:38  5       A.    I did not.

02:38  6       Q.    In fact, in these devices we have here, you

02:38  7   removed the XP Bus entirely, correct?

02:38  8       A.    Yes.  I said that.  Uh-huh.

02:38  9       Q.    And the only time you got your modular system

02:38  10  to work in a way that you could sell it was when you

02:38  11  did not include your LVDS channel idea, correct?

       12      A.    Correct.

02:38  13      Q.    Now, we've talked about PCI some.

02:38  14            You remember there was also the USB peripheral

02:38  15  bus on Figure 5 --

02:38  16      A.    Yes.

02:38  17      Q.    -- of J-22.

02:38  18      A.    There was.

02:38  19      Q.    Now, you never even tried to build a chip that

02:38  20  would communicate USB over your XP Bus; is that right?

02:38  21      A.    That's right.

02:38  22      Q.    Never even attempted it?

02:38  23      A.    No.

02:38  24      Q.    In fact, you didn't even actually think about

02:39  25  how to design or implement carrying USB over your XP

195

02:39   1    Bus.  You never even thought about the design of that,

02:39   2    did you?

02:39   3        A.    How can you say that?  It's in my description

02:39   4    of the patent.

02:39   5        Q.    I'll ask you the question again.

02:39   6              You didn't think about how to design and how

02:39   7    to implement sending USB over the LVDS bus, correct?

02:39   8    That's my question.

02:39   9        A.    Say it again, please.

02:39   10       Q.    You did not think about how to design and how

02:39   11   to implement sending USB over the LVDS bus; is that

02:39   12   correct?

02:39   13       A.    I did not go and study the USB specification

02:39   14   and try to do a design to convert -- in those days

02:39   15   would be the USB 2.0 or 1.0 -- and put it through my

02:39   16   bus.  But what I did respond I had just now, I have

02:40   17   shown in my patent description to say those are slow

02:40   18   buses.  So if you need to do that, you can pass it

02:40   19   through the XP Bus.

02:40   20             MR. BURESH:  All right.  Let's pull up

02:40   21   June 8th, 2022 transcript.

02:40   22   BY MR. BURESH:

02:40   23       Q.    Were you -- excuse me.

02:40   24             Were you deposed in a proceeding on June 8th?

02:40   25       A.    Yes.  Of course.  Uh-huh.

| | | |
|---|---|---|
| 02:40 | 1 | MR. BURESH: Sorry. It's June 8th, 2022. |
| 02:41 | 2 | BY MR. BURESH: |
| 02:41 | 3 | Q. Can you see the deposition on the screen in |
| 02:41 | 4 | front of you, Dr. Chu? |
| 02:41 | 5 | A. Yes. |
| 02:41 | 6 | Q. Were you deposed on June 8th, 2022? |
| 02:41 | 7 | A. Yes. |
| 02:41 | 8 | MR. BURESH: Okay. If we could go to |
| 02:41 | 9 | Page 75, starting at Line 7, please. |
| 02:41 | 10 | Page 75. |
| 02:41 | 11 | BY MR. BURESH: |
| 02:41 | 12 | Q. I'm going to give you a second to review this |
| 02:41 | 13 | portion of your transcript, Dr. Chu, and then I'm going |
| 02:41 | 14 | to ask you the question again. All right? |
| 02:41 | 15 | A. Sure. Uh-huh. |
| 02:41 | 16 | Q. You didn't think about how to design and how |
| 02:41 | 17 | to implement sending USB over the LVDS bus, correct? |
| 02:42 | 18 | MR. COLLARD: Objection, Your Honor, to |
| 02:42 | 19 | improper impeachment. He actually gave an answer |
| 02:42 | 20 | that's close to what was the answer here. |
| 02:42 | 21 | MR. BURESH: It's not even in the |
| 02:42 | 22 | ballpark. |
| 02:42 | 23 | THE COURT: Could I hear the question |
| 02:42 | 24 | again? |
| 02:42 | 25 | MR. BURESH: Yes. |

```
           1   BY MR. BURESH:
02:42      2        Q.   You didn't think about how to design and how
02:42      3   to implement sending USB over the LVDS bus, correct?
02:42      4                 THE COURT:  And your objection is?
02:42      5                 MR. COLLARD:  Improper impeachment.
02:42      6                 THE COURT:  Overruled.
02:42      7   BY MR. BURESH:
02:42      8        Q.   Can you answer the question?
02:42      9        A.   Yes.  If you look at the answer, I said -- I
02:42     10   said it's possible.  I did not think about the design.
02:42     11            What I mean by that --
02:42     12        Q.   And I don't need an explanation.
02:42     13                 THE COURT:  He just asked you to respond
02:42     14   to the question.
02:42     15                 THE WITNESS:  Oh, okay.
02:42     16                 THE COURT:  You may continue.
02:42     17   BY MR. BURESH:
02:42     18        Q.   You didn't figure out how to actually go and
02:42     19   do it, correct?
02:42     20        A.   Correct.
02:42     21        Q.   You didn't do the design work for USB,
02:42     22   correct?
02:42     23        A.   The design work for the USB circuitry.
02:43     24   Correct.
02:43     25        Q.   All you said was it's possible?
```

198

02:43   1        A.    It's possible to send through the XP Bus.

02:43   2   Yes.

02:43   3        Q.    So to summarize --

02:43   4              MR. BURESH:  You can go back to the

02:43   5   exhibit now.

02:43   6   BY MR. BURESH:

02:43   7        Q.    So to summarize, you could not get PCI local

02:43   8   bus working over your XP Bus, correct?

02:43   9        A.    Correct.

02:43   10       Q.    You didn't try to implement your XP Bus with

02:43   11  USB, correct?

02:43   12       A.    Correct.

02:43   13       Q.    Now, sitting here today, I believe you

02:43   14  testified that if you just tried hard enough, you'd get

02:43   15  your XP Bus working or something to that effect, right?

02:43   16       A.    Yes.

02:43   17       Q.    But you can't say for sure that your XP Bus

02:43   18  would even work, can you?

02:43   19       A.    Why do you say that?

02:43   20       Q.    Because actions speak louder than words.

02:43   21             You never got it working, did you?

02:43   22       A.    I didn't have the time to prove my action.

02:43   23       Q.    Now, after you went ahead and built your

02:44   24  modular computer system with the PCI local bus as the

02:44   25  connection, you did sell some, correct?

02:44   1          A.    Yes.

02:44   2          Q.    But you wouldn't consider that to be

02:44   3     commercially successful, correct?

02:44   4          A.    No.

02:44   5          Q.    In fact, you didn't make enough money to keep

02:44   6     your business going, correct?

02:44   7          A.    Correct.

02:44   8          Q.    Since 2004, you have not developed any

02:44   9     products, correct?

02:44   10         A.    Yes.  We sold the hardware business.

02:44   11         Q.    I'm sorry?

02:44   12         A.    We sold the hardware business.

02:44   13         Q.    So since 2004, you have not developed any

02:44   14     products at all, correct?

02:44   15         A.    Correct.

02:44   16         Q.    And since 2004, you have not sold any

02:44   17     products, correct?

02:44   18         A.    Correct.

02:44   19         Q.    So for about the past 20 years, ACQIS has not

02:44   20     built or sold a single product, correct?

02:44   21         A.    Correct.

02:44   22         Q.    Now, once you stopped trying to build products

02:45   23     in 2004, you shifted gears, right, with your business?

02:45   24         A.    Yes.  Yes.

02:45   25         Q.    In fact, you changed your company name just

—200—

02:45   1    slightly, from LLC to Inc. or vice versa.  I can't

02:45   2    remember which way you went.  You can tell me.

02:45   3        A.    We did not change the company name.

02:45   4        Q.    You didn't?

02:45   5        A.    We had a subsidiary as LLC.

02:45   6        Q.    Okay.  And you focused on licensing, correct?

02:45   7        A.    Correct.

02:45   8        Q.    That was your full business going forward, was

02:45   9    trying to license your patents?

02:45   10       A.    Correct.

02:45   11       Q.    Okay.  Now, you showed us a lot of licenses,

02:45   12   right?

02:45   13       A.    Yes.

02:45   14       Q.    Now, every one of those was really a

02:45   15   settlement agreement; isn't that correct?

02:45   16       A.    What do you mean?

02:45   17       Q.    I mean that every one of those that you showed

02:45   18   us was a settlement agreement to resolve a lawsuit that

02:45   19   you brought; isn't that correct?

02:46   20       A.    You used the term "settlement agreement."

02:46   21       Q.    Uh-huh.

02:46   22              MR. COLLARD:  Objection, Your Honor.  Can

02:46   23   we approach?

02:46   24              THE COURT:  Sure.

02:46   25              (Bench conference.)

—201—

02:46   1                  MR. COLLARD:  Your Honor, it seems to be
02:46   2   going right up to your motion in limine talking about
02:46   3   litigations.  We avoided that on our direct.  We
02:46   4   avoided opening the door to that issue, and now he's
02:46   5   asking him about them all being from litigation.
02:46   6                  THE COURT:  I think he's just trying to
02:46   7   make the point of how they arrived at these.
        8                  MR. COLLARD:  Correct.
02:46   9                  THE COURT:  And you're correct that all
02:46   10  of them were a result of either respect to litigation
02:46   11  or --
02:46   12                 MR. COLLARD:  They were all the result of
02:46   13  litigation.  Every single one.
02:46   14                 THE COURT:  That's just a fact.
02:46   15                 MR. COLLARD:  Okay.  Thank you.
02:46   16                 (Bench conference concludes.)
02:46   17  BY MR. BURESH:
02:46   18     Q.   Every single agreement that you entered with
02:47   19  all those companies we saw on the screen, they were the
02:47   20  settlement of a lawsuit that you brought, correct?
02:47   21     A.    Correct.
02:47   22     Q.   So in the 20 years that you've been trying to
02:47   23  license your patents, there's never been a single
02:47   24  company that's come to you and said, oh, Dr. Chu.  We
02:47   25  really love your idea for an X bus.  Can we use your

202

| | | |
|---|---|---|
| 02:47 | 1 | technology? |
| 02:47 | 2 | Never been one of those, right? |
| 02:47 | 3 | A.    Nobody wants to talk to us.  Yes. |
| 02:47 | 4 | Q.    So you've sued a lot of companies, correct? |
| 02:47 | 5 | A.    Correct. |
| 02:47 | 6 | Q.    And many of those companies that you've sued |
| 02:47 | 7 | have settled, correct? |
| 02:47 | 8 | A.    You just said that.  Yes. |
| 02:47 | 9 | Q.    So it's correct? |
| 02:47 | 10 | A.    Correct. |
| 02:47 | 11 | Q.    It's a fact, isn't it, that when you sue |
| 02:47 | 12 | companies, many will enter a settlement agreement just |
| 02:47 | 13 | to avoid the time and expense of the litigation without |
| 02:48 | 14 | any admission of liability or fault.  Isn't that a |
| 02:48 | 15 | fact? |
| 02:48 | 16 | MR. COLLARD:  Objection.  Foundation, |
| 02:48 | 17 | Your Honor. |
| 02:48 | 18 | THE COURT:  Overruled. |
| 02:48 | 19 | A.    I cannot speak to what the other companies are |
| 02:48 | 20 | thinking of when they license our patents.  There are |
| 02:48 | 21 | small amounts and there are large amounts.  It is not |
| 02:48 | 22 | for me to say whether it's because of legal costs or |
| 02:48 | 23 | other reason. |
| 02:48 | 24 | MR. BURESH:  Okay.  Let's pull up Joint |
| 02:48 | 25 | Exhibit 52, which has been previously admitted. |

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | Did you publish that already?  Thank you.              |
| 02:49 | 2  | Could you zoom in on the first "whereas"               |
| 02:49 | 3  | clause, Mr. Palisoul?                                   |
| 02:49 | 4  | BY MR. BURESH:                                          |
| 02:49 | 5  | Q.    So it's not for you to say why companies         |
| 02:49 | 6  | settle.                                                 |
| 02:49 | 7  | Is that your answer previously?                        |
| 02:49 | 8  | A.    Yes.  It's the other party's decision.           |
| 02:49 | 9  | Q.    But you actually say in some of your             |
| 02:49 | 10 | settlement agreements that the parties are currently   |
| 02:49 | 11 | engaged in the litigation, and to avoid the time and   |
| 02:49 | 12 | expense of the litigation and without any admission of |
| 02:49 | 13 | liability or fault, the parties desire to enter a full,|
| 02:49 | 14 | final, complete, and global settlement, correct?       |
| 02:49 | 15 | A.    First of all, this is --                         |
| 02:49 | 16 | Q.    Is that what the document says?                  |
| 02:49 | 17 | A.    That's what the document said.                   |
| 02:49 | 18 | Q.    And this is a settlement agreement, is it not?   |
| 02:49 | 19 | A.    But you have to understand who wrote this        |
| 02:49 | 20 | settlement agreement.                                  |
| 02:49 | 21 | THE COURT:  No, no, no, no.  You answer               |
| 02:50 | 22 | his question.                                          |
| 02:50 | 23 | THE WITNESS:  Okay.                                   |
| 02:50 | 24 | THE COURT:  If your lawyer wants to have              |
| 02:50 | 25 | you explain it, he can.                                |

02:50  1          A.    Please ask the question again.  Yep.

02:50  2     BY MR. BURESH:

02:50  3          Q.    My question was:  This is a settlement

02:50  4     agreement, correct?

02:50  5          A.    It's a patent licensing agreement.  Correct.

02:50  6          Q.    It is a settlement and license agreement,

02:50  7     correct?

02:50  8          A.    Yes.  Both.

02:50  9          Q.    Okay.  And we're seeing here the desire of the

02:50  10    parties is to end the litigation; isn't that correct?

02:50  11         A.    Yes.  It is.  Uh-huh.

02:50  12         Q.    Okay.  That's what was said in this formal

02:50  13    document, correct?

02:50  14         A.    Correct.

02:50  15                   MR. BURESH:  Can we pull up P-925,

02:50  16    please?

02:51  17                   (Off-the-record discussion.)

02:51  18    BY MR. BURESH:

02:51  19         Q.    Dr. Chu, you used this document in your direct

02:51  20    testimony, correct?

02:51  21         A.    Correct.  Uh-huh.

02:51  22         Q.    Now, every one of these companies on this

02:51  23    slide in front of us offered modular computers for

02:51  24    sale, correct?

02:51  25         A.    Yes.  That's the time when we had our first

02:51    1    activity on licensing.

02:51    2        Q.    So every one of these companies is doing

02:51    3    modular computing?

02:51    4        A.    Yes.  That's because we had at that time only

02:52    5    modular computing patents.

02:52    6        Q.    And my clients aren't doing modular computing,

02:52    7    right?

02:52    8        A.    I don't think so.

02:52    9        Q.    So we're not quite situated the same as these

02:52    10    companies; isn't that fair?

02:52    11        A.    Well, you have to look at the time frame.

02:52    12    This is --

02:52    13        Q.    I'm just saying, we're not doing modular

02:52    14    computing.  They are.  We're not situated the same way

02:52    15    as they are, correct?

02:52    16        A.    We are not situated the way they are in 2010.

02:52    17    Yes.

02:52    18                MR. BURESH:  Now, you can take this down

02:52    19    now.

02:52    20    BY MR. BURESH:

02:52    21        Q.    When companies do pay settlement agreements or

02:52    22    enter settlement agreements with you, Dr. Chu, and they

02:52    23    pay some dollars to get out of their lawsuit, you take

02:52    24    a big chunk of that change, right?

02:52    25        A.    Do you mean me myself?

206

02:52  1       Q.    I mean you as your company.  Yes.

02:52  2       A.    As a company, of course we take a percentage

02:52  3  of the settlement.  Yes.

02:52  4       Q.    And you're the largest shareholder of your

02:52  5  company, right?

02:52  6       A.    Yes.  I am.

02:52  7       Q.    So if these companies settle after you sue

02:53  8  them, you stand to personally profit from every one of

02:53  9  those, right?

02:53  10      A.    As an aggregate, when we do have money

02:53  11 remaining in the company, we certainly would distribute

02:53  12 to our hundred shareholders, and I'm one of them.  Yes.

02:53  13      Q.    Now, let me ask -- I'll give you an open-ended

02:53  14 one, okay?  It won't have "correct" at the end.

02:53  15            Would you agree with me that it wouldn't be

02:53  16 fair to take credit for things you don't invent?

02:53  17      A.    Yes.

02:53  18      Q.    Okay.  I'm going to go through a few things

02:53  19 here that are inside of my client's computers, all

02:53  20 right?

02:53  21            You didn't invent a CPU?

02:53  22      A.    No.

02:53  23      Q.    You didn't invent a graphics processing

02:53  24 subsystem, right?

02:53  25      A.    No.

02:53  1        Q.    So you shouldn't get credit for that?

02:53  2        A.    It's for the damage expert to decide.

02:54  3        Q.    I'm just -- you agree with me that you

02:54  4    shouldn't get credit for what you don't invent.  You've

02:54  5    said you don't invent a graphics processing unit; ergo,

02:54  6    you shouldn't get credit for the graphics processing

02:54  7    unit, right?

02:54  8        A.    If the graphics processing unit uses the bus I

02:54  9    invented, certainly there would be credit.

02:54  10       Q.    You didn't invent RAM, which is a type of

02:54  11   memory, correct?

02:54  12       A.    Correct.

02:54  13       Q.    You didn't invent a hard drive for a computer,

02:54  14   correct?

02:54  15       A.    Correct.

02:54  16       Q.    You didn't invent SSD memory or persistent

02:54  17   memory, correct?

02:54  18       A.    Correct.

02:54  19       Q.    You didn't invent flash memory?

02:54  20       A.    Correct.

02:54  21       Q.    You didn't invent a circuit board, correct?

02:54  22       A.    Correct.

02:54  23       Q.    You didn't invent a battery, right?

02:54  24       A.    Correct.

02:54  25       Q.    You didn't invent a power supply for a

02:54  1  computer?

02:54  2      A.    Correct.

02:54  3      Q.    You didn't invent a new case for a computer,

02:54  4  like the outer shell, correct?

02:54  5      A.    Correct.

02:55  6      Q.    So you wouldn't get credit for any of those

02:55  7  things I just listed, correct?

02:55  8              MR. COLLARD:  Your Honor, I object to

02:55  9  vague as to credit.  I'm not really sure what the

02:55  10  question is.

02:55  11              THE COURT:  Are you objecting, you think

02:55  12  your witness doesn't know what "credit" means?

02:55  13              MR. COLLARD:  Okay.  I don't know if he

02:55  14  knows in the context --

02:55  15              THE COURT:  If he would like to ask what

02:55  16  "credit" means, he can; otherwise, I'm going to

02:55  17  overrule the objection.

02:55  18      A.    If the computer system is using my invention,

02:55  19  which is the bus I mentioned, and if the computer

02:55  20  system would not work without that invention, then the

02:55  21  question is:  If you cannot sell the computer without

02:55  22  that invention, then the -- then the computer -- the

02:55  23  whole computer is going to be sold based on the

02:55  24  invention.

02:55  25              So there would be credit if it's required for

02:55    1    my invention to work.

02:55    2    BY MR. BURESH:

02:55    3        Q.    So you would get credit for a battery because

02:56    4    it's sold, because you allege that they're using LVDS,

02:56    5    that you should get credit for a battery.

02:56    6            Is that your testimony?

02:56    7        A.    That's not what I'm saying.

02:56    8        Q.    Okay.

02:56    9        A.    If they -- can I continue on that?

02:56    10       Q.    No.  That's fine.  Your attorney can take his

02:56    11   time to ask you again if he'd like, all right?

02:56    12           You weren't involved in the development of PCI

02:56    13   Express at all, correct?

02:56    14       A.    No.  I wasn't involved.

02:56    15       Q.    Or USB -- any version of USB, you weren't

02:56    16   involved in the development of that either?

02:56    17       A.    I was not.

02:56    18       Q.    Okay.  You weren't even aware of PCI Express

02:56    19   until it was publicly announced in 2003, correct?

02:56    20       A.    Yes.  Of course.  Uh-huh.

02:56    21       Q.    And PCI was -- PCI Express was in wide use

02:56    22   after 2003, wasn't it?

02:56    23       A.    If it become an industry standard, yes.

02:56    24       Q.    It kind of took off like wild fire, right?

02:56    25       A.    It took off.  Yes.

02:56  1      Q.    You aware that ASUSTeK was using PCI Express

02:56  2  by 2004?

02:57  3      A.    I don't think at 2004, but at a later date,

02:57  4  yes.

02:57  5      Q.    You've testified that you believe you've

02:57  6  invented some aspects of PCI Express; is that fair?

02:57  7      A.    Yes.

02:57  8      Q.    Okay.  And you realized that once you saw the

02:57  9  announcement of PCI Express in 2003 or 2004?

02:57  10      A.    Yes.  Uh-huh.

02:57  11      Q.    But you didn't go to ASUSTeK at that point and

02:57  12  say, you might be infringing?

02:57  13      A.    Remember what I said earlier, that --

02:57  14      Q.    Did you go to ASUSTeK at that point and say,

02:57  15  you might be infringing?

02:57  16      A.    I did not have the patent to go to ASUSTeK at

02:57  17  the time.

02:57  18      Q.    Okay.  It took you -- from the time PCI

02:57  19  Express was released, it took you 14 years to send a

02:57  20  letter to ASUSTeK, correct?

02:57  21      A.    It took me only two years after I have the

02:58  22  asserted patents to go tell ASUSTeK.

02:58  23      Q.    You had 30 patents, right?

02:58  24      A.    Not all patents would apply to ASUSTeK.

02:58  25      Q.    Okay.  Now, let me just ask you this:  If

02:58  1    someone trespassed on your property, like the barbed

02:58  2    wire fence that we saw during your counsel's opening,

02:58  3    they cut your fence down, would you go immediately as

02:58  4    soon as you learned about it and say something?

02:58  5        A.    "Immediate" is a relative term.  We have to

02:58  6    gather the proper resource and situation to really take

02:58  7    a company -- basically to file a suit against a company

02:58  8    or...

02:58  9            So it is not a simple process of if I know

02:58  10   somebody, I would right away be able to notify that

02:58  11   company.

02:58  12       Q.    It sounded pretty easy during your direct.

02:58  13   You just looked up on the Internet and it said that

02:58  14   ASUSTeK was using PCI Express, boom.

02:59  15       A.    Yes.

02:59  16       Q.    Pretty easy, right?

02:59  17       A.    Given the resources we had, the most important

02:59  18   thing is for our company or myself to send a letter to

02:59  19   notify ASUSTeK, hoping that they would talk to us.  So

02:59  20   that is really the start of the damage in terms of

02:59  21   patent -- violating our patent rights.

02:59  22       Q.    So on -- the letter you sent was on May 15th

02:59  23   of 2018, correct?

02:59  24       A.    Correct.

02:59  25       Q.    That was one year before your patents started

—212—

02:59  1    expiring, correct?

02:59  2        A.    Yes.

02:59  3        Q.    To the day?

02:59  4        A.    I guess.

02:59  5        Q.    Yeah.

02:59  6              But that timing, that pending expiration of

02:59  7    your patents didn't have anything to do with why you

02:59  8    sent them a letter?

02:59  9        A.    No.

02:59  10       Q.    Okay.  It just happened to be on the one-year

02:59  11   pre-anniversary?

02:59  12       A.    I didn't even consider that.

02:59  13       Q.    Okay.  "Expired" means your patents are

02:59  14   running out of life, correct?

02:59  15       A.    "Expired" means any product that's built after

03:00  16   that date, you have no rights to.

03:00  17       Q.    Because you get 20 years of patent life,

03:00  18   right?

03:00  19       A.    Correct.

03:00  20       Q.    And you did your invention back in 1998, 1999,

03:00  21   right?

03:00  22       A.    Yes.

03:00  23       Q.    So your 20 years was up?

03:00  24       A.    Correct.

03:00  25       Q.    Sitting here today, your 20 years has been up

213

03:00  1    for a while now, right?

03:00  2        A.    Yes.

03:00  3        Q.    Now, you testified that ASUSTeK didn't respond

03:00  4    to your letter, correct?

03:00  5        A.    Yes.

03:00  6        Q.    You have no idea whether anyone at ASUSTeK

03:00  7    ever read your letter, do you?

03:00  8        A.    No idea.

03:00  9        Q.    You never followed up with them with another

03:00  10   letter or an e-mail?

03:00  11       A.    I did not.

03:00  12       Q.    You didn't pick up the phone and try to call

03:00  13   somebody?

03:00  14       A.    I did not.

03:00  15       Q.    In your letter, you never told them, I think

03:00  16   you're infringing, did you?

03:00  17       A.    I think I did.

03:00  18       Q.    You didn't use those words?

03:01  19       A.    It's just a word.

03:01  20       Q.    It's a word.  And I'm asking, did you say that

03:01  21   word in your letter?

03:01  22       A.    I did not say that word for ASUSTeK.

03:01  23       Q.    You didn't tell them to stop using PCI Express

03:01  24   or USB 3, did you?

03:01  25       A.    I just asked them to talk to us.

03:01  1        Q.    You never told them you were going to sue

03:01  2   them, right?

03:01  3        A.    If I don't say they infringe, of course I

03:01  4   haven't said that I would sue them.  Yes.

03:01  5        Q.    After your letter in May of 2018, you waited

03:01  6   for two more years before you filed a lawsuit, correct?

03:01  7        A.    Correct.

03:01  8        Q.    You waited until after your patents expired to

03:01  9   file your lawsuit, correct?

03:01  10        A.    I didn't wait for anything.  It was -- it

03:01  11   takes time for us to collect the resource to file the

03:01  12   lawsuit.

03:01  13        Q.    What's the filing fee to file a lawsuit in

03:01  14   this court?  Do you know?

03:01  15        A.    Could you say that again?

03:02  16        Q.    What's the filing fee to file a lawsuit in

03:02  17   this court?  Do you know?

03:02  18        A.    It's -- I'm not talking about that.

03:02  19        Q.    Oh.  Because it's like, what, 150 bucks?

03:02  20        A.    As I said, I'm not talking about that.

03:02  21             MR. BURESH:  Pass the witness, Your

03:02  22   Honor.

03:02  23                   REDIRECT EXAMINATION

03:02  24   BY MR. COLLARD:

03:02  25        Q.    Good afternoon, Dr. Chu.

03:02  1      A.    Good afternoon.

03:02  2      Q.    Let's just start right where you left off.

03:02  3  You said that you weren't talking about the filing fee

03:02  4  of a lawsuit when you were saying that.  You had to --

03:02  5  that -- when you were talking about the cost to file a

03:02  6  lawsuit, what were you talking about?

03:02  7      A.    To be able to have maybe the guts or the

03:02  8  financial resource to file a lawsuit, even before you

03:02  9  go to court, it costs a lot of money.  It costs what we

03:03  10  call out-of-pocket expense.  It costs legal fees.

03:03  11  Because you have to go through depositions, testimony,

03:03  12  discovery.  So it's a very expensive process.  So we

03:03  13  don't take it lightly.

03:03  14          And what I meant was when I sent out the

03:03  15  letter in 2018, I sent out to 18 companies, not just

03:03  16  ASUSTeK.  That's just one of them.  And it took me a

03:03  17  long time to find a partnership in a law firm to be

03:03  18  able to say, okay.  I'm willing to handle your case.

03:03  19  In fact, it took me a lot of time to find the financing

03:03  20  for it.

03:03  21          And two years is really not that long because

03:03  22  we filed -- at the same time when we filed lawsuit

03:03  23  against ASUSTeK, we already have filed three lawsuits

03:03  24  before that.  And together with ASUSTeK, we filed

03:04  25  another four companies.  It took a huge amount of

03:04  1    resource to do that.  So --

03:04  2        Q.    But, Dr. Chu, do you like to litigate, or do

03:04  3    you want to avoid litigation?

03:04  4        A.    We try to avoid litigation very much.  As you

03:04  5    see, in terms of settlements we got, we --

03:04  6        Q.    So you looked at that Lenovo settlement for a

03:04  7    little bit with Mr. Buresh.

03:04  8              Do you recall that?

03:04  9        A.    Yes.

03:04  10       Q.    Is -- does Lenovo make computers like ASUS?

03:04  11   Do you know if they're a competitor of ASUS?

03:04  12       A.    Lenovo is even -- is actually what you will

03:04  13   see today as the IBM laptops.  They bought the

03:04  14   business.  So they are actually very large in U.S.

03:04  15       Q.    So do you know what they settled that case

03:04  16   for?

03:04  17       A.    They settled for, I believe, ███████████

03:04  18       Q.    Okay.  Is that settlement -- you do know how

03:04  19   much litigation costs.

03:04  20             Was that settlement, is that sort of just

03:05  21   calculated to whatever the litigation costs would be,

03:05  22   they would pay you that instead?

03:05  23       A.    No.  Even though coming to court costs a lot

03:05  24   of money, typically the assumption is anywhere from 3

03:05  25   to $5 million.  ███████████████████████

—217—

| | | |
|---|---|---|
| 03:05 | 1 | ███████████ |
| 03:05 | 2 | Q.    Okay.  Were the patents at issue in that |
| 03:05 | 3 | settlement with Lenovo, were they similar to the |
| 03:05 | 4 | patents that were at issue here? |
| 03:05 | 5 | A.    Yes.  They were. |
| 03:05 | 6 | Q.    Okay.  And did Lenovo have an opportunity in |
| 03:05 | 7 | that -- in that case to evaluate the patents and get |
| 03:05 | 8 | their own experts and do all sorts of litigation? |
| 03:05 | 9 | A.    They actually challenged the patent in the |
| 03:05 | 10 | Patent Office.  Even ASUSTeK did. |
| 03:05 | 11 | Q.    Let's -- |
| 03:05 | 12 | MR. BURESH:  Your Honor, move to strike |
| 03:05 | 13 | that answer. |
| 03:05 | 14 | THE COURT:  Why? |
| 03:05 | 15 | MR. BURESH:  Because we don't get to talk |
| 03:05 | 16 | about other proceedings like that. |
| 03:05 | 17 | THE COURT:  Overruled. |
| 03:06 | 18 | BY MR. COLLARD: |
| 03:06 | 19 | Q.    So even after doing all those things and |
| 03:06 | 20 | having their own expert and challenging the patent, did |
| 03:06 | 21 | they -- did Lenovo settle after doing those things? |
| 03:06 | 22 | A.    Yes. |
| 03:06 | 23 | Q.    Did -- of the other settlements on that |
| 03:06 | 24 | demonstrative 920 or that Exhibit 920, did they do the |
| 03:06 | 25 | same thing?  They had the chance to look at the patents |

218

03:06  1   and test them and get their own experts and their own

03:06  2   evaluations before they settled?

03:06  3       A.    Any large computer companies with the resource

03:06  4   we're talking about, these are companies with billions

03:06  5   of dollars in revenue.  They certainly would look at

03:06  6   the patent and try to challenge it.  That's why I said

03:06  7   our patent was being challenged many times.  And --

03:06  8       Q.    Okay.  Oh, sorry.  Go ahead.

03:06  9       A.    And so they know.  A company knows whether a

03:06  10  patent has value.  Otherwise, they would not pay for

03:07  11  it.  They are not certainly lack of money to fight.

03:07  12      Q.    Dr. Chu, there's a lot of discussion about the

03:07  13  modular aspects of your computer with Mr. Buresh.

03:07  14            Do you remember that discussion?

03:07  15      A.    Yes.

03:07  16      Q.    Okay.  And I want to try to explain that a

03:07  17  little more because I want to talk about a word that

03:07  18  came up a little bit in the patent video but we haven't

03:07  19  talked about.

03:07  20            Can you explain to the jury what an embodiment

03:07  21  of your invention is, Dr. Chu?

03:07  22      A.    An embodiment is just a description of one of

03:07  23  the ways of using, in this case, the computer bus.

03:07  24      Q.    Okay.  And over the life of all of your

03:07  25  patents, you said there were over 30.

219

03:07  1        Were there different embodiments in different

03:07  2   patents and different claims?

03:07  3        A.    Embodiment is just to tell the patent examiner

03:08  4   this is one way you can do it.  But what I would like

03:08  5   to add is if you look at our claim, the claim can --

03:08  6   can claim that the bus has been used more than once in

03:08  7   a computer system.  Because once you have invented a

03:08  8   bus, nothing really prevents you from using it more

03:08  9   than once.

03:08  10       So please do not feel that because the

03:08  11  description itself doesn't talk about the bus being

03:08  12  used in two different places.  I certainly, as an

03:08  13  inventor, have a right to say this bus can be used in

03:08  14  this situation.  Plus in the same computer, I can use

03:08  15  the bus in another situation.

03:08  16       Q.    Let's -- Dr. Chu, let's try to let -- let's

03:08  17  look at something specific.  I want to look at the

03:08  18  patent application you looked at -- or sorry -- the

03:08  19  issued patent you looked at with Mr. Buresh.

03:08  20       A.    Yes.

03:08  21       Q.    So he compared some parts of the white papers

03:08  22  with some parts of the patent application?

03:09  23       A.    Yes.

03:09  24       Q.    But does it sound right to you that J-23, the

03:09  25  first white paper that you were looking at, it's about

03:09   1    16 pages?  Does that seem about right?

03:09   2        A.    Okay.  Yes.

03:09   3        Q.    And then your patent application, let's -- or

03:09   4    sorry.  Your issued patent '768 --

03:09   5              MR. COLLARD:  Let's look at J-1.

        6    BY MR. COLLARD:

03:09   7        Q.    And I think that this is said to be two pages.

03:09   8              So was there more information in your patent

03:09   9    than there was in the original white paper, even if

03:09   10   some parts of the white paper made their way into the

03:09   11   patent?

03:09   12       A.    I mentioned that most of the invention that is

03:09   13   contained --

03:09   14       Q.    Sorry.  Is that -- can you answer my question

03:09   15   yes or --

        16       A.    Oh, sorry.

03:09   17       Q.    Like, can you -- if you -- it's okay if you

03:09   18   need to explain, but first, will you say yes or no?

03:09   19       A.    Yes.  Yes.

03:09   20             MR. COLLARD:  Okay.  So let's look at

03:09   21   J-1, please.

03:09   22             Oh, I have to do my things.

03:09   23             This is admitted.

03:09   24             And I want to go -- let's start at

03:09   25   Page 15 because I think we know that the prior art went

-221-

03:10   1   through the first 14 pages.  And then we started having

03:10   2   some of the figures.

03:10   3            So, Vicki, would you please flip through

03:10   4   these pictures?  Will you just flip a few pages ahead,

03:10   5   please?

03:10   6            Can you please -- I'm not seeing them.

03:10   7   If -- are you flipping a few pages ahead?

03:10   8            Okay.  Thank you.  And just keep going.

        9   BY MR. COLLARD:

03:10  10       Q.    So not all of these figures were in your white

03:10  11   paper, were they, sir?

03:10  12       A.    No.  These are some of the design work I did

03:10  13   after the white paper.  So it's between January and

03:10  14   May, I provided the patent attorney more detail design

03:10  15   of my invention.

03:11  16       Q.    Okay.  Thank you.

03:11  17            MR. COLLARD:  So we're up to about

03:11  18   Figure 28.  We can stop there.  And let's go to

03:11  19   Page 75.

03:11  20            Let's go to the last page then, and we'll

03:11  21   work back.  72.  Sorry.  So I want to go back till we

03:11  22   get to Claim 10.  And then I want to blow up Claim 10

03:11  23   really big.  It's on the left side.

03:11  24   BY MR. COLLARD:

03:11  25       Q.    So Claim 10 is actually one of the asserted

222

03:11  1    claims in this case.  And Mr. Buresh was asking you a

03:11  2    lot of different questions about what you invented.

03:11  3            But for the purposes of this case, what

03:11  4    describes your invention?

03:11  5    A.    My invention in most of claims are described

03:11  6    in actually a few sentence.

03:12  7    Q.    So what I'm really trying to ask, Dr. Chu, is

03:12  8    for the purposes of this case, do you need to prove

03:12  9    that ASUS is doing what you said in a white paper, or

03:12  10   do you need to prove that they are doing what is said

03:12  11   in the claim?

03:12  12   A.    In the claim.

03:12  13   Q.    In the claim.

03:12  14   A.    Yes.

03:12  15   Q.    All right.  So let's look at this claim.  And

03:12  16   it claims "a printed circuit board comprising."

03:12  17           Do you see that?

03:12  18   A.    Yes.

03:12  19   Q.    All right.  Sir, you were talking a lot about

03:12  20   some of the modular components.

03:12  21           Is there anything in this claim that requires

03:12  22   bridging between something like a computer module and a

03:12  23   bay like this?

03:12  24   A.    No.  No.

03:12  25   Q.    There's nothing -- there's nothing like that

03:12  1    in this claim?

03:12  2        A.    No.

03:12  3        Q.    Okay.  And so this claim's talking about a

03:13  4    printed circuit board.

03:13  5              And did your modular computer, though, did it

03:13  6    have a printed circuit board inside of it?

03:13  7        A.    Yes.

03:13  8        Q.    Do servers have printed circuit boards inside

03:13  9    them?

03:13  10       A.    Yes.

03:13  11       Q.    What about laptops?

03:13  12       A.    Yes.

03:13  13       Q.    Desktops?

03:13  14       A.    Yes.

03:13  15       Q.    Phones?

03:13  16       A.    Yes.

03:13  17       Q.    Okay.  So are you required in -- after you

03:13  18   invent something and write about it in white papers,

03:13  19   are you required for every claim to put in all the

03:13  20   different parts that you invented?  Every time you make

03:13  21   a claim?

03:13  22             You have to put in the modular part.  You have

03:13  23   to put in the bus.

03:13  24             Do you have to put in everything, or can you

03:13  25   have claims that are on parts of your invention?

224

03:13　1　　　　A.　　You don't have to put in everything, of

03:14　2　course.　You only put in the primary invention.

03:14　3　　　　Q.　　You talked a lot about integration, and you

03:14　4　walked through the figures.　And you said -- Mr. Buresh

03:14　5　said to you, Dr. Chu, are you integrating these two

03:14　6　things together and then these two things?

03:14　7　　　　　　Do you remember that?

03:14　8　　　　A.　　Yes.

03:14　9　　　　Q.　　Okay.　And then he said and showed you a

03:14　10　sentence that said:　That integration didn't change the

03:14　11　modular aspect of your computer.

03:14　12　　　　　　Do you remember that?

03:14　13　　　　A.　　Yes.

03:14　14　　　　Q.　　Did that integration change the computer bus

03:14　15　aspect of your invention?

03:14　16　　　　A.　　Yes.　Because it uses my invention.

03:14　17　　　　Q.　　Okay.　You were asked a lot of questions about

03:15　18　LVDS.

03:15　19　　　　　　Do you recall that?

03:15　20　　　　A.　　Yes.

03:15　21　　　　Q.　　Did you mean for your invention to be the same

03:15　22　thing as the LVDS in TTL technology from National?

03:15　23　　　　A.　　Yeah.　LVDS is the technology that I was

03:15　24　using, and National Semiconductor was building two

03:15　25　chips to do a special connection with TTL signals.

225

03:15  1          But the one I'm trying to use in the computer

03:15  2   system is taking the PCI local bus, even though they

03:15  3   are also TTL signals, but it's far more complicated

03:15  4   than the TTL signal that's shown by National.

03:16  5      Q.   Okay.  And I want to go back to your early

03:16  6   patents for a second.

03:16  7          When we were talking about how you're -- the

03:16  8   patents you were choosing -- or you were choosing to

03:16  9   assert.

03:16  10     A.   Yes.

03:16  11     Q.   What were your early patents directed to?

03:16  12     A.   The early group of patents I mentioned earlier

03:16  13  was -- has to have a modular computer.  So every claim

03:16  14  would start off with a modular computer module and

03:16  15  console.

03:16  16         And so that was the first group of patents.

03:16  17  That also probably came up to about 10 or 11.

03:16  18     Q.   Okay.  Just a couple more things, Dr. Chu.

03:16  19         Let's go back to the very first page of this

03:16  20  document and the date on this.  And we looked at this

03:16  21  during your direct examination.

03:16  22         And the date on this patent is December 27,

03:17  23  2016, almost the very end of 2016.

03:17  24         And can you enforce a patent before this

03:17  25  issued date?

03:17  1      A.    No.   I cannot.   I don't have the patent

03:17  2   rights.

03:17  3      Q.    Okay.   And did this patent expire -- or I

03:17  4   don't know actually when this one expired, but around

03:17  5   2019 or 2020?

03:17  6      A.    This one expired 2020.

03:17  7      Q.    Okay.   That's only four years.

03:17  8          Can you explain to the jury why this patent

03:17  9   only had four years between when it issued and when it

03:17  10  expired when they heard on the video that you usually

03:17  11  get closer to 20 years?

03:17  12          And I think that that's something that

03:17  13  Mr. Buresh may have said too.

03:17  14     A.    I only had the right to be able to get a new

03:17  15  patent on new claims that described -- that's described

03:17  16  in this patent based on the invention that I had in

03:18  17  1998.

03:18  18          So because in this particular case, it was

03:18  19  based on the patent I had in 20 -- sorry -- in 2000.

03:18  20  So that was the patent.   And I cannot change the

03:18  21  content of what I have invented in any of these later

03:18  22  patents.   You have to -- the Patent Office will only

03:18  23  allow you to claim things that was already in those

03:18  24  disclosures way early.

03:18  25          So as I said, I was awarded 30 patents.   So

—227—

03:18  1    sequentially, I was working on each one of them.  This

03:18  2    is one of the very late ones.  So Patent Office allows

03:18  3    it because it all relates to the invention I did prior

03:18  4    to the 2000 time frame.  But I only got four years left

03:18  5    because this 20 years of lifetime.

03:18  6         Q.    Okay.  Thank you, Dr. Chu.

03:19  7                   MR. COLLARD:  Your Honor, I can be really

03:19  8    brief, but can we approach?  I think it would be the

03:19  9    quickest way.

03:19  10                   THE COURT:  Sure.

03:19  11                   (Bench conference.)

03:19  12                   MR. COLLARD:  Your Honor, sorry to go

03:19  13   around on this again, but Mr. Buresh asked if he

03:19  14   mentioned the word "infringe" in his letter.  And he

03:19  15   does, but it's in the redacted section.

03:19  16                   MR. BURESH:  It's what?

03:19  17                   MR. COLLARD:  It does.  It says they were

03:19  18   found liable for infringement.  It says infringe.

03:19  19                   THE COURT:  He asked whether --

03:19  20                   MR. BURESH:  I asked whether --

03:19  21                   (Simultaneous conversation.)

03:19  22                   MR. COLLARD:  Okay.  Fine.

03:19  23                   THE COURT:  -- whether he accused the

24   defendant of infringing.

03:19  25                   MR. BURESH:  That was my question.

228

03:19  1              MR. COLLARD:  All right.  Thank you.

03:19  2              (Bench conference concludes.)

03:19  3    BY MR. COLLARD:

03:19  4        Q.    Just one last thing then, Dr. Chu.

03:20  5              Do you remember when you were asked about what

03:20  6    words you used in your letter to ASUS that's Exhibit

03:20  7    P-50?

03:20  8              Do you recall that?

03:20  9        A.    Yes.

03:20  10       Q.    In your view, when you wrote the letter, did

03:20  11   you provide information to ASUS so that they could

03:20  12   understand that they were infringing your patents?

03:20  13       A.    I personally think that I provide all the

03:20  14   information necessary for ASUS to determine whether

03:20  15   they infringe, because they are, you know, in a

03:20  16   multibillion dollar company.  I told them what product

03:20  17   that they potentially infringe.  I told them the ten

03:20  18   patents that I asked them to look at.

03:20  19             I make the job easier.  I told them, look at

03:20  20   PCI Express.  Look at USB 3.0.  Look at the CPU you're

03:20  21   using, which is the Intel CPU.

03:20  22             So if they were serious about my letter, only

03:20  23   take probably -- not very long time for the engineering

03:21  24   people or their legal people to look at this and say,

03:21  25   this is a serious thing.

229

03:21    1              Because, you know, I mean, if they ever take a

03:21    2    letter seriously, they would know that it infringe,

03:21    3    because I know 100 percent they infringe.  But to

03:21    4    not --

03:21    5              THE COURT:  Why don't we move on to

03:21    6    another question?

03:21    7              MR. COLLARD:  That's all I have, Your

03:21    8    Honor.

03:21    9              Thank you, Dr. Chu.

03:21   10              THE WITNESS:  Okay.  I'm done?

03:21   11              MR. BURESH:  Nothing further, Your Honor.

03:21   12              THE COURT:  Yes.  You are done.  He had

03:21   13    to say that before I could answer.

03:21   14              THE WITNESS:  Okay.  Thank you.

03:21   15              THE COURT:  Ladies and gentlemen of the

03:21   16    jury, let's take our afternoon recess -- well,

03:21   17    actually, your next witness is an expert?

03:21   18              MR. COLLARD:  Yes, Your Honor.

03:21   19              THE COURT:  Why don't you go ahead and

03:21   20    get him proven up, and then we'll -- that will let you

03:21   21    start with your direct.

03:21   22              MR. COLLARD:  Okay.  It'll be Mr. Hales.

03:22   23              MR. HALES:  Plaintiff calls Dr. Nabil

03:22   24    Sarhan.

03:22   25              (The witness was sworn.)

230

```
03:22   1                    DIRECT EXAMINATION
03:22   2    BY MR. HALES:
03:23   3        Q.    Dr. Sarhan, welcome.
03:23   4              Will you please introduce yourself to the
03:23   5    Court and the jury?
03:23   6        A.    Yeah.  My name is Nabil Sarhan, and I'm an
03:23   7    associate professor of electrical and computer
03:23   8    engineering at Wayne State University in Detroit,
03:23   9    Michigan.
03:23  10        Q.    Dr. Sarhan, did you move to the United States
03:23  11    from another country?
03:23  12        A.    Yes.
03:23  13        Q.    Which one?
03:23  14        A.    From Jordan.
03:23  15        Q.    Why did you move to the United States?
03:23  16        A.    The United States is -- the United States is
03:23  17    well-known for the best universities in the world.  My
03:23  18    brother who's 12 years older than me came to the United
03:23  19    States before me for his Ph.D. at Virginia Tech.
03:23  20              Since I was 13, I realize that my best
03:23  21    opportunity to learn and grow is to do the same.  So I
03:24  22    joined Penn State University, where I completed my
03:24  23    master's and Ph.D. degrees in computer science and
03:24  24    engineering.
03:24  25        Q.    Thank you.
```

03:24   1              Are you a citizen of the United States?

03:24   2      A.    Yes.

03:24   3      Q.    Since what time?

03:24   4      A.    2011.

03:24   5      Q.    Okay.  And do you have a family here?

03:24   6      A.    Yes.

03:24   7      Q.    Will you tell us a little bit about them?

03:24   8      A.    Yeah.  I'm married with six kids, ages 2 to

03:24   9  14.

03:24   10     Q.    Be sure to thank your wife for loaning you to

03:24   11  us this week.

03:24   12            Dr. Sarhan, have you prepared some slides to

03:24   13  support our discussion today?

03:24   14     A.    Yes.  As a professor, I try my best to explain

03:24   15  things in the easiest way possible for the jury to

03:24   16  understand.

03:24   17     Q.    Are we looking at the title of the slide deck?

03:24   18     A.    Yes.

03:24   19     Q.    Okay.  Would you please describe your

03:24   20  educational background for the jury?

03:24   21     A.    Yeah.  I have a slide about that.

03:24   22            So I have -- I got my bachelor of science

03:24   23  degree in electrical engineering, and then I got my

03:24   24  master's and Ph.D. degrees in computer science and

03:25   25  engineering from Pennsylvania State University.

03:25   1          I'm an associate professor of electrical and

03:25   2   computer engineering at Wayne State University.  I'm

03:25   3   also the director of Wayne State computer systems and

03:25   4   deep learning research lab.  I'm also the director of

03:25   5   the masters of science degree in artificial

03:25   6   intelligence.

03:25   7      Q.   What does one do to secure degrees in computer

03:25   8   science and computer engineering?

03:25   9      A.   Yeah.  So basically, you need to have

03:25   10   experience in both the hardware and software aspects.

03:25   11   To get the Ph.D., you have to do a lot of research in

03:25   12   the field.

03:25   13      Q.   I see some of your study here is on deep

03:25   14   learning.

03:25   15          Can you help the jury understand what deep

03:25   16   learning is?

03:25   17      A.   Yes.  So deep learning is a way to achieve

03:25   18   artificial intelligence.  For example, like when you

03:25   19   interact like with Siri, you ask questions to Siri.

03:25   20   Basically, Siri uses the information that it learned

03:26   21   previously in order to answer the question.  So it was

03:26   22   trained using deep learning techniques in order to

03:26   23   learn these tasks that you ask her to do.

03:26   24      Q.   Did you write a dissertation as part of your

03:26   25   Ph.D.?

233

03:26  1      A.    Yes.

03:26  2      Q.    Will you please tell the jury about that

03:26  3  dissertation?

03:26  4      A.    Yeah.  I basically investigated how to design

03:26  5  large scale computer systems to support multimedia

03:26  6  applications, including video streaming.  I developed

03:26  7  new solutions to support huge number of users at the

03:26  8  same time.

03:26  9      Q.    Can you give them a more, I guess, tactile

03:26  10  understanding of what this is and whether it's in use

03:26  11  today?

03:26  12      A.    Yeah.  So at that time, people questioned why

03:26  13  would anyone watch a movie on the Internet?  They have

03:26  14  like best store.  They have all these other store.

03:26  15  They can just go to the store, rent a DVD.  Why would

03:26  16  anyone rather watching a movie over the Internet?

03:26  17           Now, of course we have Netflix, we have

03:27  18  YouTube.  We have all these online video streaming

03:26  19  services.

03:27  20      Q.    Great.

03:27  21           What did you do after your dissertation and

03:27  22  graduation from your Ph.D. program?

03:27  23      A.    I immediately joined Wayne State University as

03:27  24  a faculty member.

03:27  25      Q.    And what year was this?

03:27   1        A.    2003.

03:27   2        Q.    Okay.  In what department did you join Wayne

03:27   3   State?

03:27   4        A.    Electrical and computer engineering.

03:27   5        Q.    Do you teach any courses at Wayne State?

03:27   6        A.    Yeah.  Sure.  And I have a slide about that.

03:27   7              So I teach a variety of undergraduate and

03:27   8   graduate courses in computer engineering.  I teach

03:27   9   computer architecture, advanced computer architecture,

03:27  10   computer networking and network programming.  I teach a

03:27  11   scalable and secure Internet services and

03:27  12   architectures, among other courses.

03:27  13        Q.    Okay.  I want to back up on that timeline just

03:27  14   a little bit.  The patents, as we've heard from

03:27  15   Dr. Chu, were applied for in the kind of 1999/2000

03:27  16   frame.

03:27  17              Did you consider yourself at this time a

03:27  18   person of ordinary skill in the field of computer

03:28  19   science and computer engineering?

03:28  20        A.    Yes.

03:28  21        Q.    Why?

03:28  22        A.    So I already finish a five-year bachelor of

03:28  23   science degree in electrical engineering at that time.

03:28  24   And then I, like, work in the industry for a little

03:28  25   while, and then I joined a master degree program where

235

03:28  1   I, like -- like basically taught -- like, I learned all

03:28  2   of -- took all the courses, and I almost done with my

03:28  3   master thesis back in -- back in Jordan.  And also, I

03:28  4   sub as a teaching assistant, and I was supervising

03:28  5   teaching labs there.

03:28  6       Q.    Tell me about supervising and teaching in

03:28  7   labs.  What would that entail?

03:28  8       A.    So basically, I was a teaching assistant, and

03:28  9   part of my duty was to, like, teach -- teach -- be in

03:28  10  control of the whole lab, to teach different labs in

03:28  11  computer engineering.

03:28  12      Q.    Okay.  Let's return, I guess, in the timeline

03:28  13  back to after you joined Wayne State.

03:28  14            What professional activities have you

03:28  15  undertaken while being a professor there?

03:29  16      A.    Yes.  I have a slide about that.

03:29  17            I published more than 50 refereed research

03:29  18  papers in computer science and engineering, including

03:29  19  those in the top venues in the field.  I have a

03:29  20  patent -- a U.S. patent on Automated Video Surveillance

03:29  21  Systems.

03:29  22            I served as a chair of almost 20 international

03:29  23  accreditation panels for undergraduate programs and

03:29  24  universities.

03:29  25            I also served as the chair of the Interest

236

03:29  1    Group on Media Streaming.  This is one interest group

03:29  2    within IEEE.  And I served as associate editor of some

03:29  3    fun, prestigious journal in the field.

03:29  4         Q.    I want to revisit a couple of these.

03:29  5               What does it mean for a paper to be refereed?

03:29  6         A.    "Refereed," it means like before it can be

03:29  7    accepted, it has to be reviewed by peers.  And then

03:29  8    they will decide whether the quality of the paper is

03:29  9    high enough and novel to be accepted or not.

03:29  10        Q.    Can you provide the jury with a couple of

03:30  11   examples of the types of areas of research you've

03:30  12   engaged in?

03:30  13        A.    Yeah.  I have engaged in multiple research

03:30  14   projects, and I have a slide that shows only two of

03:30  15   them.

03:30  16              Basically, one of the -- like here, we can see

03:30  17   in the slide here, like, basically, there are two

03:30  18   projects that I worked on.

03:30  19              One of them is regard to -- is about the

03:30  20   design of automated video surveillance systems for

03:30  21   automatic detection of the threats, which will allocate

03:30  22   resources dynamically in the best way possible to

03:30  23   various cameras and video sources in such a way that it

03:30  24   will optimize the threat detection accuracy without any

03:30  25   human intervention.

237

```
03:30   1              And here I have a picture with the -- some of
03:30   2    my Ph.D. students who helped me design and develop this
03:30   3    automated video surveillance system.  This project was
03:30   4    sponsored by the National Science Foundation.
03:30   5              Another project has to do -- which I'm showing
03:31   6    here a little bit about it -- has to do with designing
03:31   7    a computer chip and a computer system for epileptic
03:31   8    seizure prediction.  The system would actually predict
03:31   9    epileptic seizures before they happen.
03:31  10      Q.    And that's with the use of computer chips?
03:31  11      A.    Yes.
03:31  12      Q.    Okay.  Is that also funded by NSF or --
03:31  13      A.    This is like while we're still working on it.
03:31  14      Q.    Okay.  I saw earlier that you're an inventor
03:31  15    on a U.S. patent.
03:31  16              Will you introduce the jury to that patent?
03:31  17      A.    Yeah.  I have a slide about that.
03:31  18              So I have a patent on the design of Automated
03:31  19    Video Surveillance Systems.  Again, the system
03:31  20    optimally recognizes the threats, detects the threats
03:31  21    without any human intervention and allocate resources
03:31  22    to different sources to different cameras in such a way
03:31  23    that it will maximize the threat detection accuracy.
03:31  24      Q.    Have you received any awards, Dr. Sarhan, in
03:31  25    the field of computer engineering?
```

238

03:31  1      A.    Yes.  I received the -- multiple awards,

03:32  2   including I have recently been inducted to Wayne State

03:32  3   University Academy of Teachers.  I received the Wayne

03:32  4   State University President's Award for Excellence in

03:32  5   Teaching.  And I received an Outstanding Professional

03:32  6   of the Year award from IEEE.

03:32  7      Q.    Thank you.

03:32  8            Have you ever been retained as an expert

03:32  9   witness in other technology and computer-related cases?

03:32 10      A.    Yes.

03:32 11      Q.    How many?

03:32 12      A.    About ten, I would say.

03:32 13      Q.    Have you ever testified as an expert witness

03:32 14   in a patent dispute?

03:32 15      A.    Yeah.  I testified once.  Actually, I appeared

03:32 16   in this same court two years ago, also with Judge

03:32 17   Albright.

03:32 18      Q.    Have you ever been rejected by a Court as an

03:32 19   expert witness?

03:32 20      A.    No.

03:32 21      Q.    Thank you.

03:32 22            Let's discuss your involvement in this case.

03:32 23            Were you hired as an expert witness in this

03:32 24   case?

03:32 25      A.    Yes.

03:32  1         Q.    By whom?

03:32  2         A.    ACQIS.

03:32  3         Q.    Are you compensated for your analysis and

03:32  4    testimony in this case?

03:32  5         A.    Yes.

03:32  6         Q.    Does your compensation depend in any way on

03:33  7    the outcome of the case or the content of your

03:33  8    opinions?

03:33  9         A.    No.

03:33  10        Q.    What were you asked to do in this case?

03:33  11        A.    So I was asked to study the patents at issue

03:33  12   this case and then look at the accused products,

03:33  13   investigate the accused product, and see whether the

03:33  14   accused products infringe the asserted claims of the

03:33  15   patents.

03:33  16        Q.    Did you also analyze the validity of the

03:33  17   asserted patents?

03:33  18        A.    Yes.  I reviewed the defendants' expert

03:33  19   witness reports on invalidity, and I responded to these

03:33  20   reports.

03:33  21             MR. HALES:  Your Honor, we tender

03:33  22   Dr. Sarhan as an expert witness in computer science and

03:33  23   computer engineering to evaluate accused products for

03:33  24   potential infringement and the patents for issues of

03:33  25   validity.

240

| | | |
|---|---|---|
| 03:33 | 1 | MR. BURESH:  No objection. |
| 03:33 | 2 | THE COURT:  He'll be admitted as an |
| 03:33 | 3 | expert. |
| 03:33 | 4 | Ladies and gentlemen of the jury, we'll |
| 03:33 | 5 | take our afternoon recess.  Please remember my |
| 03:33 | 6 | instructions not to discuss the case as well as the |
| 03:33 | 7 | other instructions.  We'll be back in 10 or 15 minutes. |
| 03:33 | 8 | THE BAILIFF:  All rise. |
| 03:34 | 9 | (Jury exited the courtroom.) |
| 03:34 | 10 | THE COURT:  Thank you.  You may be |
| 03:34 | 11 | seated. |
| 03:34 | 12 | And I'm not going to hold you to this. |
| 03:34 | 13 | (Off-the-record discussion.) |
| 03:35 | 14 | (Recess taken.) |
| 03:52 | 15 | THE BAILIFF:  All rise. |
| 03:52 | 16 | THE COURT:  Please remain standing for |
| 03:52 | 17 | the jury. |
| 03:52 | 18 | (Jury entered the courtroom.) |
| 03:53 | 19 | THE COURT:  Thank you.  You may be |
| 03:53 | 20 | seated. |
| 03:53 | 21 | Counsel? |
| 03:53 | 22 | BY MR. HALES: |
| 03:53 | 23 | Q.    Dr. Sarhan, I'd just like to point out for the |
| 03:53 | 24 | record, I delivered in the break four binders of |
| 03:53 | 25 | various trial exhibits, and then two other binders I |

241

03:53  1    don't think the jury can see.  They're in your footwell

03:53  2    just because we ran out of space.

03:53  3          I count four.  Are there not two more of your

03:53  4    expert report itself?

03:53  5       A.    Yes.

03:53  6       Q.    Okay.

03:53  7       A.    Here.

03:53  8       Q.    Very good.  You can put that back.  Let's

03:53  9    return to the discussion where we left off.

03:53  10         Why did you decide to serve as an expert

03:53  11   witness in this case?

03:53  12      A.    Computer systems -- computer systems and data

03:53  13   communication are my main areas of research and

03:53  14   expertise.  I also have experience in both the hardware

03:54  15   and software aspects.

03:54  16         I'm also passionate about computer technology

03:54  17   and how it evolved over time.  And as a professor, I

03:54  18   hope to teach the jury about the patents and the

03:54  19   technologies at issue in this case.

03:54  20      Q.    Thank you.

03:54  21         How did you go about performing your analysis

03:54  22   in this case?  What materials did you review?

03:54  23      A.    So the core of my analysis relies on the

03:54  24   patents themselves.

03:54  25      Q.    Is that what we see on the screen here?

242

03:54  1        A.    Yes.  We have these five patents.

03:54  2        Q.    How did you analyze these patents?

03:54  3        A.    Initially, it took me a long time to review

03:54  4    these patents.  They are lengthy.  They have a lot of

03:54  5    figures, detailed disclosure.

03:54  6             So the -- and then like after that, since one

03:54  7    of them, like, seems to be, like, representative of the

03:54  8    others, I focused on one patent, the '768 patent.  And

03:54  9    I read that multiple times during the course of this

03:54  10   case.

03:55  11       Q.    For purposes of your testimony today, would a

03:55  12   discussion of the '768 patent represent the contents of

03:55  13   the other patents as well?

03:55  14       A.    Yes.

03:55  15       Q.    Okay.  Can you provide the jury with a

03:55  16   high-level overview of the contents of the '768 patent?

03:55  17       A.    So the patent basically describes the state of

03:55  18   computers or computer technology in the late 1990s.

03:55  19   And they -- they describe the main limitations of one

03:55  20   technology, which is referred to as the PCI local bus,

03:55  21   at that time.

03:55  22             And then the patents disclose a solution or

03:55  23   solutions to address these limitations while

03:55  24   maintaining compatibility with operating system and

03:55  25   application software.

243

| 03:55 | 1 | Q.    And we'll get into that in greater detail. |

03:55    1    Q.    And we'll get into that in greater detail.

03:55    2    What other materials have you consulted to

03:55    3    form your opinions in this case?

03:55    4    A.    So I also reviewed the industry publications

03:55    5    about the patents that are discussed by the patents

03:55    6    themselves or disclosed by these patents.

03:56    7    Q.    And for the jury's benefit, what is an

03:56    8    industry publication or an industry standard?

03:56    9    A.    Yeah.  Basically, an industry publication is a

03:56    10    set of requirements that must be followed by the

03:56    11    members of the industry in order to have -- in order to

03:56    12    achieve compatibility between related products.

03:56    13    To give an idea to the jury, the HDMI port on

03:56    14    your TV is industry standard.  And this is why you can

03:56    15    use any cable -- any HDMI cable manufactured by any

03:56    16    company.  You can plug it into your computer -- your TV

03:56    17    and it's going to work.

03:56    18    Q.    What do we see here on our screen, Dr. Sarhan?

03:56    19    A.    So here we see three of the industry standards

03:56    20    that I reviewed.  The first one is the PCI Local Bus

03:56    21    implementation.  The second one is the PCI Express Base

03:56    22    Specification.  And the third one is the Universal

03:56    23    Serial Bus 3.0 Specification.

03:56    24    I also reviewed different iterations or

03:57    25    revisions of these standards.

03:57  1        Q.    Okay.  Is that to say you reviewed these three

03:57  2   specifications we see on the screen?

03:57  3        A.    Yes.

03:57  4        Q.    Okay.  What did you do after studying the

03:57  5   patents and these industry standards?

03:57  6        A.    So after that, I studied the accused products

03:57  7   and -- to determine -- and also the related

03:57  8   technologies to determine whether these products

03:57  9   infringe the asserted claims of the patents.

03:57  10        Q.    What documents or other materials did you

03:57  11   review to perform this analysis?

03:57  12        A.    Yeah.  So I basically reviewed the ASUS

03:57  13   product specifications for the computers.  Also, I

03:57  14   reviewed the ASUS user manuals.  And I also viewed

03:57  15   other documents that are produced by ASUS and third

03:57  16   parties, including Intel and AMD, which manufacture the

03:57  17   processors that ASUS use in their computers.

18        Q.    Have you reviewed any witness testimony in

03:57  19   this case?

03:57  20        A.    Yes.

03:57  21        Q.    What, at a high level, has that testimony

03:58  22   taught you?

03:58  23        A.    So I reviewed the deposition testimony by ASUS

03:58  24   employees.  They spoke generally about how the products

03:58  25   are designed and manufactured.

03:58  1      Q.    How many ASUS products are accused of

03:58  2  infringement in this case?

03:58  3      A.    To my last count, it's 576 products.

03:58  4      Q.    Did you study each one of these, Dr. Sarhan?

03:58  5      A.    Yes.

03:58  6      Q.    Will we be analyzing each of these products in

03:58  7  court today?

03:58  8      A.    Not directly.

03:58  9      Q.    How many products will we discuss today?

03:58  10     A.    We will be discussing only two products today.

03:58  11     Q.    Okay.  I'd like for you, if you can, to

03:58  12 introduce the jury to the different categories of

03:58  13 products that exist and introduce them to the

03:58  14 representative products that we'll discuss today.

03:58  15           Why don't you start with the laptops that we

03:58  16 see here on the screen?

03:58  17     A.    So we have laptops, desktops, servers, and

       18 motherboards.

03:58  19           So laptops are basically portable -- yeah --

03:59  20 portable computers.  They come with the screen, with

03:59  21 the keyboard, with the track pad, with battery.  And

03:59  22 those are the type of computers that the lawyers are

03:59  23 using right now in the court.

03:59  24     Q.    Before you go on, Dr. Sarhan, I see you

03:59  25 actually have a specific name for this, this laptop.

246

03:59   1              Is this one of the representative laptops

03:59   2    we'll be discussing today?

03:59   3        A.    Yes.

03:59   4        Q.    Okay.  And what -- which of the 500-odd

03:59   5    accused products will this representative laptop

03:59   6    represent?

03:59   7        A.    Yeah.  So this specific product will represent

03:59   8    all laptop products.

03:59   9        Q.    Okay.  I see a desktop quadrant here in this

03:59   10   image.

03:59   11             Can you introduce the jury to desktop

03:59   12   products?

03:59   13       A.    Yeah.  We said laptops are portable.  Desktops

03:59   14   are stationary, are not portable computers.  They are

03:59   15   pretty much the computers that the jury might have at

03:59   16   home.

03:59   17             They come -- they may be purchased with

03:59   18   separate keyboards, monitors, and other peripheral

03:59   19   devices.  Sometimes they may come in the form of a

04:00   20   all-in-one computer.

04:00   21       Q.    What is an all-in-one computer?

04:00   22       A.    An all-in-one computer is basically a computer

04:00   23   that has all the computer components, and those would

04:00   24   be integrated with the monitor, so it looks more like,

04:00   25   you know, one big monitor.

04:00    1        Q.    Kind of like Apple famously has those
04:00    2    all-in-one desktop?
04:00    3        A.    Yes.
04:00    4        Q.    Okay.  And I see you've named this one as
04:00    5    well.
04:00    6            Is that to say that this is another one of our
04:00    7    representative products?
04:00    8        A.    Yes.
04:00    9        Q.    Okay.  Which products -- I guess which accused
04:00   10    products will this product represent for purposes of
04:00   11    your infringement analysis?
04:00   12        A.    Sure.  It represents all desktops, all
04:00   13    servers, and all motherboards.
04:00   14        Q.    Let's introduce the jury to these last two
04:00   15    product categories that will be represented by the
        16    desktops.
04:00   17            What is a server?
04:00   18        A.    A server is -- you can think about it as a
04:00   19    high-performance computer that's used generally by the
04:00   20    industries such as banks to process transactions very
04:00   21    fast or to process a huge amount of information.  And
04:01   22    those generally do not come with the -- like, the --
04:01   23    with the peripheral devices.
04:01   24        Q.    Do they come with -- so when you say
04:01   25    "peripheral devices," is that to say they don't come

04:01    1    with, like, screens and keyboards and mice?

04:01    2        A.    Yeah.    That's right.

04:01    3        Q.    And motherboards, will you introduce the jury

04:01    4    briefly to those?

04:01    5        A.    Motherboards, basically a motherboard is the

04:01    6    main circuit board that we have inside any computer

04:01    7    product.    So it's going to have a main circuit board

04:01    8    that has basically the -- it holds the different chips,

04:01    9    the different components that we have within the

04:01   10    computer and connects them together.

04:01   11            For example, here, we can see this

04:01   12    motherboard.    And see here, we have a slot for -- where

04:01   13    we can insert the CPU.    And here we have other slots

04:01   14    where we can insert the system memory.    So it holds all

04:01   15    the main computer components together.

04:01   16        Q.    Okay.    At a very high level, what did you do

04:01   17    to perform your infringement analysis for the products

04:01   18    we see on the screen here?

04:01   19        A.    Yeah.    So basically what I did is that I

04:02   20    looked at the -- at the features of these products, and

04:02   21    then I see whether they meet the claim limitations of

04:02   22    the asserted patents.

04:02   23        Q.    "Claim limitation" is a term you just used.

04:02   24    Will you introduce the jury to the concept of claim

04:02   25    limitations?

04:02  1      A.    A claim limitation, like, generally at the end

04:02  2  of each patent, the inventor will have a list of

04:02  3  claims.  A claim describes the specific technology or

04:02  4  product or computer that the inventor regards as his or

04:02  5  her invention.

04:02  6      Q.    Dr. Sarhan, what patent claims are asserted in

04:02  7  this matter?

04:02  8      A.    Yeah.  I believe I have a slide about that.

04:02  9          So here we have three apparatus claims, and we

04:02  10  have four method claims.

04:02  11      Q.    What is an apparatus claim?

04:02  12      A.    An apparatus claim is a claim that describes a

04:02  13  physical product such as a computer.

04:02  14      Q.    What is a method claim?

04:03  15      A.    A method claim describes the process that's

04:03  16  used to manufacture physical products.

04:03  17      Q.    Do I understand that right, it's steps to be

04:03  18  followed to manufacture a product but not actually a

04:03  19  claim on the product itself?

04:03  20      A.    Exactly.

04:03  21      Q.    Okay.  Have you reached any opinions about

04:03  22  whether the accused products in this case infringe the

04:03  23  claims we see on the screen here?

04:03  24      A.    Yeah.  I believe that the accused products,

04:03  25  they must demonstrate infringement of the asserted

04:03    1    claims of the patents.

04:03    2        Q.    Is that reflected on Slide 12, Dr. Sarhan?

04:03    3        A.    Yes.

04:03    4        Q.    Thank you.

04:03    5            Will you please open your exhibit binder, the

04:03    6    first one, to Joint Exhibits 1, 2, 3, 5, and 6 and

04:03    7    confirm that those are the patents asserted in this

04:03    8    case?

04:03    9        A.    Yes.  These are the asserted patents.

04:03    10        Q.    As I said earlier, I'd like to focus on the

04:03    11    discussion of the '768 patent, if you agree to that?

04:04    12        A.    Yes.

04:04    13        Q.    Dr. Sarhan, who is the named inventor of the

04:04    14    '768 patent?

04:04    15        A.    Dr. William Chu.

04:04    16        Q.    And how far back do these patents reach in

04:04    17    time as their priority date or kind of their invention

04:04    18    date?

04:04    19        A.    Yeah.  So we see that here that they reach

04:04    20    back to basically Year 2000.

04:04    21        Q.    Okay.  What do these patents describe?

04:04    22        A.    Basically, they describe the state of computer

04:04    23    technology in the late 1990s, and they discuss the

04:04    24    limitations -- they disclose the limitations of the PCI

04:04    25    local bus specification.  And then they -- basically

251

04:04  1    they -- the patents describe solutions that will fix

04:04  2    these problems.

04:04  3        Q.    What solutions do these patents describe to

04:04  4    problems that existed in the computer field at this

04:04  5    time?

04:04  6        A.    Yeah.  So basically, the main problem was

04:04  7    related to PCI local -- PCI local bus.  And the --

04:05  8    like, the patents basically describe a way in which

04:05  9    this -- basically, the PCI local bus limitation can be

04:05  10    addressed.

04:05  11        Initially, the patents disclosed a portable

04:05  12    module that Dr. Chu showed the -- an ACM, as we can see

04:05  13    in this screen.  So this is the ACM or the attached

04:05  14    computer module.

04:05  15        This attached computer module can be inserted.

04:05  16    It's in the office console, and then it will function

04:05  17    as a regular computer.  Then the user can take -- later

04:05  18    on, the user can take this with him or her home and

04:05  19    plug it in there, and he or she can resume work

04:05  20    instantly from the place where they left off when they

04:05  21    were at the office.

04:05  22        Q.    Dr. Sarhan, we'll get to the specifics of the

04:05  23    patent claims in a bit, but do any of the patent claims

04:05  24    asserted in this case claim this attached computer

04:05  25    module idea?

252

04:05  1          A.    No.

04:05  2          Q.    Okay.  What do the claims actually at issue in

04:06  3   this case focus on?

04:06  4          A.    Yeah.  They focus basically on the -- like,

04:06  5   addressing the limitation of the PCI local bus.

04:06  6                    (Clarification by Reporter.)

04:06  7          A.    So the patents describe that the use of this

04:06  8   module was not possible without -- with the existing

04:06  9   computer bus technology at that time.

04:06  10  BY MR. HALES:

04:06  11         Q.    Okay.  And we're going to introduce very

04:06  12  quickly the jury to the idea of a computer bus.

04:06  13               What is that?

04:06  14         A.    Yeah.  A computer bus is basically an

04:06  15  interconnect that connects different computer

04:06  16  components and devices together.  It includes the wires

04:06  17  on which the data will be transferred.  Also, it

04:06  18  includes any necessary software to do that.

04:06  19         Q.    Is there a specific computer bus that these

04:06  20  patents sought to improve?

04:06  21         A.    Yes.  It's the PCI local bus specification.

04:06  22         Q.    Are you familiar with the PCI local bus

04:07  23  specification?

04:07  24         A.    Of course.

04:07  25         Q.    How so?

253

04:07  1      A.    I read it very well and...

04:07  2      Q.    Okay.  Did you have prior familiarity with it

04:07  3   before you got involved in this case?

       4      A.    Yes.

04:07  5      Q.    Okay.  How so?

04:07  6      A.    Yeah.  While I was a Ph.D. student, like a

04:07  7   graduate student, like I -- we learned about the PCI

04:07  8   local bus.

04:07  9      Q.    Okay.  Will you please turn to Exhibit J-42 in

04:07 10   your binder and confirm that that is a copy of the PCI

04:07 11   local bus standard?

04:07 12      A.    Yes.

04:07 13      Q.    Have you studied this in the course of forming

04:07 14   your opinions in this case?

04:07 15      A.    Yes.

04:07 16      Q.    Have you formed -- I'm sorry.

04:07 17            Have you studied other iterations or

04:07 18   generations of the PCI local bus standard as well?

04:07 19      A.    Yes.

      20      Q.    Okay.

04:07 21            MR. HALES:  Your Honor, we offer J-42

04:07 22   into evidence.

04:07 23            MR. BURESH:  No objection.

04:07 24            THE COURT:  Admitted.

04:07 25   BY MR. HALES:

254

04:07  1      Q.   Dr. Sarhan, at a high level, what is the PCI

04:07  2  local bus standard?

04:07  3      A.   Basically, the PCI local bus is an industry

04:08  4  standard that describes a parallel bus that sends data

04:08  5  on parallel.  And I might have a slide about that.

04:08  6           So we see here -- we have -- on this slide we

04:08  7  have one peripheral device, and here we have another

04:08  8  device.  And these two devices communicate to each

04:08  9  other through the bus, which is what you see in the

04:08  10  middle.  So this is the interconnection between these

04:08  11  two devices.

04:08  12      Q.   Nabil -- I'm sorry, Dr. Sarhan.  I'm being too

04:08  13  familiar given our circumstances.

04:08  14           If you're trying to tell us straight, it's not

04:08  15  coming through on our screens.

04:08  16      A.   Oh, you cannot see that it's --

04:08  17      Q.   We cannot.  No.

04:08  18      A.   Okay.

04:08  19           THE WITNESS:  Also the jury, you cannot

       20  see?  You can see it?

       21           (Brief off-the-record discussion.)

04:08  22  BY MR. HALES:

04:08  23      Q.   I can't see it on mine.  How fortunate for

04:08  24  everyone else.  I'll tune in to your guys' screens.

04:08  25           Please proceed, Dr. Sarhan.

255

04:08    1        A.    Yeah.  So we have like on the left -- on the

04:08    2    right, we have two devices, and these two devices are

04:08    3    interconnected with the -- with the -- basically the

04:08    4    PCI local bus, which is in the middle.  We see all

04:08    5    these wires.  These are parallel wires.

04:08    6              So the data will be transferred on --

04:09    7              (Clarification by Reporter.)

04:09    8        A.    So the data will be transferred in parallel

04:09    9    across all these wires.

04:09    10   BY MR. HALES:

04:09    11       Q.    Will you please describe how -- well, first,

04:09    12   what we're looking at, and then how the PCI local bus

04:09    13   operates with regard to this image?

04:09    14       A.    Yeah.  Sure.  So this begins from the PCI

04:09    15   local bus specification that we described a little bit

04:09    16   ago.  And here I added some limitation just to explain

         17   the principles.

04:09    18              So we see here we have different computer

04:09    19   components.  We have the processor, we have the

04:09    20   graphics card, we have the local area network device

04:09    21   that connects the computer like to the network such as

04:09    22   the Internet.

04:09    23              The processor is the main -- like you can

04:09    24   think about it as the brain of the computer.  It's the

04:09    25   part that executes instructions.

04:09  1          The graphics card is basically the device that

04:09  2   prepares the graphics that you guys can now see on the

04:10  3   screen.  So all these graphics that you see is prepared

04:10  4   by the graphics card.

04:10  5          Q.    And is that the --

04:10  6          A.    Or the CPU.

04:10  7          Q.    And is that the PCI local bus we see in the

04:10  8   middle is that two-sided arrow?

04:10  9          A.    Exactly.  And here we see the -- in the middle

04:10  10  we see the PCI local bus.  And you see the main

04:10  11  purpose, the main goal of the PCI local bus is to

04:10  12  connect all these components together.

04:10  13         Q.    What are some important characteristics of the

04:10  14  operation of the PCI local bus that you think the jury

04:10  15  should understand for purposes of your analysis?

04:10  16         A.    Sure.  I prepared a slide about that that

04:10  17  shows the main characteristics.

04:10  18         So one of them is parallel transmission.  It

04:10  19  requires a large amount of wires.  It's a shared bus.

04:10  20  It's bidirectional, but it can be used only in one

04:10  21  direction at a time.  And it uses single-sided

04:10  22  signaling with either 3.3 or 5 volts.

04:10  23         Q.    I'd like to take these one by one, if we can.

04:10  24         What does it mean that the PCI local bus

04:11  25  utilizes parallel transmission?

257

04:11   1        A.    Yeah.  I have a slide to describe this.

04:11   2              As you see here, we have data.  And this data

04:11   3   is sent on parallel on all these wires.  In reality

04:11   4   what can happen with the PCI local bus, we can have

04:11   5   either 32 or 64 data wires.  So these wires can be

04:11   6   either 32 or 64, and the data will be sent on all these

04:11   7   wires at the same time.

04:11   8              As we see here, we have these bits, 0, 1, 1.

04:11   9   And a bit here, we see it's 0 or 1.  This bit -- a bit

04:11   10  is the smallest unit of information in the computer.

04:11   11  So the smallest will be one bit, which could either be

04:11   12  the value zero or the value would be one.

04:11   13       Q.    And was this the prevailing approach that the

04:11   14  PCI used in the late '90s?

04:11   15       A.    That's right.

04:11   16       Q.    Okay.  Are there any disadvantages to this

04:11   17  type of signaling scheme?

04:11   18       A.    Yeah.  And I have a slide about that.

04:11   19              So parallel transmission has some major

04:12   20  issues.  First, it uses lots of wires, as we described

04:12   21  before.  It needs a lot of space also.  It's very hard

04:12   22  to mount these wires on the motherboard.  Also, it

04:12   23  suffers from a crosstalk --

04:12   24       Q.    What is crosstalk?

04:12   25       A.    -- crosstalk problem.

04:12  1        So here, we see like when we have data are

04:12  2   transmitted on adjacent wires.  So basically, data

04:12  3   transmission on one wire may impact the transmission of

04:12  4   adjacent wires.

04:12  5        To give an example, if a jury member is in a

04:12  6   busy cafeteria and you try to speak with the -- trying

04:12  7   to have a conversation with a friend, it's very easy to

04:12  8   miss something your friend mentioned because a lot of

04:12  9   people are talking at the same time in a closed space.

04:12  10       And this is what's happening here, but it's

04:12  11  going to be even worse.

04:12  12  Q.   I see a final point here on your slide, timing

04:12  13  skew.

04:12  14       What is that and why is it significant?

04:12  15  A.   Yeah.  So see here, like those in the

04:13  16  animation, like we saw these bits going all the way

04:13  17  from the left to the right or from the right to the

04:13  18  left, all of them in parallel.

04:13  19       In real life, it's very hard for these bits to

04:13  20  arrive exactly at the same time.  And this is basically

04:13  21  the time skew and give us -- it gives designers a lot

04:13  22  of problem.

04:13  23  Q.   Okay.  How many wires are we talking about

04:13  24  employed in PCI Express?  How many were utilized?

04:13  25  A.   Yeah.  I have a slide about this.  And this

259

04:13  1    slide is from the PCI local bus specification that we

04:13  2    discussed earlier.

04:13  3            Here, it shows one -- a certain device, one

04:13  4    called PCI-compliant device.  This is a PCI device that

04:13  5    implements this specification.

04:13  6            And we see on the left, we have different

04:13  7    wires that are required and shows the required pins,

04:13  8    which are the required wires.  And you can see it will

04:13  9    have 47-plus wires.

04:13  10           Some of these wires, see here like this one is

04:13  11   the address/data lines.  And here, those are by

04:14  12   themselves 32 wires.

04:14  13                   (Clarification by Reporter.)

04:14  14   A.    So those by themselves are 32 wires.

04:14  15           On the right side, we have optional pins.  And

04:14  16   those -- in some implementations, 32 bits may not be

04:14  17   sufficient, so we have to go with 64 bits for the

04:14  18   address and data bits.  And we can get like, you know,

04:14  19   in that case approximately 100 wires.

04:14  20   BY MR. HALES:

04:14  21   Q.    For the jury's benefit, do you consider

04:14  22   requiring anywhere from 47 to 80 pins or wires to be a

04:14  23   lot for a computer bus standard?

04:14  24   A.    Yes.

04:14  25   Q.    What downsides are there to that requirement?

04:14  1       A.    It's not going to be cable friendly, as --

04:14  2    like we're going to discuss later on.  Also, the

04:14  3    connector will be, like, bigger.  It's going to have a

04:14  4    lot of issues.

04:14  5       Q.    I saw the term "shared" on your earlier slide.

04:14  6             What does it mean for a bus to be a shared

04:14  7    bus?

04:14  8       A.    Yeah.  I have a slide to illustrate the

04:15  9    concept.

04:15  10            You see here the process of sending data to

04:15  11   the graphics card.  And the LAN is waiting.  The LAN

04:15  12   waits for something or receives something but still

04:15  13   waiting.

04:15  14            So -- and this is the whole idea of the shared

04:15  15   bus.  This bus is shared by everyone, by all the

04:15  16   devices, but only one device can send at any point of

04:15  17   time.  So now when the processor sends data to the

04:15  18   graphics card, the LAN has to wait.

04:15  19            When the processor is over, then it might be

04:15  20   the term of the LAN to engage in the transaction.

04:15  21      Q.    Would this scheme slow down the overall

04:15  22   operation of a computer?

04:15  23      A.    Of course.

04:15  24      Q.    Okay.  On your earlier slide, I think I read

04:15  25   single-ended signaling with 3.3 or 5 volts.

04:15  1        Will you please introduce the jury to what

04:15  2   this means?

04:15  3      A.    Sure.  And I think I have a slide to

04:15  4   illustrate the concept.

04:15  5        Basically, in single-sided -- in single-sided

04:15  6   signaling, we use one wire to transmit each signal.  So

04:15  7   we use only one wire to transmit each signal, but we

04:16  8   may have multiple wires sharing a common reference

04:16  9   line, like something like the ground.

04:16  10        Some people are familiar with house wiring.

04:16  11   So there is a ground, the ground voltage.  So we need

04:16  12   to have a common reference.

04:16  13        But each -- generally each signal will be

04:16  14   transmitted on a wire by itself.  And you see here, in

04:16  15   order to transmit -- to transmit one, if I send like

04:16  16   one, which is the smallest -- like one bit is the

04:16  17   smallest piece of information for the computer.  If

04:16  18   when I send one, then we have to bring the voltage

04:16  19   to -- sorry.

04:16  20        To send one, we have to bring the voltage to

04:16  21   its highest level.  So we have to make the volt 5

04:16  22   volts.  In order to send at zero, we have to make the

04:16  23   voltage close to zero, right, and so on.  And this is

04:16  24   how we can -- we can send one, zero, one, zero, one and

04:16  25   so on.

04:16  1      Q.    Are there downsides to using a signaling

04:16  2    scheme requiring 5 volts in order to generate a 1?

04:16  3      A.    Yeah.  5 volts for data transmission is a lot.

04:17  4    To give you an idea, like your car battery operates

04:17  5    with 12 volts.  And it's sufficient to power all the

04:17  6    devices within your car.  All the electrical

04:17  7    requirements for the car -- by just this 12-volt

04:17  8    battery.

04:17  9           Using 5 volts for transmitting data in a

04:17  10   computer system is a lot.

04:17  11     Q.    Thanks for this introduction to PCI local bus.

04:17  12           What does the '768 patent have to say about

04:17  13   the PCI local bus?

04:17  14     A.    Yeah.  I have a slide that shows some of the

04:17  15   main points.

04:17  16     Q.    What are we looking at here, Dr. Sarhan?

04:17  17     A.    Yeah.  So here, we're looking to see -- we're

04:17  18   looking at a snapshot from the '768 patent.  It's one

04:17  19   of the asserted patents in this case.  And this is a

04:17  20   snapshot of that patent, but I added some highlighting

04:17  21   so that I can relay the information easily to the jury.

04:17  22           It says it clearly here that PCI buses are not

04:17  23   cable friendly.  Right?  It says that the interface

04:17  24   includes a very large number.  You see a very large

04:18  25   number -- a very large number of signal channels and

04:18    1    also large number of pins.

04:18    2              And it says that it costs more.  And it's

04:18    3    bulkier and more cumbersome to handle.

04:18    4              So this basically are the main limitation of

04:18    5    the PCI local bus as described, as disclosed by the

04:18    6    patents.

04:18    7         Q.   Does the '768 patent propose a new bus to

04:18    8    solve the problems you just identified with the PCI

04:18    9    local bus?

04:18   10         A.   Yes.

04:18   11         Q.   What is that bus?

04:18   12         A.   So here the patent -- again, this is a

04:18   13    snapshot from the same patent.  It says:  It is

04:18   14    desirable to use low voltage differential or LVDS

04:18   15    channel.  And it says that it's:  More cable friendly,

04:18   16    fast -- it's more cable friendly, it's faster, consumes

04:18   17    less power, generates less noise, including

04:18   18    electromagnetic interference.

04:18   19         Q.   Again, if you would finish that sentence,

04:19   20    please.

04:19   21         A.   Yeah.  And --

04:19   22         Q.   Just "than a PCI channel."

04:19   23              Did I read that right?

04:19   24         A.   Yeah.  Than a PCI channel.  Yes.

04:19   25         Q.   Okay.  How do you interpret this passage,

04:19  1    Dr. Sarhan?  What is the author here trying to convey?

04:19  2        A.    It means that the -- that the inventor is

04:19  3    aware of the limitations of the PCI local bus and

04:19  4    proposed -- disclosed a solution that will address

04:19  5    these specific limitations.

04:19  6        Q.    Does the '768 patent go on to disclose how to

04:19  7    replace the signaling scheme and PCI local bus with an

04:19  8    LVDS signaling scheme?

04:19  9        A.    Yes.

04:19  10       Q.    Okay.  And we'll dive into that, but I want to

04:19  11   discuss some constituent pieces first, if we can.

04:19  12             Do the asserted patents disclose to the reader

04:19  13   how to understand this term, "low-voltage differential

04:19  14   signaling," or LVDS for short?

04:19  15       A.    Yes.  And I have a slide that -- a snapshot

04:19  16   from the patent.

04:19  17             Again, this is from the asserted patent, the

04:19  18   '768 patent.  It says that:  The term "LVDS" is herein

04:19  19   used to generically refer to low-voltage differential

04:20  20   signals and is not intended to be limited to any

04:20  21   particular type of LVDS technology.

04:20  22       Q.    I see you've highlighted a couple of portions

04:20  23   here with your telestrator.

04:20  24             Why have you circled "generically"?

04:20  25       A.    Yeah.  So here, those are the keywords that

04:20  1    I'd like the jury to pay attention to.

04:20  2              So here, the definition of LVDS, according to

04:20  3    the patents themselves, it says that:  This term should

04:20  4    be used generically to refer to low-voltage

04:20  5    differential signals and is not intended to be limited

04:20  6    to any specific type of LVDS technology.

04:20  7              I think this is, like, very important, like,

04:20  8    message I would like the jury to remember.

04:20  9        Q.    Is this the meaning of LVDS you've applied in

04:20  10   the course of performing your infringement analysis?

04:20  11       A.    Yes.

04:20  12       Q.    I want to focus on the DS portion of LVDS.

04:21  13             What is a differential signal?

04:21  14       A.    Like as we discussed before, when we talk

04:21  15   about single-sided signaling, "single-sided" means we

04:21  16   only use one wire for each signal, right?  Only one

04:21  17   wire for each signal.

04:21  18             In double -- in differential signaling, we use

04:21  19   two wires for each signal.  So for each signal, we'd be

04:21  20   using two wires instead of one.  And basically, the

04:21  21   data that want to encode, whether it's zero or one, we

04:21  22   encode it as the difference in voltage between these

04:21  23   two wires.

04:21  24             And the keyword here is the difference in

04:21  25   voltage.

04:21   1    Q.    I'd like to investigate that.  But first, why

04:21   2    would someone teach using two wires and two signals to

04:21   3    do the job that used to be done by one wire and one

04:21   4    signal?  Why this extra hardware?  Why this extra

04:21   5    signal?

04:21   6    A.    Yeah.  By encoding the data as the difference

04:21   7    in voltage between two lines, we make the data more

04:22   8    reliable.  So it can be transmitted in -- like, it will

04:22   9    be resilient to noise interference and about factors

04:22   10   that would impact the communicate -- the quality of the

04:22   11   communication.

04:22   12   Q.    How does differential signaling accomplish

04:22   13   this greater resilience?

04:22   14         And if you can answer slowly, our court

04:22   15   reporter would certainly appreciate it.

04:22   16   A.    Sorry.  I'm driving you crazy today.

04:22   17         (Laughter.)

04:22   18   A.    So basically, we have -- we have two wires

04:22   19   and -- very close to each other.  And the -- basically,

04:22   20   the noise will hit the two wires in exactly the same

04:22   21   way.  It will impact the two wires in the same way.

04:22   22         So if one of them, the voltage goes down, for

04:22   23   the other one also the voltage will go down.  The

04:22   24   difference will remain the same.  So although we're

04:22   25   going to have noise, it's -- but the noise on both

04:22　1　lines will cancel each other.

04:22　2　BY MR. HALES:

04:22　3　　Q.　Have we attempted to demonstrate that on this

04:22　4　slide here, Dr. Sarhan?

04:22　5　　A.　Yes.　And here see, this is the single-sided

04:23　6　scheme that we mentioned before that's used by PCI --

04:23　7　the PCI local bus specification.　You see here we have

04:23　8　only one wire to transmit the signal.　But we said,

04:23　9　like, we're going to have a reference voltage for

04:23　10　multiple wires.

04:23　11　　　　But here, basically, we have one wire for --

04:23　12　one wire, like, for each signal.　In the case of the

04:23　13　differential signal, we use two wires.　Right?

04:23　14　　　　So if you go here now, for single-sided

04:23　15　signaling, if you look here at this figure, you see

04:23　16　here, if we have noise, then we have fluctuation in the

04:23　17　voltage here, right?

04:23　18　　　　And if the fluctuation in voltage becomes

04:23　19　severe enough, this one may be thought to be like a

04:23　20　zero.　So the receiver may think this one is a zero, so

04:23　21　the data will be corrupted.

04:23　22　　　　In the case of -- in the case of double-sided

04:23　23　signaling, what's going to happen here, we're still

04:23　24　going to have some noise, but the noise will impact

04:23　25　both wires in the same way.

04:24   1          And, like, when one of them here goes down,

04:24   2   that other one will go down.  When the other one goes

04:24   3   up, that other one goes up.  So the difference remains

04:24   4   unchanged.  And remember that difference, because the

04:24   5   data is encoded, is represented by the difference in

04:24   6   voltage and is going to remain unchanged regardless of

04:24   7   the noise.

04:24   8      Q.    Is this resilience characteristic of

        9   differential signaling significant in your view?

04:24  10      A.    Extremely.  Remember, like, we use this type

04:24  11   of signaling to communicate information from one place

04:24  12   to the other.

04:24  13          When we communicate information, one of the

04:24  14   most important metrics that we use is the fidelity

04:24  15   of -- or the integrity of the data that we want to

       16   send.  The most important thing, we want to send the

04:24  17   data and receive it exactly the same way.

04:24  18      Q.    Let's move to the LV portion of LVDS, low

04:24  19   voltage.

04:24  20          What does the patent have to say about low

04:24  21   voltage, and how do you understand that term?

04:24  22      A.    Yeah.  So as the term -- like, as it's shown

04:24  23   here, like, you know, as it's -- the term itself means

04:25  24   that instead of having high voltage, we're going to

04:25  25   have low voltage.

269

04:25  1      Q.    Okay.  Do the asserted patents call for the

04:25  2   same parallel transmission scheme you diagramed earlier

04:25  3   where the bits are traveling side by side across

04:25  4   stacked wires?

04:25  5      A.    No.  The data will be sent serially.

04:25  6      Q.    What is serial transmission?

04:25  7      A.    Serial transmission means the data will be

04:25  8   sent one bit at time.  Instead of sending the data on,

04:25  9   like, multiple pieces of data in parallel on multiple

04:25  10  wires, we send, like, the data serially, one bit at a

04:25  11  time on one wire.

04:25  12     Q.    What are we looking at here on Slide 30,

04:25  13  Dr. Sarhan?

04:25  14     A.    Okay.  So here on the left, this is the left

04:25  15  side.  This is basically the scheme used by the PCI

04:25  16  local bus that the patent discussed and describe its

04:25  17  disadvantages.

04:25  18         As you see here, we have multiple wires and

04:25  19  the data is sent in parallel on multiple wires at the

04:25  20  same time.  But it's going to be sent all -- but only

04:25  21  one direction at a time, either the receive direction

04:26  22  or the transmit direction.  So this is basically the --

04:26  23  how things go with the PCI local bus.

04:26  24         Now, this is the -- on the right, we see the

04:26  25  disclosed solution in the patents.  As we see here, in

270

04:26   1    this case, we have two differential pairs, right?  So

04:26   2    these, one, two, because we're using differential

04:26   3    signaling, which will cancel out the noise that we

04:26   4    discussed before.

04:26   5            So we have one pair in one direction, and then

04:26   6    we have another pair in the other direction.  So the

04:26   7    data can be communicated in both directions at the same

04:26   8    time benefitting from the -- from the differential

04:26   9    signaling approach that we cancel the noise.

04:26   10   Q.    And is this the technology that is described

04:26   11   and claimed in this patent?

04:26   12   A.    Yes.

04:26   13   Q.    Okay.  Does the serial LVDS signaling

04:26   14   discussed in the patents offer advantages over the

04:26   15   parallel signaling called for in the PCI local bus

04:26   16   standard?

04:26   17   A.    Yes.  And I have a slide about that to

04:27   18   illustrate to the jury.

04:27   19           So on the left, we have the scheme used by the

04:27   20   PCI local bus, right?  And so this scheme will have too

04:27   21   many wires.  It will have high interference, high

04:27   22   noise.  It will have high voltage.  It will have low

04:27   23   data transfer rate.  It will have high power

04:27   24   consumption.

04:27   25           These are the characteristics of the PCI local

04:27  1    bus implementation.

04:27  2              In the disclosed solution in the -- these

04:27  3    patents, basically we're going to have fewer wires.

04:27  4    It's going to have less noise.  The communication will

04:27  5    be more reliable.  The -- we're going to have lower

04:27  6    voltage.  It's going to have higher data transfer rate,

04:27  7    and it's going to result in lower power consumption.

04:27  8              Power consumption relates to that -- to

04:27  9    explain it to the jury, if we have higher power

04:27  10   consumption, then your laptop battery will drain

04:27  11   sooner.  So it has -- it's a very important metric.

04:28  12       Q.    Okay.  I'd like to zoom out a little bit.

04:28  13   Looking at these collection of -- this collection of

04:28  14   advantages as an expert in this field, do you find this

04:28  15   to be a significant collection of advantages over the

04:28  16   prior art?

04:28  17       A.    Certainly.

04:28  18       Q.    Why?

04:28  19       A.    I have -- I prepared a slide to summarize the

04:28  20   benefits of the disclosed -- or the patented LVDS

04:28  21   approach.

04:28  22              It's going to result in smaller connectors.

04:28  23   It's going to have longer battery life.  It's going to

04:28  24   ensure faster operation, so the data is going to be

04:28  25   sent faster.  And it's going to result in fewer errors,

04:28  1    fewer transmission errors.

04:28  2         Q.    Thank you, Dr. Sarhan.

04:28  3              I want to return to an issue I raised earlier:

04:28  4    Do the patents teach how to implement LVDS in place of

04:28  5    the parallel signaling scheme called for by PCI local

04:28  6    bus?

04:28  7         A.    Yes.  The patents have detailed disclosure

04:28  8    about that.  And I believe I have a figure to

04:28  9    illustrate this.

04:28  10        Q.    Sure.

04:28  11             Dr. Sarhan, will you describe to the jury what

04:29  12   we're looking at here on Figure 33?  And take your

04:29  13   time.  We'll take as much time as it takes to make

04:29  14   sense of what we're looking at here.

04:29  15        A.    Yeah.  Okay.

04:29  16             So the -- as you see here, the -- on the left

04:29  17   side, we have the attached computer module, which is

04:29  18   basically the module that we see next to Dr. Chu that

04:29  19   he showed us, like, you can insert into the console.

04:29  20             And here, we have the peripheral console where

04:29  21   we actually insert the -- that module.

04:29  22             And you see these two things are connected by

04:29  23   the XIS Bus.  And this bus includes this bus I want you

04:29  24   to pay attention to, the XP Bus.

04:29  25             The -- now, if we look at the -- at the

273

04:29  1    attached computer module, we see here we have the CPU,

04:29  2    which is the main part of the computer.  It has the

04:29  3    memory.  It has the graphics subsystem.  So it has the

04:29  4    main components of the computer system.  It also has

04:29  5    the storage.

04:30  6         On the right side, we have the peripherals so

04:30  7    that we can actually -- for example, like a screen or

04:30  8    keyboard or whatever.

04:30  9         The -- as we see here, we have a PCI bus on

04:30  10   the left, and also we have a PCI bus on the right,

04:30  11   right?

04:30  12   Q.    Right.

04:30  13   A.    And these -- basically, two PCI buses will

04:30  14   communicate with each other through the -- this

04:30  15   interface controller and this interface controller.

04:30  16   Q.    So thanks for that explanation.  We've been

04:30  17   discussing LVDS serial signaling technology.

04:30  18        Where is that in what we're viewing here?

04:30  19   A.    Yeah.  Exactly.  So this one's going to be

04:30  20   here.  See the XP Bus.  XP Peripheral Bus.  So this bus

04:30  21   has the LV -- the disclosed LVDS channels.

04:30  22        What's going to happen here, let's say that we

04:30  23   have -- going to choose a different color here.

04:30  24        We have this -- still the same color.

04:30  25        So we have this PCI bus here.  And let's say

04:31  1    this PCI bus needs to send data to the other PCI bus on

04:31  2    the other side.  They want to communicate with each

04:31  3    other, want to establish communication between these

       4    two buses.

       5           Now, what's going to happen, remember, the

04:31  6    PCI --

04:31  7                  (Clarification by Reporter.)

04:31  8    A.    So the PCI bus is a parallel bus, right, as we

04:31  9    mentioned before.  So it's going to send the data in

04:31  10   parallel format to the host interface controller.

04:31  11          The host interface controller will convert it

04:31  12   to serial format.  It's going to send it serial one bit

04:31  13   at a time.  And these data will be sent on these LVDS

04:31  14   channels which are part of the XP peripheral bus.

04:31  15          When this data goes to the other interface

04:31  16   controller, which is this interface controller now,

04:31  17   what's going to happen, it's going to do the opposite.

04:31  18   It's going to get the data in serial format, receive it

04:31  19   in serial format, convert it to parallel format so that

04:31  20   this -- the PCI bus will receive it in the manner it's

04:31  21   accustomed to.

04:31  22   BY MR. HALES:

04:31  23   Q.    That sounds great, but does the patent teach

04:32  24   how that host interface controller does the process you

04:32  25   just described, take in parallel PCI data and serialize

04:32    1    it for transmission on the LVDS channels?

04:32    2        A.    Yes.  We have some -- the patents have

04:32    3    detailed disclosure about that.  And I have a figure.

04:32    4    But I do not want to put the jury to sleep or bore

04:32    5    them.  So please bear with me.

04:32    6            I'm going to try my best to explain.  I only

04:32    7    have so many minutes.  If I'm going to go over every

04:32    8    single unit, it's going to take forever.  So I'm going

04:32    9    to just, like, give you an idea about the overall

04:32   10    points so that you understand the overall principles so

04:32   11    that you can judge accordingly.

04:32   12        Q.    And if you could start by saying where this is

04:32   13    from, that would be great.  Thank you.

04:32   14        A.    Sure.  So here, this one, again, is from the

04:32   15    '768 patent, one of the asserted patents in this case.

04:32   16    And we see here, we have -- again, here, see, we have

04:32   17    the host PCI bus on this slide.

04:32   18        Q.    And before you get going, what is this overall

04:32   19    box that we're looking at with all of the sub

04:32   20    components?

04:32   21        A.    Yeah.  So this one is referred to as the -- is

04:33   22    the host interface controller.

04:33   23        Q.    Okay.  So is this the component that receives

04:33   24    the PCI information and serializes it before it goes

04:33   25    on --

04:33  1        A.     That's right.  So when I --

04:33  2        Q.     If I can finish my question.

04:33  3               -- before it goes on the LVDS channels?

04:33  4        A.     That's right.  So like when we talk about the

04:33  5    PCI local bus and they examine it and they said is

04:33  6    going to be sent to the other one, when the first one

04:33  7    sends to the other one, like is going to go to first to

04:33  8    that host interface controller.

04:33  9        Q.     Okay.  Will you please describe to the jury

04:33  10   how the host interface controller -- how the sausage

04:33  11   gets made, so to speak?

04:33  12       A.     Yeah.  So here, the -- remember the PCI bus.

04:33  13   It works in parallel form.  Right?  Transmit data in

04:33  14   parallel form.  So this data now will come and will be

04:33  15   stored in these buffers -- or not just all of them, but

04:33  16   will be stored in these buffers temporarily.  And then

04:33  17   this data will be encoded in a certain format.

04:33  18               After that it's going to be sent to this unit,

04:33  19   which is the serial to parallel -- which is the

04:33  20   parallel to serial converter.

04:34  21               Now, the data that receives it from the PCI

04:34  22   bus will be in parallel.  That parallel to serial

04:34  23   converter does exactly what the name means.  Like it

04:34  24   just will -- will convert the data from parallel form

04:34  25   to serial form so that it can be sent on these LVDS

04:34  1    channels.

04:34  2        Q.    Okay.   Thanks for that crash course on how the

04:34  3    host interface controller works.

04:34  4            So I'm going to pop back a slide.  Here we

04:34  5    have an ACM on the left, a peripheral console on the

04:34  6    right, PCI local bus hardware on both systems, and then

04:34  7    the LVDS sits in the middle.

04:34  8            Is this the only type of embodiment of

04:34  9    Dr. Chu's invention disclosed in his patents?

04:34  10       A.    No.   We have other documents and here I have

04:34  11   another figure.  And in this -- this specific

04:34  12   embodiment, here this is Figure -- it's Figure 8B in

04:34  13   the '768 patent.

04:34  14           Now, if we look at this figure closely, here

04:34  15   we see the CPU.  It's -- and it's integrated with other

04:35  16   units.  Like within the CPU, we're going to have other

04:35  17   also units.  And we -- here, we have a channel

04:35  18   extending directly from this integrated CPU.  And this

04:35  19   is -- you see here, it's called the XP Bus, which has

04:35  20   the LVDS channels.

04:35  21           So in this -- this embodiment teaches having

04:35  22   LVDS -- LVDS channel extending directly from the CPU,

04:35  23   which might be integrated by -- with other units.

04:35  24       Q.    Dr. Sarhan, looking at this image and having

04:35  25   read the patents, does this embodiment of Dr. Chu's

04:35  1    inventions have any PCI local bus hardware in it?

04:35  2        A.    No.    And as a matter of fact, like if you look

04:35  3    back, if you -- can you go back to the previous slide?

04:35  4    I think it's very important for the jury to see.

04:35  5        Q.    This one?

04:35  6        A.    So here, like you see, like it's marked

04:35  7    directly.    In the patents themselves, we see this is

04:35  8    PCI bus.    Here it says this is PCI bus.

04:35  9              And the slide after -- I mean the one just

04:35  10   before this one.    Yeah.

04:36  11             And here this one is marked as a PCI bus.

04:36  12             Now, here, in Figure 8B, which is another

04:36  13   figure in the same patent, here, we don't have any PCI

04:36  14   bus.    And we have these LVDS -- LVDS channels extending

04:36  15   directly from this bus.

04:36  16       Q.    Is this an important figure for your patent

04:36  17   analysis in this case?

04:36  18       A.    Yeah.    And I think this is something very

04:36  19   important for the jury to pay attention to.    Because

04:36  20   the accused products, the accused ASUS products do not

04:36  21   have any PCI local bus hardware.    So they don't have a

04:36  22   PCI local bus hardware.

04:36  23             And -- however, they do exactly what's done

04:36  24   here.    Like we have a CPU, and from the CPU, which

04:36  25   could be integrated with other units, we have an LVDS

279

| | | |
|---|---|---|
| 04:36 | 1 | channel extending from there. |
| 04:36 | 2 | Q.    Thank you. |
| 04:36 | 3 | Dr. Sarhan, let's move on to patent claims, if |
| 04:36 | 4 | you don't mind. |
| 04:36 | 5 | Dr. Sarhan, how have you approached your |
| 04:36 | 6 | understanding of the claims, the patent claims in this |
| 04:36 | 7 | case? |
| 04:36 | 8 | A.    Yeah.  So initially, the -- there used to be |
| 04:37 | 9 | like -- when I first work on this case, there used to |
| 04:37 | 10 | be a huge number of claims. |
| 04:37 | 11 | And then the claims -- like a -- like the |
| 04:37 | 12 | asserted claims, like, became smaller and smaller to |
| 04:37 | 13 | the extent now we have a smaller number of claims so |
| 04:37 | 14 | that the jury can be able to, like, examine them and |
| 04:37 | 15 | make their decision. |
| 04:37 | 16 | So now we have a smaller amount of claims. |
| 04:37 | 17 | The -- although there's -- even like before, there used |
| 04:37 | 18 | to be a huge number of claims, but they shared some |
| 04:37 | 19 | limitations.  They shared certain elements.  Right? |
| 04:37 | 20 | And in my analysis, I tried to focus on the |
| 04:37 | 21 | claim limitations that appeared the most.  Right? |
| 04:37 | 22 | Especially like in this presentation to the jury, I'm |
| 04:37 | 23 | going to focus on the claim limitation that -- on the |
| 04:37 | 24 | limitation that appear in most claims so that you can |
| 04:37 | 25 | get the overall picture in the best way possible. |

04:37    1        Q.    Have you identified some of the most important

04:37    2    often repeated claims -- I'm sorry -- claim limitations

04:37    3    found in the asserted claims?

04:37    4        A.    Yes.  And I have a slide about that.

04:38    5        Q.    Let's take a look at those.

04:38    6              Will you please introduce the jury to, I

04:38    7    guess, what they're looking at here?

04:38    8        A.    Yeah.  So these are the claim limitations that

04:38    9    appear in most claims.  Right?  So these are the most

04:38    10    popular claim limitations.

04:38    11            A claim limitation is an element.  It's part

04:38    12    of the requirement of the overall claim.

04:38    13        Q.    Okay.  So when we get to the claim language

04:38    14    and start performing the infringement analysis, we'll

04:38    15    see these six limitations again and again?

04:38    16        A.    Exactly.

04:38    17        Q.    Okay.  Let's learn about them.  Let's start

04:38    18    with the first one, if we can.

04:38    19            Dr. Sarhan, what should the jury know about an

04:38    20    LVDS channel conveying address and data bits of a PCI

04:38    21    transaction?

04:38    22        A.    Yeah.  So here, I think the most important

04:38    23    thing for the jury to realize first here is that we

04:38    24    have a PCI transaction.  And the Court construed the

04:38    25    term, so it give a specific meaning to this term as we

04:38    1    see on this slide.

04:38    2         So the Court construed "PCI bus transaction"

04:38    3    as a transaction in accordance with the industry

04:39    4    standard PCI local bus specification for communication

04:39    5    with interconnected peripheral component, and "in

04:39    6    accordance with" includes backward compatibility.

04:39    7         And also, I want the jury to pay attention to

04:39    8    what I underlined here.  So here, according to the

04:39    9    Court construction, "in accordance" includes backward

04:39    10   compatibility.

04:39    11   Q.    Can you help explain kind of accessible terms?

04:39    12   What does it mean for something to be in accordance --

04:39    13   well, let me start from the end.

04:39    14        What does it mean for something to be

04:39    15   "backward compatible"?

04:39    16   A.    Yeah.  So the -- as we -- we'll see like in

04:39    17   the later slide, the -- like, as I mentioned -- or even

04:39    18   I mentioned earlier when I describe the patents, I said

04:39    19   like the patents, I defined problems in the PCI local

04:39    20   bus specification.  And then the sure, like, ways to

04:39    21   address this limitation.  And address these limitations

04:40    22   while maintaining backward compatibility with the PCI

04:40    23   local bus.  So we want to make sure it's compatible

04:40    24   with the PCI local bus.

04:40    25   Q.    How is that -- if I can ask, how is that

04:40  1   compatibility described in the patents?  What does it

04:40  2   mean that we can use these new LVDS channels but remain

04:40  3   compatible with PCI local bus?

04:40  4      A.    Yeah.  So one of the things -- like, this is

04:40  5   an important question.  In real life, software

04:40  6   development takes time.  You have companies that design

04:40  7   and develop operating system.  For example, Microsoft,

04:40  8   like they have their Windows operating system.  There

04:40  9   are also, like, other companies like Apple, they have

04:40  10  their own operating system, iOS, et cetera.

04:40  11      It takes time to make massive changes to the

04:40  12  operating system, to support, let's say, like new

04:40  13  interconnect.  Right?  So this takes a little while.

04:40  14      And also, they have to basically debug it,

04:40  15  which works with different -- for different devices.

04:40  16  This takes a lot of time.

04:40  17      So the patents describe a solution that will

04:40  18  work with existing operating systems without any

04:41  19  modifications, with existing drivers without

04:41  20  modifications.

04:41  21      So the solution that we discuss here in the --

04:41  22  that are disclosed in the patent are supposed to work

04:41  23  with no changes whatsoever to the operating system, or

04:41  24  to the applications, or to the drivers, or to the BIOS,

04:41  25  et cetera.

283

04:41    1        Q.    Thank you for that explanation.

04:41    2             Have you applied the Court's definition for

04:41    3    this claim limitation in performing your infringement

04:41    4    analysis?

04:41    5        A.    Definitely.

04:41    6        Q.    Have you researched whether the accused

04:41    7    products satisfy this limitation:  LVDS channels to

04:41    8    convey address and data bits of a PCI transaction?

04:41    9        A.    Yes.  Remember when we talk about the PCI

04:41   10    local bus and we said it has all these limitations?  It

04:41   11    was the technology prevailing in the late 1990s.  And

04:41   12    that the patents said that it has all of these sort of

04:41   13    problems that we discussed previously.

04:41   14             This -- the PCI local bus was then replaced by

04:42   15    a new technology called PCI Express.  PCI Express is an

04:42   16    evolution over the PCI local bus implementation.  The

04:42   17    accused products, they have this technology.  They have

04:42   18    the PCI Express technology.  And this is the technology

04:42   19    and the question, like, that we're going to be

04:42   20    analyzing in a little bit.

04:42   21             So this -- the PCI Express technology

04:42   22    basically use -- employs LVDS channels that convey

04:42   23    address and data bits of a PCI transaction, as we'll

04:42   24    see later on in a little bit more detail.

04:42   25        Q.    Thank you for that.  I want to put a finer

04:42  1    point on it if I can.

04:42  2            Have you concluded whether PCI Express

04:42  3    satisfies the limitation we're looking at here on our

04:42  4    screen?

04:42  5        A.    Yes.

04:42  6        Q.    And what have you concluded?

04:42  7        A.    Yeah.  I concluded that it does satisfy

04:42  8    these -- this claim limitation.

04:42  9        Q.    Will you open your binder to J-20, please?

04:43  10       A.    Yes.

04:43  11       Q.    What is J-20?

04:43  12       A.    So this is the PCI Express Base Specification.

04:43  13       Q.    Have you reviewed this document in performing

04:43  14   your infringement analysis?

04:43  15       A.    Yes.

04:43  16            MR. HALES:  Your Honor, we'd like to

04:43  17   offer this into evidence.

04:43  18            MR. BURESH:  No objection.

04:43  19            THE COURT:  Admitted.

04:43  20   BY MR. HALES:

04:43  21       Q.    What does this document have to say, if

04:43  22   anything, about the term that we see on our screen

04:43  23   here, ability to convey address and data by PCI bus

04:43  24   transaction?

04:43  25       A.    Yeah.  So I have a slide that shows this

285

04:43    1    information.

04:43    2            So basically the -- if we -- again, this is

04:43    3    the document that we just discussed, the PCI Express,

04:43    4    which is the evolution of the PCI local bus.

04:43    5            In the introduction, so this is in the --

04:43    6    like, the mid section of the -- of this -- of the PCI

04:43    7    Express standard, it says clearly that:  The key PCI

04:43    8    attributes -- again, here, this is PCI -- the key PCI

04:43    9    attributes, such as its usage model, load store

04:44    10   architecture, and software interfaces, are maintained,

04:44    11   whereas its parallel bus implementation is replaced by

04:44    12   a highly scalable, fully serial interface.

04:44    13   Q.   I'd like to parse this and see if we can make

04:44    14   it a little more accessible for the jury.

04:44    15           What does it mean that key PCI attributes,

04:44    16   including a usage model, load store architecture, and

04:44    17   software interface, are maintained in PCI Express?

04:44    18   A.   Yeah.  So basically here the -- like, to make

04:44    19   it, like, as simple as possible, PCI Express uses a

04:44    20   PCI-compatible software model.

04:44    21           So by design, PCI Express is made so that it

04:44    22   retains compatibility with the software model of PCI.

04:44    23   Q.   Is that your conclusion, or is the PCI Express

04:44    24   standard --

04:44    25   A.   This is --

04:44  1        Q.    -- explicit in this regard?

04:44  2        A.    Yeah.  It's very explicit, and we see some

       3   statements that are on -- directly from the

04:44  4   specification about that.

04:44  5        Q.    Okay.  Let's look at the second half of this

04:45  6   sentence.

04:45  7              Its parallel bus implementation is replaced by

04:45  8   a highly scalable, fully serial interface.

04:45  9              What is important about this statement for the

04:45  10  jury's analysis today?

04:45  11       A.    Yeah.  So what's important here is that --

04:45  12  like I'm sure the jury will, like, kind of remember,

04:45  13  like, we talked about so much about the parallel bus.

04:45  14  Like, we said this is bad, right?

04:45  15             So -- and the PCI Express -- PCI Express

04:45  16  replaces that parallel bus with a serial interconnect,

04:45  17  a fully serial interconnect.

04:45  18             And remember when we talk about the patents,

04:45  19  we said that the patents, they want to replace the,

04:45  20  like, basically the PCI -- that -- the parallel PCI bus

04:45  21  with a serial interconnect utilizing LVDS channels.

04:45  22       Q.    Well, we have serial.  Do we have LVDS

04:45  23  anywhere in the PCI Express standard?

04:45  24       A.    Say it again.

04:45  25       Q.    LVDS, do we have any disclosure of whether PCI

04:45  1   Express uses low-voltage differential signaling?

04:45  2       A.   Yes.  Definitely.  We have that from the

04:45  3   standard itself.

04:46  4                   MR. HALES:  Let's take a look at Slide

04:46  5   40.

       6   BY MR. HALES:

04:46  7       Q.   Will you please tell the jury what we're

04:46  8   looking at here?

04:46  9       A.   Again, so this is the PCI Express

04:46  10  specification.  So this specifies the PCI Express

04:46  11  standard.

04:46  12             And here, it says that the fundamental PCI

04:46  13  Express link consists of two low-voltage,

04:46  14  differentially driven signal pairs, a transmit pair and

04:46  15  a receive pair, as shown in this figure.

04:46  16             So here it shows this figure as well.

04:46  17             And in this figure, you see here we have two

04:46  18  components that communicate with each other.  And you

04:46  19  see here we have -- this one is one pair that's used in

04:46  20  one direction.  And here we have another differential

04:46  21  pair in another direction.

04:46  22             And as we see here, it describes that these

04:46  23  are low-voltage, differentially driven, which means

04:46  24  that they are low -- they use differential signaling.

04:46  25  And they have low -- and also low voltage at the same

288

04:46  1  time.  And each -- and in each direction.  One in the

04:47  2  transmit direction, and one in the receive direction.

04:47  3         And this is basically like what we talk about

04:47  4  when we discuss the patents.

04:47  5     Q.    Who published this document?  Who wrote this?

04:47  6     A.    This is, like -- as I mentioned earlier, like,

04:47  7  a standard is written, like, by a body of companies.

04:47  8  They have different companies, like Intel and so many

04:47  9  other companies, computer-related companies.  They sit

04:47  10  together, they form certain committees, and they

04:47  11  develop standards accordingly.

04:47  12    Q.    And so the fruit of that effort is what we're

04:47  13  looking at here.  They've described this as

04:47  14  low-voltage, differentially driven signaling; is that

04:47  15  right?

04:47  16    A.    That's right.

04:47  17    Q.    Okay.  And you interpret this figure to show

04:47  18  that it will use unidirectional pairs of those

04:47  19  low-voltage, differentially driven signal pairs?

04:47  20    A.    That's right.

04:47  21    Q.    Okay.  So I appreciate that you've reviewed

04:47  22  the PCI Express standard and made conclusions about

04:47  23  what's in PCI Express.

04:47  24         Have you reviewed any other materials --

04:48  25  independent materials of what this body says about this

04:48  1   technology?

04:48  2      A.   I reviewed so many different material,

04:48  3   including a presentation by Intel.  Intel like --

04:48  4      Q.   Let me stop you right there.

04:48  5      A.   Sorry.

04:48  6      Q.   I need to seal the courtroom to talk about

04:48  7   Intel documents.

04:48  8               MR. HALES:  With apologies to our

04:48  9   gallery.

04:48  10               THE COURT:  If there's anyone in the

04:48  11   courtroom who's not under the protective order, please

04:48  12   step outside.

04:48  13               (Sealed proceedings.)

04:48  14   BY MR. HALES:

04:48  15      Q.   Dr. Sarhan, I believe you were referencing an

04:48  16   Intel document?

04:48  17      A.   Yes.  So basically, it's a presentation by

04:49  18   Intel.  Intel -- just like to tell the jury, I'm sure

04:49  19   like most of you might know, Intel is one of the main

04:49  20   processor companies in the whole world.  And they make

04:49  21   processors and those processors are used, like, by so

04:49  22   many companies, including ASUS.  And actually played a

04:49  23   center role in the development of PCI Express.

04:49  24      Q.   Dr. Sarhan, will you open to P-744 in your

04:49  25   binders and tell me if this is the Intel document which

04:49  1    you just referenced?

04:49  2        A.    Yes.  It's the one.

04:49  3        Q.    What does this document -- what is this

04:49  4    document, and what does it describe?

04:49  5        A.    So this document is -- provides information,

04:49  6    details about the PCI Express specification.

04:49  7        Q.    But specifically, like, its title page, what

04:49  8    indication does it give to you of how it was used and

04:49  9    put together?

04:49  10        A.    Yeah.  So here we say that PCI --

04:50  11            (Clarification by Reporter.)

04:50  12        A.    So many, like, very heavy documents.  It's

04:50  13    better than going to the gym.

04:50  14            So basically, it says:  PC Architecture to

04:50  15    IDC.  And here it talks about, like, different aspects

04:50  16    of the PC, which is the computer architecture.

04:50  17            It talks about so many different interconnects

04:50  18    and interfaces.

04:50  19    BY MR. HALES:

04:50  20        Q.    Have you relied on this document in forming

04:50  21    your opinions?

04:50  22        A.    Definitely.

04:50  23            MR. HALES:  Your Honor, we offer it into

04:50  24    evidence.

04:50  25            MR. BURESH:  No objection.

291

| 04:50 | 1 | THE COURT: Admitted. |
| 04:50 | 2 | BY MR. HALES: |

04:50   3    Q.   Dr. Sarhan, I'm showing you here on Page 41 an

04:50   4  excerpt from that document.

04:50   5          Will you please tell the jury what we're

04:50   6  looking at?

04:50   7    A.   Yeah.  So here we see the title of the slide

04:50   8  is PCI-Express Overview, which is the standard that

04:50   9  we're talking about.  And here, it -- clearly, it says

04:50   10  ███████████████████████████████████████████

04:51   11  ██████

04:51   12          And also, I want to bring to the attention of

04:51   13  the jury, this figure which describes this in some

04:51   14  detail.

04:51   15          And again, here we see we have differential

04:51   16  signal occurs.  See here, ████████████████████

04:51   17  ████████████████████████  ████████████████████

04:51   18  ██████████████████████████████████████

04:51   19  ███████████████████████████████████████████

04:51   20  █████████████████

04:51   21    Q.   Thank you.

04:51   22          MR. HALES:  Your Honor, we can unseal the

04:51   23  courtroom at this point.

04:51   24          THE COURT:  Okay.

09:42   25          (Sealed proceedings end.)

04:51  1                MR. HALES:  I'll proceed if I don't need

04:51  2   to wait for anyone to come back in.

04:51  3   BY MR. HALES:

04:51  4       Q.    Dr. Sarhan, have you studied how much voltage

04:51  5   PCI signaling calls for?

04:51  6       A.    Yeah.  Yes.

04:51  7       Q.    Have you collected the voltage amounts in your

04:51  8   expert report?

04:51  9       A.    Yeah.  In my expert report, I have -- I made

04:51  10  one table that shows the voltage levels.

04:52  11      Q.    Is this that table, Dr. Sarhan?

04:52  12      A.    Yes.  This is part of the table that I have in

04:52  13  my expert's report.  And here, like, may seem to be too

04:52  14  complicated, but, like, I'm going to describe it in the

04:52  15  easiest way possible.

04:52  16            You see here, like in this column, we have the

04:52  17  different technology.  And here, we have different PCI

04:52  18  Express speeds and generations.  On the left, these are

04:52  19  different -- see, 2.5 GT per second.  These are

04:52  20  different speeds.  As we go down, we have higher speeds

       21  generally.

04:52  22            And here, we have -- in this column, we have

04:52  23  the minimum voltage.  And here, we have the maximum

04:52  24  voltage.  And you see it calls it $V_{TX-DIFF\ -P-P}$, which is

04:52  25  basically the peak-to-peak differential voltage output,

04:52  1    right?

04:52  2            And here, we can see that, like, generally,

04:52  3    for PCI Express, we're going to have a value -- a

04:52  4    minimum value from .8 to a maximum value of 1.2 volt.

04:52  5    So from .8 volt to 1.2 volt.

04:52  6        Q.    Okay.  So if we were to average those, we'd

04:52  7    come out with 1 volt?

04:52  8        A.    Yeah.  Probably.  I didn't do the average

04:53  9    myself.

04:53  10       Q.    Well, would you remind the jury how many volts

04:53  11   are called for in the PCI local bus standard?

04:53  12       A.    In the PCI local bus standard, which is the

04:53  13   old one that we discussed, uses either 5 volt or 3.3

04:53  14   volt.

04:53  15       Q.    And here, we're using roughly somewhere

04:53  16   between .8 volts and 1.2 volts, if I've understood your

04:53  17   testimony?

04:53  18       A.    That's right.

04:53  19       Q.    Is the voltage that you see here on the screen

04:53  20   what you would consider low voltage within the meaning

04:53  21   of the asserted patents?

04:53  22       A.    Definitely.

04:53  23       Q.    Dr. Sarhan, I'd like to discuss address and

04:53  24   data bits.

04:53  25            What are address and data bits?

04:53  1        A.     Okay.  So I have a slide about that to

04:53  2  illustrate the concept.

04:53  3             But before getting to the address and data

04:53  4  bits, let's say where do they actually come from.

04:53  5             So here on the left, we have a set of commands

04:53  6  that PCI -- like, that PCI transactions have.  So we

04:54  7  have different types of commands.  We have memory read,

04:54  8  memory write.  We have I/O read, I/O write.

04:54  9             So these are the main commands that we have in

04:54  10  the -- in PCI.  The -- those commands or requests

04:54  11  include address and data bits of a PCI transaction.  So

04:54  12  we have address and data bits.

04:54  13             What do you mean by address bits and data

      14  bits?

04:54  15             So the address bits are the -- they describe

04:54  16  where the data will be written or where exactly we're

04:54  17  going to get it from.  So it specify that address.

04:54  18             The data is the data that we're going to

04:54  19  communicate from one place to another place.

04:54  20             And knowledge here I would give to the jury is

04:54  21  this:  Like if a jury member would like to send a

04:54  22  letter to someone, he or she would put the address.

04:54  23  The address will specify where this letter will go.

04:54  24  Right?  And this is similar to the address in the case

04:54  25  of PCI.

04:54   1          And when you write the letter -- when you send

04:55   2   the letter, when you write the actual letter, what you

04:55   3   write is the content, is the actual data.  And so

04:55   4   basically, the data, you send this data, which is the

04:55   5   actual content of the letter.  We sent it to a certain

04:55   6   destination.  Right?

04:55   7       Q.    How have you concluded that PCI Express uses

04:55   8   address and data bits?

04:55   9       A.    Yeah.  So the -- of course I looked at the --

04:55  10   the standard itself gives us guidance about that.  It

04:55  11   shows clearly that PCI Express has address and data

04:55  12   bits.

04:55  13       Q.    Is that what we're looking at on Slide 44?

04:55  14       A.    That's right.  Again, this is from the PCI

04:55  15   Express specification.  And this is the most

04:55  16   authoritative document on PCI Express.  This is why

04:55  17   it's the specification.

04:55  18          And here, it shows -- like, it may seem to be

04:55  19   complicated, but here it shows basically the packet,

04:55  20   the collection of data that we have, the unit of data

04:55  21   that we want to send.

04:55  22          And see, this is the -- like, this is

04:55  23   basically the generic packet, and part of the packet

04:56  24   here, one header will be for the data.  So the data

04:56  25   that will be sent from one device to another, from one

04:56    1    unit to another is included right here.

04:56    2        Q.    Have you concluded whether PCI Express uses

04:56    3    address bits as well?

04:56    4        A.    Yes.  And also the specification itself

04:56    5    teaches that PCI Express has address bits as well, and

04:56    6    also some other documents have that information as

04:56    7    well.

04:56    8        Q.    Will you please look at P-488 in your binder,

04:56    9    Dr. Sarhan?

04:56    10       A.    Yes.

04:56    11       Q.    What is P-488?

04:56    12       A.    It's a -- it's Introduction to PCI Express - A

04:56    13    Hardware and Software Developer's Guide.  So this is a

04:56    14    book, a developer guide, and it's issued by Intel

04:56    15    Press.

04:56    16       Q.    Okay.  And is this a document you've relied on

04:56    17    to conclude that PCI Express uses address bits?

04:56    18       A.    Yes.

04:56    19              MR. HALES:  We offer it into evidence,

04:56    20    Your Honor.

04:56    21              MR. BURESH:  No objection.

04:56    22              THE COURT:  Admitted.

04:56    23    BY MR. HALES:

04:57    24       Q.    Dr. Sarhan, will you tell the jury what we're

04:57    25    looking at on Slide 45?

—297—

04:57  1      A.    Yeah.  So here it shows the different type of

04:57  2   requests.  So here, we have memory requests, and here

04:57  3   we have the memory.  Like here -- sorry.  This is

04:57  4   64-bit address memory request, and this is 32-bit

04:57  5   address memory request.  And this is I/O.  The bottom

04:57  6   we have the I/O request.

04:57  7         So these are different type of requests.  And

04:57  8   here, it shows the header.  "Header" means like the

04:57  9   beginning.  Generally, it's the beginning of the

04:57  10   packet.  It describes some stuff that's -- are related

04:57  11   to the packet.

04:57  12         And inside that header, which is part of the

04:57  13   whole overall packet, we see here these fields.  It

04:57  14   shows here clearly the address bits.

04:57  15      Q.    Thank you.

04:57  16         Dr. Sarhan, do you consider the address and

04:57  17   data bits used in PCI Express to be address and data

04:57  18   bits in accordance with the PCI local bus

04:57  19   specification?

04:57  20      A.    Yes.

04:57  21      Q.    Why?

04:57  22      A.    As I mentioned earlier, PCI Express uses

04:58  23   the -- uses a PCI compatible software model, right?

04:58  24   And I have the -- I believe I might have a slide here.

04:58  25   Yeah.

04:58  1           So this is, again, from PCI Express, right?

04:58  2  And it says here clearly that it has a PCI compatible

04:58  3  software model.

04:58  4           This is one of the many features of PCI -- PCI

04:58  5  Express.  And this is why it was able to become as

04:58  6  successful as it became.

04:58  7           And here, it shows that it has the ability to

04:58  8  enumerate and configure PCI Express hardware using PCI

04:58  9  system configuration software implementation.  So this

04:58  10  is part of the software that you have in the computer.

04:58  11          What does it mean?

04:58  12          This software is designed for PCI.  It's

04:58  13  designed -- this software is just -- the only thing it

04:58  14  knows in the world is PCI.

04:58  15          It does not know anything about PCI Express

04:58  16  because it might be newer.  Right?  So this --

04:59  17  basically the PCI Express has the ability to work with

04:59  18  old software that was meant only for PCI.

04:59  19          And also, it says it has the ability to boot

04:59  20  existing operating systems with no modification.

04:59  21  Don't -- does not need any modification to the

04:59  22  operating system.  So the -- you have -- even if you

04:59  23  have a legacy operating system and you have PCI

04:59  24  hardware, PCI devices, it's going to work without any

04:59  25  problem, although the operating system itself --

299

| | | |
|---|---|---|
| 04:59 | 1 | although the operating system itself does not know |
| 04:59 | 2 | anything about PCI Express. It was made before even |
| 04:59 | 3 | PCI Express. |
| 04:59 | 4 | So it has nothing to know about PCI Express, |
| 04:59 | 5 | but still it can work with PCI Express devices with no |
| 04:59 | 6 | problem. |
| 04:59 | 7 | And also says that it can support existing I/O |
| 04:59 | 8 | device drivers. And these drivers also ended up -- |
| 04:59 | 9 | software -- software that we have in the computer, and |
| 04:59 | 10 | it can work with those with no modifications as well. |
| 04:59 | 11 | And finally, it has the ability to configure |
| 05:00 | 12 | and enable PCI Express functionality. So still, PCI |
| 05:00 | 13 | Express has some additional functionality. That |
| 05:00 | 14 | functionality is enabled by adopting the PCI |
| 05:00 | 15 | configuration paradigm. |
| 05:00 | 16 | Q.   Thank you for that. |
| 05:00 | 17 | Dr. Sarhan, have you prepared any |
| 05:00 | 18 | demonstration about how the PCI Express system achieves |
| 05:00 | 19 | this compatibility with PCI local bus? |
| 05:00 | 20 | A.   Yes.  I have a figure to show that.  And |
| 05:00 | 21 | that -- |
| 05:00 | 22 | Q.   My question of course, as always when we look |
| 05:00 | 23 | at a slide, is what are we looking at?  And please help |
| 05:00 | 24 | the jury understand why you find this significant. |
| 05:00 | 25 | A.   Sure.  So this is, again, from the PCI Express |

05:00  1   specification.  This is the most authoritative document

05:00  2   that describes PCI Express.

05:00  3          And here, this is a snapshot.  But I added

05:00  4   some highlighting.  The highlighting is mine, just to

05:00  5   make sure like the jury can follow easily.

05:00  6          And see here, this is the CPU.  This is the

05:00  7   main -- the brain of the computer, which execute

05:00  8   instruction and software.  And remember on the previous

05:01  9   slide, we said that PCI Express uses a PCI compatible

05:01  10  software model.  Right?

05:01  11         Now, when the CPU execute instructions from

05:01  12  that PCI compatible software, right, is going to

05:01  13  encounter some instructions.  And while it executes

05:01  14  these instructions, it will convey address and data

05:01  15  bits of a PCI intersection.

05:01  16         To give you like a specific example, let's say

05:01  17  that this CPU wanted to execute -- in here we have

05:01  18  certain software that executes -- a program that

05:01  19  execute.  And in the program here, we have a write

05:01  20  instruction, memory write instruction.  So this

05:01  21  instruction will be writing to the memory.  So -- and

05:01  22  the memory can read -- right?

05:01  23         And -- sorry.  So here, like -- so it's going

05:01  24  to be writing to memory, but the PCI Express devices --

05:01  25  so this is the CPU.  It executes code, and part of the

05:01    1    code we have a memory write instruction.

05:01    2            This memory write instruction, if you have a

05:02    3    certain -- like depending on the address of that

05:02    4    instruction, it might be for a certain PCI device or

05:02    5    within the territory of a certain PCI device or within

05:02    6    a certain PCI Express device.

05:02    7            Here, I'm showing like those devices

05:02    8    differently.  I'm showing the PCI Express endpoints.

05:02    9    See this?  I'm showing them in this color.

05:02    10           And I'm showing here the -- old PCI local

05:02    11   hardware in here.  So this is the old PCI hardware.  So

05:02    12   in this system, we're going to -- we have old and new

05:02    13   hardware.  The new -- the new PCI Express hardware and

05:02    14   the old PCI local bus hardware.

05:02    15           The -- when the CPU, like, executes

05:02    16   instructions from that PCI compatible software, it may

05:02    17   encounter, let's say, a memory write instruction.  This

05:02    18   memory write instruction, what does it do?  It's going

05:02    19   to write to a memory location.

05:02    20           That memory location could be either in this

05:02    21   memory, or it could be in the -- in -- within a certain

05:03    22   PCI device or within a certain PCI Express device.

05:03    23   Right?

05:03    24           So now -- and it will have -- because you're

05:03    25   writing to a memory, you have to specify -- when you

05:03   1   write something, you have to specify where to write it.

05:03   2       Q.    And what do you use to specify where to write

05:03   3   something?

05:03   4       A.    Yeah.   This -- the address.   So you need to

05:03   5   know the address of the location where you're going to

05:03   6   write the data.

05:03   7           And also, because you want to write something,

05:03   8   you need to write data.   Right?   So the memory write

05:01   9   instruction includes data that want to communicate,

05:03  10   will write to the memory, and it's going to have the

05:03  11   address.

05:03  12           And because -- remember, like we said, this is

05:03  13   PCI compatible software.   The CPU now is executed --

05:03  14               (Clarification by Reporter.)

05:03  15       A.    So the CPU -- I feel bad for my students.

05:03  16           So the -- basically the -- when the CPU

05:03  17   execute PCI compatible software, right, if the -- those

05:03  18   are meant like -- I mean, it's PCI compatible.   So

05:03  19   that would -- when you have a memory write instruction,

05:03  20   they are going to -- those address and data bits will

05:04  21   actually be for a PCI transaction, because this whole

05:04  22   term is PCI compatible software.

05:04  23           And another reason I would give about this is

05:04  24   that the -- remember we talk about the courtroom

05:04  25   section, this Court, like all the certain definition

05:04    1    of -- definitions of certain terms?

05:04    2           The Court said define PCI Express -- a PCI

05:04    3    transaction to be a transaction in accordance -- in

05:04    4    accordance with the PCI local bus specification.  And

05:04    5    then it says -- it clarifies and says "in accordance

05:04    6    includes compatibility."  Right?

05:04    7           This is the key word, compatibility.

05:04    8           PCI Express is backward compatible with the

05:04    9    PCI local bus specification.  And this is one of the

05:04    10    main features of PCI Express, and this is what

05:04    11    contributed to the great success of PCI Express.

05:04    12    BY MR. HALES:

05:04    13    Q.    Thank you, Dr. Sarhan.

05:04    14           Have you prepared a demonstration of how a CPU

05:05    15    is able to speak both to a PCI local bus device and a

05:05    16    PCI Express device?

05:05    17    A.    Yes.  I have one quick animation about this.

05:05    18           I wanted to make it in the easiest way

05:05    19    possible so that the jury can understand, but there's

05:05    20    more details to it.  Just like an oversimplified

05:05    21    animation that explains just the overall concept.

05:05    22    Q.    I'll hit "play."  You go ahead and explain

05:05    23    what we're looking at.

05:05    24    A.    Sure.  So here the CPU is going to be sending

05:05    25    data to a PCI Express device.  This is a new device.

05:05  1    Right?  And --

05:05  2         Q.    And I think you saw a switch of orientation in

05:05  3    there from --

05:05  4         A.    Exactly.

05:05  5         Q.    -- one angle to another.

05:05  6               Can you tell the jury what that was?

05:05  7         A.    Yeah.  So basically, the CPU -- like, we --

05:05  8    the CPU will have address and data bits.  The address

05:05  9    and data bits of the CPU are parallel.  So the CPU will

05:05  10   send the data to the root complex in parallel form.

05:06  11   This is how the CPU operates.  It has a parallel bus.

05:06  12               So it will send the data in parallel to the --

05:06  13   like, in parallel form, and then the root complex will

05:06  14   serialize the -- this data, will send it serially over

05:06  15   to the PCI Express device, which is the new device that

05:06  16   we're referring to here.

05:06  17        Q.    Can you explain to the jury how it works if

05:06  18   the CPU wants to speak to any PCI local bus device?

05:06  19        A.    Yeah.  So here we have another -- another part

05:06  20   of the demo now.  The same thing, it will be

05:06  21   converted -- data converted -- it's going to be -- it's

05:06  22   going to be converted to the serial to PCI Express, and

05:06  23   now it's going to go to the PCI local bus.  And now

05:06  24   those devices will receive this data in parallel format

05:06  25   because of this little thing here.

05:06    1              This is the bridge, a bridge that bridges

05:06    2    between PCI Express and PCI -- the old PCI.

05:06    3         Q.    Thank you, Dr. Sarhan.

05:06    4              The CPU, when it issues this memory write

05:06    5    instruction, does it know whether it's speaking to a

05:06    6    downstream PCI local bus device or if it's speaking to

05:07    7    a PCI Express device?

05:07    8         A.    A -- like, it's going to be, like, we have a

05:07    9    certain command, like let's say a memory write command,

05:07   10    within a certain software that we set up the addresses

05:07   11    in such a way so that work fine.

05:07   12              The data -- like, it will send -- like, the

05:07   13    root complex will know what addresses belong to it.

05:07   14    And then it will actually work on them and forward them

05:07   15    to the place that can -- will claim those addresses.

05:07   16         Q.    So thanks for that.  I guess my question's a

05:07   17    little different.

05:07   18              When the CPU says, I want to send this

05:07   19    downstream, does it -- does it operate in one way for

05:07   20    PCI local bus devices and a different way for PCI

05:07   21    Express devices?

05:07   22         A.    No.  It uses a PCI compatible software, and

05:07   23    the data will be sent using memory commands, like,

05:07   24    memory -- and by memory read or memory write commands

05:07   25    or I/O read, I/O write.  But memory read and memory

05:07  1    write are the more common commands.

05:07  2        Q.    And when these endpoints, whether it's PCI

05:08  3    local bus or PCI Express, present themselves to the

05:08  4    CPU, do they say, hey.  I'm PCI Express.  Or do they

05:08  5    say, hey.  I'm PCI local bus.  How does that work?

05:08  6        A.    Yeah.  Actually, the -- like, the devices are

05:08  7    enumerated.  Like, when you, for example, like, turn on

05:08  8    your computer, like you have your -- any machine that

05:08  9    you have, Windows, Linux, whatever machine, when you

05:08  10   turn it on, at the very beginning it will do a process

05:08  11   called enumeration.

05:08  12        In the enumeration process, it will recognize

05:08  13   the different devices that are connected.  Could be,

05:08  14   like, if we have, like, an old computer with PCI local

05:08  15   bus hardware or we have a new one with PCI Express, or

05:08  16   sometimes they may exist with each other.

05:08  17        Now each device will be identified accordingly

05:08  18   by the -- using the PCI configuration paradigm.  And

05:08  19   this is a PCI configuration mechanism.

05:08  20        Like, for example, like, you know, when

05:08  21   working on this case, I -- like, I used some software,

05:08  22   like, to look at the devices and I have like a figure

05:09  23   on my report.  What I -- in my -- in my -- in my

05:09  24   computer, in that software that I use, when I did that

05:09  25   enumeration to see the list of devices, all the devices

05:09    1    are shown to be PCI devices.

05:09    2            Not that they are PCI devices -- these are PCI

05:09    3    Express devices, but they are using the PCI enumeration

05:09    4    paradigm.  And the devices will be thought of as if

05:09    5    they are PCI devices, right?

05:09    6            But in this enumeration process, of course

05:09    7    they can be configured using the new capabilities and

05:09    8    additional function maybe that they might have.

05:09    9        Q.    Thank you, Dr. Sarhan.

05:09   10            I'd like to move on from this point to the

05:09   11    other five elements you'd like to teach the jury about.

05:09   12            But I -- before we go, based on your study of

05:09   13    the asserted patents, have you concluded whether PCI

05:09   14    Express transactions are backward compatible with the

05:09   15    requirements of the PCI local bus specification?

05:09   16        A.    Yes.

05:09   17        Q.    Okay.  Have you determined whether, in your

05:09   18    view, the address and data bits of a PCI Express

05:09   19    transaction are properly considered to be in accordance

05:10   20    with the PCI local bus specification?

05:10   21        A.    Yes.

05:10   22        Q.    All right.  Let's return then to that second

05:10   23    element of the six that you'd like to introduce the

05:10   24    jury to.

05:10   25            What is important for the jury to know about:

05:10    1    LVDS channel conveying USB protocol data, packets, or

05:10    2    information?

05:10    3        A.    Yeah.  So, again, this is -- we've talked

05:10    4    about the most popular claims in the patents.  This is

05:10    5    the second claim that we have in that list, which is

05:10    6    basically:  LVDS channel conveying USB protocol

05:10    7    data/packets/information.

05:10    8            And the Court also, basically, like, construed

05:10    9    the term to have its plain and ordinary meaning.  So

05:10   10    USB here, when you deal with USB, I'm instructed to

05:10   11    apply a plain and ordinary meaning of this term.

05:10   12        Q.    Is that the meaning you've applied in your

05:10   13    analysis?

05:10   14        A.    Yes.

05:10   15        Q.    What have you analyzed to see if this

05:10   16    limitation is met in the accused products?

05:10   17        A.    So basically the -- like, I identified certain

05:11   18    USB ports, USB 3.X, could be USB 3.0, 3.1, 3.2, or USB

05:11   19    4 or Thunderbolt.  These ports basically, like, meet

05:11   20    this limitation, LVDS channels conveying USB protocol

05:11   21    data.

05:11   22        Q.    Will you open to J-47, please?

05:11   23            And once you're there, will you please share

05:11   24    with the jury what you're looking at?

05:11   25        A.    Okay.  Yeah.  It's the -- you said J-47,

05:11   1    right?

05:11   2        Q.    Yes.

05:11   3        A.    Yeah.  It's the Universal Serial Bus 3.0

05:11   4    Specification.

05:11   5        Q.    The same one that you analyzed in forming your

05:11   6    infringement opinions?

05:11   7        A.    Yes.

05:11   8              MR. HALES:  Your Honor, we offer it into

05:11   9    evidence.

05:11   10             MR. BURESH:  No objection.

05:11   11             THE COURT:  Admitted.

05:11   12   BY MR. HALES:

05:11   13       Q.    What does this document say relative to the

05:11   14   term that we see here on your screen?

05:11   15       A.    Yeah.  So here -- and I have a slide about

05:11   16   that, a snapshot from the -- I have a snapshot from,

05:12   17   again, the USB 3.0 Specification.

05:12   18             And I'm sure like most of the jury worked with

05:12   19   USB devices before and you have that USB cable.  If

05:12   20   that USB cable is 3.0 above, it's going to have

05:12   21   something like this.

05:12   22             So this is -- I'm showing you what's inside --

05:12   23   the wires inside that USB cable that you use a lot in

05:12   24   your life.

05:12   25             So if we look at the wires inside that cable,

310

05:12  1    we're going to see here this set of wires.  And this

05:12  2    set of wires here, we have two -- see here, we have --

05:12  3    SS stands for super speed because this is the whole

05:12  4    idea of USB 3 to provide super speed -- super speed on

05:12  5    top of like USB 2, higher than USB 2.

05:12  6              And you see we have super speed TX, TX for the

05:12  7    transmitter.  And then we have another pair, SST --

05:13  8    another set of pairs for the receiver.

05:13  9              So here, it just -- I mixed things up.

05:13  10             So here, the -- we have one pair, right, for

05:13  11   the -- this is the pair that I'm showing here in

05:13  12   yellow.  This pair is for the -- for the -- for the

05:13  13   receiver on one -- for the transmitter on this side.

05:13  14             And we have another pair of wires for the --

05:13  15   for the receiver.  And here, each one of these pair is

05:13  16   a differential signal pair as we describe before.

05:13  17        Q.   Do you know whether this is a low-voltage

05:13  18   differential signal?

05:13  19        A.   Yes.  And I have, like, a slide about that.

05:13  20        Q.   But before we get to that slide, the question

05:13  21   I have is:  We're looking at a diagram of a cable.

05:13  22             Would these same channels be found on the

05:13  23   other side of a USB 3 port inside of the computer as

05:13  24   well?

05:13  25        A.   That's right.  So any cable will have two

05:13 1    sides.  So we have -- like, let's say this side -- does

05:13 2    not matter which side, but we can -- this side

05:14 3    eventually we're going to connect it to the USB port on

05:14 4    the computer, right?

05:14 5         And the other side, this one will be connected

05:14 6    to the device, USB device, like, could be like a

05:14 7    camera, storage, whatever.

05:14 8         On this side now, when we -- for this side,

05:14 9    when we connect this cable -- cable to that USB port,

05:14 10   all these wires will have matching wires within that

05:14 11   port, right?

05:14 12        Q.   Perfect.  Thank you.

05:14 13        Now, the question I didn't let you answer was

05:14 14   whether these are low-voltage differential signal

05:14 15   channels.

16        A.   Yes.

05:14 17        Q.   I believe you indicated that you have a slide

05:14 18   on that?

05:14 19        A.   Yes.

05:14 20        Q.   Can you tell the jury what we're looking at on

05:14 21   our screen?

05:14 22        A.   And again, like, here it shows the -- this --

05:14 23   this value.  It shows the differential, $V_{TX-DIFF-PP}$, which

05:14 24   is the peak-to-peak value of the differential voltage,

05:14 25   and shows that here we have two values, the minimum is

05:14  1    .8 and the maximum 1.2, right.

05:14  2            And just remind us, with PCI Express, right?

05:15  3    PCI Express, the previous technology that we discussed,

05:15  4    also has .8 to 1.2 normally.

05:15  5        Q.    I think in that context you determined that

05:15  6    was low voltage.  Do I remember correctly?

05:15  7        A.    That was low.  Yeah.

05:15  8        Q.    Is this similarly low voltage?

05:15  9        A.    Yes.  I'm not the only one that would

05:15  10   determine it to be low, because the specification

05:15  11   itself refers to it as low voltage.

05:15  12       Q.    Very good.

05:15  13           Let's move on to that third claim limitation

05:15  14   you want to introduce the jury to.

05:15  15           What is a central processing unit?

05:15  16       A.    Yeah.  So the central processing unit, like

05:15  17   this one, basically the brain of the computer.  It's

05:15  18   the part of the computer that executes instructions.

05:15  19           You have programs.  Those programs will

05:15  20   execute it by the CPU.  They could be add instruction,

05:15  21   multiply, divide, whatever.

05:15  22           So -- and this CPU is generally inserted in

05:15  23   the motherboard in this slot, for example.  This is

05:15  24   just an example.  So here we put this CPU, and we

05:15  25   insert it in this slot on the motherboard, right?

313

05:15  1        Q.    Great.

05:15  2              What is an interface controller, and what are

05:15  3    we looking at?

05:15  4        A.    Okay.  So remember the LVDS channels that we

05:16  5    talk about that were disclosed, like, by the patents to

05:16  6    convey USB -- to convey PCI Express data or USB data?

05:16  7              So here, we have these -- these are the LVDS

05:16  8    channels that we have.  And there we go.  And the

05:16  9    interface controllers, see, we have one interface

05:16 10    controller here and we have one interface controller on

05:16 11    this side.

05:16 12              The interface controller basically manages

05:16 13    these LVDS channels.  Everything needs to be somehow

05:16 14    managed configured toward the way it's supposed to

05:16 15    work.  So the interface control basically manages these

      16    channels.

05:16 17              And to give an example to the jury, if -- if

05:16 18    you can think about the CPU as the chef in the

05:16 19    restaurant, then the interface controller will be the

05:16 20    wait staff that will manage the orders and take food to

05:16 21    the customers when the food is ready.

05:16 22        Q.    Very good.

05:16 23              The next limitation you highlighted was

05:16 24    graphics controller.

05:16 25              Can you introduce the jury to what that is?

314

05:17  1      A.    Yeah.  So I'm sure like if the -- some of the

05:17  2  jury have kids, like their kids love gaming and all

05:17  3  that and they care about the graphics cards.  So the

05:17  4  graphics cards can be like in this form.  And in this

05:17  5  case, it would be inserted in one of these PCI Express

05:17  6  slots.

05:17  7          And it sometimes can come like this in the

05:17  8  form of a GPU with some surrounding elements, and that

05:17  9  one, in the case of laptop, it will be like that.  It

05:17  10  will be like this in the laptop.  This one, like it

05:17  11  will be like in the PC.

05:17  12          And in some cases, the GPU itself or the

05:17  13  graphics system or the graphics controller can be

05:17  14  integrated part of the CPU.  So the CPU can act as both

05:17  15  CPU and GPU at the same time.

05:17  16      Q.    Great.

05:17  17          And the final of the six was a peripheral

05:17  18  bridge?

05:17  19          Can you introduce the jury to this hardware?

05:17  20      A.    Yes.  According to the patents, the peripheral

05:17  21  bridge is a unit that can allow more and more devices

05:18  22  to be connected to the computer system or to the

05:18  23  motherboard.  And the peripheral bridge is basically

05:18  24  the chipset that we have in the computers.  It's most

05:18  25  commonly referred to as a chipset, which is this unit.

05:18  1          Remember the CPU which is the main part of the

05:18  2     computer, the brain of the computer.  Sometimes we

05:18  3     refer to this chipset as the companion chipset because

05:18  4     it's meant to be a companion to the CPU.

05:18  5          And by this we can add additional ports, we

05:18  6     can have, like, additional USB ports.  We have

05:18  7     additional PCI Express slots and so on.

05:18  8     Q.    Thank you for that crash course.

05:18  9          Dr. Sarhan, is this, what you've just

05:18  10    described to the jury, the understanding of the patent

05:18  11    claim limitations you've applied in performing your

05:18  12    infringement analysis?

05:18  13    A.    Yes.

05:18  14    Q.    And how specifically did you present that

05:18  15    infringement analysis in this case to date?

05:18  16    A.    So I wrote an expert witness report which is

05:19  17    part of these exhibits.  So like this -- it's 500-page

05:19  18    report -- more than 500-page report on infringement.

05:19  19          And basically, I analyzed the patents and the

05:19  20    claims and figured out whether the products, according

05:19  21    to the specifications and how they work, et cetera,

05:19  22    whether they meet the claim limitations in the -- in

05:19  23    the patents.

05:19  24    Q.    You mentioned 500-some-odd products had been

05:19  25    accused of infringement.

—316—

05:19   1          How did you organize that for purposes of your

05:19   2   infringement analysis?

05:19   3      A.    Okay.  So what I did is that I grouped these

05:19   4   products into -- or I classified these products into

05:19   5   groups.  Right?  And then, like, I examined one

05:19   6   representative product in each group.

05:19   7      Q.    How many groups did you have?

05:19   8      A.    So I ended up with like -- yeah.  We have 29

05:19   9   representative groups.

05:19   10     Q.    Did you conclude that each of these 29 groups

05:19   11  infringed the asserted claims?

05:19   12     A.    No.  Not the whole 29.

05:20   13     Q.    Describe how many you left behind.

05:20   14     A.    Okay.  What I did -- yeah.  When I did my

05:20   15  analysis on the accused products and I classified them

05:20   16  into 29 representative groups, 4 of the groups I didn't

05:20   17  find adequate evidence for infringement, so I decided

05:20   18  to remove them from my report.  And then like the rest,

05:20   19  25, basically, I determined that they infringed ACQIS'

05:20   20  products.

05:20   21     Q.    And those 25 groups, are those the 500-odd

05:20   22  products that you discussed earlier in your testimony?

05:20   23     A.    Yes.

05:20   24     Q.    Okay.  And did you conclude that each of these

05:20   25  products that remain in the case infringe the apparatus

—317—

05:20    1    claims we discussed earlier, the claims protecting a

05:20    2    computer?

05:20    3        A.    Yes.

05:20    4        Q.    Did you conclude that each of the products

05:20    5    that remain in the case were manufactured according to

05:20    6    the method claims asserted in this case?

05:20    7        A.    Yes.

05:20    8        Q.    Does Slide 57 accurately summarize the

05:20    9    infringement opinions you arrived at in this case?

05:20    10       A.    Yes.

05:21    11                MR. HALES:    Your Honor, we're going to do

05:21    12    the infringement walk at this point.    It's probably

05:21    13    going to take about 45 to 50 minutes.    I know it's

05:21    14    going to put us about 6:05 or 6:10.    I just will

05:21    15    proceed however you think is wisest.

05:21    16                THE COURT:    Ladies and gentlemen, I try

05:21    17    and defer to you all.    I'm happy to stay.    We could

05:21    18    stay till 5:45 and then break.    We could break now.    We

05:21    19    can stay till 6:00.    You let me know what you'd like to

05:21    20    do.

05:21    21                You're okay?    Want to go to 5:45?    Will

05:21    22    that work?

05:21    23                MR. HALES:    I'll bet we could do one of

05:21    24    the representative products by then.

05:21    25                THE COURT:    Let's do that.    But thank you

318

05:21  1    for asking.

05:21  2              MR. HALES:  Yes.  I certainly appreciate

05:21  3    it.

05:21  4    BY MR. HALES:

05:21  5       Q.    Dr. Sarhan, let's share with the jury how you

05:21  6    arrived at your infringement conclusions.  Let's start

05:21  7    with the representative desktop, if we can.

05:22  8       A.    Yes.

05:22  9       Q.    What materials did you review to make your

05:22  10   infringement determinations with respect to this -- the

05:22  11   S340MF product?

05:22  12      A.    Yeah.  I reviewed the ASUS product

05:22  13   specification.  I reviewed the ASUS user manual.  And

05:22  14   also, I reviewed other technical documents produced by

05:22  15   ASUS and third parties, in this case, Intel, for the

05:22  16   processor.

05:22  17      Q.    Will you take a look at P-17, please?

05:22  18      A.    Say it again?

05:22  19      Q.    P-17.

05:22  20      A.    J-17, right?

05:22  21      Q.    P-17.

05:22  22      A.    Oh, P.  I'm getting tired.

05:23  23      Q.    Should be in Volume I, if I'm not mistaken.

05:23  24      A.    Yeah.  In Volume I, I have J-17.

05:23  25      Q.    Let's open J-17 and tell me what you see.

05:23   1        A.    Yeah.   Okay.   So this is the -- okay.   So this

05:23   2   is the -- basically the products, the ASUS product

05:23   3   specification for this desktop.

05:23   4        Q.    Okay.   Is this the same specification sheet

05:23   5   you relied on in arriving at your infringement

05:23   6   opinions?

05:23   7        A.    Yes.

05:23   8        Q.    Great.   My mistake.   It is J-17.

05:24   9             And will you please open to P-344?

05:24   10        A.    Yes.

05:24   11        Q.    What is P-344?

05:24   12        A.    It's the -- it's the data sheet for the 8th

05:24   13   and 9th Generation Intel core processor.   This is

05:24   14   basically the data sheet from Intel for the -- this

05:24   15   desktop.   This desktop uses an Intel processor.   And

05:24   16   this data sheet gives us the details about this

05:24   17   processor, how it's designed, the background, and all

05:24   18   of that information.

05:24   19        Q.    And have you relied on this document in

05:24   20   forming your opinions?

05:24   21        A.    Yes.

05:24   22             MR. HALES:   Your Honor, we offer them

05:24   23   into evidence.

05:24   24             MR. BURESH:   Which ones?

05:24   25             MR. HALES:   J-17 and P-344.

| | | |
|---|---|---|
| 05:24 | 1 | MR. BURESH:  No objection. |
| 05:24 | 2 | THE COURT:  Admitted. |
| 05:24 | 3 | BY MR. HALES: |
| 05:24 | 4 | Q.    All right, Dr. Sarhan.  Let's turn our |
| 05:24 | 5 | attention to the first claim and perform an |
| 05:24 | 6 | infringement analysis. |
| 05:24 | 7 | Have you concluded whether the S340MF has a |
| 05:24 | 8 | printed circuit board? |
| 05:24 | 9 | A.    Yes. |
| 05:24 | 10 | Q.    Does it -- |
| 05:24 | 11 | A.    So yeah.  Just I'm organizing all these |
| 05:25 | 12 | folders. |
| 05:25 | 13 | Q.    You know, I'm jumping into it.  Let's just |
| 05:25 | 14 | pause for one second. |
| 05:25 | 15 | Is this Claim 10 of the '768 patent? |
| 05:25 | 16 | A.    Yes. |
| 05:25 | 17 | Q.    And are we looking at the claim limitations of |
| 05:25 | 18 | this Claim 10? |
| 05:25 | 19 | A.    Yes. |
| 05:25 | 20 | Q.    Okay.  Let's walk through them just one row at |
| 05:25 | 21 | a time and decide if you've concluded whether they are |
| 05:25 | 22 | found in this accused product, all right? |
| 05:25 | 23 | Does this product have a printed circuit |
| 05:25 | 24 | board? |
| 05:25 | 25 | A.    Yes.  As any computer, like it will have a |

05:25    1    motherboard which contains -- which holds all the

05:25    2    different components of the computer and connects them

05:25    3    together.

05:25    4        Q.    Okay.  What about a central processing unit?

05:25    5        A.    Yes.  As any computer, like it will have a

05:25    6    central processing unit.

05:25    7              And here, even if we look at the ASUS product

05:25    8    specification -- this is the ASUS product

05:25    9    specification -- it shows the information about the

05:25   10    processor.  It can have either this or that about the

05:25   11    processor.

05:25   12        Q.    Okay.  Let's go to the third row.

05:25   13              Does this product have a peripheral bridge

05:25   14    directly coupled to that CPU without an intervening PCI

05:25   15    bus?

05:25   16        A.    Yes.  So we have this chipset.  This is again

05:26   17    from the ASUS product specification.  And this

05:26   18    specifies this chipset.  That's connected directly to

05:26   19    the central processing unit.

05:26   20        Q.    So that was a long limitation.

05:26   21              What is the chipset from the language we see

05:26   22    at the left?

05:26   23        A.    The -- yeah.  The chipset is basically the

05:26   24    peripheral bridge.

05:26   25        Q.    Okay.  And what are we looking at here on

322

05:26  1    Slide 62?

05:26  2        A.    Yeah.  So here we see the -- this is now from

05:26  3    the Intel CPU data sheet.  So this is the details for

05:26  4    the CPU that -- that used in this product.  And you see

05:26  5    here we have in this diagram -- in this diagram we have

05:26  6    this part, which is the CPU itself.  And this part is

05:26  7    the peripheral bridge or the chipset or PCI chip.

05:26  8        Q.    Okay.  And in between them I see you've put a

05:26  9    square around DMI.

05:26  10        What is DMI?

05:26  11        A.    So DMI is an interconnect between the -- it's

05:26  12    proprietary to Intel.  Intel develop this interconnect

05:27  13    to connect between the processor and the chipset.

05:27  14        Q.    Is DMI a peripheral component interconnect

05:27  15    bus?

05:27  16        A.    No.

05:27  17        Q.    Okay.  Well, what is it based on?

05:27  18        A.    DMI is based on PCI Express.

05:27  19        Q.    Is PCI Express itself a PCI -- I'm sorry -- a

05:27  20    peripheral component interconnect bus?

05:27  21        A.    No.

05:27  22        Q.    Okay.  I've run out of language to investigate

05:27  23    here.

05:27  24        Are the limitations of claim -- or Row 3 met

05:27  25    in this product?

05:27  1          A.    Yes.

05:27  2          Q.    Okay.  This is a lengthy limitation here in

05:27  3     Row 4.  Let's take it in constituent pieces.

05:27  4                Have you concluded whether this accused

05:27  5     desktop product has a low voltage differential signal

05:27  6     channel directly extending from the peripheral bridge

05:27  7     that you've identified?

05:27  8          A.    Yes.  So here it says:  LVDS comprising two

05:27  9     unidirectional serial channels of multiple opposite

05:27  10    directions, right?  And this is -- must be used, like,

05:27  11    to convey address and data bits of a PCI transaction.

05:27  12               And here, we see this -- like, this is the

05:28  13    peripheral bridge again.

05:28  14               And directly extending from this peripheral

05:28  15    bridge, we have this DMI.  And we have this PCI here --

05:28  16    PCI Express channels.  And these are -- as we discussed

05:28  17    earlier, like, they employ LVDS in opposite directions

05:28  18    and they are used to convey address and data bits of a

05:28  19    PCI transaction.

05:28  20         Q.    Okay.  So we heard the earlier analysis about

05:28  21    PCI Express, but DMI, what reason do you have to

05:28  22    believe that it also would be a LVDS channel?

05:28  23         A.    Yeah.  I looked at a lot of documents from

05:28  24    Intel, a lot of -- and these documents, they described

05:28  25    how -- like, details about DMI, how it works.

05:28   1            And even, like, in one of the documents I

05:28   2   looked at, it showed the differences between DMI and

05:28   3   PCI Express.  None of these differences would matter in

05:28   4   terms of this analysis that I just performed.

05:28   5      Q.   Great.  Let's proceed further in this lengthy

05:28   6   limitation.

05:29   7            Does this product have the LVDS channels we

05:29   8   just discussed, which have two unidirectional serial

05:29   9   channels of multiple differential line pairs to convey

05:29  10   data in opposite directions?

05:29  11      A.   Yes.  And here, now we're going back to that

05:29  12   ASUS product specification that tells us the features

05:29  13   of this product.

05:29  14            And clearly here it shows that we have

05:29  15   different PCI Express channels, including this channel,

05:29  16   which has 16 lanes, right?  And here, like -- yeah.

05:29  17   And here, this one like -- and this one has one lane,

05:29  18   and that one, here, is not specified.

05:29  19      Q.   Okay.  Are you confident that these channels

05:29  20   will have signal pairs to convey data in opposite

05:29  21   directions?

05:29  22      A.   Yes.  This is the nature of LVDS as we

05:29  23   discussed before.  So when talk about PCI Express, I

05:29  24   don't want to, like, maybe, like, show it again in the

05:29  25   slides, but we show that we have, like, differential

325

05:29  1    pairs in opposite directions.

05:29  2        Q.    Great.

05:29  3        A.    So we already established that.

05:29  4        Q.    The language here at the end:  Wherein, the

05:30  5    LVDS channels convey address and data bits of a PCI bus

05:30  6    transaction.

05:30  7            Is this limitation satisfied?

05:30  8        A.    Yes.  Because the whole idea of PCI Express is

05:30  9    to convey address and data bits of PCI transaction.

05:30  10       Q.    Very good.

05:30  11           And this last limitation, it appears new.  Can

05:30  12   you introduce the jury to a network controller?

05:30  13       A.    The -- yes.  So here, like, if we look again

05:30  14   at the product specifications, we can see that here we

05:30  15   have different network controllers, right?

05:30  16           And so here, we have WiFi.  And here, we have

05:30  17   RJ45 Gigabit Ethernet connector, which is, like, to

05:30  18   connect it to a local network through a certain wire.

05:30  19       Q.    Is this final limitation met in the accused

05:30  20   desktop product?

05:30  21       A.    Yes.

05:30  22       Q.    Does the accused desktop product satisfy all

05:30  23   limitations of Claim 10 of the '768 patent?

05:30  24       A.    Yes.

05:30  25       Q.    Very good.

05:30  1            Let's move on to Claim 13 of the '768 patent.

05:30  2            Is the accused desktop a computer, Dr. Sarhan?

05:30  3       A.   Yes.  Of course.

05:30  4       Q.   Does it have an integrated central processing

05:31  5  unit with an interface controller on the same chip?

05:31  6       A.   Yes.  And we said all of them have it, and we

05:31  7  have that in the processor diagram, which shows that.

05:31  8       Q.   On what basis do you conclude that it has an

05:31  9  interface controller?

05:31  10      A.   Yeah.  So here -- yeah.  So the -- this is the

05:31  11 integrated CPU.  This is the CPU.  And if we look at

05:31  12 this CPU, we see here we have some channels coming out

05:31  13 of it, including the PCI Express channel and we have

05:31  14 DMI channels.

05:31  15           So these are LVDS channels, as I described

05:31  16 earlier, and these LVDS channels basically -- the --

05:31  17 yeah.  Sorry -- needs to be managed, needs to be

05:31  18 configured.  So we must have interface controllers to

05:31  19 manage these LVDS channels.

05:31  20      Q.   Okay.  Is this limitation met, Dr. Sarhan?

05:31  21      A.   Yes.

05:31  22      Q.   Let's go to Row 3.  Again, it's another big

05:31  23 limitation.  I'd like you to focus your analysis here

05:31  24 on anything that's new relative to the prior LVDS term

05:31  25 we've analyzed.

05:31  1      A.    Yes.  So here like -- yeah.  Go ahead.

05:32  2      Q.    In the first half here, is there any important

05:32  3  language the jury should focus on for purposes of your

05:32  4  analysis?

05:32  5      A.    So same as before, we have these, like, the

05:32  6  PCI Express channels here, DMI.  These are LVDS

05:32  7  channels to -- that convey address and data bits of a

05:32  8  PCI bus transaction.

05:32  9      Q.    Okay.  In the second half of the language, is

05:32 10  there any important new concept that the jury should

05:32 11  focus on?

05:32 12      A.    Everything is same as before except here now

05:32 13  we have "multiple," right?  So this is the keyword

05:32 14  here.

05:32 15      Q.    Does --

05:32 16      A.    This is the additional requirement.

05:32 17      Q.    Does the accused desktop product use multiple

05:32 18  lanes of the LVDS channels you've identified?

05:32 19      A.    Yes.  So here, like, we can see this one here,

05:32 20  like, for the PCI Express, right?  So it shows x 16.

05:32 21      Q.    What does "x 16" mean?

05:32 22      A.    16 bits.

05:32 23      Q.    Okay.

05:32 24      A.    So it has 16 bits.

05:32 25            And also, the DMI here, although it does not

05:32  1   here show, like, how many lanes it has, DMI, like, by

05:32  2   reading Intel documents, I determined that it has

05:32  3   between four to eight lanes.

05:32  4       Q.   Okay.  This final limitation, what is system

05:32  5   memory, and is it directly coupled to the CPU of this

05:33  6   accused product?

05:33  7       A.   Yes.  So here we see the -- in the processor

       8   diagram, we have this main memory or system memory as

05:33  9   we can see even in here.  And it's connect -- and this

05:33  10  is the CPU.  And here, we have direct connections

05:33  11  between the CPU and memory.

05:33  12      Q.   And does this product actually use the diagram

05:33  13  system memory found in the internal document?

05:33  14      A.   Yes.  Actually, if you look at the product

05:33  15  specification, if you go back to the ASUS product

05:33  16  specification, it tells us, yeah.  This...

05:33  17      Q.   I guess this specific product, does it employ

05:33  18  the scheme that we see recommended by Intel on the

05:33  19  product --

05:33  20      A.   Yeah.  In the next slide, we -- yeah.  So

05:33  21  here, it shows the specific memory that's actually

05:33  22  used.

05:33  23      Q.   Okay.  Are all limitations of Claim 13 found

05:33  24  in the accused desktop product?

05:33  25      A.   Yes.

329

05:33  1      Q.    Let's go to Claim 19 of the '359 patent.

05:33  2            Does this patent require any special handling,

05:33  3    or does our discussion of the '768 patent suffice?

05:33  4      A.    Yeah.  I'd like to discuss -- whatever we

05:33  5    discuss about '768 would be sufficient.

05:34  6      Q.    Okay.  I think we've established this is a

05:34  7    computer, Dr. Sarhan?

05:34  8      A.    Yes.

05:34  9      Q.    Does it have a CPU connected to a first LVDS

05:34  10   channel with the limitations that are recited there?

05:34  11     A.    Yeah.  So here, we have the CPU again.  And

05:34  12   you see here, we have these PCI Express and DMI

05:34  13   channels, which are LVDS channels that, like, convey

05:34  14   data in opposite directions.

05:34  15     Q.    Does your prior discussion of system memory

05:34  16   apply for this limitation too, Dr. Sarhan?

05:34  17     A.    Yes.  And if you look at this product, it

05:34  18   tells us that it has this specific memory.

05:34  19     Q.    Okay.  Does this product have a connector that

05:34  20   can couple to a console?

05:34  21     A.    Yeah.  It has actually a lot of connectors.

05:34  22   You see here, like, it has these different USB

05:34  23   connectors.  It has Ethernet connector, HDMI, and so

05:34  24   on.

05:34  25     Q.    Now, the Court has construed the term

330

05:34  1    "console."

05:34  2            Have you applied the Court's construction of

05:34  3    console in interpreting infringement of this

05:34  4    limitation?

05:34  5        A.    Yes.

05:34  6        Q.    Okay.  Do you have any reason to doubt that

05:34  7    the connectors we view from the spec sheet here are

05:34  8    capable of connecting to a console as that term has

05:35  9    been defined?

05:35  10       A.    Yes.

05:35  11       Q.    I'm sorry.  You do have reason to doubt or --

05:35  12       A.    Sorry.  Yeah.

05:35  13       Q.    I'll re-ask the question.

       14       A.    Yeah.

05:35  15       Q.    Do you -- having applied the Court's

05:35  16   construction for console, do you have any reason to

05:35  17   doubt the connectors we see here are capable of

05:35  18   coupling to a console?

05:35  19       A.    No.

05:35  20       Q.    Okay.  What about this second LVDS channel,

05:35  21   what do you look to in the accused product for

05:35  22   satisfaction of this limitation?

05:35  23       A.    Yeah.  So here it says that:  A second LVDS

05:35  24   channel, again, comprising two sets of unidirectional

05:35  25   differential signal pairs in opposite directions.

—331—

05:35  1          And here, like we'll see in the next

05:35  2  limitation, that calls for USB --

05:35  3               (Clarification by Reporter.)

05:35  4     A.    The next limitation also -- it says that's

05:35  5  going to send USB data.

05:35  6          If we go, like, to the previous slide, you can

05:35  7  see -- like, you know, as we discussed before in the

05:35  8  Universal Serial Bus Specification 3.0, like we showed

05:35  9  this cable previously and we showed that it has -- it

05:35 10  uses two LVDS channels in opposite directions.

05:36 11     Q.    Okay.  Is that limitation met, Dr. Sarhan?

05:36 12     A.    Yes.

05:36 13     Q.    And the final limitation is -- are those USB

05:36 14  channels and ports capable of -- are they adapted to

05:36 15  transmit data packets in accordance with the USB

05:36 16  protocol?

05:36 17     A.    Yes.  The whole purpose of the USB protocol is

05:36 18  to send and transmit USB data.

05:36 19     Q.    Okay.  Are all limitations of Claim 19 in this

05:36 20  patent found in the accused desktop product?

05:36 21     A.    Yes.

05:36 22     Q.    Okay.  I'd like to move on to the method

05:36 23  claims.

05:36 24          Will you provide the jury a refresher?  What

05:36 25  are we looking for in a method claim?

332

| 05:36 | 1 | A.    Method claims, they specify the steps taken to |
| 05:36 | 2 | manufacture a certain product, a physical product.  So |
| 05:36 | 3 | here, we're referring to manufacturing steps. |
| 05:36 | 4 | Q.    How did you perform your infringement analysis |
| 05:36 | 5 | for the method claims? |
| 05:36 | 6 | A.    Still I use the -- like, the same documents I |
| 05:36 | 7 | mention before.  I looked at the -- I reviewed the ASUS |
| 05:36 | 8 | product specification, user manual.  I looked at |
| 05:36 | 9 | third-party documents, including those by Intel. |
| 05:37 | 10 | Q.    Any witness testimony, Dr. Sarhan? |
| 05:37 | 11 | A.    Yes.  I reviewed some deposition testimony by |
| 05:37 | 12 | ASUS employees that spoke about, you know, like, how |
| 05:37 | 13 | the ASUS products are designed and manufactured. |
| 05:37 | 14 | Q.    Did you visit the manufacturing facilities? |
| 05:37 | 15 | A.    No. |
| 05:37 | 16 | Q.    Okay.  Why not? |
| 05:37 | 17 | A.    So I don't think it's necessary to visit the |
| 05:37 | 18 | manufacturing facility. |
| 05:37 | 19 | Q.    Okay.  Let's go to Claim 36 of the '797 |
| 05:37 | 20 | patent. |
| 05:37 | 21 | Is there anything that you want to slow down |
| 05:37 | 22 | and describe that is particular, unique to the '797 |
| 05:37 | 23 | patent, or was our discussion of the '768 sufficient? |
| 05:37 | 24 | A.    Yeah.  It should be sufficient. |
| 05:37 | 25 | Q.    Very well. |

05:37 1       Have you concluded that the limitation here in

05:37 2  Row 1 is satisfied in the manufacture of this accused

05:37 3  product?

05:37 4      A.   Yes.  So here, because it speaks about the

05:37 5  method of improving data throughput on a motherboard,

05:37 6  right?  And later on, in the later limitation, we'll

05:37 7  see, like, how it's going to actually improve the

05:37 8  throughput.

05:37 9      Q.   Okay.  In any event, have you concluded this

05:37 10  product has a motherboard?

05:38 11      A.   Yes.

05:38 12      Q.   Okay.  Have you concluded whether a CPU has

05:38 13  been mounted in it with an interface controller as a

05:38 14  single chip?

05:38 15      A.   Yes.  As we see, the product will have a CPU,

05:38 16  and the CPU will have interface controller as mentioned

05:38 17  earlier because of these LVDS channels, and the CPU

05:38 18  will be mounted on the motherboard because this is

05:38 19  where the CPUs will be mounted.

05:38 20      Q.   Has the manufacturer connected the low voltage

05:38 21  differential signal with the properties recited there

05:38 22  in Row 3?

05:38 23      A.   Yes.  As we see, we have these PCI Express and

05:38 24  DMI channels, which, again, employ LVDS technology.

05:38 25      Q.   Has the manufacturer increased data throughput

05:38    1    of these channels by providing them with multiple

05:38    2    differential signal pairs?

05:38    3        A.    Yes.   So as I mention before, PCI Express

05:38    4    here, x 16, which means it has 16 lanes.   And DMI, as I

05:38    5    mentioned, has between four to eight lanes.

05:38    6        Q.    Okay.   Has the manufacturer configured the

05:38    7    interface controller to --

05:38    8                MR. HALES:   I'm going to discuss an Intel

05:38    9    document, Your Honor, and I have to seal the courtroom

05:39   10    for about 30 seconds.

05:39   11                THE COURT:   Okay.   If you're not under

05:39   12    the protective order, please exit the courtroom.

05:39   13                (Sealed proceedings.)

05:39   14    BY MR. HALES:

05:39   15        Q.    Dr. Sarhan, has the manufacturer increased the

05:39   16    throughput of the serial channels by providing them

05:39   17    with -- oh.   We've discussed that.

05:39   18                Have the -- has the interface controller of

05:39   19    this product been configured to adapt to different

05:39   20    numbers of differential signal line pairs for conveying

05:39   21    encoded address and data bits?

05:39   22                I'd like for you in your answer, please, to

05:39   23    focus specifically on the concept of adapting to

05:39   24    different numbers of differential line pairs and

05:39   25    encoding.

335

05:39  1        A.    Okay.  So the -- which limitation are we at at

05:39  2    this point?

05:39  3        Q.    The fifth limitation here -- the fifth row,

05:39  4    rather.

05:39  5        A.    Okay.  So the -- I'm not sure if we talked

05:39  6    about the previous one.  Just like -- maybe like to be

05:39  7    sure.

05:39  8            So it says that increasing the data throughput

05:40  9    with multiple differential signal channels.  When we

05:40  10   have, like, multiple lanes, as we saw here, like x 16

05:40  11   means 16 lanes.  The whole idea of having more lanes is

05:40  12   to increase the data throughput.

05:40  13       Q.    Okay.  And how many lanes is DMI employed

05:40  14   with?

05:40  15       A.    Again,  ████████████

05:40  16       Q.    Okay.  Is this Row 4 of the limitations there

05:40  17   satisfied?

05:40  18       A.    Yes.

05:40  19       Q.    Okay.  This fifth row, I'd like for you to pay

05:40  20   special attention in your analysis, if you can, to

05:40  21   whether the interface controller is able -- capable of

05:40  22   adapting to different numbers of line pairs and whether

05:40  23   it's capable of encoding address and data bits --

05:40  24       A.    Yes.

05:40  25       Q.    -- in the manner recited there.

05:40  1       A.    So again, like the interface controller

05:40  2   charged with managing the LVDS channels, the --

05:40  3   according to the PCI Express specification, the --

05:40  4   the -- like the PCI Express will adapt whatever number

05:40  5   of LVDS channels, whatever number of lanes that are

05:41  6   actually supported by the peripheral device.  Right?

05:41  7           So whatever, like, number of lanes that are

05:41  8   supported by the peripheral device, the PCI Express

05:41  9   system will adapt accordingly and will -- there'll be

05:41  10  some negotiation and they will reach the minimum number

05:41  11  that's actually supported by two -- the two parties,

05:41  12  like the two units that communicate with each other.

05:41  13          And also, like in the PCI Express

05:41  14  specification, it teaches that some lanes -- if some

05:41  15  lanes may experience temporary or permanent failures,

05:41  16  then the PCI Express standard calls for changing the

05:41  17  number of lanes, like, dynamically to account for any

05:41  18  temporary or permanent errors that may occur.

05:41  19      Q.    And the analysis you just provided is relevant

05:41  20  to what claim limitation here in Row 5?

05:41  21      A.    Yeah.  So here, like basically, the interface

05:41  22  and control does adapt to the number of lanes that are

05:41  23  available.

05:41  24      Q.    Okay.  Proceeding through that limitation,

05:41  25  does PCI Express -- or I think you've identified DMI as

| | | |
|---|---|---|
| 05:41 | 1 | another LVDS channel. |
| 05:42 | 2 | Are they capable of encoding and conveying |
| 05:42 | 3 | address and data bits of a PCI bus transaction in a |
| 05:42 | 4 | serial form? |
| 05:42 | 5 | A.    Yeah.  So here, we have the -- and I did, |
| 05:42 | 6 | like, a new keyword, encoded.  Encoded has been -- this |
| 05:42 | 7 | word has been construed by the Court.  And basically, |
| 05:42 | 8 | it will require like the address and data bits to be |
| 05:42 | 9 | converted from parallel to serial form. |
| 05:42 | 10 | Q.    Does PCI Express do that? |
| 05:42 | 11 | A.    Yes. |
| 05:42 | 12 | |
| 05:42 | 13 | |
| 05:42 | 14 | Q.    Uh-huh. |
| 05:42 | 15 | A. |
| 05:42 | 16 | |
| 05:42 | 17 | |
| 05:42 | 18 | |
| 05:42 | 19 | |
| 05:42 | 20 | |
| 05:42 | 21 | |
| 05:42 | 22 | |
| 05:42 | 23 | |
| 05:43 | 24 | Q.    Thank you, Dr. Sarhan. |
| 05:43 | 25 | Are the limitations of Row 5 met in this -- |

338

05:43   1   the manufacture of this accused desktop product?

05:43   2       A.    Yes.

05:43   3       Q.    Dr. Sarhan, has the manufacturer coupled an

05:43   4   integrated CPU and interface device in the manner

05:43   5   recited in this final row?

05:43   6       A.    Yeah.  So here, it says that coupling the

        7   integrated CPU to a peripheral device attached to the

05:43   8   motherboard through that LVDS channel.  And we see

        9   here, we have --

05:43   10                 (Clarification by Reporter.)

05:43   11      A.    Okay.  And here, we can see that the -- like

05:43   12  the storage, it has storage that's connected through

05:43   13  the PCI Express channels.  And we have also additional

05:43   14  expansions so that you can have additional devices.

05:43   15  BY MR. COLLARD:

05:43   16      Q.    Thank you.

05:43   17           Are all limitations of Claim 36 performed in

05:43   18  the manufacture of this accused desktop product?

05:43   19      A.    Yes.

05:43   20      Q.    All right.  Let's move on, if you will, to

05:43   21  Claims 20 and 21 of the '654 patent.

05:43   22           Is there any reason to discuss this patent

05:44   23  individually at this point?

05:44   24      A.    No.

05:44   25      Q.    Okay.  I'd like to take these claims together,

-339-

05:44    1    if I can, because of their interrelation.

05:44    2                    THE COURT:  Why don't you wrap up with

05:44    3    these claims?

05:44    4                    MR. HALES:  Sure.  I've just got one

05:44    5    claim after that and then --

05:44    6                    THE COURT:  Thank you.

05:44    7                    MR. HALES:  -- the desktop is done.  I'll

05:44    8    go fast.

05:44    9                    THE COURT:  No, no, no.  I don't want you

05:44   10    to go fast.  I just -- that's fine.

05:44   11                    MR. HALES:  Well, I'm going to do it

05:44   12    anyway if you won't get mad at me.

        13    BY MR. HALES:

05:44   14        Q.    Dr. Sarhan, has the data communication speed

05:44   15    of this computer been increased by following the steps

05:44   16    that are recited below?

05:44   17        A.    Yes.  And we'll see that as we go through

05:44   18    them.

05:44   19        Q.    Has this product been provided with a CPU that

05:44   20    has a graphics controller on the printed circuit board?

05:44   21        A.    Yes.  The CPU data sheet shows that it has --

05:44   22    that specific computer has integrated the graphics.

05:44   23        Q.    And is that what you've highlighted here?

05:44   24        A.    Yeah.  So this is -- here, it shows the --

05:44   25    like for different product lines, it shows that all of

05:44  1    them have graphics configuration, which means that they

05:45  2    include -- integrated the graphics.

05:45  3        Q.    Thank you.

05:45  4              This third row, is there anything unique about

05:45  5    this row relative to the prior discussion we had of

05:45  6    LVDS channels?

05:45  7        A.    No.  So here, basically we have still like the

05:45  8    CPU, and we have these LVDS channels coming out of it,

05:45  9    as we discussed before.

05:45  10       Q.    Okay.  Has the manufacturer provided a

05:45  11   connector for the computer to connect to a console?

05:45  12       A.    Sure.  And we see here in these connectors --

05:45  13   the USB connectors that we see here.

05:45  14       Q.    Has the manufacturer provided a second LVDS

05:45  15   channel that has been enabled to convey USB protocol

05:45  16   data in the manner recited in these last two rows of

05:45  17   Claim 20?

05:45  18       A.    Yes.  So here -- yeah.

05:45  19             So here, like we have the -- like basically

05:45  20   the LVDS channel, like, we have a second LVDS channel

05:45  21   to convey USB data.  And this is met by the USB ports

05:45  22   in these products.

05:45  23       Q.    Are all limitations of Claim 20 met in the

05:45  24   manufacture of this product?

05:45  25       A.    Yes.

| | | |
|---|---|---|
| 05:45 | 1 | Q.    Okay.  Let's move on to Claim 21.  This |
| 05:45 | 2 | recites conveying encoded address and data bits of a |
| 05:45 | 3 | PCI bus transaction and then more language. |
| 05:46 | 4 | I think we've discussed this encoded |
| 05:46 | 5 | limitation.  I think you pointed to PCI Express and |
| 05:46 | 6 | DMI; is that right? |
| 05:46 | 7 | A.    Yeah. |
| 05:46 | 8 | Q.    Do you continue to do so for this claim |
| 05:46 | 9 | limitation? |
| 05:46 | 10 | A.    Yes. |
| 05:46 | 11 | Q.    We see a conveying step here. |
| 05:46 | 12 | Do you have any opinion about whether an act |
| 05:46 | 13 | of conveying the recited address and data bits occurs |
| 05:46 | 14 | during the manufacture of this product? |
| 05:46 | 15 | A.    Yes.  So the -- like, basically, I looked at |
| 05:46 | 16 | the deposition testimony of ASUS employees. |
| 05:46 | 17 | Unfortunately, they did not give, like, specific |
| 05:46 | 18 | answers and specific information about this. |
| 05:46 | 19 | But based on my own experience, like general |
| 05:46 | 20 | experience, like all -- like most electronic products |
| 05:46 | 21 | require testing.  And I know like generally, computer |
| 05:46 | 22 | products undergo testing while -- during manufacturing. |
| 05:46 | 23 | Q.    Why are you talking about testing, Dr. Sarhan? |
| 05:46 | 24 | A.    Say it again. |
| 05:46 | 25 | Q.    Why are you talking about testing? |

342

05:46   1        A.    Yeah.  Because like when they are tested, then

05:47   2   like they will be running -- one of the ways that

05:47   3   computers can be tested is by basically turning on the

05:47   4   computer and running the operating system and the --

05:47   5   like -- which will do that enumeration, et cetera.  And

05:47   6   this enumeration step will result in conveyance of PCI

05:47   7   data.

05:47   8        Q.    So simply the act of turning on a computer

05:47   9   that had been manufactured --

05:47   10       A.    Yeah.  By running the operating system.  Yeah.

05:47   11       Q.    Will that result in the limitation that we see

05:47   12   here in Claim 21?

05:47   13       A.    That's right.

05:47   14       Q.    Okay.  Do you know if this step is performed

05:47   15   during the manufacture of this product?

05:47   16       A.    I didn't go to the manufacturing facility, but

05:47   17   I know, like, computers are very complicated products.

05:47   18   They have so many different units, interconnecting

05:47   19   units.  They have hardware.  They have software.  A lot

05:47   20   of things that can actually go wrong.

05:47   21            So this is why generally manufacturers test

05:47   22   their products to make sure, like, you know, like, if

05:47   23   they ship them to customers and they have problems,

05:47   24   right, you know, then the customers would send them

05:47   25   back.  It will impact their reputation.  And they know

343

| 05:47 | 1 | ASUS and their website, and then -- like, they say that |
| 05:48 | 2 | they test their products. |
| 05:48 | 3 |     Q.    Do you find it likely that this accused |
| 05:48 | 4 | desktop product was turned on and tested during the |
| 05:48 | 5 | course of its manufacture? |
| 05:48 | 6 |     A.    Yes. |
| 05:48 | 7 |     Q.    Okay.  Are all limitations of Claims 20 and 21 |
| 05:48 | 8 | met in the manufacture of this desktop product? |
| 05:48 | 9 |     A.    Yes. |
| 05:48 | 10 |     Q.    One more claim to go, Dr. Sarhan and our jury. |
| 05:48 | 11 |     Before we jump into Claim 35, are there any |
| 05:48 | 12 | limitations in this claim related to conveying PCI |
| 05:48 | 13 | address and data bits or USB bits? |
| 05:48 | 14 |     A.    Okay.  So here, like we -- like in previous |
| 05:48 | 15 | (indiscernible) we can see sometimes it says LVDS |
| 05:48 | 16 | channels used to convey USB data.  Sometimes it's used |
| 05:48 | 17 | to convey PCI address and data bits. |
| 05:48 | 18 |     So here in this -- in these cases, we don't |
| 05:48 | 19 | see any language like that.  We don't see any PCI |
| 05:48 | 20 | anywhere.  So it does not -- does not require -- convey |
| 05:48 | 21 | any PCI address or data bits. |
| 05:48 | 22 |     Also, here, they don't even require |
| 05:49 | 23 | conveying -- conveyance of any USB data. |
| 05:49 | 24 |     Q.    Great. |
| 05:49 | 25 |     Let's jump in. |

344

| | | |
|---|---|---|
| 05:49 | 1 | Dr. Sarhan, has the performance of this |
| 05:49 | 2 | computer been improved by the manufacturing steps |
| 05:49 | 3 | recited below? |
| 05:49 | 4 | A.   Yes.  And as we'll see when we discuss it. |
| 05:49 | 5 | Q.   Does this product have a CPU with an |
| 05:49 | 6 | integrated -- I'm sorry -- and a graphics controller on |
| 05:49 | 7 | a single chip? |
| 05:49 | 8 | A.   That's right, as we discussed before. |
| 05:49 | 9 | Q.   We've seen similar LVDS language before. |
| 05:49 | 10 | Has this -- has the manufacturer connected an |
| 05:49 | 11 | LVDS channel in the manner recited here? |
| 05:49 | 12 | A.   Yes.  So we have these two LVDS channels. |
| 05:49 | 13 | Q.   Okay.  Has the manufacturer connected a |
| 05:49 | 14 | differential signal channel to the CPU and graphics |
| 05:49 | 15 | controller to output video data?  And if so, why? |
| 05:49 | 16 | A.   Yeah.  So here, differential signals channels, |
| 05:49 | 17 | we see here we have DVI, HDMI.  Like, I'm sure like |
| 05:49 | 18 | most jury may be familiar with HDMI.  DVI is an older |
| 05:49 | 19 | one that's used, like, to -- both of them are used for |
| 05:49 | 20 | videos, like, to connect that to the monitor. |
| 05:49 | 21 | And both of these employ differential |
| 05:50 | 22 | signaling. |
| 05:50 | 23 | Q.   Okay. |
| 05:50 | 24 | A.   And then I say here, like, it says |
| 05:50 | 25 | differential signal.  It does not require, like, low |

05:50   1   voltage or anything.  But it just says differential

05:50   2   signal, which is more general than low voltage.

05:50   3        Q.   Thank you for that.

05:50   4             Has the manufacturer provided a connector for

05:50   5   this computer to connect to external peripherals?

05:50   6        A.   Yeah.  And we see here all these connectors.

05:50   7        Q.   Has the manufacturer provided a second LVDS

05:50   8   channel that conveys in the manner recited here?

05:50   9        A.   Yeah.  We already talk about the first LVDS

05:50   10  channel.  Now here, like, as a second LVDS, those USB

05:50   11  ports will qualify as requiring an -- another LVDS

05:50   12  channel.

05:50   13       Q.   Are all limitations of Claim 35 met in the

05:50   14  manufacture of this product?

05:50   15       A.   Yes.

05:50   16       Q.   Are all of the asserted claims met -- I'm

        17  sorry.

05:50   18            Does this accused desktop product meet every

05:50   19  limitation of every asserted claim in this case?

05:50   20       A.   Yes.

05:50   21       Q.   Okay.

05:50   22            MR. HALES:  It's probably a good breaking

05:50   23  point, Your Honor.

05:50   24            THE COURT:  Very good.

05:50   25            Ladies and gentlemen of the jury, please

05:50   1   remember my instructions not to discuss the case when

05:50   2   you go home.

05:50   3              If you all will be here by about by 8:15

05:51   4   tomorrow, we'll get started around 8:30.

05:51   5              THE BAILIFF:  All rise.

05:51   6              (Jury exited the courtroom.)

05:51   7              THE COURT:  Thank you.  You may be

05:51   8   seated.

05:51   9              Is there anything that we need to take

05:51   10  up?

05:51   11             MR. HALES:  No, Your Honor.

05:51   12             MR. BURESH:  No, Your Honor.

05:51   13             THE COURT:  Okay.

        14             (Hearing adjourned.)

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1    UNITED STATES DISTRICT COURT  )

2    WESTERN DISTRICT OF TEXAS     )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5    United States District Court, Western District of

6    Texas, do certify that the foregoing is a correct

7    transcript from the record of proceedings in the

8    above-entitled matter.

9       I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial

11   Conference of the United States.

12      Certified to by me this 7th day of April 2022.

13                              /s/ Kristie M. Davis

14                              KRISTIE M. DAVIS
                                Official Court Reporter
15                              800 Franklin Avenue
                                Waco, Texas 76701
16                              (254) 340-6114
                                kmdaviscsr@yahoo.com
17

18

19

20

21

22

23

24

25