```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                       WACO DIVISION

3   ACQIS LLC                    *
                                 *      March 19, 2024
4   VS.                          *
                                 * CIVIL ACTION NO. 6:20-CV-966
5   ASUSTEK COMPUTER, INC.   *
    ASUS GLOBAL PTE. LTD.    *
6
              BEFORE THE HONORABLE ALAN D ALBRIGHT
7                  JURY TRIAL PROCEEDINGS
                      Volume 2 of 5
8
    APPEARANCES:
9
    For the Plaintiff:   Case L. Collard, Esq.
10                       Gregory S. Tamkin, Esq.
                         Dorsey & Whitney LLP
11                       1400 Wewatta Street, Suite 400
                         Denver, CO 80202
12
                         Madeline Hepler, Esq.
13                       Dorsey & Whitney LLP
                         701 5th Ave, Suite 6100
14                       Seattle, WA 98104

15                       Elliot J. Hales, Esq.
                         Dorsey & Whitney LLP
16                       111 S. Main Street, Suite 2100
                         Salt Lake City, UT 84111
17
                         Paige Arnette Amstutz, Esq.
18                       Scott, Douglass & McConnico, LLP
                         303 Colorado Street, Suite 2400
19                       Austin, TX 78701

20  For the Defendants:  Eric A Buresh, Esq.
                         Mark C. Lang, Esq.
21                       Michelle L. Marriott, Esq.
                         Erise IP, PA
22                       7015 College Boulevard
                         Overland Park, KS 66211
23
                         James Travis Underwood, Esq.
24                       Gillam & Smith
                         102 N. College, Suite 800
25                       Tyler, TX 75702
```

349

```
 1    Court Reporter:        Kristie M. Davis, CRR, RMR
                             PO Box 20994
 2                           Waco, Texas 76702-0994
                             (254) 340-6114
 3

 4      Proceedings recorded by mechanical stenography,

 5    transcript produced by computer-aided transcription.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

07:41 (line 5)
07:41 (line 6)
08:34 (line 8)

08:34  1                    (Hearing begins.)

08:34  2                    THE BAILIFF:  All rise.

08:34  3                    THE COURT:  My understanding is there are

08:34  4    issues to be taken up, but they're not going to have to

08:34  5    do with this gentleman, correct?  So I'll just take

08:34  6    them up at our morning break.

08:34  7                    Is everyone ready to go?

08:34  8                    MR. COLLARD:  No.  I need to grab him.  I

08:34  9    thought we were going to --

08:34  10                   THE COURT:  No.  You can bring him in.

08:34  11   We're going to line the jury up.

08:34  12                   (Pause in proceedings.)

08:36  13                   THE BAILIFF:  All rise.  Please remain

08:36  14   standing for the jury.

08:36  15                   (Jury entered the courtroom.)

08:36  16                   THE COURT:  Thank you.  You may be

08:36  17   seated.

08:36  18                   Counsel?

08:37  19                   DIRECT EXAMINATION CONTINUED

08:37  20   BY MR. HALES:

08:37  21   Q.    Dr. Sarhan, it's good to see you again.

08:37  22         You understand you're still under oath?

08:37  23   A.    Yes.

08:37  24   Q.    Great.  Let's begin our discussion this

08:37  25   morning with analysis of the representative laptop

08:37    1    product, the ROG Strix Hero II GL504GV.

08:37    2    Do you see that on your screen?

08:37    3    A.    Yes.

08:37    4    Q.    Have you studied this product and made any

08:37    5    conclusions about whether it infringes the asserted

08:37    6    patents?

08:37    7    A.    Yes.

08:37    8    Q.    What have you concluded?

08:37    9    A.    That it does infringe the asserted patents.

08:37    10    Q.    How have you performed your infringement

08:37    11    analysis for this product?

08:37    12    A.    I reviewed the ASUS product specifications,

08:37    13    ASUS user manuals, and other documents produced by the

08:37    14    ASUS and third parties, including Intel.

08:37    15    Q.    The Intel document, is it the same processor

08:37    16    data sheet that you reviewed yesterday?

08:37    17    A.    Yes.  For the desktop product.

08:37    18    Q.    Is that to say that this desktop product will

08:38    19    use a processor from the same generation that we

08:38    20    studied yesterday?

08:38    21    A.    Yes.

08:38    22    Q.    Okay.  You mentioned two other documents, the

08:38    23    product specification sheet and user manual.

08:38    24    Will you turn to J-16 and J-60 in your binder?

08:38    25    Are these the spec sheet and user manual you

352

08:38   1   mentioned?

08:38   2       A.   Yes.  So you said J-16.  J-16 is the --

08:38   3   basically the ASUS product specification.

08:38   4       Q.   Uh-huh.

08:38   5       A.   And the other one you said?

08:38   6       Q.   J-60, 6-0.

08:38   7       A.   Yes.  This is the ASUS user manual for the

08:38   8   product.

08:38   9               MR. HALES:  All right.  We honor them --

08:38   10  I'm sorry -- offer them into evidence.

08:38   11              MR. BURESH:  No objection.

08:38   12              THE COURT:  They're admitted.

08:38   13  BY MR. HALES:

08:39   14      Q.   You can go ahead and clear this out of the

08:39   15  way.  We'll do it digitally from here on out,

08:39   16  Dr. Sarhan.

08:39   17          Let's begin our infringement analysis with

08:39   18  Claim 10 of the '768 patent.  And as -- refresh it for

08:39   19  the jury.

08:39   20          Have we already studied this patent claim for

08:39   21  infringement yesterday?

08:39   22      A.   Yes.

08:39   23      Q.   Okay.  Let's borrow -- to the extent that

08:39   24  lessons yesterday apply in this context, let's go ahead

08:39   25  and explain that to the jury as appropriate.

353

08:39  1              Dr. Sarhan, have you concluded whether this

08:39  2    product has a printed circuit board in it?

08:39  3        A.    Yes.  It does.

08:39  4        Q.    Does this product have a central processing

08:39  5    unit?

08:39  6        A.    Yes.  And as we see here, it has a processor.

08:39  7        Q.    And what are we looking at here on the screen?

08:39  8        A.    So I'm looking at the -- again, the --

08:39  9        Q.    Will you bring the microphone closer to your

08:39  10   mouth, please?

08:39  11       A.    Yes.

       12       Q.    Thank you.

08:39  13       A.    So I'm looking at the spec sheet for -- the

08:39  14   ASUS spec sheet for this product.

08:39  15       Q.    Okay.  What about the limitation here in the

08:39  16   third row, a peripheral bridge directly connected to

08:39  17   the CPU without an intervening PCI bus?  Is this

08:40  18   limitation met?

08:40  19       A.    Yes.

08:40  20       Q.    How?

08:40  21       A.    So we have the chipset, as we discussed

08:40  22   yesterday, and it's connected to the central processing

08:40  23   unit, which is this, through the DMI channel.

08:40  24       Q.    And is DMI considered the old PCI interconnect

08:40  25   bus?

354

08:40    1        A.    No.

08:40    2        Q.    Okay.  Is limitation of Row 3 met for the --

08:40    3        A.    Yes.

08:40    4        Q.    -- this claim?

         5        A.    Yes.

08:40    6        Q.    All right.  We've tackled this lengthy

08:40    7    limitation once before.

08:40    8             What should the jury know about whether this

08:40    9    is satisfied in this representative laptop product?

08:40   10        A.    Yeah.  So basically, here it says we're going

08:40   11    to have low voltage differential signal channels

08:40   12    directly extending from the peripheral bridge.

08:40   13             Again, this is the peripheral bridge, which is

08:40   14    the chipset.  And here, we have two types of channels,

08:40   15    DMI and PCI Express channels.

08:40   16        Q.    And how many lanes do these have?

08:40   17        A.    Yeah.  As I mentioned yesterday, DMI between

08:40   18    four to eight.  And for PCI, this one we can see.  It's

08:41   19    like x 20, which means it has 20 lanes.

08:41   20        Q.    Thank you.

08:41   21             And the second half of this claim limitation

08:41   22    here in Row 4, does this have multiple signal lines

08:41   23    with data traveling in opposite directions to convey

08:41   24    address and data bits of a PCI bus transaction?

08:41   25        A.    Yes.  As we discussed yesterday, PCI Express

355

08:41  1    conveys address and data bits for a PCI transaction,

08:41  2    and DMI is based on PCI Express.

08:41  3        Q.    Okay.  Are the limitations found in Row 4 met

08:41  4    in this product?

08:41  5        A.    Yes.

08:41  6        Q.    This final limitation, does this product have

08:41  7    a network controller coupled to the CPU?

08:41  8        A.    Yes.

08:41  9        Q.    What is that network controller?

08:41  10       A.    So here, we can see again from the ASUS, this

08:41  11   is the ASUS product specification.  We can see it has

08:41  12   here like these networking controllers.  This is for

08:41  13   WiFi.

08:41  14       Q.    Are all limitations of Claim 10 of the '768

08:41  15   patent satisfied in this representative laptop product?

08:42  16       A.    Yes.

08:42  17       Q.    Let's go to Claim 13 of the '768 patent,

08:42  18   Dr. Sarhan.

08:42  19             Have we established that this is a computer?

08:42  20       A.    Yes.

08:42  21       Q.    Does it have an integrated CPU and interface

08:42  22   controller in a single chip?

08:42  23       A.    Yes.  As we see here, we have -- again, this

08:42  24   one is from the Intel processor data sheet.  This is

08:42  25   from Intel.

08:42  1          And here we have the processor.  Right?  This

08:42  2     is the CPU.  And it has an integrated interface

08:42  3     controller because we have these different PCI Express

08:42  4     channels extending from it.

08:42  5          Q.   Okay.  We're going to do another large

08:42  6     limitation.  Please walk the jury through this and

08:42  7     describe whether it's different from, you know, any of

08:42  8     the LVDS analysis we've done to this point.

08:42  9          A.   It's the same -- the same analysis.  So we

08:42  10    have LVDS channels, as I mentioned, extending directly

08:42  11    from this integrated CPU and interface controller.  And

08:43  12    here, it also has -- it says we're going to have

08:43  13    multiple differential signal pairs in opposite

08:43  14    directions.

08:43  15         And here, this is exactly what we have.  As we

08:43  16    see here, this is 16 lanes for the PCI Express.  It's

08:43  17    16 lanes.  And this one, as I mentioned, it's between

08:43  18    four and eight lanes.

08:43  19         Q.   Thank you for that.

08:43  20         I want to ask, the discussion we had yesterday

08:43  21    about PCI Express and LVDS channels, does it have equal

08:43  22    applications to the technology used here in this laptop

08:43  23    product?

08:43  24         A.   Say it again.

08:43  25         Q.   The lengthy discussion we had yesterday about

08:43    1    PCI Express and its LVDS channels, does it apply

08:43    2    equally in this laptop context as it did in the desktop

08:43    3    context?

08:43    4        A.    Yes.  Definitely.

08:43    5        Q.    Okay.  Are the limitations of Row 3 met in

08:43    6    this laptop product?

08:43    7        A.    Yes.

08:43    8        Q.    For this final limitation -- oh, before we

08:43    9    move on, does this product use multiple lanes of the

08:43   10    LVDS channels?  And if so, why?

08:43   11        A.    Yes.  According to the ASUS product

08:44   12    specification -- this is, again, a document by ASUS.

08:44   13    We can see it has integrated -- it has a discrete

08:44   14    graphics card, NVIDIA GeForce RTX 2060.  And this one

08:44   15    is connected through the PCI Express channel that we

08:44   16    saw in the previous figure.

08:44   17        Q.    How many lanes of PCI Express does this

08:44   18    graphics card use?

08:44   19        A.    16, as we see here.  X 16 means it has 16

08:44   20    lanes.

08:44   21        Q.    And this lower image, what is that?

08:44   22        A.    The -- this lower image is from, like, the

08:44   23    specification for this NVIDIA graphics card.

08:44   24        Q.    Okay.  Are the limitations of Row 3 met in

08:44   25    Claim 13?

358

08:44  1    A.    Yes.

08:44  2    Q.    Let's go to the final limitation then.

08:44  3          Does this product have system memory directly

08:44  4    coupled to the CPU?

08:44  5    A.    Yes.  And here we see this from the ASUS

08:44  6    product specification.  It has memory.

08:44  7    Q.    Okay.  Are all limitations of this claim found

08:45  8    in the accused laptop product?

08:45  9    A.    Yes.

08:45  10   Q.    Claim 19 of the '359 patent.

08:45  11         I think we've established this is a computer.

08:45  12   Do you agree, Dr. Sarhan?

08:45  13   A.    Yes.

08:45  14   Q.    Does it have the central processing unit

08:45  15   directly connected to the LVDS channel with the further

08:45  16   qualifications set forth in Row 2?

08:45  17   A.    Yes.  And again, this one is -- shows here

08:45  18   from the Intel data sheet for that processor.  So this

08:45  19   is the processor, and you see it's connected directly

08:45  20   to these LVD -- LVDS channels.

08:45  21   Q.    Okay.  What about system memory directly

08:45  22   connected to the CPU?  Is this the same limitation we

08:45  23   just analyzed in Claim 13?

08:45  24   A.    Yes.  And we see this one from the ASUS

08:45  25   product specification.  It has memory.

```
08:45   1        Q.    The next limitation is:  A connector that can

08:45   2   couple to a console.

08:45   3             Is this met, and how so, in this accused

08:45   4   laptop product?

08:45   5        A.    Yes.  We see -- again, from the ASUS product

08:46   6   specification, we see all these different connectors,

08:46   7   HDMI and different USB connectors.

08:46   8        Q.    Now, you're aware that "console" is a term

08:46   9   that the Court has defined in this case?

08:46  10        A.    Yes.

08:46  11        Q.    Have you applied the Court's construction of

08:46  12   this term?

08:46  13        A.    Yes.

08:46  14        Q.    Okay.  Is this limitation met in Row 4?

08:46  15        A.    Yes.

08:46  16        Q.    And what about the last two limitations?

08:46  17             We're looking for:  A second LVDS channel

08:46  18   comprising two sets of unidirectional signal line

       19   pairs.

08:46  20             And it's further qualified that:  This channel

08:46  21   should be adapted to convey data packets in accordance

08:46  22   with a USB protocol.

08:46  23             Is this satisfied and how so?

08:46  24        A.    Yes.  And again, here, when you look at the

08:46  25   ASUS product specification, we see it has these USB
```

360

08:46  1    ports, right?  And these ports are used to convey USB

08:46  2    data.  And as we mentioned earlier, USB employs

08:47  3    low-voltage differential signaling.

08:47  4        Q.    Are all limitations of Claim 19 found in the

08:47  5    representative laptop product?

08:47  6        A.    Yes.

08:47  7        Q.    To return to the method claims.

08:47  8              As a refresher, what are the method claims in

08:47  9    this case, Dr. Sarhan, at a high level?

08:47  10       A.    Yeah.  So a method claim, basically a claim

08:47  11   that describes the steps in a manufacturing process.

08:47  12       Q.    Okay.  Let's start with Claim 36 and see if

08:47  13   those steps have been followed in the manufacture of

08:47  14   the representative laptop product.

08:47  15             Does this product have a motherboard with a

08:47  16   CPU mounted thereon with an interface controller as a

08:47  17   single chip?

08:47  18       A.    Yes.

08:47  19       Q.    What is that?

08:47  20       A.    And here we see from the ASUS product

08:47  21   specification, we see that has a processor and as also

08:47  22   we saw previously.

08:47  23       Q.    Okay.  Do you know whether the manufacturer

08:47  24   has connected the LVDS channel with the properties

08:47  25   recited here?

08:47  1    A.    Yes.  We see here we have these PCI Express

08:48  2  and DMI channels, which are LVDS channels.

08:48  3    Q.    Do you know whether the manufacturer has

08:48  4  increased the throughput of this product -- I'm

08:48  5  sorry -- the serial channels of this product by

08:48  6  providing each with multiple differential signal line

08:48  7  pairs?

08:48  8    A.    Yes.  As we see here, this LVDS channel has

08:48  9  16 -- sorry.  You see here x 16.  It means it has 16

08:48  10  lanes.  And DMI, as I mentioned, it's between -- it's

08:48  11  generally four to eight lanes.

08:48  12    Q.    Thank you.

08:48  13          Row 5, we're looking for an interface

08:48  14  controller which has been configured to adapt to

08:48  15  different numbers of line pairs and which is capable of

08:48  16  conveying encoded address and data bits.

08:48  17          Will you tell the jury whether this limitation

08:48  18  is met and why that is so?

08:48  19    A.    Yeah.  Because we have the -- basically the --

08:48  20  these LVDS channels extending from the integrated chip,

08:48  21  what we have is we're going to have an interface

08:48  22  controller.  And here, it says it has to adapt to

08:49  23  different numbers of differential signal lines.

08:49  24          As we mentioned here, we have different -- we

08:49  25  have multiple lanes.  And then the -- like, according

08:49  1   to PCI Express specification, it will -- the interface

08:49  2   controller will adjust based on the available number of

08:49  3   lanes of the other device.

08:49  4       Q.   We saw yesterday an Intel diagram about data

08:49  5   coming in in parallel form and then being serialized.

08:49  6           Would that have equal application to this

08:49  7   product?

08:49  8       A.   Yes.  Of course.  And here, this is like --

08:49  9   because of this -- this term was the Court -- according

08:49  10  to the Court construction, serializing the data from

08:49  11  the parallel form to serial form.

08:49  12      Q.   Okay.  Is this limitation in Row 5 met?

08:49  13      A.   Yes.

08:49  14      Q.   And the final limitation, have you made any

08:49  15  determinations about whether the manufacturer has

08:49  16  coupled the CPU and interface device through the LVDS

08:49  17  channel with those previously recited adapted number of

08:50  18  differential signal line pairs?

08:50  19      A.   Yes.  As we see from this ASUS product

08:50  20  specification, it has this NVIDIA graphics.  And this

08:50  21  one uses 16 lanes of the -- the 16 lanes that extend

08:50  22  out of the integrated CPU.

08:50  23      Q.   Are all limitations of Claim 36 met in the

08:50  24  manufacture of the representative laptop product?

08:50  25      A.   Yes.

363

08:50  1        Q.    All right.  Dr. Sarhan, I'd like to take

08:50  2    Claims 20 and 21 of the '654 patent at the same time as

08:50  3    we did yesterday, if that's okay.

08:50  4        A.    Sure.

08:50  5        Q.    Will you please let the jury know whether you

08:50  6    found satisfaction of the first two rows here in this

08:50  7    representative laptop product and its manufacture?

08:50  8        A.    Yes.  So it has a method of increasing

08:50  9    external data communication, as we're going to see in

08:50  10   the later claim limitations, and says that it's going

08:50  11   to have integrated CPU and graphics controller.

08:51  12          And the -- according to the Intel data sheet

08:51  13   for the processor, it shows that this processor has

08:51  14   integrated graphics.

08:51  15       Q.    All right.  We see another LVDS limitation.

08:51  16          Has the manufacturer connected the LVDS

08:51  17   channels you've identified in the manner recited here?

08:51  18       A.    Yes.  We have, again, these PCI Express

08:51  19   channel -- and this PCI Express channel, and we have

08:51  20   this DMI channel.  Both employ LVDS.

08:51  21       Q.    Has the manufacturer provided a connector that

08:51  22   can connect to a console?

08:51  23       A.    Yes.  As we see in the ASUS product

08:51  24   specification, we have a variety of connectors.

08:51  25       Q.    Has the manufacturer provided a second LVDS

08:51  1    capable of conveying -- or enabled to convey USB

08:51  2    protocol data over that second LVDS channel?

08:51  3        A.    Yes.  And this is satisfied by these USB ports

08:51  4    or connectors, and those ports, as we mentioned

08:52  5    yesterday, they employ LVDS.  And they are used to

08:52  6    transmit USB data.

08:52  7        Q.    All right.  And this final -- I'm sorry.

08:52  8    Claim 21, have you concluded whether the manufacturer

08:52  9    conveys encoded address bits -- address data -- address

08:52  10   and data bits of a PCI bus transaction in the manner

08:52  11   recited here in the course of manufacture of this

08:52  12   product?

08:52  13       A.    Yes.

08:52  14       Q.    How so?

08:52  15       A.    As we discussed earlier, while manufacturing

08:52  16   computers, generally those computers will be tested

08:52  17   thoroughly to make sure that they are -- they function

08:52  18   as desired.

08:52  19       Q.    Okay.  Are all limitations of Claims 20 and 21

08:52  20   found in the manufacture of this representative laptop?

08:52  21       A.    Yes.

08:52  22       Q.    On to Claim 35 of the '140 patent.

08:52  23             As a reminder, Dr. Sarhan, are there any

08:52  24   limitations in this claim pertaining to PCI or USB?

08:53  25       A.    Okay.  So here, we clearly see, like, we don't

08:53   1    have the words "PCI."  We don't have anything about

08:53   2    USB.

08:53   3         Q.   Okay.  Let's focus on the first two rows.

08:53   4              Have you found evidence of the manufacturer of

08:53   5    this product improving the performance of this computer

08:53   6    by obtaining an integrated CPU and graphics controller?

08:53   7         A.   That's right.  So -- and according to the --

08:53   8    again, to the ASUS product specification, it shows that

08:53   9    it has this Intel processor.

08:53  10         Q.   Okay.  And is that an integrated processor

08:53  11    with a GPU?

08:53  12         A.   Yeah.  And this is what we discuss earlier, it

08:53  13    has integrated graphics.

08:53  14         Q.   Has the manufacturer connected the LVDS

08:53  15    channel in the manner recited here?

08:53  16         A.   Yes.  We have these two channels that we keep

08:53  17    referring to over and over, so...

08:53  18         Q.   Is this limitation satisfied, Dr. Sarhan?

08:53  19         A.   Yes.

08:53  20         Q.   Has the manufacturer connected a differential

08:54  21    signal channel to the CPU that can output video data?

08:54  22         A.   So you are talking about the differential

08:54  23    channel?  Okay.

08:54  24              Yeah.  So here, this one requires differential

08:54  25    signal channel, which is a generic channel.  And we see

366

08:54    1    here, this is the CPU again.  And this is the slot

08:54    2    that's used to connect to the graphics card or to the

08:54    3    GPU.  And this differential -- it's going to use

08:54    4    differential signaling.

08:54    5        Q.    Is that capable of conveying video data?

08:54    6        A.    Yes.

08:54    7        Q.    Okay.  Limitation 5 here, do we have

08:54    8    connectors for this computer for connection to an

08:54    9    external peripheral?

08:54    10        A.    Yes.  And here we see all these connectors.

08:54    11        Q.    What is a peripheral, Dr. Sarhan?

08:54    12        A.    A peripheral is a device that we connect to

08:54    13    the computer.

08:54    14        Q.    What kinds of devices can this laptop connect

08:54    15    to?

08:54    16        A.    For example, it can be connected to external

08:55    17    storage to a printer, to a monitor, et cetera.

08:55    18        Q.    Can it connect to these devices through the

08:55    19    USB 3 channels found on this product?

08:55    20        A.    So for the -- like, for -- like, here, with --

08:55    21    like -- yeah.  So the -- you are talking about the

08:55    22    connector, this limitation, or something else?

08:55    23        Q.    Yeah.  I'm just asking:  Can one use the

08:55    24    connectors that are recited here to connect to a

08:55    25    printer or external storage?

08:55  1      A.    Yeah.  Sure.  Like, so here, for example,

08:55  2  these USB ports can be used to connect to, like,

08:55  3  external storage.  It can be used to connect to, like,

08:55  4  a variety of devices.  And this HDMI connector is used

08:55  5  to connect to the monitor.

08:55  6      Q.    Okay.  Is this limitation satisfied,

08:55  7  Dr. Sarhan?

08:55  8      A.    Yes.

08:55  9      Q.    Let's go to the final limitation here.

08:55  10          Has the manufacturer provided this computer

08:55  11  with a second LVDS channel capable of what's recited

08:55  12  here?

08:55  13      A.    Yes.  We talk already about the first channel,

08:55  14  which is a PCI Express channel here.  It's going to be,

08:55  15  like, satisfied by these USB ports, which employ LVDS.

08:56  16      Q.    Okay.  Are all limitations of Claim 35 found

08:56  17  in the manufacture of this product?

08:56  18      A.    Yes.

08:56  19      Q.    Okay.  Dr. Sarhan, are all limitations of all

08:56  20  claims satisfied in the manufacture of -- I'm sorry --

08:56  21  in this representative accused laptop product?

08:56  22      A.    Yes.

08:56  23      Q.    All right.  I understand the analysis you just

08:56  24  provided to be a literal infringement analysis.

08:56  25          Do I understand that correctly?

368

08:56  1       A.    Yes.

08:56  2       Q.    Are your opinions in this case limited to just

08:56  3    literal infringement?

08:56  4       A.    I understand that the accused products can

08:56  5    infringe literally, as I already showed, and they can

08:56  6    also infringe under the doctrine of equivalents.

08:56  7       Q.    Do you have any reason to doubt your literal

08:56  8    infringement conclusions?

08:56  9       A.    No.

08:56  10      Q.    Okay.  I want to talk about the doctrine of

08:56  11   equivalents opinion.  All the same.

08:56  12            What is your understanding of the doctrine of

08:56  13   equivalents?

08:56  14      A.    So according to the doctrine of equivalents,

08:56  15   accused products can still infringe if the accused

08:57  16   products -- if there is no substantial difference

08:57  17   between the accused products and the claim limitations.

08:57  18   And we do that, like, on an element-by-element basis.

08:57  19      Q.    For which claim element have you performed a

08:57  20   doctrine of equivalents analysis?

08:57  21      A.    For the elements that state address and data

08:57  22   bits of a PCI transaction.

08:57  23      Q.    How have you performed this analysis,

08:57  24   Dr. Sarhan?

08:57  25      A.    So I did analysis using something called the

08:57  1    "triple identity test."

08:57  2    Q.    Okay.  And that triple identity test, is that

08:57  3    searching for similarities between the function, the

08:57  4    way, and the result that this accused technology

08:57  5    operates compared to what's recited in the claims?

08:57  6    A.    Yes.

08:57  7    Q.    Okay.  I'd like to pull up a slide.  I think

08:57  8    you've summarized that opinion --

08:57  9    A.    Yes.

08:57  10    Q.    -- for the jury's benefit.

08:57  11          I'd like to walk through this slide to explain

08:57  12    whether you've concluded the function of PCI Express is

08:57  13    substantially different.  And we'll move down the row.

08:57  14    A.    Yeah.

08:58  15    Q.    Dr. Sarhan, is the function performed by PCI

08:58  16    Express substantially different from what's recited in

08:58  17    the claims relative to PCI limitations?

08:58  18    A.    No.

08:58  19    Q.    Why?

08:58  20    A.    So the address and data bits, as I stated

08:58  21    here, the address and data bits in a PCI Express

08:58  22    transaction perform substantially the same function as

08:58  23    those in a PCI local bus specification.

08:58  24    Q.    What about the way PCI Express operates?  Is

08:58  25    it substantially different from the operation of the

08:58  1    PCI limitations claimed in the asserted claims?

08:58  2        A.    No.

08:58  3        Q.    How so?

08:58  4        A.    So as I stated here, PCI Express and the PCI

08:58  5    local bus both include data bits and address bits in a

08:58  6    transaction.  Then they send them as a sequence of bits

08:58  7    across the interconnect.

08:58  8            So the transactions are conducted in their own

08:58  9    specified ways, and these ways are not substantially

08:58  10   different.

08:58  11       Q.    What about the results of PCI Express?  Are

08:58  12   they substantially different from what is claimed in

08:59  13   the asserted patents?

08:59  14       A.    No.

08:59  15       Q.    How so?

08:59  16       A.    So as I mentioned here, they obtain

08:59  17   substantially the same result, which is conducting the

08:59  18   communication and performing the desired functionality.

08:59  19       Q.    Under your doctrine of equivalents analysis,

08:59  20   are the PCI limitations of the asserted claims

08:59  21   satisfied by the accused products?

08:59  22       A.    Yes.

08:59  23       Q.    Dr. Sarhan, before we conclude, I'd like to

08:59  24   kind of end our discussion with just some simple

08:59  25   questions for you.

371

08:59  1          Did you read the patents thoroughly before

08:59  2    forming your opinions in this case?

08:59  3          A.   Yes.  I read them thoroughly, and I read some

08:59  4    of them multiple times even.

08:59  5          Q.   Do you understand the patents well?

08:59  6          A.   Absolutely.

08:59  7          Q.   What about the patent claims?  Do you

08:59  8    understand the patent claims well?

08:59  9          A.   Definitely.

08:59  10         Q.   Have you understood and applied the Court's

08:59  11   definitions for claim terms?

08:59  12         A.   Definitely.

08:59  13         Q.   What materials did you primarily rely on in

08:59  14   forming your opinions in this case?

08:59  15         A.   I relied on ASUS' own documents, and also I

09:00  16   relied on the industry standards and third-party

09:00  17   documents by Intel and AMD.

09:00  18         Q.   In your experience, Dr. Sarhan, are these

09:00  19   reliable sources of information to form the opinions

09:00  20   you've shared with the jury today?

09:00  21         A.   I believe there are as reliable as anything

09:00  22   can be.

09:00  23         Q.   What happened when you were performing your

09:00  24   infringement analysis and concluded there was

09:00  25   insufficient evidence of infringement for a product

| | | |
|---|---|---|
| 09:00 | 1 | group? |
| 09:00 | 2 | A.   I removed those products from my expert |
| 09:00 | 3 | report. |
| 09:00 | 4 | Q.   Are those products in the case anymore? |
| 09:00 | 5 | A.   No. |
| 09:00 | 6 | Q.   What -- how confident are you in your |
| 09:00 | 7 | conclusions that every remaining product in this case |
| 09:00 | 8 | infringes every limitation of every asserted patent |
| 09:00 | 9 | claim? |
| 09:00 | 10 | A.   Very confident. |
| 09:00 | 11 | MR. HALES:  I'll turn over the witness, |
| 09:00 | 12 | Your Honor. |
| 09:00 | 13 | CROSS-EXAMINATION |
| 09:00 | 14 | BY MR. BURESH: |
| 09:01 | 15 | Q.   Good morning, Dr. Sarhan. |
| 09:01 | 16 | A.   Good morning. |
| 09:01 | 17 | Q.   How are you doing? |
| 09:01 | 18 | A.   I'm good.  How about you? |
| 09:01 | 19 | Q.   Doing well.  Get a good night sleep last |
| 09:01 | 20 | night? |
| 09:01 | 21 | A.   Sort of. |
| 09:01 | 22 | Q.   Sort of me too. |
| 09:01 | 23 | I wanted to start out on a lighter topic, just |
| 09:01 | 24 | a little bit of your timeline, if that's okay? |
| 09:01 | 25 | A.   Yes. |

09:01  1      Q.    I have a copy of your CV, which you've

09:01  2  attached to each of your expert reports; is that

09:01  3  correct?

09:01  4      A.    Yes.

09:01  5      Q.    I believe you testified that you received your

09:01  6  bachelor of science in electrical engineering in 1995

09:01  7  from Jordan University; is that correct?

09:01  8      A.    Yes.  Jordan University of Science and

09:01  9  Technology.

09:01  10     Q.    Thank you.

09:01  11           Now, on your CV, after that I see that you

09:02  12 were an engineer at the Voice Processing Department of

09:02  13 the Jordan Computer Center in Amman, Jordan; is that

09:02  14 correct?

09:02  15     A.    Yes.

09:02  16     Q.    And you were responsible for developing a

09:02  17 phone bank, correct?

09:02  18     A.    Say it again.  A --

09:02  19     Q.    Responsible for developing a phone bank?

09:02  20     A.    A phone bank system.  Phone bank computer

09:02  21 system.  Yeah.

09:02  22     Q.    Now, the phone bank system doesn't have

09:02  23 anything to do with what we're talking about here

09:02  24 today, correct?

09:02  25     A.    It's a computer system that receives a request

374

09:02  1    from users, and then it will recognize what they want

09:02  2    and respond to them.  It's a computer system.

09:02  3        Q.    You weren't building a, like, hardware

09:02  4    computer system, though, correct?

09:02  5        A.    So I was using, like, some specialized

09:02  6    computers to do so, and I was developing the software

09:02  7    to interact with the user and to do the processor

09:03  8    requests.

09:03  9        Q.    Okay.  Now, my main question is -- I don't see

09:03  10   this on your CV.  What were you doing between February

09:03  11   of 1996 and when you came to Penn State University in

09:03  12   June of 1999?

09:03  13       A.    Yeah.  I joined the -- after I finished the

09:03  14   job that you just mentioned, I joined immediately

09:03  15   the -- a master degree program at the same university

09:03  16   where I graduated from.

09:03  17            So I finished all the coursework.  I started

09:03  18   working with research and computer systems.  And

09:03  19   actually, like, I was almost entirely done with my

09:03  20   master thesis.

09:03  21            And then at certain point, I got admitted to

09:03  22   Pennsylvania State University.  And as I mentioned

09:03  23   earlier, my dream was to come over to the United States

09:03  24   to study in the best universities.

09:03  25            So I actually immediately, like, joined -- I

375

09:04  1    went to Penn State right away to -- like, I joined a

09:04  2    master degree program for a certain period of time.

09:04  3         Q.    Okay.

09:04  4         A.    And then while I was -- I didn't mention --

09:04  5         Q.    I didn't ask anything else.

09:04  6         A.    Okay.  Because you asked me what I was doing.

09:04  7    So...

09:04  8         Q.    Oh.  I thought you completed that answer.

09:04  9         A.    Okay.

09:04  10        Q.    Okay.  Now, did you get your -- you talked

09:04  11   about your master's degree.

09:04  12              You got your master's degree from Penn State

09:04  13   in 2003, correct?

09:04  14        A.    Yes.

09:04  15        Q.    And you had your doctorate degree also in

09:04  16   2003?

09:04  17        A.    Yes.

09:04  18        Q.    Okay.  So in the time frame we're talking

09:04  19   about, 1998 to 2000, you didn't have any of your

09:04  20   advanced degrees; is that correct?

09:04  21        A.    Between 90 -- say it again.  Between -- what's

09:04  22   the years?

09:04  23        Q.    Between 1998 and 2000 --

09:04  24        A.    Yes.

09:04  25        Q.    -- when Dr. Chu was filing his original

| 09:04 | 1 | patents, you didn't have any of your advanced degrees, |

09:04  1   patents, you didn't have any of your advanced degrees,

09:05  2   correct?

09:05  3        A.   Yes.

09:05  4        Q.   You didn't have your master's degree during

09:05  5   that time frame, correct?

09:05  6        A.   No.

09:05  7        Q.   And you weren't Dr. Nabil Sarhan during that

09:05  8   time frame, correct?

09:05  9        A.   Not a doctor.  Yeah.

09:05  10       Q.   Now, PCI Express was introduced in July of

09:05  11  2003, correct?

09:05  12       A.   Yes.

09:05  13       Q.   So by the time PCI Express was introduced, you

09:05  14  still didn't have your master's degree, correct?

09:05  15       A.   So the -- I don't know the exact date, but

09:05  16  PCI -- like, I graduated in -- I got my Ph.D. in 2003.

09:05  17  And this is about the time that PCI Express, like,

09:05  18  was -- was released -- was basically released around

09:05  19  that year.

09:05  20       Q.   Right.  It was released in July, and you got

09:05  21  your degree in August of 2003?

09:05  22       A.   Yeah.

09:05  23       Q.   So you were a student even during all of the

09:05  24  development time for PCI Express, correct?

09:06  25       A.   Yes.

09:06  1        Q.    You're aware that Mr. Bhatt, who we'll hear
09:06  2    from a little later today, was the chief architect of
09:06  3    PCI Express?
09:06  4        A.    The question, was it -- can you say the
09:06  5    question again?
09:06  6        Q.    Sure.
09:06  7              You are aware that Mr. Bhatt, who we will hear
09:06  8    from a little later today, was the chief architect of
09:06  9    PCI Express, correct?
09:06  10       A.    Yes.  Yes.  I'm aware of that.
09:06  11       Q.    He led the industry in creating PCI Express,
09:06  12   correct?
09:06  13       A.    This is what I learned by reading his report.
09:06  14   Yeah.
09:06  15       Q.    You didn't know anything about his work prior
09:06  16   to your -- prior to reading his report?
09:06  17       A.    I learned about the actual product, of course.
09:06  18   PCI Express, it's very famous.  And, like, I followed
09:06  19   that very closely.  But this is an industry standard.
09:06  20   So like so many companies are involved, and in each
09:06  21   industry there are so many people.  So, like -- and
09:06  22   generally, like, they don't really give a credit to
09:06  23   some person, like, okay, affiliate PCI Express with a
09:07  24   certain person.
09:07  25       Q.    So you'd never heard of Mr. Bhatt prior to

378

```
09:07   1    this case?
09:07   2         A.    No.
09:07   3         Q.    And you weren't in any way involved in the
09:07   4    development of PCI Express, correct?
09:07   5         A.    No.
09:07   6         Q.    Or any of the USB technology you're talking
09:07   7    about, correct?
09:07   8         A.    No.
09:07   9         Q.    And during the time frame while Mr. Bhatt and
09:07  10    many others in the industry were creating PCI Express,
09:07  11    you were still a student, correct?
09:07  12         A.    A Ph.D. student.  Yes.
09:07  13         Q.    Now, going back in time to May of 1998,
09:07  14    Dr. Chu filed his original provisional patent
09:07  15    application, correct?
09:07  16         A.    Uh-huh.
09:07  17         Q.    Yes?
09:07  18         A.    Yes.
09:07  19              MR. BURESH:  Could we bring up J-35,
09:07  20    please?
09:07  21    BY MR. BURESH:
09:07  22         Q.    Do you recognize this document, Dr. Sarhan?
09:08  23         A.    Yes.
09:08  24              MR. BURESH:  If we can go to J-35-10.
09:08  25    BY MR. BURESH:
```

09:08  1          Q.    We've seen this paragraph before during

09:08  2    previous testimony.

09:08  3                You were in the courtroom, correct?

09:08  4          A.    Yes.

09:08  5          Q.    Okay.  And this is talking about the XP Bus of

09:08  6    Dr. Chu's invention, correct?

09:08  7          A.    Yes.

09:08  8          Q.    And it is referred to as a peripheral bridge

09:08  9    bus, correct?

09:08  10         A.    Yes.

09:08  11         Q.    In this provisional application, which you've

09:08  12   reviewed, correct?

09:08  13         A.    Yes.

09:08  14         Q.    This is the only written description, the only

09:09  15   words describing the XP Bus; is that fair to say?

09:09  16         A.    I also reviewed the white papers and I did

09:09  17   analysis based on --

09:09  18         Q.    I'm just asking about the provisional patent

09:09  19   application.

09:09  20               Is this the only description, the written

09:09  21   description of the XP Bus, in the provisional patent

09:09  22   application?

09:09  23         A.    In this specific application?

09:09  24         Q.    Yes.

09:09  25         A.    Yeah.  Yeah.  So like, there's more than --

09:09  1    like, there's more disclosure than this that's more in
09:09  2    detail later on.  This is only a snapshot of that.
09:09  3         Q.    I'm not sure I understand your answer.
09:09  4         A.    Yeah.  I'm not sure I understood your
09:09  5    question.
09:09  6         Q.    In this J-35, this provisional patent
09:09  7    application --
09:09  8         A.    Yeah.
09:09  9         Q.    -- this paragraph is the only one describing
09:09  10   in writing Dr. Chu's XP Bus; is that correct?
09:09  11        A.    Can I -- can we look at the figures in the
09:09  12   patent?
09:09  13        Q.    I'm asking about the written description, the
09:09  14   words.
09:09  15              Is this the only written words describing the
09:10  16   XP Bus?
09:10  17        A.    I have reviewed so many documents.  I reviewed
09:10  18   this.  I reviewed all the -- like, so many patent --
09:10  19   the history, so I would like to look at it, like, just
09:10  20   to confirm.
09:10  21              MR. BURESH:  Derek, can you do a search
09:10  22   for XP Bus in this document?
09:10  23   BY MR. BURESH:
09:10  24        Q.    Okay.  Prior to the figures, are you seeing
09:10  25   any other XP Bus references than the ones we just

381

09:10  1    looked at?

09:10  2        A.    Yeah.  It seems like -- if the search is

09:11  3    working correctly, yes.  It seems that's only in that

09:11  4    paragraph.

09:11  5        Q.    So the only disclosure we have in this

09:11  6    provisional application regarding the XP Bus of

09:11  7    Dr. Chu's invention is describing it as a peripheral

09:11  8    bridge bus, nothing else, correct?

09:11  9        A.    Yes.

09:11  10                MR. BURESH:  Go to Figure 11, please.

09:11  11   BY MR. BURESH:

09:11  12       Q.    Do you recognize this as a figure from the

09:11  13   provisional patent application?

09:11  14       A.    Yes.

09:11  15       Q.    Okay.  And we see the XP Bus going between the

09:11  16   attached computer module and the peripheral console,

09:12  17   correct?

09:12  18       A.    Yes.

09:12  19       Q.    And I talked about this with Dr. Chu as well.

09:12  20   We see some peripheral buses, PCI, 1394, USB.

09:12  21            Do you agree with me those are peripheral

09:12  22   buses?

09:12  23       A.    Yes.

09:12  24       Q.    Okay.  And there are also buses on the other

09:12  25   side, the same matching set, right?

382

09:12  1        A.    Yes.

09:12  2        Q.    Okay.  With the XP Bus in the middle, correct?

09:12  3        A.    Yes.

09:12  4        Q.    So there's buses on one side, buses on the

09:12  5   other side, and a bridge in the middle?

09:12  6        A.    Yes.

09:12  7        Q.    Like a bridge crossing from one bank of a

09:12  8   river to another?

09:12  9        A.    Maybe.

09:12  10       Q.    Okay.  You got bank on one side, bank on the

09:12  11  other, bridge in the middle, similar picture, correct?

09:12  12       A.    Yeah.  Probably.  At the high level, it's an

09:12  13  analogy.

09:12  14       Q.    Now, you would agree with me that the XP Bus

09:12  15  is meant to support data of different protocols like

09:13  16  PCI, 1394, and USB in a cohesive manner, correct?

09:13  17       A.    Yes.

09:13  18       Q.    And this Figure 11 is depicting the XP Bus

09:13  19  supporting data of different protocols in a cohesive

09:13  20  manner; is that fair?

09:13  21       A.    Yes.

09:13  22       Q.    Now, the vision of Dr. Chu for the XP Bus is

09:13  23  to use an essentially common approach to deliver data

09:13  24  of these different protocols, correct?

09:13  25       A.    Say it again.

09:13  1        Q.   The vision of Dr. Chu for the XP Bus is to use

09:13  2   an essentially common approach to deliver data of

09:13  3   different protocols, correct?

09:13  4        A.   Yes.

09:13  5        Q.   So whether it's carrying PCI or 1394 or USB,

09:14  6   the XP Bus is going to be operating under a common

09:14  7   approach, correct?

09:14  8        A.   So I -- like, there's more detail to it, but

09:14  9   generally, yes.

09:14  10       Q.   Now, the asserted patents describe how the XP

09:14  11  Bus is configured to use the same -- and let me take a

09:14  12  step back.

09:14  13            The XP Bus uses LVDS channels, correct?

09:14  14       A.   Yes.

09:14  15       Q.   Okay.  And the asserted patents describe how

09:14  16  the XP Bus is configured to use the same LVDS channels

09:14  17  to convey USB protocol data and PCI local bus data,

09:14  18  correct?

09:14  19       A.   Yes.  Generally, yeah.

09:14  20       Q.   Now, USB protocol transactions were well-known

09:14  21  at the time of Dr. Chu's invention, correct?

09:14  22       A.   Yes.

09:14  23       Q.   And both USB and LVDS channels were separately

09:15  24  known in the art?

09:15  25       A.   Separately known, yes.

09:15    1      Q.    And correct me if I'm wrong, I think you used

09:15    2    the '768 patent as the example during your direct

09:15    3    testimony?

09:15    4      A.    Yes.

09:15    5            MR. BURESH:  Can we pull up the '768

09:15    6    patent, please?

09:15    7    BY MR. BURESH:

09:15    8      Q.    And when we looked at -- when we look at the

09:15    9    '768 patent, we're going to find a consistent

09:15   10    description of the XP Bus as connecting an ACM and a

09:15   11    peripheral console using the same bridging technique,

09:15   12    correct?

09:15   13      A.    Yeah.  A type of it.  Yes.

09:15   14            MR. BURESH:  If could we pull up Column

09:16   15    15, please?

09:16   16            Lines 65 through Column 16, Line 2.

09:16   17    BY MR. BURESH:

09:16   18      Q.    And this is a similar description to what

09:16   19    we've been looking at, correct?

09:16   20      A.    Yes.

09:16   21      Q.    ACM on one side, peripheral console on the

09:16   22    other with an XP Bus in between?

09:16   23      A.    Yes.

09:16   24      Q.    Now, in this patent, when we see the words

09:16   25    "interface channel," if the jury happens to try to read

385

09:16  1  this patent during deliberations and they see interface

09:16  2  channel, they should think XP Bus, correct?

09:16  3      A.    Yes.

09:17  4              MR. BURESH:  If we could go to Column 5,

09:17  5  please, starting at about Line 19.

09:17  6  BY MR. BURESH:

09:17  7      Q.    Here we see that the present invention, that's

09:17  8  Dr. Chu's invention, correct?

09:17  9      A.    Yes.

09:17  10     Q.    It encompasses an apparatus for bridging a

09:17  11 first computer interface bus and a second computer

09:17  12 interface bus, correct?

09:17  13     A.    Yes.

09:17  14     Q.    Like we've seen in the figures, bus on one

09:17  15 side, bus on the other, XP Bus in between, correct?

09:17  16     A.    Yes.  This is not only the disclosure, but

09:17  17 yeah.

09:17  18     Q.    That apparatus that it's talking about here,

09:17  19 that is the interface channel, that is the XP Bus,

09:17  20 correct?

09:17  21     A.    Yes.  In this embodiment.

09:17  22     Q.    The embodiment described as the present

09:17  23 invention?

09:17  24     A.    Yes.

09:18  25              MR. BURESH:  Mr. Palisoul, do you have

09:18  1    plaintiff's -- or Dr. Sarhan's slides available?

09:18  2             Could you pull up Slide 25, please?

09:18  3    BY MR. BURESH:

09:18  4        Q.   Is this one of your slides that you used

09:18  5    during direct, Dr. Sarhan?

09:18  6        A.   Yes.

09:18  7        Q.   Okay.  And you have effectively one paragraph

09:18  8    out of the patent specification on this slide, correct?

09:18  9        A.   Say it again.  I have --

09:18  10       Q.   You have one paragraph out of the '768 patent

09:18  11   specification on this slide, correct?

09:18  12       A.   Yes.  I want to be brief.  Yeah.

09:18  13       Q.   Okay.  Now, you pointed out the first

09:18  14   highlighting:  PCI buses are not cable friendly,

09:18  15   correct?

09:18  16       A.   Yes.

09:18  17       Q.   And then you have more highlighting:  The

09:18  18   interface includes a large number of signals, correct?

09:18  19       A.   Yes.

09:18  20       Q.   Now, in between what you've highlighted, we

09:18  21   see some context, right?

09:19  22            In the context of the computer system of the

09:19  23   present invention, which is described in some of

09:19  24   Dr. Chu's other papers, we have a cable-friendly

09:19  25   interface -- or we see that a cable-friendly interface

09:19    1    is desired for interfacing an attached computer module

09:19    2    and a peripheral console of the present invention.

09:19    3           That's what's being described here in context,

09:19    4    correct?

09:19    5      A.    Yes.  And I referred to this as well in my

09:19    6    direct.

09:19    7      Q.    And this is talking about Figure 5 in this

09:19    8    paragraph, correct?

09:19    9      A.    Yes.

09:19   10              MR. BURESH:  Now, if we could pull up

09:19   11    Figure 5, please.

09:19   12    BY MR. BURESH:

09:19   13      Q.    Now, in Figure 5, what's being described is

09:19   14    replacing the interface between what's called here a

09:19   15    notebook PC and a docking system, correct?

09:19   16      A.    Yes.

09:19   17      Q.    That would be your computer and a console

09:19   18    that's called a docking system, correct?

09:20   19      A.    Yes.

09:20   20      Q.    And we see Boxes 501 and 502.

09:20   21              MR. BURESH:  Could you highlight those

09:20   22    for us, Derek, right in the middle?

09:20   23              Thank you.

09:20   24    BY MR. BURESH:

09:20   25      Q.    That's the interface that's being replaced by

388

| | |
|---|---|
| 09:20 | 1 | Dr. Chu's invention, correct? |
| 09:20 | 2 | A.    Yes.  In this specific embodiment, yeah. |
| 09:20 | 3 | Q.    And the figure you were describing -- the text |
| 09:20 | 4 | you were describing to the jury is about this figure, |
| 09:20 | 5 | right? |
| 09:20 | 6 | A.    Yes.  The snapshot from there. |
| 09:20 | 7 | Q.    Now, we also see in this figure that there's a |
| 09:20 | 8 | primary PCI bus labeled 505 in the computer part, |
| 09:20 | 9 | correct? |
| 09:20 | 10 | A.    Yes. |
| 09:20 | 11 | Q.    And we have a secondary PCI bus in 555? |
| 09:20 | 12 | A.    Yes. |
| 09:20 | 13 | Q.    Those are the buses that are being bridged? |
| 09:20 | 14 | A.    That's right. |
| 09:20 | 15 | Q.    Now, this patent doesn't talk about replacing |
| 09:20 | 16 | 505.  It doesn't say, let's get rid of the primary PCI |
| 09:21 | 17 | bus, does it? |
| 09:21 | 18 | A.    If you're referring to the specific |
| 09:21 | 19 | embodiment, I agree with you. |
| 09:21 | 20 | Q.    It doesn't say, let's get rid of the secondary |
| 09:21 | 21 | PCI bus, does it? |
| 09:21 | 22 | A.    But I want to be -- like, to answer your |
| 09:21 | 23 | question, I just -- |
| 09:21 | 24 | Q.    Does the patent say eliminate the primary and |
| 09:21 | 25 | the secondary PCI bus, yes or no? |

09:21    1        A.    Can I get a clarification?  Ask, like -- like,

09:21    2   are you talking about the patent as a whole, or you

09:21    3   just talking about this figure?

09:21    4        Q.    Well, I'm talking right now about this figure.

09:21    5        A.    Okay.  About this figure, no.  Here, we have

09:21    6   PCI -- as you mention, we have a PCI local bus on each

09:21    7   side.

09:21    8        Q.    Okay.  So at least in this figure, we're

09:21    9   replacing the interface between the two devices, but

09:21    10   we're leaving the PCI buses on both sides?

09:21    11        A.    Yes.  In this figure.

09:21    12               MR. BURESH:  If we could go to Slide 33

09:22    13   from Dr. Sarhan's slide deck.

09:22    14   BY MR. BURESH:

09:22    15        Q.    This is another figure that you placed in

09:22    16   front of the jury, correct?

09:22    17        A.    Yes.

09:22    18        Q.    Figure 6 from the '768 patent?

09:22    19        A.    Yes.

09:22    20        Q.    And here, Dr. Chu's invention is the -- it's

09:22    21   the piece down the middle with the XP Bus, correct?

09:22    22        A.    Can I ask for a clarification about the

09:22    23   question?  You are saying the invention.  So for me,

09:22    24   the invention is like in these asserted -- in this

09:22    25   case, the invention would refer to the actual claims.

09:22    1    So here --

09:22    2        Q.    Dr. Sarhan, you asked if I would give you a

09:22    3    clarification, and then you started talking.  I didn't

09:22    4    give any clarification.

09:22    5        A.    Yeah.  Go ahead.  I'm sorry.

09:22    6        Q.    Okay.  I'll try to give a clarification on my

09:22    7    question.

09:22    8              The XP Bus that we've been discussing is in

09:22    9    the middle of this figure, correct?

09:23    10       A.    Yes.

09:23    11       Q.    It is the bridge between the attached computer

09:23    12   module and the peripheral console, correct?

09:23    13       A.    Yes.  I said that.  Yeah.

09:23    14       Q.    And on the attached computer module, we still

09:23    15   see a PCI bus, correct?

09:23    16       A.    Yes.

09:23    17       Q.    That's not being replaced in this figure

09:23    18   either, correct?

09:23    19       A.    Yes.

09:23    20       Q.    And on the peripheral console, we still see a

09:23    21   PCI local bus, correct?

09:23    22       A.    Yes.

09:23    23       Q.    That's not being replaced, correct?

09:23    24       A.    That's not that -- not that bus.  Yeah.

09:23    25       Q.    Because the XP Bus is a peripheral bus bridge.

391

09:23    1                You need buses on both sides to have a

09:23    2    peripheral bus bridge, correct?

09:23    3        A.    If you are talking about this specific figure

09:23    4    or generally?  Like, I'm just confused.  Like, if you

09:23    5    can make it specific, I'll...

09:23    6        Q.    A peripheral bus bridge that we've been

09:23    7    talking about, it bridges two buses.  One on one side;

09:24    8    one on the other, correct?

09:24    9        A.    I do not agree with this because in the

09:24    10    patent -- yep.  If you want me to explain, I'll be

09:24    11    happy to explain.

09:24    12        Q.    If you don't agree, just say you don't agree.

09:24    13        A.    I don't agree.

09:24    14        Q.    So you can have a bus bridge that doesn't

09:24    15    bridge buses?

09:24    16        A.    We're talking about the XIS Bus, right?

09:24    17        Q.    We're talking about --

09:24    18        A.    So if we're talking about the XIS Bus, we have

09:24    19    embodiments in this patent that's --

09:24    20                THE COURT:  So here's the way it works:

09:24    21    When he asks you a question, you need to answer

09:24    22    directly.  We're not having a discussion here.

09:24    23                Do you understand?

09:24    24                THE WITNESS:  Okay.

09:24    25                THE COURT:  So he's given you every

09:24   1    chance to answer his question directly.  Now I'm asking

09:24   2    you to do it.

09:24   3                    Do you understand?

09:24   4                    THE WITNESS:  Okay.

09:24   5    BY MR. BURESH:

09:24   6        Q.    A peripheral bridge bus bridges two buses,

09:24   7    correct?  Yes or no?

09:24   8        A.    Yes.

09:24   9        Q.    And the XP Bus is a peripheral bridge bus.

09:25  10    We've seen that multiple times now, correct?

09:25  11        A.    I don't agree with this.

09:25  12                    MR. BURESH:  Let's go to Slide 34,

09:25  13    please.

09:25  14    BY MR. BURESH:

09:25  15        Q.    This is another figure that you placed in

09:25  16    front of the jury from your slide deck, correct?

09:25  17        A.    Yes.

09:25  18        Q.    It's describing the host interface controller

09:25  19    in all kinds of detail, correct?

09:25  20        A.    Yes.

09:25  21        Q.    Now, this host interface controller is the

09:25  22    chip that Dr. Chu couldn't get to work, correct?

09:25  23        A.    Yes.

09:25  24        Q.    And this host interface controller, if it ever

09:25  25    could work, the intent was for it to convert PCI local

393

09:25    1    bus into XP Bus, correct?

09:25    2        A.    Yes.  In this embodiment.

09:25    3        Q.    Right.  The embodiment you put in front of the

09:25    4    jury, right?

09:25    5            Now, this host interface controller has a host

09:26    6    PCI bus on the left side, correct?

09:26    7        A.    Yes.

09:26    8        Q.    So it's not replacing the PCI local bus?

09:26    9        A.    Yes.

09:26    10        Q.    It's just creating a bridge for the XP Bus?

09:26    11        A.    Yes.

09:26    12            MR. BURESH:  Now, let's go to Slide 35.

09:26    13    BY MR. BURESH:

09:26    14        Q.    This is Figure 8B from the '768 patent,

09:26    15    correct?

09:26    16        A.    Yes.

09:26    17        Q.    Okay.  And we are still seeing the XP Bus?

09:26    18        A.    Yes.

09:26    19        Q.    Okay.  And I believe you testified on direct

09:26    20    that when the south bridge and the north bridge and all

09:26    21    those buses we saw, when they're all smooshed into this

09:27    22    Box 825, I believe you said that the buses disappear,

09:27    23    correct?

09:27    24        A.    Yeah.  Here, we don't have a PCI bus.

09:27    25        Q.    That's your testimony?

394

09:27  1        A.    Yes.

09:27  2        Q.    Okay.  So we have a peripheral bridge bus in

09:27  3   this embodiment that's not bridging buses.

09:27  4              That's your opinion?

09:27  5        A.    I wouldn't phrase it like that.  So I cannot

09:27  6   answer it the way you asked it.

09:27  7        Q.    You're saying there's no bus on the left side

09:27  8   here, right?  That's your opinion?

09:27  9        A.    No PCI bus.  Yes.

09:27  10       Q.    And no other buses either.  USB wouldn't be

09:27  11  there, right?

09:27  12       A.    You are not seeing USB here.

09:27  13       Q.    Okay.  Because it's not depicted inside this

09:27  14  box that we have, right?

09:27  15       A.    Part of the reason, yes.

09:27  16       Q.    Now, this particular figure -- and we've heard

09:28  17  testimony on this already -- we have the caption,

09:28  18  correct, with the attached computer module, single

09:28  19  full -- chip, fully integrated, et cetera.  That's the

09:28  20  caption of Figure 8B, right?

09:28  21       A.    Yes.

09:28  22       Q.    And the only other description in the '768

09:28  23  patent of this entire figure is to repeat that caption,

09:28  24  correct?

09:28  25       A.    I don't remember, but it could be.

09:28   1      Q.   You've said you've reviewed these patents so

09:28   2   carefully.  You said that on direct --

09:28   3      A.   Yeah.  I don't remember --

09:28   4               (Simultaneous conversation.)

09:28   5      Q.   What?

09:28   6      A.   I don't remember every word in the patents by

09:28   7   heart.  There are so many patents.  But if you want, I

09:28   8   can check it and let you know.

09:28   9      Q.   Well, let's go look at it.

09:28  10               MR. BURESH:  Let's go to Column 8, Lines

09:28  11   24 to 36.

09:28  12   BY MR. BURESH:

09:28  13      Q.   This is Figure 8B.  Identical language to the

09:28  14   caption, correct?

09:28  15      A.   Yes.

09:28  16               MR. BURESH:  Let's go to Column 16, 29 to

09:29  17   31.

09:29  18   BY MR. BURESH:

09:29  19      Q.   Figure 8B.  Identical language to the caption,

09:29  20   correct?

09:29  21      A.   Yes.

09:29  22      Q.   And that's it.  There's no more discussion of

09:29  23   Figure 8B in the entire patent?

09:29  24      A.   Yes.

09:29  25               MR. BURESH:  If we could go back to just

396

09:29  1  the figure now.

09:29  2       A.    Actually, like, there are some discussion

09:29  3  about the integrations in other part of the patent

09:29  4  specification.  Like integrating different components

09:29  5  together, et cetera.  Like, it's discussed in the

09:29  6  specification.

09:29  7  BY MR. BURESH:

09:29  8       Q.    We could put different things in different

09:29  9  boxes.  I agree.  Is that what you're saying?

09:29  10      A.    No.  What I'm saying, like, I just want to

09:29  11 clarify my answer because that -- like, the disclosure

09:29  12 of itself, part of the specification, the '768

09:29  13 specification, it does, like, talk about different

09:29  14 levels of integration of the process of -- with other

09:29  15 components.  Other than just this sentence that you

09:30  16 showed me.

09:30  17      Q.    Okay.  Not my question.

09:30  18      A.    Okay.

09:30  19      Q.    Here's my question:  Inside of Figure 8B, we

09:30  20 see Box 825.  Right?  The box that has everything in

09:30  21 it?

09:30  22      A.    Yes.

09:30  23      Q.    There is no disclosure in this patent saying

09:30  24 that there is not a PCI local bus inside that box, is

09:30  25 there?

09:30    1          A.    Not these words.  No.

09:30    2          Q.    So your opinion that there's no PCI local bus

09:30    3    inside this box is just your opinion.  You don't find

09:30    4    those words in the patent, correct?

09:30    5          A.    It's based on my understanding of the patents.

09:30    6    Based on my deep understanding of the patents.

09:30    7          Q.    There is -- the deep understanding that -- I'm

09:30    8    going to start that question over again.

09:30    9          Your deep understanding is not based on the

09:30    10   words of the patent because the patent does not say

09:30    11   that a PCI local bus is not in Box 825 --

09:30    12         A.    Doesn't say that.

09:30    13         Q.    -- is that correct?

09:31    14               MR. BURESH:  All right.  Could we go to

09:31    15   Claim 10 of the '768 patent, please?

09:31    16   BY MR. BURESH:

09:31    17         Q.    Now, in this claim we see the requirement that

09:31    18   there is LVDS channel -- a LVDS channel conveys address

09:31    19   and data bits of a PCI bus transaction in serial form.

09:31    20         Did I read that correctly?

09:31    21         A.    Yes.

09:31    22               MR. BURESH:  Could we go to Slide 38,

09:31    23   please?  Plaintiff's Slide 38.

09:32    24               Okay.  Thank you.

09:32    25   BY MR. BURESH:

09:32   1      Q.    Here we have the Court's definition of a PCI

09:32   2   bus transaction; is that correct?

09:32   3      A.    Yes.

09:32   4      Q.    And it is a bus transaction that we're talking

09:32   5   about here, correct?

09:32   6      A.    Yes.

09:32   7      Q.    And we see that it is a transaction in

09:32   8   accordance with the industry standard PCI local bus

09:32   9   specification for communication with interconnected

09:32   10   peripheral component, and "in accordance with" includes

09:32   11   backwards compatibility, correct?

09:32   12      A.    Yes.

09:32   13      Q.    So we're talking about the PCI local bus

09:32   14   specification, correct?

09:32   15      A.    Yes.

09:32   16      Q.    And that we've seen previously.  You've had

09:32   17   that up on one of your slides, the specification of PCI

09:33   18   local bus.

09:33   19            That entire specification is describing how a

09:33   20   PCI local bus operates, correct?

09:33   21      A.    Yes.

09:33   22      Q.    And the Court's construction is talking about

09:33   23   a PCI bus transaction, correct?

09:33   24      A.    Yes.

09:33   25      Q.    And the claims are requiring a PCI bus

399

09:33   1    transaction, correct?

09:33   2        A.    Yes.

09:33   3              MR. BURESH:  Could we go to Slide 22,

09:33   4    please?

09:33   5    BY MR. BURESH:

09:33   6        Q.    Another one of your slides, correct?

09:33   7        A.    Yes.

09:33   8        Q.    And this is talking about the PCI local bus

09:33   9    characteristics, correct?

09:33  10        A.    Yes.

09:33  11        Q.    And to operate on the PCI local bus, you need

09:33  12    47-plus wires and signals, fair?

09:33  13        A.    Sure.

09:33  14        Q.    36 of those wires are reserved for address and

09:34  15    data bits, correct?

09:34  16        A.    Yes.

09:34  17        Q.    Okay.  And when signals --

09:34  18        A.    You said 32?

09:34  19        Q.    I said 36.

09:34  20        A.    36 reserved for address and data bits?

09:34  21    Address and data bits are 32 bits.

09:34  22        Q.    I'm sorry.  Could you say that again?

09:34  23        A.    The address and data bits are 32 bits.

09:34  24        Q.    Okay.  What's -- I'm just saying the red "36

09:34  25    wires" that you have on your slide here.

400

09:34  1     A.    Yeah.  This is for -- if you want me to

09:34  2  explain, I can explain.

09:34  3     Q.    You have 36 wires listed on your slide

09:34  4  highlighted around address and data, correct?

09:34  5     A.    The --

09:34  6     Q.    Correct?

09:34  7     A.    Yes.

09:34  8     Q.    Okay.  Now, these wires and signals, they are

09:34  9  transmitting signals on the PCI local bus, correct?

09:34  10    A.    Yes.

09:34  11    Q.    That's required to be a PCI local bus

09:35  12  transaction, correct?

09:35  13    A.    Yes.

09:35  14          MR. BURESH:  Now, let's go back to Slide

09:35  15  37 now, please.

       16  BY MR. BURESH:

09:35  17    Q.    Now, we've seen the claim language.  I want to

09:35  18  talk about your first claim limitation here, all right?

09:35  19          You say:  LVDS channel conveying address and

09:35  20  data bits of a PCI transaction.

09:35  21          You see that?

09:35  22    A.    Yes.

09:35  23    Q.    Now, you've omitted the word "bus," correct?

09:35  24    A.    Not intentionally.  But yeah.  It's not shown

09:35  25  here.

09:35  1    Q.    You accidentally omitted the word "bus"?

09:35  2    A.    Like, does not matter, either/or.  Like,

09:35  3    according to my report, does not matter.  Like, so

09:35  4    it's -- if you want to make it -- if I say PCI bus

09:35  5    transaction or PCI transaction, it's the same thing.

09:35  6    Q.    But that is not what you said on your slide.

09:35  7          You omitted the word "bus" from your analysis

09:35  8    on your slide, correct?

09:35  9    A.    I omitted it from the slide, not from my

09:36  10   analysis.

09:36  11              MR. BURESH:  If we go to the next slide.

09:36  12   BY MR. BURESH:

09:36  13   Q.    This is throughout, isn't it?  Every time you

09:36  14   talk about the limitation, LVDS channel conveying

09:36  15   address and data bits of a PCI transaction, the bus is

09:36  16   gone, isn't it?

09:36  17   A.    Gone from where?  Meaning, like, in the --

09:36  18   Q.    Gone from your description of what's required

09:36  19   by the claims.  It's gone.

09:36  20   A.    Yeah.  In just the slide, not in the report.

09:36  21   Q.    This slide that you put in front of the jury

09:36  22   omitted the word "bus," correct?

09:36  23   A.    Yes.

09:36  24   Q.    Because the bus requires 47 pins to operate on

09:36  25   the PCI local bus in accordance with the PCI local bus

09:36  1   specification, doesn't it?

09:36  2       A.    No.   It's not the reason why it's not shown

09:36  3   here.

09:36  4       Q.    Maybe the reason is that there's no PCI local

09:36  5   bus in any of my clients' products; isn't that correct?

09:37  6       A.    No.   It's not the reason why it's not shown

09:37  7   here.

09:37  8       Q.    There is no PCI local bus in my clients'

09:37  9   products; is that correct?

09:37  10      A.    Yes.

09:37  11                  MR. BURESH:   Could we go to Slide 43,

09:37  12  please?

09:37  13  BY MR. BURESH:

09:37  14      Q.    Now, you testified that PCI Express, the new

09:37  15  standard, it has address and data, correct?

09:37  16      A.    Yes.

09:37  17      Q.    That would be address and data of a PCI

09:37  18  Express transaction, correct?

09:37  19      A.    Say the question again.

09:37  20      Q.    Sure.

09:37  21                  When you find address and data bits that are

09:38  22  used in PCI Express, they are address and data of a PCI

09:38  23  Express transaction, fair?

09:38  24      A.    Yes.   But there's more detail than that.

09:38  25                  MR. BURESH:   Let's go to Slide 44,

09:38  1    please.

09:38  2    BY MR. BURESH:

09:38  3        Q.    Here you showed the jury data that's in a PCI

09:38  4    Express transaction, correct?

09:38  5        A.    Yes.

09:38  6        Q.    Now, what we're seeing here on this screen is

09:38  7    the format of a packet according to PCI Express,

09:38  8    correct?

09:38  9        A.    Yes.

09:38  10       Q.    And that's -- this data would be in one of

09:38  11   those packets?

09:38  12       A.    Yes.

09:38  13       Q.    And a packet's like an envelope, right?

09:38  14       A.    I'm not sure about analogies, but generally.

09:38  15       Q.    You stuff information inside and then you

09:38  16   address it, fair?

09:38  17       A.    Yeah.

09:38  18       Q.    Okay.  So this data's in a packet in a PCI

09:38  19   Express transaction.

09:39  20             Now, PCI local bus, it doesn't have any

09:39  21   packets at all, right?

09:39  22       A.    Yes.

09:39  23       Q.    So what we're looking at here is not a PCI

09:39  24   local bus transaction, correct?

09:39  25       A.    Yes.  And there -- but there's more detail

09:39  1    than that.  Yeah.

09:39  2        Q.    So this data that we're looking at on Slide 44

09:39  3    in the packet, that is not data on a PCI local bus,

09:39  4    correct?

09:39  5        A.    Yeah.  In this one, but there's more detail

09:39  6    than that as well.

09:39  7                  MR. BURESH:  Let's go to your next slide.

09:39  8    BY MR. BURESH:

09:39  9        Q.    Here, you pointed out address in a PCI Express

09:39  10   transaction, correct?

09:39  11       A.    Yes.

09:39  12       Q.    And this address is a field in a packet

09:39  13   header, correct?

09:39  14       A.    Yes.

09:39  15       Q.    And again, there's no packet headers in a PCI

09:39  16   local bus transaction --

09:40  17       A.    Yes.

09:40  18       Q.    -- fair?

09:40  19                  MR. BURESH:  Slide 48, please.

09:40  20   BY MR. BURESH:

09:40  21       Q.    I believe this is a depiction of a figure out

09:40  22   of the PCI Express specification, correct?

09:40  23       A.    Yes.

09:40  24       Q.    And it's an example architecture for PCI

09:40  25   Express?

09:40  1      A.    Yeah.   The topology.   Yeah.   It's referred to

09:40  2  as the topology.

09:40  3      Q.    Okay.   Now, in PCI Express, the root complex

09:40  4  will generate PCI Express transactions, correct, the

09:40  5  packets we were looking at?

09:40  6      A.    Yes.

09:40  7      Q.    And those PCI Express transactions in this

09:41  8  Figure 1-2 on Slide 48, they can go in two different

09:41  9  directions, one down and one over, fair?

09:41  10      A.    Can I --

09:41  11      Q.    Sure.   Let me ask that question a little bit

09:41  12  better.

09:41  13      A.    Yeah.   More specific.

09:41  14      Q.    There is a PCI Express transaction that you've

09:41  15  depicted going from root complex into what's called a

09:41  16  switch, correct?

09:41  17      A.    Yes.

09:41  18      Q.    And then, I think in your animation, it went

09:41  19  from the switch on to the PCI Express endpoint?

09:41  20      A.    Yes.

09:41  21      Q.    Okay.   Now, in the direction going to the

09:41  22  left, we've got PCI Express transactions going into

09:41  23  something called a PCI Express to PCI/PCI-X bridge,

09:41  24  right?

09:41  25      A.    Yes.

09:41  1      Q.    And then depicted below that are PCI or PCI-X

09:41  2  endpoints?

09:41  3      A.    Yes.

09:42  4      Q.    PCI-X is just --

09:42  5      A.    Well, they're not called -- in PCI

09:42  6  terminology, they're not called endpoints, but...

09:42  7      Q.    What do you call them?

09:42  8      A.    So devices.

09:42  9      Q.    Okay.  Just for clarification, PCI is

09:42  10  shorthand for PCI local bus, correct?

09:42  11      A.    You are saying in this specific -- what you

09:42  12  are highlighting now?

09:42  13      Q.    I'm saying --

09:42  14      A.    What has been highlighted?

09:42  15      Q.    -- the PCI is PCI local bus?

09:42  16      A.    Yeah.  In this context, yeah.  Definitely.

09:42  17      Q.    So to get from PCI Express to a PCI local bus,

09:42  18  you've got to go through this PCI Express to PCI

09:42  19  bridge, right?

09:42  20      A.    Yes.

09:42  21      Q.    And that bridge is -- is converting from one

09:42  22  transaction type to another?

09:42  23      A.    Yes.

09:42  24      Q.    So the transactions aren't the same on both

09:42  25  sides of that bridge?

| | | |
|---|---|---|
| 09:42 | 1 | A.    Yes.  They are not the same. |
| 09:42 | 2 | Q.    In fact, they're different? |
| 09:42 | 3 | A.    Yes. |
| 09:42 | 4 | Q.    Okay.  Now, this is a capability that's |
| 09:43 | 5 | described in the specification, correct? |
| 09:43 | 6 | A.    Yes. |
| 09:43 | 7 | Q.    But the accused products, they don't have any |
| 09:43 | 8 | PCI/PCI-X devices, do they? |
| 09:43 | 9 | A.    Yes. |
| 09:43 | 10 | Q.    And they don't have this PCI Express to PCI |
| 09:43 | 11 | bridge, do they? |
| 09:43 | 12 | A.    Yeah.  Most likely, yes, don't. |
| 09:43 | 13 | Q.    What? |
| 09:43 | 14 | A.    Yes.  Most likely they don't. |
| 09:43 | 15 | Q.    You don't know? |
| 09:43 | 16 | A.    So if -- we're talking about there are accused |
| 09:43 | 17 | products -- can I explain? |
| 09:43 | 18 | Q.    No. |
| 09:43 | 19 |        I'm just asking:  Do you know whether the |
| 09:43 | 20 | accused products you studied so carefully, if they have |
| 09:43 | 21 | this bridge, surely you would have said something? |
| 09:43 | 22 | A.    Yeah.  I said most likely they do not have -- |
| 09:43 | 23 | they -- they do not have the bridge.  Yes. |
| 09:43 | 24 | Q.    And that's because the accused products don't |
| 09:43 | 25 | use PCI anymore.  That was obsoleted a long time ago, |

—408—

09:43  1   wasn't it?

09:43  2       A.    They don't use PCI local bus transactions.

09:44  3   That's right.

09:44  4               MR. BURESH:  Could we pull up DX-1121,

09:44  5   please?

09:44  6   BY MR. BURESH:

09:44  7       Q.    This is a sizable document.  In fact, it's a

09:44  8   book.

09:44  9             Do you recognize it?

09:44  10      A.    Yes.

09:44  11      Q.    Okay.  What is it?

09:44  12      A.    It's a book that talks about different aspects

09:44  13  of PCI Express.

09:44  14      Q.    It's a book you cited multiple times in your

09:44  15  report, correct?

09:44  16      A.    Yes.

09:44  17              MR. BURESH:  Your Honor, I move to admit

09:44  18  DX-1121.

09:44  19              MR. HALES:  No objections.

09:44  20              THE COURT:  Admitted.

09:45  21              MR. BURESH:  Could we go to Page 1,

09:45  22  please, Mr. Palisoul?  Zoom in on the first paragraph.

09:45  23  BY MR. BURESH:

09:45  24      Q.    Okay.  You see in the second sentence here:

09:45  25  For the computing sector and communications, the

409

09:45   1   adoption of PCI Express, a groundbreaking new general

09:45   2   input/output architecture, will serve as an inflection

09:45   3   point.

09:45   4           Do you see that?

09:45   5   A.   Yes.

09:45   6   Q.   Do you agree that PCI Express is a

09:45   7   groundbreaking new architecture?

09:45   8   A.   Yes.

09:45   9   Q.   And that's when compared to the PCI local bus,

09:45  10   correct?

09:45  11   A.   Yes.

09:45  12   Q.   And it talks about an inflection point.  In

09:45  13   the sentence above, it says:  There's certain times in

09:45  14   the evolution of technology that serve as inflection

09:45  15   points that forever change the course of events.

09:45  16   Correct?

09:45  17   A.   Yes.

09:45  18   Q.   PCI Express was one of those inflection

09:46  19   points, correct?

09:46  20   A.   Yes.

09:46  21   Q.   It forever changed the computing industry?

09:46  22   A.   Sure.

09:46  23   Q.   In comparison to the PCI local bus?

09:46  24   A.   Yes.

09:46  25           MR. BURESH:  Ms. Clark, could you go

410

09:46  1    ahead and publish?

09:46  2              And I'm going to give the jury just a

09:46  3    couple of seconds to catch up with us.  Or more than a

09:46  4    couple seconds.

09:46  5              If we could zoom in on the second

09:46  6    paragraph, Mr. Palisoul.

09:46  7    BY MR. BURESH:

09:46  8        Q.    Now, here in this second paragraph, it's

09:46  9    talking about PCI, PCI local bus, correct?

09:46  10       A.    Yes.

09:47  11       Q.    And PCI-X, which is a derivative of PCI,

09:47  12   correct?

09:47  13       A.    Can you say the question again?

09:47  14       Q.    Yeah.  It also talks about PCI-X, which is a

09:47  15   derivative of PCI --

09:47  16       A.    Yes.

09:47  17       Q.    -- local bus?

09:47  18       A.    Uh-huh.

09:47  19       Q.    And then the new architecture, PCI Express,

09:47  20   fair?

09:47  21       A.    Yes.

09:47  22       Q.    Now, PCI-X, the derivative, is an architecture

09:47  23   that evolved from PCI, correct?

09:47  24       A.    Yes.

09:47  25       Q.    And it's backwards compatible with PCI, right?

411

09:47  1      A.    Yes.

09:47  2      Q.    In contrast, in the next sentence:  PCI

09:47  3  Express is neither an evolved nor an enhanced form of

09:47  4  PCI or PCI-X and as such is not backwards compatible

09:48  5  from a hardware perspective.

09:48  6            Do you see that?

09:48  7      A.    Like -- just like -- it's being highlighted.

09:48  8  Okay.  Now it's coming up.  Okay.

09:48  9      Q.    Do you see that?

09:48  10     A.    Could you say the question again -- yeah.  I

09:48  11  see it now.

09:48  12     Q.    Do you agree that PCI Express is not backwards

09:48  13  compatible with PCI from a hardware perspective?

09:48  14     A.    Yeah.  From hardware perspective, if we don't

09:48  15  have the bridge, it's not going to be compatible from

09:48  16  the hardware perspective.

09:48  17     Q.    Okay.  In fact, if we go on to the next

09:48  18  sentence:  The only commonality between PCI Express and

09:48  19  PCI is that many software and configuration space

09:48  20  models are preserved.

09:48  21            Do you see that?

09:48  22     A.    Yes.  I see that.

09:48  23     Q.    Do you agree that software and configuration

09:48  24  space models being preserved is the only commonality

09:48  25  between PCI and PCI Express?

09:49  1        A.    I don't agree this 100 percent.  No.

09:49  2        Q.    So the writers of this book were wrong?

09:49  3        A.    I refer to the PCI -- the actual standard

09:49  4   itself in my report.  And according to the report, it

09:49  5   shows a lot of things that are taken from PCI.  But

09:49  6   this is one of the main, like, commonalities.

09:49  7        Q.    So let me focus this in a little bit more.

09:49  8              You cited this book over 25 times in your

09:49  9   report, correct?

09:49  10       A.    Yes.

09:49  11       Q.    And the authors of this book say the only

09:49  12  commonality, the only commonality between PCI Express

09:49  13  and PCI is that many software and configuration space

09:49  14  models are preserved.

09:49  15             And you disagree with the authors of the book

09:49  16  that you cited 25 times in your report.  That's where

09:49  17  we're at, right?

09:49  18       A.    Can I explain?

09:49  19       Q.    No.  It's a yes or no.  You disagree with

09:50  20  them?

09:50  21       A.    Like the -- even according -- I don't entirely

09:50  22  disagree, but there are more detail to it even from the

09:50  23  book.

09:50  24             MR. BURESH:  If we go to Page 52, please.

09:50  25  BY MR. BURESH:

09:50   1       Q.    Are you familiar with the five layers of PCI

09:50   2   Express architecture?

09:50   3       A.    Yes.

09:50   4             MR. BURESH:  Now, if we go right below

09:50   5   Figure 4.2, Mr. Palisoul.  Highlight the first sentence

09:50   6   there.

09:50   7   BY MR. BURESH:

09:50   8       Q.    The software layer contains two critical

09:50   9   aspects to maintain software compatibility with PCI to

09:50   10  ease migration:  Initialization operations and run-time

09:50   11  operations.

09:50   12            Do you see that?

09:50   13      A.    Yes.

09:50   14      Q.    Okay.  So the commonality at the software

09:50   15  level that you've been describing to the jury, that

09:51   16  takes place at the software level, software layer,

09:51   17  correct?

09:51   18      A.    Yes.  It takes place there.

09:51   19            MR. BURESH:  Derek, could you pull up the

09:51   20  Court's claim construction for PCI local bus

09:51   21  transaction?

09:51   22  BY MR. BURESH:

09:51   23      Q.    And, Dr. Sarhan, you would agree with me that

09:51   24  the Court's construction of the peripheral component

09:51   25  interconnect bus transaction focuses on the

—414—

09:51    1    transaction, correct?

09:51    2        A.    Say it again.

09:51    3        Q.    What we're defining here, according to the

09:51    4    Court's construction, is the transaction, correct?

09:51    5        A.    Yeah.  The PCI bus transaction.

09:52    6        Q.    And when we're determining whether something

09:52    7    is backwards compatible or not, we would need to be

09:52    8    looking at the transaction, correct?

09:52    9        A.    Yes.

09:52   10                  MR. BURESH:  If we can go back to

09:52   11    Page 52.

09:52   12    BY MR. BURESH:

09:52   13        Q.    Now, in the PCI Express model, it's the next

09:52   14    three layers down below software that actually build

09:52   15    the PCI Express transaction; isn't that correct?

09:52   16        A.    Yes.

09:52   17        Q.    Those are the layers that are responsible for

09:52   18    building a PCI Express transaction?

09:52   19        A.    Yes.  The transactions are terminated by the

09:52   20    transaction layer.

09:52   21        Q.    Your answer's yes?

09:52   22        A.    Yes.

09:52   23        Q.    And those are called the transaction layer,

09:53   24    the data link layer, and the physical layer, correct?

09:53   25        A.    Yes.  Are you saying the transactions are

415

09:53  1    terminated by all the layers?

09:53  2        Q.    I'm saying those three layers are responsible

09:53  3    for building the PCI Express transaction.

09:53  4        A.    Yes.

09:53  5        Q.    The main responsibility of the transaction

09:53  6    layer is to begin the process of turning requests from

09:53  7    the device core into a PCI Express transaction,

09:53  8    correct?

09:53  9        A.    Yes.

09:53  10       Q.    And the main responsibility of the data link

09:53  11   layer is to ensure that the transactions are received

09:53  12   properly, correct?

09:53  13       A.    Yes.

09:53  14       Q.    And the physical layer is responsible for

09:53  15   actually transmitting and receiving PCI Express

09:53  16   transactions?

09:53  17       A.    Say it again.

09:53  18       Q.    The physical layer is responsible for the

09:53  19   actual transmitting and receiving of the PCI Express

09:54  20   transactions?

09:54  21       A.    Yes.

09:54  22       Q.    So together these three layers build a full

09:54  23   scale PCI Express transaction?

09:54  24       A.    Yes.

09:54  25       Q.    And on a receiving side, that process would be

09:54    1    done in reverse, correct?

09:54    2        A.    Yes.

09:54    3        Q.    So the physical layer, data link layer, and

09:54    4    transaction layer would tear down a PCI Express

09:54    5    transaction?

09:54    6        A.    At high level.

09:54    7        Q.    Those layers do not generate a PCI local bus

09:54    8    transaction, correct?

09:54    9        A.    Yes.

09:54    10       Q.    Those layers could not process a received PCI

09:54    11   local bus transaction, correct?

09:54    12       A.    Yes.  Not directly.

09:54    13       Q.    In fact, for PCI Express to work with PCI, you

09:54    14   would have to have that bridge we looked at earlier

09:54    15   that's not in the accused products, correct?

09:55    16       A.    Can you say the question again and make it

09:55    17   more specific, please?

09:55    18       Q.    Yeah.

09:55    19             For PCI Express to work with PCI technology,

09:55    20   you would have to have a PCI Express to PCI bridge that

09:55    21   we looked at earlier, correct?

09:55    22       A.    Yes.  To work with the PCI local bus devices.

09:55    23   Yeah.

09:55    24       Q.    And that bridge is not in the accused

09:55    25   products?

417

09:55  1      A.    Yeah.  As I said, most likely not.

09:55  2                  MR. BURESH:  Could we go back to Page 52?

09:55  3  BY MR. BURESH:

09:55  4      Q.    I'd also like to talk briefly about the

09:55  5  mechanical layer of PCI Express.  That one's labeled

09:55  6  here "connectors and form factors."

09:55  7            Do you see that?

09:55  8      A.    Yes.

09:55  9      Q.    Now, a PCI Express card, the thing that sticks

09:55  10  in the slots, you couldn't put a PCI Express card in a

09:56  11  PCI local bus slot, correct?

09:56  12      A.    Yes.

09:56  13      Q.    The connectors are different?

09:56  14      A.    Yes.

09:56  15      Q.    And you couldn't put a PCI local bus card in a

09:56  16  PCI Express slot, correct?

09:56  17      A.    Yes.

09:56  18      Q.    They are not interoperable?

09:56  19      A.    Yes.

09:56  20      Q.    So let's say I have a computer, all right?

09:56  21  Back in 2004.  Okay?  In this hypothetical.  It has a

09:56  22  PCI local bus slot on it.

09:56  23            Are you with me?

09:56  24      A.    Yes.

09:56  25      Q.    Now, let's say I go to -- I don't know if this

418

09:56  1    is even accurate.  Let's say I go to Micro Center --

09:56  2    it's the only computer store I know about -- and I buy

09:56  3    a PCI Express card that has some graphics on it, a

09:56  4    graphics controller, and I want to take my PCI Express

09:57  5    card and I'm expecting it to be backwards compatible

09:57  6    with what I have on my computer.

09:57  7            When I go home and try to plug that brand new

09:57  8    PCI Express card into my old PCI local bus slot, what's

09:57  9    going to happen?

09:57  10   A.    Yeah.  You cannot put a PCI Express device on

09:57  11   that PCI -- on a normal PCI slot.  Yes.  It will not

09:57  12   work.

09:57  13   Q.    Will not work.

09:57  14           Let me ask it this way:  If I jammed it in

09:57  15   and -- is it going to work at all?

09:57  16   A.    No, no, no.

09:57  17   Q.    Because PCI Express and PCI are

09:57  18   interchangeable.  They're not interoperable, correct?

09:57  19   A.    Please be more specific now.

09:57  20   Q.    PCI Express and PCI local bus are not

09:57  21   interoperable, correct?

09:57  22   A.    Again, you have to be more specific for me to

09:57  23   answer.  You are talking about the hardware, the slot?

09:57  24   Yes.  I agree.

09:57  25   Q.    As sold, the accused products, there's no way

419

09:58    1    for me to use PCI local bus on them, correct?

09:58    2        A.    PCI local bus devices, yes.  Not directly.

09:58    3    Yeah.

09:58    4        Q.    So wrapping up Page 52 of this introduction to

09:58    5    PCI Express, from the transaction layer down, there is

09:58    6    no commonality between PCI Express and PCI local bus,

09:58    7    correct?  Yes or no?

09:58    8        A.    There's more detail.  But general at high

09:58    9    level.  Yes.

09:58    10                MR. BURESH:  Could we go to Slide 92,

09:58    11   please?

09:58    12   BY MR. BURESH:

09:59    13       Q.    I just have a few questions now kind of about

09:59    14   this analysis so -- that you walked through, all right?

09:59    15                Hopefully, it won't take as long as the

09:59    16   original.

09:59    17       A.    Yeah, hopefully.

09:59    18       Q.    Now, here you have a claim limitation that

09:59    19   says you're providing a connector for the computer that

09:59    20   connects to a console --

09:59    21       A.    Yes.

09:59    22       Q.    -- correct?

09:59    23                Now, I assume you've depicted the computer.

09:59    24   Those are the accused devices you have pictured on the

09:59    25   right-hand side of the slide; is that correct?

420

09:59  1      A.    Yes.  This is the computer.

09:59  2      Q.    Now, you didn't tell the jury what the console

09:59  3  was, correct?  You didn't identify any console that it

09:59  4  was connected to, did you?

09:59  5      A.    I don't remember.  But in my report, I did.

10:00  6  But I don't remember if I explained it on --

10:00  7      Q.    In fact, you mentioned that you applied the

10:00  8  Court's claim construction --

10:00  9      A.    Definitely.

10:00  10     Q.    -- but you never showed the jury the Court's

10:00  11  claim construction, did you?

10:00  12     A.    For the console?

10:00  13     Q.    Yes.

10:00  14     A.    No.  There were -- I used a number of slides,

10:00  15  so, like -- but I said that I applied all the Court's

10:00  16  construction.

10:00  17     Q.    Okay.  And I'm just asking a simple question.

       18     A.    Yes.

10:00  19     Q.    You didn't show the jury the Court's claim

10:00  20  construction of console, did you?

10:00  21     A.    For console, I think, yes.  I think, yeah.

10:00  22  Yeah.  I didn't -- I didn't show it.

10:00  23     Q.    Okay.

10:00  24            MR. BURESH:  Could we pull up the

10:00  25  construction of console, please?

421

| | | |
|---|---|---|
| 10:00 | 1 | BY MR. BURESH: |
| 10:00 | 2 | Q.   Now, a console needs to be a chassis or |
| 10:00 | 3 | enclosure housing one or more coupling sites that |
| 10:00 | 4 | connects components of a computer system. |
| 10:01 | 5 | That's what a console has to be, correct? |
| 10:01 | 6 | A.   Yes. |
| 10:01 | 7 | MR. BURESH:  If we can go back to the |
| 10:01 | 8 | slide now.  Slide 92. |
| 10:01 | 9 | BY MR. BURESH: |
| 10:01 | 10 | Q.   Now, you didn't show the jury any device that |
| 10:01 | 11 | connects the components of a computer system.  You just |
| 10:01 | 12 | showed them a computer with some ports on it, correct? |
| 10:01 | 13 | A.   Yeah.  But I explained, like, the concept of |
| 10:01 | 14 | the drawing. |
| 10:01 | 15 | Q.   What is this computer connected to, in your |
| 10:01 | 16 | opinion, that is a console? |
| 10:01 | 17 | A.   So we see the USB ports.  Those, you can |
| 10:01 | 18 | connect them to, for example, an external storage |
| 10:01 | 19 | device. |
| 10:01 | 20 | Q.   External storage device, so like an external |
| 10:01 | 21 | hard drive? |
| 10:01 | 22 | A.   Yes. |
| 10:01 | 23 | Q.   Now, an external hard drive is a peripheral, |
| 10:02 | 24 | is it not? |
| 10:02 | 25 | A.   It's a peripheral device. |

10:02  1      Q.    It's a peripheral device.  It's not a device

10:02  2  that connects the components of a computer system

10:02  3  together.  It's a device that connects to a computer

10:02  4  system; isn't that correct?

10:02  5      A.    That -- say the question again.

10:02  6      Q.    An external hard drive --

10:02  7      A.    Yes.

10:02  8      Q.    -- is a peripheral device that connects to a

10:02  9  computer system.  It is not a device that connects a

10:02  10  computer system together, correct?

10:02  11      A.    This -- according to the Court construction.

10:02  12  So we had -- that you showed a little bit ago.  So it

10:02  13  says a console -- can I speak, because I have to

10:02  14  clarify things?  Can I -- if you allow me to --

10:02  15      Q.    I'm just asking you yes or no.  You've said an

10:02  16  external hard drive is a peripheral.  We all know what

10:02  17  peripherals are.

10:02  18          They plug into the computer, right?

10:03  19      A.    Yes.

10:03  20      Q.    An external hard drive is not the thing that

10:03  21  connects the computer system together, is it?

10:03  22      A.    It connects components of a computer system

10:03  23  according to Court construction.

10:03  24      Q.    Let's talk about a mouse.  I could connect a

10:03  25  mouse through this USB port, correct?

423

10:03 1    A.    So I didn't give the mouse as an example, but

10:03 2    I just talked about the storage.  So if you want to

10:03 3    focus on it, maybe we can --

10:03 4    Q.    You also gave a printer as an example?

10:03 5    A.    Yes.

10:03 6    Q.    Okay.  Now, a printer is something we're all

10:03 7    familiar with.  You could plug that into this USB port?

10:03 8    A.    Yes.

10:03 9    Q.    Now, the printer is a peripheral device,

10:03 10   correct?

10:03 11   A.    Yeah.  It has components of a computer system.

10:03 12   Q.    A printer connects to a computer system,

10:03 13   correct?

10:03 14   A.    It does.

10:03 15   Q.    A printer is not the thing that connects the

10:03 16   components of a computer system together, right?

10:03 17   A.    It connects components of a computer system.

10:03 18   This is my -- and I can explain if you want.

10:04 19   Q.    I believe you've said a monitor, printer,

10:04 20   external hard drive, those are all to you consoles?

10:04 21   A.    Yes.

10:04 22   Q.    And those are all things that most people

10:04 23   would say are peripherals, correct?

10:04 24   A.    Yeah.  We could say they are peripheral as

10:04 25   well.  Yeah.

—424—

10:04   1              MR. BURESH:  If we could go to the '768

10:04   2    patent, please.

10:04   3              Column 10, Lines 57 to Column 11 -- I'm

10:04   4    sorry -- to -- yeah -- Column 11, Line 2.

10:04   5    BY MR. BURESH:

10:05   6        Q.    Give me just one moment, Dr. Sarhan.

10:05   7        A.    Yeah.  No problem.

10:05   8              MR. BURESH:  You've got it, Derek.  Can

10:05   9    you pull that section up, please?

10:05  10    BY MR. BURESH:

10:05  11        Q.    Okay.  Do you recognize this from the patent

10:05  12    specification, Dr. Sarhan?

10:05  13        A.    Yes.

10:05  14        Q.    Here, it says:  The shared peripheral console

10:05  15    has a chassis and motherboard that connects the

10:05  16    following devices.

10:05  17              Correct?

10:05  18        A.    Yes.

10:05  19        Q.    In the context of the specification, we're

10:05  20    talking about the console here, correct?

10:06  21        A.    Yes.

10:06  22        Q.    And the console is something that connects

10:06  23    No. 2, a display means, which is a monitor, correct?

10:06  24        A.    Yes.

10:06  25        Q.    So the monitor is not the console.  The

425

| | |
|---|---|
| 10:06 | 1 |
| 10:06 | 2 |
| 10:06 | 3 |
| 10:06 | 4 |
| 10:06 | 5 |
| 10:06 | 6 |
| 10:06 | 7 |
| 10:06 | 8 |
| 10:06 | 9 |
| 10:06 | 10 |

1  monitor is the thing that connects to the console in

2  the specification.  Is that fair to say?

3       A.    Say that question again.

4       Q.    Sure.

5             In the specification of the patents, the

6  monitor is not the console.  The monitor is something

7  that connects to the console, correct?

8       A.    Say it again one more time.  It's very

9  important, so I want to make sure that I answer the

10  right question.

11       Q.    No. 2 is talking about a monitor?

12       A.    Yeah.

13       Q.    It says that the console connects the

14  following devices.

15       A.    Yeah.

16       Q.    See that?

17       A.    Yes.

18       Q.    My question is:  The monitor is something that

19  connects to the console.  It is not the console itself,

20  correct?

21       A.    No.  I disagree.

22       Q.    You disagree with the specification?

23       A.    No.  Not the -- with your understanding of it.

24             MR. HALES:  Your Honor, you've construed

25  this term and he's, in effect, attempting to

—426—

10:07  1    reconstrue.

10:07  2                    MR. BURESH:  Just asking about his

10:07  3    understanding of the context of the patent.

10:07  4                    THE COURT:  Overruled.

10:07  5    BY MR. BURESH:

10:07  6        Q.    No. 6, we see:  Shared storage subsystems,

10:07  7    like a CD-ROM drive or a second hard drive.

10:07  8        Do you see that?

10:07  9        A.    Yes.

10:07  10       Q.    So a second hard drive would be something that

10:07  11   connects to a console.  The second hard drive is not

10:07  12   the console itself, correct?

10:07  13       A.    I disagree.

10:08  14       Q.    But you are saying that an external hard

10:08  15   drive, in your opinion, would be a console?

10:08  16       A.    Yes.

10:08  17                    MR. BURESH:  Can we go to Slide 52,

10:08  18   please?

10:08  19   BY MR. BURESH:

10:08  20       Q.    All right.  Now, you showed the jury some

10:08  21   pictures of a motherboard that was, in your opinion,

10:08  22   showing the central processing unit limitations of the

10:08  23   claims, correct?

10:08  24       A.    Say it again.

10:08  25       Q.    Sure.

—427—

10:08    1          You showed the jury a picture of a motherboard
10:08    2    in order to demonstrate that there's a CPU, one of the
10:08    3    limitations of the claim, correct?
10:08    4        A.    Not the main reason.  I just wanted -- not
10:09    5    the -- it's not my main reason.  No.
10:09    6                MR. BURESH:  Let's go to Slide 54.
10:09    7    BY MR. BURESH:
10:09    8        Q.    Here, you're using a motherboard as evidence
10:09    9    of a graphics controller limitation being met by the
10:09   10    accused products, correct?
10:09   11        A.    It's not the reason why I showed this.  I
10:09   12    didn't show it as -- I wanted to explain the concept,
10:09   13    like, to the jury so that they understand what the
10:09   14    graphics controller is.
10:09   15        Q.    Okay.  But you agree that's a limitation in
10:09   16    the claims?
10:09   17        A.    Yeah.  That's a claim limitation.
10:09   18        Q.    And on your slide you say "limitation"?
10:09   19        A.    Yes.
10:09   20                MR. BURESH:  Can we go to Slide 55 now?
10:09   21    BY MR. BURESH:
10:09   22        Q.    On Slide 55, you have a picture of a
10:09   23    motherboard and you're addressing the limitation
10:09   24    peripheral bridge, correct?
10:09   25        A.    Yes.

428

10:09  1        Q.    Now, my question -- I've seen quite a few ASUS

10:10  2   motherboards.  I know you have as well, correct?

10:10  3        A.    Yes.

10:10  4        Q.    They always have an ASUS brand and a product

10:10  5   identifier right below the CPU -- right below the CPU,

10:10  6   correct?

10:10  7        A.    Yeah.  Might be.  Yeah.

10:10  8              MR. HALES:  Your Honor, if we could

10:10  9   side-bar?

10:10  10             THE COURT:  Yes.

10:10  11             (Bench conference.)

10:10  12             MR. HALES:  We have a stipulation not to

10:10  13  talk about the motherboard products or the server

10:10  14  products because they're represented by the desktop

10:10  15  products.

10:10  16             So when we pulled this image, we actually

10:10  17  obscured that this is an ASUS product just to make it

10:10  18  more generic and not run afoul of the stipulation we

10:10  19  have here.

10:10  20             So if he wants to get into, you know, is

10:10  21  this an ASUS product, has that been obscured, it'll

10:10  22  look nefarious when, in fact, it's just our attempt to

10:11  23  comply with the stipulation.

10:11  24             MR. BURESH:  Your Honor, he has testified

10:11  25  that that motherboard that we're looking at is in the

429

| | | |
|---|---|---|
| 10:11 | 1 | accused products. |
| 10:11 | 2 | MR. HALES:  It was done on a |
| 10:11 | 3 | demonstrative basis, not a this is the specific |
| 10:11 | 4 | motherboard that's in here. |
| 10:11 | 5 | MR. BURESH:  And I'm telling you that |
| 10:11 | 6 | that motherboard is not in the accused products, and |
| 10:11 | 7 | it's a very different architecture from even what the |
| 10:11 | 8 | expert has opined on other claim limitations. |
| 10:11 | 9 | MR. HALES:  This is a demonstrative, not |
| 10:11 | 10 | evidence. |
| 10:11 | 11 | MR. BURESH:  If they chose to monkey with |
| 10:11 | 12 | their demonstrative and use some different motherboard, |
| 10:11 | 13 | that's their problem. |
| 10:11 | 14 | MR. HALES:  Again, we're prohibited under |
| 10:11 | 15 | a stipulation from talking about what is in and not in |
| 10:11 | 16 | the motherboard, the capacities of the motherboards. |
| 10:11 | 17 | MR. BURESH:  And they could have taken a |
| 10:11 | 18 | picture from the accused products, as motherboards are |
| 10:11 | 19 | also freely available, if he wanted to do his analysis |
| 10:11 | 20 | correctly. |
| 10:11 | 21 | THE COURT:  We'll take a recess. |
| 10:11 | 22 | (Bench conference concludes.) |
| 10:11 | 23 | THE COURT:  Ladies and gentlemen, we're |
| 10:11 | 24 | going to take our morning recess.  Please remember my |
| 10:11 | 25 | instructions not to discuss the case amongst |

430

| | |
|---|---|
| 10:11 | 1 |
| 10:12 | 2 |
| 10:12 | 3 |
| 10:12 | 4 |
| | 5 |
| 10:12 | 6 |
| 10:12 | 7 |
| 10:12 | 8 |
| 10:12 | 9 |
| 10:12 | 10 |
| 10:12 | 11 |
| 10:12 | 12 |
| 10:12 | 13 |
| 10:13 | 14 |
| 10:13 | 15 |
| 10:13 | 16 |
| 10:13 | 17 |
| 10:13 | 18 |
| 10:13 | 19 |
| 10:13 | 20 |
| 10:13 | 21 |
| 10:13 | 22 |
| 10:13 | 23 |
| 10:13 | 24 |
| 10:13 | 25 |

1  yourselves.  We'll be back in 10 or 15 minutes.

2                    THE BAILIFF:  All rise.

3                    (Jury exited the courtroom.)

4                    THE COURT:  Thank you.  You may be

5  seated.

6                    You may step down.

7                    Okay.  If we could take up this issue

8  with respect to the motherboard, please.

9                    I'm happy to hear whatever y'all want to

10  argue with respect to -- explain to me what it is that

11  you're trying to put in with respect to the motherboard

12  and why you think they opened the door and why you

13  think the stipulation does not impact it.

14                    MR. BURESH:  Your Honor, with respect to

15  the accused products, they need to show certain

16  limitations are satisfied.  This has nothing to do with

17  motherboard accused products.  They need to show that

18  there's chips with certain architectures in the accused

19  products themselves.

20                    THE COURT:  Got it.

21                    MR. BURESH:  Okay?  The chips that they

22  chose to show to the jury are not chips from either of

23  the representative accused products.  They're just not.

24                    And part of Dr. Sarhan's analysis is

25  based upon the wrong chip, and part of it is based upon

10:13   1   the right chip.  They're not matched up.

10:13   2              And I don't know why that is.  I'm not

10:13   3   going to try and explain what the plaintiff's thinking

10:13   4   was.  But I'm just telling you the jury's entitled to

10:13   5   hear that the analysis he presented to them is not

10:13   6   based upon anything coming out of the accused products.

10:13   7              THE COURT:  That makes sense to me.

10:13   8              A response?

10:13   9              MR. HALES:  Your Honor.

10:13   10             (Interruption.)

10:13   11             MR. HALES:  Your Honor, the images that

10:14   12  he's attempting to use, some evidence of faulty -- I'm

10:14   13  sorry -- some showing faulty evidence were not offered

10:14   14  as evidence.  They were demonstratives of conclusions

10:14   15  that he's reached and which are uncontested and by

10:14   16  opposing expert in this case.

10:14   17             To say that we're faultily showing a CPU

10:14   18  or faultily showing a motherboard isn't the intent, and

10:14   19  it wasn't the testimony.  These are generic

10:14   20  demonstratives.

10:14   21             And the parties' stipulation here is that

10:14   22  for purposes of infringement, the parties will not

10:14   23  introduce evidence relating to represented products.

10:14   24             Motherboards are a represented product.

10:14   25  And for that reason, we decided it'd be best to put an

10:14    1    image of a motherboard just representative of the

10:14    2    specific motherboards found in these products.

10:14    3                    MR. BURESH:  Infringement evidence needs

10:14    4    to be limited to the representative accused products.

10:14    5    That's the stipulation.  And what the evidence they put

10:14    6    in in front of the jury, it's not coming out of the

10:15    7    representative accused products.  Plain and simple.

10:15    8                    Again, I don't care why they did what

10:15    9    they did.  The jury's entitled to hear that the

10:15    10   evidence that they were presented with is not from the

10:15    11   representative accused products.

10:15    12                    THE COURT:  Here's the problem, is I'm

10:15    13   not sure that the jury is -- I get your point and I

10:15    14   think it's legitimate.  I'm not sure that the jury's

10:15    15   following the point you're trying to make through that.

10:15    16   And is there a way -- is there a reason you can't just

10:15    17   ask him that directly and make that point?

10:15    18                    MR. BURESH:  I only got one question into

10:15    19   it, Your Honor.

10:15    20                    THE COURT:  Okay.  Well, the plaintiff's

10:15    21   concerned because they feel like they -- my sense is

10:15    22   they feel like they used a generic demonstrative to

10:15    23   make sure they did not run afoul of the stipulation.

10:15    24                    And so what I'm trying to thread the

10:15    25   needle here is if there's a way for you to make your

433

10:15    1    point, which I think, again, is legitimate, without

10:16    2    having to involve what the plaintiff had thought you

10:16    3    all had agreed to in the stipulation.

10:16    4                Is it requisite that you -- is it

10:16    5    necessary that you go through the mother- -- if it is,

10:16    6    then explain that to me, but is there a -- it seems to

10:16    7    me you could do a much more direct job of forcing the

10:16    8    issue about what he did and didn't look at and what he

10:16    9    has and hasn't told the jury.

10:16   10                MR. BURESH:  I can make it more direct.

10:16   11                THE COURT:  And would it involve the

10:16   12    motherboards that were shown in the demonstratives?

10:16   13                MR. BURESH:  Yeah.  It will.  I don't

10:16   14    know how else to do it.

10:16   15                THE COURT:  Okay.  Well, we'll -- you go

10:16   16    through it, and I'll do the best I can.

10:16   17                The plaintiff can make their objections,

10:16   18    but if the -- if your goal is to -- is tethered to

10:16   19    making it clear to the jury that he -- that he used

10:17   20    products that were not -- or features that are not in

10:17   21    the accused products, I don't see how I can stop you

10:17   22    from doing that.

10:17   23                Now, if the plaintiff wants to object

10:17   24    because there's something in a stipulation, I'll just

10:17   25    have to deal with that on a question-by-question basis.

434

| | | |
|---|---|---|
| 10:17 | 1 | MR. BURESH: Fair enough, Your Honor. |
| 10:17 | 2 | THE COURT: Now, let's go ahead and take |
| 10:17 | 3 | up the issues that we had that you wanted to take up |
| 10:17 | 4 | before trial. |
| 10:17 | 5 | MR. TAMKIN: Good morning, Your Honor. |
| 10:17 | 6 | Greg Tamkin on behalf of ACQIS. |
| 10:17 | 7 | The issue that we're taking up is a |
| 10:17 | 8 | series of demonstratives for a witness that'll come in |
| 10:18 | 9 | the first part of the defendants' case, Ajay or Ajay |
| 10:18 | 10 | Bhatt. |
| 10:18 | 11 | There are a whole series of |
| 10:18 | 12 | demonstratives, and the first one that causes an issue |
| 10:18 | 13 | is a four-minute video concerning Mr. Bhatt that |
| 10:18 | 14 | appears to be produced by something like CNN, where |
| 10:18 | 15 | it's a -- the video begins with a statement that |
| 10:18 | 16 | Mr. Bhatt is a rock star because he's a engineer who is |
| 10:18 | 17 | well-known for the invention of USB. |
| 10:18 | 18 | It goes on to spend the next four minutes |
| 10:18 | 19 | talking about Mr. Bhatt's accolades and how, you know, |
| 10:18 | 20 | fantastic USB is, and it all is generated by this |
| 10:18 | 21 | Mr. Bhatt. And Mr. Bhatt, in fact, signs autographs |
| 10:19 | 22 | and things of that nature. |
| 10:19 | 23 | Certainly I think that is not appropriate |
| 10:19 | 24 | for a -- not appropriate demonstrative for a variety of |
| 10:19 | 25 | reasons. A four-minute video that is effectively |

435

| | | |
|---|---|---|
| 10:19 | 1 | bolstering, which is character evidence, violates |
| 10:19 | 2 | Rule 404 in this case. |
| 10:19 | 3 | I also think certainly Mr. Bhatt can talk |
| 10:19 | 4 | about his history and things of that nature, but to |
| 10:19 | 5 | have a third party provide what's effectively a puff |
| 10:19 | 6 | piece on Mr. Bhatt would be -- |
| 10:19 | 7 | THE COURT:  I got it. |
| 10:19 | 8 | A response? |
| 10:19 | 9 | MR. UNDERWOOD:  Is it okay if I share? |
| 10:19 | 10 | MR. TAMKIN:  Yes. |
| 10:19 | 11 | MR. UNDERWOOD:  Your Honor, the video |
| 10:19 | 12 | he's describing introduces the work that Mr. Bhatt is |
| 10:19 | 13 | going to be discussing with the jury.  It's a |
| 10:19 | 14 | demonstrative.  We're not seeking to admit it into |
| 10:20 | 15 | evidence as an initial matter. |
| 10:20 | 16 | And what it does is it talks about his |
| 10:20 | 17 | background, and it talks about the work that he did in |
| 10:20 | 18 | developing USB 3 technology.  That is an accused |
| 10:20 | 19 | technology in this case. |
| 10:20 | 20 | And we are introducing Mr. Bhatt and his |
| 10:20 | 21 | work to the jury much in the same way that the |
| 10:20 | 22 | plaintiff introduced Dr. Chu and his work to the jury |
| 10:20 | 23 | when he took the stand. |
| 10:20 | 24 | Now, admittedly, there wasn't a |
| 10:20 | 25 | four-minute CNN video of Dr. Chu, but I imagine if |

```
10:20   1    there was, they would have wanted to show some of that
10:20   2    to the jury.  So we're doing the exact same thing here.
10:20   3            And with respect to the content of the
10:20   4    video, Your Honor, I think it's telling that the
10:20   5    plaintiffs agree that he can speak to these things.
10:20   6    They just don't want the fact to come in that it's --
10:20   7    he was featured in a commercial in a CNN video.
10:20   8            And briefly, Your Honor, with respect to
10:20   9    the bolstering argument, my understanding of their
10:21  10    bolstering argument is that the real problem arises
10:21  11    when you have a third-party witness speak to the
10:21  12    character for truthfulness or lack thereof with respect
10:21  13    to another witness, and that's simply not what's
10:21  14    happening here, Your Honor.
10:21  15            THE COURT:  Do you all have -- go ahead
10:21  16    and play the video.
10:21  17            MR. UNDERWOOD:  Derek, do we have the --
10:21  18    it'll take just a second, Your Honor.  I apologize.
10:21  19    Oh, yeah.
10:21  20            (Video played.)
10:22  21            THE COURT:  I'm good.  You can stop it.
10:22  22    This is not coming in.
10:23  23            What else are we taking up?  I mean, I
10:23  24    would want to put it in too.
10:23  25            (Laughter.)
```

| | | |
|---|---|---|
| 10:23 | 1 | MR. UNDERWOOD:  At least you understand |
| 10:23 | 2 | where we're going. |
| 10:23 | 3 | THE COURT:  Oh, I can understand why you |
| 10:23 | 4 | would want to put it in. |
| 10:23 | 5 | MR. TAMKIN:  Then you probably understood |
| 10:23 | 6 | the objection. |
| 10:23 | 7 | Okay.  A little bit less entertaining, |
| 10:23 | 8 | but certainly want to -- |
| 10:23 | 9 | THE COURT:  I think there's one of those |
| 10:23 | 10 | same videos about me somewhere. |
| 10:23 | 11 | (Laughter.) |
| 10:23 | 12 | THE COURT:  I'd want that in too.  So -- |
| 10:23 | 13 | MR. TAMKIN:  I want to walk through the |
| 10:23 | 14 | demonstratives, if we can put those up.  The Bhatt |
| 10:23 | 15 | demonstrative.  The revised demonstrative. |
| 10:23 | 16 | Okay.  There we go. |
| 10:24 | 17 | You've included 5, but I think 5 is out |
| 10:24 | 18 | now.  That's what you said yesterday?  It's just in |
| 10:24 | 19 | this -- the deck, but you're not going to show 5. |
| 10:24 | 20 | MS. MARRIOTT:  The timeline.  Yes. |
| 10:24 | 21 | MR. TAMKIN:  Okay.  Good. |
| 10:24 | 22 | Then the first one is No. 14.  And just |
| 10:24 | 23 | to give the Court a quick reminder, Mr. Bhatt was |
| 10:24 | 24 | originally designated as an expert.  There was some |
| 10:24 | 25 | discussion about him in a motion in limine, I believe. |

| | | |
|---|---|---|
| 10:24 | 1 | The Court ruled that he's not going to |
| 10:24 | 2 | testify about claim terms.  He's not going to |
| 10:24 | 3 | testify -- not going to provide expert opinion.  He's |
| 10:24 | 4 | going to provide factual opinion. |
| 10:24 | 5 | The reason for that, Your Honor, was |
| 10:24 | 6 | because Mr. Bhatt has now read the patents and then |
| 10:24 | 7 | would provide testimony about things like LVDS or about |
| 10:24 | 8 | backwards compatibility when those are claims and those |
| 10:24 | 9 | are issues in the case. |
| 10:24 | 10 | So if the Court ruled -- just to refresh |
| 10:24 | 11 | the Court's recollection, the Court was not going to |
| 10:24 | 12 | strike Mr. Bhatt entirely.  The Court was going to |
| 10:25 | 13 | limit his testimony.  And if he gets into something, |
| 10:25 | 14 | for -- I'm quoting Your Honor -- if he gets into |
| 10:25 | 15 | something, for example, with regard to LVDS, you don't |
| 10:25 | 16 | think that's admissible. |
| 10:25 | 17 | Likewise, if he spoke -- Mr. Buresh asked |
| 10:25 | 18 | you about, well, what if he raises backwards |
| 10:25 | 19 | compatible? |
| 10:25 | 20 | No.  That's expert testimony.  And that's |
| 10:25 | 21 | related to a PCI bus transaction.  So that would be a |
| 10:25 | 22 | claim term.  So for those reasons, that would not be |
| 10:25 | 23 | appropriate. |
| 10:25 | 24 | So now I want to talk about Slides 14 |
| 10:25 | 25 | through 18, which are a PCI bus transaction.  This -- |

—439—

10:25  1    what 14 through 18 show, here's 14, this is the start,

10:25  2    15.  And then it goes to 16.

10:25  3                And says:  PCI local bus cycle created in

10:25  4    the north bridge.

10:25  5                17 also is a PCI.  The cycle's then

10:26  6    broadcast onto PCI local bus.

10:26  7                And then the last one keeps that up and

10:26  8    it says:  And the addressed recipient takes action.

10:26  9                So this looks like -- well, this is

10:26  10   something different than a PCI local bus transaction.

10:26  11   But in fact, this is exactly what a PCI local bus

10:26  12   transaction is.

10:26  13               How do we know?  Because when these were

10:26  14   originally presented, Your Honor, what that said was

10:26  15   not a PCI local bus cycle created in the north bridge.

10:26  16   It actually said PCI local bus transaction created in

       17   north bridge.

10:26  18               If I can approach, Your Honor, I have the

10:26  19   original slide.

10:26  20               And so what they're having Mr. Bhatt do

10:26  21   is having Mr. Bhatt testify to what a PCI local bus

10:27  22   transaction is.  Obviously, if we heard the testimony

10:27  23   of Dr. Sarhan, a lot of the testimony most recently was

10:27  24   all about a PCI local bus transaction.  It is a claim

10:27  25   term.  The Court has construed that.

10:27  1           Mr. Bhatt has never looked at these

10:27  2  particular patents.  So the Court made it very clear,

10:27  3  he can't talk about claim terms.

10:27  4           This is a claim term that the

10:27  5  demonstrative seeks to have Mr. Bhatt talk about, and

10:27  6  this demonstrative is simply a changed version by

10:27  7  taking out the word "transaction" and putting in

10:27  8  "cycle" where the Court has already ruled he cannot

10:27  9  talk about claim terms.

10:27  10          So that is 14 through 18.

10:27  11          I want to briefly hit on, I think, 19

10:27  12  as -- or 19 is just the specification.

10:27  13          20, however, has the same issue.  20 is a

10:28  14  piece of that specification -- I'm sorry.  It's not 20.

10:28  15  20 is good.

10:28  16          It is -- I'm sorry -- 24 and 25 that

10:28  17  raise the exact same issue.

10:28  18          24 is, I think, the setup to 25.  And 25

10:28  19  is a PCI local bus intertwined protocol and signaling

10:28  20  slide that is a write transaction.  In other words,

10:28  21  this is an example of a PCI local bus transaction for

10:28  22  the write process.

10:28  23          Figure 3-6 illustrates a write

10:28  24  transaction.  So that what they're going to have --

10:28  25  this slide does is it has Mr. Bhatt testify or provide

441

10:28    1    some information about protocol and signaling and

10:28    2    something related to a PCI bus transaction.

10:28    3              And then the last issue where this comes

10:29    4    up, Your Honor, is Slides 29 through 34.

10:29    5              29 through 34 -- if we can just flip,

10:29    6    29 -- this is very similar to 14 through 18 that I

10:29    7    already referenced.  And this just walks through the

10:29    8    PCI Express transaction.

10:29    9              And if you walk through 19, 20.

10:29   10              This one actually does call it a PCI

10:29   11    Express transaction.  I will admit, Your Honor, PCI

10:29   12    Express transaction is not a claim term.  However, this

10:29   13    is the comparison to the other.

10:29   14              And so we know we're comparing PCI bus

10:29   15    transaction claim term, PCI Express transaction in

10:29   16    this -- these slides.

10:29   17              And if you can hit the next one.

10:29   18              They all talk about the PCI bus

10:29   19    transaction.

10:29   20              He's talking about a transaction in this

10:30   21    kind of a context.  Given that he's been excluded from

10:30   22    providing expert testimony and is providing fact

10:30   23    testimony, it's improper.  Certainly, it's improper to

10:30   24    talk about the claim terms when he hasn't read the

10:30   25    patents and he's not an expert.  And it's certainly

442

| 10:30 | 1 | improper to then compare it to another transaction in |
| 10:30 | 2 | this context. |
| 10:30 | 3 | THE COURT:  A response? |
| 10:30 | 4 | MR. BURESH:  Your Honor, Mr. Bhatt, as |
| 10:30 | 5 | I -- we talked about several months ago now, it's pure |
| 10:30 | 6 | fact testimony.  So there is a PCI local bus |
| 10:30 | 7 | specification that -- |
| 10:30 | 8 | THE COURT:  And he's going to explain how |
| 10:30 | 9 | it works? |
| 10:30 | 10 | MR. BURESH:  And he's going to explain |
| 10:30 | 11 | how it works. |
| 10:30 | 12 | THE COURT:  That's fine. |
| 10:30 | 13 | MR. BURESH:  And there's -- |
| 10:30 | 14 | THE COURT:  I'm okay with these |
| 10:30 | 15 | demonstratives. |
| 10:30 | 16 | MR. BURESH:  Thank you, Your Honor. |
| 10:30 | 17 | THE COURT:  Anything else?  Anything else |
| 10:30 | 18 | we need to take up? |
| 10:30 | 19 | MR. HALES:  Not to my knowledge, Your |
| 10:30 | 20 | Honor. |
| 10:30 | 21 | THE COURT:  We'll be back in a few |
| 10:30 | 22 | minutes. |
| 10:30 | 23 | THE BAILIFF:  All rise. |
| 10:30 | 24 | (Recess taken.) |
| 10:39 | 25 | THE BAILIFF:  All rise. |

10:39  1              THE COURT:  Please remain standing for

10:39  2     the jury.

10:39  3              (Jury entered the courtroom.)

10:40  4              THE COURT:  Thank you.  You may be

      5     seated.

10:40  6              MR. BURESH:  Mr. Palisoul, could you pull

10:40  7     up Slide 59 from the plaintiff's demonstratives,

10:40  8     please?

10:40  9              Thank you.

10:40  10             And could you zoom in on the picture of

10:40  11    the motherboard there?

10:40  12    BY MR. BURESH:

10:41  13       Q.    Do you see there, Dr. Sarhan, the branding

10:41  14    ASUS and it says Pro B660M?

10:41  15       A.    Yes.

10:41  16       Q.    That motherboard is not in either of the

10:41  17    representative accused products; is that correct?

10:41  18       A.    Yes.

10:41  19       Q.    This motherboard that you've depicted here, it

10:41  20    has Intel's 13th and 12th generation processors on it;

10:41  21    is that correct?

10:41  22       A.    Probably.

10:41  23             MR. BURESH:  If we could go to Slide 62.

      24    BY MR. BURESH:

10:41  25       Q.    For other claim limitations, you're pointing

—444—

| | | |
|---|---|---|
| 10:41 | 1 | to an architecture document from Intel that's |
| 10:41 | 2 | describing 8th and 9th generation Intel processors; is |
| 10:41 | 3 | that correct? |
| 10:41 | 4 | A.   Yes. |
| 10:41 | 5 | Q.   So what you're describing on this slide is |
| 10:42 | 6 | different than the motherboard that you're using for |
| 10:42 | 7 | other claim limitations, correct? |
| 10:42 | 8 | A.   You are talking about the report -- the |
| 10:42 | 9 | motherboard that just showed a little bit ago?  Are you |
| | 10 | talking about the motherboard that you showed a little |
| 10:42 | 11 | bit ago with the picture? |
| 10:42 | 12 | Q.   Well, I'm talking about the motherboard that |
| 10:42 | 13 | you showed.  But yes. |
| 10:42 | 14 | A.   Yeah.  Okay.  Yeah.  Yeah.  Say the question |
| 10:42 | 15 | again. |
| 10:42 | 16 | Q.   Sure. |
| 10:42 | 17 |      This architecture on Slide 62 with the 8th and |
| 10:42 | 18 | 9th generation Intel processors is a different |
| 10:42 | 19 | architecture than the motherboard that you also showed |
| 10:42 | 20 | to the jury that's not in the accused products, |
| 10:42 | 21 | correct? |
| 10:42 | 22 | A.   Yeah.  It's different than the picture. |
| 10:42 | 23 | Q.   Now, you offered some testimony about how ASUS |
| 10:42 | 24 | manufactures its products; is that correct? |
| 10:42 | 25 | A.   Yes. |

445

10:42  1      Q.    I believe you said that your belief was that

10:43  2  generally all the computers would be tested before they

10:43  3  would come out of the factory?

10:43  4      A.    Yes.

10:43  5      Q.    Now, you didn't offer the jury any proof of

10:43  6  that, did you?

10:43  7      A.    I mentioned that I saw some -- like, some

10:43  8  videos from -- from ASUS that shows that computers

10:43  9  undergo testing, a variety of testing so that -- to

10:43 10  ensure the best quality.

10:43 11      Q.    You didn't show the jury any of these videos?

10:43 12      A.    I did not.

10:43 13      Q.    And you didn't go check out the manufacturing

10:43 14  process, correct?

10:43 15      A.    Yeah.  I did not.

10:43 16      Q.    And you've never been involved in

10:43 17  manufacturing a computer during, well, your life,

10:43 18  correct?

10:43 19      A.    I served as an intern in a computer-making

10:43 20  company.

10:43 21      Q.    Have you been involved in the manufacturing

10:43 22  process?

10:43 23      A.    I was involved in the design but not in the

10:43 24  actual manufacturing.

10:43 25      Q.    So you're making some assumptions about what

446

10:43    1    happens during ASUSTeK's manufacturing process,

10:43    2    correct?

10:43    3        A.    Not assumptions, but...

10:44    4        Q.    Okay.

10:44    5              MR. BURESH:  Can we turn to Slide 140,

10:44    6    please?

10:44    7    BY MR. BURESH:

10:44    8        Q.    Now, this is your doctrine of equivalents

10:44    9    analysis; is that correct?

10:44    10       A.    Yes.

10:44    11       Q.    And here you're comparing PCI Express to the

10:44    12   old PCI local bus, correct?

10:44    13       A.    Address and data bits.  Yeah.

10:44    14       Q.    So is it your testimony that the new PCI

10:44    15   Express operates in the -- substantially the same way

10:44    16   as the old PCI local bus?  Is that your testimony?

10:44    17       A.    That -- say it again.  If you can make it more

10:44    18   specific, please.

10:44    19       Q.    Is it your testimony that the PCI Express

10:44    20   system operates in substantially the same way as the

10:44    21   PCI local bus that it replaced?

10:45    22       A.    Yeah.  I'm talking about the address and data

10:45    23   bits in this case.  Yeah.

10:45    24       Q.    So the way PCI Express works, in your opinion,

10:45    25   is substantially the same as the old PCI local bus?

447

10:45  1      A.    Again, here, I'm talking about address and

10:45  2  data bits in a PCI transaction.

10:45  3      Q.    And you say also that the result is

10:45  4  substantially the same, correct?

10:45  5      A.    Yes.

10:45  6      Q.    Now, let me grab one of your reports.  I'm

10:45  7  going to turn to your 6/27 report.

10:45  8           Do you have that in front of you, June 27th,

10:45  9  2022?

10:45  10     A.    You're talking about the infringement report?

10:45  11     Q.    Correct.

10:45  12     A.    Yeah.

10:45  13     Q.    I'm going to go to Page 124, which is

10:45  14  Paragraph 155.

10:45  15           MR. BURESH:  Can you pull that up for us?

      16  BY MR. BURESH:

10:46  17     Q.    Put it on the screen for you.

10:46  18           Is this your report, by the way?

10:46  19     A.    Yes.

10:46  20     Q.    Okay.

10:46  21           MR. BURESH:  Go to Paragraph 155, please.

10:46  22  BY MR. BURESH:

10:46  23     Q.    Now, you'd agree with me that the PCI local

10:46  24  bus, without any extensions, the max speed it reached

10:46  25  was 33 megahertz, correct?

—448—

10:46  1    A.    The PCI local bus, you're saying?

10:46  2    Q.    Yes.

10:46  3    A.    So we have like 33, 66, as you can see.

10:46  4    Q.    And I said without any extensions.

10:46  5          So the 33 megahertz, it operates at 133

10:46  6    megabits, correct?

10:46  7    A.    That's right.

10:46  8    Q.    That was the top speed of the 33-megahertz PCI

10:46  9    local bus, correct?

10:46  10    A.    That's right.

10:46  11    Q.    And the very original PCI Express bus

10:46  12    specification, the first one that came out, it was

10:46  13    operating at 5 gigabits per second, correct?

10:46  14    A.    That's correct.

10:46  15    Q.    So for the jury's sake, the difference between

10:47  16    that is 133 million for the old standard and 5 billion

10:47  17    for the new standard?

10:47  18    A.    Yes.

10:47  19    Q.    Those aren't the same results?

10:47  20    A.    There's a difference between results and

10:47  21    performance.

10:47  22          THE COURT:  Could you answer his

10:47  23    question?

10:47  24    A.    Okay.  Say the question again.

10:47  25          THE WITNESS:  I'm sorry, Judge.

449

| | | |
|---|---|---|
| 10:47 | 1 | A.    Yeah.  Go ahead. |
| 10:47 | 2 | BY MR. BURESH: |
| 10:47 | 3 | Q.    The difference between 133 million bits per |
| 10:47 | 4 | second and 5 billion bits per second, those two |
| 10:47 | 5 | systems, the old and the new, they don't generate the |
| 10:47 | 6 | same results, do they? |
| 10:47 | 7 | A.    I disagree. |
| 10:47 | 8 | Q.    Well, you'd agree with me that PCI Express is |
| 10:47 | 9 | a whole lot faster than PCI local bus? |
| 10:47 | 10 | A.    Yes. |
| 10:47 | 11 | Q.    And that the work that Mr. Bhatt and the |
| 10:47 | 12 | industry put in, it wasn't wasted, was it? |
| 10:47 | 13 | A.    No. |
| 10:47 | 14 | Q.    Because they substantially changed the |
| 10:47 | 15 | computer industry with their new technology, didn't |
| 10:47 | 16 | they? |
| 10:48 | 17 | A.    Yes. |
| 10:48 | 18 | Q.    In fact, the technology that Mr. Bhatt and the |
| 10:48 | 19 | rest of the industry developed is benefitting all of us |
| 10:48 | 20 | still today, is it not? |
| 10:48 | 21 | A.    Yes. |
| 10:48 | 22 | Q.    And the PCI local bus is obsolete, is it not? |
| 10:48 | 23 | A.    Still not -- yes. |
| 10:48 | 24 | Q.    Okay.  So it's your opinion, though, that an |
| 10:48 | 25 | obsolete technology and a "game-changing still |

450

10:48  1    benefitting us today" technology are substantially the

10:48  2    same thing?

10:48  3        A.    Here, I'm talking about -- like, please make

10:48  4    it specific to a certain context before he -- if you

10:48  5    can make the question more specific, please.

10:48  6        Q.    I withdraw the question.

10:48  7                MR. BURESH:  Your Honor, I pass the

10:48  8    witness.

10:48  9                    REDIRECT EXAMINATION

10:48  10   BY MR. HALES:

10:48  11       Q.    Dr. Sarhan, just a few questions for you.  I'm

10:49  12   going to go kind of in reverse order, just to highlight

10:49  13   how we'll proceed.

10:49  14             You spoke with my colleague in this case about

10:49  15   doctrine of equivalents analysis?

10:49  16       A.    Yes.

10:49  17       Q.    I believe he asked questions at kind of the

10:49  18   system level.  PCI Express is a system.  Is it

10:49  19   equivalent to the PCI local bus as a system?

10:49  20             Do you remember that line of questioning?

10:49  21       A.    Yes.

10:49  22       Q.    Is that the level at which you performed your

10:49  23   doctrine of equivalents analysis?

10:49  24       A.    So I focused on the PCI transactions.

10:49  25       Q.    And why did you focus on the transaction

—451—

10:49  1    itself instead of all of the elements of the system?

10:49  2         A.    Because the claim limitations themselves speak

10:49  3    about address and data bits of a PCI transaction.

10:49  4         Q.    And why does the claim limitation itself guide

10:49  5    your analysis?

10:49  6         A.    Yeah.  The -- so we have this claim

10:49  7    limitation, and we have -- I'm also instructed to look

10:49  8    at the Court construction.  So I read the claims, and

10:49  9    then I apply the Court construction.

10:49 10              And the Court construction clearly specifies,

10:50 11    as I showed the jury yesterday, and "in accordance"

10:50 12    includes compatibility, backwards compatibility.

10:50 13         Q.    Do any of the claims recite the entire PCI

10:50 14    local bus system?

10:50 15         A.    No.

10:50 16         Q.    Do any of the claims recite:  Do this at PCI

10:50 17    local bus speeds?

10:50 18         A.    No.

10:50 19         Q.    Okay.

10:50 20              MR. HALES:  If you could, please, Vicki,

10:50 21    bring up Slide 61 from Dr. Sarhan's slide deck.

      22              Thanks.

10:50 23              Can we wind it back a couple of slides?

10:50 24    BY MR. HALES:

10:50 25         Q.    So we see here a -- or we will.

452

10:50  1              MR. HALES:  Can we publish it to the

10:51  2    jury?  Thank you.

10:51  3              I'll start my question because I've never

10:51  4    asked a short one in my life.

       5    BY MR. HALES:

10:51  6       Q.    Here on Slide 59, we see a motherboard.

10:51  7             Do you see that?

10:51  8       A.    Yes.

10:51  9       Q.    Is this the same motherboard that appears on

10:51  10   various slides throughout your presentation?

10:51  11      A.    Say it again.

10:51  12      Q.    Is this the same image we'll see on other

10:51  13   slides throughout your presentation?

10:51  14      A.    Yes.

10:51  15      Q.    Why did you include this picture of this

10:51  16   motherboard in the presentation?

10:51  17      A.    So this is just for demonstrative purposes.

10:51  18      Q.    Did you rely on the architecture of this

10:51  19   specific motherboard to perform your analysis?

10:51  20      A.    No.  Not for these two products.  No.

       21      Q.    Okay.

10:51  22              MR. HALES:  Can we move forward one

10:51  23   slide?  Make it two slides, please.  One more, please.

10:51  24   BY MR. HALES:

10:51  25      Q.    Is this the computer architecture that you

| | | |
|---|---|---|
| 10:51 | 1 | relied on in your analysis? |
| 10:51 | 2 | A.    Yeah.  This is the one. |
| 10:51 | 3 | Q.    Where does this come from? |
| 10:52 | 4 | A.    From the 8th and 9th Generation Intel core |
| 10:52 | 5 | processor data sheet. |
| 10:52 | 6 | Q.    What processors do the accused products have? |
| 10:52 | 7 | A.    The same processors from the same generations. |
| 10:52 | 8 | Q.    Dr. Sarhan, have you analyzed the correct |
| 10:52 | 9 | computer architecture -- |
| 10:52 | 10 | A.    Of course. |
| 10:52 | 11 | Q.    -- in arriving at your conclusions? |
| 10:52 | 12 | A.    Of course. |
| 10:52 | 13 | Q.    Thank you. |
| 10:52 | 14 | Do you remember speaking with opposing counsel |
| 10:52 | 15 | about the concept of a console and the Court's |
| 10:52 | 16 | construction for a console? |
| 10:52 | 17 | A.    Yes. |
| 10:52 | 18 | Q.    Okay. |
| 10:52 | 19 | MR. HALES:  Vicki, can you bring up the |
| 10:52 | 20 | Court's claim construction portion of the jury |
| 10:52 | 21 | instructions, specifically the console construction? |
| 10:52 | 22 | BY MR. HALES: |
| 10:52 | 23 | Q.    While she's bringing it up, Dr. Sarhan, I |
| 10:52 | 24 | think you testified that a printer or an external hard |
| 10:52 | 25 | drive or other components under the Court's |

454

| | | |
|---|---|---|
| 10:52 | 1 | construction might be considered a console? |
| 10:52 | 2 | Do you remember that? |
| 10:52 | 3 | A.   Yes. |
| 10:52 | 4 | Q.   And opposing counsel kept going back into the |
| 10:53 | 5 | patent and into the -- you know, some of the portions |
| 10:53 | 6 | of the specification that discuss something called a |
| 10:53 | 7 | peripheral console. |
| 10:53 | 8 | Do you remember that? |
| 10:53 | 9 | A.   Yes. |
| 10:53 | 10 | Q.   Do the patents claim a peripheral console? |
| 10:53 | 11 | A.   No. |
| 10:53 | 12 | Q.   Okay.  They -- do they -- what do they claim |
| 10:53 | 13 | with respect to this console idea? |
| 10:53 | 14 | A.   Yeah.  So here, we saw in the claim |
| 10:53 | 15 | limitations connecting the computer to a console.  This |
| 10:53 | 16 | is what's being claimed. |
| 10:53 | 17 | Q.   Okay. |
| 10:53 | 18 | MR. HALES:  Let's zoom in, Vicki, on the |
| 10:53 | 19 | console construction. |
| 10:53 | 20 | BY MR. HALES: |
| 10:53 | 21 | Q.   Dr. Sarhan, I'd like for you to apply this |
| 10:53 | 22 | construction to a printer, for instance, and we'll see |
| 10:53 | 23 | if you faithfully applied it. |
| 10:53 | 24 | Does a printer have a chassis or enclosure? |
| 10:53 | 25 | A.   Yes. |

455

| | | |
|---|---|---|
| 10:53 | 1 | Q.    What would that be? |
| 10:53 | 2 | A.    So like whatever, like the housing that we see |
| 10:53 | 3 | the printer, it has a housing and it's -- everything's |
| 10:53 | 4 | included within that housing. |
| 10:53 | 5 | Q.    And what's within the housing? |
| 10:53 | 6 | A.    So we have components of computer system. |
| 10:53 | 7 | Q.    Okay.  Would that printer have one or more |
| 10:54 | 8 | coupling sites? |
| 10:54 | 9 | A.    Yes. |
| 10:54 | 10 | Q.    Okay.  What about an external hard drive? |
| 10:54 | 11 | Let's do the same analysis. |
| 10:54 | 12 | Would an external hard drive that I plugged |
| 10:54 | 13 | into my computer, would that have a chassis or |
| 10:54 | 14 | enclosure? |
| 10:54 | 15 | A.    Yes. |
| 10:54 | 16 | Q.    Would it have a coupling site? |
| 10:54 | 17 | A.    Yes. |
| 10:54 | 18 | Q.    What would that be? |
| 10:54 | 19 | A.    It's the port where you actually connect it to |
| 10:54 | 20 | the computer. |
| 10:54 | 21 | Q.    And would the interior of this external hard |
| 10:54 | 22 | drive have the components of a computer system? |
| 10:54 | 23 | A.    Yes. |
| 10:54 | 24 | Q.    And when connected to the computer, would the |
| 10:54 | 25 | computer recognize it as an available resource for that |

456

10:54  1    computer system?

10:54  2        A.    Yes.

10:54  3        Q.    Okay.  I recall you discussing with opposing

10:54  4    counsel the different layers that exist in PCI Express?

10:54  5        A.    Yes.

10:54  6        Q.    Okay.  Do any of the claim limitations recite

10:54  7    that the mechanical layer of PCI local bus needs to be

10:54  8    preserved in order to find infringement?

10:54  9        A.    No.

10:54  10       Q.    Okay.  And the mechanical layer would be the

10:54  11   actual connector itself?

10:54  12       A.    Yes.

10:54  13       Q.    Does the patent speak highly about the

10:54  14   connector of PCI local bus?

10:55  15       A.    Actually, yesterday when I explain this to the

10:55  16   jury, that the patents themselves that set the -- the

10:55  17   connector has so many wires, so many pins.  And one of

10:55  18   the main ideas of the patents are actually to get rid

10:55  19   of that connector, not to maintain the compatibility

10:55  20   with the same type of connector.  Something which is

10:55  21   actually better with fewer pins, with the fewer

10:55  22   conductive lines to address all these problems.

10:55  23       Q.    Do we need to preserve the connector to

10:55  24   maintain backward compatibility as that would be

10:55  25   understood in view of the asserted patents?

457

```
10:55   1        A.    No.  And this is not.

10:55   2        Q.    What about the physical layer?  We discussed

10:55   3   the idea that the physical layer of PCI local bus

10:55   4   required 47 or more wires.

10:55   5             Do you remember this conversation?

10:55   6        A.    Yes.

10:55   7        Q.    Did the patent contemplate to maintain

10:55   8   backward compatibility, we need to keep all of those

10:55   9   wires?

10:55   10       A.    It's actually the opposite.  Also, like

10:55   11  yesterday when I discuss this to and explained it to

10:55   12  the jury, I said this is actually the main problems

10:55   13  disclosed in the patents about the PCI local bus

10:55   14  specification.

10:55   15            So the whole idea -- one of the whole -- the

10:56   16  main idea is actually to get rid of like so many of

10:56   17  these wires.  Instead of having this huge number of

10:56   18  wires, we're going to have something which is more

10:56   19  cable friendly, has fewer conductive lines.

10:56   20       Q.    We looked at a book during the discussion

10:56   21  between you and opposing counsel about the idea that

10:56   22  there is no hardware compatibility between PCI local

10:56   23  bus and PCI Express.

10:56   24            Do you remember that testimony?

10:56   25       A.    Yes.
```

458

10:56  1       Q.    Do the patents contemplate that we will

10:56  2   maintain hardware compatibility with Dr. Chu's

10:56  3   invention relative to the 47 pins and lines that were

10:56  4   required in PCI local bus?

10:56  5       A.    No.  This is actually one of the shortcomings

10:56  6   of the PCI local bus that the patents saw and, like,

10:56  7   wanted to get rid of.

10:56  8       Q.    I think in the course of that conversation, we

10:56  9   kind of went up the stack of layers but stopped at

10:56  10  software.

10:56  11          Dr. Sarhan, do you understand that -- or what

10:56  12  is your understanding as it relates to software

10:56  13  compatibility between PCI local bus and PCI Express?

10:56  14      A.    The software compatibility, based on all the

10:57  15  papers that I read -- I read a huge number of

10:57  16  industrial papers from different companies, Dell,

10:57  17  et cetera -- all of them mention the -- this software

10:57  18  compatibility as one of the main reasons why PCI

10:57  19  Express became as successful as it became right now.

10:57  20      Q.    Preserving software compatibility, was that a

10:57  21  large benefit for PCI Express?

10:57  22      A.    Exactly.

10:57  23      Q.    Why?

10:57  24      A.    So as I mentioned earlier, developing

10:57  25  operating systems, developing software, it takes time.

10:57  1    So many like -- like myself, I'm sure the jury

10:57  2    sometimes, you know, they keep waiting for some sort of

10:57  3    update to fix certain issues.  Like drivers, they take

10:57  4    a long time to update.  And we -- we have certain

10:57  5    problems with that.

10:57  6         So the main -- one of the main ideas of PCI

10:57  7    Express is actually to develop new hardware that can

10:57  8    work with existing operating systems with -- without

10:57  9    any modification, with existing drivers without

10:57  10   modifications.

10:57  11        And this is why PCI Express incorporated --

10:58  12   utilized a PCI-compatible software model.  These are

10:58  13   not my words.  This is from the -- the standard

10:58  14   specification for PCI Express.

10:58  15   Q.    I heard you emphasize "compatible" in your

10:58  16   answer.  Why did you lay emphasis on that word?

10:58  17   A.    Yeah.  Because this is the -- compatibility is

10:58  18   a central issue here.  I'm instructed as an expert to

10:58  19   observe and follow the Court construction, the Court

10:58  20   construction of the PCI bus transaction that says "in

10:58  21   accordance with," and then explains that to say in

10:58  22   accordance includes compatibility.

10:58  23        It does not say includes hardware

10:58  24   compatibility; it says includes backwards

10:58  25   compatibility.

460

10:58  1          MR. HALES:  Vicki, can we bring up the
10:58  2    same claim construction sheet, but look at the PCI
10:58  3    limitation, please?
10:58  4    BY MR. HALES:
10:58  5        Q.   Dr. Sarhan, do you understand this to be one
10:58  6    of the limitations in dispute in the course of your
10:58  7    writing your report and the cross-examination?
10:58  8        A.   Yes.
10:58  9        Q.   Okay.  This construction, does it require --
10:59  10   well, I -- let me ask you this:  What does it mean when
10:59  11   the Court says to look for:  A transaction in
10:59  12   accordance with the industry standard PCI local bus
10:59  13   specification for communication with interconnected
10:59  14   peripheral components?
10:59  15         And I want to put a finer point on it.  Does
10:59  16   this dictate that we have to have hardware
10:59  17   compatibility, in your view?
10:59  18       A.   No.
10:59  19       Q.   Why not?
10:59  20       A.   So here, like, it clearly states in
10:59  21   accordance.  See, we have this word, right?
10:59  22         And it says:  In accordance includes backward
10:59  23   compatibility.
10:59  24         It does not recite a specific type of
10:59  25   compatibility.

—461—

```
10:59   1        Q.    Let me ask a new question.
10:59   2              What is the thing itself for which we are
10:59   3    searching for backward compatibility?  Is that found
10:59   4    here in this construction?
10:59   5        A.    Yes.  Here, we're talking about the -- like,
10:59   6    basically it says:  A transaction in accordance with
10:59   7    the industry standard of PCI local --
10:59   8        Q.    Thank you.
        9        A.    Yeah.
       10        Q.    Thank you.
10:59  11              So you said "a transaction in accordance."
       12        A.    Yes.
10:59  13        Q.    What is the transaction of PCI local bus?  Is
11:00  14    that its hardware?
11:00  15        A.    No.  It's the software, the software aspect.
11:00  16        Q.    And is software compatible between these two
11:00  17    systems?
11:00  18        A.    Yes.
11:00  19        Q.    If I have loaded PCI local bus software onto a
11:00  20    CPU or, rather, the CPU will run that old software, can
11:00  21    that CPU speak to connected PCI Express endpoints?
11:00  22        A.    That's right.
11:00  23        Q.    Can they speak back to that CPU?
11:00  24        A.    Yes.
11:00  25        Q.    Do any of the asserted claims in this case
```

11:00  1    require a full PCI bus transaction?

11:00  2        A.    No.

11:00  3        Q.    What is the transaction language that we see

11:00  4    again and again in the claims?

11:00  5        A.    So the claims themselves provide great clarity

11:00  6    about this.  The claim -- the start of the claims, they

11:00  7    say:  To convey address and data bits of a PCI

11:00  8    transaction.

11:00  9              So here, they specify address and data bits.

11:00  10   We're not talking about the control signals.  We're not

11:00  11   talking about a full -- a full PCI transaction.

11:01  12       Q.    Are the address and data bits of a PCI Express

11:01  13   transaction qualitatively different from those of a PCI

11:01  14   local bus transaction?

11:01  15       A.    No.  They are in accordance.  As I described

11:01  16   yesterday, they are in according to -- in accordance.

11:01  17       Q.    Are the address and data bits of a PCI Express

11:01  18   transaction backward compatible with PCI local bus?

11:01  19       A.    Yes.

11:01  20              MR. HALES:  Just one moment, Your Honor.

11:01  21              That's all I have.  Thank you.

11:01  22              MR. BURESH:  Nothing further, Your Honor.

11:01  23              THE COURT:  You may step down.

11:01  24              THE WITNESS:  Thank you.

11:01  25              THE COURT:  Next witness?

11:01  1          MS. AMSTUTZ:  Your Honor, plaintiff calls

11:01  2   Barbara Chen, the corporate representative of ASUSTeK

11:02  3   Computer, Inc.

11:02  4          (The witness was sworn.)

11:02  5               DIRECT EXAMINATION

11:02  6   BY MS. AMSTUTZ:

11:03  7      Q.    Good morning.  Please introduce yourself to

11:03  8   the jury.

11:03  9      A.    Good morning.  My name's Barbara Chen.  I work

11:03  10  at ASUSTeK, one of the defendants in this case.

11:03  11     Q.    And, Ms. Chen, you're actually with ASUSTeK

11:03  12  Computer, Inc.; is that correct?

11:03  13     A.    Yes.  It's correct.

11:03  14     Q.    And ASUSTeK Computer, Inc. is a publicly

11:03  15  traded company in Taiwan, right?

11:03  16     A.    Yes.

11:03  17          MS. AMSTUTZ:  Vicki, can we pull up the

11:03  18  beginning of the demonstrative?

11:03  19  BY MS. AMSTUTZ:

11:03  20     Q.    And instead of referring to that entity as

11:03  21  ASUSTeK Computer, Inc. each time, which is kind of a

11:03  22  mouthful, can we agree that I'll just refer to it as

11:03  23  ASUSTeK?

11:03  24     A.    Yes.  We can.

11:03  25     Q.    And you're employed by ASUSTeK?

464

11:04  1        A.    Yes.

11:04  2        Q.    And you're the director of the dispute

11:04  3   resolution team there?

11:04  4        A.    Yes.  I am.

11:04  5        Q.    And the dispute resolution team falls within

11:04  6   the legal -- I'm sorry -- let me do it right -- Legal

11:04  7   Affairs Center; is that right?

       8        A.    Yes.

11:04  9        Q.    And is that basically the legal department?

11:04  10       A.    Could you please be more specific?

11:04  11       Q.    Sure.

11:04  12             Is the function of the Legal Affairs Center to

11:04  13  provide legal services to ASUSTeK and its subsidiaries?

11:04  14       A.    Yes.

11:04  15       Q.    And you realize that ASUSTeK got to pick one

11:04  16  person to represent it at this trial and you're that

11:04  17  person?

11:04  18       A.    Yes.

11:04  19       Q.    Now, there's another defendant in the case

11:04  20  called ASUS Global Pte. Limited.

11:04  21             You're aware of that?

11:04  22       A.    Yes.  I am.

11:04  23       Q.    And that company is commonly referred to as

11:04  24  ASGL; is that right?

11:05  25       A.    Yes.

11:05    1        Q.    And ASGL is a wholly owned subsidiary of
11:05    2    ASUSTeK, right?
11:05    3        A.    Yes.
11:05    4        Q.    And by wholly owned, you know I mean
11:05    5    100 percent, correct?
11:05    6        A.    Correct.
11:05    7        Q.    And are you familiar with a third company
11:05    8    called ASUS Computer International?
11:05    9        A.    Yes.
11:05   10        Q.    And that's known as ACI, right?
11:05   11        A.    Yes.
11:05   12        Q.    And ACI is also a wholly owned subsidiary of
11:05   13    ASUSTeK?
11:05   14        A.    Yes.
11:05   15        Q.    Now, if I refer to --
11:05   16              MS. AMSTUTZ:    Can we add that to the --
        17    there you go.
        18    BY MS. AMSTUTZ:
11:05   19        Q.    If I refer to this group of ASUS companies,
11:05   20    ASUSTeK, ASGL, and ACI, as the "ASUS group," will you
11:05   21    understand what I'm referring to if I use that phrase?
11:05   22        A.    Yes.
11:05   23        Q.    Now, let's talk about -- we've built this org
11:06   24    chart.  Let's talk about the roles and responsibilities
11:06   25    of each of these entities with regard to the accused

466

11:06    1    products in this case.

11:06    2            Are you with me?

11:06    3    A.    Yes.

11:06    4    Q.    And when I use the phrase "accused products,"

11:06    5    you understand that I'm referring to the ASUS products

11:06    6    that ACQIS, my client, claims infringe its patents?

11:06    7    A.    I'm going to say ASUS-branded products,

11:06    8    because ASUS is a brand.

11:06    9    Q.    Okay.  Well, I'll clarify.

11:06    10           When I say "accused products," you know I'm

11:06    11   referring to ASUS-branded products that my client ACQIS

11:06    12   claims infringe its patents?

11:06    13   A.    Yes.

11:06    14   Q.    Okay.  So let's start with the top level

11:06    15   company, your employer, ASUSTeK.

11:06    16           ASUSTeK is in charge of designing the accused

11:06    17   products; isn't that right?

11:06    18   A.    Yes.

11:06    19   Q.    And after ASUSTeK designs the accused

11:07    20   products, it then sends its specifications and its

11:07    21   instructions to manufacturers that it chooses to

11:07    22   actually make the products?

11:07    23   A.    Yes.

11:07    24   Q.    And so while ASUSTeK designs the accused

11:07    25   products, it doesn't actually make the products, right?

467

11:07  1      A.    Right.

11:07  2      Q.    And these manufacturers that it chooses, those

11:07  3  are third parties that aren't affiliated in any way

11:07  4  with ASUSTeK other than by a contract?

11:07  5      A.    Right.

11:07  6      Q.    And, Ms. Chen, all of those third-party

11:07  7  contract manufacturers are located outside of the

11:07  8  United States, correct?

11:07  9      A.    Correct.

11:07 10      Q.    And is it fair to say that most of those

11:07 11  third-party manufacturers are located in mainland

11:07 12  China?

11:07 13      A.    I think, yes.  But because of the

11:07 14  international politics, so most of them -- some of them

11:08 15  moved to different places like India or Vietnam.

11:08 16      Q.    That's fair enough.

11:08 17            But the majority, most of these third-party

11:08 18  manufacturers are in mainland China, correct?

11:08 19      A.    Yes.

11:08 20      Q.    So we've established that ASUSTeK's role and

11:08 21  responsibilities are to design and instruct the

11:08 22  manufacturers.

11:08 23            Is that a fair summary?

11:08 24      A.    Yes.

11:08 25      Q.    Okay.  Let's move on to the roles and

468

| | | |
|---|---|---|
| 11:08 | 1 | responsibilities of ACI. |
| 11:08 | 2 | Do you see that? |
| 11:08 | 3 | A.   Yes. |
| 11:08 | 4 | Q.   ACI is the exclusive distributor of |
| 11:08 | 5 | ASUS-branded products in the United States; isn't that |
| 11:08 | 6 | correct? |
| 11:08 | 7 | A.   Yes. |
| 11:08 | 8 | Q.   And when I say "exclusive," I mean the only |
| 11:08 | 9 | distributor? |
| 11:08 | 10 | A.   Yes. |
| 11:08 | 11 | Q.   And you're aware that ASUSTeK acquired ACI |
| 11:08 | 12 | back in the Year 2000, right? |
| 11:08 | 13 | A.   Yes. |
| 11:08 | 14 | Q.   And ACI has been the exclusive and only |
| 11:09 | 15 | distributor of ASUS-branded products since 2000? |
| 11:09 | 16 | A.   Yes. |
| 11:09 | 17 | Q.   And as you understand it, the reason that |
| 11:09 | 18 | ASUSTeK bought ACI was to expand its business in the |
| 11:09 | 19 | United States, correct? |
| 11:09 | 20 | A.   Yes. |
| 11:09 | 21 | Q.   And that's because ACI only sells ASUS-branded |
| 11:09 | 22 | products, right? |
| 11:09 | 23 | A.   Yes. |
| 11:09 | 24 | Q.   It doesn't sell other manufactured computers |
| 11:09 | 25 | like Dell or Samsung, right? |

—469—

11:09  1        A.    That's correct.

11:09  2        Q.    And ACI only sells ASUS-branded products in

11:09  3   the United States.  It doesn't sell beyond the borders

11:09  4   of the U.S.?

11:09  5        A.    I would not put it that way.  I'm not sure

11:09  6   about like Canada.

11:09  7        Q.    Okay.  That's a good clarification.

11:09  8              So quite possibly in North America?

11:09  9        A.    Yes.

11:09 10        Q.    But ACI does not sell ASUS-branded products

11:09 11   beyond North America; is that fair?

11:10 12        A.    Yes.

11:10 13        Q.    So now we've established that ACI's role and

11:10 14   responsibility in this process is to order the products

11:10 15   and distribute them in the U.S.?

11:10 16        A.    Yes.

11:10 17        Q.    Okay.  Would you agree with me, Ms. Chen, that

11:10 18   the United States is a pretty important market for a

11:10 19   tech company like ASUSTeK?

11:10 20        A.    Yes.

11:10 21        Q.    Okay.  Let's talk about ASUSTeK's other

11:10 22   subsidiary, ASGL, and its role and responsibility,

11:10 23   okay?

11:10 24        A.    Okay.

11:10 25        Q.    I've heard ASGL referred to as a global

470

| | | |
|---|---|---|
| 11:10 | 1 | logistics arm. |
| 11:10 | 2 | Would you agree with that characterization? |
| 11:10 | 3 | For ASUSTeK, of course. |
| 11:10 | 4 | A.   I think yes. |
| 11:10 | 5 | Q.   And ASUSTeK was formed -- or I think you've |
| 11:11 | 6 | used the word before "built" -- back in 2013, correct? |
| 11:11 | 7 | A.   Yes. |
| 11:11 | 8 | Q.   And there were a couple of reasons why ASGL |
| 11:11 | 9 | was built by ASUSTeK. |
| 11:11 | 10 | Do you agree with that? |
| 11:11 | 11 | A.   Yes. |
| 11:11 | 12 | Q.   And the first one was to collect orders for |
| 11:11 | 13 | ASUS-branded products, right? |
| 11:11 | 14 | A.   Yes. |
| 11:11 | 15 | Q.   And the second reason that ASGL was built in |
| 11:11 | 16 | 2013 was to arrange to ship those products, those |
| 11:11 | 17 | ASUS-branded products, to their final destination? |
| 11:11 | 18 | A.   Yes. |
| 11:11 | 19 | Q.   So now just to complete our org chart, we've |
| 11:11 | 20 | established that the responsibilities of ASGL are to |
| 11:11 | 21 | receive the orders and ship the orders; is that fair? |
| 11:11 | 22 | A.   If I may, I can give you some clarification |
| 11:11 | 23 | here. |
| 11:11 | 24 | Q.   Well, you're going to have an opportunity to |
| 11:12 | 25 | do that with your counsel if it needs. |

471

11:12  1              Do you understand my question?

11:12  2       A.    Yes.  I -- so I think the short answer is yes.

11:12  3       Q.    Okay.  Okay.  So now that we've established

11:12  4    who does what between ASUSTeK, ACI, and ASGL, I want to

11:12  5    kind of switch gears and help the jury understand how

11:12  6    these AS -- I'm sorry -- ASUS-branded products actually

11:12  7    get to the United States.  Okay?

11:12  8              Are you with me?

     9       A.    Okay.

11:12  10      Q.    The process starts with ACI as the exclusive

11:12  11   distributor for the United States sending its order for

11:12  12   ASUS-branded products to ASGL; is that correct?

11:12  13      A.    Yes.

11:12  14      Q.    And ASGL is located in Singapore, correct?

11:12  15      A.    Yes.

11:12  16      Q.    So ASGL in Singapore receives an order for X

11:12  17   number of ASUS-branded products from ACI and then sends

11:13  18   it to ASUSTeK in Taiwan; is that right?

11:13  19      A.    Yes.

11:13  20      Q.    And then once the order is in Taiwan, ASUSTeK

11:13  21   designs the order products and then sends the

11:13  22   specifications and instructions to the manufacturers

11:13  23   mainly in China, right?

11:13  24      A.    No.

11:13  25      Q.    Well, I think you just testified that

472

11:13  1   ASUSTeK's job is to design and then send the

11:13  2   specifications and instructions to the manufacturers?

11:13  3       A.   Because we design the products first and then

11:13  4   we receive the orders.  But according to this

11:13  5   flowchart, it's like -- it's more like they place the

11:13  6   order for us, then we design the products.

11:13  7       Q.   Okay.  So I just had the order and the design

11:13  8   process backwards.

11:13  9       A.   Okay.

11:13 10       Q.   Is that right?

11:13 11       A.   Yes.

11:14 12       Q.   Okay.  But other than that, this flowchart

11:14 13   thus far is accurate?

11:14 14       A.   Yes.

11:14 15       Q.   Okay.  And then the manufacturer, which is

11:14 16   mainly in China but could be in India or Vietnam --

11:14 17       A.   Yes.

11:14 18       Q.   -- they manufacture and assemble and make the

11:14 19   products, correct?

11:14 20       A.   Yes.

11:14 21       Q.   And isn't it true at this point, Ms. Chen,

11:14 22   when the manufacturer is making the ASUS-branded

11:14 23   products, the manufacturer actually owns the products?

11:14 24       A.   Yes.

11:14 25       Q.   But once the products are ready to ship, the

| | | |
|---|---|---|
| 11:14 | 1 | manufacturer transfers title to the products to ASGL; |
| 11:14 | 2 | is that right? |
| 11:14 | 3 | A.    Yes. |
| 11:14 | 4 | Q.    And when I say "transfer title," do you |
| 11:14 | 5 | understand that to mean transfer ownership of the |
| 11:14 | 6 | products? |
| 11:14 | 7 | A.    Yes. |
| 11:14 | 8 | Q.    But even though at that point ASGL owns the |
| 11:15 | 9 | products, it never takes physical possession of them, |
| 11:15 | 10 | does it? |
| 11:15 | 11 | A.    Sorry.  Could you please repeat your question? |
| 11:15 | 12 | Q.    Sure. |
| 11:15 | 13 | Once the manufacturer transfers ownership to |
| 11:15 | 14 | the products, they now belong to ASGL, right? |
| 11:15 | 15 | A.    Yeah. |
| 11:15 | 16 | Q.    Correct? |
| 11:15 | 17 | A.    Yes. |
| 11:15 | 18 | Q.    But ASGL never really takes possession of the |
| 11:15 | 19 | products? |
| 11:15 | 20 | A.    That's correct. |
| 11:15 | 21 | Q.    Instead, ASGL arranges for them to get on some |
| 11:15 | 22 | kind of forwarding method, whether it be a ship or some |
| 11:15 | 23 | kind of other transportation, to get to their final |
| 11:15 | 24 | destination? |
| 11:15 | 25 | A.    Yes. |

474

11:15  1    Q.   And then isn't it true with regard to products

11:15  2    that are going to the United States, at that point ASGL

11:15  3    transfers title to ACI, right?

11:15  4    A.   Yes.

11:15  5    Q.   And from there, ACI is responsible for

11:15  6    importing and marketing and selling the ASUS-branded

11:16  7    products in the U.S.?

11:16  8    A.   No.  According to this flowchart, no.

11:16  9    Q.   Well, once ACI takes title of the ASUS-branded

11:16  10   products, it's their responsibility to get them into

11:16  11   the U.S., market them, and sell them, correct?

11:16  12   A.   Yes, but ACI takes title when the products are

11:16  13   loaded on the ship.  So it's not just when they arrive

11:16  14   in the U.S.

11:16  15   Q.   I understand that's ASUSTeK's position, but

11:16  16   that when title exchanges may be in dispute.

11:16  17   A.   Okay.

11:16  18   Q.   But the fact of the matter is title goes from

11:16  19   ASGL to ACI in the shipment process, whether at the

11:16  20   beginning or the end, and at that point it's ACI's

11:16  21   responsibility to get them into the U.S., market them,

11:16  22   and sell them?

11:16  23   A.   Yes.

11:16  24   Q.   So kind of wrapping this up, even though

11:16  25   ASUSTeK designs the products and arranges for them to

11:17  1    be manufactured, they never take title to them,

11:17  2    correct?

11:17  3        A.    Correct.

11:17  4        Q.    And they never take possession of them?

11:17  5        A.    Yes.

11:17  6        Q.    So is it fair to say, Ms. Chen, that without

11:17  7    using their subsidiaries, ASGL and ACI, ASUSTeK can't

11:17  8    get products to the United States?  Is that correct?

11:17  9        A.    Correct.

11:17  10       Q.    And if ASUSTeK wanted to get products to the

11:17  11   United States without using its subsidiaries, ASGL and

11:17  12   ACI, it would have to do it itself, correct?

11:17  13       A.    No.

11:17  14       Q.    Well, the process requires ACI and ASGL as it

11:17  15   exists today, correct?

11:17  16       A.    Yes.

11:17  17       Q.    And if you take them out of the mix, ASUSTeK

11:18  18   can't get the products to the U.S. without doing it

11:18  19   themselves, correct?

11:18  20       A.    Yes.  According to the current role.

11:18  21            MS. AMSTUTZ:  Your Honor, we're going to

11:18  22   discuss some financial information of the -- of

11:18  23   defendants.  So we should go on the confidential

11:18  24   record.

11:18  25            THE COURT:  If anyone is not under the

476

| 11:18 | 1 | protective order, please step out of the courtroom. |
|---|---|---|

11:18    1    protective order, please step out of the courtroom.

11:18    2                    (Sealed proceedings.)

11:18    3                    MS. AMSTUTZ:  Can we pull up J-18?  To

11:18    4    the witness only, please.

11:18    5                    Vicki, can I have it in the Excel

11:18    6    spreadsheet format, please?

11:18    7    BY MS. AMSTUTZ:

11:19    8        Q.    Okay.  Ms. Chen, can you see this Excel

11:19    9    spreadsheet?

11:19    10       A.    Yes.

11:19    11       Q.    And you've seen this spreadsheet before,

11:19    12   haven't you?

11:19    13       A.    Yes.

11:19    14       Q.    And you recognize that this is a report

11:19    15   generated by ACI for the sales and revenue of ACI --

11:19    16   ASUS-branded products that came into the United States

11:20    17   during the particular period of time?

11:20    18       A.    Yes.

11:20    19       Q.    And ACI creates these reports, correct?

11:20    20       A.    Yes.

11:20    21       Q.    And you know that ACI creates these

11:20    22   reports because they routinely send them to the Legal

11:20    23   Affairs Center when y'all need sales and

11:20    24   revenues -- revenue data for lawsuits that are filed

11:20    25   against ASUS in the United States?

—477—

11:20  1      A.    For the lawsuit against ASUSTeK in the United

11:20  2  States.  Yes.

11:20  3      Q.    That's yes?  Okay.

11:20  4            And you're aware that ACI generates these

11:20  5  reports about every quarter or every three months out

11:20  6  of the year?

11:20  7      A.    Yes.

11:20  8      Q.    And is it true that when the Legal Affairs

11:20  9  Center gets one of these sales and revenues reports

11:20  10  from ACI, there's someone within the organization that

11:20  11  goes into the report and pulls out the information

11:20  12  about the accused products in a particular lawsuit?

11:21  13      A.    Yes.

11:21  14      Q.    And you know that with regard to J-18, this is

11:21  15  the sales report that was generated when ACQIS sued

11:21  16  ASUSTeK and someone within your organization went in

11:21  17  and pulled out the accused products, correct?

11:21  18      A.    Yes.

11:21  19            MS. AMSTUTZ:  Now, Your Honor, I move to

11:21  20  admit J-18.

11:21  21            MR. UNDERWOOD:  No objection.

11:21  22            THE COURT:  Admitted.

11:21  23  BY MS. AMSTUTZ:

11:21  24      Q.    Okay.  So looking at the sales report, we see

11:21  25  that it contains --

478

11:21  1              MS. AMSTUTZ:  Well, actually, Vicki, can

11:21  2   you highlight the tab that shows the date of this sales

11:21  3   report?

11:22  4              There we go.  That's the one.  You're on

11:22  5   the right one.

11:22  6              (Off-the-record discussion.)

11:22  7   BY MS. AMSTUTZ:

11:22  8      Q.   Do you see, Ms. Chen, towards the bottom left

11:22  9   of the spreadsheet, where there's a tab that says 16Q2

11:22  10  versus 20Q4?

11:22  11     A.   Yes.

11:22  12     Q.   And do you understand that to mean the second

11:22  13  quarter of 2016 through the fourth quarter of 2020?

11:22  14     A.   Yes.

11:22  15     Q.   And you were present during Dr. Sarhan's

11:22  16  testimony yesterday and today, right?

11:22  17     A.   Yes.

11:22  18     Q.   And he testified that there were about 576

11:22  19  accused ASUS-branded products in this lawsuit, right?

11:22  20     A.   Yes.

11:22  21     Q.   And he also testified and you're aware that

11:22  22  the parties have agreed to narrow down to two

11:23  23  representative products, correct?

11:23  24     A.   Yes.

11:23  25     Q.   And there's a laptop and there's a desktop?

—479—

11:23    1        A.    Yes.

11:23    2        Q.    And the laptop has the model number GL504GV.

11:23    3              I don't expect you've committed that to

11:23    4    memory, but do you have any reason to disagree with

11:23    5    that?

11:23    6        A.    No.

11:23    7        Q.    And same with the desktop, it has a model

11:23    8    number S340MF.

11:23    9              Again, without having committed it to your

11:23   10    memory, do you have any reason to dispute that?

11:23   11        A.    No.

11:23   12        Q.    And those would have been among the accused

11:23   13    products that someone from your team would have gone

11:23   14    into the sales report and culled out so that they could

11:23   15    put the sales report and revenue report that accurately

11:23   16    reflected the accused products in this case?

11:23   17        A.    Yes.

11:23   18        Q.    Now, let's look at a couple of examples of

11:23   19    those representative products in this spreadsheet,

11:23   20    okay?

11:24   21              MS. AMSTUTZ:  Vicki, can you please

11:24   22    highlight Row 2823, Columns AO and AP?

11:24   23    BY MS. AMSTUTZ:

11:24   24        Q.    Okay.  Ms. Chen, here in the sales report, we

11:24   25    see information about a gaming notebook with the model

480

11:24  1  number GL504GV.

11:24  2         Do you see that?

11:24  3  A.    Yes.

11:24  4  Q.    And in Columns AO and AP -- we'll start with

11:24  5  AO.

11:24  6         AO has the sales quantity of █████; is that

11:24  7  correct?

11:24  8  A.    Yes.

11:24  9  Q.    And then in Column AP, there's a revenue

11:24  10  amount of just shy of ████████, correct?

11:24  11  A.    Yes.

11:24  12  Q.    And this is the type of information you would

11:24  13  expect to see in one of these ACI sales and revenue

11:24  14  reports regarding ASUS-branded products sold in the

11:25  15  U.S.?

11:25  16  A.    Yes.

11:25  17  Q.    Let's look at one more example.

11:25  18         MS. AMSTUTZ:  Vicki, can you highlight

11:25  19  Row 3833 and Row 3834, Columns BD and BE?

11:25  20  BY MS. AMSTUTZ:

11:25  21  Q.    Okay.  Ms. Chen, similarly, we see sales

11:25  22  information for a commercial desktop.

11:25  23         Do you see that?

11:25  24  A.    Yes.

11:25  25  Q.    With the model number S340MF, correct?

481

11:25  1        A.    Yes.

11:25  2        Q.    And then in Columns BD and BE, we see the

11:25  3    sales and revenues for those products in the second

11:25  4    quarter of 2020.

11:25  5              Do you see that?

11:25  6        A.    Yes.

11:25  7        Q.    And if you add up both -- I mean, sorry --

11:25  8    both rows, it's about ███ units, correct?

11:25  9        A.    Yes.

11:25 10        Q.    For roughly about ███████, if that's expressed

11:25 11    in dollars, right?

11:25 12        A.    Yes.

11:25 13        Q.    And if we were to F5 and search through this

11:26 14    Excel spreadsheet, we would see other examples for

11:26 15    other quarters covered by 2016 and 2020 for these same

11:26 16    two representative products, correct?

11:26 17        A.    Yes.

11:26 18        Q.    And to be clear, the numbers in the sales and

11:26 19    revenue report, they reflect actual numbers as opposed

11:26 20    to some kind of budget or projection or estimate,

11:26 21    right?

11:26 22        A.    Yes.  Actual -- ACI's number.  Yes.

11:26 23        Q.    And ACI is the one that sold the products in

11:26 24    the U.S., right?

11:26 25        A.    Yes.

11:26  1      Q.    And you have no reason to doubt the accuracy

11:26  2  of these numbers in this spreadsheet, correct?

11:26  3      A.    No.

11:26  4      Q.    So would you agree with me that based on the

11:26  5  information in the ACI spreadsheet that is provided to

11:26  6  the Legal Affairs Center during this lawsuit, that at

11:27  7  least one or more of the accused products in this case

11:27  8  were sold in the United States from at least the second

11:27  9  quarter of 2016 through the fourth quarter of 2020?

11:27  10     A.    Yes.

11:27  11     Q.    Okay.

11:27  12            MS. AMSTUTZ:  Your Honor, we can go off

11:27  13  the confidential record.

11:27  14            THE COURT:  Thank you, ma'am.

09:42  15            (Sealed proceedings end.)

11:27  16  BY MS. AMSTUTZ:

11:27  17     Q.    Okay.  Ms. Chen, you're aware that each year

11:27  18  ASUSTeK submits an annual report for itself and its

11:27  19  subsidiaries, correct?

11:27  20     A.    Yes.

11:27  21     Q.    And you're familiar with those annual reports,

11:27  22  aren't you?

11:27  23     A.    Yes.

11:27  24     Q.    And you understand that because ASUSTeK is a

11:27  25  publicly traded company, those annual reports are also

11:27  1   publicly available?

11:27  2       A.   Yes.

11:27  3       Q.   And you also understand that ASUSTeK is in

11:27  4   control of what information goes into the annual

11:28  5   report?

11:28  6       A.   Yes.

11:28  7       Q.   Knowing that it will be public for the world

11:28  8   to see, correct?

11:28  9       A.   Yes.

11:28  10      Q.   And you agree that the information that

11:28  11  ASUSTeK puts into its annual report should be accurate

11:28  12  information?

11:28  13      A.   Yes.

11:28  14      Q.   And you understand that the information that

11:28  15  ASUSTeK puts in its annual report should be -- should

11:28  16  include honest disclosures to the public?

11:28  17      A.   Yes.

11:28  18      Q.   And you have no reason to believe that ASUSTeK

11:28  19  has ever put anything in its annual report that was not

11:28  20  accurate or honest; is that right?

11:28  21      A.   Right.

11:28  22      Q.   Okay.

11:28  23           MS. AMSTUTZ:  Can we pull up P-95?

      24  BY MS. AMSTUTZ:

11:28  25      Q.   Okay.  Ms. Chen, I have a notebook in front of

—484—

11:28  1    you that has the documents, but I'll also pull them up

11:29  2    on the screen.  So whatever's easier or more

11:29  3    comfortable for you, okay?

11:29  4       A.    Okay.

11:29  5       Q.    But I've pulled up the first page of P-95.

11:29  6    Can you see that on your screen?

11:29  7       A.    Correct.

11:29  8       Q.    And do you recognize this as the first page of

11:29  9    the -- ASUSTeK's annual report for 2020?

11:29  10      A.    Yes.

11:29  11      Q.    And if you look in your notebook, there's a

11:29  12   full copy if you need to reference that, okay?

11:29  13      A.    Okay.

11:29  14            MS. AMSTUTZ:  Move to admit P-95.

11:29  15            MR. UNDERWOOD:  No objection.

11:29  16            THE COURT:  Admitted.

11:29  17   BY MS. AMSTUTZ:

11:29  18      Q.    And you agree that Exhibit P-95 is an example

11:29  19   of an annual report that ASUSTeK submits on behalf of

11:29  20   itself and its subsidiary?

11:30  21            Just in general, does it look like the type of

11:30  22   annual report?

11:30  23      A.    Yes.

11:30  24      Q.    Okay.

11:30  25            MS. AMSTUTZ:  Okay.  Can we pull up P-48,

485

11:30    1    please?

11:30    2    BY MS. AMSTUTZ:

11:30    3        Q.    Okay.  Ms. Chen, I pulled up Exhibit P-48, but

11:30    4    the first page for whatever is blacked out, so if you

11:30    5    wouldn't mind looking into your notebook.

11:30    6            Do you recognize, just based on the second

11:30    7    page of P-48, that this is another example of an annual

11:30    8    report by ASUSTeK?

11:30    9        A.    Yes.

11:30   10        Q.    And this one is for the Year 2019; is that

11       right?

11:31   12            Let me do this first and we'll get into more

11:31   13    details.

11:31   14                MS. AMSTUTZ:  Move to admit P-48.

11:31   15        A.    The first page is in -- is black, so I need to

11:31   16    check the page.

11:31   17    BY MS. AMSTUTZ:

11:31   18        Q.    That's okay.  I'll walk you through it.

11:31   19        A.    Okay.

11:31   20                MS. AMSTUTZ:  Move to admit P-48.

11:31   21                MR. UNDERWOOD:  No objection.

11:31   22                MS. AMSTUTZ:  Thank you.

11:31   23                THE COURT:  Admitted.

11:31   24    BY MS. AMSTUTZ:

11:31   25        Q.    So you understand that one purpose of these

486

11:31  1    ASUSTeK --

11:31  2              MS. AMSTUTZ:  Can we publish, Ms. Clark?

11:31  3              Okay.  Thank you.

     4    BY MS. AMSTUTZ:

11:31  5        Q.    I'll go ahead and start my question.

11:31  6              You understand one purpose of these annual

11:31  7    reports is for ASUSTeK to communicate to its

11:31  8    shareholders?

11:31  9        A.    Yes.

11:31  10       Q.    And to its investors?

11:31  11       A.    Yes.

11:31  12       Q.    Okay.

11:31  13             MS. AMSTUTZ:  If we can move to the

11:31  14   letter to the shareholders at Page P-48-5.

     15    BY MS. AMSTUTZ:

11:31  16       Q.    And again, it's up on your screen as well,

11:31  17   Ms. Chen.  Whatever's easier for you.

11:31  18             Do you see that this is the letter to the

11:31  19   shareholders in the 2019 annual report?

11:31  20       A.    Yes.

11:31  21             MS. AMSTUTZ:  And if we go ahead and go

11:32  22   to the third page -- it's a three-page letter.  If we

11:32  23   go to the third page at P-48-7.

     24    BY MS. AMSTUTZ:

11:32  25       Q.    You see that it's signed by the ASUS chairman,

487

11:32  1    correct?

11:32  2        A.    Yes.

11:32  3              MS. AMSTUTZ:  Now, let's go back to the

11:32  4    first page of the letter to the shareholders at P-48-5.

       5    BY MS. AMSTUTZ:

11:32  6        Q.    And I'll direct you to the first statement

11:32  7    that the ASUS chairman makes in this annual report.

11:32  8              And it says:  I would like to begin by

11:32  9    expressing my gratitude to all investors for your

11:32  10   longstanding support for ASUS.

11:32  11             Correct?

11:32  12       A.    Yes.

11:32  13       Q.    And throughout this letter, and you're welcome

11:32  14   to flip through the three pages that are in your

11:32  15   notebook, the chairman of ASUS constantly refers to the

11:32  16   company as ASUS.

11:32  17             Do you see that?

11:32  18       A.    Yes.

11:32  19       Q.    And I'll represent to you that in this

11:33  20   three-page letter, the chairman uses ASUS roughly 20

11:33  21   times.

11:33  22             Does that look about right based on the

11:33  23   highlighting?

11:33  24       A.    Yes.

11:33  25       Q.    But he doesn't reference ASUSTeK even once in

—488—

11:33    1    this letter; isn't that correct?

11:33    2        A.    Correct.

11:33    3        Q.    So would you agree with me that when ASUS is

11:33    4    used in the context of these annual reports, the

11:33    5    chairman's referring to ASUSTeK and its subsidiaries as

11:33    6    one group?

11:33    7        A.    Yes.

11:33    8            MS. AMSTUTZ:    Now, let's turn to P-48 at

11:34    9    346.

10    BY MS. AMSTUTZ:

11:34    11        Q.    And if you want to look in your notebook,

11:34    12    Ms. Chen, I put a red tape flag for you, but we're also

11:34    13    going to pull it up.

11:34    14        A.    Okay.

11:34    15        Q.    Do you see that this is a table in the 2019

11:34    16    annual report entitled ASUSTeK Computer, Inc. and

11:34    17    Subsidiaries?    It starts with that title.

11:34    18            Do you see that?

11:34    19        A.    Yes.

11:34    20            MS. AMSTUTZ:    And can we pull out the

11:34    21    title, Vicki?    That would be great.

11:34    22    BY MS. AMSTUTZ:

11:34    23        Q.    And then it goes on to say:    Names, locations,

11:34    24    and related information of investees over which the

11:34    25    company exercises significant influence.

489

11:34  1           Do you see that rest of the title?

11:34  2       A.    Yes.

11:34  3       Q.    And this is for the year ended December 31st

11:34  4   of 2019, correct?

11:34  5       A.    Yes.

11:34  6       Q.    Does that give you a comfort level that this

11:34  7   is the 2019 annual report, that date?

11:34  8       A.    Yes.

11:34  9       Q.    And you understand the word "company" here

11:35  10  refers to ASUSTeK?

11:35  11      A.    Yes.

11:35  12      Q.    And what follows in this table is a list of

11:35  13  entities over which ASUSTeK "exercises significant

11:35  14  influence."

11:35  15          Would you agree with that?

11:35  16      A.    Yes.

11:35  17      Q.    And if we go down into the table, you see that

11:35  18  the first entity, the first subsidiary that's listed is

11:35  19  ACI; is that right?

11:35  20      A.    Yes.

11:35  21      Q.    And it confirms that the company ASUSTeK owns

11:35  22  100 percent of it, right?

11:35  23      A.    Yes.

11:35  24      Q.    And then if we go down to the sixth entity

11:35  25  listed -- I believe it's six -- or eight, you see ASGL

490

11:35  1    as a subsidiary that's included in the table confirming

11:35  2    100 percent ownership by ASUSTeK, correct?

11:35  3         A.    Yes.

11:35  4         Q.    And so would you agree with me, Ms. Chen, that

11:36  5    in this 2019 annual report, ASUSTeK is not only

11:36  6    disclosing to its shareholders and investors but

11:36  7    disclosing to the world that ACI and ASGL are two

11:36  8    subsidiaries over which it exercises significant

11:36  9    influence?

11:36  10        A.    Yes.

11:36  11        Q.    Okay.

11:36  12              MS. AMSTUTZ:  If we can turn to Page

11:36  13   P-48-194 of the same 2019 annual report.

      14   BY MS. AMSTUTZ:

11:36  15        Q.    This is under a heading called Summary of

11:36  16   Significant Accounting Policies.

11:36  17              Do you see that?

11:36  18        A.    Yes.

11:36  19        Q.    And if we go down to Paragraph 3A(A), this

11:36  20   paragraph starts out by saying:  All subsidiaries are

11:36  21   included in the group's consolidated financial

11:37  22   statements.  Subsidiaries are all entities, including

11:37  23   structured entities, controlled by the group.

11:37  24              Did I read that correctly?

11:37  25        A.    Yes.

11:37   1          Q.    And is it your understanding that "group" is
11:37   2    referring to the ASUS group?
11:37   3          A.    Yes.
11:37   4          Q.    It goes on to say:  The group controls an
11:37   5    entity when the group is exposed, or has rights, to
11:37   6    variable returns from its involvement with the entity
11:37   7    and has the ability to affect those returns through its
11:37   8    power over the entity.
11:37   9          Did I read that correctly?
11:37  10          A.    Yes.
11:37  11          Q.    And similar to the last table that we looked
11:37  12    at, when you follow down on the same portion of the
11:37  13    annual report, you see a table of companies or
11:37  14    subsidiaries that are included in the -- in this
11:38  15    portion of the annual report.
11:38  16          Do you see that?
11:38  17          A.    Yes.
11:38  18          Q.    And the -- let's see.
11:38  19          The first company listed again is ACI,
11:38  20    correct?
11:38  21          A.    Yes.
11:38  22          Q.    And then I believe this is the one where the
11:38  23    sixth company that's listed is ASGL.
11:38  24          Do you see that?
11:38  25          A.    Yes.

11:38  1      Q.    And would you agree with me that the

11:38  2   subsidiaries included in the consolidated financial

11:38  3   statements relate back to that paragraph that we just

11:38  4   read?

11:38  5      A.    Yes.

11:38  6      Q.    Because they relate to the consolidated

11:38  7   financial statement, let's look at a sample of one of

11:38  8   those.

11:38  9            MS. AMSTUTZ:  Can we pull up P-841,

11:38  10  please?

11:38  11  BY MS. AMSTUTZ:

11:39  12     Q.    Okay.  Ms. Chen, do you see the first page of

11:39  13  P-841 on your screen?

11:39  14     A.    Yes.

11:39  15     Q.    And it's entitled Consolidated Financial

11:39  16  Statements and it's dated December 31st, 2020 and 2019.

11:39  17           Do you see that?

11:39  18     A.    Yes.

11:39  19           MS. AMSTUTZ:  Move to admit P-841.

11:39  20           MR. UNDERWOOD:  No objection.

11:39  21           THE COURT:  Admitted.

11:39  22  BY MS. AMSTUTZ:

11:39  23     Q.    Okay.  If we turn to P-841-17 in the

11:39  24  consolidated financial statements and we go to

11:39  25  Paragraph A, do you see that it contains that same

11:40  1    language that we just read in the annual report about

11:40  2    the control and power over certain subsidiaries?

11:40  3        A.    Yes.

11:40  4        Q.    And again, in the consolidated financial

11:40  5    statement, if we go further down the page on P-841-17,

11:40  6    we see that the first entity listed is ACI, correct?

11:40  7        A.    Yes.

11:40  8        Q.    And if we go to the next page, we see that the

11:40  9    first entity listed there is ASGL.

11:40  10        Do you see that?

11:40  11        A.    Yes.

11:40  12        Q.    Okay.

11:40  13            MS. AMSTUTZ:    Okay.  We can pull that

11:40  14    down.  Thank you.

11:40  15    BY MS. AMSTUTZ:

11:40  16        Q.    Okay.  I want to go back to your role as the

11:40  17    director of the dispute resolution team within the

11:40  18    Legal Affairs Center.  Okay?

11:40  19        A.    Okay.

11:40  20        Q.    Now, the Legal Affairs Center handles all the

11:40  21    legal matters for ASUSTeK; is that right?

11:41  22        A.    Yes.

11:41  23        Q.    The department that you direct, the dispute

11:41  24    resolution team, handles all of the patent-related

11:41  25    disputes; is that right?

494

11:41  1        A.    Yes.

11:41  2        Q.    And that dispute resolution team handles

11:41  3   patent-related disputes worldwide?

11:41  4        A.    Yes.

11:41  5        Q.    And those patent-related disputes include

11:41  6   patent lawsuits filed in the United States, correct?

11:41  7        A.    Correct.

11:41  8        Q.    And given that the dispute resolution team

11:41  9   handles patent disputes worldwide, then it would handle

11:41 10   patent disputes that are brought that involve their

11:41 11   subsidiaries too, correct?

11:41 12        A.    Yes.

11:41 13        Q.    Now, these patent-related disputes that your

11:41 14   team handles, they also include offers to license?

11:41 15        A.    Yes.

11:41 16        Q.    And you know that ASUSTeK takes licenses from

11:42 17   patent owners in the United States?

11:42 18        A.    Yes.

11:42 19        Q.    And your team is actually responsible for

11:42 20   negotiating those patent licenses, correct?

11:42 21        A.    Yes.

11:42 22        Q.    And isn't it true that when ASUSTeK negotiates

11:42 23   a patent license, it insists that that patent license

11:42 24   cover its subsidiaries as well?

11:42 25        A.    I will not put it that way.

495

| | | |
|---|---|---|
| 11:42 | 1 | Q.    Okay.  Let me ask it one more time. |
| 11:42 | 2 | Generally in your license agreement that |
| 11:42 | 3 | ASUSTeK negotiates, you will insist that patent rights |
| 11:42 | 4 | cover your subsidiaries, correct? |
| 11:42 | 5 | A.    Again, I would not put it that way. |
| 11:43 | 6 | Q.    Okay.  In front of you in the smaller |
| 11:43 | 7 | notebook -- |
| 11:43 | 8 | A.    Okay. |
| 11:43 | 9 | Q.    -- is a copy of a deposition transcript. |
| 11:43 | 10 | Ms. Chen, do you recall being deposed -- |
| 11:43 | 11 | A.    Yes. |
| 11:43 | 12 | Q.    -- in connection with this case? |
| 11:43 | 13 | A.    Yes. |
| 11:43 | 14 | Q.    And in that deposition, you testified, just |
| 11:43 | 15 | like you are today, as the corporate representative of |
| 11:43 | 16 | ASUSTeK, correct? |
| 11:43 | 17 | A.    Yes. |
| 11:43 | 18 | Q.    And that deposition occurred on May 2nd of |
| 11:43 | 19 | 2022. |
| 11:43 | 20 | Do you see in your notebook that's the date on |
| 11:43 | 21 | the front of your transcript? |
| 11:43 | 22 | A.    Yes. |
| 11:43 | 23 | Q.    And one of ASUSTeK's lawyers was there |
| 11:43 | 24 | representing you? |
| 11:43 | 25 | A.    I think it's Mr. Schmidt. |

| | | |
|---|---|---|
| 11:43 | 1 | Q.    Oh, Mr. Schmidt, he was there representing |
| 11:43 | 2 | you, correct? |
| 11:43 | 3 | A.    Yes. |
| 11:43 | 4 | Q.    And one of the lawyers from ACQIS was asking |
| 11:43 | 5 | questions? |
| 11:43 | 6 | A.    Yes. |
| 11:43 | 7 | Q.    And there was a court reporter there taking |
| 11:43 | 8 | down your testimony just like we have one here today? |
| 11:43 | 9 | A.    Yes. |
| 11:43 | 10 | Q.    And you were under oath at that time, right? |
| 11:43 | 11 | A.    Yes. |
| 11:44 | 12 | Q.    I'm going to direct you, Ms. Chen, to Page 19. |
| 11:44 | 13 | A.    Okay. |
| 11:44 | 14 | Q.    At Lines 12 through 19. |
| 11:44 | 15 | A.    Okay. |
| 11:44 | 16 | Q.    Are you with me? |
| 11:44 | 17 | A.    Yes. |
| 11:44 | 18 | Q.    Okay. |
| 11:44 | 19 | Question:  All right.  And do those licenses |
| 11:44 | 20 | typically apply to ASUSTeK alone or to the entire ASUS |
| 11:44 | 21 | group? |
| 11:44 | 22 | Answer:  I think ASUSTeK will take a license, |
| 11:44 | 23 | but generally in our agreement, in our license |
| 11:44 | 24 | agreement, we will insist that the patent rights cover |
| 11:44 | 25 | our subsidiaries or the products that we sell to the |

—497—

11:44  1    United States.

11:44  2        A.    Yes.

11:44  3        Q.    And you're aware that ASUSTeK has some patents

11:45  4    of its own in the United States, correct?

11:45  5        A.    Yes.

11:45  6        Q.    So is it fair to say that ASUSTeK recognizes

11:45  7    the importance of intellectual property rights?

11:45  8        A.    Yes.

11:45  9        Q.    And is it fair to say that ASUSTeK will take

11:45  10   measures to protect and enforce those rights if it

11:45  11   believes an entity is infringing on its patents?

11:45  12       A.    In the United States?

11:45  13       Q.    In the United States.

11:45  14       A.    I think yes.

11:45  15       Q.    Going back to the dispute resolution team, the

11:45  16   patent-related disputes that they handle also include

11:45  17   warning or notice letters, right?

11:45  18       A.    Yes.

11:45  19       Q.    And when I say "notice letters," do you

11:45  20   understand that I'm referring to a letter that a patent

11:45  21   owner sends to ASUSTeK advising them of the existence

11:46  22   of their patents and other information?

11:46  23       A.    Yes.

11:46  24       Q.    And you understand that notice letters can be

11:46  25   sent in a variety of ways.  They can be sent by snail

498

11:46  1    mail or FedEx or DHL, something like that?

11:46  2        A.    Yes.

11:46  3        Q.    And you're aware of how the mail was processed

11:46  4    back in May of 2018; is that right?

11:46  5        A.    Yes.

11:46  6        Q.    And in general, mail that was addressed to

11:46  7    ASUS in Taiwan would go to a -- kind of a central

11:46  8    mailroom; is that fair?

11:46  9        A.    Yes.

11:46  10       Q.    And that was true whether the mail came in the

11:46  11   old-fashioned way, through the post office, or if it

11:46  12   came in through FedEx, right?

11:46  13       A.    Yes.

11:46  14       Q.    And then once the mail got to the mailroom, it

11:46  15   would be delivered to whoever was listed as the

11:46  16   recipient on that mail?

11:46  17       A.    Yes.

11:46  18       Q.    And, for example, if the mail was addressed to

11:46  19   the CEO of ASUS, it would then be routed to the CEO's

11:47  20   office, correct?

11:47  21       A.    Yes.

11:47  22       Q.    And if the mail had to do with a

11:47  23   patent-related dispute, it would eventually make its

11:47  24   way from the CEO's office to your team at the dispute

11:47  25   resolution center -- I mean -- sorry -- dispute

499

11:47  1    resolution team.

11:47  2        A.    Yes.

11:47  3        Q.    And at that point the Legal Affairs Center

11:47  4    would actually make a record that the mail was received

11:47  5    at the Legal Affairs Center?

11:47  6        A.    Yes.

11:47  7        Q.    But back in 2018, that was not true for mail

11:47  8    that was received in the central mailroom, correct?

11:47  9        A.    Correct.

11:47  10       Q.    They didn't keep records of what they got, did

11:47  11   they?

11:47  12       A.    You mean the mail center or the --

11:47  13       Q.    The mailroom.

11:47  14       A.    The mailroom.  Well, they never keep any

11:47  15   record of the mail we received at ASUSTeK.

11:47  16       Q.    Okay.  Let me ask my question differently

11:47  17   because I think we may be talking past each other.

11:48  18             Back in 2018, if something came into the

11:48  19   central mailroom at ASUS in Taiwan, there was not a

11:48  20   procedure where they made a record of that mail; is

11:48  21   that fair?

11:48  22       A.    You mean the mailroom or the Legal Affairs

11:48  23   Center?

11:48  24       Q.    I'm talking about the central mailroom.

11:48  25       A.    No.  They don't keep a record of that.

500

| | | |
|---|---|---|
| 11:48 | 1 | Q.    Okay.  And to your knowledge, back in 2018, |
| 11:48 | 2 | the CEO's office did not make records of the mail that |
| 11:48 | 3 | was routed from the mailroom to the CEO's office, |
| 11:48 | 4 | correct? |
| 11:48 | 5 | A.    Correct. |
| 11:48 | 6 | MS. AMSTUTZ:  Can we pull up PX-50, which |
| 11:48 | 7 | is already in evidence? |
| 11:48 | 8 | BY MS. AMSTUTZ: |
| 11:48 | 9 | Q.    Okay.  Ms. Chen, can you see PX-50 on your |
| 11:48 | 10 | monitor? |
| 11:48 | 11 | A.    Yes. |
| 11:49 | 12 | Q.    Okay.  And this is a -- you were here for |
| 11:49 | 13 | Dr. Chu's testimony, correct? |
| 11:49 | 14 | A.    Yes. |
| 11:49 | 15 | Q.    And this is the letter that he discussed in |
| 11:49 | 16 | his testimony, dated May 15th, 2018, that he sent to |
| 11:49 | 17 | Mr. Jerry Shen, the director and chief executive |
| 11:49 | 18 | officer of ASUS. |
| 11:49 | 19 | Do you recognize this as the letter that he |
| 11:49 | 20 | testified about? |
| 11:49 | 21 | A.    Yes. |
| 11:49 | 22 | Q.    And do you agree that back in May of 2018 |
| 11:49 | 23 | Mr. Shen was the director and chief executive officer |
| 11:49 | 24 | of ASUS? |
| 11:49 | 25 | A.    Yes. |

501

```
11:49   1        Q.    And you heard Dr. Chu, his testimony about
11:49   2   receiving confirmation from FedEx that this letter was
11:49   3   delivered to ASUS on May 18th of 2018.
11:49   4           Do you remember that testimony?
11:49   5        A.    Yes.
11:49   6              MS. AMSTUTZ:  Let's pull up PX-838, which
11:50   7   is already in evidence.
11:50   8   BY MS. AMSTUTZ:
11:50   9        Q.    And Dr. Chu testified about this shipment
11:50  10   information report that he received from FedEx.
11:50  11           Do you recall that testimony?
11:50  12        A.    Yes.
11:50  13        Q.    And he testified about the signature stamp in
11:50  14   the bottom right corner.
11:50  15           Do you see that on -- on the exhibit?
11:50  16        A.    Yes.
11:50  17        Q.    And you recall that testimony?
11:50  18        A.    Yes.
11:50  19        Q.    And he testified that because he can read
11:50  20   Chinese, he knew that this signature stamp was from
11:50  21   someone with the last name Lee?
11:50  22        A.    Yes.
11:50  23        Q.    And he actually, for the jury, provided the
11:50  24   full name of the person that signed this with the
11:50  25   stamp.
```

502

| | | |
|---|---|---|
| 11:50 | 1 | Do you recall that? |
| 11:50 | 2 | A.    Yes. |
| 11:50 | 3 | Q.    And he testified that he believed the notation |
| 11:50 | 4 | of 15:30 was military time for 3:30 p.m. |
| 11:51 | 5 | Do you disagree with that? |
| 11:51 | 6 | A.    No. |
| 11:51 | 7 | Q.    Now, it's ASUSTeK's position that no one read |
| 11:51 | 8 | this letter back in May of 2018; isn't that correct? |
| 11:51 | 9 | A.    That's correct. |
| 11:51 | 10 | MS. AMSTUTZ:  Can we pull PX-50 back up, |
| 11:51 | 11 | please? |
| 11:51 | 12 | BY MS. AMSTUTZ: |
| 11:51 | 13 | Q.    Going back to the letter, Ms. Chen, would you |
| 11:51 | 14 | agree with me that had someone at ASUS read this letter |
| 11:51 | 15 | back in May of 2018, they would have seen that it |
| 11:51 | 16 | referenced licensing? |
| 11:51 | 17 | Do you see that in the subject line? |
| 11:51 | 18 | A.    Yes. |
| 11:51 | 19 | Q.    And if you go down to the second paragraph, if |
| 11:51 | 20 | anybody had read this letter in May of 2018, they would |
| 11:51 | 21 | have seen that it was -- that Dr. Chu was telling them |
| 11:51 | 22 | that his patents were relevant to PCI Express, USB 3.0, |
| 11:52 | 23 | and other communication technology, right? |
| 11:52 | 24 | A.    Yes.  That's what it says here. |
| 11:52 | 25 | Q.    Okay.  And going down to the third paragraph, |

11:52  1    if anyone read this letter in May of 2018, they would

11:52  2    have seen that Dr. Chu was advising ASUS that the

11:52  3    patent portfolio had been tested in various venues.

11:52  4         Do you see that?

11:52  5    A.    Yes.

11:52  6    Q.    And then turning to the second page, if anyone

11:52  7    had read this letter in May of 2018, they would have

11:52  8    seen a list of ACQIS' patents, wouldn't they?

11:52  9    A.    Yes.

11:52  10   Q.    And they would have seen a list of the

11:52  11   ASUS-branded products that ACQIS accused of infringing

11:52  12   its patents, wouldn't they?

11:52  13   A.    No.  It does not say infringing.

11:53  14   Q.    Okay.  Fair enough.

11:53  15        They would have seen a list of ASUS-branded

11:53  16   products that Dr. Chu wanted ASUS to check out to see

11:53  17   if they infringed his patents?

11:53  18   A.    I do not see infringing here, so the answer is

11:53  19   no.

11:53  20   Q.    Okay.  I didn't ask you if you see the word

11:53  21   "infringe."

11:53  22   A.    Okay.

11:53  23   Q.    I asked:  If someone had read this letter in

11:53  24   May of 2018, they would have seen a list of products

11:53  25   that they could have gone and pulled from their

504

11:53  1   inventory and compared to the patent and made their own

11:53  2   decision about infringement, right?

11:53  3        A.    No.  I don't think so.  I would not put that

11:53  4   way.

11:53  5        Q.    Does the dispute resolution -- the dispute

11:53  6   resolution team knows how to research and pull patents

11:53  7   based on numbers that we find in PX-50; is that

11:53  8   correct?

11:53  9        A.    Yes.

11:53  10       Q.    And ASUS knows how to go and find one of their

11:53  11  products that would be listed in this letter, correct?

11:53  12       A.    Yes.

11:53  13       Q.    ACQIS filed this lawsuit against ASUSTeK in

11:54  14  October of 2020.

11:54  15             Does that sound right?

11:54  16       A.    Yes.

11:54  17       Q.    And because it's a patent-related dispute, it

11:54  18  came to your team, correct?

11:54  19       A.    Yes.

11:54  20       Q.    And is it fair to say that back in 2020,

11:54  21  ASUSTeK affirmatively denied that anyone ever received

11:54  22  this May 2018 letter?  Is that fair?

11:54  23       A.    Yes.

11:54  24       Q.    And that was without even looking into it,

11:54  25  correct?

505

11:54  1    A.    Could you please explain "without looking into

11:54  2    it"?

11:54  3    Q.    That's a fair point.

11:54  4          In October of 2020, the dispute resolution

11:54  5    team did not conduct an internal investigation into

11:54  6    whether the May 2018 letter was received; isn't that

11:54  7    right?

11:54  8    A.    No.

11:54  9    Q.    You did conduct an internal investigation?

11:54  10   A.    Yes.

11:54  11   Q.    Did you go and interview anyone?

11:55  12   A.    Yes.

11:55  13   Q.    Who did you interview?

11:55  14   A.    We checked our internal log, and I interviewed

11:55  15   the people who work in our mailroom and the proper

11:55  16   employee of our Legal Affairs Center that how they log

11:55  17   mails.

11:55  18         Yeah.  That's what we did.

11:55  19   Q.    Okay.  Your testimony earlier was that there

11:55  20   was no internal investigation until May of 2021.

11:55  21         Are you confusing your dates?

11:55  22   A.    No.  I think my testimony was there was no

11:55  23   record of the incoming mail made by our mailroom.  But

11:55  24   because of the -- because we receive this complaint, so

11:55  25   we were surprised.  So we went down to our mailroom to

506

11:55  1    check if they had any logged and they said no.

11:55  2        Q.    Okay.  And that happened in October of 2020?

11:56  3        A.    Yes.

11:56  4        Q.    But you testified that in October of 2020, the

11:56  5    mailroom didn't have a practice of keeping a mail log;

11:56  6    isn't that right?

11:56  7        A.    Yes.  Because we asked them, so we know that

11:56  8    they do not keep any record.

11:56  9        Q.    Okay.  But certainly by the time that ACQIS

11:56  10   had to sue ASUSTeK in October 2020, y'all knew about

11:56  11   the May 2018 letter then, correct?

11:56  12              It was referenced in the complaint.

11:56  13       A.    No.  Do you want me to explain that?

11:56  14       Q.    I don't.  You can explain it with your

11:56  15   counsel.

11:56  16       A.    Okay.

11:56  17       Q.    Can we agree that in May of 2021, y'all

11:56  18   actually did conduct some type of internal

11:56  19   investigation into the letter?

11:56  20       A.    Yes.  We conducted internal investigation

11:56  21   again based on the new information we received from

11:56  22   ACQIS.

11:56  23       Q.    And the new information that you received were

11:56  24   these FedEx confirmations saying, in fact, that letter

11:56  25   had been delivered on May 18th, 2018, correct?

507

11:57  1    A.    More than that.  Yes.

11:57  2    Q.    And isn't it true, Ms. Chen, that in your

11:57  3  investigation in 2021, it showed that someone named Lee

11:57  4  signed for this package?

11:57  5    A.    No.  It is not what our investigation shows.

11:57  6  It's what the FedEx record shows.

11:57  7    Q.    Okay.  I'm going to ask it one more time.

11:57  8    A.    Okay.

11:57  9    Q.    Your investigation in 2021 -- May of 2021, I

11:57  10 believe --

11:57  11   A.    Yeah.

11:57  12   Q.    -- showed that someone named Lee signed for

11:57  13 this package; isn't that true?

11:57  14   A.    It's kind of complicated, but yes.  Generally

11:58  15 speaking, yes.

11:58  16   Q.    Okay.  So your investigation revealed that

11:58  17 someone named Lee signed for the package?

11:58  18   A.    Yes.

11:58  19   Q.    And your investigation revealed that Mr. Lee

11:58  20 was, in fact, an ASUSTeK employee in May of 2018,

11:58  21 correct?

11:58  22   A.    Not in that investigation, a later

11:58  23 investigation.  Yes.

11:58  24   Q.    When you're saying "that investigation," what

11:58  25 are you referring to?

508

11:58  1        A.    Okay.  That requires some explanation, so I'm

11:58  2   not sure if you want me to explain that or not.

11:58  3        Q.    Well, let me -- at some point after ASUSTeK

11:58  4   was sued, y'all determined that someone named Lee had

11:58  5   signed for the package, right?

11:58  6        A.    Yeah.  That's correct.

11:59  7        Q.    And that someone named Lee was an employee of

11:59  8   ASUSTeK?

11:59  9        A.    Yes.  That's correct.

11:59  10       Q.    Okay.  But isn't it true that report -- in

11:59  11  reporting that information back to ACQIS, ASUSTeK

11:59  12  could -- said they didn't know what Mr. Lee's full name

11:59  13  was?

11:59  14             Do you remember that?

11:59  15       A.    Back in 2021?

11:59  16       Q.    Ever.

11:59  17       A.    In 2021, yes.

11:59  18       Q.    But we know his full name now because Dr. Chu

11:59  19  testified about it yesterday, correct?

11:59  20       A.    Yes.  That's in 2022.

11:59  21       Q.    That wasn't my question.

11:59  22             We know his full name now because --

11:59  23       A.    Yes.

11:59  24       Q.    -- Dr. Chu testified about it yesterday,

11:59  25  correct?

509

11:59   1        A.    Yes.

11:59   2        Q.    And back in 2021, ASUSTeK also claimed that it

11:59   3    really couldn't figure out what department Mr. Lee

11:59   4    worked in back in 2018.

12:00   5              Do you remember that?

12:00   6        A.    Yes.

12:00   7        Q.    But somehow back in 2021, ASUSTeK was able to

12:00   8    figure out that Mr. Lee was no longer with the company;

12:00   9    isn't that correct?

12:00   10       A.    Yes.

12:00   11       Q.    But again, ASUSTeK couldn't tell ACQIS when

12:00   12   Mr. Lee left the company, could it?

12:00   13       A.    That's correct.

12:00   14       Q.    And no one reached out to Mr. Lee to find out

12:00   15   what happened; isn't that right?

12:00   16       A.    Yes.

12:00   17       Q.    And by the time ASUSTeK investigated the

12:00   18   May 2018 letter, the CEO, Jerry Shen, he had left the

12:00   19   company too, right?

12:00   20       A.    Yes.

12:00   21       Q.    And by that time, his secretary left the

12:00   22   company too, right?

12:00   23       A.    Yes.

12:00   24       Q.    And they live in Taiwan, right?

12:00   25       A.    No.  They don't.

510

| | | |
|--|--|--|
| 12:00 | 1 | Q.    Well, they don't live here; is that correct? |
| 12:00 | 2 | A.    I think our prior CEO now lives in the U.S. |
| 12:01 | 3 | Q.    What about back in 2021? |
| 12:01 | 4 | A.    Maybe they already move to the U.S. |
| 12:01 | 5 | Q.    Okay.  Did ASUSTeK know their names? |
| 12:01 | 6 | A.    Yes. |
| 12:01 | 7 | Q.    Yeah? |
| 12:01 | 8 | But no one at ASUSTeK spoke to Mr. Shen to |
| 12:01 | 9 | find out what happened; isn't that correct? |
| 12:01 | 10 | A.    He got very sick.  So... |
| 12:01 | 11 | Q.    No one spoke with Mr. Shen to find out what |
| 12:01 | 12 | happened with the May 2018 letter, did they? |
| 12:01 | 13 | A.    That's correct. |
| 12:01 | 14 | Q.    And no one spoke to Mr. Shen's secretary about |
| 12:01 | 15 | what happened with the May 2018 letter, did they? |
| 12:01 | 16 | A.    That's correct. |
| 12:01 | 17 | Q.    So ASUSTeK has no one here to testify that |
| 12:01 | 18 | Mr. Shen did not receive that May 2018 letter, do you? |
| 12:01 | 19 | A.    That's correct. |
| 12:01 | 20 | Q.    And ASUSTeK has no one here to testify that |
| 12:02 | 21 | Mr. Shen did not read that letter back in May of 2018, |
| 12:02 | 22 | correct? |
| 12:02 | 23 | A.    Correct. |
| 12:02 | 24 | Q.    What we do know that was confirmed by your |
| 12:02 | 25 | investigations is that ASUS through Mr. Lee signed for |

511

12:02  1    the letter on November 18th of 2018, correct?

12:02  2        A.    Yes.

12:02  3        Q.    Now, after ACQIS sued ASUSTeK in October of

12:02  4    2020, ASUSTeK also learned about the other companies

12:02  5    that have taken a license to ACQIS' patents through the

12:02  6    course of this lawsuit, correct?

12:02  7        A.    Correct.

12:02  8        Q.    Companies like Dell and Lenovo and Acer, are

12:02  9    you aware of those?

12:02  10       A.    Yes.

12:02  11       Q.    And would you agree that those are

12:02  12   companies -- those are also companies that sell

12:02  13   computers and laptops and the like?

12:02  14       A.    Yes.

12:02  15       Q.    And when you -- would you also agree that

12:02  16   those are companies that compete with ASUSTeK in that

12:03  17   market in the United States?

12:03  18       A.    Yes.

12:03  19       Q.    But to this day, ASUSTeK has never offered to

12:03  20   take a license to the ACQIS patents, correct?

12:03  21       A.    Correct.

12:03  22            MS. AMSTUTZ:  I'll pass the witness, Your

12:03  23   Honor.

12:03  24            THE COURT:  Do you intend to take her on

12:03  25   now, or are you going to call her in your case?

512

| | | |
|---|---|---|
| 12:03 | 1 | MR. UNDERWOOD:  We'll take her on now, |
| 12:03 | 2 | Your Honor. |
| 12:03 | 3 | THE COURT:  Would you prefer to do it now |
| 12:03 | 4 | or break for lunch? |
| 12:03 | 5 | MS. AMSTUTZ:  I'm fine breaking for lunch |
| 12:03 | 6 | if the Court and counsel -- |
| 12:03 | 7 | MR. UNDERWOOD:  We're fine as well.  I |
| 12:03 | 8 | estimate maybe 30 minutes or so.  And I don't want to |
| 12:03 | 9 | stand between everyone and lunch. |
| 12:03 | 10 | THE COURT:  No, no.  Would y'all like to |
| 12:03 | 11 | go to lunch now and come back and have the redirect, or |
| 12:03 | 12 | would you like to finish up -- you were done, right? |
| 12:03 | 13 | MS. AMSTUTZ:  Yeah.  I'm done.  I'm also |
| 12:03 | 14 | happy to get it -- get it over with.  Whatever the -- |
| 12:03 | 15 | y'all want. |
| 12:03 | 16 | JUROR:  Let's finish. |
| 12:03 | 17 | THE COURT:  Okay. |
| 12:04 | 18 | MR. UNDERWOOD:  I was going to say good |
| 12:04 | 19 | morning.  But good afternoon, ladies and gentlemen. |
| 12:03 | 20 | CROSS-EXAMINATION |
| 12:03 | 21 | BY MR. UNDERWOOD: |
| 12:04 | 22 | Q.    Good afternoon, Ms. Chen. |
| 12:04 | 23 | A.    Good afternoon. |
| 12:04 | 24 | Q.    I want to talk a little bit about you and |
| 12:04 | 25 | ASUSTeK.  Is that all right? |

513

```
12:04    1         A.    Okay.

12:04    2         Q.    Where are you from?

12:04    3         A.    I'm from Taipei, Taiwan.  In case -- Taipei is

12:04    4    the capital city of Taiwan.

12:04    5         Q.    And did I hear you say when Ms. Amstutz was

12:04    6    asking you questions, you work for ASUSTeK?

12:04    7         A.    Yes.

12:04    8         Q.    There were several companies discussed.  So I

12:04    9    want to seek some clarity.

12:04   10         Do you work for any other companies?

12:04   11         A.    No.

12:04   12         Q.    Now, there's another defendant in this case

12:05   13    called ASGL.

12:05   14         Do you work for them?

12:05   15         A.    No.  I don't.

12:05   16         Q.    There was another company discussed called ACI

12:05   17    in the United States.

12:05   18         Do you work for them?

12:05   19         A.    No.  I don't.

12:05   20         Q.    There was -- I think you called it a brand

12:05   21    name, ASUS.

12:05   22         A.    Yes.

12:05   23         Q.    Do you work for something called ASUS?

12:05   24         A.    No.

12:05   25         Q.    What about ASUS group?  Do you work for
```

514

| 12:05 | 1 | anything called the ASUS group? |
| 12:05 | 2 | A.    No. |

12:05   3     Q.    Have you ever testified in court before,

12:05   4   Ms. Chen?

12:05   5     A.    No.   Never.

12:05   6     Q.    Is today your first time?

12:05   7     A.    Yes.

12:05   8     Q.    Why did you come from Taipei, Taiwan to Waco

12:05   9   to offer testimony?

12:05   10     A.    Okay.   Because we think of this as a very

12:05   11   important case to us, and we respect intellectual

12:05   12   property and we respect this Court and the jury.   So we

12:05   13   want to have someone who's in charge of patent cases

12:06   14   for ASUSTeK to come here to tell the truth and to

12:06   15   answer all these questions.

12:06   16     Q.    And do you understand that the plaintiff ACQIS

12:06   17   is accusing ASUSTeK of infringing the patents involved

12:06   18   in this case?

12:06   19     A.    Yes.

12:06   20     Q.    What is ASUSTeK's reaction to the plaintiff's

12:06   21   infringement allegations?

12:06   22     A.    We don't think it's fair.

12:06   23     Q.    Can you explain?

12:06   24     A.    Well, I think we -- we are wrongly accused of

12:06   25   what ACQIS or Dr. Chu accused.

515

12:06   1          Q.    Thank you.

12:06   2                How long have you been with ASUSTeK, Ms. Chen?

12:06   3          A.    I joined ASUSTeK in 2014.  So this year is my

12:06   4    tenth year.

12:06   5          Q.    And you spoke a little bit with Ms. Amstutz

12:06   6    about this, but can you explain for me your role at the

12:06   7    company?

12:06   8          A.    Okay.  My current position is senior director

12:06   9    at the patent dispute team of Legal Affairs Centers at

12:07  10    ASUSTeK.

12:07  11          Q.    So you're involved in patent-related issues?

12:07  12          A.    Yes.

12:07  13          Q.    Let's talk a little bit about ASUSTeK and who

12:07  14    they are as a company.

12:07  15                What does ASUSTeK do?

12:07  16          A.    We design products, electronic products.

12:07  17          Q.    That includes things like computers?

12:07  18          A.    Yes.  That includes like laptops, desktop,

12:07  19    monitors, routers.  What else?  Motherboards,

12:07  20    smartphones, smart watch.  Everything.

12:07  21          Q.    When was ASUSTeK founded?

12:07  22          A.    It was in 1989, 35 years ago.

12:07  23          Q.    And who founded ASUSTeK?

12:07  24          A.    ASUS was -- ASUSTeK was founded by four young

12:07  25    engineers back in 20 -- I'm sorry -- 1989.  And they

516

12:07  1    were just, you know, young engineers under 30.

12:08  2    Q.    Were these people who at the time were at the

12:08  3    top of the tech world?

12:08  4    A.    No.  They were like nobody.  So actually, they

12:08  5    found -- they tried to find a small humble apartment in

12:08  6    Taipei as their first office, and I think the landlord

12:08  7    was very worried that they could not make a payment.

12:08  8    Q.    Had they started any other companies when they

12:08  9    formed ASUSTeK?

12:08 10    A.    No.  This was the very first company they

12:08 11    started, but they achieved a great success in the first

12:08 12    year.

12:08 13    Q.    One thing I was wondering, Ms. Chen, is the

12:08 14    name ASUS in ASUSTeK, A-S-U-S.

12:08 15          Where does that come from?

12:08 16    A.    It comes from a -- the word Pegasus.  Pegasus

12:08 17    is a Greek mythology creature.  It's a horse with big

12:08 18    wings.  Actually, I saw one on my way to the court this

12:08 19    morning.

12:08 20          And so it can fly high in the sky.  And it

12:09 21    symbolize wisdom, knowledge, and purity and perfection.

12:09 22    So we took these words to represent our pursuit of

12:09 23    perfection.

12:09 24    Q.    And just to clarify, that's Pegasus, the

12:09 25    mythological Greek creature?

517

| | | |
|---|---|---|
| 12:09 | 1 | A.    Yes. |
| 12:09 | 2 | Q.    Did you see the one over at Jake's, the red |
| 12:09 | 3 | one?  Is that the one you saw? |
| 12:09 | 4 | A.    Yes. |
| 12:09 | 5 | Q.    Okay.  Now, did you work with me to prepare |
| 12:09 | 6 | just a couple of PowerPoint slides that you wanted to |
| 12:09 | 7 | show the jury? |
| 12:09 | 8 | A.    Yes. |
| 12:09 | 9 | MR. UNDERWOOD:  Could we turn to the |
| 12:09 | 10 | first slide, please? |
| | 11 | BY MR. UNDERWOOD: |
| 12:09 | 12 | Q.    What were the first products that were |
| 12:09 | 13 | developed by ASUSTeK after it was started in 1989? |
| 12:09 | 14 | A.    Yes.  That was the motherboard. |
| 12:09 | 15 | Q.    What is a motherboard?  The jury's heard a |
| 12:09 | 16 | little bit about that.  But in your words? |
| 12:09 | 17 | A.    Yes.  Motherboard basically is the most |
| 12:09 | 18 | important part of the computer.  You need to have it. |
| 12:10 | 19 | And you put on the CPU, and it can control everything |
| 12:10 | 20 | operated inside the computer system. |
| 12:10 | 21 | Q.    And is this a picture of the motherboard on |
| 12:10 | 22 | the screen? |
| 12:10 | 23 | A.    Yes. |
| 12:10 | 24 | Q.    Now, the jury's heard a little bit so far in |
| 12:10 | 25 | this case about a different company called Intel and |

518

12:10  1    Intel computer chips.

12:10  2            Has ASUSTeK ever worked with Intel to develop

12:10  3    any products?

12:10  4    A.    Yes.  Let me share with you a very interesting

12:10  5    story that is true.  So in 1989, when our founders

12:10  6    created ASUSTeK, they had the passion of making good

12:10  7    products.  But as I said, they were nobody.  But they

12:10  8    decided to create the first motherboard which can

12:10  9    support Intel 486 processor as it is here.

12:10  10           Only back then Intel had not launched this

12:10  11   processor 486.  So how did they do that?  They

12:11  12   started -- they use their knowledge to start at a prior

12:11  13   generation, 386.  And they analyzed --

12:11  14               MS. AMSTUTZ:  Your Honor, I object to the

12:11  15   narrative.

12:11  16               THE COURT:  Overruled.

12:11  17   A.    Can I continue?

12:11  18   BY MR. UNDERWOOD:

12:11  19   Q.    Yes, please.

12:11  20   A.    Okay.  So they analyzed the prior generation

12:11  21   products, and they used their knowledge to analyze this

12:11  22   product and correctly and accurately predict how the

12:11  23   new generation 486 would be like.

12:11  24           So they have no access to the spec of 486.

12:11  25   They have no access to the chip, but they create that

519

12:11  1    motherboard.  But the story does not end here.

12:11  2            Of course, they were very proud of they make,

12:11  3    so they tried to promote these products to Intel.  So

12:11  4    they paid a visit to Intel in Taipei, and they found

12:11  5    that Intel's engineer were troubled by some technical

12:11  6    issues with their own boards.

12:12  7            So our founders helped Intel engineers to fix

12:12  8    their problem.  So I think that's the collaboration,

12:12  9    then makes a start of a very strong bond between Intel

12:12  10   and ASUSTeK.

12:12  11      Q.    And does that bond exist to this very day?

12:12  12      A.    Yes.  Yes.  They are very close partners.

12:12  13      Q.    Now, today, what type of products -- you spoke

12:12  14   a little bit about it earlier, but since we've just

12:12  15   talked about motherboards.

12:12  16            Today, what type of products does ASUSTeK

12:12  17   design?

12:12  18      A.    Like I said, we design motherboards, laptops,

12:12  19   desktop, monitors, routers, tablets.  Yeah.

12:12  20                  MR. UNDERWOOD:  Can we get the next

12:12  21   slide, please?

12:12  22   BY MR. UNDERWOOD:

12:12  23      Q.    When did ASUSTeK release its first laptop?

12:12  24      A.    It was in 1997.

12:12  25      Q.    Are there any famous slogans that ASUSTeK has

520

| | | |
|---|---|---|
| 12:12 | 1 | used to refer to its laptops over the years? |
| 12:13 | 2 | A.    Yes.    The most famous one is:    Solid as a |
| 12:13 | 3 | rock. |
| 12:13 | 4 | Q.    What does that mean? |
| 12:13 | 5 | A.    It actually was not made by us.    It was a |
| 12:13 | 6 | slogan inspired by the comments and the compliments by |
| 12:13 | 7 | our consumers.    Because we made our commitment to our |
| 12:13 | 8 | customers that you buy our products, you buy the |
| 12:13 | 9 | quality. |
| 12:13 | 10 | Q.    Are there any famous examples of that high |
| 12:13 | 11 | quality? |
| 12:13 | 12 | A.    Okay.    I can give you two.    The first one is: |
| 12:13 | 13 | Our laptop was the first laptop which reached the top |
| 12:13 | 14 | of Mount Everest.    Because at that time, other brands |
| 12:13 | 15 | just failed to boot up at the base camp. |
| 12:13 | 16 | Q.    Any other examples? |
| 12:13 | 17 | A.    Yes.    That particular laptop that we create in |
| 12:13 | 18 | 1997, one year later, it was brought to space to serve |
| 12:14 | 19 | the space station mission. |
| 12:14 | 20 | Q.    And did ASUSTeK recently release a laptop |
| 12:14 | 21 | commemorating the use of that first laptop in space? |
| 12:14 | 22 | A.    Yes.    Because that laptop actually continued |
| 12:14 | 23 | to operate in space for more than 600 days without any |
| 12:14 | 24 | malfunction, and we are very proud of that.    So in |
| 12:14 | 25 | 2022, we made a space shuttle space edition |

| | | |
|---|---|---|
| 12:14 | 1 | commemorating and paying tribute to what we achieved |
| 12:14 | 2 | 25 years ago. |
| 12:14 | 3 | Q.    And is there a video that ASUSTeK released to |
| 12:14 | 4 | commemorate that laptop? |
| 12:14 | 5 | A.    Yes. |
| 12:14 | 6 | Q.    And do you have it here with you to show the |
| 12:14 | 7 | jury? |
| 12:14 | 8 | A.    Yes. |
| 12:14 | 9 | MR. UNDERWOOD:  Can we go to the next |
| 12:14 | 10 | slide? |
| 12:14 | 11 | (Video played.) |
| 12:15 | 12 | MR. UNDERWOOD:  Thank you.  We can pull |
| 12:15 | 13 | down the demonstratives now. |
| 12:15 | 14 | BY MR. UNDERWOOD: |
| 12:15 | 15 | Q.    Is ASUSTeK proud of the quality of its laptops |
| 12:15 | 16 | and other computer products? |
| 12:15 | 17 | A.    Yes. |
| 12:15 | 18 | Q.    Why? |
| 12:15 | 19 | A.    Because it's good. |
| 12:15 | 20 | Q.    Fair enough. |
| 12:15 | 21 | Ms. Chen, there's a term that's been used a |
| 12:15 | 22 | little bit in this lawsuit, "standards organization." |
| 12:15 | 23 | A.    Yes. |
| 12:15 | 24 | Q.    What is that? |
| 12:16 | 25 | A.    Okay.  It is a organization sets the |

522

12:16  1    specification of certain technology to make sure

12:16  2    that -- that the products made by different

12:16  3    manufacturers or brands can work together correctly so

12:16  4    that you don't need to worry that you buy, say, Brand A

12:16  5    and it cannot work with Brand B's products.

12:16  6         Q.    Are you familiar with the PCI Express

12:16  7    technology and the USB 3 technology that the jury's

12:16  8    heard about in this case?

12:16  9         A.    Yes.

12:16  10        Q.    And were there standards organizations

12:16  11   involved in the development of the PCI Express and USB

12:16  12   3 technology?

12:16  13        A.    Okay.  For PCI Express, it's PCI-SIG, Special

12:16  14   Interest Group; and for USB, it's USB-IF, is

12:16  15   Implementers Forum.

12:16  16        Q.    Is ASUSTeK a member of these organizations?

12:16  17        A.    Yes.  We are, for both.

12:16  18        Q.    Now, in order to use PCI Express and USB 3,

12:17  19   does one have to be a member of the organizations?

12:17  20        A.    Yes.

12:17  21        Q.    And is there any fee associated with

12:17  22   membership?

12:17  23        A.    Yes.  You need to pay the annual fee.

12:17  24        Q.    What is the annual fee?  Do you know?

12:17  25        A.    Like, for PCI Express, we pay $5,000 per year

523

```
12:17   1   to become a member.  And for USB, it's 4,000.  I could
12:17   2   be wrong.  Maybe 4,000, 5,000.  Sorry for that.  I'm
12:17   3   not really good at remembering the numbers, but it's
12:17   4   between 4,000 and 5,000.
12:17   5        Q.   Thank you.
12:17   6             And after paying that membership fee, does
12:17   7   ASUSTeK have to pay any royalties or any other fees to
12:17   8   use PCI Express or USB 3?
12:17   9        A.   No.
12:17  10        Q.   On that note, does ASUSTeK use PCI Express in
12:17  11   its products?
12:17  12        A.   Yes.  We do.
12:17  13        Q.   For how long has ASUSTeK been using PCI
12:17  14   Express in its products?
12:17  15        A.   I think we had our first product supporting
12:18  16   PCI Express in 2004.
12:18  17        Q.   And why in 2004 was PCI Express added?
12:18  18        A.   Well, the first thing is it is a standard
12:18  19   adopted by the industry, and second's that Intel
12:18  20   supports that.  Intel makes chips supporting the
12:18  21   standard, and we use Intel's chips.
12:18  22        Q.   And what about USB 3, does ASUSTeK use USB 3
12:18  23   in its products?
12:18  24        A.   Yes.
12:18  25        Q.   When -- or strike that.
```

-524-

12:18  1          About how long now has ASUSTeK been using USB

12:18  2  3 in its products?

12:18  3     A.    I think we started using USB 3 in 2009, so

12:18  4  it's 15 years.

12:18  5     Q.    So why has ASUSTeK been using USB 3 since

12:18  6  2009?

12:18  7     A.    Same as PCI Express, it's the industry

12:18  8  standard.

12:18  9     Q.    Now, we've talked about PCI Express.  Are you

12:19 10  familiar with another technology called PCI local bus?

12:19 11     A.    Yes.

12:19 12     Q.    And has ASUSTeK ever used PCI local bus in its

12:19 13  products?

12:19 14     A.    Many years ago.

12:19 15     Q.    Okay.  About when did ASUSTeK use PCI local

12:19 16  bus in its products?

12:19 17     A.    I think we stopped using PCI local bus in

12:19 18  2010, so it's way back.

12:19 19     Q.    Are you familiar with one of the two

12:19 20  representative accused products in this case, the ROG

12:19 21  Strix Hero II GL504GV laptop?

12:19 22     A.    Yes.

12:19 23     Q.    Does that laptop have a PCI local bus card or

12:19 24  slot?

12:19 25     A.    No.

```
12:19   1         Q.    All right.  Now, there's another

12:19   2   representative accused product.  This one's called the

12:19   3   S340MF desktop.

12:19   4         Are you familiar with that?

12:20   5         A.    Yes.

12:20   6         Q.    And does that desktop computer have a PCI

12:20   7   local bus card or slot?

12:20   8         A.    No.

12:20   9         Q.    What is the relationship, if any, between PCI

12:20  10   local bus and PCI Express?

12:20  11         A.    I would say PCI Express is a replacement of

12:20  12   PCI local bus.

12:20  13         Q.    Now, Ms. Amstutz also asked you some questions

12:20  14   about the relationship between ASUSTeK and a few other

12:20  15   companies.  So I want to follow up on some of those.

12:20  16         First of all, the first question is:  Are

12:20  17   ASUSTeK and ACI the same company?

12:20  18         A.    No.

12:20  19         Q.    Now, to be clear, does ASUSTeK own ACI?

12:20  20         A.    We own the shares.  Yes.

12:20  21         Q.    And has ASUSTeK ever tried to hide from the

12:20  22   fact that it owns the shares of ACI?

12:21  23         A.    No.

12:21  24         Q.    Has ASUSTeK been upfront about that?

12:21  25         A.    I'm sorry.  Could you please say that again?
```

526

12:21  1      Q.    That's public knowledge, right?

12:21  2      A.    Yes.

12:21  3      Q.    Now, Ms. Amstutz also asked you some questions

12:21  4   about some annual reports.

12:21  5            Do you remember those?

12:21  6      A.    Yes.

12:21  7      Q.    And there was some language in there talking

12:21  8   about significant influence.

12:21  9            Do you remember those questions?

12:21  10     A.    Yes.  I do.

12:21  11     Q.    What type of term is "significant influence"?

12:21  12     A.    It is an accounting or financial term.

12:21  13     Q.    What does that term mean?

12:21  14     A.    Because, like I said, we are a public company

12:21  15   in Taiwan, so we are obliged to disclose our financial

12:21  16   statements to our investors.  So we of course need to

12:21  17   list all the -- our investment.  So ACI is just like

12:21  18   our investment.

12:21  19     Q.    Does ASUSTeK control the operations of ACI?

12:22  20     A.    No.

12:22  21     Q.    Where is ACI located?

12:22  22     A.    ACI is in California.

12:22  23     Q.    Does ASUSTeK share any employees with ACI?

12:22  24     A.    No.

12:22  25     Q.    Does ACI report to ASUSTeK?

—527—

12:22  1      A.    No.

12:22  2      Q.    When it comes to products being sold in the

12:22  3   United States, who decides where to sell ASUS-branded

12:22  4   products?

12:22  5      A.    ACI does.

12:22  6      Q.    Does ASUSTeK have any role in that decision?

12:22  7      A.    No.

12:22  8      Q.    Has ACQIS sued ACI in this lawsuit?

12:22  9      A.    No.

12:22  10     Q.    Does ASUSTeK do business in the United States?

12:22  11     A.    Sorry.  I just missed it.  You mean ACI or

12:22  12  ASUSTeK?

12:22  13     Q.    Does ASUSTeK do business in the United States?

12:22  14     A.    No.

12:22  15     Q.    I think earlier you testified that ASUSTeK is

12:22  16  involved in the design of laptops?

12:22  17     A.    Yes.

12:22  18     Q.    Where does that design work take place?

12:22  19     A.    In Taipei, Taiwan.

12:22  20     Q.    About how many employees are involved in the

12:22  21  design work of these products in Taipei, Taiwan?

12:23  22     A.    We have 1,800 people in that department.

12:23  23     Q.    And are any of them located in the United

12:23  24  States?

12:23  25     A.    No.

528

12:23  1    Q.    Does ASUSTeK have its own factories to
12:23  2  manufacture products?
12:23  3    A.    No.
12:23  4    Q.    How does ASUSTeK manufacture products?
12:23  5    A.    We contract with so-called EMS, electronic
12:23  6  manufacturing service.  We contract with -- this is
12:23  7  third-party EMS companies to make these products.
12:23  8    Q.    And are those manufacturing companies located
12:23  9  in the United States?
12:23  10   A.    No.
12:23  11   Q.    Does ASUSTeK have any offices or facilities in
12:23  12 the United States?
12:23  13   A.    No.
12:23  14   Q.    Any employees --
12:23  15   A.    No.
12:23  16   Q.    -- in the United States?
12:23  17         Does ASUSTeK import or sell any products in
12:23  18 the United States?
12:23  19   A.    No.
12:23  20   Q.    Ms. Chen, I think you've been sitting here at
12:23  21 this table throughout trial, right?
12:23  22   A.    Yes.
12:23  23   Q.    Did you hear the testimony of Dr. Sarhan
12:24  24 yesterday?
12:24  25   A.    Yes.

529

12:24  1       Q.    The plaintiff's infringement expert?

12:24  2       A.    Yes.

12:24  3       Q.    And did you hear him say that he found it

12:24  4   likely that this accused desktop product was turned on

12:24  5   and tested during the course of its manufacture?

12:24  6       A.    I heard that.

12:24  7       Q.    Does ASUSTeK or its manufacturers turn on

12:24  8   products for purposes of testing during the

12:24  9   manufacturing process?

12:24  10      A.    No.

12:24  11      Q.    Does ASUSTeK turn on products at all during

12:24  12  the manufacturing process before those products are

12:24  13  shipped out the door?

12:24  14      A.    No.

12:24  15      Q.    Now, Ms. Amstutz also asked you about a letter

12:24  16  from Dr. Chu.  So I want to follow up on some of those

12:24  17  questions.

12:24  18            Before this case, had you seen that letter

12:24  19  before?

12:24  20      A.    I only saw that letter in, I think, 2021.

12:24  21      Q.    Where do patent letters that are sent to

12:25  22  ASUSTeK end up?

12:25  23      A.    My department.

12:25  24      Q.    And again, before this lawsuit, had you or

12:25  25  your department seen this letter?

530

```
12:25   1        A.    No.

12:25   2        Q.    How do you know that?

12:25   3        A.    Because we investigate.

12:25   4        Q.    And what investigation did you do?

12:25   5        A.    Okay.  So in October 2020, we were sued by

12:25   6   ACQIS, and we saw -- they claimed that they actually

12:25   7   send a notice to us in 2018.  So we were surprised

12:25   8   because we had no record of that.

12:25   9              So we did our investigation.  Like I said, we

12:25  10   talked to our mailroom and we found nothing.  And then

12:25  11   we checked our internal Legal Affairs Center log and we

12:25  12   found nothing.

12:25  13              And we check our e-mails because we were

12:25  14   thinking maybe somebody just, you know, transfer the

12:25  15   file to PDF.  So -- and still we found nothing.

12:25  16              And because back then, we have not -- because

12:26  17   that letter was not attached to the complaint.  So that

12:26  18   is the only information we got back in 2020, that ACQIS

12:26  19   claimed they sent a notice letter to ASUSTeK in

12:26  20   May 2018.  So that's what -- all we can do back in

12:26  21   2020.

12:26  22        Q.    If you and ASUSTeK had received the letter,

12:26  23   what would you have done?

12:26  24        A.    We would respond.

12:26  25        Q.    Is it ASUSTeK's practice to ignore letters?
```

—531—

12:26  1          A.    No.

12:26  2          Q.    Prior to this lawsuit, was ASUSTeK aware of

12:26  3    the plaintiff ACQIS?

12:26  4          A.    No.

12:26  5          Q.    Prior to this lawsuit, did ASUSTeK know about

12:26  6    the patents that are at issue this case?

12:26  7          A.    No.

12:26  8          Q.    Now, the letter, I think, said it was sent in

12:26  9    2018.

12:26  10          Does that sound right?

12:26  11          A.    Yes.

12:26  12          Q.    In 2018, was PCI Express a new addition to

12:26  13    ASUSTeK's products?

12:26  14          A.    No.

12:26  15          Q.    In 2018, how long had PCI Express been in

12:27  16    ASUSTeK's products?

12:27  17          A.    It's more than 14 years.

12:27  18          Q.    What about USB 3?  In 2018, was that a new

12:27  19    addition to ASUSTeK's products?

12:27  20          A.    No.

12:27  21          Q.    So in 2018, how long had USB 3 been used in

12:27  22    the ASUSTeK products?

12:27  23          A.    So it's more than nine years.

12:27  24                MR. UNDERWOOD:  Thank you, Ms. Chen.

12:27  25                I pass the witness.

532

| | | |
|---|---|---|
| 12:27 | 1 | REDIRECT EXAMINATION |
| 12:27 | 2 | BY MS. AMSTUTZ: |
| 12:27 | 3 | Q.    Ms. Chen, you testified that ASUSTeK is a |
| 12:27 | 4 | member of the standards organization for PCI Express |
| 12:27 | 5 | and USB? |
| 12:27 | 6 | A.    Yes. |
| 12:27 | 7 | Q.    And as a member of those standard |
| 12:27 | 8 | organizations, you can confirm that they did not ask |
| 12:27 | 9 | Dr. Chu to use his intellectual property, did they? |
| 12:27 | 10 | A.    That, I don't know. |
| 12:27 | 11 | Q.    You have no knowledge of them asking him, |
| 12:27 | 12 | correct? |
| 12:27 | 13 | A.    Right. |
| 12:27 | 14 | Q.    As a member of those organizations? |
| 12:28 | 15 | A.    Right. |
| 12:28 | 16 | Q.    And isn't it true that ASUSTeK makes a lot of |
| 12:28 | 17 | money selling products with the serial bus technology |
| 12:28 | 18 | in PCI Express and USB? |
| 12:28 | 19 | A.    I would not say so. |
| 12:28 | 20 | Q.    You -- billions? |
| 12:28 | 21 | A.    We sell products.  We make products and our |
| 12:28 | 22 | subsidiaries sells products, but I would not say we |
| 12:28 | 23 | make a big fortune because of making products |
| 12:28 | 24 | supporting PCI Express. |
| 12:28 | 25 | Q.    ASUSTeK makes billions of dollars, correct? |

-533-

12:28  1          A.    That's our revenue.  Yes.

12:28  2          Q.    And a lot of the products that are sold are

12:28  3  laptops and desktops and those types of things,

12:28  4  correct?

12:28  5          A.    Yes.

12:28  6                    MS. AMSTUTZ:  No further questions.

12:28  7                    THE COURT:  Anything else, sir?

12:28  8                    MR. UNDERWOOD:  No further questions,

12:28  9  Your Honor.

12:28  10                    THE COURT:  You get to step down, but you

12:28  11  don't get to go very far.  You have to go back to your

12:28  12  table.

12:28  13                    Ladies and gentlemen of the jury, you

12:28  14  just saw one of the rarest things I've ever seen, which

12:28  15  is a lawyer predicted how long he would go and then

12:29  16  actually stuck by it.  So I will give a compliment to

12:29  17  that and to the speed with which both the lawyers were

12:29  18  able to do that.

12:29  19                    We will stand in recess until -- if

12:29  20  you'll be back here, we'll start at 1:45.

12:29  21                    THE BAILIFF:  All rise.

12:29  22                    THE COURT:  Please remember my

12:29  23  instructions.

12:29  24                    (Jury exited the courtroom.)

12:29  25                    THE COURT:  We can go off the record.

| | | |
|---|---|---|
| 12:29 | 1 | (Off-the-record discussion.) |
| 12:31 | 2 | THE COURT:  Let's go back on the record. |
| 12:31 | 3 | Is there anything we need to take up |
| 12:31 | 4 | before we break? |
| 12:31 | 5 | MR. COLLARD:  Not from plaintiffs. |
| 12:32 | 6 | (Conference between counsel.) |
| 12:32 | 7 | MR. COLLARD:  Oh, we have some objections |
| 12:32 | 8 | on the slides for Edwards, but I don't know if they |
| 12:32 | 9 | want to handle -- |
| 12:32 | 10 | THE COURT:  Are those the damages -- |
| 12:32 | 11 | that's the damages? |
| 12:32 | 12 | MR. COLLARD:  No.  Those aren't probably |
| 12:32 | 13 | until -- somebody who's going to probably go tomorrow. |
| 12:32 | 14 | THE COURT:  Oh, for their person. |
| 12:32 | 15 | MR. COLLARD:  Theirs.  Yes. |
| 12:32 | 16 | THE COURT:  Okay.  Yeah.  I think we're |
| 12:32 | 17 | in good shape then. |
| 12:32 | 18 | Anything else? |
| 12:32 | 19 | MR. BURESH:  Nothing for defendants. |
| 12:32 | 20 | THE COURT:  Okay. |
| 12:32 | 21 | MS. AMSTUTZ:  No, Your Honor. |
| 12:32 | 22 | THE COURT:  I'll see you at 1:45. |
| 12:32 | 23 | THE BAILIFF:  All rise. |
| 12:32 | 24 | (Recess taken.) |
| 01:49 | 25 | THE BAILIFF:  All rise. |

01:49  1              THE COURT:  Please remain standing for

01:49  2    the jury.

01:49  3              (Jury entered the courtroom.)

01:50  4              THE COURT:  Thank you.  You may be

01:50  5    seated.

01:50  6              Plaintiffs can call their next witness,

01:50  7    please.

01:50  8              MS. AMSTUTZ:  Your Honor, plaintiff calls

01:50  9    Emma Ou, corporate representative for ASUS Global Pte.

01:50  10   Limited.

01:50  11             (The witness was sworn.)

01:50  12                   DIRECT EXAMINATION

01:50  13   BY MS. AMSTUTZ:

01:51  14      Q.    Good afternoon.

01:51  15      A.    Good afternoon.

01:51  16      Q.    Introduce yourself to the jury, please.

01:51  17      A.    Okay.  My name's Emma Ou.  I am from ASUS

01:51  18   Global.

01:51  19      Q.    And you're actually here as the corporate

01:51  20   representative of ASGL, correct?

01:51  21      A.    Yes.

01:51  22      Q.    And you call it ASUS Global.  If I call it

01:51  23   ASGL, are we talking about the same entity?

01:51  24      A.    Yes.

01:51  25      Q.    And, Ms. Ou, you've been here for the duration

536

01:51  1    of the trial to listen to all of the testimony,

01:51  2    including the testimony of Ms. Chen that happened

01:51  3    earlier today?

01:51  4        A.    Yes.

01:51  5        Q.    And she and I discussed three entities in some

01:51  6    detail:  ASUSTeK, ACI, and ASGL.

01:51  7              Do you recall that?

01:51  8        A.    Yes.  I do.

01:51  9        Q.    And would you agree with me that if you used

01:51  10   their full formal names of all three, they all contain

01:51  11   "ASUS"?

01:52  12       A.    Yes.

01:52  13       Q.    And at your job at ASGL, you have an e-mail

01:52  14   address that ends in ASUS.com, correct?

01:52  15       A.    Correct.

01:52  16       Q.    And all the employees at ASGL have that same

01:52  17   domain for their e-mail address, correct?

01:52  18       A.    Correct.

01:52  19       Q.    And you've worked at ASGL since 2014, right?

01:52  20       A.    I'm sorry.  Can I have your question again?

01:52  21       Q.    Sure.

01:52  22             You've been employed by ASGL since 2014?

01:52  23       A.    Correct.

01:52  24       Q.    And you are currently the operation director

01:52  25   for ASGL?

01:52   1          A.    Yes.

01:52   2          Q.    And you've been in that particular position

01:52   3   since 2019?

01:52   4          A.    Yes.

01:52   5          Q.    Now, as the operation director of ASGL, you

01:52   6   are in charge of the company's administration center?

01:52   7          A.    Yes.  Correct.

01:52   8          Q.    And in that capacity, you manage the

01:52   9   operations at ASGL's office in Singapore, correct?

01:52   10         A.    Correct.

01:52   11         Q.    And the Singapore office of ASGL is the only

01:53   12   office of ASGL; is that right?

01:53   13         A.    Correct.

01:53   14         Q.    And that's been the case -- it's been the only

01:53   15   office of ASGL since you joined in 2014?

01:53   16         A.    Yes.

01:53   17         Q.    As a company, ASGL is a distributor of

01:53   18   ASUS-branded products; is that fair?

01:53   19         A.    Fair.

01:53   20         Q.    Is that correct?

01:53   21         A.    Correct.

01:53   22         Q.    And ASGL has been a distributor for

01:53   23   ASUS-branded products since 2013?

01:53   24         A.    Yes.

01:53   25         Q.    And is it your understanding that in 2013,

538

| | | |
|---|---|---|
| 01:53 | 1 | ASUSTeK built ASGL from the ground up? |
| 01:53 | 2 | A.    Yes. |
| 01:53 | 3 | Q.    So by the time you joined the company in 2014, |
| 01:53 | 4 | it was only about a year old; is that right? |
| 01:53 | 5 | A.    Correct. |
| 01:53 | 6 | Q.    And you agree that ASGL is a wholly owned |
| 01:53 | 7 | subsidiary of ASUSTeK? |
| 01:54 | 8 | A.    Yes. |
| 01:54 | 9 | Q.    And you're aware that that parent-subsidiary |
| 01:54 | 10 | relationship has existed since 2013? |
| 01:54 | 11 | A.    Yes. |
| 01:54 | 12 | Q.    Now, am I correct that in order to distribute |
| 01:54 | 13 | the ASUS-branded products, ASGL must purchase the |
| 01:54 | 14 | products first from ASUSTeK? |
| 01:54 | 15 | A.    Yes. |
| 01:54 | 16 | Q.    And when I say "ASUS-branded products," do you |
| 01:54 | 17 | understand that I'm referring to computers, |
| 01:54 | 18 | motherboards, laptops, desktops, and the like? |
| 01:54 | 19 | A.    Yes. |
| 01:54 | 20 | Q.    Physical products? |
| 01:54 | 21 | A.    Yes. |
| 01:54 | 22 | Q.    And ASGL does not purchase computer products |
| 01:54 | 23 | from any other company other than ASUSTeK? |
| 01:54 | 24 | A.    Yes. |
| 01:54 | 25 | Q.    Is that -- that's correct? |

539

01:54  1      A.    Correct.

01:54  2      Q.    So ASGL doesn't purchase computer products

01:54  3  from ASUSTeK's competitors like Dell or Samsung,

01:55  4  correct?

01:55  5      A.    Correct.

01:55  6      Q.    And for products going to the United States,

01:55  7  ASGL later sells those products to a company called

01:55  8  ACI, correct?

01:55  9      A.    Correct.

01:55  10     Q.    And ASGL does not sell ASUS-branded products

01:55  11  to any company in the United States other than ACI,

01:55  12  correct?

01:55  13     A.    Correct.

01:55  14     Q.    And to facilitate those transactions, ASGL has

01:55  15  an ordering system that internally you refer to as

01:55  16  e-commerce, right?

01:55  17     A.    Right.

01:55  18     Q.    And in the process of -- the process of

01:55  19  selling products to then come into the United States

01:55  20  begins with ACI placing an order on this e-commerce

01:56  21  system; is that right?

01:56  22     A.    No.

01:56  23     Q.    Okay.  Let me phrase it a different way.

01:56  24           ACI places orders for ASUS-branded products on

01:56  25  e-commerce; is that correct?

540

01:56  1        A.    Correct.

01:56  2        Q.    And once ACI inputs that order, it's routed to

01:56  3    ASGL; is that fair?

01:56  4        A.    Yes.

01:56  5        Q.    And then once ASGL gets the order, it's routed

01:56  6    to ASUSTeK, correct?

01:56  7        A.    Correct.

01:56  8        Q.    And ASGL sends ACI's order to ASUSTeK through

01:56  9    this same e-commerce system; is that right?

01:56  10       A.    Correct.

01:56  11       Q.    And the purpose of that flow of order is to

01:57  12   tell ASUSTeK which products and how much of each

01:57  13   product ACI wants, right?

01:57  14       A.    Correct.

01:57  15       Q.    And then once the ASUS-branded products are

01:57  16   actually manufactured, it's ASGL's responsibility to

01:57  17   arrange for a forwarder to get those products to ACI,

01:57  18   right?

01:57  19       A.    Yes.

01:57  20       Q.    And ACI's in the United States, correct?

01:57  21       A.    Correct.

01:57  22       Q.    And, in fact, isn't it true that ASGL never

01:57  23   takes physical possession of the products that ACI

01:57  24   orders, right?

01:57  25       A.    Yes.

541

01:57  1          Q.    And because ASGL never takes possession of the

01:57  2    ASUS-branded products that ACI orders, ASGL doesn't do

01:58  3    any testing on those products; is that correct?

01:58  4          A.    Correct.

01:58  5          Q.    So is it fair to say that ASGL must rely on

01:58  6    someone else to test the products before they get

01:58  7    shipped to the United States?

01:58  8          A.    Yes.

01:58  9          Q.    And once the ASUS-branded products arrive in

01:58  10   the United States, ASGL does not provide any customer

01:58  11   support for those products, correct?

01:58  12         A.    Correct.

01:58  13         Q.    And I believe that you've referred to this

01:58  14   relationship between ASGL and ASUSTeK as a buy-and-sell

01:58  15   relation.

01:58  16               Does that sound right?

01:58  17         A.    Correct.

01:58  18         Q.    But ASGL and ASUSTeK don't have a formal

01:59  19   agreement that governs this buy-and-sell relationship;

01:59  20   isn't that right?

01:59  21         A.    As per my knowledge, yes.  We don't.

01:59  22         Q.    To your knowledge, there's no written contract

01:59  23   that governs that buy-and-sell relation between ASGL

01:59  24   and ASUSTeK, correct?

01:59  25         A.    Yes.

542

01:59  1        Q.    But are you aware that there is a formal

01:59  2   agreement between ASGL and ACI?

01:59  3        A.    Yes.

01:59  4        Q.    And that's called a distribution agreement.

01:59  5   You're familiar with that?

01:59  6        A.    Yes.

01:59  7             MS. AMSTUTZ:  Can we pull up J-13,

01:59  8   please?

01:59  9   BY MS. AMSTUTZ:

01:59  10       Q.    Are you able to see J-13 on your screen?

01:59  11       A.    Yes.

01:59  12       Q.    Okay.  And do you recognize this as the

01:59  13  distribution agreement by and between ASGL and ACI?

02:00  14       A.    Yes.

02:00  15             MS. AMSTUTZ:  Your Honor, move to admit

02:00  16  J-13.

02:00  17             MS. MARRIOTT:  No objection.

02:00  18             THE COURT:  Admitted.

02:00  19             MS. AMSTUTZ:  Okay.  And if we can go to

02:00  20  Paragraph 3.2, which is on Page J-13-9.

02:00  21             Okay.  There we go.

       22  BY MS. AMSTUTZ:

02:00  23       Q.    Okay.  Ms. Ou, do you see this provision in

02:00  24  the distribution agreement entitled Advertising and

02:00  25  Sales Efforts?

543

| | | |
|---|---|---|
| 02:00 | 1 | A.    Yes. |
| 02:00 | 2 | Q.    Are you familiar with this provision? |
| 02:00 | 3 | A.    Yes. |
| 02:00 | 4 | Q.    It provides that: ███████████████ |
| 02:00 | 5 | ████████████████ |
| 02:00 | 6 | And that's referring to ACI, right? |
| 02:00 | 7 | A.    Yes. |
| 02:00 | 8 | Q.    ████████████████████ |
| 02:00 | 9 | ████████████████████████ |
| 02:01 | 10 | ██████ |
| 02:01 | 11 | Did I read that correctly? |
| 02:01 | 12 | A.    Yes. |
| 02:01 | 13 | Q.    And given your familiarity with this |
| 02:01 | 14 | agreement, do you understand the territory to be the |
| 02:01 | 15 | United States? |
| 02:01 | 16 | A.    Yes. |
| 02:01 | 17 | Q.    And then it goes on to say: █████ |
| 02:01 | 18 | ████████████████████████ |
| 02:01 | 19 | ████████████████ |
| 02:01 | 20 | ████████████████████████ |
| 02:01 | 21 | ████████████████ |
| 02:01 | 22 | ████████████████ |
| 02:01 | 23 | Did I read that correctly? |
| 02:01 | 24 | A.    Yes. |
| 02:01 | 25 | Q.    Now, in practice, like in the real world, ASGL |

544

02:01  1    does not provide any direction to ACI, does it?

02:01  2        A.    Yes.  We didn't provide any direction to ACI.

02:01  3        Q.    And in practice, ASGL is not involved in any

02:02  4    efforts to make sure the advertising of ASUS-brand

02:02  5    products in the U.S. is appropriate, correct?

02:02  6        A.    Yes.

02:02  7        Q.    And you don't even know why it says

02:02  8    ███████████████████████████████████████████████

02:02  9    ██████, do you?

02:02  10       A.    No.

02:02  11       Q.    That's because not -- that's not what happens

02:02  12   in practice, correct?

02:02  13       A.    Correct.

02:02  14       Q.    So, Ms. Ou, is it possible that there are

02:02  15   other provisions in this distribution agreement that

02:02  16   are not done in practice?

02:02  17       A.    In actual practice, we didn't involve.

02:02  18       Q.    Let me ask my question a little bit different.

02:02  19             It's a -- it's not a thick agreement, but it's

02:02  20   got multiple pages, right?

02:02  21       A.    Yes.

02:02  22       Q.    And lots of different provisions.  I just read

02:02  23   one to you, correct?

02:02  24       A.    Yes.

02:02  25       Q.    Is it possible, given that ASGL doesn't, you

02:02  1    know, do in practice what it says it's going to do in

02:03  2    Section 3.2, is it possible there are other provisions

02:03  3    where either ASGL or ACI doesn't do what it says it's

02:03  4    going to do in those provisions?

02:03  5        A.    Regard to this one, yes.

02:03  6        Q.    Now, back in 2019, you were selected to be the

02:03  7    operations director by ASGL's chairman Mr. Jonathan

02:03  8    Tseng; is that correct?

02:03  9        A.    Correct.

02:03  10       Q.    And his last name is pronounced Tseng, but

02:03  11   it's spelled T-s-e-n-g; is that right?

02:03  12       A.    You spell correct.  Yeah.

02:03  13       Q.    And at the time, Mr. Tseng was the chairman --

02:03  14   let me take that back.  Strike that.

02:03  15             Mr. Tseng was the chairman of ASGL when you

02:03  16   joined the company in 2014, correct?

02:04  17       A.    Yes.

02:04  18       Q.    And he was the chairman of ASGL until at least

02:04  19   May of '22, May of 2022, right?

02:04  20       A.    Yes.

02:04  21       Q.    But Mr. Tseng is no longer the chairman of

02:04  22   ASGL; is that right?

02:04  23       A.    He is the chairman.

02:04  24       Q.    Oh, he still is the chairman?

02:04  25       A.    Yeah.

02:04   1        Q.    Okay.  And when you joined ASGL in 2014, Eric

02:04   2   Chen was the president?

02:04   3        A.    Yes.

02:04   4        Q.    Is Mr. Chen still the president of ASGL?

02:04   5        A.    Yes.

02:04   6        Q.    And as of 2020, Mr. Tseng was the chairman of

02:04   7   ASGL and Mr. Eric Chen was the president of ASGL?

02:04   8        A.    Correct.

02:05   9              MS. AMSTUTZ:  Can we pull up P-95,

02:05  10   please?

02:05  11   BY MS. AMSTUTZ:

02:05  12        Q.    Okay.  Ms. Ou, I'm showing you the 2020 annual

02:05  13   report for ASUSTeK and its subsidiaries.

02:05  14              Do you see that?

02:05  15        A.    Yes.  I do.

02:05  16        Q.    And Ms. Chen and I talked about -- or had a

02:05  17   conversation about a different version from 2019.

02:05  18              Do you recall that?

02:05  19        A.    Yes.

02:05  20              MS. AMSTUTZ:  And if we turn to P-95-33.

       21   BY MS. AMSTUTZ:

02:05  22        Q.    And you can -- if it's easier to look on the

02:05  23   screen, that's great.

02:05  24              From this 2020 annual report, do you see a

02:05  25   list of directors for ASUSTeK?

02:05   1      A.    Yes.

02:05   2      Q.    And as you go down the list of the directors,

02:05   3   you see that Jonathan Tseng is listed as the director

02:06   4   of ASUSTeK, correct?

02:06   5      A.    Correct.

02:06   6      Q.    And if you keep going down the list of the

02:06   7   directors of ASUSTeK in 2020, you see that Eric Chen is

02:06   8   a director, correct?

02:06   9      A.    Correct.

02:06  10      Q.    Do you have any reason to believe that the

02:06  11   Mr. Tseng and the Mr. Eric Chen are not the same two

02:06  12   people that were also the chairman and president of

02:06  13   ASGL that same year?

02:06  14      A.    They are same people.

02:06  15      Q.    Okay.  I have one last question for you,

02:06  16   Ms. Ou.

02:06  17            You agree, as the corporate representative of

02:06  18   ASGL, that ASGL never received permission from Dr. Chu

02:06  19   or ACQIS to use its patents; is that correct?

02:06  20      A.    Yes.  We never receive.

02:06  21      Q.    Okay.  And you never asked?

02:06  22      A.    Since we are not aware about this one.

02:07  23      Q.    Okay.  But you never asked for the permission

02:07  24   and you never received it; is that fair?

02:07  25      A.    Can I have your question again?

| | | |
|---|---|---|
| 02:07 | 1 | Q.    Sure. |
| 02:07 | 2 | ASGL never received permission to use ACQIS' |
| 02:07 | 3 | patents, correct? |
| 02:07 | 4 | A.    Correct. |
| 02:07 | 5 | MS. AMSTUTZ:  Okay.  I'll pass the |
| 02:07 | 6 | witness, Your Honor. |
| 02:07 | 7 | CROSS-EXAMINATION |
| 02:07 | 8 | BY MS. MARRIOTT: |
| 02:07 | 9 | Q.    Good afternoon. |
| 02:07 | 10 | A.    Good afternoon. |
| 02:07 | 11 | Q.    Would you please just take a moment.  I know |
| 02:07 | 12 | you introduced yourself briefly, but tell the jury a |
| 02:08 | 13 | little bit about yourself. |
| 02:08 | 14 | A.    Okay.  My name's Emma Ou.  I am the employee |
| 02:08 | 15 | from ASUS Global.  I live in Singapore about ten years' |
| 02:08 | 16 | time. |
| 02:08 | 17 | Q.    And where were you from originally?  Where |
| 02:08 | 18 | were you born? |
| 02:08 | 19 | A.    Okay.  I'm Taiwanese.  I'm from Taiwan. |
| 02:08 | 20 | Q.    And now you live in Singapore? |
| 02:08 | 21 | A.    Yes. |
| 02:08 | 22 | Q.    Why did you move to Singapore? |
| 02:08 | 23 | A.    Because of love.  I met my husband in Taiwan, |
| 02:08 | 24 | and he's a Singaporean.  So when we decided to form a |
| 02:08 | 25 | family, I move to Singapore. |

549

02:08  1      Q.    And you live in Singapore now with your

02:08  2  family?

02:08  3      A.    Yes.  With husband and with four-years-old

02:08  4  little boy.

02:08  5      Q.    Could you also tell us a little bit about your

02:08  6  educational background?

02:08  7      A.    Okay.  I have a bachelor degree, and I major

02:08  8  in Chinese culture and literature.

02:08  9      Q.    And I believe you said this, but where are you

02:08  10  currently employed?

02:08  11      A.    I employed under ASUS Global.

02:08  12      Q.    And ASUS Global is sometimes referred to and

02:08  13  has been referred to throughout this trial as ASGL,

02:09  14  correct?

02:09  15      A.    Yes.  Correct.

02:09  16      Q.    Okay.  Now, you were asked how long you've

02:09  17  been with ASGL.

02:09  18            How long have you been in the computer

02:09  19  industry?

02:09  20      A.    I'm in computer industry almost 20 years.

02:09  21      Q.    What do you like about it?

02:09  22      A.    I love tech because I believe tech is always

02:09  23  linked to innovation to me, and innovation and tech is

02:09  24  something really can change or improve our day-to-day

02:09  25  life.

550

02:09  1      Q.    And if you could remind the jury how long

02:09  2  you've been at ASGL specifically.

02:09  3      A.    Ten years.

02:09  4      Q.    What attracted you to working for ASGL?

02:09  5      A.    It is same the reason why I work in tech

02:09  6  company.  Because I believe tech equal to innovation,

02:09  7  and innovation is -- really can change and improve

02:09  8  people's life.  And ASUS philosophy is just bring the

02:09  9  most innovative product to the market.

02:09  10     Q.    When you first started working at ASGL, what

02:10  11  were -- what were your initial roles and

02:10  12  responsibilities?

02:10  13     A.    Okay.  My first few years with AGL, I am the

02:10  14  product lead in Singapore, in charge of Singapore

02:10  15  market.

02:10  16     Q.    And what does that mean, to be a product lead

02:10  17  in charge of the Singapore market?

02:10  18     A.    Okay.  The product I cover is including

02:10  19  laptop, desktop, tablet, phone product, and my job

02:10  20  function is manage entire lifecycle of the product

02:10  21  lines and included bring to the right market, position

02:10  22  the right price point, introduce to the right customer.

02:10  23  This is generally my role.

02:10  24     Q.    Now, through this work that you were just

02:10  25  describing, did you develop an understanding of what

02:10   1   customers want and they're looking for in computer

02:10   2   products such as the laptops and desktops that are at

02:10   3   issue in this case?

02:10   4       A.   Yes.  Of course.

02:10   5       Q.   Okay.  What is your current role at ASGL?

02:10   6       A.   I have two role in ASGL.  First one is

02:11   7   operation director, and the second one, I'm the

02:11   8   regional head for Australia and New Zealand.

02:11   9       Q.   In your role as operation director for ASGL --

02:11  10       A.   Yes.

02:11  11       Q.   -- what is that, if you could describe it for

02:11  12   the jury?

02:11  13       A.   Okay.  The role for operation director is

02:11  14   manage the entire office.  That means the attrition

02:11  15   process.

02:11  16       Q.   Do you have a team that reports to you?

02:11  17       A.   Yes.  I have a team, about 50 people.

02:11  18       Q.   Okay.  Did you work with me to prepare some

02:11  19   slides to share with the jury today?

02:11  20       A.   Yes.

02:11  21       Q.   Okay.  Now, when I say the word "ASUS," we've

02:11  22   heard that word throughout this trial, what does that

02:11  23   word mean to you?

02:11  24       A.   ASUS is a branding, and to me, it represents

02:11  25   innovative.

02:11  1          MS. MARRIOTT:  Okay.  We can go to the

02:11  2     next slide.

02:11  3     BY MS. MARRIOTT:

02:11  4          Q.    Within the ASUS brand that you just described,

02:11  5     what types of traits or values are important for the

02:12  6     employees and the people who work on designing those

02:12  7     products?

02:12  8          A.    Uh-huh.  We have five values, and we call it

02:12  9     our DNA.  So the first one is humility, integrity,

02:12  10    diligence, agility, and courage.  So this is the five

02:12  11    DNA and philosophy we hope all of ASUS employee can

02:12  12    carry.

02:12  13         Q.    When you mention humility, what does that

02:12  14    mean?

02:12  15         A.    Translate, I will say humble.  So when we

02:12  16    humble, we will have room to improve ourself, learn a

02:12  17    new things.

02:12  18         Q.    How about integrity, what does that mean?

02:12  19         A.    Integrity is the fundamental and basic value

02:12  20    for everyone in the company.

02:12  21         Q.    How about diligence, what does that mean?

02:12  22         A.    Diligence.  Hard working.

02:12  23         Q.    Okay.  Agility?

02:12  24         A.    Agility is also I call too hard working.  We

02:12  25    are not just work hard, but we also have to work smart.

02:12    1        Q.    And courage, what does that mean?

02:12    2        A.    Courage.  Courage, I will say, is important to

02:13    3    innovation.  Because we need to have the courage to try

02:13    4    the new things, bring the new things out.  If we have a

02:13    5    new idea, have the courage to speak it out.

02:13    6        Q.    Now, we've just been talking about traits for

02:13    7    employees and people working on developing ASUS

02:13    8    products.

02:13    9              How about for the ASUS-brand products

02:13    10   themselves?  What is the design philosophy?

02:13    11       A.    Okay.  We have three design philosophy from

02:13    12   the first one.  So focus on fundamental.  Say some --

02:13    13   tech is tech.  People will think it's fancy, but in the

02:13    14   end, tech is to improve people's life, to resolve a

02:13    15   problem.  Right?  So focus on the fundamental, focus on

02:13    16   customer needs, this is a very first philosophy.

02:13    17             And the second one, innovation.  Innovation is

02:13    18   the -- bring the new things, break through.  Challenge

02:13    19   ourself to improve and bring the new thing to the

02:13    20   market.

02:13    21             Very lastly, lean thinking.  So lean thinking,

02:14    22   I will say, is find a most cost effective way of entire

02:14    23   value chain so we can bring the best value or

02:14    24   performance product to the market.

02:14    25             MS. MARRIOTT:  Okay.  Next slide.

554

02:14    1    BY MS. MARRIOTT:

02:14    2        Q.    Have ASUS laptops and desktops won any awards

02:14    3    within the industry?

02:14    4        A.    Oh, yes.  Every years we are fortunate to have

02:14    5    a lot of recognition.  From your left-hand side, it

02:14    6    reads from the media.  So that also including Fortune

02:14    7    Magazine and Forbes.

02:14    8            In your right-hand side, it will be kind of

02:14    9    towards products.  So we have the recognition from

02:14   10    worldwide, not just in Taiwan, but also we have it from

02:14   11    like CS, which is in U.S.  We have also have something

02:14   12    from Germany.  Worldwide attributions and recognitions.

02:14   13        Q.    Now, based on your experience, what are the

02:14   14    features that drive demand for laptops, ASUS laptops?

02:15   15        A.    First of all, I will say is quality and

02:15   16    service.  Because we store our valuable memories like

02:15   17    photos, or in the work, we storage important document

02:15   18    to the laptop.  Right?  So quality is the most

02:15   19    important things for a customer to choose their device.

02:15   20        Q.    Are there any other features that you would

02:15   21    say are driving demand for ASUS products?

02:15   22        A.    Second one I will say performance.

02:15   23        Q.    What do you mean by that?  What's included in

02:15   24    performance?

02:15   25        A.    Okay.  For performance, actually customer --

555

02:15  1    if I say top four, customer might look at first one,

02:15  2    CPU, which is processor.  Second one, GPU, like

02:15  3    graphics card.  Third one, I will say storage.  And

02:15  4    fourth one might be RAM.  They were asking those type

02:15  5    of...

02:15  6        Q.    And are there any other factors that you think

02:15  7    are driving demand of laptops?

02:15  8        A.    Yes.  So I might come to a third one, so form

02:16  9    factor.  So just back to the fundamental is we offer

02:16  10   the product best suits different lifestyle.  So form

02:16  11   factor is included.  Let me take some example.

02:16  12          First one, like me myself, I am a working

02:16  13   lady.  I travel a lot.  So thinking in life solution is

02:16  14   something comes to my mind.

02:16  15          So like for students, for different age

02:16  16   students, thanks to technology, every students they

02:16  17   ask.  So I mean, kids.  Kids, they are so used to use

02:16  18   touch.

02:16  19          So touch becomes kind of a form factor that

02:16  20   people will go for, and if we have touch devices come

02:16  21   with stylus pen, they can also bring back students'

02:16  22   learning journey which practice their handwriting.

02:16  23   Because if you have kids, you might -- you maybe can

02:16  24   relate, the handwriting skills that is kind of been

02:16  25   left out for new students.

556

02:16   1              And lastly, if like a family, they won't

02:16   2    really need (indiscernible) devices.  They might choose

02:17   3    a bigger screen size device.  So third one I will say

02:17   4    is a form factor.

02:17   5        Q.   Okay.  And are you familiar -- this is -- I'm

02:17   6    holding up a laptop.

02:17   7              Are you familiar with this laptop?

02:17   8        A.   Yes.

02:17   9        Q.   Okay.  What is this particular laptop?

02:17   10       A.   This is on the (indiscernible) product line

02:17   11   ROG.

02:17   12       Q.   Okay.  So this is the ROG laptop that is the

02:17   13   representative laptop in this case, correct?

02:17   14       A.   Correct.

02:17   15       Q.   Okay.  Would you say that this is a thin and

02:17   16   light laptop?

02:17   17       A.   No.  It is not.

02:17   18       Q.   It's a different form factor?

02:17   19       A.    It's different form factor, because for a

02:17   20   gamer, gamer, they are looking at something as high

02:17   21   performing.  They might look at the high refresh of the

02:17   22   screen.  They might look at a lot of lightings.  Gamer

02:17   23   always like lightings.  So it's different form factors.

02:17   24   Yeah.

02:17   25       Q.   You've heard PCI Express mentioned throughout

—557—

02:17  1    this trial, correct?

02:17  2        A.    Yes.

02:17  3        Q.    In all of your time at ASGL, has PCI Express

02:18  4    ever been identified by customers as a key feature that

02:18  5    they're looking for in a laptop?

02:18  6        A.    No.

02:18  7        Q.    And we've also been talking about USB

02:18  8    technology, correct?

02:18  9        A.    Correct.

02:18  10       Q.    Okay.  Is the fact that ASUS laptops and

02:18  11   desktops, is the fact that they have a USB port a

02:18  12   differentiator of those products in the marketplace?

02:18  13       A.    I will not say USB is a differentiator because

02:18  14   USB port is using across all of the laptop across

02:18  15   different brands.  So I might say this is a basic

02:18  16   function for a laptop.

02:18  17       Q.    A baseline function?

02:18  18       A.    Yes.

02:18  19       Q.    Okay.  Are you aware of any ASUS laptops or

02:18  20   desktops that are designed to have a removable module

02:18  21   for the CPU?

02:18  22       A.    No.  It's not design for removable.

02:18  23       Q.    Okay.  Now, you were asked some questions

02:18  24   about the business of ASGL by Ms. Amstutz, correct?

02:18  25       A.    Yes.

558

02:18    1                    MS. MARRIOTT:  Okay.  If we can go to the

02:19    2    next slide.

02:19    3    BY MS. MARRIOTT:

02:19    4        Q.    I want to talk about that a little bit more

02:19    5    with you.

02:19    6                    So on this particular map, where is ASGL

02:19    7    located?

02:19    8        A.    Okay.  ASGL is located in Asia.  Singapore.

02:19    9        Q.    Okay.  And ASGL has an office, a physical

02:19   10    office in Singapore?

02:19   11        A.    Yes.  We do.

02:19   12        Q.    About how many employees does ASGL have?

02:19   13        A.    We have around 250.

02:19   14        Q.    Does ASGL have any offices in the United

02:19   15    States?

02:19   16        A.    No.  We don't.

02:19   17        Q.    Does ASGL have any employees in the United

02:19   18    States?

02:19   19        A.    No.  We don't.

02:19   20        Q.    Does ASGL have any business operations in the

02:19   21    United States?

02:19   22        A.    No.

02:19   23        Q.    Does ASGL make any products in the United

02:19   24    States?

02:19   25        A.    No.

559

02:19   1      Q.    Does ASGL import products into the United

02:19   2  States?

02:19   3      A.    No.

02:19   4      Q.    Does ASGL sell products to customers in the

02:19   5  United States, end consumers?

02:19   6      A.    No.

02:19   7      Q.    Now, you were also asked some questions about

02:20   8  the relationship between ASGL and ASUSTeK.

02:20   9           Do you recall that?

02:20   10     A.    Yes.

02:20   11     Q.    Okay.  And just to be clear, is ASGL the same

02:20   12  company as ASUSTeK?

02:20   13     A.    No.  We are different.

02:20   14     Q.    Okay.  Does ASGL share any employees with

02:20   15  ASUSTeK?

02:20   16     A.    No.  We don't.  And it's not about for --

02:20   17  like, one employee work for two companies.

02:20   18     Q.    Sorry.  Could you explain that a little more?

02:20   19     A.    We are not allow one employee works for two

02:20   20  companies.  So we are different and not even allowed.

02:20   21     Q.    Okay.  And does ASUSTeK manage the operations,

02:20   22  the day-to-day, of ASGL?

02:20   23     A.    No.

02:20   24     Q.    Does ASUSTeK tell ASGL what to do?

02:20   25     A.    No.

560

02:20  1       Q.    Does ASGL, when it's doing business, does it

02:20  2   manage its own financial records?

02:20  3       A.    Yes.

02:20  4       Q.    Does it give all of its revenue to ASUSTeK?

02:21  5       A.    No.

02:21  6       Q.    Now, you also discussed that ASGL is a

02:21  7   distributor of ASUS products, correct?

02:21  8       A.    Correct.

02:21  9       Q.    Who does -- just generally, and I'm not

02:21 10   limiting it to the United States.

02:21 11            But who does ASGL sell products to?

02:21 12       A.    We sell product worldwide to our subsidiary

02:21 13   company.  To some other country we don't even have

02:21 14   subsidiary, we will sell it to the distributor there.

02:21 15       Q.    Okay.  So throughout Europe?

02:21 16       A.    Huh?

02:21 17       Q.    Countries throughout Europe, you sell?

02:21 18       A.    Yes.  All over the world.

02:21 19       Q.    And what is the name of the subsidiary company

02:21 20   that ASGL sells products to in the United States?

02:21 21       A.    ACI.

02:21 22       Q.    Are ASGL and ACI the same company?

02:21 23       A.    No.  We are different.

02:21 24       Q.    Does ASGL have any ownership whatsoever over

02:22 25   ACI?

561

02:22  1        A.    No.

02:22  2                  MS. MARRIOTT:  If we can pull up J-13,

02:22  3    please.

02:22  4    BY MS. MARRIOTT:

02:22  5        Q.    This is the distribution agreement between

02:22  6    ASGL and ACI, correct?

02:22  7        A.    Correct.

02:22  8        Q.    And you discussed this earlier with

02:22  9    Ms. Amstutz?

02:22  10       A.    Yes.

02:22  11       Q.    Okay.

02:22  12                 MS. MARRIOTT:  If we could go to

02:22  13   Section 2.4.

02:22  14   BY MS. MARRIOTT:

02:22  15       Q.    You were shown one provision of this

02:22  16   agreement, but I want to ask you about this one.

02:22  17              Does this agreement say anything about whether

02:22  18   ASGL can control ACI?

02:22  19       A.    As you can see, in this agreement, we can't --

02:22  20   we can't control and nothing to do, give the power to

02:22  21   or control their day-to-day activities.

02:22  22       Q.    So according to this Paragraph 2.4: ███████

02:22  23   ██████████████████████████████████████████████████

02:23  24   ██████████████████████████████████████████████████

02:23  25   ████████████████████████████████████████████

562

02:23   1              Correct?

02:23   2       A.    Correct.

02:23   3                    MS. AMSTUTZ:  Objection, leading.

02:23   4                    THE COURT:  Overruled.

02:23   5                    MS. MARRIOTT:  If we could go back to the

02:23   6       slides, please.  And specifically, the map we were

02:23   7       looking at.

02:23   8                    Thank you.

02:23   9       BY MS. MARRIOTT:

02:23   10      Q.    Now, I'd like to ask you just briefly some

02:23   11      questions about the process of how the products get

02:23   12      into the United States.

02:23   13                    When ASGL sells products to ACI, how does ASGL

02:23   14      know what products ACI would like to buy?

02:23   15      A.    ACI will put in forecasting to e-commerce

02:23   16      system so we will know what is the product they want to

02:23   17      buy.

02:23   18      Q.    So ACI decides what it wants to buy?

02:23   19      A.    Yes.  Correct.

02:23   20      Q.    Once ACI buys products from ASGL, what happens

02:23   21      next?

02:23   22      A.    Once they buy product on ASGL, ASGL order will

02:24   23      direct back to the factory.  So when factory

02:24   24      manufacture and the product is ready for order, we'll

02:24   25      pick up the goods, then ship to the United States.

563

02:24  1       Q.    Okay.  So once the factories make the

02:24  2   products, what happens to the goods?

02:24  3       A.    The forwarder will pick up the goods --

02:24  4       Q.    Okay.

02:24  5       A.    -- and ship to U.S.

02:24  6       Q.    They're loaded onto a ship?

02:24  7       A.    Yes.  So -- oh, of course.  Yes.  So from

02:24  8   factory, then we will load on a ship, then send to

02:24  9   United States.

02:24  10      Q.    And on this slide, do you -- can you show us

02:24  11  or point out to the jury, where do those goods get

02:24  12  loaded onto the ship?  Is it depicted on the slide?

02:24  13      A.    Yes.  There is -- yeah.  There's a blue dot

02:24  14  located in China, so they will be shipping out from

02:24  15  China.

02:24  16      Q.    Okay.  And on this slide, it says:  Free on

02:24  17  board.

02:24  18            Do you see that?

02:25  19      A.    Yes.

02:25  20      Q.    Do you understand that term?

02:25  21      A.    Yes.

02:25  22      Q.    What does it mean?

02:25  23      A.    Okay.  Free on board is the trading terms

02:25  24  between ASGL and ACI.  We call it FOB, which means when

02:25  25  the goods load on the ship, the ownership will transfer

02:25  1    from ASGL to ACI.

02:25  2        Q.    And that happens when the goods are loaded

02:25  3    onto the ship typically in China?

02:25  4        A.    Yes.  Correct.

02:25  5        Q.    Now, we also have a dotted line.  What is that

02:25  6    depicting?

02:25  7        A.    Sorry.  Can I have the question again?

02:25  8        Q.    Sure.

02:25  9              There's a dotted line that goes from China

02:25  10   over to the dot that says ACI, correct?

02:25  11       A.    Yes.  Yes.

02:25  12       Q.    Is that depicting that the goods are being

02:25  13   shipped?

02:25  14       A.    Yes.

02:25  15       Q.    Okay.  Who pays for the shipping of those

02:25  16   goods?

02:25  17       A.    ACI.

02:25  18       Q.    And while those goods are on the ship and

02:25  19   being transported to the United States, who's paying

02:25  20   for the insurance for those goods?

02:25  21       A.    ACI.

02:25  22       Q.    Once those goods get into the port, the

02:26  23   U.S. port, who handles getting them through customs?

02:26  24       A.    ACI.

02:26  25       Q.    Who handles importing them into the United

565

| | | |
|--|--|--|
| 02:26 | 1 | States? |
| 02:26 | 2 | A.    ACI. |
| 02:26 | 3 | Q.    And once the products are in the United |
| 02:26 | 4 | States, who sells them to U.S. customers? |
| 02:26 | 5 | A.    ACI. |
| 02:26 | 6 | Q.    Now, prior to the filing of this lawsuit, did |
| 02:26 | 7 | Dr. Chu or ACQIS ever even try to contact ASGL, to your |
| 02:26 | 8 | knowledge? |
| 02:26 | 9 | A.    No. |
| 02:26 | 10 | Q.    And did ASGL know about ACQIS or Dr. Chu's |
| 02:26 | 11 | patents prior to the filing of this lawsuit? |
| 02:26 | 12 | A.    No.  We don't know. |
| 02:26 | 13 | Q.    And my final question is:  For you -- why was |
| 02:26 | 14 | it important for you to come all the way from Singapore |
| 02:26 | 15 | to Waco to speak with the jury today? |
| 02:26 | 16 | A.    Because the case is important and kind of top |
| 02:26 | 17 | priority for us.  So this is why it brought me to here, |
| 02:26 | 18 | speak on the truth to everyone. |
| 02:26 | 19 | Q.    Thank you. |
| 02:26 | 20 | MS. MARRIOTT:  Pass the witness. |
| 02:26 | 21 | MS. AMSTUTZ:  Nothing further, Your |
| 02:26 | 22 | Honor. |
| 02:26 | 23 | THE COURT:  You may step down, ma'am. |
| 02:27 | 24 | Who's your next witness, please? |
| 02:27 | 25 | MS. AMSTUTZ:  Your Honor, we're calling |

02:27    1    Bryan Chen by deposition.

02:27    2                    THE COURT:  Ladies and gentlemen of the

02:27    3    jury, when the attorneys are getting a case ready for

02:27    4    court, they're able to request to take what is known as

02:27    5    a deposition of witnesses.

02:27    6                    What happens is the deposition is

02:27    7    arranged.  There's an attorney representing the

02:27    8    witness; there is another attorney who will be asking

02:27    9    questions.  Anyone gets to ask questions, just like

02:27    10   here.  But most importantly, the witness is sworn in by

02:27    11   a court reporter just like they are in person.

02:27    12                   Sometimes there are witnesses that the

02:27    13   parties cannot persuade either through force or

02:27    14   requesting that they attend the trial, geographically

02:27    15   or something like that.

02:27    16                   So we are going to play the deposition

02:27    17   for you in the format of one attorney asking the

02:28    18   questions and --

02:28    19                   I don't know if you're an attorney or

02:28    20   not?

02:28    21                   MR. MEYER:  I am.

02:28    22                   THE COURT:  -- and another person acting

02:28    23   as the witness who was there.

02:28    24                   That long soliloquy was to let you know

02:28    25   that what's important here is that the testimony was

02:28  1   given under oath.  You all are the judges.  You're free

02:28  2   to accept it, reject it, whatever you care to do, but

02:28  3   you should give it equal dignity as you would if that

02:28  4   person were here live and giving you the testimony in

02:28  5   person.

02:28  6                    Counsel?

02:28  7                    MS. AMSTUTZ:  Thank you, Your Honor.

       8   (Deposition of Bryan Chen read as follows:

02:28  9        Q.    Thank you for joining us, Mr. Chen.

02:28  10             You understand you're here today to be deposed

02:28  11  in this, a dispute between ACQIS and ASUSTeK?

02:28  12       A.    Yes.

02:28  13       Q.    And do you understand that your role in this

02:28  14  deposition is to provide testimony on behalf of

02:28  15  ASUSTeK?

02:28  16       A.    Yes.

02:28  17       Q.    And that is to say, your testimony today is

02:28  18  not provided strictly on behalf of yourself but,

02:29  19  rather, on behalf of your company ASUSTeK; is that

02:29  20  right?

02:29  21       A.    Yes.

02:29  22       Q.    All right.  What is your position at ASUSTeK,

02:29  23  Mr. Chen?

02:29  24       A.    I am the product manager for laptops.

02:29  25       Q.    For what company?

568

02:29  1       A.    ASUS Taipei.

02:29  2       Q.    How is ASUS Taipei related to ASUSTeK Computer

02:29  3  Incorporated?

02:29  4       A.    Actually, it would be ASUSTeK in Taipei.

02:29  5       Q.    Help me understand.  Is ASUSTeK Taipei a

02:29  6  distinct legal entity from ASUSTeK Computer

02:29  7  Incorporated?

02:29  8       A.    They are distinct.  The Taipei one is just

02:29  9  ASUSTeK.

02:29  10      Q.    Okay.  So you work for ASUSTeK Computer

02:29  11 Incorporated?

02:29  12      A.    Yes.  I work at ASUSTeK.  Is what you want to

02:29  13 know the complete name?

02:29  14      Q.    Well, this lawsuit is being maintained against

02:29  15 ASUSTeK Computer Incorporated.  I want to know if you

02:30  16 work for that company or some other legal entity.

02:30  17      A.    Yes.  Indeed, I work for ASUSTeK Computer.

02:30  18      Q.    Did ASUSTeK have its own manufacturing

02:30  19 facilities or does it exclusively rely on third-party

02:30  20 manufacturers?

02:30  21      A.    ASUSTeK relies fully on third-party

02:30  22 manufacturing.

02:30  23      Q.    And these third-party manufacturers

02:30  24 manufacture ASUSTeK's products according to

02:30  25 specifications and designs provided by ASUSTeK?

02:30  1      A.    Correct.  They contract manufacture for us.

02:30  2      Q.    Let me ask the question another way.

02:30  3            Every ASUSTeK product that leaves a

02:30  4   third-party facility leaves constructed according to

02:30  5   the specifications and instructions provided by ASUSTeK

02:30  6   to the manufacturer, correct?

02:30  7      A.    Yes.  They are manufactured based on our

02:30  8   requirement and our instructions.

02:30  9      Q.    Is it fair to infer, then, that PCIe Gen 3

02:31  10  provides a fast and stable connection between the

02:31  11  expansion slot and the CPU socket?

02:31  12     A.    I believe so.  This would be the CPU

02:31  13  constraint or recommendation, and the engineer would

02:31  14  choose such a channel.

02:31  15     Q.    Okay.  Do you know when ASUSTeK or its

02:31  16  competitors began to introduce USB 3 components to

02:31  17  their products?

02:31  18     A.    USB 3, it was quite early.  I'm not sure.

02:31  19  Maybe between 2011 and 2013.

02:31  20     Q.    Okay.  So in this time period, 2011 to 2013,

02:31  21  would it have been important to ASUS to also begin

02:31  22  introducing USB 3 ports to its products?

02:31  23     A.    This is my understanding.  We wanted a few

02:31  24  models to incorporate better performing features.  And

02:31  25  that includes GPU and I/O port.  So we discuss with the

02:31   1    USB alliance in Intel and prioritize this in some

02:31   2    models.

02:31   3        Q.    Okay.  By 2013, would it have been important

02:32   4    to include USB 3 ports on ASUSTeK products in the

02:32   5    United States?

02:32   6        A.    If it was 2013, then only a few models would

02:32   7    support this feature.  Most models would be supporting

02:32   8    2.0 back then.

02:32   9        Q.    What about PCIe, could ASUSTeK remain

02:32  10    competitive in the motherboard, server, and PC markets

02:32  11    if it did not have PCIe interconnections in its

02:32  12    products?

02:32  13        A.    In our discussion, we are talking about

02:32  14    whether without PCIe, we can maintain our

02:32  15    competitiveness.  Now, that depends on the platform

02:32  16    used.  ASUS products now are mainly based on Intel and

02:32  17    AMD which have constraints.  And we would not be able

02:32  18    to break through those constraints, but those include

02:32  19    their recommendation, which is PCIe.

02:32  20        Q.    I heard testimony earlier that ASUSTeK

02:33  21    Computer Incorporated provided product design and

02:33  22    instructions to its manufacturers, and these

02:33  23    manufacturers design the products according to those

02:33  24    schematics and instructions.

02:33  25            Do you remember that testimony?

02:33  1    A.    Yes.  I remember that.

02:33  2    Q.    Okay.  Is that true for this entire list of

02:33  3   Chinese, Taiwanese, and Vietnamese manufacturers of

02:33  4   these four classes of products?  Your employer provides

02:33  5   designs and instructions to these third parties and

02:33  6   they manufacture these products according to those

02:33  7   designs and instructions?

02:33  8    A.    Correct.  That is how we collaborate with

02:33  9   them.

02:33  10            MS. AMSTUTZ:  Your Honor, that's the

02:33  11  conclusion of the deposition testimony of Bryan Chen.

02:33  12            Plaintiff now calls Jaime Morquecho via

02:33  13  deposition.

02:33  14  (Deposition of Jamie Morquecho read as follows:

02:33  15    Q.    It's nice to meet you.

02:34  16            Will you just say your name for the record so

02:34  17  I make sure that I'm pronouncing it correctly?

02:34  18    A.    My name is Jaime Morquecho.

02:34  19    Q.    Okay.  You're here today to testify on behalf

02:34  20  of -- of what's called a Rule 30(b)(6) designee.

02:34  21            Do you understand that?

02:34  22    A.    Correct.

02:34  23    Q.    Which company do you understand you're here to

02:34  24  testify on behalf of today?

02:34  25    A.    My understanding is ASUS Computer

02:34  1    International.

02:34  2        Q.    Does ACI have office space?

02:34  3        A.    Yes.

02:34  4        Q.    And where are ACI's offices?

02:34  5        A.    Fremont, California.

02:34  6        Q.    Is that it?  Nowhere else?

02:34  7        A.    I believe we also have in Southern California.

02:34  8        Q.    All right.  Any other offices outside of

02:34  9    Southern California?

02:34  10       A.    Not to my knowledge.  For ACI, no.

02:34  11       Q.    How long have you been with ACI?

02:35  12       A.    Since early 2008.

02:35  13       Q.    But because ACI has affiliated companies, it

02:35  14   may be the case that your duties sometimes have you

02:35  15   performing work for affiliated companies.

02:35  16             Do you understand?

02:35  17       A.    No.  I do not.  I do not do work for

02:35  18   affiliated companies.

02:35  19       Q.    All right.  And when you are communicating

02:35  20   with people in Taiwan, what types of subjects are you

02:35  21   communicating with them about?

02:35  22       A.    Service.

02:35  23       Q.    All right.  And typically, who would your

02:35  24   contacts in Taiwan be?

02:35  25       A.    Customer service-related people.

573

02:35  1      Q.    So do they have a -- is there another service

02:35  2   department in Taiwan?

02:35  3      A.    There is a -- a Taiwan service department or

02:35  4   global service department, if you want to call it that.

02:35  5      Q.    All right.  How many employees does ACI have?

02:35  6      A.    Approximately 320, give or take.

02:35  7      Q.    Let's talk about an exhibit.

02:36  8      A.    So I see Exhibit 3.

02:36  9      Q.    Yep.  And then it says:  Copy of ACI 000001.

02:36  10          Do you see that?

02:36  11     A.    Yes.  Similar to that.

02:36  12     Q.    And this is a spreadsheet, and it was

02:36  13  produced.  It says "copy of ACI" and then all those

02:36  14  zeros because that's the designation that it was

02:36  15  produced in our case with.

02:36  16          Have you ever seen this spreadsheet before?

02:36  17     A.    Yes.  This was one of the files I mentioned in

02:36  18  the beginning.

02:36  19     Q.    That you reviewed preparing for today?

02:36  20     A.    Yes.

02:36  21     Q.    Would ACI maintain this sort of information,

02:36  22  sales, revenue, cost of goods in some sort of database

02:36  23  or computerized system?

02:36  24     A.    ACI maintains its own records.  Yes.

02:36  25     Q.    All right.  Are all of the sales in the

574

02:36   1   spreadsheet made by ACI?

02:36   2       A.   My understanding, this is in response to the

02:37   3   notice for relevant products by ACI.  Yes.

02:37   4       Q.   Are there any other entities that sell ASUS

02:37   5   products in the United States other than ACI?

02:37   6       A.   No.  Not to my knowledge.  No.

02:37   7       Q.   All right.  Let's open up another exhibit.

02:37   8       A.   I have Exhibit 0004 open.

02:37   9       Q.   Okay.  You see in Dell -- I'm sorry.  Strike

02:37   10  that.

02:37   11       Okay.  You see in the cell D1, it says 90 part

02:37   12  number.

02:37   13       A.   Yes.

02:37   14       Q.   Does that have any significance or meaning to

02:37   15  you?

02:37   16       A.   It's a part number.

02:37   17       Q.   What does the "90" mean?

02:37   18       A.   It appears that just everything below it also

02:37   19  has the 90.

02:37   20       Q.   So do all ASUS products have 90 as part of the

02:37   21  part number?

02:37   22       A.   Based on what you're showing me here, yes.

02:37   23       Q.   All right.  You don't have any independent

02:37   24  knowledge about what part numbers ASUS products have?

02:37   25       A.   Also the Exhibit 0003, what you also had shown

575

02:38  1    me.

02:38  2        Q.    All right.  So they all have 90 or 9-0?

02:38  3    That's just something that they all have?

02:38  4        A.    That's my understanding as a part number.

02:38  5        Q.    Okay.  So if you take any of these, just pick

02:38  6    one for me, will you?

02:38  7        A.    Let's see here.  I guess Row 5.

02:38  8        Q.    Okay.

02:38  9        A.    It's random.  Yeah.

02:38 10        Q.    Okay.  So that's Prime X299-A II.

02:38 11        A.    That's what I see in Row 5.

02:38 12        Q.    Okay.  And then you see it then has this 90

02:38 13    part number associated with it?

02:38 14        A.    Yes.

02:38 15        Q.    Okay.  Is there a way to find this part number

02:38 16    within the exhibit we were looking at before,

02:38 17    Exhibit 3?

02:38 18        A.    Yeah.  You would just look at the -- the

02:38 19    number that you just called out in Column D and search

02:38 20    for it in the previous.

02:38 21        Q.    All right.  ACI is the importer of ASUS

02:38 22    products in the United States; is that right?

02:38 23        A.    Yes.

02:38 24        Q.    Do you know how it became the importer for

02:39 25    ASUS products in the United States?

576

02:39  1          A.     For products that we purchase.

02:39  2          Q.     All right.  It's the only importer of ASUS

02:39  3    products into the United States?

02:39  4          A.     All I can speak to is the products that we

02:39  5    purchase that we import.

02:39  6          Q.     Does ACI pay any dividends to ASUSTeK?

02:39  7          A.     Not to my knowledge.  No.

02:39  8          Q.     Does it make any payments of any nature to

02:39  9    ASUSTeK?

02:39  10         A.     Not to my knowledge.

02:39  11         Q.     Does it pay any dividends to any company?

02:39  12         A.     Not to my knowledge.

02:39  13         Q.     All right.  Do they come, do you know -- do

02:39  14   the ASUS products come directly from the factory to the

02:39  15   United States or are there intermediate stops?

02:39  16         A.     When we import the product, it goes to ports.

02:39  17   And when customs gets cleared, then, you know, we will

02:39  18   distribute it where they need to go.

02:39  19         Q.     So after it clears customs, where are the

02:39  20   products taken to?

02:39  21         A.     They may go to warehouses.

02:40  22         Q.     Okay.  Are these like regional warehouses?

02:40  23         A.     There's warehouses in California.

02:40  24         Q.     Okay.  And who is taking the products from

02:40  25   customs to the warehouse?

02:40  1        A.    You said who is taking?

02:40  2        Q.    Yeah.

02:40  3        A.    It would be couriers.

02:40  4        Q.    All right.  Couriers hired by whom?

02:40  5        A.    By ACI.

02:40  6        Q.    Okay.  Do ASUS products ever go directly from

02:40  7   customs to customers?

02:40  8        A.    They would go to our -- from the port to --

02:40  9   after clearing customs, to our warehouse.

02:40  10       Q.    Okay.  So -- and how is ACI deciding what to

02:40  11  import?

02:40  12       A.    It's -- ACI purchases what we want from ASGL

02:40  13  and we import it.

02:40  14       Q.    Okay.  Well, does ACI -- how does ACI know how

02:40  15  much to purchase from ASGL?

02:40  16       A.    We have a sales staff that will, you know,

02:40  17  work with customers locally and, you know, collect what

02:40  18  the customers are interested to -- to potentially

02:40  19  order, and we'll buy those products from ASGL and

02:40  20  import them to the United States.

02:40  21       Q.    Is there approval from ASUSTeK of the sales

02:41  22  target -- well, let's back up.

02:41  23             Does ACI create sales targets for itself?

02:41  24       A.    Absolutely.

02:41  25       Q.    All right.  And who do -- is in charge of

02:41  1    developing those?

02:41  2        A.    It would be Steve Chang.

02:41  3        Q.    Does he work with ASUSTeK in developing those

02:41  4    targets?

02:41  5        A.    No.

02:41  6        Q.    Does he submit those targets for approval from

02:41  7    ASUSTeK?

02:41  8        A.    No.

02:41  9        Q.    Okay.  What type of coordination is there

02:41  10   between ASUSTeK R&D department and ACI?

02:41  11       A.    I don't believe there's any.

02:41  12       Q.    There's no coordination or communication that

02:41  13   happens whatsoever between ACI and ASUSTeK regarding

02:41  14   customer demand in the United States?

02:41  15       A.    Not to my knowledge, other than the

02:41  16   information I've already answered previously.

02:41  17       Q.    Do you know how ACI sets its own prices for

02:41  18   its customers?

02:41  19       A.    ACI, for the products we purchase from ASGL

02:41  20   and import to the United States, we -- we then sell,

02:41  21   ask, set our own pricing in our own country for our own

02:42  22   customers.

02:42  23       Q.    All right.  Do you know what extent ASGL is

02:42  24   setting suggested prices for the United States market?

02:42  25       A.    I don't know how ASGL sets its own pricing for

579

02:42  1    their own products.  All I know is that ACI purchases

02:42  2    from them.  We import it and, you know, we sell based

02:42  3    on price to our customer in our market.

02:42  4        Q.    When the ASUS products hit the port in the

02:42  5    United States, are they packaged in any certain way?

02:42  6    Well, I guess they're packaged in some way, right?

02:42  7        A.    They would be in palletized format, possibly,

02:42  8    depending on the mode of the transportation, or wrapped

02:42  9    in plastic.  I'm not too familiar.  But that would be

02:42  10   to make sure they arrive safely.

02:42  11       Q.    Does the -- does ACI add any sort of written

02:42  12   materials, like user manuals, specifications,

02:42  13   advertisements, to the packaging between the time that

02:42  14   they arrive at the port to when they're sent to ACI's

02:42  15   customers?

02:42  16       A.    Not to my knowledge.  No.  We would not do

02:43  17   that.

02:43  18       Q.    How about accessories, like keyboards, power

02:43  19   cords, those sorts of things, are those added into the

02:43  20   packaging by ACI, or are those already there when they

02:43  21   hit the port?

02:43  22       A.    It would vary based on the product.  If the

02:43  23   product includes that, it would be in the box.  If the

02:43  24   product doesn't include that, it would not be in the

02:43  25   box.

02:43  1       Q.    Would ACI ever add that sort of stuff into the

02:43  2  box?

02:43  3       A.    No.

02:43  4       Q.    Do you know where that -- user manuals and

02:43  5  written materials are added into the packaging?

02:43  6       A.    The factories oversees.

02:43  7       Q.    And power adapters, keyboards, and those types

02:43  8  of accessories, do you know when those are added into

02:43  9  the box?

02:43  10      A.    Whatever is relevant to the product that's

02:43  11 configured, that would be all done in the manufacturing

02:43  12 overseas.

02:43  13      Q.    For the user manuals, who creates those?

02:43  14      A.    All contents that's in the box is manufactured

02:43  15 overseas.

02:43  16      Q.    How often are the user manuals updated?

02:43  17      A.    I don't have visibility to that.  That's done

02:44  18 by the overseas team.

02:44  19      Q.    All right.  And when we say "overseas," we're

02:44  20 talking about ASUSTeK?

02:44  21      A.    The manufacturer.  Yes.

02:44  22      Q.    After the products are imported and hit the

02:44  23 port in the United States, is there any additional

02:44  24 function -- functional testing that's performed by ACI?

02:44  25      A.    No.

02:44    1        Q.    Is there any software installation that's

02:44    2   performed by ACI?

02:44    3        A.    No.

02:44    4        Q.    Is there an operating system or anything like

02:44    5   that installed by ACI?

02:44    6        A.    No.

02:44    7        Q.    So all of the software and operating system

02:44    8   already comes on the computer at the factory?

02:44    9        A.    If it -- if the product comes with an

02:44   10   operating system, yes.

02:44   11        Q.    Are any manufacturing steps performed in the

02:44   12   United States at all?

02:44   13        A.    No.

02:44   14             MS. AMSTUTZ:  Your Honor, that concludes

02:44   15   the deposition testimony of Jaime Morquecho.

02:44   16             Plaintiff next calls Wen-Bin Jian by

02:45   17   deposition.

        18   (Deposition of Wen-Bin Jian read as follows:

02:45   19        Q.    Thank you, Mr. Jian, for being here.

02:45   20             Can you please state your name for the record

02:45   21   and tell me who is your employer?

02:45   22        A.    My name is Wen-Bin Jian.  My employer is

02:45   23   ASUSTeK Computer, Inc.

02:45   24        Q.    Thank you, Mr. Jian.

02:45   25             What is your position with ASUSTeK?

582

02:45  1    A.    The division director of the R&D division of
02:45  2  the laptop business unit of ASUSTeK.
02:45  3    Q.    Are there any members of the desktop group or
02:45  4  the business PC group that are part of ACI?
02:45  5    A.    Not to my understanding.
02:45  6    Q.    Are there any members in your department who
02:45  7  are part of ACI?
02:45  8    A.    No.
02:45  9    Q.    Do you ever communicate with anybody at ACI in
02:45  10  your job?
02:45  11    A.    No.
02:45  12    Q.    Do ASUS laptops use PCI Express communication,
02:46  13  correct?
02:46  14    A.    Yes.
02:46  15    Q.    Are you aware of any ASUS product, laptop,
02:46  16  desktop, server, or motherboard that does not use PCI
02:46  17  Express?
02:46  18    A.    I don't think there is.
02:46  19    Q.    Are you aware of any CPU products that do not
02:46  20  use PCI Express?
02:46  21    A.    None.
02:46  22    Q.    So if a competitor laptop in a similar price
02:46  23  range uses PCI Express and has USB 3.0 or later ports,
02:46  24  would that lead you to want to include that same
02:46  25  technology for competitive reasons?

02:46  1      A.    Yes.

02:46  2      Q.    But you understand that if you connect PCI

02:46  3  Express to a traditional PCI device, they can still

02:46  4  communicate, right?

       5      A.    (No audible response.)

02:46  6      Q.    Right.  What I meant was:  The PCI traditional

02:46  7  device could understand the data transmitted by the PCI

02:46  8  Express.  I wasn't talking about the physical hardware

02:47  9  connection.

02:47  10     A.    We have not experienced that in doing our

02:47  11  design.

02:47  12             MS. AMSTUTZ:  Your Honor, that concludes

02:47  13  the deposition testimony of Wen-Bin Jian.

02:47  14             THE COURT:  Was that the last depo?

02:47  15             MS. AMSTUTZ:  I'm sorry?

02:47  16             THE COURT:  Was that the last depo?

02:47  17             MS. AMSTUTZ:  Yes, Your Honor.

02:47  18             THE COURT:  You may step down, sir.

02:47  19  Thank you.

02:47  20             MS. HEPLER:  Your Honor, ACQIS calls

02:47  21  Justin Lewis to the stand.

02:47  22             (The witness was sworn.)

02:47  23             MS. HEPLER:  Your Honor, may I approach?

02:48  24                  DIRECT EXAMINATION

02:48  25  BY MS. HEPLER:

—584—

02:48  1      Q.    Good afternoon, Mr. Lewis.

02:48  2      A.    Good afternoon.

02:48  3      Q.    Could you please introduce yourself to the

02:48  4  jury for us?

02:48  5      A.    Yes.  My name is Justin Lewis.

02:48  6      Q.    And what do you do for a living, Mr. Lewis?

02:48  7      A.    Currently, I am the CEO of Truest Consulting,

02:48  8  a financial consulting firm that focuses on the value

02:48  9  of intellectual property.

02:48  10     Q.    And, Mr. Lewis, have you been retained by

02:48  11 ACQIS to provide an expert opinion in this case?

02:48  12     A.    I have.  Yes.

02:48  13     Q.    What opinion have you been asked to provide?

02:48  14     A.    In this matter, I've been asked to determine

02:48  15 what I think the appropriate measure of damages is in

02:48  16 this case.

02:48  17     Q.    And, Mr. Lewis, are you being compensated by

02:48  18 ACQIS for your time here today?

02:48  19     A.    I am.  Yes.

02:48  20     Q.    Does your compensation in any way depend on

02:48  21 the content of your testimony?

02:49  22     A.    It doesn't, and it can't.  As a CPA and as a

02:49  23 damages witness, it would be improper for me to accept

02:49  24 any contingent payment.

02:49  25     Q.    And have you provided some slides for us to go

585

02:49  1    through to support your opinion today?

02:49  2         A.    I have.  Yes.

02:49  3         Q.    Okay.  All right.  Mr. Lewis, before we get

02:49  4    into the analysis you performed, I'd like to discuss

02:49  5    your qualifications and background.

02:49  6              Can you describe your background for the jury,

02:49  7    please?

02:49  8         A.    Sure.  So let's see.  I spent the first

02:49  9    16 years of my life in Houston, Texas before moving to

02:49  10   California in the middle of high school.

02:49  11             Ultimately, I ended up at the University of

02:50  12   California at Santa Barbara, where I received a degree

02:50  13   in business and economics with an emphasis in

02:50  14   accounting.

02:50  15             From there, I joined a Big 6 accounting firm

02:50  16   where I was a financial statement auditor for a number

02:50  17   of years before joining a small firm called Degnan &

02:50  18   Associates, where I began my career in the exciting

02:50  19   world of damages.

02:50  20             And for the past -- gosh.  That was almost

02:50  21   25 years ago.

02:50  22             So from Degnan & Associates, I went to a much

02:50  23   larger firm called Deloitte.  It's a Big 4 accounting

02:50  24   firm, where I did forensic accounting investigations as

02:50  25   well as any type of damage-related work.

586

02:50  1           After Deloitte, I joined another firm called

02:50  2   StoneTurn, which was a group of Deloitte partners who

02:50  3   left doing similar work.

02:50  4           And then I left and went to a firm called

02:50  5   Ocean Tomo.  And Ocean Tomo was a firm that specialized

02:51  6   in all the financial aspects of intellectual property.

02:51  7   And so we called ourselves a merchant bank, and our

02:51  8   merchant class of asset was intellectual property.

02:51  9           And so for the last -- for those -- for

02:51  10  16 years that I was there, our focus was on licensing,

02:51  11  selling, valuing, and testifying about the value of

02:51  12  intellectual property.

02:51  13          And then about eight, nine months ago, I left

02:51  14  Ocean Tomo and I started my own firm, Truest

02:51  15  Consulting, in which I perform similar work that I did

02:51  16  at Ocean Tomo.

02:51  17  Q.    Mr. Lewis, do you have any certifications?

02:51  18  A.    I do.  Yes.  I'm a certified public accountant

02:51  19  or a CPA.  I am a certified valuation analyst or a CVA.

02:51  20  I'm certified in financial forensics or a CFF.  And I

02:51  21  think those are my...

02:51  22  Q.    Are you also a member of any professional

02:51  23  associations?

02:51  24  A.    I am.  Yes.  So I am a member of the American

02:52  25  Institute of Certified Public Accountants.  I am a

02:52  1   member of the National Association of Certified

02:52  2   Valuation Analysts.

02:52  3        I'm also a member of a number of intellectual

02:52  4   property-oriented organizations, the Intellectual

02:52  5   Property Owners Association, where I'm on the licensing

02:52  6   committee.  And the Licensing Executive Society, where

02:52  7   I've been past chair of the pricing and taxation

02:52  8   committee and I'm currently chair of the San Francisco

02:52  9   chapter.

02:52  10        I also speak regularly on the topic of

02:52  11  intellectual property valuation.  I teach college-level

02:52  12  courses on intellectual property damages and valuation,

02:52  13  and I speak regularly at conferences with respect to

02:52  14  various intellectual property and value issues.

02:52  15  Q.    Thank you, Mr. Lewis.

02:52  16        Do you have experience in providing damages

02:52  17  opinions in patent cases?

02:52  18  A.    I do.  Yes.  I've worked on hundreds of

02:52  19  patents.

02:52  20  Q.    What kind of patent cases have you worked on?

02:53  21  A.    I'll tell you, this is what I love about this

02:53  22  job is that the technologies that I get to work on

02:53  23  pretty much span from low tech to high tech.  I've done

02:53  24  cases that are related to clothing apparatuses.  I've

02:53  25  done -- I testified last year in a case involving a

588

02:53    1    biodegradable coating for drug-eluting stents.

02:53    2            But a lot of what I do is very high tech.

02:53    3    I've done a number of cases involving the Australian

02:53    4    government asserting a patent they had on WiFi.  I've

02:53    5    done a number of cases in the smartphone industry for

02:53    6    different types of apps or features of smartphones.

02:53    7            I've worked on a number of

02:53    8    semiconductor-related cases related to, I guess, new

02:53    9    ways of creating semiconductors.  And then again,

02:53    10   cases -- cases like this one, for example.

02:53    11       Q.    Thank you very much, Mr. Lewis.

02:53    12            MS. HEPLER:  Your Honor, at this time,

02:53    13   ACQIS would like to qualify Mr. Lewis as a damages

02:53    14   expert and give his expert opinion on damages in this

02:54    15   trial.

02:54    16            MS. MARRIOTT:  No objection.

02:54    17            THE COURT:  He'll be admitted as such.

02:54    18   BY MS. HEPLER:

02:54    19       Q.    Mr. Lewis, can you describe for the jury the

02:54    20   assignment that you were tasked with?

02:54    21       A.    Sure.  So as you'll see here, I was asked to

02:54    22   determine the compensation that ACQIS would be entitled

02:54    23   to if you, the jury, find that ASUSTeK or ASGL are

02:54    24   found to infringe one or more claims of the asserted

02:54    25   claims.

589

02:54   1       Q.     And are those the patents we see on the screen

02:54   2   here?

02:54   3       A.     They are.  Yes.

02:54   4       Q.     Is there a name for this compensation?

02:54   5       A.     Yes.  And you'll read this in the jury

02:54   6   instructions as well, but the form of damages is

02:54   7   referred to as a "reasonable royalty."

02:54   8              So in the patent world, you're entitled to two

02:54   9   forms.  One would be lost profits.  The other is at a

02:54   10  minimum, a reasonable royalty for the use made of the

02:54   11  technology.

02:54   12      Q.     Mr. Lewis, how did you go about your analysis

02:54   13  for determining a reasonable royalty?

02:54   14      A.     Well, so initially, it starts with kind of

02:55   15  reviewing all the evidence, but ultimately, the way

02:55   16  that I guess you are really asked to kind of determine

02:55   17  damages is to make considerations of these 15

02:55   18  Georgia-Pacific factors and envision this hypothetical

02:55   19  negotiation between these two parties just prior to

02:55   20  infringement beginning.

02:55   21      Q.     Okay.  And, Mr. Lewis, did you review evidence

02:55   22  specific to this case?

02:55   23      A.     I did.  Yes.  Absolutely.

02:55   24      Q.     Let's start with the evidence you reviewed.

02:55   25             Could you describe for the jury the materials

590

02:55    1    that you reviewed to inform your opinion on a

02:55    2    reasonable royalty in this case?

02:55    3        A.    Certainly.  So as you can see here, I reviewed

02:55    4    quite a bit of information.  Some of the more important

02:55    5    aspects of -- well, there's a number of license

02:55    6    agreements that you've already heard a little bit

02:55    7    about.  We'll talk about those in more detail.

02:55    8            I received the document production, so the

02:55    9    Bates-numbered documents from both parties that talk

02:55    10    about the sales data, you know, their financials,

02:56    11    marketing, product information, that type of

02:56    12    information from each of the parties.

02:56    13            I've had discussions with Dr. Chu as well as

02:56    14    Dr. Sarhan with respect to the technical aspects and

02:56    15    kind of the history of the patents at issue here.

02:56    16            I've read deposition transcripts.  So like the

02:56    17    ones you were just hearing somebody read, I've read all

02:56    18    of those transcripts as well.

02:56    19            And then I do a bunch of public research.  So

02:56    20    I'm wanting to understand the markets for these

02:56    21    products and the pricing and competitors.  So I do

02:56    22    research into these products and others.

02:56    23            I also have to look at some of the legal

02:56    24    filings.  There's interrogatory responses and other

02:56    25    things where the parties are exchanging information.

02:56  1    I've reviewed those.

02:56  2             And then I've read the expert reports of

02:56  3    Dr. Sarhan, and I've also reviewed the expert report of

02:56  4    ASUS' damages expert, Mr. Newell.

02:56  5        Q.    Thank you, Mr. Lewis.

02:56  6             Have you also been sitting in the courtroom

02:57  7    during this trial and listening to the testimony that

02:57  8    has been presented so far?

02:57  9        A.    Yes.  I have.

02:57  10       Q.    Thank you.

02:57  11            And why have you been sitting here?

02:57  12       A.    So I think what's important is you could tell

02:57  13   I've reviewed probably more than you're going to get to

02:57  14   see, but really what your job is is to determine

02:57  15   damages based on the evidence that's presented here in

02:57  16   court.

02:57  17            So I think it's helpful for me hear the same

02:57  18   evidence that you're going to hear so that when I'm

02:57  19   explaining to you what I believe the right form of

02:57  20   damage is, I can focus on that evidence as well.

02:57  21       Q.    Thank you.

02:57  22            And has the testimony and evidence that you've

02:57  23   seen here at trial impacted your opinion on damages?

02:57  24       A.    The testimony that I've -- and the evidence

02:57  25   I've seen here has been consistent with my

| | | |
|---|---|---|
| 02:57 | 1 | determination of damages. |
| 02:57 | 2 | MS. HEPLER:  Okay.  Your Honor, at this |
| 02:57 | 3 | time we'd like to go on the confidential record.  We're |
| 02:57 | 4 | going to show some ASUS -- |
| 02:57 | 5 | THE COURT:  Okay.  If you're not under |
| 02:57 | 6 | the protective order, please exit the courtroom. |
| 02:58 | 7 | (Sealed proceedings.) |
| 02:58 | 8 | BY MS. HEPLER: |
| 02:58 | 9 | Q.    All right.  Mr. Lewis, before we go down into |
| 02:58 | 10 | the weeds and talk about the details of your analysis, |
| 02:58 | 11 | could you please explain to the jury concisely your |
| 02:58 | 12 | ultimate conclusion on damages in this case? |
| 02:58 | 13 | A.    Sure.  So I think you heard a little bit about |
| 02:58 | 14 | this in the opening statements.  I have determined that |
| 02:58 | 15 | I believe the right reasonable royalty rate in this |
| 02:58 | 16 | case would be a royalty rate of 1.15 percent. |
| 02:58 | 17 | That rate would then be applied to an |
| 02:58 | 18 | apportioned royalty base, which again, we'll talk about |
| 02:58 | 19 | how I reached these conclusions in a minute. |
| 02:58 | 20 | But the apportioned royalty base of accused |
| 02:58 | 21 | U.S. sales that ASUS has made is just over |
| 02:58 | 22 | $███████████.  And when you multiply those together, |
| 02:58 | 23 | you come to damages in the amount of $████████. |
| 02:59 | 24 | Q.    Thank you. |
| 02:59 | 25 | MS. HEPLER:  And we can go off the |

593

02:59  1    confidential record.

02:59  2                    THE COURT:  Okay.

09:42  3                    (Sealed proceedings end.)

02:59  4    BY MS. HEPLER:

02:59  5        Q.    Mr. Lewis, you've used this term "royalty" a

02:59  6    few times.

02:59  7               What is a royalty?

02:59  8        A.    Yes.  So again, from the opening statements,

02:59  9    we'll kind of keep with a real estate or real property

02:59  10   example.

02:59  11              So if you're renting a house or an office, you

02:59  12   would enter into a lease agreement, and as part of that

02:59  13   you would make rent payments.  In the intellectual

02:59  14   property world, you would enter into a license

02:59  15   agreement, and you would make royalty payments.  So

02:59  16   it's really the payments made for use of intellectual

02:59  17   property.

02:59  18       Q.    Are there different types of royalties?

02:59  19       A.    There are.  Yes.  There are really two forms

02:59  20   of a royalty.  One would be a running royalty in which

02:59  21   you pay as you go.  So that would be a percentage or a

02:59  22   per unit, and you would pay each time you sold a

02:59  23   product.

02:59  24              The other is a lump sum.  And in a lump-sum

03:00  25   agreement, you make usually a single payment that

594

03:00  1   usually you've done some estimate of the total amount

03:00  2   you're going to sell over some period of time and you'd

03:00  3   rather pay it upfront all as one payment.

03:00  4   Q.    And which royalty approach did you use in your

03:00  5   opinion?

03:00  6   A.    In this case, I state it as a running royalty

03:00  7   rate, but because all of the infringement is in the

03:00  8   past because these patents expired in 2020, the form of

03:00  9   the royalty almost doesn't matter because there isn't

03:00  10  any future payments to be made.

03:00  11  Q.    Okay.  Now, Mr. Lewis, earlier you mentioned

03:00  12  using a framework called a "hypothetical negotiation"

03:00  13  in your reasonable royalty analysis.

03:00  14         Can you explain to the jury what is a

03:00  15  hypothetical negotiation and how you used it?

03:00  16  A.    Sure.  So this is where -- and damages is

03:00  17  unique in the patent world.

03:00  18         In determining patent damages, you're asked to

03:01  19  really put yourself back into -- at the time just

03:01  20  before infringement.  So it's kind of like if you -- if

03:01  21  they had not infringed -- if ASUS had not infringed but

03:01  22  instead taken a license, what royalty would they have

03:01  23  agreed to pay at that time?

03:01  24         And so that's essentially what you'll be asked

03:01  25  to do, and I'm going to help provide what I believe the

595

03:01  1   evidence is that the parties would have considered in

03:01  2   that negotiation.

03:01  3      Q.   And who would be sitting at the hypothetical

03:01  4   negotiation table that we have here?

03:01  5      A.   Yes.  So as you can imagine, it would be ACQIS

03:01  6   as the licensor or Dr. Chu would likely be sitting

03:01  7   there.  And as the licensee, it would be ASUSTeK or

03:01  8   ASGL.

03:01  9      Q.   And, Mr. Lewis, I see on the slide here

03:01  10  "required assumptions."

03:01  11         Can you explain what these assumptions are?

03:01  12     A.   Yes.  So as I mentioned, this is a

03:01  13  hypothetical negotiation.  Obviously it didn't happen.

03:02  14  And so as part of envisioning this hypothetical

03:02  15  negotiation, there are some required assumptions.

03:02  16         The first one is that the patents are known to

03:02  17  be valid, enforceable, and infringed.  And the reason

03:02  18  for that is by the time you get to determining damages,

03:02  19  you will have already decided that the patents are

03:02  20  infringed and valid and enforceable, because if you

03:02  21  believe they're not infringed, then there won't be

03:02  22  damages at all.

03:02  23         Nos. 2 and 3 are that the parties are willing

03:02  24  licensor, willing licensee.  So they both want to enter

03:02  25  into an agreement.  And three, that they really must

03:02    1    reach an agreement.

03:02    2            So unlike the real world, where parties could

03:02    3    try to negotiate for something and then say, well, I

03:02    4    don't accept your terms, we can't come to an agreement

03:02    5    and walk away, in this hypothetical negotiation, they

03:02    6    must reach an agreement.

03:02    7            And then finally, the parties have an

03:02    8    understanding of each other's bargaining position and

03:02    9    the relevant facts.  And so as I guess you can imagine

03:03    10   here, we've seen evidence from both the plaintiff and

03:03    11   the defendant.  And in this negotiation, they're

03:03    12   known -- they're believed to see all that information.

03:03    13           And so unlike the real world, where -- when

03:03    14   you enter into a negotiation or you enter into a

03:03    15   license, there could be some bluffing or there might

03:03    16   be -- some of what was really happening on the other

03:03    17   side.

03:03    18           In this hypothetical negotiation, you know,

03:03    19   the parties know each other.  It's like they've shown

03:03    20   each other their hand and they know each other's

03:03    21   information.

03:03    22       Q.    Okay.  Thank you, Mr. Lewis.

03:03    23           Now, I see on the slide here there's a date.

03:03    24   Can you tell us about this date?

03:03    25       A.    Yeah.  So in this case, December of 2013 is

03:03  1   when this negotiation would be taking place.  That is

03:03  2   the date that the first of the patents at issue was

03:03  3   issued.

03:03  4            And at that time, it is alleged that ASUS'

03:03  5   products were already incorporating the patented

03:03  6   technology.  So just prior to the issuance of the first

03:04  7   patent would be when they would sit and have this

03:04  8   negotiation.

03:04  9      Q.   Okay.  And a little earlier you mentioned

03:04  10  Georgia-Pacific factors.

03:04  11           What are Georgia-Pacific factors?

03:04  12     A.   Oh, yes.  Okay.  So there was a patent

03:04  13  litigation case called Georgia-Pacific versus U.S.

03:04  14  Plywood.  In that case, the Court laid out for, I

03:04  15  guess, all of us a series of factors.

03:04  16           Those factors are items that the Court found

03:04  17  relevant and that should be considered when determining

03:04  18  a reasonable royalty.  And really ever since that case,

03:04  19  we have been walking through the Georgia-Pacific

03:04  20  factors in an effort to reach a conclusion.

03:04  21           I will say these factors can somewhat break

03:04  22  down into a number of categories.  So some of them

03:04  23  relate to past licenses.  Right?  So licenses from --

03:04  24  of the patents at issue or licenses that the licensee

03:05  25  has entered into for other technologies.

598

03:05  1          Some relate to the products themselves and

03:05  2  the -- and -- or the patents, the benefits of the

03:05  3  patents and alternatives.

03:05  4          Some relate to the commercial success and the

03:05  5  popularity and/or the profits earned from selling and

03:05  6  using the technology.

03:05  7          And so they're kind of business-related,

03:05  8  licensing-related, and then technology-related factors.

03:05  9     Q.    Are any, as a rule, more important than the

03:05  10 other?

03:05  11    A.    They really aren't.  But what you'll find is

03:05  12 that some of them are -- become unimportant because

03:05  13 there may not be any evidence.  So, for example, Factor

03:05  14 1, licenses to the patents at issue.

03:05  15         In some cases, there are no licenses, historic

03:05  16 licenses, to the patents at issue.  And so that factor

03:05  17 wouldn't be very important in that case.

03:05  18         Whereas, like in this case, there's a large

03:05  19 number of licenses to the patents at issue.  And so in

03:05  20 this case, that factor becomes quite important.

03:06  21    Q.    Thank you.

03:06  22         All right.  We're going to come and talk about

03:06  23 these a little bit later.

03:06  24             MS. HEPLER:  At this time, I'd like to go

03:06  25 back on the confidential record, Your Honor.

| | | |
|---|---|---|
| 03:06 | 1 | THE COURT:  Okay. |
| 03:06 | 2 | (Sealed proceedings.) |
| 03:06 | 3 | BY MS. HEPLER: |
| 03:06 | 4 | Q.   Okay.  Mr. Lewis, so I'd like to turn to |
| 03:06 | 5 | discussing the ASUS accused products in this case. |
| 03:06 | 6 | What are the product classes that you |
| 03:06 | 7 | evaluated for purposes of calculating damages? |
| 03:06 | 8 | A.   Yes.  So as you've been hearing throughout, |
| 03:06 | 9 | you've heard Dr. Sarhan discuss, there are four primary |
| 03:06 | 10 | categories of products.  They are the desktops, the |
| 03:06 | 11 | laptops, the servers, and the motherboards. |
| 03:06 | 12 | Q.   And were you in the courtroom earlier when |
| 03:06 | 13 | Dr. Sarhan gave his opinion on infringement? |
| 03:06 | 14 | A.   I was.  Yes. |
| 03:06 | 15 | Q.   And are the representative product classes |
| 03:06 | 16 | that you analyzed the same as what he discussed? |
| 03:06 | 17 | A.   They are.  And I think if you recall -- with |
| 03:06 | 18 | respect to the representative desktop product, if you |
| 03:06 | 19 | find the desktop representative product infringes, that |
| 03:07 | 20 | also would then include the servers and the |
| 03:07 | 21 | motherboards. |
| 03:07 | 22 | And if you determine that the laptop |
| 03:07 | 23 | representative product infringes, then that would |
| 03:07 | 24 | include all of the various laptop products. |
| 03:07 | 25 | Q.   So I want to talk about a royalty base.  Did |

600

03:07    1    you calculate a royalty base in this case?

03:07    2        A.    I did.  Yes.

03:07    3        Q.    Okay.  And how did you go about calculating

03:07    4    that?

03:07    5        A.    I used the data that ASUS produced in this

03:07    6    case to determine the royalties.

03:07    7        Q.    And when you say "data that ASUS produced,"

03:07    8    what data is that?

03:07    9        A.    I think if you -- in the last -- in one of

03:07    10   those last deposition reads, you -- they describe that

03:07    11   ASUS produced a file -- an Excel file that included the

03:07    12   sales data of the accused products.

03:07    13       Q.    So, Mr. Lewis, if you go ahead and open one of

03:07    14   your binders, the one that has the most tabs, to J-18.

03:08    15       A.    Yes.

03:08    16       Q.    Is this the sales data that you relied on in

03:08    17   coming to your royalty base calculation?

03:08    18       A.    Yes.  It is.

03:08    19       Q.    And can you explain how you used this

03:08    20   spreadsheet to calculate product sales?

03:08    21       A.    I will.  So this file, which I had in

03:08    22   electronic format because it's quite hard to read here,

03:08    23   it includes the part numbers, and then it has the sales

03:08    24   and the costs for each of the different part numbers.

03:08    25            I was also provided in this case a listing of,

601

03:08  1    like, a correlation file that said, here are the

03:08  2    various part numbers and here are the accused products.

03:08  3    And it correlated the accused products to the part

03:08  4    numbers, which I could then match up with the sales

03:08  5    data produced by ASUS.

03:08  6         Q.    Okay.  Mr. Lewis, if you open your binder

03:08  7    again to D-881.

03:09  8         A.    Yes.

03:09  9         Q.    Is this one of the correlation documents that

03:09  10   you relied on?

03:09  11        A.    It is.  Yes.

03:09  12        Q.    So once you identified accused products in the

03:09  13   spreadsheet, did you calculate the accused sales

03:09  14   revenue for each accused product during the relevant

03:09  15   damages period for that product?

03:09  16        A.    I did.  Yes.

03:09  17        Q.    And, Mr. Lewis, why do you have the date of

03:09  18   October 2014 to May 2020 here on the slide?

03:09  19        A.    So October 15, 2014 to May 12 of 2020 is the

03:09  20   damage period in this case.  I think you may have

03:09  21   already -- we already heard that in patent litigation,

03:09  22   you can at most go back six years from the filing of a

03:09  23   case.

03:09  24              So the case was filed in October 15 of 2020,

03:09  25   so the largest damage period would go back to

602

03:09  1    October 15th of 2014.

03:09  2          And then the last of the patents at issue here

03:10  3    to expire expires in May 12th of 2020, and so that

03:10  4    would serve as the end of the damage period.

03:10  5      Q.    Okay.

03:10  6          MS. HEPLER:  And we can go off the

03:10  7    confidential record.

09:42  8          (Sealed proceedings end.)

03:10  9    BY MS. HEPLER:

03:10 10      Q.    All right.  Mr. Lewis, once you calculated

03:10 11    accused product sales, what did you do next to

03:10 12    calculate a royalty base?

03:10 13      A.    Yeah.  So if we could just go back one real

03:10 14    quick.

03:10 15          This was the total of the accused sales, and

03:10 16    it totaled just over $█████  █████  of total U.S. sales

03:10 17    of the accused products.  So once I had the total

03:10 18    U.S. sales, the next step was now to apportion those

03:10 19    sales.

03:10 20      Q.    And how did you go about this apportionment

03:10 21    analysis?

03:10 22      A.    So initially, early on, I had a conversation

03:10 23    with Dr. Chu to get an understanding of how did ACQIS

03:10 24    approach licensing when it went out to license its

03:11 25    patents.

603

03:11  1          And so Dr. Chu, as I think you heard him

03:11  2    testify, the initial round of litigation or parties

03:11  3    that he sought licenses from were selling what are

03:11  4    called blade servers or they've been referred to as

03:11  5    modular computers.  Those were almost all comprised of

03:11  6    the patented system.

03:11  7          When I -- when I talked to him about what he

03:11  8    included in that base, he said he made an effort to

03:11  9    exclude the software or things that weren't part of

03:11  10   that hardware system.

03:11  11          So then I tried to make this royalty base of

03:11  12   desktops, laptops, servers, and motherboards more

03:11  13   comparable to that royalty base that he used.

03:11  14          So I went to exclude the components of a

03:11  15   laptop and a desktop and a server that were not similar

03:11  16   to or part of that patented system that the patents

03:12  17   cover.

03:12  18     Q.    Mr. Lewis, did you calculate an apportionment

03:12  19   factor for all four categories of products that you

03:12  20   just mentioned?

03:12  21     A.    I did.  Yes.

03:12  22     Q.    And what information did you rely on in your

03:12  23   apportion calculation?

03:12  24     A.    So initially, I looked to the ASUS data to see

03:12  25   if they gave a breakdown of the various component

604

03:12　1    costs.

03:12　2              I think, as we've heard, they don't

03:12　3    manufacture their own products and they don't maintain

03:12　4    the cost of breakdowns.  So I went to look for the

03:12　5    next-best alternative to that.

03:12　6              I searched publicly available data, and I was

03:12　7    able to locate public data that described the component

03:12　8    costs of the various components in the products.

03:12　9    Q.    And is this the type of information you would

03:12　10    regularly rely on as an expert in calculating damages?

03:12　11    A.    It is.  I mean, obviously, if ASUS had the

03:12　12    data themselves, I would have preferred that.  But we

03:13　13    rely on publicly available data from reputable sources

03:13　14    regularly in our calculations.

03:13　15    Q.    Okay.  Mr. Lewis, let's talk about laptops.

03:13　16              Can you explain your laptop apportionment

03:13　17    analysis, please?

03:13　18    A.    Certainly.  So for laptops, I was able to find

03:13　19    a public source from a company called TechInsights.

03:13　20    TechInsights is a company that does what are called

03:13　21    teardowns of various consumer electronics products.

03:13　22              And so I found a teardown of the ASUS Zenbook

03:13　23    S13.  That actually happened to be one of the accused

03:13　24    laptops.  And so I utilized that to list out each of

03:13　25    the components within that laptop and then made a

605

03:13  1    determination of whether or not the component was

03:13  2    related to that core patented system or whether it was

03:13  3    not.

03:13  4         Q.    Okay.  And I see some yeses and nos on a

03:14  5    column here.

03:14  6              Can you explain what that's all about?

03:14  7         A.    Yes.  So as you'll see, where it says -- well,

03:14  8    it says -- the column heading is the "Deducted from

03:14  9    Total Costs."

03:14  10             Where it says "yes," those were components

03:14  11   that were not part of that core packet system.  So

03:14  12   things like the display, the keyboard, the touch pad,

03:14  13   the speakers, the web cam, the fingerprint reader, and

03:14  14   the software, the operating system, the value of each

03:14  15   of those, I excluded from the royalty base.

03:14  16        Q.    Now, Mr. Lewis, why did you choose not to

03:14  17   remove cost for case, battery, and ACI adapter?

03:14  18        A.    So again, having a discussion with Dr. Chu and

03:14  19   looking at what the patented system is, in order for it

03:14  20   to work, you would need to have a power.  You need a

03:14  21   power to it.  And so the battery and the power supply

03:14  22   would need to be included for it to work.

03:15  23             And then, similarly, it needed something to

03:15  24   hold all the pieces together.  So similarly to, like,

03:15  25   the blade server cases, they would come in a chassis.

03:15  1    Here, like, a laptop would come in a case as well.  So

03:15  2    those were part of that core system.

03:15  3        Q.    Thank you.

03:15  4            And once you kind of removed these component

03:15  5    costs, what'd you do next?

03:15  6        A.    So once I removed those component costs, I

03:15  7    determined what was the remainder.  So you'll see on

03:15  8    the right here, the patented system value was

03:15  9    82 percent of the total of the value of this ASUS

03:15  10   Zenbook S13.

03:15  11       Q.    And, Mr. Lewis, why a percentage and not

03:15  12   removing a dollar amount?

03:15  13       A.    Again, so because data -- we don't have data

03:15  14   on every single one of these accused devices.  And

03:15  15   again, if you're putting yourself back into 2013 where

03:15  16   the parties were sitting at this negotiating table,

03:15  17   you're trying to figure out what would they have done

03:15  18   as part of this license.

03:16  19           And so typically what you would do is use a

03:16  20   couple of representative products to develop an

03:16  21   apportionment percentage and then apply it to

03:16  22   everything.

03:16  23           And so that's what I've done here.  I've used

03:16  24   the data available to determine a laptop apportionment

03:16  25   factor, and then I apply that to all the laptop sales.

03:16   1        Q.    Is the 82 percent your laptop apportionment

03:16   2   factor?

03:16   3        A.    It is.  Yes.

03:16   4        Q.    All right.  Let's move on to desktops.

03:16   5              How did you calculate an apportionment factor

03:16   6   for desktops?

03:16   7        A.    In a very similar way that I did for laptops.

03:16   8   I started by looking at -- well, so first, I noted that

03:16   9   there are two different types of desktops.  There's

03:16  10   what's called the all-in-one desktops.  And the

03:16  11   all-in-one desktops are ones that come with a screen

03:16  12   and a web cam.

03:16  13              And then I note that there were tower desktops

03:16  14   that really just come with the tower.  And they often

03:17  15   come with a mouse and a keyboard, but they do not

03:17  16   include the screen and the web cam.

03:17  17              So I identified, again, the components of the

03:17  18   all-in-ones and the tower computers that would be not

03:17  19   core to that patented system.  And I sought pricing for

03:17  20   them and removed the value of those components.

03:17  21        Q.    And once you removed the components for the

03:17  22   two different types of products, what did you do?

03:17  23        A.    Yes.  So the all-in-ones, when I removed the

03:17  24   component value for these, I guess, non-patented

03:17  25   system-related components, I came to 68 percent of the

608

03:17  1    value was the patented system.

03:17  2              For the tower computers, I came to 86 percent

03:17  3    of the total value was the patented system.

03:17  4              And when I applied those to the total sales of

03:17  5    all-in-ones and I applied the 86 to the towers, I

03:18  6    determined that the overall across all desktops, the

03:18  7    weighted average was an 82 percent apportionment factor

03:18  8    applied to all of the desktop sales.

03:18  9        Q.    Okay.  And so is 82 percent the apportionment

03:18  10   factor for desktops?

03:18  11       A.    It was.  Yes.

03:18  12       Q.    Moving on to servers.

03:18  13             How did you calculate an apportionment factor

03:18  14   for servers?

03:18  15       A.    So again, servers, as I understood from my

03:18  16   discussion with Dr. Sarhan and Dr. Chu, are very

03:18  17   similar to the early blade servers that they were --

03:18  18   that they licensed in their first set of licenses.

03:18  19             Again, Dr. Chu explained that he tried to take

03:18  20   out the value of the software.  When I researched the

03:18  21   ASUS servers, it looked like the majority of them don't

03:18  22   come with, say, a server operating system, but they did

03:18  23   come with a software management system.

03:19  24             And so I was able to find data that showed

03:19  25   that the software management system was about $60.  And

609

03:19  1    so I deducted that from the total cost of the servers.

03:19  2    And that resulted in a 96 percent apportionment factor

03:19  3    that I would apply to the servers.

03:19  4        Q.    And when you say you deducted it from the

03:19  5    servers, was that all the servers, or you deducted it

03:19  6    from like the cost of an individual server?

03:19  7        A.    So again, as I understood it, all of the ASUS

03:19  8    servers came with this management software.  And so I

03:19  9    applied the 96 percent apportionment factor to all the

03:19  10   server sales.

03:19  11       Q.    And then finally, Mr. Lewis, can you explain

03:19  12   your analysis for motherboards?

03:19  13       A.    Yes.  Once again, I had a conversation with

03:19  14   Dr. Sarhan about, you know, how much of the motherboard

03:19  15   is part of the patented system.  And it was explained

03:20  16   to me that the motherboard is a component of the

03:20  17   patented system.

03:20  18            And so there were no other components like

03:20  19   keyboards or other things to -- or software to remove.

03:20  20   And so ultimately, the apportionment factor was

03:20  21   100 percent for the motherboards.

03:20  22       Q.    Thank you.

03:20  23            MS. HEPLER:  Your Honor, at this time,

03:20  24   we'd ask to go back on the confidential record, please.

03:20  25            (Sealed proceedings.)

610

03:20  1    BY MS. HEPLER:

03:20  2        Q.    So, Mr. Lewis, what was your ultimate

03:20  3    conclusion following your apportionment analysis?

03:20  4        A.    So now we bring the two together.  You'll see

03:20  5    accused sales on the left side here, left column.

03:20  6    These are the total.  So that was the ███████████ in

03:20  7    sales.

03:20  8            We then apply the apportionment factor of

03:20  9    82 percent for the desktops, 82 percent for the

03:20  10   laptops, 96 percent for the servers, 100 percent for

03:20  11   the motherboards to reach our apportioned royalty base,

03:21  12   which amounts to just over ██████████ of apportioned

03:21  13   U.S. sales of the accused products.

03:21  14       Q.    Thank you, Mr. Lewis.

03:21  15           Did you consider any other royalty bases?

03:21  16       A.    I did.

03:21  17           So I also considered a royalty base that was

03:21  18   the sale from ASGL into the United States.  The reason

03:21  19   I considered that is, one, ASUS' expert had utilized

03:21  20   that cost of goods sold as his royalty base.  So I

03:21  21   considered it.

03:21  22           And one of the reasons -- and this would be

03:21  23   for you guys to decide -- is that here we are in 2013,

03:21  24   we're trying to determine what the parties would have

03:21  25   agreed to as the right royalty base.

611

```
03:21   1            I believe that the parties and what Dr. Chu
03:22   2   and ACQIS was looking to do is exclude components that
03:22   3   weren't related to or the value of those components
03:22   4   that weren't related to the patent.
03:22   5            That would have been one way of approaching
03:22   6   it, which is the apportionment factors.
03:22   7            To the extent that ASUS was like, well, we
03:22   8   can't agree on what the apportionment factors are, they
03:22   9   may have suggested using their sale of these products
03:22  10   into the U.S. as a potential royalty base because that
03:22  11   would have been data that they had available to them.
03:22  12            Again, that sale from ASGL to ACI in the U.S.,
03:22  13   it turns out that it's about ███████ less than the
03:22  14   sale in the United States.
03:22  15            And so you could see that as a form of
03:22  16   apportionment where there was, you know, the
03:22  17   $████████ of sales in the U.S.  The sale from ASGL
03:22  18   to the U.S. is this amount, $████████.  That would
03:23  19   have been a potential base that ASUS may have chosen.
03:23  20       Q.   Thank you, Mr. Lewis.
03:23  21            I'd now like to turn back to the hypothetical
03:23  22   negotiation and some of those Georgia-Pacific factors
03:23  23   we were talking about earlier.
03:23  24            Are these here that we see on the slide what
03:23  25   you found to be the key considerations of the
```

612

03:23  1    hypothetical negotiation?

03:23  2        A.    They are.  Yes.

03:23  3        Q.    All right.  Let's go ahead and start with the

03:23  4    first one.  The parties' licensing history.

03:23  5              What did you analyze -- well, actually, did

03:23  6    you analyze ACQIS' past licensing history?

03:23  7        A.    I did.  Yes.  I -- that's where I started.

03:23  8    Absolutely.

03:23  9        Q.    And then how many past ACQIS agreements did

03:23  10   you analyze?

03:23  11       A.    There were over 20 -- just over 20 agreements

03:23  12   that ACQIS had entered into for this family of patents.

03:23  13       Q.    Okay.  And what did you analyze with respect

03:23  14   to these past licenses?

03:24  15       A.    So there were a few, I think, you know, key

03:24  16   findings.  I think you've heard some of these from

03:24  17   Dr. Chu already.  In the early days, when he went out

03:24  18   to license his -- his patent portfolio, he was

03:24  19   originally seeking -- so it was like early, early --

03:24  20   before 2011.  He was seeking rates in the range of 3 to

03:24  21   5 percent.

03:24  22              I think he noted that after 2011, he reduced

03:24  23   that.  And so when he entered into a license with IBM,

03:24  24   IBM had this policy of licensing for 1 percent per

03:24  25   invention.  And so you heard Dr. Chu testify that he

03:24  1   thought that there was two to three different

03:24  2   inventions here, the PCIe, the USB, and I think there

03:24  3   was some other modular component technology.

03:24  4        And so he reduced his request or his kind of

03:24  5   soft rate to 1 to 3 percent post 2011.

03:24  6        And then when we look at the actual effective

03:25  7   rates of the agreements he was entering into around the

03:25  8   time of the hypothetical negotiation, we see that for

03:25  9   those where we can or there was an effective rate, he

03:25  10  was getting between ███████████████████████.

03:25  11       So we note that he was seeking that, and he

03:25  12  was at least entering into agreements where the parties

03:25  13  noted there was an effective rate between that --

03:25  14  those -- that range.

03:25  15  Q.   Okay.  Now, going on to the next slide, are

03:25  16  these some of the ACQIS agreements you analyzed,

03:25  17  perhaps a select few over the ones we may have seen

03:25  18  earlier in the trial?

03:25  19  A.   It is.  Yes.

03:25  20  Q.   Okay.  And what are these agreements?

03:25  21  A.   These are what I consider to be probably the

03:25  22  most informative agreements here.  There's a few

03:25  23  reasons for that.  One, you -- we were asked to kind of

03:25  24  envision this negotiation back in December of 2013.

03:26  25       So you'll see that these agreements, almost

614

```
03:26   1   all of them predate that December 2013 date.  A few of
03:26   2   them are shortly thereafter.  And so these agreements,
03:26   3   I think, would have been the most known or knowable
03:26   4   agreements that the parties would have been relying on
03:26   5   at that time.
03:26   6           The other I think very important aspect of
03:26   7   these agreements is that there actually was an
03:26   8   effective rate in almost all of them.
03:26   9           And so what I mean by that is that the parties
03:26  10   for these agreements actually either stated in the
03:26  11   agreement what the royalty rate was that -- you know,
03:26  12   that kind of resulted in the agreed-upon amount, or
03:26  13   they had an agreed-upon amount, but they noted what the
03:26  14   total sales were expected to be over the life of the
03:26  15   agreement so that I could calculate what the effective
03:26  16   rate was.
03:26  17       Q.   Okay.  Mr. Lewis, if you could go ahead and
03:27  18   open your binder.  If we look at the Nex and ClearCube
03:27  19   agreements, which are already admitted Exhibits J-34
03:27  20   and J-28, would I see these percentages, ████████
03:27  21   ████████  that are in the Effective Royalty Rate
03:27  22   column, written in these agreements?
03:27  23       A.   You would.  Yes.
03:27  24       Q.   And if I looked at some of these later
03:27  25   agreements on the slide, Alcatel and Huawei, which are
```

615

03:27    1    admitted as J-30 and J-33, would I be able to determine

03:27    2    the effective rates listed here on the slide by looking

03:27    3    at what is actually written in the agreement?

03:27    4         A.    Once again, you would.  Yes.

03:27    5              And again, that was also consistent with

03:27    6    this -- this post 2011 date that, you know, Huawei and

03:27    7    Alcatel, their agreements were in 2015.  And you'll see

03:27    8    the rates -- the effective rates that were written into

03:27    9    those agreements are ████████████  percent.

03:28   10         Q.    Now, Mr. Lewis, did you find any of these

03:28   11    licenses that we're looking at here with effective

03:28   12    rates to be comparable to the license that ACQIS and

03:28   13    defendants would enter into in a hypothetical

03:28   14    negotiation?

03:28   15         A.    I did.  Yes.

03:28   16         Q.    Okay.  And can you explain what or why you

03:28   17    found them to be comparable?

03:28   18         A.    Yes.  So in litigation, we are asked to

03:28   19    consider two main factors.  One is the technology

03:28   20    license comparable, and then so the -- the

03:28   21    technological component, and then are the economics of

03:28   22    the license comparable?

03:28   23              And so for the -- for the technology aspect, I

03:28   24    relied on my discussion with Dr. Sarhan where, you

03:28   25    know, some of the patents that were licensed here are

616

03:28   1    not the same as the ones at issue in this case.

03:28   2           So I had a conversation with Dr. Sarhan as to

03:28   3    did those patents benefit these blade servers and

03:29   4    modular computers in a similar fashion to what the

03:29   5    patents at issue here benefit laptops and desktops and

03:29   6    servers and motherboards.

03:29   7      Q.    Mr. Lewis, just a moment.

03:29   8           When you say they're not the same, are they

03:29   9    related at all?

03:29   10     A.    They are.  And so they are what's called a

03:29   11   family of patents.  And so each of these patents is

03:29   12   part of the same family of patents.

03:29   13          And so Dr. Sarhan explained to me that the

03:29   14   benefits of the patents in these licenses were very

03:29   15   similar, same type of benefit as the patents at issue

03:29   16   here to the accused products here.

03:29   17          So from a technical perspective, I believe

03:29   18   there was comparability.

03:29   19          So then for the economic comparability, we

03:29   20   consider a number of different things.  So the date,

03:29   21   for example, these were near or close to the

03:29   22   hypothetical negotiation date.  These were all also

03:29   23   relatively large companies.

03:29   24          And then, you know, almost most importantly

03:30   25   here, could we make the economics of those -- these

03:30  1    agreements comparable to the economics of the

03:30  2    hypothetical negotiation?

03:30  3            And so this is part of the reason why I

03:30  4    adjusted the royalty base of desktops and laptops to

03:30  5    make that royalty base more comparable to the blade

03:30  6    servers and modular computers that were the subject of

03:30  7    these agreements.

03:30  8    Q.    Now, Mr. Lewis, I believe earlier in the trial

03:30  9    we discussed how pretty much all of the agreements that

03:30  10   ACQIS has entered into are the result of settlements.

03:30  11           Does that matter to you?

03:30  12   A.    It does.

03:30  13   Q.    Why does it matter?

03:30  14   A.    So I think if you recall when we talked about

03:30  15   the assumptions we need to make as part of the

03:30  16   hypothetical negotiation, the parties are willing

03:30  17   parties.  The parties know that the patents are valid

03:30  18   and infringed.

03:30  19           Also, those are not -- that wasn't the case in

03:31  20   the settlements, right?  So I think defendants'

03:31  21   attorney had put one of the agreements up and noted

03:31  22   that in the preamble, they had said to settle this

03:31  23   litigation and to save the money and time of the

03:31  24   litigation, we're entering into this.

03:31  25           Well, typically what happens when the parties

618

03:31  1    settle prior to trial is there's a dispute as to

03:31  2    whether the patents are valid and infringed.  And in

03:31  3    fact, most of the agreements entered into here actually

03:31  4    state, we disagree that we are infringing your

03:31  5    technology, but we're going to take a license for this

03:31  6    amount.  Right?

03:31  7            So that's different than this hypothetical

03:31  8    negotiation that we're considering here because by the

03:31  9    time you guys determine damages, you will have already

03:31  10   determined that the patents are valid, infringed, and

03:31  11   therefore, you will know that.  Right?

03:31  12           So that typically would have an impact of

03:31  13   increasing the value, because unlike these agreements

03:32  14   where it was disputed, it will be a fact that it's

03:32  15   valid and infringed.  Which if the parties know that

03:32  16   it's valid and infringed, they would usually be willing

03:32  17   to pay a lot more for that technology.

03:32  18       Q.    Now, Mr. Lewis, earlier you mentioned that you

03:32  19   reviewed the expert report of ASUS' witness Mr. Newell;

03:32  20   is that right?

03:32  21       A.    I did.  Yes.

03:32  22       Q.    And are these the same licenses that

03:32  23   Mr. Newell found to be comparable to the hypothetical

03:32  24   negotiation?

03:32  25       A.    We reviewed the same, but he focused on a

03:32  1    different set of licenses of the ones that he thought

03:32  2    were most relevant.

03:32  3         Q.   Are some of those licenses here on this slide?

03:32  4         A.   They are.  Yes.

03:32  5         Q.   Which ones are those?

03:32  6         A.   So again, he's going to describe what he

03:32  7    believed, but for the most part, he relies on these

03:32  8    last three, the Inventec, the Acer, and the Lenovo

03:32  9    agreements.  And again, I mean, we disagree as to

03:32  10   whether or not those would have been the most relevant

03:33  11   agreements.

03:33  12        Q.   Did you also analyze these agreements?

03:33  13        A.   I did.  Yes.

03:33  14        Q.   And did you analyze the other two on the slide

03:33  15   as well?

03:33  16        A.   I did.  Absolutely.  Yes.

03:33  17             And again, you know, what I think is very

03:33  18   important to me, if you note the dates of these

03:33  19   agreements, they're all eight-plus years after this

03:33  20   hypothetical negotiation.

03:33  21             And so while some of the products are

03:33  22   comparable, the weight that you should put on

03:33  23   agreements that are eight to ten years after the

03:33  24   hypothetical negotiation should be less than the weight

03:33  25   you would put on agreements that were known and

620

03:33    1    knowable to the parties at that time.

03:33    2        Q.    And now, Mr. Lewis, what do these agreements

03:33    3    show about what the parties actually agreed to?

03:33    4        A.    Well, I mean, what you'll see here as time

03:33    5    went on, the settlements actually got much larger from

03:33    6    a dollars perspective.  And so we'll note that, you

03:33    7    know, the smallest one, MiTAC, is ███████████ up to

03:34    8    the Samsung agreement at over -- ███████████.

03:34    9        Q.    Okay.  And just before you were talking about

03:34   10    some agreements that had a royalty rate or a royalty

03:34   11    base written into the agreement.

03:34   12            Do any of these licenses have a royalty rate

03:34   13    or a royalty base written into the agreement?

03:34   14        A.    They do not.  And again, this is probably one

03:34   15    of the other -- well, the date is a big factor, but I

03:34   16    will tell you that the exercise of trying to convert

03:34   17    these lump-sum payments into something that the parties

03:34   18    were actually considering at the time of these

03:34   19    agreements is almost impossible.

03:34   20            And so unlike the agreements that I focused on

03:34   21    where both parties agreed and put into the agreement,

03:34   22    here's the payment and here's the sales that that

03:34   23    covers, or here's the percentage of sales that we're

03:34   24    paying, in these agreements, the parties couldn't agree

03:34   25    on that, right?

621

03:34  1          And so as you can imagine, there were -- there

03:35  2     were -- there were disputes as to which products were

03:35  3     infringed, what the time period was for infringement.

03:35  4          And so ultimately, these amounts, it's unknown

03:35  5     exactly what amount of sales they cover, and therefore,

03:35  6     I find them to be far less relevant than the ones that

03:35  7     actually do.

03:35  8     Q.    Okay.  Now, Mr. Lewis, I heard you mention the

03:35  9     date quite a few times.

03:35  10          Why does the date of the license matter?

03:35  11     A.    Again, I -- you're going to hear -- there's

03:35  12     this -- there's a principle in litigation called the

03:35  13     Book of Wisdom.  And there's this Book of Wisdom that

03:35  14     allows you to consider things that happened after the

03:35  15     hypothetical negotiation date.

03:35  16          But while you can consider things that

03:35  17     happened after, the focus should be on things that were

03:35  18     known.  Weight -- more weight should be given to the

03:35  19     things that were known then, because if everything is

03:35  20     treated equally, it negates the whole need to go back

03:35  21     in time to 2013, right?

03:36  22          So if I can consider something that happened

03:36  23     yesterday as just as powerful as something that existed

03:36  24     in 2013 when they sat down, then why does the date

03:36  25     matter?

622

03:36  1              And so really the focus should be on the data

03:36  2    that was known or knowable at that time in December of

03:36  3    2013, but in -- in -- what you have is in many cases,

03:36  4    there isn't a lot of data from these old periods, and

03:36  5    so we're allowed to try to look at certain things that

03:36  6    happened after to kind of fill in the holes, right?

03:36  7              And so ultimately, I think that in this case,

03:36  8    because we have a good set of agreements at the time of

03:36  9    the hypothetical negotiation, these agreements become a

03:36  10   lot less relevant and useful.

03:36  11       Q.    Thank you, Mr. Lewis.

03:36  12             Did you also analyze ASUSTeK or ASGL's

03:36  13   licensing history?

03:36  14       A.    I did.  ASUS produced five settlement

03:36  15   agreements.  Ultimately, both myself and I believe

03:36  16   ASUS' expert all determined that the technologies that

03:37  17   were licensed were not comparable to the technologies

03:37  18   at issue here in this case.  So little to no emphasis

03:37  19   was put on the agreements that they produced.

03:37  20       Q.    Okay.  And did you analyze any other

03:37  21   information with respect to ASUSTeK or ASGL's licensing

03:37  22   history or policies?

03:37  23       A.    I did.  Yes.

03:37  24             And so as you'll note here, I believe it was

03:37  25   Ms. Chen that testified that typically -- I think you

623

| | | |
|---|---|---|
| 03:37 | 1 | heard this earlier.  Typically, when ASUS licenses, it |
| 03:37 | 2 | licenses on behalf of all of its subsidiaries.  So they |
| 03:37 | 3 | don't do one license for the U.S. and one license for |
| 03:37 | 4 | Singapore and one license for other places.  When they |
| 03:37 | 5 | enter into license agreements, they're usually seeking |
| 03:37 | 6 | rights that would cover all of their subsidiaries. |
| 03:37 | 7 | Q.    And now, what was your ultimate conclusion |
| 03:37 | 8 | after reviewing the licensing history of both parties? |
| 03:37 | 9 | A.    So again, when you look at all of this and you |
| 03:38 | 10 | say, you know, we're now back in this hypothetical |
| 03:38 | 11 | negotiation, what would the parties have been |
| 03:38 | 12 | considering after looking at the licenses, I believe |
| 03:38 | 13 | the parties would have been sitting down, looking |
| 03:38 | 14 | between 1 and 3 percent as the range of quantitative |
| 03:38 | 15 | royalty indicators they would have been working |
| 03:38 | 16 | towards. |
| 03:38 | 17 | MS. HEPLER:  And, Your Honor, we can go |
| 03:38 | 18 | off the confidential record at this time. |
| 09:42 | 19 | (Sealed proceedings end.) |
| 03:38 | 20 | BY MS. HEPLER: |
| 03:38 | 21 | Q.    Thank you, Mr. Lewis. |
| 03:38 | 22 | Now, coming back to our key considerations of |
| 03:38 | 23 | the hypothetical negotiation. |
| 03:38 | 24 | What did you analyze with respect to price |
| 03:38 | 25 | premiums for products incorporating at least USB 3.0? |

624

03:38  1      A.    Yes.  So we often -- in intellectual property

03:38  2  valuation, we try to look for ways of pulling out the

03:38  3  value of the IP.  One way to do that is what's called

03:38  4  an analytical approach or product pairs where you

03:38  5  compare a product that doesn't use the technology to

03:39  6  one that does.

03:39  7           So I -- I started by looking to see if there

03:39  8  was a way to find an ASUS-accused product that didn't

03:39  9  infringe versus an accused one.  But as you can imagine

03:39  10  in laptops and desktops, there are so many differences

03:39  11  and so many features that it was hard to find a clean

03:39  12  pair.  So again, I looked at publicly available data to

03:39  13  see if I could find a cleaner pair of a product pair.

03:39  14           And ultimately, while these are not accused

03:39  15  products in this case, they -- they give us an example

03:39  16  of kind of the price premiums that were being charged

03:39  17  for products that use the patents at issue versus those

03:39  18  that didn't.

03:39  19           And so what we'll see here is that there's a

03:39  20  SanDisk 32-bit -- 32-Gigabit Thumb Drive that used USB

03:39  21  2.0.  And on the right, we found a very similar SanDisk

03:40  22  32-Gigabit Thumb Drive using USB 3.0.  And you'll

03:40  23  notice that on Amazon, the pricing in 2014 for these

03:40  24  two devices, one was $18 and the USB 3.0 device was 33.

03:40  25           And so what this just tells us is that

625

03:40  1    incorporating the newer standard, the USB 3.0, allowed

03:40  2    companies to charge pricing premiums for access to the

03:40  3    faster technology.

03:40  4        Q.    On to our third key consideration -- well, let

03:40  5    me back up.

03:40  6            What would this impact -- how would this

03:40  7    impact the hypothetical negotiation?

03:40  8        A.    Yes.  So again, this -- this -- it's not one

03:40  9    of the accused products, but it gives us some idea of

03:40 10    the pricing and profit premiums that one might get from

03:41 11    incorporating the technology.

03:41 12            So I can't make a quantitative -- I can't say,

03:41 13    oh, this means they would pay $15, but what this would

03:41 14    show is that there's a significant ability to charge

03:41 15    more when incorporating the technologies that would

03:41 16    usually have the parties agree to a higher royalty rate

03:41 17    because it's a valuable technology.

03:41 18        Q.    Now on to the third key consideration.

03:41 19            What did you consider with respect to

03:41 20    profitability, commercial success, and popularity of

03:41 21    the accused products?

03:41 22        A.    Yes.  So Georgia-Pacific Factor 8 has us look

03:41 23    at, again, the popularity.  We typically look at the

03:41 24    sales and the profits of the accused products.  And so

03:41 25    going back to, you know, these accused products --

626

| | | |
|---|---|---|
| 03:41 | 1 | Q.   Mr. Lewis, I'll just stop you a moment. |
| 03:41 | 2 | MS. HEPLER:  Go on the confidential |
| 03:41 | 3 | record, please. |
| | 4 | THE WITNESS:  Sorry. |
| | 5 | (Sealed proceedings.) |
| | 6 | BY MS. HEPLER: |
| 03:41 | 7 | Q.   You can continue. |
| 03:41 | 8 | A.   Okay.  All right.  So again, we note that |
| 03:42 | 9 | there was over $⬛⬛⬛ of accused products sold in |
| 03:42 | 10 | the U.S.  That's -- that's a lot of sales that was |
| 03:42 | 11 | incorporated into, you know, hundreds of their |
| 03:42 | 12 | products. |
| 03:42 | 13 | When looking at the gross profits which we got |
| 03:42 | 14 | from the ASUS financial information, you'll see on |
| 03:42 | 15 | these sales in the -- in the United States, there was |
| 03:42 | 16 | over $⬛⬛⬛ of gross profit just at the U.S. |
| 03:42 | 17 | level related to these accused sales. |
| 03:42 | 18 | Q.   And -- and the sales that you calculated here, |
| 03:42 | 19 | did they come from that same J-18 admitted exhibit we |
| 03:42 | 20 | discussed earlier? |
| 03:42 | 21 | A.    It does.  Yes.  So this represents the profit |
| 03:42 | 22 | share just in the U.S. |
| 03:42 | 23 | Q.   And, Mr. Lewis, what influence would this have |
| 03:42 | 24 | on the hypothetical negotiation? |
| 03:42 | 25 | A.   Again, when -- when the accused products are |

627

| | | |
|---|---|---|
| 03:42 | 1 | commercially successful and have significant sales and |
| 03:42 | 2 | profits, that often has the parties saying, we'd be |
| 03:43 | 3 | willing to pay more to have access to technology for |
| 03:43 | 4 | very popular, you know, profitable products. |
| 03:43 | 5 | MS. HEPLER: And, Your Honor, we can go |
| 03:43 | 6 | off the confidential record. |
| 09:42 | 7 | (Sealed proceedings end.) |
| 03:43 | 8 | BY MS. HEPLER: |
| 03:43 | 9 | Q. Now, Mr. Lewis, on to the fourth, the benefits |
| 03:43 | 10 | and advantages of the patented technology in the |
| 03:43 | 11 | accused products. |
| 03:43 | 12 | What did you analyze here? |
| 03:43 | 13 | A. Yeah. So this one is really a technical |
| 03:43 | 14 | factor. And so most of Georgia-Pacific Factor 10 |
| 03:43 | 15 | I relied on Dr. Sarhan for. So I had conversations |
| 03:43 | 16 | with Dr. Sarhan and Dr. Chu, and I had this kind of |
| 03:43 | 17 | technical discussion of what is it that these patents |
| 03:43 | 18 | do? |
| 03:43 | 19 | And so me being the accounting guy and them |
| 03:43 | 20 | being the technical guy, they explained to me, like |
| 03:43 | 21 | they did to you, ultimately these -- the benefits of |
| 03:43 | 22 | the patents at issue allowed for this smaller number of |
| 03:43 | 23 | wires or a smaller connector, longer battery life |
| 03:43 | 24 | because it was less power. It was much faster data |
| 03:44 | 25 | transfer, and it was -- it had fewer errors. |

628

03:44  1          And so again, having significant technical
03:44  2  benefits at the time of this negotiation, ACQIS would
03:44  3  have said, hey, these are really important benefits,
03:44  4  and that would usually push the royalty rate higher
03:44  5  between that 1 to 3 percent.
03:44  6      Q.    Mr. Lewis, did we also hear some maybe
03:44  7  deposition testimony about ASUS' opinions on the
03:44  8  benefits of the technology?
03:44  9      A.    We did.  Yes.
03:44  10         And so I think we heard testimony that, again,
03:44  11  the ASUS representatives, it's not just the technical
03:44  12  witnesses but also ASUS agreed that the PCIe was
03:44  13  fast and -- was a fast and stable connection, similar
03:44  14  USB 3 was a -- was a much -- better performing compared
03:44  15  to USB 2, for example.
03:44  16     Q.    And what influence would this ultimately have
03:44  17  on the hypothetical negotiation?
03:44  18     A.    Again, you know, this -- great benefits would
03:45  19  usually push to a higher royalty rate.
03:45  20     Q.    On to the next.
03:45  21         What did you consider with respect to
03:45  22  alternatives to the patented technology?
03:45  23     A.    Yeah.  So again, Georgia-Pacific Factor 9 is
03:45  24  usually, again, a technical-related factor.  And so one
03:45  25  of the things that parties consider when sitting down

629

03:45  1    is ACQIS would say, take a license to my patents, and

03:45  2    ASUS could say something like, no.  We'll just switch

03:45  3    to something else.  So we have these available

03:45  4    alternatives.

03:45  5           Again, I had a discussion with Dr. Sarhan

03:45  6    about the identified technologies that ASUS said were

03:45  7    potential alternatives.  And according to Dr. Sarhan,

03:45  8    those really wouldn't have been viable alternatives

03:45  9    because by that time, essentially the industry had

03:45  10   switched to PCIe and USB.  And, therefore, these other

03:45  11   alternatives really wouldn't have been possible.

03:45  12   Q.    And what influence would this have on the

03:46  13   hypothetical negotiation?

03:46  14   A.    Again, to the extent that ASUS really didn't

03:46  15   have much of an alternative to switch to, that would

03:46  16   usually point to a higher royalty rate between the 1

03:46  17   and 3 percent.

03:46  18   Q.    All right.  Back to our key considerations.

03:46  19          What did you analyze with respect to use of

03:46  20   the patented features in the commercially successful

03:46  21   accused products?

03:46  22   A.    Yes.  So Georgia-Pacific 11 is usually about

03:46  23   extent of use.  And so you look to see, you know,

03:46  24   how -- in how many of ASUS' products do they utilize

03:46  25   this technology.

03:46  1        And I think we just heard in the reading of

03:46  2  those depositions that they really use PCIe across all

03:46  3  of their products.

03:46  4        And so you see in both the testimony and in

03:46  5  their product literature description where they're

03:46  6  using PCIe and USB 3 or higher across their entire

03:46  7  product line.

03:46  8    Q.    Mr. Lewis, what impact would this have on the

03:47  9  hypothetical negotiation?

03:47  10   A.    Again, so when you have great extent of use of

03:47  11  the patents at issue, it usually would have the parties

03:47  12  arguing for a higher royalty rate.

03:47  13   Q.    All right.  On to the last key consideration.

03:47  14        What did you consider with respect to the

03:47  15  portion of profit due to ASUSTeK's contributions to the

03:47  16  commercial success of the accused products?

03:47  17   A.    Yes.  So I think we discussed that I was able

03:47  18  to pull out in an apportionment of the base certain

03:47  19  value of components that have separate value.

03:47  20  Georgia-Pacific 13 is where I consider all of ASUS'

03:47  21  other contributions.

03:47  22        And so again, I think that we've heard

03:47  23  throughout this case that ACQIS should not get credit

03:47  24  for all of the technologies that already existed or

03:47  25  that ASUS brought to these products.

631

03:47   1          And so Georgia-Pacific 13 is where we consider

03:48   2   all of ASUS' contributions and others' contributions

03:48   3   above and beyond what the patents at issue contribute.

03:48   4          And then I think we were just also hearing

03:48   5   some testimony today about ASUS' branding.  There's no

03:48   6   question that ASUS has a very strong brand name in the

03:48   7   computer and laptop industry and that the success of

03:48   8   their products in the United States is in part due to

03:48   9   their brand and reputation for making great products.

03:48   10          And so Georgia-Pacific Factor 13 would say

03:48   11   ASUS has made great contributions to these, and they

03:48   12   should get the credit for that.  And so at the time of

03:48   13   this negotiation, ASUS would say, we designed these

03:48   14   products.  We built them, we shipped them here, we sold

03:48   15   them.  We would want to pay a much lower royalty rate

03:48   16   because we've done so much work here.

03:49   17          And that would typically push the rate back

03:49   18   down between the 1 and 3 percent.

03:49   19   Q.    Thank you.

03:49   20          Now, Mr. Lewis, if you could just sum up for

03:49   21   us, what was your overall conclusion taking into

03:49   22   account all the key considerations of the hypothetical

03:49   23   negotiation that we've discussed today?

03:49   24   A.    Right.  So this is really Georgia-Pacific

03:49   25   Factor 15.  This is where you kind of bring together

632

03:49  1    all of that evidence and all of those considerations.

03:49  2              And so, you know, now we're sitting in this

03:49  3    hypothetical conference room back in December of 2013.

03:49  4    They've looked at these licenses, they looked at the

03:49  5    products, they've looked at the benefits.  All of the

03:49  6    things we've talked about.

03:49  7              And based on all of that, it is my opinion

03:49  8    that the evidence indicates that they would have agreed

03:49  9    to a royalty rate of 1.15 percent that would have been

03:49  10   applied to that apportioned royalty base.

03:49  11   Q.    Now, Mr. Lewis, there are five asserted

03:49  12   patents in this case.

03:50  13             If there was a hypothetical negotiation for

03:50  14   each of the asserted patents, would the parties be

03:50  15   negotiating the same rate each time?

03:50  16   A.    They wouldn't.  So as we saw in their historic

03:50  17   licensing and is very common in patent licensing in

03:50  18   general, patents are usually licensed as families.

03:50  19             And so all of the patents at issue here are

03:50  20   all part of one family.  And so they would almost

03:50  21   always include -- the license would almost always

03:50  22   include the rights to the patents that they were --

03:50  23   that were issued and any other patents that would issue

03:50  24   related to that family.  And, therefore, it would be

03:50  25   one rate for the entire family of patents.

633

03:50  1     Q.    And just to be clear, Mr. Lewis, would the

03:50  2  running royalty rate be applied more than once if a

03:50  3  product infringes more than one of the patents in this

03:50  4  suit?

03:50  5     A.    It wouldn't.  No.  It would be -- it would be

03:50  6  1.15, you know, for all of the patents or any of the

03:50  7  patents.

03:51  8     Q.    Thank you, Mr. Lewis.

03:51  9            MS. HEPLER:  Your Honor, again I ask to

03:51  10  go back on the confidential record, please.

03:51  11            (Sealed proceedings.)

03:51  12  BY MS. HEPLER:

03:51  13     Q.    All right.  Mr. Lewis, now that you've

03:51  14  determined the royalty base and the royalty rate, how

03:51  15  do you get to the resulting damages from your opinion?

03:51  16     A.    Yes.  So now we're just doing the basic math.

03:51  17  We've apportioned the royalty base to exclude

03:51  18  components that were part of that patented system.

03:51  19  We've now concluded the royalty rate is 1.15 percent.

03:51  20  Multiplying that times the $███████████ royalty base

03:51  21  results in reasonable royalty damages of $█████████.

03:51  22     Q.    Okay, Mr. Lewis.  And did you hear Dr. Chu

03:51  23  earlier -- I believe yesterday morning talked about two

03:51  24  time periods for damages depending on the asserted

03:52  25  claim type?

634

03:52  1    A.    I did.  Yes.

03:52  2    Q.    Okay.  And so just to clarify for the jury, is

03:52  3    the -- is the category listed on the left of the slide

03:52  4    here the calculation if the damages are limited in time

03:52  5    to 2018, for example, if only apparatus claims are

03:52  6    found to infringe?

03:52  7    A.    Yes.  That is the number of the 17.97 million.

03:52  8    That has a date between May '18 and May 2020.

03:52  9    Q.    And did you apply the same apportionment

03:52  10    factors and the same rate to get this number?

03:52  11    A.    I did.  Yes.

03:52  12    Q.    You just adjusted the base in time frame?

03:52  13    A.    Correct.

03:52  14    Q.    And then on the right-hand, is -- does this

03:52  15    number here represent the one we were just discussing,

03:52  16    of the calculation if all patents are found by the jury

03:52  17    to be infringed during this time period?

03:52  18    A.    Yes.  It does.

03:52  19    Q.    Okay.  And so if you could just one more time

03:52  20    for us, what was your ultimate conclusion on damages?

03:53  21    A.    Yes.  So again, I believe that the parties

03:53  22    would have agreed in December of 2013 to a reasonable

03:53  23    royalty rate of 1.15 percent applied to an apportioned

03:53  24    royalty base and that the total damages would be

03:53  25    $███████ .

635

03:53   1          Q.    Thank you very much, Mr. Lewis.

03:53   2                    MS. HEPLER:  Pass the witness.

03:53   3                    THE COURT:  Ladies and gentlemen, why

03:53   4    don't we take our afternoon recess?  We'll be in recess

03:53   5    for about ten minutes.

03:53   6                    (Jury exited the courtroom.)

03:53   7                    THE COURT:  You may be seated.

03:53   8                    You may step down.

03:53   9                    Welcome back.

03:53   10                    Is there anything that we need to take

03:53   11   up?

03:53   12                    MR. COLLARD:  Very briefly and just a

03:53   13   clerical issue, Your Honor --

        14                    THE COURT:  Sure.

03:54   15                    MR. COLLARD: -- on exhibits.

03:54   16                    (Clarification by Reporter.)

03:54   17                    MR. COLLARD:  Yeah.  Sorry.

03:54   18                    Just a clerical issue on exhibits.  When

03:54   19   we admitted the patents -- when I admitted the patents,

03:54   20   I admitted J-1 through J-5.

03:54   21                    And it should have been J-1 through 3 and

03:54   22   J-5 and 6.  So I've talked to the other side.  And we'd

03:54   23   like to swap out J-4 for J-6.  The jurors' notebooks

03:54   24   are correct.

03:54   25                    THE COURT:  Okay.

636

| | | |
|---|---|---|
| 03:54 | 1 | Anything else? |
| 03:54 | 2 | MR. BURESH:  No, Your Honor. |
| 03:54 | 3 | THE COURT:  Okay.  We'll finish with this |
| 03:54 | 4 | gentleman on cross.  About -- I'm just -- generally |
| 03:54 | 5 | about how long is this cross?  30 minutes?  40 minutes? |
| 03:54 | 6 | MS. MARRIOTT:  Probably less than 30. |
| 03:54 | 7 | THE COURT:  Okay.  And whatever it takes |
| 03:54 | 8 | to do the redirect.  We will break at that -- last |
| 03:54 | 9 | witness? |
| 03:54 | 10 | MR. COLLARD:  Yes. |
| 03:54 | 11 | THE COURT:  We'll break at that time, and |
| 03:54 | 12 | we'll do the motions. |
| 03:54 | 13 | Who would your first witness be? |
| 03:54 | 14 | MR. BURESH:  It will be Mr. Bhatt, Your |
| 03:54 | 15 | Honor. |
| 03:54 | 16 | THE COURT:  Okay.  And about how long is |
| 03:54 | 17 | he? |
| 03:54 | 18 | MR. BURESH:  It's about an hour.  And a |
| 03:55 | 19 | little more. |
| 03:55 | 20 | THE COURT:  That's okay. |
| 03:55 | 21 | Let's see where we're at.  It seems like |
| 03:55 | 22 | we've gone -- we're getting -- we've gone pretty fast. |
| 03:55 | 23 | I mean, do you anticipate between your direct and your |
| 03:55 | 24 | cross it'll take us more than two days to finish your |
| 03:55 | 25 | case? |

637

```
03:55   1                    MR. BURESH:  No, Your Honor.  We're on
03:55   2    track.
03:55   3                    THE COURT:  Okay.  Well, then I'm happy
03:55   4    with us breaking after you finish, and we can start
03:55   5    tomorrow if you care to.
03:55   6                    MR. BURESH:  That'd be our preference.
03:55   7                    THE COURT:  Well, no.  Let's -- well,
03:55   8    remember when you're rating me on Yelp, a lot of stars.
03:55   9    I want to keep this job.
03:55  10                    So let's do that.  We'll finish with the
03:55  11    damages expert.  I'll let the jury go.
03:55  12                    I'm going to have -- I'm going to have
03:55  13    you go ahead then and rest when -- formally when he's
03:56  14    finished, and then we'll take up -- because we know
03:56  15    that's what's going to happen.  And then we'll take up
03:56  16    the motions without them and we'll start tomorrow
03:56  17    morning.
03:56  18                    Anything else?
03:56  19                    MR. BURESH:  No, Your Honor.
03:56  20                    THE COURT:  Okay.
03:56  21                    (Recess taken.)
09:42  22                    (Sealed proceedings end.)
04:07  23                    THE COURT:  Please remain standing for
04:07  24    the jury.
04:07  25                    (Jury entered the courtroom.)
```

638

04:08    1                    THE COURT:  Thank you.  You may be

04:08    2    seated.

04:08    3                    Counsel, cross-examination?

04:08    4                    MS. MARRIOTT:  Thank you, Your Honor.

04:08    5                    CROSS-EXAMINATION

04:08    6    BY MS. MARRIOTT:

04:08    7        Q.   Mr. Lewis?

04:08    8        A.   Hi.

04:08    9        Q.   Good afternoon.

04:08    10       A.   Good afternoon.

04:08    11       Q.   Now, we just heard your testimony, and I have

04:08    12   a few kind of quick questions to start out.

04:08    13            You are here offering an opinion on damages,

04:08    14   correct?

04:08    15       A.   Correct.

04:08    16       Q.   And that only applies if the jury finds

04:08    17   infringement, correct?

04:08    18       A.   Correct.

04:08    19       Q.   Okay.  So if the jury does not find any

04:08    20   infringement, then there would be no damages; isn't

04:09    21   that correct?

04:09    22       A.   That's correct.

04:09    23       Q.   Now, one of the other questions that the jury

04:09    24   will be considering is whether these patents are

04:09    25   invalid.

639

04:09  1           If the jury finds that the patents are

04:09  2    invalid, there would also be no damages; isn't that

04:09  3    correct?

04:09  4        A.    Correct.

04:09  5        Q.    Okay.  And in either of those scenarios, your

04:09  6    testimony doesn't matter, correct?

04:09  7        A.    It's sad to think, but yes, I believe that's

04:09  8    true.

04:09  9        Q.    Now, I believe you said you relied on

04:09  10   Dr. Sarhan for some things that he told you about

04:09  11   noninfringing alternatives.

04:09  12           Do you recall that?

04:09  13       A.    I do.

04:09  14       Q.    Were you present in the courtroom during the

04:09  15   duration of this trial?

04:09  16       A.    Yes.

04:09  17       Q.    And I didn't hear Dr. Sarhan mention anything

04:09  18   about noninfringing alternatives.  Did you?

04:09  19       A.    I -- not in his direct.

04:09  20       Q.    Okay.  So you think maybe that's coming at

04:09  21   some point?

04:09  22       A.    I do.

04:09  23       Q.    Okay.  But we haven't heard it yet, have we?

04:09  24       A.    We have not.

04:09  25       Q.    Okay.  All right.  So you were in the

04:10  1    courtroom yesterday when the plaintiff ACQIS put up an

04:10  2    exhibit that had licenses listed out.

04:10  3            Do you remember that?

04:10  4    A.    I do.

04:10  5    Q.    A chart, right?  A blue chart?

04:10  6    A.    Yes.

04:10  7    Q.    And all of those were settlement agreements,

04:10  8    correct?

04:10  9    A.    Correct.

04:10  10   Q.    Okay.  And if I understood your testimony just

04:10  11   now, I believe you said that in all of those

04:10  12   agreements, infringement was hotly disputed by the

04:10  13   parties, correct?

04:10  14   A.    I don't remember if I said in all of them, but

04:10  15   I -- I noted that it is written into many that they --

04:10  16   they denied the allegations made against them.

04:10  17   Q.    So you would agree with me it's -- that those

04:10  18   parties were not agreeing to infringement, right?  They

04:10  19   didn't think they infringed?

04:10  20   A.    I believe that's correct.

04:10  21   Q.    Okay.  Now, during your testimony on direct,

04:11  22   you mentioned -- I think you talked about some of those

04:11  23   settlement agreements, right?

04:11  24   A.    I did.

04:11  25   Q.    Okay.  But not all of them, right?

641

04:11  1      A.    Correct.

04:11  2      Q.    I think you said it was a select few that

04:11  3   you -- that you chose to talk about today?

04:11  4      A.    Yes.  The ones I thought were the most

04:11  5   relevant, correct.

04:11  6      Q.    By my count, and you can correct me if I'm

04:11  7   wrong, I think there were, like, seven that you didn't

04:11  8   mention at all?

04:11  9      A.    I guess can you be more specific?

04:11  10     Q.    Sure.  We can -- we can look at them.

04:11  11            MS. MARRIOTT:  Can we pull up P-920?

04:11  12   That chart?

04:11  13            Okay.  All right.  Can everyone see that?

       14   BY MS. MARRIOTT:

04:11  15     Q.    So if I recall, and you can correct me if I'm

04:11  16   wrong, Supermicro, you didn't mention that one at all,

04:11  17   right?

04:11  18     A.    Correct.

04:12  19     Q.    So that one's not relevant to damages at all,

04:12  20   correct?

04:12  21     A.    It was not one that I believe the parties

04:12  22   would have focused on at the time of the negotiations.

04:12  23     Q.    Yeah.  Let me rephrase it.

04:12  24            You didn't find it relevant to damages in this

04:12  25   case; isn't that correct?

04:12  1      A.    I found it less -- less comparable, correct.

04:12  2      Q.    All right.  So let's cross that one off the

04:12  3  list.

04:12  4            I didn't hear you mention NEC.  You didn't

04:12  5  find that one relevant to your damages opinions,

04:12  6  correct?

04:12  7      A.    So I want to be careful because I reviewed

04:12  8  them all, and I evaluated each one for comparability,

04:12  9  and the ones I testified to were the ones I found most

04:12  10  comparable.  And so in my report, I described that

04:12  11  these I found to have less -- be less comparable.

04:12  12     Q.    Okay.  My question is different.

04:12  13           My question is:  You didn't talk about NEC

04:13  14  during your testimony today, correct?

04:13  15     A.    I did not speak about that one specifically,

04:13  16  correct.

04:13  17     Q.    Okay.  So you didn't find it relevant enough

04:13  18  to talk to the jury about it today as being relevant to

04:13  19  damages; isn't that fair?

04:13  20     A.    I found it less comparable, correct.

04:13  21     Q.    Okay.  Okay.  So we can -- we can mark that

04:13  22  one off.

04:13  23           HP.  That one's not -- you didn't talk about

04:13  24  HP at all today either, did you?

04:13  25     A.    Again, I didn't -- I did not discuss it

643

04:13    1    specifically, but I reviewed it as part of my work.

04:13    2        Q.   Again, not my question.

04:13    3            You didn't -- you did not discuss this HP

04:13    4    settlement agreement at all with the jury today,

04:13    5    correct?

04:13    6        A.   I did not.

04:13    7        Q.   Okay.  And so it's not what you're basing your

04:13    8    damages opinion on, correct?

04:13    9        A.   Well, so that's where I take issue, because

04:13   10    part of the work I did to reach my conclusions -- but

04:13   11    I -- again, I only focused on certain ones for today.

04:13   12        Q.   Okay.  You didn't talk about Dell with the

04:13   13    jury today, correct?

04:13   14        A.   Correct.

04:13   15        Q.   Okay.  So we can mark that one off.

04:14   16            Oracle, didn't talk about that one with the

04:14   17    jury today either, did you?

04:14   18        A.   I did not.

04:14   19        Q.   Okay.

04:14   20            MS. MARRIOTT:  If we go to the next page

04:14   21    of this exhibit.

        22    BY MS. MARRIOTT:

04:14   23        Q.   IBM, you didn't talk about that one with the

04:14   24    jury at all either, did you?

04:14   25        A.   We did not.

644

04:14  1         Q.    Okay.  And if we look at the bottom, there's

04:14  2   Wiwynn, second to last.  You didn't talk about that one

04:14  3   with the jury either, did you?

04:14  4         A.    I did not talk about it specifically, correct.

04:14  5         Q.    Okay.  So we can mark that one off.

04:14  6               And Microsoft as well, you didn't talk about

04:14  7   that with the jury at all; isn't that correct?

04:14  8         A.    That's correct.

04:14  9         Q.    Okay.  So we can mark that one off too.

04:14 10               Now, if I understood your testimony on this

04:14 11   particular page of -- of P-920 of this exhibit, you

04:14 12   didn't find the Samsung license to be relevant to the

04:14 13   damages calculation that you did in this case either,

04:14 14   right?

04:14 15         A.    Again, I don't -- I don't believe I said that.

04:15 16   No.

04:15 17         Q.    Okay.  You didn't base your damages on

04:15 18   Samsung -- on the Samsung settlement; is that fair?

04:15 19         A.    I believe that it was less relevant to the

04:15 20   hypothetical negotiation that I --

      21         Q.    Okay.

04:15 22         A.    -- considered.

04:15 23         Q.    Okay.  But it was less relevant?

04:15 24         A.    It was less comparable, correct.

04:15 25         Q.    Okay.  I think we can mark that one off.

645

| | | |
|---|---|---|
| 04:15 | 1 | MiTAC, also less relevant to you? |
| 04:15 | 2 | A.    Yes.  For the reasons I discussed. |
| 04:15 | 3 | Q.    Okay.  Inventec, less relevant to you? |
| 04:15 | 4 | A.    Again, I mean, I discussed -- I discussed it, |
| 04:15 | 5 | and so it was one I considered, but... |
| 04:15 | 6 | Q.    My question was different. |
| | 7 | A.    Yes. |
| 04:15 | 8 | Q.    It was less relevant to you? |
| 04:15 | 9 | A.    I think what I had said was it was less |
| 04:15 | 10 | comparable. |
| 04:15 | 11 | Q.    Less comparable to you. |
| 04:15 | 12 | A.    Correct. |
| 04:15 | 13 | Q.    Okay.  Acer, less comparable to you? |
| 04:15 | 14 | A.    It was less comparable, correct. |
| 04:15 | 15 | Q.    Okay.  And Lenovo, less comparable to you, |
| 04:15 | 16 | correct? |
| 04:15 | 17 | A.    Correct. |
| 04:16 | 18 | Q.    Okay. |
| 04:16 | 19 | A.    For the reasons I stated.  Yeah. |
| 04:16 | 20 | Q.    Okay.  Now, that leaves, I think, really |
| 04:16 | 21 | just -- just the settlement agreements that you had on |
| 04:16 | 22 | your slide. |
| 04:16 | 23 | MS. MARRIOTT:  So we can go -- if we can |
| 04:16 | 24 | go to Mr. Lewis' Slide No. -- let's look at No. 20. |
| | 25 | BY MS. MARRIOTT: |

646

04:16  1    Q.    Now, these are ones that -- that you found to

04:16  2    be more relevant, right?

04:16  3    A.    I believe these are the most comparable

04:16  4    agreements.

04:16  5    Q.    Okay.  And every single one of these

04:16  6    companies -- I think you've been in the courtroom for

04:16  7    the trial, right?

04:16  8    A.    I have.

04:16  9    Q.    Every single -- and you issued a report in

04:16  10   this case, correct?

04:16  11   A.    Correct.

04:16  12   Q.    And every single one of these companies who

04:16  13   settled lawsuits with ACQIS and entered into settlement

04:16  14   agreements to do that, they were all making modular

04:17  15   computers; isn't that correct?

04:17  16   A.    As I mentioned, they were blade servers, and

04:17  17   that was sometimes referred to as modular computers.

04:17  18   Q.    And ACQIS contended those were modular

04:17  19   computers, right?

04:17  20   A.    At the time, yes.

04:17  21   Q.    Yeah.  In the litigations that they brought.

04:17  22   A.    I mean, I wasn't part of that, but that's my

04:17  23   understanding.

04:17  24   Q.    Okay.  And we heard the same thing from

04:17  25   Dr. Chu yesterday, didn't we?  You heard that?

647

04:17  1       A.    Correct.

04:17  2       Q.    Okay.  And you understand that none of the

04:17  3   ASUSTeK/ASUS-branded products that are at issue in this

04:17  4   case, none of them are modular computers; isn't that

04:17  5   correct?

04:17  6       A.    Again, I discussed that they are not, but

04:17  7   again, I made adjustments to make them comparable.

04:17  8       Q.    They are not, correct?

04:17  9       A.    They're not blade servers, correct.

04:17  10      Q.    They're not modular computers either, correct?

04:17  11      A.    I don't believe they're referred to as modular

04:17  12  computers.

04:17  13      Q.    Okay.  So those ASUS products are not situated

04:17  14  similarly to any of these agreements that you found to

04:17  15  be comparable; wouldn't you agree?

04:18  16      A.    I disagree.

04:18  17      Q.    Okay.  I want to talk to you about this

04:18  18  opinion and this testimony that you gave about

04:18  19  apportionment.

04:18  20            Do you recall that testimony?

04:18  21      A.    I do.

04:18  22      Q.    Okay.  Mr. Lewis, you would agree with me,

04:18  23  wouldn't you, that ACQIS in this lawsuit is not

04:18  24  entitled to take economic credit for things that

04:18  25  Dr. Chu and ACQIS did not invent?  You would agree with

04:18   1    that, right?

04:18   2        A.    I agree.  I believe I stated that.

04:18   3        Q.    Okay.  And is that the apportionment concept

04:18   4    that you testified about?

04:18   5        A.    It's part of the -- the two different

04:18   6    apportionments that I discussed, correct.

04:18   7        Q.    And you would agree with me that the purpose

04:18   8    of apportionment -- the reason why you have to do that

04:19   9    exercise in the damages context is to separate the

04:19   10   value of patented features on the one hand from

04:19   11   unpatented features on the other, correct?

04:19   12       A.    That is -- that is why we do it, yes, in part.

04:19   13       Q.    Yeah.  Now, throughout the duration of this

04:19   14   trial, we've been talking about -- all about PCI

04:19   15   Express, right?

04:19   16       A.    PCI Express and USB 3.0 and higher.

04:19   17       Q.    Yeah.  And you understand that those are the

04:19   18   allegedly infringing patented features that ACQIS

04:19   19   contends are the patented features, right?

04:19   20       A.    I believe -- again, I defer to the technical

04:19   21   experts on what's infringing.  But yes.  That PCIe and

04:19   22   USB 3 and higher infringe the patents.  Correct.

04:19   23       Q.    Yeah.  And those are the features that are

04:19   24   accused -- the features of the ASUS products that are

04:19   25   accused of infringement in this case, correct?

649

04:19    1          A.    I believe that's correct.

04:19    2          Q.    And your -- you understand as well that it's

04:20    3    the implementation of those standards, PCI Express and

04:20    4    USB 3.  That's what you understand would infringe the

04:20    5    patents-in-suit under ACQIS' infringement theory; isn't

04:20    6    that correct?

04:20    7          A.    I mean, again, I think -- I don't -- I want to

04:20    8    make sure you're not asking me a technical question,

04:20    9    but as I understand it, ASUS products that practice

04:20   10    PCIe and USB 3.0 have been accused of infringing.

04:20   11    So --

04:20   12          Q.    Yeah.

04:20   13          A.    -- I believe that's correct.  Yes.

04:20   14          Q.    Okay.  Now, when you were describing the

04:20   15    apportionment exercise that you conducted, you did not

04:20   16    limit the accused features just to PCI Express and USB,

04:20   17    right?

04:20   18          A.    I'm not following.

04:20   19          Q.    Sure.

04:20   20                MS. MARRIOTT:  If we look at Slide 12 of

04:20   21    Mr. Lewis' deck.

        22    BY MS. MARRIOTT:

04:20   23          Q.    PCI Express isn't on here.  Would you agree

04:21   24    with me?

04:21   25          A.    Correct.

650

04:21  1       Q.    USB isn't on here, correct?

04:21  2       A.    Correct.

04:21  3       Q.    Okay.  You weren't trying to separate the

04:21  4   value of PCI Express and USB; isn't that correct?

04:21  5       A.    The ultimate conclusion of my analysis was to

04:21  6   do that.  This is a part of that analysis.

04:21  7       Q.    Okay.  So you think 82 percent of the computer

04:21  8   is related to PCI Express; is that correct?

04:21  9       A.    That's not what I said.

04:21  10      Q.    Okay.  Okay.  Instead of looking -- just

04:21  11  really honing in on PCI Express and USB, I believe you

04:21  12  described it as looking at just the entire hardware

04:21  13  cost of the device; isn't that correct?

04:21  14      A.    That's not exactly correct.

04:21  15      Q.    Okay.  Isn't that what the slide is showing,

04:21  16  Slide 12?  These are the hardware costs?

04:21  17      A.    Again, I was -- as I described it -- so -- so

04:21  18  as I described it, it was trying to get to the patented

04:22  19  system and make it comparable --

04:22  20      Q.    Mr. Lewis, that wasn't my question.

04:22  21            On this slide, Slide 12, are these depicting

04:22  22  hardware costs, the components?

04:22  23      A.    Yes, but I think all of these components are

04:22  24  hardware components.

04:22  25      Q.    Okay.  These are all hardware components,

651

04:22  1    right?

04:22  2        A.    Correct.

04:22  3        Q.    Okay.  And some of them you're including in

04:22  4    the patented system, and some of them you're not,

04:22  5    right?

04:22  6        A.    Correct.

04:22  7        Q.    Okay.  And you're doing that as -- if I

04:22  8    understand your testimony, because Dr. Chu told you

04:22  9    that he would have considered all of these hardware

04:22  10   costs to be the patented system?

04:22  11       A.    Not exactly.

04:22  12       Q.    Okay.  Dr. Chu didn't tell you that?

04:22  13       A.    Dr. Chu said that it was his goal in

04:22  14   negotiating to reduce the royalty base to the patented

04:22  15   system, and I had discussions with Dr. Sarhan as well

04:22  16   as to which components to include and which to exclude.

04:22  17       Q.    So I believe Dr. Chu, though -- I believe this

04:23  18   was your testimony, was that he told you that he

04:23  19   considered these components to -- hardware to be his

04:23  20   patented system when he was licensing modular

04:23  21   computers.

04:23  22             That was your testimony, correct?

04:23  23       A.    Again, not exactly.

04:23  24       Q.    Okay.  In this hardware exercise that you're

04:23  25   doing, first of all, let me just -- let me just

652

04:23  1    confirm.

04:23  2            You're excluding software, right?

04:23  3        A.   Correct.

04:23  4        Q.   Because that's not the patented invention,

04:23  5    correct?

04:23  6        A.   Correct.

04:23  7        Q.   And Dr. Chu told you that too?

04:23  8        A.   Dr. Chu mentioned that when he was licensing

04:23  9    the blade servers and the modular computers, he made an

04:23 10    effort to exclude software.

04:23 11        Q.   Okay.

04:23 12        A.   Correct.

04:23 13        Q.   Okay.  So Dr. Chu doesn't consider software to

04:23 14    be his patented invention; is that fair?

04:23 15        A.   I mean, that is my understanding, that he

04:24 16    sought to exclude it.

04:24 17        Q.   Yeah.  That's your understanding, right?

04:24 18        A.   Correct.

04:24 19        Q.   Now, if I understand what this particular

04:24 20    slide is depicting, you concluded that 82 percent of

04:24 21    ASUS laptops are ACQIS' patented system; is that

04:24 22    correct?

04:24 23        A.   82 percent of the value is related to the

04:24 24    components that would make up the patented system.

04:24 25    Yes.

653

04:24  1      Q.    82 percent of the hardware is the patented

04:24  2  system?

04:24  3      A.    Of the component costs that we could see.

04:24  4      Q.    Okay.  So if we're looking at this ASUS

04:24  5  laptop, 82 percent of this is the patented system?

04:24  6      A.    Of the component costs, yes.

04:24  7      Q.    Okay.  82 percent of this is Dr. Chu's

04:24  8  invention?

04:24  9      A.    Well, no.  So again, you can't get all the way

04:24  10  to the invention from the component costs.  So we take

04:25  11  a cut of what we can exclude by component cost out, and

04:25  12  then we go through the rest of the factors and make

04:25  13  further deductions.

04:25  14      Q.    Okay.  82 percent.  So let's look at each of

04:25  15  these.

04:25  16          The first one that -- the first hardware that

04:25  17  you include here is the CPU, correct?

04:25  18      A.    Correct.

04:25  19      Q.    Okay.  So that's in for you.  That's in the

04:25  20  patented system according to you, according to your

04:25  21  slide, right?

04:25  22      A.    Correct.

04:25  23      Q.    Okay.  And you heard Dr. Chu's testimony

04:25  24  yesterday, right?

04:25  25      A.    I did.

654

04:25  1        Q.    You heard him testify that he didn't invent a
04:25  2   CPU, didn't you?
04:25  3        A.    I did.  Yes.
04:25  4        Q.    Okay.  The next one is a GPU.  That's a
04:25  5   graphics system, right?
04:25  6        A.    Correct.
04:25  7        Q.    You included it?
04:25  8        A.    I did.
04:25  9        Q.    Dr. Chu admitted he didn't invent it, correct?
04:25  10       A.    He did not invent GPUs.  Correct.
04:25  11       Q.    Okay.  The next was RAM.  You included it?
04:26  12       A.    Correct.
04:26  13       Q.    Dr. Chu didn't invent it, correct?
04:26  14       A.    Again, that is my understanding.  Yes.
04:26  15       Q.    Okay.  The next one's SSD, flash memory.  You
04:26  16   included it?
04:26  17       A.    Correct.
04:26  18       Q.    Dr. Chu didn't invent it, correct?
04:26  19       A.    Again, yes.  It's -- it was part of a system.
04:26  20   He didn't invent each of the pieces.
04:26  21       Q.    Just a yes or no.
04:26  22       A.    Correct.
04:26  23       Q.    Okay.  Motherboard.  You included it?
04:26  24       A.    Correct.
04:26  25       Q.    Dr. Chu didn't invent it, correct?

655

04:26  1    A.   Again, Dr. Chu did not invent an entire

04:26  2    motherboard.  That's correct.

04:26  3    Q.   Okay.  Battery.  You included it?

04:26  4    A.   Correct.

04:26  5    Q.   Dr. Chu did not invent it, correct?

04:26  6    A.   Correct.

04:26  7    Q.   AC adapter.  That's a power supply, right?

04:26  8    A.   Correct.

04:26  9    Q.   That's how you plug a computer into the wall?

04:26  10   A.   It is.

04:26  11   Q.   Yeah.  You included it?

04:26  12   A.   Correct.

04:26  13   Q.   Dr. Chu didn't invent it, correct?

04:27  14   A.   Again, yes.  We discussed that one

04:27  15   specifically.

04:27  16   Q.   Okay.  And case, that's just the outer cover

04:27  17   of the laptop, right?

       18   A.   Yes.

04:27  19   Q.   You included that as the patented system?

04:27  20   A.   I included it as it holds the patented system

04:27  21   together.  Correct.

04:27  22   Q.   And Dr. Chu didn't invent that either,

04:27  23   correct?

04:27  24   A.   Correct.

04:27  25   Q.   Okay.

656

| | | |
|---|---|---|
| 04:27 | 1 | MS. MARRIOTT:  Pass the witness. |
| 04:27 | 2 | REDIRECT EXAMINATION |
| 04:27 | 3 | BY MS. HEPLER: |
| 04:27 | 4 | Q.   Hi, Mr. Lewis. |
| 04:27 | 5 | A.   Hello. |
| 04:27 | 6 | Q.   The items that Ms. Marriott were just |
| 04:27 | 7 | discussing, are some of them listed in the claims that |
| 04:27 | 8 | Dr. Sarhan was talking about earlier? |
| 04:27 | 9 | A.   They are. |
| 04:27 | 10 | Q.   Now, Mr. Lewis, are you a technical expert? |
| 04:28 | 11 | A.   I am not. |
| 04:28 | 12 | Q.   Are you here to give your opinion on |
| 04:28 | 13 | infringement? |
| 04:28 | 14 | A.   I am not. |
| 04:28 | 15 | Q.   And of the components that you were just |
| 04:28 | 16 | discussing with opposing counsel, the software that was |
| 04:28 | 17 | removed, is that like the Microsoft Windows or other |
| 04:28 | 18 | type of software that might be installed on the |
| 04:28 | 19 | computer? |
| 04:28 | 20 | A.   It is.  In fact, it's the Windows operating |
| 04:28 | 21 | system for the laptops and the desktops.  Correct. |
| 04:28 | 22 | Q.   Okay.  And, Mr. Lewis, is it your |
| 04:28 | 23 | understanding that blade servers are a type of modular |
| 04:28 | 24 | computer? |
| 04:28 | 25 | A.   Correct. |

657

04:28  1       Q.    Okay.  And when you were doing your

04:28  2  apportionment analysis, was the -- did you have a

04:28  3  particular goal in mind with respect to making your

04:28  4  apportionment more similar to blade servers?

04:28  5       A.    I did.  Yes.  That was the goal, was to take

04:28  6  these laptops and desktops and pull out the components

04:28  7  that are not included in a blade server or modular

04:28  8  computer.  Correct.

04:28  9       Q.    Okay.  And the components that you included

04:29  10  that you did not remove in your apportionment analysis,

04:29  11  is it your understanding that those components are

04:29  12  required to make up the whole system that benefits from

04:29  13  Dr. Chu's invention?

04:29  14       A.    That's my understanding.  Yes.

04:29  15       Q.    Okay.  And then once you get down to that

04:29  16  82 percent, do you leave it at that, or do you take

04:29  17  another step to reduce the amount of money even

04:29  18  further?

04:29  19       A.    That's right.  Yes.  So the component cost

04:29  20  reduction is what I can do quantitatively.  I can pull

04:29  21  out actual dollars.

04:29  22            And then if you recall, when we talked about

04:29  23  Georgia-Pacific 13, about all of the other

04:29  24  contributions that ASUS had made and their brand name

04:29  25  and all the other technologies that they had brought to

658

04:29  1    it, that's where we do that qualitatively, where that

04:29  2    pushes the rate back down.

04:29  3         Q.    And then does the rate then apply to even

04:29  4    further reduce the amount of revenue that you're

04:29  5    attributing to that whole computer?

04:29  6         A.    That's right.  Because we're really applying

04:29  7    1.15 percent to 82 percent, for example, of laptops.

04:30  8    So it's been apportioned twice.

04:30  9         Q.    Okay.  And then, Mr. Lewis, you reviewed all

04:30  10   of the ACQIS licenses in this case, did you?

04:30  11        A.    I did.  Yes.

04:30  12        Q.    Okay.  And the ones that you talked about were

04:30  13   the ones that you found most relevant to the

04:30  14   hypothetical negotiation between the parties?

04:30  15        A.    They were for the reasons that we discussed.

04:30  16   Yes.

04:30  17        Q.    Okay.  And is that to say that the others are

04:30  18   completely irrelevant?

04:30  19        A.    It's not.  No.  I think, as we talked about,

04:30  20   as time went on, you see the numbers went up, but

04:30  21   again, using them as an effective rate to determine or

04:30  22   make them comparable to the hypothetical was impossible

04:30  23   based on the evidence that we had.

04:30  24        Q.    Okay.  And holistically speaking, you still

04:30  25   agree that the ones you discussed are most relevant to

659

| | | |
|---|---|---|
| 04:30 | 1 | the discussion we're having today about the |
| 04:30 | 2 | hypothetical negotiation? |
| 04:30 | 3 | A.    That's correct. |
| 04:30 | 4 | Q.    Okay.  No further questions. |
| 04:30 | 5 | MS. MARRIOTT:  Nothing further. |
| 04:30 | 6 | THE COURT:  Thank you. |
| 04:30 | 7 | Thank you, sir. |
| 04:30 | 8 | THE WITNESS:  Thank you. |
| 04:30 | 9 | THE COURT:  Could I have counsel up here |
| 04:31 | 10 | just a second? |
| 04:31 | 11 | (Off-the-record bench conference.) |
| 04:31 | 12 | THE COURT:  You may call your next |
| 04:31 | 13 | witness. |
| 04:31 | 14 | MR. COLLARD:  Thank you, Your Honor. |
| 04:31 | 15 | Though the -- ACQIS rests. |
| 04:31 | 16 | THE COURT:  Okay.  Ladies and gentlemen, |
| 04:31 | 17 | while they were up here, they both said they'd like to |
| 04:31 | 18 | stay two more hours.  And I said no way.  I'm kidding. |
| 04:31 | 19 | I said I wanted to stay two hours, and they both said |
| 04:31 | 20 | no.  The jury would be much happier if we quit at a -- |
| 04:31 | 21 | what time is it -- 4:30.  So that's what we'll do. |
| 04:32 | 22 | If you all will be kind enough to be back |
| 04:32 | 23 | by about 8:15 or 8:20, we'll start tomorrow at 8:30. |
| 04:32 | 24 | Please remember my instructions not to |
| 04:32 | 25 | discuss the case.  Be safe on your way home, and I will |

04:32  1    see you all tomorrow.

04:32  2                    (Jury exited the courtroom.)

04:32  3                    THE COURT:  You may be seated.

04:32  4                    I'll hear from the defendant on any

04:32  5    motions.

04:32  6                    MR. LANG:  Good morning (sic), Your

04:32  7    Honor.  Mark Lang on behalf of defendants.

04:32  8                    Defendants are going to -- we're going to

04:32  9    have four motions here.

04:32  10                   THE COURT:  Okay.

04:33  11                   MR. LANG:  So we'll take them in turn.

04:33  12                   The first one is going to be for a

04:33  13   finding of no alter ego liability as a matter of law.

04:33  14                   Your Honor may recall that defendants

04:33  15   raised this issue at summary judgment.  Your Honor

04:33  16   invited us to re-raise it at this time in the event

04:33  17   that ASUS did not present additional evidence.

04:33  18                   We heard significantly the same thing

04:33  19   that we heard at summary judgment, which is a typical

04:33  20   parent-subsidiary relationship between two entities,

04:33  21   neither of which do any activity in the United States.

04:33  22                   And as a matter of law, that's not

04:33  23   sufficient to establish an alter ego relationship.

04:33  24                   We also heard evidence that ASUSTeK

04:33  25   controls ASGL or ACI or vice versa, or that ASGL

661

| | | |
|---|---|---|
| 04:33 | 1 | controls -- or ACI or vice versa.  As a matter of law, |
| 04:34 | 2 | that's not sufficient to prove alter ego liability. |
| 04:34 | 3 | The only thing I believe we heard about |
| 04:34 | 4 | was some overlap in directors between two of the |
| 04:34 | 5 | entities, and as a matter of law, that's not sufficient |
| 04:34 | 6 | to establish alter ego liability either. |
| 04:34 | 7 | And that's all we have. |
| 04:34 | 8 | THE COURT:  Okay.  Any response? |
| 04:34 | 9 | MR. TAMKIN:  Do you mind if I just stand |
| | 10 | up here, Your Honor? |
| | 11 | THE COURT:  I don't mind at all.  You can |
| | 12 | do whatever you care or would like to. |
| 04:34 | 13 | MR. TAMKIN:  I think this one could be |
| 04:34 | 14 | quick, Your Honor. |
| 04:34 | 15 | I think there was a credible amount of |
| 04:34 | 16 | evidence concerning alter ego.  Specifically, I'll |
| 04:34 | 17 | start with the confirmation with what was in the annual |
| 04:34 | 18 | reports, for example, that ASUSTeK asserts what's |
| 04:34 | 19 | called "significant influence" over its subsidiaries. |
| 04:35 | 20 | In fact, it lists them -- it consolidates |
| 04:35 | 21 | those information and lists them as something that it |
| 04:35 | 22 | asserts significant influence over. |
| 04:35 | 23 | Likewise, there was another piece of |
| 04:35 | 24 | testimony where -- I think this was what Ms. Chen -- |
| 04:35 | 25 | where there's an assertion in the annual report as well |

662

04:35  1    about the control that is exercised, and specifically

04:35  2    that ASUSTeK has specifically been authorized and does

04:35  3    exert control over issues that are variable.

04:35  4              Variable such as how much money it makes

04:35  5    and things of that nature.  So there's specific and

04:35  6    direct control that is asserted in the -- those annual

04:35  7    reports.

04:35  8              Likewise, I think the general testimony

04:35  9    was that ASUSTeK doesn't seem to touch the products and

04:35 10    nor does ASGL, and they somehow magically get to the

04:35 11    United States.  But, in fact, ASUSTeK designs the

04:36 12    products, provides those designs to contract

04:36 13    manufacturers, and then has its agents sell those

04:36 14    products in the U.S.

04:36 15              Now, in this case, it specifically says

04:36 16    those agents and those other parties are significantly

04:36 17    influenced and controlled.  Likewise, there's

04:36 18    domination by the parent over the subsidiary in the

04:36 19    form of the officers.

04:36 20              Specifically, there's Mr. -- I can't

04:36 21    remember -- recall the names off the top of my head

04:36 22    right now, Your Honor, but both the chairman as well as

04:36 23    the president are both directors of ASUSTeK.  And one

04:36 24    of the factors in alter ego is, does the parent have

04:36 25    influence directly over them?

04:36    1          And clearly if you have two of the

04:36    2    members of the board of directors as the chairmen and

04:36    3    as the president, that parent -- there's certainly

04:37    4    sufficient evidence to find that the parent is

04:37    5    influencing them.

04:37    6          And then overall, there's the overall

04:37    7    scheme, the overall scheme where you have a parent who

04:37    8    seems to avoid touching the products and uses its

04:37    9    subsidiaries to do its bidding in a non-arm's length

04:37    10   transaction where all of the work is done by the

04:37    11   subsidiaries.  The only business of the subsidiaries is

04:37    12   to distribute those products.

04:37    13          I think for those reasons, the jury can

04:37    14   easily find that there is alter ego in this case.

04:37    15          THE COURT:  I'm going to overrule that

04:37    16   motion.

04:37    17          Next motion?

04:37    18          MR. LANG:  The next motion, Your Honor,

04:37    19   relates to the notice letter.  And this motion has

04:37    20   subparts, I guess.

04:37    21          It would result in a finding of

04:37    22   indirect -- no indirect infringement as a matter of

04:37    23   law, no willful infringement as a matter of law, and no

04:37    24   damages on the apparatus claims.

04:37    25          As we heard from everyone who read the

04:38   1    letter, it doesn't use the word "infringe."  Mr. Chu

04:38   2    offered to collaborate, partner, and license with

04:38   3    ASUS -- ASUSTeK.  He never made a charge of

04:38   4    infringement.

04:38   5           To the extent he identified any patents,

04:38   6    he said, this is to assist in your analysis of this

04:38   7    opportunity.  Not you're infringing, this is an

04:38   8    opportunity for you to assess your infringement or

04:38   9    anything along those lines.

04:38   10          He said the patents are only relevant to

04:38   11   certain products without saying anything about

04:38   12   infringement or how they may be used.

04:38   13          And he ended his letter with:  ACQIS is

04:38   14   committed to entering into a mutually beneficial

04:38   15   relationship, and this letter is written in this -- in

04:38   16   that spirit -- spirit.  That doesn't sound like

04:38   17   infringement to me, and I don't think it's going to

04:38   18   sound like infringement to any reasonable juror.

04:38   19          Finally, there's no evidence that --

04:38   20          THE COURT:  Help me out here.

04:39   21          MR. LANG:  Yeah.

04:39   22          THE COURT:  I'm pretty familiar with the

04:39   23   dance.  You want to send them a letter that says they

04:39   24   infringe, but you can't say they infringe because if

04:39   25   you say they infringe, they might file a dec action.

04:39    1    So you have to say something that kind of says they

04:39    2    infringe but not really.

04:39    3                    We've all -- you've sent those letters to

04:39    4    them; they've sent those letters to you.  I get all

04:39    5    that.

04:39    6                    So what I'm not exactly following -- we

04:39    7    actually were discussing this at lunch, because I was

04:39    8    trying to figure out the reason y'all were spending so

04:39    9    much time on the letter, and I was having a hard time

04:39    10   figuring out what it was.

04:39    11                   I'm not sure why, for the indirect

04:39    12   infringement they're alleging, they have to have put

04:39    13   you on notice through a letter of infringement.

04:39    14                   And, I mean, I don't want to sound dumb,

04:40    15   but as of that point, you had notice of the patent.

04:40    16   And then obviously, I think there's relatively weak, if

04:40    17   any, evidence that you all did indirectly infringe or

04:40    18   meant to do something that was infringing.

04:40    19                   But I'm not -- I'm not sure why you all

04:40    20   on both sides have spent so much time fighting over

04:40    21   what -- you know, we don't have the guy here who got

04:40    22   the letter.  We don't know what he thought.  We'll

04:40    23   never know what he thought, you know, all that.

04:40    24                   But I'm not -- help me out here.  I'm not

04:40    25   sure why you, the defendant, is tethering it to this

666

| | |
|---|---|
| 04:40 | 1 |
| 04:40 | 2 |
| 04:40 | 3 |
| 04:40 | 4 |
| 04:40 | 5 |
| 04:40 | 6 |
| 04:41 | 7 |
| 04:41 | 8 |
| 04:41 | 9 |
| 04:41 | 10 |

1  argument about what I ought to dismiss.  When I was

2  guessing, I was thinking maybe it was a date

3  infringement would start or maybe it had to do with

4  willfulness.  But I'm not following the connection

5  between the two.  Maybe I just -- I'm not smart enough

6  to follow it.  So...

7            MR. LANG:  I don't think that's the case,

8  Your Honor.

9            THE COURT:  I mean, I -- I mean, I know

10  there's -- I just don't see how it connects up to

11  this -- to this allegation and why there are either

12  facts -- and again, I'm not -- I was expecting you --

13  go ahead and argue the rest of what you want to argue,

14  and maybe it'll help me pull it all together, and then

15  you can come back and explain that last -- because

16  maybe when I hear your other motions, I'll understand

17  it better.

18            MR. LANG:  Okay.  Do you want me to

19  finish that one, Your Honor?

20            THE COURT:  Sure.

21            MR. LANG:  Okay.  So I guess with respect

22  to that, so the letter was sent -- supposedly sent --

23  or was sent in 2018.  The suit was filed in 2020 after

24  the patents expired.  So if we don't have notice before

25  the suit was filed, there won't be damages.

04:41  1              THE COURT:  That was -- now, that, I

04:41  2  understand.

04:41  3              MR. LANG:  Okay.

04:41  4              THE COURT:  That -- that part, I

04:41  5  understand.

04:41  6              MR. LANG:  Okay.

04:41  7              THE COURT:  That was my guess at lunch.

       8              MR. LANG:  Okay.

04:41  9              THE COURT:  I should have bet -- I should

04:41  10  have bet lunch because that was what I was thinking.

04:42  11              MR. LANG:  Well, and so for indirect

04:42  12  infringement, you'd need to have notice of the patents

04:42  13  at some point.

04:42  14              THE COURT:  Well, you had notice of the

04:42  15  patents.

04:42  16              MR. LANG:  After the patents expired.

04:42  17              THE COURT:  No.  You had notice through

04:42  18  the letter.  You're -- that's what I'm saying is you

04:42  19  got the notice.  You -- there's a fight over did they

04:42  20  say you infringe or not infringe.  I get it with

04:42  21  respect to the damages issue.  I'm less -- I have a

04:42  22  harder time --

04:42  23              MR. LANG:  Okay.

04:42  24              THE COURT:  -- following the -- why

04:42  25  the -- there's the fight over you had to say

04:42  1  infringe -- you infringe in the -- the taoism of saying

04:42  2  you infringe in the letter for the purposes of the

04:42  3  indirect infringement side.

       4              MR. LANG:  Okay.

04:42  5              THE COURT:  I get -- I do get why there's

04:42  6  a fight over when you got the letter, when they filed

04:42  7  the suit, the expiration of the patent.  That, I

04:42  8  understand.

04:42  9              MR. LANG:  Okay, Your Honor.  Yeah.  I

04:42  10 think I understand now.

04:42  11             Because for purposes of indirect

04:42  12 infringement, you have to have notice of the patents

04:42  13 and notice of some alleged infringement.  And I think

04:42  14 you need to articulate that.

04:42  15             THE COURT:  And so -- so we have the

04:43  16 letter.  The letter says what it says.  Clearly, the

04:43  17 plaintiffs feel like they have -- are able to go to the

04:43  18 jury and say, you have a letter.  You know, this put

04:43  19 them on notice.  We didn't -- you know, we were telling

04:43  20 them that we had the patent.  They're a sophisticated

04:43  21 company.  They would know -- they would have

04:43  22 sophisticated lawyers.  Y'all can stipulate to that.

04:43  23 It would say, look, they didn't say you infringe in

04:43  24 there, but, you know, they didn't send this just for

04:43  25 fun.

669

04:43  1              And so I'm -- again, I think that --

04:43  2    whether or not they were put on notice in that way I

04:43  3    think is something for the jury to decide.

04:43  4              MR. LANG:  Okay.

04:43  5              THE COURT:  But again, help me out with

04:43  6    regard to your motion with respect to the timing of the

04:43  7    getting the letter and then not filing the suit

04:43  8    until -- until after the patent expired.

04:44  9              MR. LANG:  For purposes of --

04:44  10              THE COURT:  Of damages.

04:44  11              MR. LANG:  Of damages.  Okay.

04:44  12              THE COURT:  Yes.

04:44  13              MR. LANG:  So that's for the apparatus

04:44  14    claims.

04:44  15              THE COURT:  Okay.

04:44  16              MR. LANG:  So that's the -- you need to

04:44  17    have notice -- actual or constructive notice before to

04:44  18    start damages, essentially.  And they filed their

04:44  19    lawsuit after the patents expired.  And if that letter

04:44  20    isn't sufficient, then they don't get damages for those

04:44  21    claims.

04:44  22              THE COURT:  Okay.  I think I've got all

04:44  23    of that.  What other motions do you have?

04:44  24              MR. LANG:  We have a motion for

04:44  25    noninfringement as a matter of law.  Under the Court's

04:44  1  construction of the PCI bus transaction, as you have

04:44  2  heard ad nauseam at this point, it must be a

04:44  3  transaction in accordance with the PCI local bus

04:44  4  specification and "in accordance with" includes

04:44  5  backwards compatibility.

04:44  6            I don't think there's much dispute.  We

04:44  7  haven't heard any evidence that the accused products

04:44  8  include a local PCI bus of any kind or anything that

04:45  9  generates PCI local bus transactions.

04:45  10            And I think Dr. Sarhan testified that in

04:45  11  order to have a PCI local bus transaction in

04:45  12  combination with PCI Express, there's got to be

04:45  13  something to help that out.  And he also testified that

04:45  14  that's not present in the accused products.

04:45  15            THE COURT:  Okay.

04:45  16            Anything else?

04:45  17            MR. LANG:  Do you want to go through them

04:45  18  all?

04:45  19            THE COURT:  Yes.

04:45  20            MR. LANG:  Okay.  And then the last one

04:45  21  relates to the method claims which Dr. Sarhan presented

04:45  22  as methods.

04:45  23            THE COURT:  Yeah.  And you don't need to

04:45  24  argue that one because I understand -- it's on the

04:45  25  record.  I understand your point.

671

04:45  1                    What I heard -- because I'm going to --
04:45  2   I'm setting this up for the plaintiff to respond to it.
04:45  3   All I've heard was that their expert said there was a
04:45  4   likelihood that it might have happened, that they might
04:45  5   have been testing at some point to satisfy the method
04:45  6   claims.
04:45  7                    Is your argument that there was nothing
04:45  8   more than that evidence?
04:46  9                    MR. LANG:  Yeah.  There was no evidence,
04:46  10  really.  There was an assumption of some sort.
04:46  11                   THE COURT:  There was some evidence, but
04:46  12  I'm -- I've been through the -- I've had a couple
04:46  13  trials where I was on your side.  I've got a pretty
04:46  14  good handle on this one.
04:46  15                   So was that your last issue?
04:46  16                   MR. LANG:  I believe so, Your Honor.
04:46  17                   THE COURT:  Okay.
04:46  18                   If I could hear from plaintiff, starting
04:46  19  with the evidence you have of beyond speculation that
04:46  20  at some point there may or must have been testing which
04:46  21  would satisfy the method claim.
04:46  22                   MR. TAMKIN:  I think it was Ms. Ou who
04:46  23  confirmed that ACI gets products, and it then sells
04:46  24  those products.  And those products don't ever go to
04:46  25  anyone at ASUSTeK.  They don't go to anyone at ASGL.

672

04:47   1    They never take it.  They go from ACI to consumers or

04:47   2    to the retailers.

04:47   3                    And she said in her testimony somebody --

04:47   4    if it -- somebody must test those products before they

04:47   5    get to the United States.

04:47   6                    THE COURT:  No.  I think -- the way I

04:47   7    took it -- and I know facts are facts, but I mean,

04:47   8    that's like me saying before I got this iPad, at some

04:47   9    point Apple must have tested iPads.  I mean, that's not

04:47  10    saying they ever performed that -- that's not going to

04:47  11    get you there on the method claim.  That's not the way

04:47  12    I took her testimony.

04:47  13                    And I'm still waiting for you to show me

04:47  14    any evidence that anyone -- the defendants ever used

04:47  15    the method of any of the claims.

04:47  16                    MR. TAMKIN:  The method is based on --

04:47  17    some of the claims involve turning on the product.

04:48  18                    THE COURT:  But they don't turn it on.

04:48  19    They sell it.

04:48  20                    MR. TAMKIN:  But they direct the party

04:48  21    who does.

04:48  22                    THE COURT:  So is your only claim for a

04:48  23    liability indirect infringement?

04:48  24                    MR. TAMKIN:  No.  It's as an ASUS --

       25                    THE COURT:  Who did they direct to turn

```
04:48    1    it on?
04:48    2                    MR. TAMKIN:  The parties who manufacture
04:48    3    it.
04:48    4                    THE COURT:  You have no -- you have not
04:48    5    put on any evidence that they direct those people to
04:48    6    turn it on.
04:48    7                    MR. TAMKIN:  The evidence is an expert
04:48    8    opinion who says --
04:48    9                    THE COURT:  Yeah.  They would have to
04:48   10    test it, but that's not evidence that anyone ever did.
04:48   11    There's no evidence that anyone -- I know I'm arguing
04:48   12    with you, but I didn't hear -- I'll tell you what.
04:48   13    We're going to -- we have time.
04:48   14                    So tomorrow -- you'll have the record
04:48   15    tonight.  Go through the record.  Find whatever you can
04:48   16    find that you think your expert said that supports a
04:48   17    method -- infringement of a method claim.
04:48   18                    I will tell you that it will not be
04:48   19    sufficient for -- if the expert said, you know,
04:49   20    products wouldn't get sold without being tested or
04:49   21    something like that.  If there's evidence that -- you
04:49   22    have some evidence where -- as you -- there's clearly
04:49   23    no evidence they ever used -- there's no evidence that
04:49   24    they practiced the method.  That's easy.
04:49   25                    If you -- your best evidence will be that
```

674

| | |
|---|---|
| 04:49 | 1 |

they, in your opinion, directed someone to do it.  And

tomorrow show me in the record where you have that

evidence and I'll look at it.

So -- and then going back to the other

claims, I'm going to deny the other motions.  But with

respect to that one, I -- color me skeptical.

Now -- and I won't -- I won't make up my

mind till I give you a chance to do that tomorrow, but

were I to -- you should be thinking about this.  Were I

to grant the motion with respect just to the method

claims, I wasn't paying careful enough attention to

know does that change the -- how the damages -- I mean,

was there some allocation between --

MR. TAMKIN:  There was.

THE COURT:  Okay.  So if I grant the

motion by the way your expert put on the testimony,

will you be able to cab out the damages that were

attributable just to the method claims?  Can we do

it -- can we present it to the jury where those damages

would not be included?

MR. TAMKIN:  I believe there's testimony

about that.  Yes.

THE COURT:  Okay.  So you ought to -- you

ought to find that -- you ought to find that testimony

too so that we know when the jury is considering what

| | |
|---|---|
| 04:50 | 1 |

the appropriate amount is that it's consistent with
what might be before -- again, if -- I might -- I might
deny the motion, but in the event that I do grant it,
you ought to be prepared to present the damages case
without that in it when we give it to the jury.

          MR. TAMKIN:  Understood.

          THE COURT:  And I would not -- I would
not -- again, I'll decide tomorrow.  I would not look
favorably on defense counsel making an issue that, you
know, at one point they were in or out.  I mean, that's
a decision that I'm making.  And so in other words, I
would not -- I wouldn't go into it.

          So that -- I mean, the -- when the
plaintiff put on their case, everything they did was in
good faith.  It would be in there.  So I don't want any
impression given that anything was inappropriate that
they did.

          So I will decide that tomorrow.  Get --
you have the transcript from Kristie.  Let's get here
tomorrow.  This is important, obviously.  Let's plan on
meeting at 8:30, and we'll take up this issue and any
others, but this will be the primary one we take up.

          If I haven't been clear, all the motions
for directed verdict are denied with the exception of
this one.

676

04:52   1                    I don't usually have motions from the

04:52   2    plaintiff, if you have any.

04:52   3                    MR. TAMKIN:  No motions at this time.

04:52   4                    THE COURT:  Okay.  Thank you.

04:52   5                    (Hearing adjourned.)

677

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS    )

3

4

5                I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10               I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13               Certified to by me this 7th day of April

14   2024.

15

16                         /s/ Kristie M. Davis
                           KRISTIE M. DAVIS
17                         Official Court Reporter
                           800 Franklin Avenue
18                         Waco, Texas 76701
                           (254) 340-6114
19                         kmdaviscsr@yahoo.com

20

21

22

23

24

25

04:52