07:45

1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
2                            WACO DIVISION

3   ACQIS LLC                     *
                                  *      March 20, 2024
4   VS.                           *
                                  * CIVIL ACTION NO. 6:20-CV-966
5   ASUSTEK COMPUTER, INC.   *
    ASUS GLOBAL PTE. LTD.    *
6
                    BEFORE THE HONORABLE ALAN D ALBRIGHT
7                        JURY TRIAL PROCEEDINGS
                            Volume 3 of 5
8
    APPEARANCES:
9
    For the Plaintiff:   Case L. Collard, Esq.
10                        Gregory S. Tamkin, Esq.
                          Dorsey & Whitney LLP
11                        1400 Wewatta Street, Suite 400
                          Denver, CO 80202
12
                          Madeline Hepler, Esq.
13                        Dorsey & Whitney LLP
                          701 5th Ave, Suite 6100
14                        Seattle, WA 98104

15                        Elliot J. Hales, Esq.
                          Dorsey & Whitney LLP
16                        111 S. Main Street, Suite 2100
                          Salt Lake City, UT 84111
17
                          Paige Arnette Amstutz, Esq.
18                        Scott, Douglass & McConnico, LLP
                          303 Colorado Street, Suite 2400
19                        Austin, TX 78701

20  For the Defendants:  Eric A Buresh, Esq.
                          Mark C. Lang, Esq.
21                        Michelle L. Marriott, Esq.
                          Erise IP, PA
22                        7015 College Boulevard
                          Overland Park, KS 66211
23
                          James Travis Underwood, Esq.
24                        Gillam & Smith
                          102 N. College, Suite 800
25                        Tyler, TX 75702

679

1    Court Reporter:        Kristie M. Davis, CRR, RMR
                            PO Box 20994
2                           Waco, Texas 76702-0994
                            (254) 340-6114
3

4     Proceedings recorded by mechanical stenography,

5    transcript produced by computer-aided transcription.

6

7

8

08:00    9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

680

08:38  1                    (Hearing begins.)

08:38  2                    THE BAILIFF:  All rise.

08:38  3                    THE COURT:  Good morning, everyone.

08:38  4             You may be seated.

08:38  5             Let's go ahead and take up the issue of

08:38  6   the Rule 50 motion with respect to the method claims.

08:38  7             Yes, sir.

08:38  8             Yes, sir.  Good morning.

08:38  9             MR. TAMKIN:  Good morning, Your Honor.

08:38  10  Greg Tamkin on behalf of ACQIS.  Thank you for giving

08:38  11  us some time to look over the issues and hopefully

08:38  12  provide a more cogent argument this morning.

08:38  13            I think the first place to start is where

08:38  14  the Court had trouble, which is the method claims.  And

08:38  15  I think where the Court was focused is the method

08:38  16  claims that -- because there was -- there's a method

08:38  17  claim that involves turning on a computer, and I think

08:39  18  that's the issue that we were talking about where the

08:39  19  Court got hung up.

08:39  20            But there are actually four method

08:39  21  claims, and I would say three out of the four don't

08:39  22  require turning on a computer at all.

08:39  23            And so let me just walk through some of

08:39  24  that briefly, and we'll get to the evidence which we

08:39  25  can provide with respect to turning on the computer.

681

08:39  1                        You can go ahead and put up the slides.

08:39  2                        This is the two claims at issue from the

08:39  3    '654 patent, and these are product-by-process claims.

08:39  4    And I think it's important to understand that

08:39  5    product-by-process claims can be not only proven by

08:39  6    circumstantial evidence but are proven typically by the

08:39  7    actual result of the product.

08:39  8                        And so I give the Court -- I can give the

08:39  9    Court a cite on that but -- well, I'll go ahead.  The

08:40  10   Nichia v. Vizio case.  I have the Lexis cite.  I can

08:40  11   get the Lexis Law cite.  It's 219 Lexis 77851, and I'm

08:40  12   going to read from Page 23 in that case.

08:40  13                       In that case, it says on bottom of 23:

08:40  14   Claim 4 of the '375 patent is a method claim disclosing

08:40  15   several manufacturing steps, the preparation of an LED

08:40  16   chip made of certain materials...

08:40  17                       And then it goes on to say all these

08:40  18   other things that are very similar.

08:40  19                       And the Court says -- or plaintiff says

08:40  20   it hasn't met its burden -- excuse me -- defendant says

08:40  21   plaintiff hasn't met its burden because it hasn't

08:40  22   actually provided the physical nature of the

08:40  23   manufacturing.

08:40  24                       And the Court says:  The claim process

08:40  25   requires combining two components that consist of

682

| | |
|---|---|
| 08:40 | 1 |
| 08:40 | 2 |
| 08:40 | 3 |
| 08:40 | 4 |
| 08:41 | 5 |
| 08:41 | 6 |
| 08:41 | 7 |
| 08:41 | 8 |
| 08:41 | 9 |
| 08:41 | 10 |

08:40  1  various different materials.  Whether this occurred can

08:40  2  be readily determined by an expert after the fact and

08:40  3  need not be ascertained through direct observation of

08:40  4  the manufacturing process.

08:41  5      And that's at Page 23.

08:41  6      And so ultimately, the Court goes on:

08:41  7  It's apparent from the result of the process and what

08:41  8  the product is how it is manufactured.

08:41  9      So let's take a look at the particular

08:41  10  claim in this case.  Those -- Claim 20 has five steps,

08:41  11  none of which require turning on a computer or -- as

08:41  12  part of the method.  They're just looking at a product

08:41  13  and seeing if it has been constructed this way.

08:41  14      Claim 21 is the one that sort of --

08:41  15  that -- where there was the discussion about testing.

08:41  16      So the first element is:  Providing an

08:41  17  integrated CPU and graphics controller on a printed

08:41  18  circuit board.

08:41  19      Obviously, that can be determined by

08:41  20  determining if there's a printed circuit board, if it

08:41  21  has a GPU, and if it has a CPU.

08:41  22      The next step is:  Connecting a first low

08:41  23  voltage differential signal channel directly to said

08:42  24  integrated CPU and graphics controller and the first

08:42  25  LVDS channel comprising two unidirectional serial

683

08:42  1   channels that transmit data in opposite directions.

08:42  2                    This says you need to look at -- are --

08:42  3   is the -- are the channels, are the wires connected to

08:42  4   the CPU and graphics controller?  What type of wires

08:42  5   are they?  Are they unidirectional channels?  Serial

08:42  6   channels?  And there's been expert testimony about

08:42  7   that.

08:42  8                    Next is:  Providing a connector for the

08:42  9   computer that connects to the console.

08:42  10                   Are these connected?  You can determine

08:42  11  that.

08:42  12                   Likewise:  Providing a second channel to

08:42  13  couple the console through the connector, the second

08:42  14  LVDS channel comprising two unidirectional serial

08:42  15  channels that transmit the data.

08:42  16                   Again, is there a couple?  Is there a

08:42  17  console?  Is there a second set of wires or a second

08:42  18  channel?

08:42  19                   And then:  Enabling universal serial bus

08:42  20  protocol to be conveyed over the second LVDS channel.

08:42  21                   Does -- do those wires, do those

08:43  22  materials, are they such that USB serial protocol data

08:43  23  can be conveyed?  All of that is simply what is the

08:43  24  product?  What is the result?

08:43  25                   And so Claim 20 doesn't involve testing,

08:43   1   doesn't involve turning it on.  It's simply a product.

08:43   2                  Now, Claim 21, where I think there's been

08:43   3   some testimony, is:  The method of Claim 20 comprising

08:43   4   conveying encoded address and data bits of a PCI

08:43   5   component interconnect bus transaction for a peripheral

08:43   6   data communication in serial form over the first LVDS

08:43   7   channel.

08:43   8                  Here, the step is conveying.  And

08:43   9   conveying the address and data bits is going to happen

08:43   10  when the product is turned on as opposed to a --

08:43   11  something that happens now.

08:43   12                  I think you can determine that that will

08:43   13  happen when it's turned on, but you have to prove, to

08:43   14  the Court's point, that it is turned on.

08:44   15                  And so Claim 21 does require the product

08:44   16  to be turned on to meet that limitation.  So again,

08:44   17  Claim 20, no requirement of testing or turning it on;

08:44   18  Claim 21, requirement of testing.

08:44   19                  If we can go to Slide 4, please.

08:44   20                  We can talk about the evidence.  And I

08:44   21  think I was paraphrasing yesterday, and I want to walk

08:44   22  through -- the Court through the evidence.

08:44   23                  First of all, Ms. Ou said in response to

08:44   24  a question, and this is on -- at the Trial Transcript

08:44   25  541, Lines 4 through 7:  So is it fair to say that ASGL

08:44   1   must rely on someone else to test the products before

08:44   2   they get shipped to the United States?

08:44   3                    Answer:  Yes.

08:44   4                    So ASGL is -- must rely -- is relying on

08:44   5   someone else to test the products before they get

08:44   6   shipped to the United States.

08:44   7                    Now, then, just to be clear, if we go to

08:44   8   the next witness, was Mr. Morquecho, who was done over

08:45   9   deposition testimony:  After the products are imported

08:45   10  and hit the port in the United States, is there any

08:45   11  additional functional testing that's performed by ACI?

08:45   12                    No.

08:45   13                    So no testing is done by ACI, and we know

08:45   14  these products then go to the customer.

08:45   15                    So if there is testing, it has to be done

08:45   16  by somebody before it gets to the United States based

08:45   17  on Ms. Ou's testimony.

08:45   18                    Then -- next slide, please.

08:45   19                    We know that there's testing because it's

08:45   20  all over the documents.  For example, here is the

08:45   21  annual report, which is in evidence.  And the annual

08:45   22  report is P-95, and this is at Pages 116 to 124.

08:45   23                    The production process of major markets.

08:45   24  More than 90 percent of the processes are automated.

08:45   25  So then it talks about what are the steps in the

08:45   1    automated process for the motherboards and VGAs?

08:46   2                    So the motherboards, there's the series

08:46   3    of processes that are automated, and then there's the

08:46   4    testing process.

08:46   5                    Likewise, for notebooks, which is the

08:46   6    laptop computers, which is the bulk of the products

08:46   7    accused in this case, or certainly the largest in terms

08:46   8    of revenue, there are two that -- the annual report

08:46   9    indicates there are two test processes for all of these

08:46   10   products.

08:46   11                   And then, finally -- so it's clear that

08:46   12   there's testimony that they have to -- that ASUS group

08:46   13   defendants do do testing and they rely on somebody to

08:46   14   do that testing.  So that has to be somebody before it

08:46   15   gets to the United States, so it must be turned on in

08:46   16   the process if there's a test; otherwise, you have no

08:46   17   idea if it works.

08:46   18                   So let's go to the final piece of

08:46   19   evidence here.  I guess there's two pieces of evidence

08:47   20   with respect to Mr. Sarhan.

08:47   21                   So this is in talking about Claim 21.

08:47   22   And again, Your Honor, Claim -- this is not about Claim

08:47   23   20, but it's about Claim 21 and that last conveying

08:47   24   step there.

08:47   25                   Ultimately, there's a question:  Did he

08:47   1   go to the manufacturing facility?  Does he know?

08:47   2                I didn't go to the manufacturing

08:47   3   facility, but I know, like, computers are very

08:47   4   complicated products.  They have so many different

08:47   5   units, interconnecting units.  They have hardware.

08:47   6   They have software.  A lot of things that can actually

08:47   7   go wrong.

08:47   8                So this is why generally manufacturers

08:47   9   test their products to make sure, like, you know, like,

08:47   10  if they ship them to customers and they have problems,

08:47   11  right, you know, then the customers will send them

08:47   12  back.  It will impact their reputation.  And they know

08:47   13  ASUS and their website.  And then -- like, they say

08:47   14  they test their products.

08:47   15               So the expert looked and their website

08:47   16  says they test their products.

08:47   17               And then on cross-examination, I think he

08:47   18  was also asked about this point.

08:47   19               And if we go to the next slide.

08:48   20               And this is the -- now, you didn't offer

08:48   21  the jury any proof of that, did you?

08:48   22               I mentioned that I saw some, like, videos

08:48   23  from ASUS that shows that the computers undergo

08:48   24  testing.

08:48   25               So ASUS is telling us that the computers

08:48    1    undergo testing.  I think the witnesses are telling us

08:48    2    that there is functional testing, and I think the

08:48    3    documents are telling us that there is testing.

08:48    4              And so based on that, I think there's

08:48    5    certainly enough evidence to go to the jury with

08:48    6    respect to Claim 21 on testing.

08:48    7              I think with respect to Claim 20, we

08:48    8    don't need it.

08:48    9              To just briefly turn to the other claims,

08:48   10    Your Honor --

08:48   11              If we can go to Slide 2, please.

08:48   12              This -- just to be -- sort of close the

08:48   13    loop on this, Your Honor.  I think this also is a claim

08:48   14    that doesn't require a computer or a product to be

08:49   15    turned on.  It's, again, steps of building a product by

08:49   16    a process.

08:49   17              Obtaining an integrated processing unit

08:49   18    and graphics controller, that simply means that you --

08:49   19    the product has a CPU and GPU.  On a single chip, you

08:49   20    can determine what kind of chip it is.

08:49   21              Connecting a first low voltage -- and by

08:49   22    the way, I'm at, for the record, the '140 patent, Claim

08:49   23    35 -- connecting a first low voltage differential

08:49   24    signal channel directly to the CPU and graphics

08:49   25    controller.  So that means that there is a channel

08:49  1    connected those -- to those two.  And then it talks

08:49  2    about what kind of channel that is.  That can be

08:49  3    determined by the end result.

08:49  4                    Likewise, connecting a differential

08:49  5    signal channel -- I'm sorry.  I'm on the next element.

08:49  6                    Connecting a differential signal channel

08:49  7    directly to the integrated CPU and graphics controller

08:49  8    to output video data.  This is determined by the

08:50  9    ultimate product.

08:50  10                   Likewise, providing a connector for the

08:50  11   computer for the connection to the external peripheral,

08:50  12   you can look at the product.  Has a connector been

08:50  13   provided?

08:50  14                   And then there's a last step of what is

08:50  15   the nature of that connector, providing a second LVDS

08:50  16   channel to couple the connector to the connector.  And

08:50  17   so you can determine from the product itself whether or

08:50  18   not it has that second LVDS channel that couples to the

08:50  19   connector.

08:50  20                   So again, there's no testing step.

08:50  21   There's no turning it on step to get to any of this in

08:50  22   Claim 140.

08:50  23                   And then finally, if we just go to the

08:50  24   next slide, this is the '797, Claim 36.

08:50  25                   Again, from a manufacturing perspective,

08:50  1   this is all steps that can be determined, and the

08:50  2   expert did determine all of these steps based on the

08:51  3   product itself.

08:51  4                And we can look at it briefly, Your

08:51  5   Honor.  It's mounting the chip and interface controller

08:51  6   on a single integrated -- integrated CPU and interface

08:51  7   controller on a single chip on a motherboard, determine

08:51  8   what the motherboard is, did it have a CPU and

08:51  9   interface controller mounted on that as a single chip.

08:51  10               Likewise, connecting a low voltage

08:51  11   differential signal channel directly to the interface

08:51  12   controller on the motherboard and then some description

08:51  13   of that low voltage differential signal channel.

08:51  14   Again, that can be determined by the actual product

08:51  15   that has been produced.

08:51  16               You don't have to see -- and the case

08:51  17   law's very clear.  You don't have to see how it was

08:51  18   done, just that it was done, what the result is.

08:51  19               Here, we have the result.  We have the

08:51  20   products.  We have looked at that.  There's been expert

08:51  21   testimony about that.

08:51  22               Increasing data throughput of the serial

08:51  23   channels by providing each channel with multiple

08:52  24   differential signal line pairs.  Again, what is

08:52  25   required here is that each channel with multiple

08:52    1    differential signal line pairs, that is determined by

08:52    2    the product.

08:52    3              Likewise, configuring the interface

08:52    4    controller to adapt to a different number of

08:52    5    differential signal line pairs for conveying the data,

08:52    6    the address and data bits.  Again, that can be

08:52    7    determined by the type of interface controller on the

08:52    8    product.

08:52    9              And then finally, coupling the integrated

08:52    10    CPU and interface device to a peripheral device

08:52    11    attached to the motherboard.  Again, looking at the

08:52    12    product, how is -- how has it been configured.

08:52    13              And so I think to conclude, Your Honor,

08:52    14    the real issue here seems to be where we got started on

08:52    15    this is what is the evidence that the product, the

08:52    16    computer was turned on or the desktops or the laptops

08:52    17    or the servers were turned on.

08:53    18              It's the testing step, but that testing

08:53    19    step only is required -- if we go back to the first

08:53    20    slide -- is only required by Claim 21.  I do think

08:53    21    there is sufficient evidence to go to the jury on this.

08:53    22              And even if there were not sufficient

08:53    23    evidence to go to the jury on this, I want to be

08:53    24    crystal clear that there's been no testimony that any

08:53    25    of the other steps would require a device to be turned

08:53  1    on.

08:53  2                    And because these are all

08:53  3    product-by-process claims, they can be proven through

08:53  4    the ultimate result of the -- that is the product and

08:53  5    that can be determined and understood via expert

08:53  6    testimony.

08:53  7                    Thank you, Your Honor.

08:53  8                    THE COURT:  A response?

08:53  9                    MR. LANG:  Good morning, Your Honor.

08:54  10   Mark Lang on behalf of defendants.

08:54  11                    I just want to say that based on the

08:54  12   presentation yesterday by Dr. Sarhan, we understood the

08:54  13   claims to be -- the method claims to be treated all the

08:54  14   same as a method and manufacture, and we didn't see any

08:54  15   evidence of how these products are actually

08:54  16   manufactured.

08:54  17                    We didn't see evidence of testing.  We

08:54  18   didn't see any evidence of how they're connected or

08:54  19   anything like that.

08:54  20                    Could we go to the prior slide?  I'm

08:54  21   sorry.

08:54  22                    That's good.  Thank you.

08:54  23                    And as you can see here, Your Honor,

08:54  24   these claims are directed to a method of improving

08:54  25   performance of a computer.  In order to do that, you

08:54  1    need to actually send data at some point regardless of

08:54  2    the claim limitation.  You need do that.

08:54  3                  And you can see in the connecting

08:54  4    limitation, it comprises an LVDS channel comprising two

08:54  5    unidirectional serial channels that transmit data in

08:54  6    opposite directions.  That's where this increase and

08:54  7    throughput is coming from.  And that needs to be done

08:55  8    during the process of manufacturing.

08:55  9                  And we have zero evidence that that

08:55  10   occurred at any point in time, regardless of whether

08:55  11   we're talking about turning products on or off or not.

08:55  12                  You also see that in Claim 36 of the '797

08:55  13   patent, it requires increasing data throughput of

08:55  14   serial channels.  You need to send data to increase

08:55  15   throughput.  There has to be data sent in order to

08:55  16   determine that throughput has been increased.

08:55  17                  And I think I'll just leave it at that,

08:55  18   Your Honor.

08:55  19                  THE COURT:  Anything else from the

08:55  20   plaintiff?

08:55  21                  MR. TAMKIN:  Yes, Your Honor.  Just a

08:55  22   brief response to that last argument, which is --

08:55  23   sorry -- a brief response to that last argument, which

08:55  24   is that the preambles have never been interpreted as

08:55  25   limiting.  And I think this is a new claim

694

08:55  1    construction, which is effectively you have to make the

08:55  2    product run.

08:56  3                    This is -- think of like a drug product.

08:56  4    And a lot of these cases are in the drug context, which

08:56  5    is, does the drug -- manufacture drug to do X, and it's

08:56  6    what it does is the results, sure.  But that's not the

08:56  7    limiting factor.

08:56  8                    It's what is this product?  What does it

08:56  9    consist of?

08:56  10                   And here, we know what the product

08:56  11   consists of.  Those -- it is capable of doing the

08:56  12   preamble, but that preamble has never been interpreted

08:56  13   as limiting.  So that seems to be a new claim

08:56  14   construction.  I don't know if it is or it isn't.

08:56  15                   In any event, the products, our product

08:56  16   by process, there has been an incredible amount of

08:56  17   testimony about how they are constructed and what

08:56  18   they're made of, and as a result, I think the directed

08:56  19   verdict should be denied.

08:56  20                   (Off-the-record bench conference.)

08:56  21                   THE COURT:  The Court is going to grant

08:57  22   the motion -- Rule 50 motion.  So the question then is

08:57  23   what to do with the present -- how the damages were

08:57  24   presented.

08:57  25                   Has the plaintiff gotten with their

08:57  1   damages expert and figured out how the damage expert

08:58  2   put on the case with respect to whether or not we can

08:58  3   adequately cabin off the damages for the method claims?

08:58  4              MR. TAMKIN:  Yes, Your Honor.  There was

08:58  5   actually a presentation towards the end of the damages

08:58  6   expert's presentation where if the claims are only the

08:58  7   apparatus claims, it would be from the date of the

08:58  8   notice letter forward, and there was an actual number

08:58  9   that was provided.

08:58  10             THE COURT:  Okay.  We'll go with that

08:58  11  then.

08:58  12             Then also, I was thinking about the case

08:58  13  this morning.  When we have our charge conference,

08:58  14  we'll need to take up an issue of whether or not we

08:58  15  need to have a specific question on the impact of the

08:58  16  letter with the jury, whether or not the jury -- I

08:58  17  don't think I've ever done this before, but the letter

08:58  18  is what the letter is.  But you all are taking

08:59  19  dramatically different positions on whether or not the

08:59  20  letter provided notice to the defendant and when that

       21  was.

08:59  22             And so I think that would be best

08:59  23  resolved by having the question answered by the jury as

08:59  24  to what they think.

08:59  25             That was clearly what the -- and I'm not

08:59  1   criticizing.  I'm -- the plaintiff clearly put on a

08:59  2   case trying to establish that that letter provided

08:59  3   adequate notice.

08:59  4            The thrust of the -- I think -- I never

08:59  5   know what to call it.  It's not really a cross when you

08:59  6   call the other side's witnesses, but it's not really a

08:59  7   direct.

08:59  8            So whatever it was Ms. Amstutz did with

08:59  9   the two witnesses from the defendant, whether that's a

08:59  10  cross out of order or direct, that -- clearly the point

08:59  11  of that was to establish some of the issues with regard

08:59  12  to the letter as well.

08:59  13           So you all be thinking about how we would

08:59  14  ask the jury the question of whether or not the letter

09:00  15  was sufficient to put the defendant on notice of the

09:00  16  patent infringement, and then I think we should

09:00  17  condition answers based on whether that's a yes or no.

09:00  18           Because I think it matters, especially

09:00  19  for the damages issues, of whether they answer yes or

09:00  20  no with respect to whether or not the plaintiff gave

09:00  21  sufficient notice in that letter.

09:00  22           Now, if I'm crazy about that, let me

09:00  23  know.  I mean, if both sides don't want it, I'm not

09:00  24  going to force you all to do it.  But that's what makes

09:00  25  sense to me.

09:00    1            So be thinking about that when we come to

09:00    2    the charge conference, about whether or not -- it seems

09:00    3    to me that -- having listened to the arguments for

09:00    4    directed verdict, that the only way a directed verdict

09:00    5    would not be granted is if there's a fact issue over

09:00    6    whether or not that letter was adequate.

09:00    7            And if there is a fact issue, then I

09:01    8    think the jury has to decide it and not me by denying

09:01    9    or granting a motion for directed verdict.  I don't

09:01   10    think I should be the one determining the adequacy

09:01   11    of -- or the sufficiency of a letter to put the

09:01   12    defendant on notice.

09:01   13            I think -- I'm babbling.  I know.  But I

09:01   14    think from the plaintiff's perspective, to survive a

09:01   15    motion for directed verdict, they only survive if the

09:01   16    argument is that they -- there was -- that a jury could

09:01   17    find that it was adequate notice.

09:01   18            But I don't want to be the one ruling on

09:01   19    that in either direction by not having them decide it.

09:01   20    So that's why -- again, if both sides don't want to do

09:01   21    it, I won't do it.  But let me know.

09:01   22            Maybe you all think it's better for your

09:01   23    case to not have them decide it.  And if both sides

09:01   24    don't want it, there's no appeal and I won't beat my

09:02   25    head against the wall.

```
09:02    1                      So -- but I'm thinking of doing this only
09:02    2    because I think it's better for you all, but if neither
09:02    3    side wants it, then it's not better for you all.
09:02    4    That's the way it works, I guess.
09:02    5                      So is there anything else that we need to
09:02    6    take up?
09:02    7                      MR. TAMKIN:  On the -- I understand the
09:02    8    Court's ruling on the directed verdict, obviously.
09:02    9                      Is the Court going to provide any -- any
09:02   10    written ruling or other clarification as to the basis
09:02   11    for --
09:02   12                      THE COURT:  We will, but it won't be
09:02   13    today.  Yeah.  We will -- we'll do something in
09:02   14    writing.
09:02   15                      MR. TAMKIN:  Okay.  Thank you.
09:02   16                      THE COURT:  Now -- and also, if you want
09:02   17    to -- why don't we do this?  It will be too late, but
09:02   18    it'll help us.  Why don't you all submit something in
09:02   19    writing supporting your case, and the defendant can
09:02   20    respond.  And at least that will give us something to
09:02   21    work off of with respect to giving a written order.
09:03   22                      We would have -- for example, you saw the
09:03   23    cases.  The defendant might want to cite cases.  It
09:03   24    probably would be best for us to have -- for a written
09:03   25    order for us to have something to work with.
```

| | | |
|---|---|---|
| 09:03 | 1 | And so is there anything else we need to |
| 09:03 | 2 | take up? |
| 09:03 | 3 | MS. AMSTUTZ:  Your Honor, I have one |
| 09:03 | 4 | exhibit housekeeping matter.  P-82 was referenced in |
| 09:03 | 5 | the deposition of Jaime Morquecho.  Plaintiff would |
| 09:03 | 6 | move to admit P-82. |
| 09:03 | 7 | MR. BURESH:  And, Your Honor, not the |
| 09:03 | 8 | next witness, but when Dr. -- |
| 09:03 | 9 | THE COURT:  I need a response to whether |
| 09:03 | 10 | you care about the exhibit. |
| 09:03 | 11 | MR. BURESH:  What was it?  I'm sorry. |
| 09:03 | 12 | MS. AMSTUTZ:  P-82 was referenced in |
| 09:03 | 13 | Mr. Morquecho's deposition. |
| 09:03 | 14 | MR. BURESH:  No objection, Your Honor. |
| 09:03 | 15 | THE COURT:  Okay. |
| 09:03 | 16 | MS. AMSTUTZ:  Thank you, Your Honor. |
| 09:03 | 17 | THE COURT:  Okay.  Yes, sir. |
| 09:03 | 18 | MR. BURESH:  Not the next witness, but |
| 09:03 | 19 | Dr. Edwards, the technical expert.  He will be |
| 09:03 | 20 | testifying, and his slides do still have some of the |
| 09:03 | 21 | claims that the Court has addressed via Rule 50. |
| 09:03 | 22 | We will intend to pursue invalidity as to |
| 09:03 | 23 | all claims that have been asserted in the case. |
| 09:04 | 24 | THE COURT:  Did you file a counterclaim |
| 09:04 | 25 | for invalidity? |

700

09:04  1                    MR. BURESH:  We did.

09:04  2                    THE COURT:  Anything else?

09:04  3                    MR. TAMKIN:  I think we have some

09:04  4    disputes with respect to the -- is it Mr. Newell?

09:04  5                    We haven't taken up Edwards either.

09:04  6                    There's two experts, not the next

09:04  7    witness, but they're the witnesses -- the two after

09:04  8    that where we have some disputes with respect to

09:04  9    demonstratives.

09:04  10                   THE COURT:  I'm happy to take those up

09:04  11   right now.

09:04  12                   MR. TAMKIN:  Okay.

09:04  13                   MS. HEPLER:  Vicki, could you please pull

09:04  14   up the Newell slides?  Slide 6, please?

09:04  15                   Your Honor, this first one, plaintiff

09:04  16   objects to the language:  Mr. Lewis takes economic

09:04  17   credit for work not done.

09:05  18                   THE COURT:  If you'll just hand me the

09:05  19   slides, I'll...

09:05  20                   MS. HEPLER:  I'll hand you the ones at

09:05  21   issue.

09:05  22                   So plaintiff takes issue with:  Mr. Lewis

09:05  23   takes economic credit for work not done by plaintiff.

09:05  24   This is contrary to his testimony presented yesterday.

09:05  25   Mr. Lewis actually explicitly said he understands that

| | | |
|---|---|---|
| 09:05 | 1 | Dr. Chu -- |
| 09:05 | 2 | THE COURT:  I'm going to overrule that. |
| 09:05 | 3 | I'm going to overrule the second one -- |
| 09:05 | 4 | MS. HEPLER:  5 and 6 have the same |
| 09:05 | 5 | problem, so we can just move right on to the third one, |
| 09:05 | 6 | No. 29. |
| 09:05 | 7 | Vicki, could you go to 29, please? |
| 09:05 | 8 | And I don't know if y'all have updated |
| 09:05 | 9 | the slides since you haven't sent us -- |
| 09:05 | 10 | THE COURT:  I'm going to overrule that |
| 09:05 | 11 | one as well. |
| 09:05 | 12 | Anything else? |
| 09:05 | 13 | MR. BURESH:  Your Honor, I need to -- |
| 09:05 | 14 | THE COURT:  And just for the record, the |
| 09:05 | 15 | slides I've overruled the objections on are Slide 5, |
| 09:06 | 16 | Slide 6, and Slide 29. |
| 09:06 | 17 | MS. HEPLER:  And just, Your Honor, just |
| 09:06 | 18 | one second.  The objection on Slide 29 is to the |
| 09:06 | 19 | language "real world." |
| 09:06 | 20 | Defendants are presenting Mr. Newell's |
| 09:06 | 21 | opinions as real world and labeling the slides as real |
| 09:06 | 22 | world. |
| 09:06 | 23 | THE COURT:  I read that, and I'm |
| 09:06 | 24 | overruling the objection. |
| 09:06 | 25 | MS. HEPLER:  Thank you very much. |

| | |
|---|---|
| 09:06 | 1 |

```
09:06   1                        THE COURT:  That's why we have cross.

09:06   2                        MR. BURESH:  Your Honor, I need to

09:06   3    correct the record.  I just said that we did have a

09:06   4    counterclaim and that is not correct.  We only had

09:06   5    affirmative defenses as to invalidity.  So I assume

09:06   6    you'll want me to remove slides that relate --

09:06   7                        THE COURT:  I would.

09:06   8                        MR. BURESH:  Okay.  Can we -- we will try

09:06   9    our best to do that at the morning break, but if I need

09:06  10    a little more time to make slide adjustments --

09:06  11                        THE COURT:  Just let me know.

09:06  12                        MR. BURESH:  Thank you, Your Honor.

09:06  13                        THE COURT:  Yeah.  I only -- and that

09:06  14    will come up with regard to the jury charge as well.

09:06  15    If you didn't have counterclaims for invalidity, then I

09:06  16    will -- then if the jury were to find the patents not

09:07  17    infringed, they won't answer the question on validity,

09:07  18    so, you know.

09:07  19                        Anything else?

09:07  20                        MR. TAMKIN:  There's some on Edwards as

09:07  21    well?

09:07  22                        (Conference between counsel.)

09:07  23                        THE COURT:  And thank you for letting me

09:07  24    know that.  I wish more lawyers would just say, I made

09:07  25    a mistake.  And, you know, it's -- we all do, so...
```

| | | |
|---|---|---|
| 09:07 | 1 | MR. TAMKIN:  Your Honor, how are we going |
| 09:07 | 2 | to -- how are you going to instruct the jury with |
| 09:07 | 3 | respect to the directed verdict on the claims? |
| 09:07 | 4 | THE COURT:  I'm not. |
| 09:07 | 5 | MR. TAMKIN:  Okay. |
| 09:07 | 6 | THE COURT:  I'm not going to mention it, |
| 09:07 | 7 | so... |
| 09:07 | 8 | I think you can just argue what's left in |
| 09:07 | 9 | the case.  Unless you -- if someone wants me to say |
| 09:07 | 10 | something, I can.  You all think about it -- |
| 09:07 | 11 | MR. TAMKIN:  If we can come back to you |
| 09:07 | 12 | maybe at the lunch break or -- because I -- if we're |
| 09:08 | 13 | now going to be asking for a different damages amount, |
| 09:08 | 14 | there has to be some explanation to that, I would |
| 09:08 | 15 | think. |
| 09:08 | 16 | THE COURT:  I think I would be happy to |
| 09:08 | 17 | say something very neutral like, you know, the Court |
| 09:08 | 18 | has made some -- a ruling.  And as a result of the |
| 09:08 | 19 | ruling, the amount that we're now seeking is X. |
| 09:08 | 20 | MR. TAMKIN:  Okay. |
| 09:08 | 21 | THE COURT:  I don't think that would |
| 09:08 | 22 | be -- I'd be happy to do that. |
| 09:08 | 23 | MR. TAMKIN:  Okay.  We'll come back to |
| 09:08 | 24 | Your Honor.  We don't have to do that right now. |
| 09:08 | 25 | THE COURT:  I would want to do it |

| | | |
|---|---|---|
| 09:08 | 1 | whatever way was the most neutral that I could, |
| 09:08 | 2 | obviously.  That's -- my goal is to do it -- to be |
| 09:08 | 3 | neutral.  If saying something is more neutral than not |
| 09:08 | 4 | saying something, then I would say something. |
| 09:08 | 5 | MR. TAMKIN:  Thank you. |
| 09:08 | 6 | THE BAILIFF:  All rise. |
| 09:08 | 7 | (Recess taken.) |
| 09:12 | 8 | THE BAILIFF:  All rise. |
| 09:12 | 9 | THE COURT:  Please remain standing for |
| 09:12 | 10 | the jury. |
| 09:12 | 11 | (Jury entered the courtroom.) |
| 09:12 | 12 | THE COURT:  Thank you.  You may be |
| 09:12 | 13 | seated. |
| 09:12 | 14 | Counsel? |
| 09:13 | 15 | MS. MARRIOTT:  The defense calls Mr. Ajay |
| 09:13 | 16 | Bhatt. |
| 09:13 | 17 | (The witness was sworn.) |
| 09:13 | 18 | DIRECT EXAMINATION |
| 09:13 | 19 | BY MS. MARRIOTT: |
| 09:14 | 20 | Q.    Good morning. |
| 09:14 | 21 | Would you please introduce yourself to the |
| 09:14 | 22 | jury and tell us a little bit about yourself? |
| 09:14 | 23 | A.    Sure.  My name is Ajay Bhatt.  I'm retired |
| | 24 | chief engineer -- |
| 09:14 | 25 | (Clarification by Reporter.) |

705

09:14  1        A.    Let me start again.

09:15  2              My name is -- good morning.  My name is Ajay

09:15  3    Bhatt.  I'm a retired engineer from Intel Corporation.

09:15  4    I live out of Portland, Oregon with my wife of

09:15  5    40 years.  And we have one daughter.

09:15  6        Q.    Could you give us a little background on your

09:15  7    early history prior to coming to the United States?

09:15  8        A.    I was born and brought up in India.  My dad

09:15  9    was a professor, so we lived on campus of a university.

09:15  10   I graduated out of college in India, got my master's in

09:15  11   electronics prior to coming to United States for higher

09:15  12   studies.

09:15  13       Q.    How did you end up coming to the United

09:15  14   States?

09:15  15       A.    Oh, that's a interesting story.  Back in

09:15  16   India, we had a textbook by a renowned professor out of

09:15  17   a university in New York, and I contacted him.  I got

09:16  18   accepted as a research assistant under him.  So I

09:16  19   joined City University of New York to work under him

09:16  20   and also pursue my higher studies.

09:16  21       Q.    Why were you interested in that particular

09:16  22   professor?

09:16  23       A.    The book that he wrote really got me

09:16  24   interested in electronics.  Otherwise, I come from

09:16  25   family of artists and I'm the first engineer.  And so I

—706—

```
09:16   1    was so inspired by reading the book, and I got so
09:16   2    interested that I wanted to pursue engineering.
09:16   3        Q.    What degree did you obtain from City
09:16   4    University in New York?
09:16   5        A.    I got a master's in electrical engineering.
09:16   6        Q.    And you mentioned that you were formerly at
09:16   7    Intel.
09:16   8              When did you join Intel?
09:16   9        A.    I joined Intel in 1990.
09:16   10       Q.    How long did you work there?
09:16   11       A.    I worked there for 26 years.
09:16   12       Q.    And over those 26 years, what was your role or
09:17   13   your focus?
09:17   14       A.    I had two major roles.  I was a platform
09:17   15   architect and chief I/O engineer.
09:17   16       Q.    What does a platform architect do?
09:17   17       A.    Platform architect, actually just like
09:17   18   building architect, looks at entire computer platform.
09:17   19   All -- you know, architect looks at all different
09:17   20   subsystems.
09:17   21             And the job is to look at existing platform,
09:17   22   anticipate future needs, and balance the platform such
09:17   23   that computer -- all subsystems in the computer are
09:17   24   balanced.  They work nicely.  You don't want an engine
09:17   25   that is much more powerful than wheels or the body.
```

09:17    1              So a computer engineer also makes sure that

09:17    2    all the subsystems in the computer are well balanced.

09:17    3        Q.    Now, you also mentioned that you are an I/O

09:18    4    architect.

09:18    5              Could you tell us what that means?

09:18    6        A.    So I/O is an important part of computer

09:18    7    system.  I/O means input/output.  In a simple -- this

09:18    8    is how we interact with computers.  So a keyboard is an

09:18    9    input device, or a mouse is an input device.  Whereas,

09:18    10    a display is an output device, or a printer would be an

09:18    11    output device.

09:18    12        Q.    Are there any industry standards that concern

09:18    13    I/O technology?

09:18    14        A.    When it comes to I/O, most of the time there

09:18    15    are industry standards or, you know, there are

09:18    16    agreed-upon standards that everybody follows.  So yes.

09:18    17        Q.    Okay.  And how many industry standards have

09:18    18    you personally participated in?

09:18    19        A.    In my 40 years of involvement in technologies,

09:18    20    I've done at least five or six standards.

09:18    21        Q.    How many of those five or six standards have

09:19    22    you served as the chief architect for the standard?

09:19    23        A.    So I led three very well-known and very

09:19    24    successful I/O standards.

09:19    25        Q.    And what are those?

708

09:19  1      A.    So USB is universal serial bus.  Another one

09:19  2  was AGP.  That was for bringing very high-resolution

09:19  3  graphics.  And third was PCI Express.  That is a main

09:19  4  standard for input/output inside the computers.

09:19  5      Q.    Mr. Bhatt, why did you agree to come testify

09:19  6  in court today?

09:19  7      A.    The -- you know, the -- the technologies that

09:19  8  are in dispute are the ones that I actually envisioned

09:19  9  first.  I was the guy who started these technologies

09:19  10 before anybody else.  I worked with industry and got

09:19  11 them through.

09:20  12      So I have information that very few people in

09:20  13 the world have, and I thought everybody would benefit

09:20  14 by the historical knowledge that I have and how these

09:20  15 things came about.

09:20  16      Q.    Are you getting paid for your time that you're

09:20  17 spending in this case?

09:20  18      A.    Yes.  I'm being compensated for this.

09:20  19      Q.    Does that fact impact your testimony in any

09:20  20 way?

09:20  21      A.    No.  I'm simply driven by the truth.

09:20  22      Q.    And does your compensation in the case depend

09:20  23 in any way on the outcome of this case?

09:20  24      A.    Not at all.

09:20  25      Q.    Overall -- I want to talk about the I/O

709

09:20  1    standards that we were just discussing.

09:20  2              Overall, about how many years did you work on

09:20  3    developing these standards of technology?

09:20  4    A.    I have been involved in developing standards

09:20  5    since early 1990s, till I retired.

09:20  6    Q.    And about --

09:20  7    A.    2016.

09:20  8    Q.    And about how long -- about how many years

09:21  9    were you working on developing input/output technology

09:21  10   generally?

09:21  11   A.    All throughout that time, for a significant

09:21  12   period of time I spent looking at input/output.

09:21  13   Q.    Do you have any patents?

09:21  14   A.    I have about 132 patents, both U.S. and

09:21  15   international patents, on some of these technologies.

09:21  16   Q.    Now, you mentioned one of the standards that

09:21  17   you worked on was USB, correct?

09:21  18   A.    Yes.

09:21  19   Q.    Okay.  Let's talk about that one first.

09:21  20              MS. MARRIOTT:  If we can go to the next

09:21  21   slide.  Thank you.

09:21  22   BY MS. MARRIOTT:

09:21  23   Q.    Did you bring some slides to prepare or to

09:21  24   share with the jury today?

09:21  25   A.    We have some slides that would make this

—710—

09:21  1    conversation easy.

09:21  2        Q.    Okay.

09:21  3              MS. MARRIOTT:  Okay.  If we go to that

09:21  4    second slide.  Thank you.

09:21  5    BY MS. MARRIOTT:

09:21  6        Q.    Okay.  Let's talk about USB.

09:21  7        So what does USB stand for, those letters?

09:21  8        A.    So, you know, the acronym USB really stands

09:22  9    for universal serial bus.

09:22  10       Q.    The first word is universal.

09:22  11       What do you mean by that?

09:22  12       A.    Universal, everybody sees this -- in this

09:22  13   picture on the left-hand side, you have a variety of

09:22  14   different connectors that are -- that have different

09:22  15   shapes and sizes.

09:22  16       So that's how the computer used to have I/O

09:22  17   prior to advent of USB.  So USB is the connector on the

09:22  18   right-hand side.  It is one standardized connector that

09:22  19   supports functionality that was supported by all these

09:22  20   different functions.

09:22  21       Q.    And what was your involvement in USB?

09:22  22       A.    I was the one who identified the need and

09:22  23   proposed this technology to my company and eventually

09:23  24   to the industry.

09:23  25       Q.    How did you come up with the idea for USB?

09:23    1      A.    They say necessity is mother of invention.  So

09:23    2    in my case, my wife and daughter, they're nontechnical

09:23    3    people.  They just wanted to use computer and print a

09:23    4    document for my daughter.  And they kept on struggling

09:23    5    with that.  And my wife got so frustrated.

09:23    6          And she says, why do we have this junk that

09:23    7    doesn't work when we need it?

09:23    8          So I thought about it.  And I said, you know,

09:23    9    if a common person like them is struggling with using

09:23    10    computer which is very powerful and has a lot of

09:23    11    functionality, and they couldn't use it.  And that

09:23    12    means millions of people who want to use computers, who

09:23    13    can't use it.  So I thought there's got to be a better

09:23    14    way of doing it.

09:24    15          So at Intel, we were involved in defining

09:24    16    future computers, and I said, if Intel wants to grow

09:24    17    the business and help new class of users who are not

09:24    18    very technical, then we needed to invest in something

09:24    19    like USB.  And that's where USB began.

09:24    20      Q.    How widespread is the use of USB today?

09:24    21      A.    Oh, USB is everywhere.  It is in places that I

09:24    22    never thought it would exist.  You know, on the plane

09:24    23    by my seat, you know, it's on every computer and every

09:24    24    phone.  It's just ubiquitous.

09:24    25      Q.    When your team was developing USB, was it a

| | | |
|---|---|---|
| 09:24 | 1 | proprietary technology to Intel or was it open? |
| 09:24 | 2 | A.    We always thought that it was such an |
| 09:24 | 3 | important technology that it must be broadly available, |
| 09:24 | 4 | and, hence, we should not charge any royalty.  We |
| 09:25 | 5 | should just create an open standard, give the know-how |
| 09:25 | 6 | to the industry and let everybody innovate around it. |
| 09:25 | 7 | Q.    Is there any sort of a fee at all to join the |
| 09:25 | 8 | USB standards organization? |
| 09:25 | 9 | A.    So when we develop technology -- so the |
| 09:25 | 10 | technology is free, but this technology is administered |
| 09:25 | 11 | by a nonprofit organization, and they charge fee just |
| 09:25 | 12 | to be a member. |
| 09:25 | 13 | And by being a member, you get a bunch of |
| 09:25 | 14 | privileges.  You get whole bunch of, you know, |
| 09:25 | 15 | invitations to the conferences.  You get specification. |
| 09:25 | 16 | You need help, there's compliance if you want to go |
| 09:25 | 17 | test your part.  So they -- it's for their operational |
| 09:25 | 18 | expenses.  But it's very nominal. |
| 09:25 | 19 | Q.    Is there a royalty, though, for companies -- |
| 09:25 | 20 | A.    Absolutely no royalty.  People are free to |
| 09:25 | 21 | adopt the technology and build products. |
| 09:26 | 22 | Q.    And what would you say is the benefit of a |
| 09:26 | 23 | standard being open in the way that you just described? |
| 09:26 | 24 | A.    When you create an open standard, it unleashes |
| 09:26 | 25 | innovation and creativity.  Because, you know, you got |

713

09:26  1    foundational technology.  Using USB, you can see all

09:26  2    sorts of devices that I never thought would exist.

09:26  3           So the open standard has tapped into

09:26  4    imagination of very creative engineers and users all

09:26  5    throughout the world, and that's the beauty of open

09:26  6    standards.

09:26  7    Q.    Now, as an open standard, were there more than

09:26  8    just engineers and employees at Intel working on the

09:26  9    development of USB?

09:26  10   A.    So even though technology was conceived and

09:26  11   initially developed at Intel, it has been a

09:26  12   collaborative effort, and to this day, after about

09:27  13   20-plus years of introduction of this technology, it

09:27  14   continues to be a collaborative effort by some of the

09:27  15   industry's smartest people, I would say.

09:27  16   Q.    What were some of the companies that were

09:27  17   working with Intel to develop USB?

09:27  18   A.    So back then, so the prominent companies were

09:27  19   IBM, Digital Equipment Corporation, Microsoft, Compaq

09:27  20   Computers, they're HP now, Northern Telecom.

09:27  21          So sort of leading computer and communications

09:27  22   companies of the time engaged with us in developing

09:27  23   this standard.

09:27  24   Q.    Did all of those companies that worked with

09:27  25   Intel to develop the USB standard, did they all agree

09:27   1   that the standard should be open?

09:27   2       A.    Yeah.   There was the -- there was the

09:27   3   understanding at -- from the beginning that standards

09:27   4   should always be open.

09:28   5       Q.    Let's talk about timing, the time frame, okay?

09:28   6             When did the development for the initial

09:28   7   version of USB start?

09:28   8       A.    Initially, I started kicking around this idea

09:28   9   in 1992 briefly after joining Intel.  And it took us a

09:28  10   few years and multiple rounds before we had a

09:28  11   specification.  So it was about three years or so.

09:28  12       Q.    So when was the first specification released?

09:28  13       A.    First specification was substantially done in

09:28  14   1995 and published in 1996.

09:28  15       Q.    Okay.  So four or five years to get this

09:28  16   specification out?

09:28  17       A.    Yes.  You know, technology such as USB does

09:28  18   take time.  So usually three to four years, I would

09:28  19   say.

09:28  20       Q.    How difficult was that process of development

09:28  21   over that four-year period?

09:28  22       A.    Oh, it was one of the most exciting as well as

09:28  23   most challenging thing to do.  Because when you bring

09:28  24   very creative people from all over the world, you get

09:29  25   different opinions.  You have to consider each input

```
09:29   1   that they have very carefully, leverage the best idea,
09:29   2   and discount the ideas that don't apply.
09:29   3           So, you know, these things are full of ups and
09:29   4   downs.  There are days when you come home and you feel
09:29   5   like, you know, this project is dead.  You've hit the
09:29   6   roadblock, and you just can't go forward.
09:29   7           And then you sleep on it, you think about it,
09:29   8   you go back, try and move on.  So it was very exciting
09:29   9   time but in the end, quite satisfactory.
09:29  10      Q.    Okay.
09:29  11              MS. MARRIOTT:  Okay.  Can we pull up
09:30  12   Joint Exhibit 50?
09:30  13              Thank you.
09:30  14   BY MS. MARRIOTT:
09:30  15      Q.    Now, this is Joint Exhibit 50, Mr. Bhatt.
09:30  16           Do you recognize this document?
09:30  17      A.    Yes.  I do.
09:30  18      Q.    Okay.  And what is it?
09:30  19      A.    This is the very first version of the spec
09:30  20   that we wrote.
09:30  21      Q.    For USB?
09:30  22      A.    For the USB.
09:30  23              MS. MARRIOTT:  Okay.  We move to admit
09:30  24   Joint Exhibit 50.
09:30  25              MR. TAMKIN:  No objection.
```

09:30  1                    THE COURT:  Admitted.

09:30  2                    MS. MARRIOTT:  If we could publish that

09:30  3     to the jury.  We'll just give that a second.

09:30  4     BY MS. MARRIOTT:

09:31  5          Q.    Okay.  Could you describe -- now that the jury

09:31  6     can see the document, can you describe for them what

09:31  7     this document is?

09:31  8          A.    Yeah.  This is very first version of the

09:31  9     specification that describes the technology and all

09:31  10    necessary details so that a developer can take this

09:31  11    spec and develop a product.

09:31  12         Q.    And what's the date on this first version of

09:31  13    USB?

09:31  14         A.    This is January 15, 1996.

09:31  15         Q.    Now, this document is, by my count, 268 pages.

09:31  16               Does that sound right?

09:31  17         A.    Yeah.  It was quite a comprehensive document.

09:31  18         Q.    Why was it so long?

09:31  19         A.    Well, you know, this document was made

09:31  20    available to all the developers who wanted to develop

09:31  21    new products.  And so this would be the starting point

09:31  22    for somebody who doesn't know the technology to start

09:31  23    with the documentation, study it, understand all the

09:32  24    requirements of developing the technology and start

09:32  25    doing detailed development.

717

09:32   1          So to do a development, you need all the

09:32   2   necessary technical details, and this is the

09:32   3   comprehensive document that provides those details to

09:32   4   build a product.

09:32   5              MS. MARRIOTT:  Now, if we can go back to

09:32   6   the slides.

09:32   7   BY MS. MARRIOTT:

09:32   8      Q.    Now, on this slide, Mr. Bhatt, what type of

09:32   9   connector do we have on the left-hand side where it

09:32   10  says Parallel Connector?

09:32   11     A.    So as the title says, it is a parallel

09:32   12  connector.  So back then, this is before the USB, they

09:32   13  had this very big and bulky connector that connected to

09:32   14  a printer.

09:32   15     Q.    And so this parallel connector, that's what

09:32   16  existed prior to the development of USB?

09:32   17     A.    Yes.

09:32   18     Q.    Okay.  When it says parallel connector, at a

09:32   19  high level, what does -- what does "parallel" mean?

09:33   20     A.    That's -- the word says "parallel."  So

09:33   21  imagine, you know, you're in a multilane highway and it

09:33   22  has multiple lanes and cars go in individual lanes.  So

09:33   23  similar to computers, bits of information is sent in

09:33   24  parallel.  So it's -- it's sent simultaneously over the

09:33   25  wires and the connectors.

718

09:33  1       Q.    Now, on the right-hand side, we have universal

09:33  2   serial bus, which has serial in the title.

09:33  3             What does that mean?

09:33  4       A.    So the one on the right-hand side is very

09:33  5   small connector.  Means it has much -- many -- it only

09:33  6   has few wires, particularly, only four wires.  So it

09:33  7   has significantly smaller footprint or smaller size.

09:33  8             Here, you have to send lot more information.

09:33  9   So there is a technique called "serially."  So you send

09:34 10   bits in sequence, and that's why it is called serial.

09:34 11       Q.    Why did you choose serial for USB?

09:34 12       A.    Because, you know, the computers were going

09:34 13   from the desktop to the laptop, and they were getting

09:34 14   smaller and smaller.  So we needed a smaller connector.

09:34 15             Imagine, you know, your phone.  You couldn't

09:34 16   use a connector on the left-hand side.  You needed a

09:34 17   miniature version that had same or more functionality,

09:34 18   and that's the one on the right-hand side.

09:34 19       Q.    And serial communication that you're talking

09:34 20   about, how is the data communicated?

09:34 21       A.    Data is sent serially.  So it is sent in

09:34 22   sequence.

09:34 23       Q.    And what is the name of the type of signaling

09:34 24   that USB used?

09:34 25       A.    So at that time, we chose a signaling called

719

09:34　1　differential signaling.

09:34　2　　　Q.　And how long has differential signaling been

09:35　3　around?

09:35　4　　　A.　Oh, differential signaling has been around

09:35　5　more than 50 years or more.　I mean, just one of the

09:35　6　more -- you know, it was one of the standard signaling

09:35　7　technologies.

09:35　8　　　Q.　And how long has USB been using differential

09:35　9　signaling?

09:35　10　　　A.　USB was designed to use differential signaling

09:35　11　from Day 1.

09:35　12　　　Q.　How has USB evolved over time?

09:35　13　　　A.　Oh, the evolution of USB is quite interesting.

09:35　14　We started at a really low speed.　And 20 years later,

09:35　15　it is -- so we started at actually 1.5 million bits per

09:35　16　second.　Today, it is going at 40 billion bits per

09:35　17　second.　It's a tremendous amount of speed.

09:35　18　　　Q.　Did USB, that evolution you just described,

09:35　19　did it evolve in a compatible way?

09:36　20　　　A.　Yes.　So the beauty of USB is that, you know,

09:36　21　the device that -- so yes.　The answer is compatible.

09:36　22　Yes.　It is compatible.

09:36　23　　　　That means anything that was done on Day 1

09:36　24　should work now.　And if you take today's origin and

09:36　25　plug it in, at least it would work like an old system.

09:36   1              MS. MARRIOTT:  Now, if we can go to the

09:36   2   next slide.

09:36   3              Thank you.

09:36   4   BY MS. MARRIOTT:

09:36   5      Q.   Let's talk about the -- what's in a USB cable.

09:36   6              Could you just describe for the jury, what's

09:36   7   inside of this USB cable --

09:36   8      A.   Yeah.  So this is the cable and a connector,

09:36   9   which is cut at one end.  It's dissected so that you

09:36  10   can see what's inside.

09:36  11              So you see that there are two wires that are

09:36  12   labeled D+ and D-.  So these are the wires through

09:36  13   which you send information between computer and your

09:36  14   phone or your printer.

09:37  15              The other two wires, that's a ground and Vcc.

09:37  16   They're the wires for charging.  That's how you charge

09:37  17   your phone.  Or, you know, USB allows you to charge

09:37  18   your devices.  So that's where you send power

09:37  19   information.

09:37  20              So basically, you send communication

09:37  21   information or the data and power through the -- sort

09:37  22   of charge through this kind.

09:37  23      Q.   Okay.

09:37  24              MS. MARRIOTT:  If we could go to the next

09:37  25   slide.

09:37    1    BY MS. MARRIOTT:

09:37    2        Q.    What do those wires that you just described,

09:37    3    what do they connect to?

09:37    4        A.    They connect to a mating connector that is

09:37    5    usually found -- the one on the right-hand side is

09:37    6    found on your computer.

09:37    7        Q.    Do they connect to pins?

09:37    8        A.    Yeah.  So that receptacle also has

09:37    9    corresponding pins that mate with pins on your cable.

09:37    10       Q.    And what is a pin?

09:37    11       A.    A pin is -- basically, it makes a connection.

09:38    12   It's just like your, you know, plug, electrical plug

09:38    13   that we plug in and it passes electricity.  Similarly,

09:38    14   when you make these connectors, the communication

09:38    15   information or the data and power are sent.

09:38    16       Q.    Now, on this particular slide, where are the

09:38    17   pins depicted?

09:38    18       A.    So the pins are depicted -- you know, there

09:38    19   are these arrows that are going up, Vcc, D-, D+, and

09:38    20   ground.  So the pins are inside the connector.

09:38    21       Q.    Is it --

09:38    22             MS. MARRIOTT:  If we can go to the next

09:38    23   slide.

09:38    24   BY MS. MARRIOTT:

09:38    25       Q.    Is it important to have the same pin layout on

—722—

09:38  1   a USB port, shown on the right, as you do in the USB

09:38  2   connector that's on the left?

09:38  3        A.    Of course.  Otherwise, things wouldn't work.

       4        Q.    Okay.

09:38  5              MS. MARRIOTT:  If we can look at J-47,

09:38  6   Joint Exhibit 47.  I believe it's already been

09:38  7   admitted.

09:38  8              Thank you.

09:38  9   BY MS. MARRIOTT:

09:39  10       Q.    Mr. Bhatt, do you recognize what's on the

09:39  11  screen, J-47?

09:39  12       A.    Yes.  This is a later version of the

09:39  13  specification.  It's the third evolution of the USB.

09:39  14       Q.    And what's the date on this document?

09:39  15       A.    The date is November 12th, 2008.

09:39  16       Q.    And this is the USB 3 specification?

09:39  17       A.    3.0.  Yes.

09:39  18       Q.    Okay.  So USB 3 came out after USB 2, correct?

09:39  19       A.    Yes.

09:39  20       Q.    Now, you were just talking about the way the

09:39  21  different versions work together.

09:39  22              Is USB 3 backwards compatible with USB 2?

09:39  23       A.    Yes.  It is.

09:39  24       Q.    And what does that mean?

09:39  25       A.    It means that -- say you have a computer that

09:39  1  has a USB 3 port, which has more capability than the

09:40  2  earlier version.

09:40  3        But when -- and if you bought a mouse --

09:40  4  computer mouse that you bought in early 2000 and it's

09:40  5  just sitting around in your home and you want to use

09:40  6  it, you can simply use it without any changes.

09:40  7    Q.   So if I have a computer, one of the -- this is

09:40  8  the computer that's at issue in the case -- and it has

09:40  9  a USB 3 port, right here on the side, if I plug a USB 2

09:40  10  mouse in it --

09:40  11        MR. TAMKIN:  Object, Your Honor.  May I

09:40  12  approach?

09:40  13        THE COURT:  Sure.

09:40  14        (Bench conference.)

09:40  15        MR. TAMKIN:  We're starting to get into

09:40  16  claim terms and claim issues.  Your Honor specifically

09:40  17  ruled that you're not going to allow Mr. Bhatt to talk

09:40  18  about backwards compatibility because that's an issue

09:40  19  in the claim and whether or not X is backwards with Y.

09:41  20        He did it in the context of PCI Express.

09:41  21  I -- so I think --

09:41  22        THE COURT:  What I heard him saying was

09:41  23  how this worked -- how it works.

09:41  24        MS. MARRIOTT:  In the context of USB, not

09:41  25  PCI Express.

| 09:41 | 1 | MR. TAMKIN:  In the context of USB, it's |
| 09:41 | 2 | going to be the same issue.  Is it backwards compatible |
| 09:41 | 3 | or not? |
| 09:41 | 4 | And it's how it works.  But if it's |
| 09:41 | 5 | backwards compatible, and now she's holding up the |
| 09:41 | 6 | accused product and saying, so is this going to have |
| 09:41 | 7 | backwards compatibility?  That's when we're starting to |
| 09:41 | 8 | get into claim terms and claim issues. |
| 09:41 | 9 | I agree it's going to go more with PCI |
| 09:41 | 10 | Express, but it's starting to come up now, which is why |
| 09:41 | 11 | I wanted to flag it right now and object to |
| 09:41 | 12 | specifically questions about whether the accused |
| 09:41 | 13 | product has backwards compatibility because it relates |
| 09:41 | 14 | to all of these standards. |
| 09:41 | 15 | MS. MARRIOTT:  We're talking about the |
| 09:41 | 16 | functionality of USB, and there's no claim term. |
| 09:41 | 17 | THE COURT:  I agree.  I'm going to |
| 09:41 | 18 | overrule the objection. |
| 09:41 | 19 | MS. MARRIOTT:  Thank you. |
| 09:41 | 20 | (Bench conference concludes.) |
| 09:41 | 21 | BY MS. MARRIOTT: |
| 09:42 | 22 | Q.   Mr. Bhatt, okay.  So I just kind of want to |
| 09:42 | 23 | pick up where we left off.  This is the accused product |
| 09:42 | 24 | in this case, and it has the three USB 3 ports, right? |
| 09:42 | 25 | If I plug a mouse that has a USB 2 connector |

725

09:42   1    in it, will it work?

09:42   2        A.    Yes.  It will because it's compatible.

09:42   3        Q.    Thank you.

09:42   4              MS. MARRIOTT:  Okay.  If we can go back

09:42   5    to the slides, please.

09:42   6    BY MS. MARRIOTT:

09:42   7        Q.    Mr. Bhatt, what are we seeing here on this

09:42   8    slide?

09:42   9        A.    So this is a depiction of USB connector and a

09:42   10   port.

09:42   11             MS. MARRIOTT:  Can we go to the next

09:42   12   slide, please?

09:42   13             Thank you.

09:42   14   BY MS. MARRIOTT:

09:42   15       Q.    Okay.  And on this slide, we have on the right

09:43   16   a USB 3 port; is that correct?

09:43   17       A.    Yes.

09:43   18       Q.    Okay.  What allows a USB 2 connector, such as

09:43   19   in the mouse, to work with a USB 3 port like what was

09:43   20   in the computer we just looked at?

09:43   21       A.    So the -- as you can see, the USB 3 port has

09:43   22   some additional pins in, you know, the connector.

09:43   23   They're not labeled in this picture, but if you pay

09:43   24   attention to it, there are about five additional pins

09:43   25   that are placed there where the arrow is.

09:43   1       Q.    Does the USB 3 port on the right have the

09:43   2   original USB 2 bus in it as well?

09:43   3       A.    Yes.  So the newer port preserved the original

09:43   4   four pins as well.

09:43   5       Q.    Is it possible for USB 2 to maintain

09:44   6   compatibility with USB 3 without including that

09:44   7   original USB 2 bus?

09:44   8       A.    No.  You couldn't, because then you wouldn't

09:44   9   make any connection there.  If you took the old device

09:44   10  and those pins are missing, no connection would be

09:44   11  made.

09:44   12              MS. MARRIOTT:  If we go to the next

09:44   13  slide.

09:44   14  BY MS. MARRIOTT:

09:44   15      Q.    Now, USB 3 added some new capabilities,

09:44   16  correct?

09:44   17      A.    Yes.

09:44   18      Q.    How did you add the new capabilities for USB 3

09:44   19  while still being compatible with USB 2?

09:44   20      A.    So in this case, you know, we utilized new

09:44   21  pins to run improved version of USB, a newer version of

09:44   22  USB called USB 3 to those pins.  So the original USB

09:44   23  continue to work on original pins, and then we added

09:44   24  newer pins.  It's like defining a subset/superset.

09:44   25      Q.    And can we see the new USB 3 pins in the

09:45  1    depiction on the right?

09:45  2        A.    So the red arrow really shows you those new

09:45  3    pins.

09:45  4        Q.    Okay.  When I plug a USB 3 cable into a USB 3

09:45  5    port, which pins are used?

09:45  6        A.    In that case, you would use the new pins.

09:45  7        Q.    Why did you need to add a second bus here?

09:45  8    Why couldn't you just make USB 2 faster?

09:45  9        A.    Well, so with USB 1 -- with USB 2, we ran it

09:45  10   as fast as we could with USB 1 pins.  But at -- by

09:45  11   early -- I mean, in 2000s, before we define USB 3, we

09:45  12   couldn't extend it anymore.

09:45  13        It was just the limitations of physics.  You

09:45  14   could run that bus faster, the original one.  So you

09:45  15   had to create a companion one.  So we added some more

09:45  16   pins and developed new technology that would work with

09:46  17   USB 2.

09:46  18        Q.    How much effort went into building USB 3?

09:46  19        A.    It was probably about the same as the original

09:46  20   one.  And sometimes when you try to extend something

09:46  21   that has existed in hundreds of millions of machines,

09:46  22   it's even more challenging.  Because you can't disrupt

09:46  23   what you have and you have to now add something more

09:46  24   that would last for even longer than originally.

09:46  25        Q.    Over time, did USB accomplish your original

728

09:46  1   goal?

09:46  2       A.    Oh, it has far exceeded any of the

09:46  3   expectations I had.  I thought USB would last for

09:46  4   probably couple of years.  I'm surprised that it has

09:46  5   lasted more than 20 years.

09:46  6       Q.    Now, did you secure any patents on USB

09:46  7   technology?

09:46  8       A.    Yes.  I've had -- I have number of patents

09:47  9   that were granted to me and my team for work on USB.

09:47  10      Q.    How does the fact that there are patents

09:47  11  granted on USB relate to the fact that USB is an open

09:47  12  standard?

09:47  13      A.    If you want to create an open standard, you

09:47  14  have to have patents because you can't give away

09:47  15  something that you don't own.  So when you have a

09:47  16  patent, now it's -- you know, it's assigned to you and

09:47  17  your company.  So you can decide how to open it up,

09:47  18  when to open it up, or if to open it up.

09:47  19      Q.    Okay.  Now, we've been talking about the

09:47  20  external ports, USB on a computer.  I want to switch

09:47  21  gears and talk about the internal communication within

09:47  22  a computer.

09:47  23           This is a slide, and at the top it says

09:47  24  Internal Communication Standards.

09:47  25           What does "internal" mean in this context?

09:47  1       A.    So, you know, when you open up a computer,

09:47  2   just internally there you'll see a bunch of chips or

09:48  3   components, and they have to talk to each other.

09:48  4            In this case, internal to the computer, there

09:48  5   are I/Os and there's some internal standards.  They're

09:48  6   utilized for communications within those components,

09:48  7   and that's why it is called internal communication

09:48  8   standards.  Your normal user usually doesn't see them.

09:48  9       Q.    Okay.  So if we're looking at this laptop, can

09:48  10  we see those internal components that you're talking

09:48  11  about?

09:48  12      A.    Not here, unless you open it up.

09:48  13      Q.    Open up the back panel?

09:48  14      A.    Yes.

09:48  15      Q.    Does this slide relate to the history of the

09:48  16  development of these internal communication

09:48  17  interface --

09:48  18      A.    Yeah.  This is a very high-level view.  This

09:48  19  is the way to sort of explain technologies, you know,

09:48  20  major technologies and I/O here.

09:48  21      Q.    What is the 1st Generation here of internal

09:49  22  communication standards?

09:49  23      A.    So the first one is, you know, known as ISA.

09:49  24  So at IBM in '80s, when they first defined IBM PC --

09:49  25  this is when the PC revolution started -- they had

09:49  1    internal interconnects for internal interface.  That's

09:49  2    the word computer architects use.  So that -- they used

09:49  3    a technology called ISA.  So -- anyway.

09:49  4        Q.   And what's the 2nd Generation?

09:49  5        A.   So that technology lasted for about ten years,

09:49  6    and it couldn't be extended any more.  By this time

09:49  7    processors and capabilities had grown tremendously, and

09:49  8    ISA was not good enough and we needed something faster.

09:49  9             And that's when we started thinking what PCI

09:49  10   local bus to sort of -- it was sort of looking forward.

09:50  11   By anticipating our future needs, we defined a

09:50  12   interconnect.

09:50  13       Q.   And PCI local bus was in the 1990s?

09:50  14       A.   Yeah.  Right after I joined Intel in '90s, we

09:50  15   started talking about extending internal communication.

09:50  16       Q.   Okay.  And then what's the 3rd Generation?

09:50  17       A.   So, you know, just like ISA, PCI did its job

09:50  18   for about ten years, and it started becoming a major

09:50  19   bottleneck.  Physics was a problem.  You couldn't

09:50  20   extend the technology any further.  And we needed

09:50  21   something completely new.  And we had to go in a

09:50  22   different direction, and as a result, we came up with

09:50  23   this proposal for PCI Express.

09:50  24       Q.   At the bottom here, it says:  Generational

09:50  25   technology changes.

731

09:50  1          What are you describing there?

09:50  2      A.    So generational technologies means you

09:50  3   introduce discontinuity.  You basically obsolete what

09:51  4   you have and throw out everything and start fresh

09:51  5   again.  So it's a major inflection point or change in

09:51  6   technology.

09:51  7          And if I could just add one more sentence for

09:51  8   why, it's just you can't extend things any further.

09:51  9   It's just too difficult.

09:51  10     Q.    What was your role on the development of PCI

09:51  11  Express?

09:51  12     A.    So again, just like USB, my senior management

09:51  13  trusted me to propose this technology, and I did

09:51  14  propose this technology.  So just like USB, I observed

09:51  15  the bottleneck, formed a team, and got the technology

09:51  16  developed.

09:51  17     Q.    What technology did PCI Express replace?

09:51  18     A.    It replaced PCI local bus.

09:51  19     Q.    Okay.  Now, on the slide before us, we have a

09:51  20  diagram.

09:51  21          And at a really high level, can you just

09:52  22  explain what this is depicting?  And then we'll walk

09:52  23  through it.

09:52  24     A.    Yes.  So this is a very simplified plot

09:52  25  diagram, as they call it, a very high level plot

09:52   1   diagram of a computer system.

09:52   2       Q.   And is it depicting the PCI local bus

09:52   3   architecture?

09:52   4       A.   You know, so right in the middle, you know,

09:52   5   you see the label that says PCI local bus.  So

09:52   6   everything in that color, orange or so, is associated

09:52   7   with PCI local bus.

09:52   8       Q.   In this diagram, what is the main -- what is

09:52   9   the processor in this diagram?

09:52   10       A.   So the processor, you see that -- at the top

09:52   11   you called it -- it says Intel Pentium.  So that's a

09:52   12   central processor unit.  That's sort of the brain of

09:52   13   the computer.

09:52   14       Q.   Okay.  And underneath that, we see the words

09:52   15   "north bridge."

09:52   16           What is that?

09:52   17       A.   So north bridge is one of the components, a

09:53   18   very essential component for PCI local bus that takes

09:53   19   input from CPU in one form and translates that to

09:53   20   signals that are required by PCI local bus.  So it's

09:53   21   really a translator of CPU instructions to the

09:53   22   PCI-compliant, you know, transfers.

09:53   23       Q.   Okay.  And at the bottom of this diagram,

09:53   24   there's a box that says "south bridge."

09:53   25           What is that?

09:53  1      A.    So that is also -- usually south bridge is

09:53  2   another component in the system that has -- it has a

09:53  3   number of subsystems inside, and it interfaces to the

09:53  4   PCI local bus.  And it acts as a bridge between PCI

09:54  5   local bus and, you know, USB controller, your network

09:54  6   controller, your hard drive.

09:54  7            So it again translates from PCI local bus

09:54  8   transactions into something that your output devices

09:54  9   can use.

09:54  10     Q.    And you've mentioned PCI local bus.

09:54  11           What is that at a high level?

09:54  12     A.    PCI local bus is sort of your main highway, if

09:54  13   you would, that -- it's a parallel bus or an

09:54  14   interconnect where each of the devices can talk to it.

09:54  15   So your graphics, your south bridge, your add-in cards,

09:54  16   everything talks to each other via that interconnect.

09:54  17     Q.    And on this PCI local bus on the right, it

09:54  18   says:  PCI local bus slots.

09:54  19           What are those?

09:54  20     A.    So certain things are -- you know, when you

09:54  21   buy a computer, there are certain things that are

09:54  22   already built in, but if you wanted to customize it.

09:54  23   And this is mainly true for your desktop computer.  If

09:55  24   you want to change the graphics controller or a network

09:55  25   card, after you bought the computer, you can buy a card

—734—

09:55  1    and plug it in.

09:55  2        Q.    Now, the jury throughout this trial has heard

09:55  3    the terms "PCI configurations," "software model."

09:55  4            Can you describe what that means?

09:55  5        A.    Yeah.    So, you know, when IBM first

09:55  6    developed -- historical perspective would help, I

09:55  7    think.

09:55  8            So when IBM first developed the computer,

09:55  9    there was no way for software to know what hardware was

09:55  10   there, and there was no way for hardware to know what

09:55  11   software was there.

09:55  12           So some smart computer guy would have to know

09:55  13   the right version of the hardware and the software and

09:55  14   make sure everything was loaded in the computer.    And

09:55  15   that's what created a lot of headaches for users.    You

09:55  16   need an IT guy to fix this thing.

09:55  17           So when we were doing USB and even PCI local

09:55  18   bus, we thought that it would be nice to develop a

09:56  19   technology that would automatically configure the

09:56  20   computer.    That means any information that needs to be

09:56  21   sent from hardware to software is sent, and any

09:56  22   information that software needs to know is available

09:56  23   from hardware.

09:56  24           So that's what is called software model

09:56  25   because all it means is that a computer manufacturer

| | | |
|---|---|---|
| 09:56 | 1 | would configure the system, and they would put all this |
| 09:56 | 2 | information that software needs to know in one place. |
| 09:56 | 3 | It's called config space. |
| 09:56 | 4 | It's like you have a home address.  You build |
| 09:56 | 5 | a home.  And then you put a house number.  And now you |
| 09:56 | 6 | have a street address and ZIP code and all those things |
| 09:56 | 7 | associated with that address. |
| 09:56 | 8 | So configuration space is something like that. |
| 09:56 | 9 | Each device of a computer has a unique set of |
| 09:56 | 10 | information associated with it because -- and no |
| 09:56 | 11 | device -- two devices can have the same address. |
| 09:57 | 12 | Otherwise, you know, information ends up in the wrong |
| 09:57 | 13 | place and you have chaos. |
| 09:57 | 14 | So software model is basically a process of |
| 09:57 | 15 | assigning some resources in the computer that are |
| 09:57 | 16 | necessary for computer to function and a way to |
| 09:57 | 17 | communicate that information to the software so that |
| 09:57 | 18 | even in software, there are a bunch of building blocks |
| 09:57 | 19 | that they need to configure. |
| 09:57 | 20 | So say, for example, you have a graphic |
| 09:57 | 21 | controller from IBM.  So you'd need a corresponding |
| 09:57 | 22 | software that -- from IBM that can talk to the graphic |
| 09:57 | 23 | controller.  And every subsystem has that. |
| 09:57 | 24 | So the software model is basically a process. |
| 09:57 | 25 | And this all happens before you can start using the |

736

09:57  1    computer.  You know when your computer boots, all this

09:57  2    stuff is done for you.  That used to be users'

09:58  3    headache.  By creating this new technology, we created

09:58  4    this software model.

09:58  5        Q.   Okay.  Let's take it step by step, okay?

09:58  6             In the PCI local bus architecture that we're

09:58  7    depicting here, let's say I have a computer and it's up

09:58  8    and running.  So I turned it on.  Okay?  And let's say

09:58  9    I wanted to use that computer to display graphics on

09:58  10   the screen.  Okay?

09:58  11            What's the first step in the product for PCI

09:58  12   local bus?

09:58  13       A.   So say you want to put some picture on the

09:58  14   screen.  So software instructions are already loaded in

09:58  15   a -- inside your computer.  It's already ready.  The

09:58  16   function of processor is to process instructions.

09:58  17   There is software.  And it creates a CPU transaction

09:58  18   for graphics.

09:58  19            So CPU says, please, you know, graphics

09:59  20   controller, print this.  Do this on the screen.

09:59  21       Q.   Okay.  At this point, is there any transaction

09:59  22   that's created for the PCI local bus?

09:59  23       A.   No.  So far it's just a CPU that executed

09:59  24   instruction and said -- so there's a CPU transaction

09:59  25   done on a CPU bus or CPU interface here.

—737—

09:59  1        Q.    What's the second step?

09:59  2        A.    The second step is -- so the north bridge from

09:59  3    CPU, it gets this instruction that says, please send

09:59  4    something to graphics.  So the north bridge is the one

09:59  5    in this case that talks to the graphics.  So north

09:59  6    bridge has to translate the information that it

09:59  7    obtained from the CPU in the form that PCI local bus

09:59  8    device can understand.

09:59  9        Q.    And does the north bridge create that PCI

09:59  10   local bus transaction?

09:59  11       A.    Exactly.  The role of the north bridge is to

10:00  12   primarily translate what came from CPU.

10:00  13       Q.    Does the operating system in the computer play

10:00  14   any part in that process?

10:00  15       A.    This is all hardware functionality at this

10:00  16   point.  Once the CPU generates the transaction, there

10:00  17   are waveforms in the system, and it is -- this

10:00  18   functionality is offloaded to the hardware.

10:00  19       Q.    Okay.  What is the third step?

10:00  20       A.    So the third step is the way -- so north

10:00  21   bridge took the instruction.  It says, you know, here's

10:00  22   the CPU address and data and control.  It takes all

10:00  23   those things, and it really translates and broadcasts

10:00  24   that information on PCI local bus.  Because that's how

10:00  25   the PCI local bus works.

738

10:00    1        All the devices, it's like, you know, you have

10:00    2    a street where all the houses are there.  An ice cream

10:00    3    truck comes in.  It starts announcing, hey.  Everybody

10:00    4    listen.  So this -- you know, the information is

10:00    5    broadcast.

10:00    6        Q.    And what is the fourth step?

10:01    7        A.    So the fourth -- so now everybody is listening

10:01    8    and they're saying, is this for me?  And everybody that

10:01    9    is not graphics rejects this thing and says, oh, this

10:01   10    is not for me.

10:01   11        But graphics says, oh, you want to put

10:01   12    something on the screen, so this must be for me.  So it

10:01   13    claims that transaction.  And it takes appropriate

10:01   14    action at that point.

10:01   15        Q.    Okay.

10:01   16            MS. MARRIOTT:  Permission to approach,

10:01   17    Your Honor, with an exhibit.

10:01   18            THE COURT:  Sure.

10:01   19            MS. MARRIOTT:  Thank you.

10:01   20    BY MS. MARRIOTT:

10:01   21        Q.    Now, Mr. Bhatt, I've just handed you what has

10:01   22    been marked as Defendants' Exhibit 1422.

10:01   23        Do you know what the components I have just

10:01   24    handed you are?

10:01   25        A.    Yeah.  I do.

739

10:01  1        Q.    And what are they?

10:01  2        A.    It is a slot.  It is usually found in the

10:01  3    motherboard, and this is an add-in card.

10:02  4        Q.    And what type of technology is the slot and

10:02  5    card?

10:02  6        A.    Oh, in looking at the size of the connector, I

10:02  7    recognize this.  This is a PCI local bus slot and card.

10:02  8        Q.    Thank you.

10:02  9                MS. MARRIOTT:  We move to admit.

10:02  10                MR. TAMKIN:  No objection.

10:02  11                THE COURT:  Admitted.

10:02  12                MS. MARRIOTT:  Thank you.

10:02  13    BY MS. MARRIOTT:

10:02  14        Q.    Now, using those physical components, the PCI

10:02  15    local bus slot and card, can you demonstrate to the

10:02  16    jury how they interface with each other?

10:02  17        A.    Yeah.  So this is just a small piece of

10:02  18    motherboard.  So this is a connector that you would

10:02  19    find.

10:02  20                So say that you bought a computer and it had

10:02  21    these three slots.  Now I bought this card, looks like

10:02  22    network card, Ethernet card.  That's all.  And you got

10:02  23    a new card, you open up your box, and you plug this

10:02  24    right there.

10:02  25                And then, you know, once you power up the

740

10:02  1    computer, you're ready to use it.

10:02  2        Q.    Are the pins that we see on this particular

10:03  3    connector similar to the pins that we saw on the USB

10:03  4    connector?

10:03  5        A.    No.  This is very different technology.  USB,

10:03  6    everybody knows.  Everybody uses it.

10:03  7        Q.    But there are pins on it?

10:03  8        A.    Yeah.  There are pins on it and quite a lot.

10:03  9        Q.    And how do the pins in the card relate to the

10:03  10   pins in the slot?

10:03  11       A.    Oh, there's a 1:1 correspondence.  For every

10:03  12   pin here, there is correspondence in there.

10:03  13       Q.    Okay.

10:03  14             MS. MARRIOTT:  Your Honor, would you mind

10:03  15   if we pass that for the jury?

10:03  16             THE COURT:  Sure.

10:03  17             MS. MARRIOTT:  Thank you.

10:03  18             Okay.  If we could pull up Joint

10:03  19   Exhibit 65, please.

10:03  20   BY MS. MARRIOTT:

10:03  21       Q.    Okay.  Mr. Bhatt, do you see what's marked as

10:04  22   J-65 on your screen?

10:04  23       A.    Yes.

10:04  24       Q.    Okay.  Do you recognize this document?

10:04  25       A.    This is a PCI local bus specification, Version

```
10:04   1   2.1.  It's a later version of original spec.
10:04   2       Q.    Okay.
10:04   3               MS. MARRIOTT:  Move to admit, Your Honor.
10:04   4               MR. TAMKIN:  No objection.
10:04   5               THE COURT:  Admitted.
10:04   6               MS. MARRIOTT:  Okay.  If we can publish
10:04   7   to the jury, we'll wait for that.
10:04   8   BY MS. MARRIOTT:
10:04   9       Q.    All right.  Now that the jury can see the
10:04  10   document, can you describe what this is?
10:04  11       A.    This is a specification that describes all the
10:04  12   necessary details of the technology.
10:04  13       Q.    For a PCI local bus?
10:04  14       A.    For the PCI local bus.  A very comprehensive
10:04  15   document, I must say.
10:04  16       Q.    Okay.
10:04  17               MS. MARRIOTT:  And if we go to the next
10:04  18   slide.
       19   BY MS. MARRIOTT:
10:04  20       Q.    On the right-hand side, at the bottom, see how
10:04  21   it's labeled Figure 2-1?
10:05  22       A.    Yes.
10:05  23       Q.    Is that from the PCI local bus specification
10:05  24   that we've been talking about?
10:05  25       A.    Yes.  This is -- this is information from the
```

742

10:05  1    spec, I believe.

10:05  2        Q.    Okay.  And what's depicted on the left-hand

10:05  3    side?

10:05  4        A.    On the left-hand side, you know, you have this

10:05  5    local bus slot that we just passed around.

10:05  6        Q.    Okay.  Now, what does this figure on the

10:05  7    right, this Figure 2-1 from the specification, tell us

10:05  8    about the pins in the slot that the jury has right now

10:05  9    and that's depicted on the left?

10:05  10        A.    So what is depicted here are -- is the

10:05  11    information that you need when you populate this

10:05  12    connector.  So it has all the signals necessary for

10:05  13    that connector.

10:05  14        Q.    How many pins are required to transmit PCI

10:05  15    local bus?

10:05  16        A.    So earlier you saw the card that I was using,

10:05  17    it must have 47 pins in it.  So that card has 47 pins

10:06  18    that are required.

10:06  19        Q.    And we have here highlighted that they're

10:06  20    required pins.

10:06  21              Do you see that on the screen?

10:06  22        A.    Yeah.

10:06  23        Q.    Why are there required pins?

10:06  24        A.    They're required because to do a PCI local

10:06  25    bus-compliant transaction, you must have this

743

10:06  1    functionality, or all the pins, that is supported via

10:06  2    those pins.

10:06  3         Q.   Would PCI local bus work without -- in the

10:06  4    absence of 47 pins?

10:06  5         A.   No.  You need all the signals to be compliant

10:06  6    with PCI local bus spec.

10:06  7         Q.   And now in the middle of the slide, it says:

10:06  8    PCI-compliant device.

10:06  9         Do you see that?

10:06  10        A.   Yes.

10:06  11        Q.   What is a PCI-compliant device?

10:06  12        A.   PCI-compliant device is a device that is built

10:06  13   according to the PCI local bus spec.  And once the

10:06  14   device is built, the governing body for this

10:07  15   specification actually runs compliance.

10:07  16        That means they bring component from ASUS and

10:07  17   different companies together.  So there -- there's two

10:07  18   unknown parties and you put them together, they must

10:07  19   function.  That way, you know, you as a user, when you

10:07  20   buy a component and take it home, or a card, it is

10:07  21   promised that it will work.

10:07  22        And that's what compliance means, that once

10:07  23   you buy a compliant device, it will work.

10:07  24        Q.   Now, of those 47 required PCI local bus pins,

10:07  25   how many of them are dedicated to sending and receiving

744

10:07  1    just the address and data part?

10:07  2        A.    So you see the top arrow that says AD zero to

10:07  3    31, they're both address and data.  And then there's

10:07  4    some control signals that are highlighted here as well.

10:07  5            And associated with that is information for --

10:08  6    when you send information, it must be correct.  And

10:08  7    there is a signal for that as well.

10:08  8        Q.    So how many of those pins are for address and

10:08  9    data bits?

10:08  10       A.    Address and data are 32.

10:08  11       Q.    Okay.  And if you don't have those 32 required

10:08  12   pins that we've been talking about, can there be

10:08  13   address and data in a PCI local bus architecture?

10:08  14       A.    I'm sorry.  I don't understand the question.

10:08  15       Q.    Sure.

10:08  16            If you don't have these 32 pins, can there be

10:08  17   address and data bits in a PCI local bus cycle?

10:08  18       A.    Yeah.  You must have all the address and data

10:08  19   bits to send information.

10:08  20       Q.    Okay.  How would you describe the protocol and

10:08  21   the signaling in PCI local bus?

10:08  22       A.    Yeah.  So PCI local bus was -- has monolithic

10:08  23   protocol and signaling.  So "protocol" means all the

10:08  24   rules that are required to send a transaction, and

10:08  25   "signaling" is the physical wires that carry those

745

10:09  1    signals that function according to the rules.

10:09  2           But they're monolithic, so they're

10:09  3    intertwined.  Changing one requires changing or can

10:09  4    impact other side and vice versa.

10:09  5    Q.    Now, on the right here, it's 3.3.2.  Is that

10:09  6    also from the PCI local bus specification?

10:09  7    A.    Yeah.  I think this is very simplified diagram

10:09  8    for one of the transactions.

10:09  9    Q.    Okay.  And the title is a Write Transaction?

10:09  10   A.    Yes.

10:09  11   Q.    What is the write transaction that is depicted

10:09  12   on the slide?

10:09  13   A.    So the write transaction in computer language

10:09  14   is CPU wants to store information.  Say you're a disc,

10:09  15   or a USB.  So when a transaction is sent from CPU side

10:09  16   to the disc drive or your USB device, the pin drive,

10:10  17   that's called write.

10:10  18   Q.    And on this slide, when you -- you've also --

10:10  19   you've already talked about the protocol and signaling

10:10  20   are intertwined, but what is protocol?

10:10  21   A.    So the protocol, you see -- protocol are the

10:10  22   rules for all these required signals to sort of be

10:10  23   present in certain state.  They have to be -- they have

10:10  24   to follow certain guidelines.

10:10  25          There's rules defined in the specification

10:10 1    that says that you have to send this information --

10:10 2    address information at certain time.  You have to send

10:10 3    data information after you receive certain signal.

10:10 4          So there's sequence of events that are defined

10:10 5    in the specification so that information can be

10:10 6    correctly, in this case, sent to disc drive.

10:10 7    Q.    What is the other part of this?  So what's

10:10 8    signaling?

10:10 9    A.    So the signaling, you see these labels on the

10:11 10   left-hand side, like CLK, frame, AD, C/BE, they all

10:11 11   correspond to group of signals that are actually

10:11 12   present, you know, on the connector or on the

10:11 13   motherboard.

10:11 14         So these are the individual signals there, and

10:11 15   they go between 0 volt to 5 volts.  So they go from low

10:11 16   to high.  So they change.

10:11 17         It's like you are turning on a switch and

10:11 18   light bulb goes on and off.  That's how a computer

10:11 19   works.  Signal goes up and down.  So -- and the rules

10:11 20   of how they exist in which phase, that's what is

10:11 21   depicted in protocol.

10:11 22   Q.    How does a PCI local bus cycle illustrate that

10:11 23   intertwined nature of the protocol and the signaling?

10:11 24   A.    Yeah.  So there are strict rules.  So at each

10:11 25   signal, certain things must happen to the address and

10:12    1    data and the control lines.

10:12    2           If you don't do it -- for example, if you

10:12    3    don't deliver the address when you need it, the bus

10:12    4    doesn't function.  Or if you don't get the data when

10:12    5    you want to send it and somebody doesn't take it, it

10:12    6    doesn't work.  It just malfunctions.

10:12    7           So you must follow rules.  It is like on a

10:12    8    highway.  If people, you know, start violating red

10:12    9    lights, then you have collisions and a mess happens.

10:12    10    Q.    Now, you mentioned -- you mentioned three

10:12    11    generations of internal communications standards.

10:12    12           How big of a decision was it to introduce a

10:12    13    new generation to replace PCI?

10:12    14    A.    This is very controversial decision when I

10:12    15    proposed this.  I would say Richter 10 when you look at

10:13    16    the earthquake, it's that big.  It was just a massive

10:13    17    controversy when I proposed this approach.

10:13    18    Q.    For PCI Express?

10:13    19    A.    For PCI Express.

10:13    20    Q.    Okay.  How did this impact you personally?

10:13    21    A.    Oh, this is -- like I said, it's probably one

10:13    22    of the most challenging assignments that I've ever

10:13    23    taken.  And I've done very challenging things, but this

10:13    24    was unlike anything else I had done.

10:13    25    Q.    Did you have to convince anyone at Intel to

748

10:13 1    proceed with the development?

10:13 2        A.    I had to convince almost everybody that I was

10:13 3    working with because some of the choices that I was

10:13 4    making and some of the problems I was highlighting,

10:13 5    they were very risky.  They were very challenging.

10:13 6            And there was a fair amount of disagreement, I

10:13 7    would say, among various business groups within Intel,

10:13 8    which had 100,000 people and, you know, billions of

10:13 9    dollars of business that was impacted by a major change

10:14 10   that I was proposing.

10:14 11           So to say the least, it was very

10:14 12   controversial.

10:14 13       Q.    Who did you have to make your case to at

10:14 14   Intel?

10:14 15       A.    When multiple parties are involved and each

10:14 16   very powerful and have multibillion-dollar business,

10:14 17   you have to go to the top of the chain.  And in this

10:14 18   case, it was the CEO and the president.

10:14 19       Q.    Okay.  Now, if we look at the timeline, this

10:14 20   is a timeline depicting the development of PCI Express

10:14 21   on the top?

10:14 22       A.    Yes.

10:14 23       Q.    Do you remember when you had this meeting with

10:14 24   the CEO/president of Intel?

10:14 25       A.    Yes.  It was early in December.  I think it

749

10:14  1    was 4th December.  Usually you go on a Christmas break.

10:14  2    I wanted to get -- if you're going to do this, I wanted

10:14  3    blessing from our CEO because he was the tiebreaker

10:14  4    vote.  And I have to stand in front of him and convince

10:15  5    him and his direct report that this is something we

10:15  6    should do.

10:15  7        Q.    And that was December in 2000?

10:15  8        A.    In 2000.  Yes.

10:15  9        Q.    Can you tell us just a little bit about that

10:15  10   meeting?

10:15  11       A.    So I went into it.  I knew people who build

10:15  12   computer servers, they didn't like this idea.  People

10:15  13   who build some of the laptops, they were quite

10:15  14   concerned about what I was proposing.  But the desktop

10:15  15   guys liked the idea.

10:15  16             So I went in and laid out the picture.  I

10:15  17   explained to them how this technology work in laptops

10:15  18   and desktops and servers and network devices.  So I had

10:15  19   a very comprehensive picture.  And I showed benefits.

10:15  20   I also showed them the risks and what -- and how we

10:16  21   would mitigate the risk.

10:16  22       Q.    Why did you need to go to the president and

10:16  23   CEO of Intel to make your case?

10:16  24       A.    This was such a big change.  We were going to

10:16  25   basically remove everything that was there, you know,

750

10:16   1   with PCI.  The proposal was forget about what we had in
10:16   2   PCI.  It's a new start.
10:16   3          Now, can you imagine, you know, last -- in
10:16   4   1999 we're building this desktop that was using PCI in
10:16   5   this graphics card that was sitting on a shelf.
10:16   6   Everybody knew how to use it.
10:16   7          Now you go in summer 2000.  All of a sudden
10:16   8   the PCI slot isn't there anymore, and there's a new
10:16   9   slot.  And anything new takes time to ramp up.  It's
10:16  10   not -- nothing happens overnight.
10:16  11          And if -- because there was a new technology,
10:16  12   if somebody didn't get it right, that means we could
10:17  13   not ship any of our components.  Our customers couldn't
10:17  14   ship any systems.
10:17  15          And that was a huge economic impact to not
10:17  16   only my employer but all industry.  And it was that --
10:17  17   because I was really asking them to forget about
10:17  18   everything we learned about PCI local bus.
10:17  19          And one last thing.  If you wanted to move
10:17  20   forward, you had to sort of remove this handcuff that
10:17  21   you had and just unshackle yourself and go forward.
10:17  22   Luckily, that is exactly what has happened.
10:17  23      Q.   Was PCI Express intended to be an open
10:17  24   standard, like what we discussed earlier?
10:17  25      A.   Yes.  From the very beginning, the

10:17  1   understanding was if you're building a highway, don't

10:17  2   put a toll booth.

10:17  3        Q.    And like USB, the development of USB, did you

10:17  4   have to bring others on board with you to help develop

10:17  5   the PCI Express technology?

10:17  6        A.    Absolutely.  This is, again, you know, based

10:18  7   on my experience and success with USB.  It was a known

10:18  8   model to us.

10:18  9          We valued -- we had initial ideas, but we

10:18  10  valued input from the rest of the industry.  Because

10:18  11  when you involve everybody, you have different points

10:18  12  of view that are included.  And if they buy into the

10:18  13  need for it and the requirement for it, then they

10:18  14  contribute to success of that.

10:18  15          And that's exactly what we did.  It was a very

10:18  16  cooperative effort.

10:18  17       Q.    What was the level of training or experience

10:18  18  of the folks on your team that worked to develop PCI

10:18  19  Express?

10:18  20       A.    So in this project, rookies need not apply.

10:18  21  These were some of the best of the best I found, and

10:18  22  the advantage of, you know, getting blessing from your

10:18  23  CEO is that you get a choice of the best engineers that

10:18  24  Intel had to offer, people who had been around the

10:18  25  block a number of times.

752

10:18  1         And similarly, we got some of the top leaders

10:18  2    from the industry.  They were leaders in their own

10:19  3    right within their own corporation, and they were as

10:19  4    influential or more in their own companies, so getting

10:19  5    a most influential IBM engineer or HP engineer or

10:19  6    Microsoft engineer was a must have.

10:19  7         Q.    Now, in this industry working group that you

10:19  8    just described, what was the initial name of the

10:19  9    technology that you were developing?

10:19  10        A.    Yeah.  So usually, you know, the way this is

10:19  11   developed is before you start out in a big open forum,

10:19  12   you collect these -- you know, you have collection of

10:19  13   people together from different companies, and you give

10:19  14   it a generic name.

10:19  15        So, you know, we're engineers, we don't know

10:19  16   how to name things.  So we just observed this thing.

10:19  17   1st Generation, second was PCI and its offshoots.  So

10:19  18   let's just call it a 3rd Generation and abbreviate it

10:19  19   by calling it 3GI.

10:19  20        Q.    And 3GIO stands for?

10:19  21        A.    3rd Generation I/O.  Nothing special.

10:20  22        Q.    How long did it take to develop the

10:20  23   specification for 3GIO?

10:20  24        A.    So, you know, if you count internal

10:20  25   investigation, it was much earlier than this 2000 date.

753

10:20  1    Because before you take up anybody's time, you have to

10:20  2    convince yourself and do other experiments.  So it was

10:20  3    done way before that.

10:20  4           But with industry, we started -- right after I

10:20  5    got approval from our CEO in 2000, we started engaging

10:20  6    with other industry players.

10:20  7    Q.    When was the first PCI Express base

10:20  8    specification released?

10:20  9    A.    In February of 2002.  So a good two years of

10:20  10   solid work.

10:20  11   Q.    Okay.  And it looks like here between February

10:20  12   and July of 2002, the name changed from 3GIO to PCI

10:20  13   Express; is that correct?

10:20  14   A.    Yes.

10:21  15   Q.    Why is that?

10:21  16   A.    Well, this always happens.  So first, we had

10:21  17   this small group called Promoter and Key Developer

10:21  18   Group.  It was -- it was -- you know, we had invited

10:21  19   all these people to work with us.  And the only

10:21  20   understanding was that this is going to be an open

10:21  21   standard.

10:21  22          But once the standard is done, you don't want

10:21  23   any one company controlling the standard.  You want to

10:21  24   go to something nonprofit, somebody who knows how to

10:21  25   publish a spec, take questions and inquiries, run

754

10:21    1    compliance for a job.  So that body was PCI-SIG which

10:21    2    we had formed in order to administer PCI local bus.

10:21    3        Q.    So why was the name changed to PCI Express?

10:21    4        A.    So the name was changed because, you know, now

10:21    5    we're going to this form called PCI-SIG.  SIG stands

10:21    6    for special interest group.  And the word PCI was well

10:22    7    known by then.

10:22    8              So the request was the technology is 3GIO, but

10:22    9    can we someone get word PCI in?  So even though it was

10:22   10    completely different, they wanted to get this word in,

10:22   11    PCI.

10:22   12              But then the -- by calling it "express," that

10:22   13    means a super fast version of it.

10:22   14              He said, fine.  It's a good compromise.

10:22   15        Q.    Was it just a branding exercise?

10:22   16        A.    It is really branding.  It's a marketing

10:22   17    exercise.  The technology is still at 3GI.

10:22   18        Q.    Does the fact that PCI Express used the

10:22   19    letters PCI in the name of it mean that the technology

10:22   20    is the same as PCI local bus?

10:22   21        A.    No.  Like I said, we wanted to get rid of PCI

10:22   22    local bus because it had served its purpose and would

10:22   23    be inconvenient to take it forward.  We couldn't extend

10:22   24    it any further.

10:22   25        Q.    What was the investment in the PCI Express

10:22  1    technology in terms of the number of people and the

10:23  2    amount of work involved to develop it?

10:23  3        A.    So when I started, within Intel, you know, my

10:23  4    closest direct reports, people who worked with me

10:23  5    around the clock, about 20 of very, very capable

10:23  6    people.

10:23  7            And then there are about 50 people from

10:23  8    different divisions because approach was, you know,

10:23  9    inform them as you go, get their input so the

10:23  10   technology is very implementable.

10:23  11           So about 70 guys just at Intel, and probably

10:23  12   200 people from throughout the industry reviewing every

10:23  13   major version of the specification and giving us input.

10:23  14               MS. MARRIOTT:  If we can look at Exhibit

10:23  15   J-20.

10:23  16   BY MS. MARRIOTT:

10:23  17       Q.    So the jury has heard in this trial that the

10:23  18   ASUS laptop and desktop that are at issue, that they

10:24  19   use PCI Express Version 3.

10:24  20           What are we seeing on the screen?

10:24  21       A.    So this is a later version of the spec that

10:24  22   was published in 2010.  So it's PCI Express 3.0

10:24  23   specification.

10:24  24       Q.    And is this the specification for PCI Express

10:24  25   Version 3?

756

10:24  1       A.    Yes.

10:24  2       Q.    And this specification is, by my count,

10:24  3  860 pages long?

10:24  4       A.    Yeah.  By this time, a lot -- you know, the

10:24  5  complexity went up and a lot more information needed to

10:24  6  be provided, I guess.

10:24  7       Q.    Is that why it's so long?

10:24  8       A.    It is.  Because the specifications have

10:24  9  exquisite details of the technology because you have to

10:24  10  assume that somebody just takes this specification and

10:24  11  develops a very complex product without anybody hand

10:24  12  holding.  So this is the way -- so it defines every

10:24  13  aspect of the technology.

10:24  14            MS. MARRIOTT:  If we can go back to the

10:24  15  slides?

10:24  16  BY MS. MARRIOTT:

10:25  17       Q.    How does PCI Express compare with the PCI

10:25  18  local bus architecture that we looked at earlier?

10:25  19       A.    So PCI Express is a completely different

10:25  20  technology.  We got rid of the -- you know, on the

10:25  21  other one, I was talking about this highway with

10:25  22  multiple lanes, and you had this -- everybody was

10:25  23  listening to broadcast.  This is very different.  Here,

10:25  24  you only go from one point to another point.

10:25  25            So all the components are connected to each

—757—

```
10:25   1    other through just one port.  Nothing is shared.  It
10:25   2    just goes from one point to another point.  So it is
10:25   3    not a shared technology, this point to point.
10:25   4        Q.   Is there anything the same about PCI Express
10:25   5    and PCI local bus?
10:25   6        A.   No.  It is completely changed here.
10:25   7        Q.   Was there anything about the PCI Express
10:25   8    architecture that you kept the same?
10:25   9        A.   The only thing we kept the same was the PCI
10:26  10    config model.  And by this time, you know -- actually,
10:26  11    at the time of PCI, this config -- even though it says
10:26  12    PCI config space, it was a system config space.
10:26  13            So that's the only thing.  It's -- the thing I
10:26  14    told you about, you know, it's like your home address.
10:26  15    All the information is there.  So we kept that there
10:26  16    because it didn't need to change.  You know, you go
10:26  17    from UPS to USPS to, say, Amazon.  You don't change
10:26  18    your home address.  So there was no need to change
10:26  19    that.  So we kept that.
10:26  20        Q.   And is that concept that you were just
10:26  21    describing, the PCI config space, is that the same
10:26  22    thing as software compatibility?
10:26  23        A.   No.  Software -- software compatibility is not
10:26  24    the word that you should use.  It's once you can
10:26  25    identify what components are there using -- you know, I
```

758

10:26   1   would call it a system, you know, the PCI software

10:26   2   model.  That's the appropriate word to use, software

10:27   3   model.

10:27   4       Q.   Why did you keep that software model or

10:27   5   configuration the same?

10:27   6       A.   Because we knew how to communicate information

10:27   7   between hardware and software.  There's no new thing

10:27   8   you're going to do.

10:27   9            So we took what we had.  And then only thing

10:27  10   we did with that configuration model was to add some

10:27  11   more capabilities thinking that, you know, ten years

10:27  12   down the road, if you needed to do something more,

10:27  13   let's just have extended config space.

10:27  14            But we basically kept the same.  And that's

10:27  15   why the word "model," even though the implementation

10:27  16   may be different, and it looks like that.

10:27  17       Q.   Now, let's walk through this just like we did

10:27  18   with PCI local bus.  And again, say that I have my

10:27  19   computer and I've started it up, it's running, and I

10:27  20   want to use that computer to display graphics on the

10:27  21   screen.

10:27  22            What's the first step in PCI Express?

10:27  23       A.   So the first step is quite identical to the

10:28  24   first step in PCI local bus where CPU runs

10:28  25   instructions.  As a result, there is -- on the CPU

759

10:28   1   interface, there is information sent in form of

10:28   2   hardware signals.

10:28   3              Now, in this case, you don't have a bridge.

10:28   4   You don't have a north bridge.  PCI Express being a new

10:28   5   architecture defined something new called root complex.

10:28   6              Because things are so -- organized differently

10:28   7   inside, it's point-to-point connect.  Everything goes

10:28   8   into the root complex.

10:28   9              And the role of the root complex is to take

10:28   10  cycles from CPU interface and translates them to --

10:28   11  translate them to something PCI Express devices can

10:28   12  understand, which are different than PCI local bus

10:28   13  devices.

10:28   14     Q.    Okay.  If we can break that down just a little

10:28   15  bit.

10:28   16             How does the CPU instruction that you just

10:28   17  described in the PCI Express system compare to the CPU

10:29   18  instruction that was in the PCI local bus?

10:29   19     A.    So that part is identical.  Nothing has

10:29   20  changed there.

10:29   21     Q.    And at the time that the CPU issues that

10:29   22  instruction, has the PCI Express transaction been

10:29   23  created yet?

10:29   24     A.    No.  Not yet.  To create a PCI Express

10:29   25  transaction to use, we have to wait for root complex.

760

10:29  1      Q.    Okay.  So then what's the second step?

10:29  2      A.    So the second step is the input comes into

10:29  3   root complex.  It looks at it.  And now in this case,

10:29  4   the PCI Express transactions are different.  PCI local

10:29  5   bus is parallel.  Here it is -- you form into packet.

10:29  6           So the unit of information that is sent in PCI

10:29  7   Express is in completely different form.  It is much

10:29  8   more information than PCI local bus had, even in terms

10:30  9   of quantity.

10:30  10          In PCI local bus, you send 32 bits of

10:30  11  information at once.  Here, you could send thousands of

10:30  12  bits all at once.  So it's really different approach.

10:30  13  You assemble all these different pieces of information

10:30  14  and then send.

10:30  15     Q.    And on this diagram, there are the depiction

10:30  16  of some envelopes and letters.

10:30  17          Do you see that?

10:30  18     A.    Yes.

10:30  19     Q.    Why are they there?

10:30  20     A.    So they are there because the transformation

10:30  21  that happens is very different, as I said.  You create

10:30  22  packets of information.  Instead of bits of

10:30  23  information, you create packets of information.

10:30  24     Q.    Does the operating system of a computer create

10:30  25  a PCI Express transaction?

10:30  1      A.   Operating -- see, in all these computers, your

10:30  2  computers -- see, software doesn't know hardware.  It

10:30  3  just knows the instructions.  It has no knowledge of

10:30  4  how the signals are created.  They're completely

10:31  5  decoupled.  That is left to all the hardware guys and

10:31  6  all the chips that you have.

10:31  7      Q.   So does the hardware -- or strike that.

10:31  8           Does the operating system create the PCI

10:31  9  Express transaction?

10:31  10     A.   No.  If operating system did that, your

10:31  11  computers would be very, very slow.  It just doesn't

10:31  12  work that way.

10:31  13     Q.   Is the PCI Express transaction created from a

10:31  14  PCI local bus cycle, the technology we talked about

10:31  15  previously?

10:31  16     A.   No.  In this picture, there's no PCI local

10:31  17  bus, because you start with a CPU and not PCI local

10:31  18  bus.  If you -- if somebody suggested that you have to

10:31  19  use PCI local bus, which runs very slow, it would be

10:31  20  like, you know, putting -- on a very high-speed road

10:31  21  putting a big speed bump.  It doesn't work that way.

10:31  22     Q.   Are PCI Express transactions interchangeable

10:31  23  with PCI local bus?

10:31  24     A.   No.  There's nothing common.  They're in two.

10:32  25  Separate.

762

10:32  1       Q.    So let's -- what's the next step in a PCI

10:32  2  Express architecture?  What's the third step?

10:32  3       A.    So in this case, root complex took the

10:32  4  information, as you saw, created bundles.  And now that

10:32  5  bundle of information -- it's sort of broadcast in the

10:32  6  previous case -- it is directed.  It only goes to the

10:32  7  device or its intended destination.  Here, it is

10:32  8  graphics.

10:32  9       Everybody else doesn't know that this is

10:32  10 happening, and it ends up in graphics.  And graphics

10:32  11 is -- receives it.

10:32  12      Q.    How does that compare to what we saw in the

10:32  13 PCI local bus?

10:32  14      A.    It is -- like I said, in previous case, you

10:32  15 were broadcasting things.  Here, you're directing it to

10:32  16 just one point.

10:32  17      Q.    And what's the fourth step in PCI Express?

10:32  18      A.    Yeah.  The fourth step is sort of identical.

10:32  19 The information is now received by graphics, and it

10:32  20 does exactly what it would have done in the previous

10:33  21 case, in this case put picture on the screen.  What

10:33  22 changed here is the middle, the way we delivered

10:33  23 things.

10:33  24      Q.    Okay.  Now, where in this PCI Express process

10:33  25 that you just described is there a PCI local bus cycle?

763

10:33  1     A.    There's no PCI local bus cycle in this

10:33  2  picture.

10:33  3     Q.    Are you familiar with the phrase "address and

10:33  4  data" of a PCI local bus?

10:33  5     A.    Yes.

10:33  6     Q.    Okay.  Where in this process is our address

10:33  7  and data bits of PCI local bus?

10:33  8     A.    PCI local bus isn't there.  The address and

10:33  9  data are not there.

10:33  10    Q.    Are you familiar with the concept of a bus

10:33  11  bridge?

10:33  12    A.    Yes.  I am.

10:33  13    Q.    Okay.  Is PCI Express a bus bridge?

10:33  14    A.    PCI Express is not a bus bridge.

10:33  15    Q.    How would you describe the relationship

10:33  16  between PCI local bus and PCI Express?

10:33  17    A.    Other than name PCI, which is branding,

10:34  18  nothing.

10:34  19    Q.    In PCI Express, is there ever a conversion of

10:34  20  a transaction created by PCI local bus?

10:34  21    A.    Oh, Heavens, no.  It would be very, very slow.

10:34  22  It could work -- I don't think it would work.  Because

10:34  23  PCI Express has so many advanced capabilities and so

10:34  24  much functionality, I don't even -- I don't even want

10:34  25  to go into that.

```
10:34    1         Q.    Does software compatibility or PCI
10:34    2   configuration space, does that mean that there is a PCI
10:34    3   local bus cycle in the PCI Express system?
10:34    4         A.    I'm sorry?  I don't understand the question.
10:34    5         Q.    Sure.
10:34    6               Does software compatibility mean that there is
10:34    7   a PCI local bus transaction in this PCI Express
10:34    8   architecture?
10:34    9         A.    No.
10:34   10         Q.    Okay.  Does the software compatibility have
10:34   11   anything to do at all with the type of transaction
10:35   12   that's being created by the system?
10:35   13         A.    Software doesn't know transactions.
10:35   14         Q.    So no?
10:35   15         A.    No.
10:35   16         Q.    If we look at the PCI -- the physical PCI
10:35   17   Express hardware -- actually, let's do that.
10:35   18               MS. MARRIOTT:  Okay.  Permission to
10:35   19   approach, Your Honor?
10:35   20   BY MS. MARRIOTT:
10:35   21         Q.    I've handed you what's been marked as
10:35   22   Defendants' Exhibit 1423.
10:35   23               Do you know what the components I've just
10:35   24   handed you are?
10:35   25         A.    Yes.
```

10:35  1      Q.    What are they?

10:35  2      A.    This is a PCI Express slot, and this is PCI

10:35  3  Express add-in card.

10:35  4            MS. MARRIOTT:  Move to admit.

10:35  5            MR. TAMKIN:  No objection.

10:35  6            THE COURT:  Admitted.

10:35  7  BY MS. MARRIOTT:

10:35  8      Q.    If we look at the components in your hand for

10:36  9  PCI Express, the hardware, how does it compare with the

10:36  10  components that you talked about earlier for PCI local

10:36  11  bus?

10:36  12      A.    Well, what's interesting, this card has the

10:36  13  same functionality as that add-in card.  But see how

10:36  14  small it is?  And see this connector, how small it is?

10:36  15            It just has very few wires.  And even though

10:36  16  this has more capability, there's hardly anything

10:36  17  there.  And that's the beauty of PCI Express.

10:36  18      Q.    And using those physical components, can you

10:36  19  demonstrate for the jury how they connect to each

10:36  20  other?

10:36  21      A.    Yeah.  Just like before, it only goes one way.

10:36  22  Snaps in.  So when you get it, you can play with it.

10:36  23  But it's a very small card.  It takes a lot less room.

10:36  24      Q.    How does the PCI local bus slot physically

10:36  25  compare to the PCI Express slot?

766

10:36  1       A.    Oh, it's significantly smaller, as you can see

10:36  2    from the --

10:36  3       Q.    Okay.

       4              MS. MARRIOTT:  We can go to the next

10:36  5    slide.

10:36  6       A.    Even smaller.

10:36  7    BY MS. MARRIOTT:

10:36  8       Q.    Now, on the screen, we have the PCI local bus

10:37  9    slot depicted on the left and the PCI Express slot on

10:37  10   the right.

10:37  11             Is this depiction to scale?

10:37  12      A.    Yeah.  You can actually put it side-by-side

10:37  13   and see the size difference.

10:37  14      Q.    Yeah.

10:37  15             And how do they physically compare to each

10:37  16   other?

10:37  17      A.    This is much smaller, of course.

10:37  18      Q.    Are there -- and, you know, we're depicting

10:37  19   this on the screen.

10:37  20             Are there other sizes of PCI Express slots and

10:37  21   cards?

10:37  22      A.    There are.  The PCI Express -- you know, PCI

10:37  23   local bus is just one connector that -- because it only

10:37  24   supports certain functionality, this one is very

       25   scalable.

```
10:37    1           So, for example, this card needs just few
10:37    2    bits.  It uses a smaller size connector.  A graphics or
10:37    3    very high-end server could use a bigger connector.
10:37    4    It's very scalable.
10:37    5              MS. MARRIOTT:  Permission to pass that
10:37    6    exhibit around to the jury, Your Honor?
10:37    7       A.    Do play with it.  It's very interesting.  You
10:37    8    can probably pass both of them side-by-side.
10:38    9    BY MS. MARRIOTT:
10:38   10       Q.    Would it be possible to use a PCI local bus
10:38   11    card with the PCI Express slot?
10:38   12       A.    No.
10:38   13       Q.    Why not?
10:38   14       A.    It won't fit if you try it.  It won't fit.
10:38   15       Q.    How about the opposite?  Would it be possible
10:38   16    to use a PCI Express card with a PCI local bus slot?
10:38   17       A.    No.  They're very different technology.  It's
10:38   18    like -- you know how you plug in a highly technical
10:38   19    device in your 240-volt plug, you'll create a
10:38   20    fireworks.
10:38   21       Q.    So if you plugged PCI Express card into a PCI
10:38   22    local bus slot, it would start a fire?
10:38   23       A.    Well, if it is a working system, yeah.  Don't
10:38   24    do it.  Even professionals don't do it.
10:38   25       Q.    Why not?
```

768

```
10:38   1        A.    Because they are very different technology.
10:38   2    One is a single-ended technology, and then one is a
10:38   3    differential technologies.  They're different signals.
10:39   4             You know, if your electrician wrongly wired
10:39   5    things and then you have poof.  So it's very different,
10:39   6    and it is intended to be different.
10:39   7        Q.    Why didn't you just include the PCI local bus
10:39   8    slot with PCI Express like you did with USB?
10:39   9        A.    You know, we were just moving -- there was no
10:39   10   value to gain for PCI and forward.  In middle
10:39   11   throughout -- you know, up to late '90s, we extended
10:39   12   PCI a few times.  There were different versions of PCI.
10:39   13   We tried to be as creative as we could with different
10:39   14   versions of it.  There were, like, five or six
10:39   15   different versions that were created.
10:39   16            It had reached end of the line.  It was --
10:39   17   economically, it was no way to do it.  Technically, it
10:39   18   was not really advantageous.  So we had to make a clean
10:40   19   break to sort of move forward, and that's exactly what
10:40   20   has happened.
10:40   21       Q.    How does -- you know, we talked about protocol
10:40   22   and signaling with PCI local bus.
10:40   23            Do you recall that?
10:40   24       A.    Yes.
10:40   25       Q.    How does the protocol and signaling and PCI
```

769

10:40  1    Express compare to the protocol and signaling approach

10:40  2    in PCI local bus?

10:40  3         A.   So my team and I knew PCI local bus

10:40  4    intimately.  We had all worked on the technology.  We

10:40  5    knew the strengths and weaknesses.  But one of the

10:40  6    biggest point was PCI local bus was that it was

10:40  7    monolithic.  It had very limited degree of freedom in

10:40  8    changing, you know, signaling and protocol.  We tried

10:40  9    different ways.  Didn't work.

10:40  10        When we defined PCI Express, one of the

10:40  11   controversial part was to arrange it such that we

10:41  12   separate out protocol and signaling and actually some

10:41  13   other elements of the technology with a view that, in

10:41  14   time, computer chips get faster, silicon technology

10:41  15   gets better.  So we want to have as advanced signaling

10:41  16   as possible, so keep that separate.  Don't tie it with

10:41  17   protocol.

10:41  18        And over time, you have new users of things,

10:41  19   you want to extend protocol, develop it separately.  So

10:41  20   we started to develop these two things in -- you know,

10:41  21   simultaneously so that they can evolve even better in

10:41  22   the future.

10:41  23        So changing one wouldn't change anything else

10:41  24   on other and vice versa.  So that's the approach we

10:41  25   took.

770

10:41  1    Q.    Okay.  And what is this slide showing?

10:41  2    A.    Ah.  So this is one of the -- in I think Year

10:41  3  2001, when we did the first disclosure, because it was

10:41  4  a controversial decision, I had to go convince people.

10:42  5  What's the benefit of PCI Express?

10:42  6          Because first question people -- I mean,

10:42  7  people ask is, why don't you just take what you have

10:42  8  and use it or extend it?  So these are the examples of

10:42  9  how the technology was extended in various versions.

10:42  10          And you could see initial -- so PCI was

10:42  11  running at about one and a half megabits or million

10:42  12  bits per second.  And extreme right bar is the first

10:42  13  version of PCI Express that is running at 100 -- you

10:42  14  know, at 100 megabytes per second.  And so this is what

10:42  15  I have.  It's 100.  So it's more than 20 times faster.

10:42  16          So once people look at it and say, wow.  You

10:42  17  extended all these other versions, and they still don't

10:42  18  match up to your first version of PCI Express.  And

10:42  19  this is one of the biggest benefits that people saw,

10:43  20  that you suffer pain, there's a gain.  And here's the

10:43  21  quantification of the gain.

10:43  22    Q.    Okay.  Why was PCI Express able to achieve the

10:43  23  speed that it was able to achieve?

10:43  24    A.    Yeah.  So this is sort of a graph that depicts

10:43  25  from early days of PCI local bus to sort of, I guess,

10:43  1    in this case, 2021 version of PCI Express.

10:43  2              And as you can see the graph, the

10:43  3    performance -- on the left-hand side, you see the

10:43  4    transfer rates, how fast things are going.  So you see

10:43  5    continued evolution of the technology.

10:43  6              So you saw PCI go from 1992 to 2002.  Here you

10:43  7    see nearly flat line.  It's improved just slowly.  But

10:43  8    then you'll see this astronomical jump in performance.

10:43  9              And this is possible because of the choices we

10:44  10   made, i.e., you know, layer architecture, serial

10:44  11   differential technology and all.

10:44  12     Q.    Would it be fair to say that PCI Express is

10:44  13   just a serialized version of PCI local bus?

10:44  14     A.    Oh, no, no, no.  Not at all.

10:44  15     Q.    Why not?

10:44  16     A.    Because that's not what it is.  You

10:44  17   couldn't -- say, for example, you have a six-inch pipe

       18   and you're trying to --

       19              (Clarification by Reporter.)

10:44  20     A.    Imagine you have a six-inch pipe and you're

10:44  21   trying to put some water through there.  The rate of

10:44  22   water trickling in is very low.  What you would get at

10:44  23   the other end would be a trickle.

10:44  24              PCI Express is a big hose.  It needs much

10:44  25   faster data, and that only comes from CPU.  Because in

10:44  1   this time, you know, PCI Express has gone faster.  CPUs

10:45  2   has become even faster than this.  So what comes in

10:45  3   there is much faster rate of information.

10:45  4       Q.   Did you ever -- during the development of PCI

10:45  5   Express, did you ever consider just converting PCI

10:45  6   local bus into PCI Express?

10:45  7       A.   No.  Because you saw in the previous diagram,

10:45  8   you saw all the attempts that we made in improving PCI

10:45  9   or six terms of the technology.  It couldn't be done.

10:45  10          And that's why, as I told you earlier, that

10:45  11  this was a risky and controversial decision.  If this

10:45  12  technology didn't work, I would be totally unemployed

10:45  13  forever and ever because it was a big risk.

10:45  14          And that's why it required tremendous amount

10:45  15  of talent and rigor and precision and creativity and on

10:45  16  and on.  This was probably the most challenging thing

10:46  17  I've done in my professional career.

10:46  18      Q.   Do today's Intel chips support that old PCI

10:46  19  local bus technology?

10:46  20      A.   PCI local bus technology cannot be supported

10:46  21  because the physics of the new silicon technology is

10:46  22  such that they -- it's very difficult or uneconomical

10:46  23  to support that high voltage and...

10:46  24              THE COURT:  Counsel, about how much time

10:46  25  do you have left with him?

—773—

| | | |
|---|---|---|
| 10:46 | 1 | MS. MARRIOTT:  Two more questions. |
| 10:46 | 2 | THE COURT:  There you go. |
| 10:46 | 3 | MS. MARRIOTT:  Thank you, Your Honor. |
| 10:46 | 4 | BY MS. MARRIOTT: |
| 10:46 | 5 | Q.    Okay.  Mr. Bhatt, did you secure any patents |
| 10:46 | 6 | on PCI Express technology? |
| 10:46 | 7 | A.    Yeah.  Most of my 132 patents are for PCI |
| 10:46 | 8 | Express, and this is -- one day I just laid them out on |
| 10:46 | 9 | a dining table and this is just a small subset of it. |
| 10:46 | 10 | Q.    Was it easy for you and your team to develop |
| 10:46 | 11 | PCI Express? |
| 10:46 | 12 | A.    Easy is not the word.  You can use a lot of |
| 10:47 | 13 | other words.  Easy is not the word.  But it was |
| 10:47 | 14 | thrilling.  It was exciting. |
| 10:47 | 15 | You know, now that I'm retired, I'm looking |
| 10:47 | 16 | back at my engineering career.  And as I reminisce, the |
| 10:47 | 17 | thought that comes to mind is that I was given an |
| 10:47 | 18 | opportunity to develop this technology, and I left |
| 10:47 | 19 | computer industry in better shape than I found it. |
| 10:47 | 20 | Just like USB, PCI Express is -- you know, has |
| 10:47 | 21 | made profound difference to computer industry.  You |
| 10:47 | 22 | cannot build a computer today without this technology. |
| 10:47 | 23 | So this is my American dream. |
| 10:47 | 24 | This is -- you know, I was given the |
| 10:47 | 25 | opportunity to make a difference and I made it.  And |

774

| 10:48 | 1 | I'm very thankful for the opportunity. |

10:48  1    I'm very thankful for the opportunity.

10:48  2       Q.    Thank you, Mr. Bhatt.

10:48  3       A.    Thank you.

10:48  4            MS. MARRIOTT:  Pass the witness.

10:48  5            THE COURT:  Let's take our morning

10:48  6    recess.  Please remember my instructions.  We'll be

10:48  7    back in 10 or 15 minutes.

10:48  8            THE BAILIFF:  All rise.

10:48  9            (Jury exited the courtroom.)

10:48  10           THE COURT:  You may be seated.

10:48  11           Is there anything we need to take up?

10:48  12           MR. BURESH:  Not for us, Your Honor.

10:48  13           MR. TAMKIN:  No, Your Honor.

10:48  14           THE COURT:  Who will follow -- will your

10:48  15    technical expert be next?

10:48  16           MR. BURESH:  Can I let you know after

10:48  17    break?  See where we're at on the slide changes?

10:48  18           THE COURT:  Oh, oh.

10:48  19           MR. BURESH:  We may need to change the

10:48  20    order.

10:48  21           THE COURT:  Oh, sure.

10:48  22           Who all do we have -- I'm just trying to

10:48  23    figure out for the day.  Who all do we have today?

10:49  24           MR. BURESH:  Sure.  We have two more

10:49  25    experts, Dr. Edwards and Mr. Mike Newell on the damages

775

| | | |
|---|---|---|
| 10:49 | 1 | side. |
| 10:49 | 2 | THE COURT:  And then you're done? |
| 10:49 | 3 | MR. BURESH:  And then we're done. |
| 10:49 | 4 | THE COURT:  Oh, gosh.  Okay.  Very good. |
| 10:49 | 5 | So let's plan then on -- and you will |
| 10:49 | 6 | have -- you're putting on a validity case -- |
| 10:49 | 7 | invalidity? |
| 10:49 | 8 | MR. BURESH:  It'll be part of |
| 10:49 | 9 | Dr. Edwards' presentation. |
| 10:49 | 10 | THE COURT:  Y'all will have a rebuttal on |
| 10:49 | 11 | validity? |
| 10:49 | 12 | MR. HALES:  That's right, Your Honor. |
| 10:49 | 13 | THE COURT:  Okay.  So we won't finish |
| 10:49 | 14 | today, but we'll likely finish tomorrow, it looks like. |
| 10:49 | 15 | So let's plan on doing the jury charge |
| 10:49 | 16 | conference this afternoon.  And again, just whoever |
| 10:49 | 17 | wants to attend can.  And when we finish today -- this |
| 10:49 | 18 | doesn't need to be on the record. |
| 10:49 | 19 | (Off-the-record discussion.) |
| 10:50 | 20 | THE BAILIFF:  All rise. |
| 10:50 | 21 | (Recess taken.) |
| 11:07 | 22 | THE BAILIFF:  All rise. |
| 11:07 | 23 | THE COURT:  Please remain standing for |
| 11:07 | 24 | the jury. |
| 11:07 | 25 | (Jury entered the courtroom.) |

—776—

```
11:07   1              THE COURT:  Thank you.  You may be

11:07   2    seated.

11:07   3              Counsel?

11:07   4                   CROSS-EXAMINATION

11:07   5    BY MR. TAMKIN:

11:07   6         Q.   Good morning, Mr. Bhatt.

11:07   7         A.   Good morning.

11:07   8         Q.   My name's Greg Tamkin.

11:07   9              We have only just met moments ago, correct?

11:07  10         A.   Yeah.

11:08  11              (Clarification by Reporter.)

11:08  12    BY MR. TAMKIN:

11:08  13         Q.   I'm going to be asking you a bunch of

11:08  14    questions here today, and hopefully we'll engage in a

11:08  15    good dialogue.

11:08  16              So this -- you understand this is a patent

11:08  17    case, correct?

11:08  18         A.   Yes.

11:08  19         Q.   In fact, you have 132 patents in the United

11:08  20    States and all over the world, correct?

11:08  21         A.   Yes.

11:08  22         Q.   You're proud of your patents, aren't you?

11:08  23         A.   Yes.

11:08  24              MR. TAMKIN:  Let's put up Slide 12.

11:08  25    BY MR. TAMKIN:
```

11:08  1      Q.    I think in your presentation, you put on a

11:08  2   picture of -- well, it's a picture of a plaque of one

11:08  3   of your patents, right?

11:08  4      A.    Yes.

11:08  5      Q.    And so what you have done is you have taken

11:08  6   one of your patents and taken the cover page and turned

11:09  7   it into metal and mounted it so you can hang it on the

11:09  8   wall, right?

11:09  9      A.    It's not on the wall.

11:09  10     Q.    I understand.  But it's mounted such that it

11:09  11  could be hung on a wall, right?

11:09  12     A.    Yes.

11:09  13     Q.    So mounted, this is not the whole patent.

11:09  14  It's one -- it's the cover page of the patent that is

11:09  15  made for presentation and for show, right?

11:09  16     A.    Yes.

11:09  17     Q.    Okay.  In fact, you know that patents are much

11:09  18  more significant than just the page, but you're proud

11:09  19  of this.

11:09  20           I'll ask it again.

11:09  21           You understand that patents are much more than

11:09  22  just one page that's mounted on a piece of wood, right?

11:09  23     A.    Yes.

11:09  24     Q.    And patents look like this when they come,

11:09  25  don't they?

—778—

11:09  1      A.    I have no idea.  I don't have this thick a

11:09  2   patent.

11:09  3      Q.    This is a pretty thick one, right?

11:09  4      A.    Yes.

11:10  5      Q.    It's a lot in this patent, right?  It's thick?

11:10  6      A.    I don't know what's in there.

11:10  7      Q.    You had -- I think you said it was thick,

11:10  8   though, right?

11:10  9      A.    By just look of it.

11:10  10     Q.    And your patents aren't as thick, are they?

11:10  11     A.    I don't remember how thick they are.

11:10  12     Q.    In fact, you understand this is a case about

11:10  13  five patents actually, or a number of patents anyway,

11:10  14  correct?

11:10  15     A.    I don't know that.

11:10  16     Q.    You don't know how many patents are in this

11:10  17  case, right?

11:10  18     A.    I don't.

11:10  19     Q.    But you do know it's a patent case?

11:10  20     A.    Yes.

11:10  21     Q.    Okay.  And you haven't read any of the patents

11:10  22  in the case, have you?

11:10  23     A.    Not for this case.

11:10  24     Q.    And you don't know if the Court has

11:10  25  construed -- you don't know how the Court has construed

—779—

11:10   1    any claims in this case, right?

11:10   2        A.    I don't.

11:10   3        Q.    Okay.  And you don't even know if there's been

11:11   4    a claim construction in this case, fair?

11:11   5        A.    I don't.

11:11   6        Q.    Because you have patents, you know that there

11:11   7    are parts of patents, correct?

11:11   8              Do you need me to be more specific?

11:11   9        A.    Please.

11:11   10       Q.    Sure.

11:11   11             There's something that's on the cover page

11:11   12   called the abstract.

11:11   13             Do you see that on your cover page here?

11:11   14       A.    Yes.

11:11   15       Q.    And there's something called the

11:11   16   specification, where you describe in detail all the

11:11   17   various different elements of background and

11:11   18   information about your invention, right?

11:11   19       A.    I don't recall my patents and how they're

11:11   20   written.  They were written a long time ago.

11:11   21       Q.    But you have 132 of them, right?

11:11   22       A.    Yes.

11:11   23       Q.    Okay.  And there's also parts of a patent

11:11   24   called the claims, correct?

11:12   25       A.    You know, I don't remember most of the stuff

11:12  1    about it.  It was a long time.

11:12  2        Q.   I just want to know if you remember that there

11:12  3    are claims in a patent.

11:12  4        A.   I -- I -- quite frankly, I don't remember.

11:12  5        Q.   Do you know that the claims define the

11:12  6    invention?

11:12  7        A.   I don't remember much of my patents other than

11:12  8    the overall concept, technical concept.  I don't know

11:12  9    the legalese.

11:12  10       Q.   I saw a slide at the very end of your

11:12  11   presentation with all of the patents in front of you,

11:12  12   right?

11:12  13       A.   They were just the plaques.

11:12  14       Q.   They were just the plaques.

11:12  15            And you wanted to explain to the jury that you

11:12  16   have a lot of patents and you're very proud of all of

11:12  17   those plaques, right?

11:12  18       A.   Yes.

11:12  19       Q.   Okay.  In any event, you, in this case, don't

11:12  20   have -- you understand that it's a patent infringement

11:13  21   case, right?

11:13  22       A.   I don't know much about this thing.

11:13  23       Q.   So you don't -- do you understand that there's

11:13  24   something called infringement of a patent?

11:13  25       A.   I understand general concept.

781

11:13  1        Q.    Okay.  And in any event, you don't have any
11:13  2   opinion in this case about -- you haven't rendered any
11:13  3   opinion in this case or given any opinion in this case
11:13  4   about infringement because you haven't even read the
11:13  5   patents, right?
11:13  6        A.    Yes.  Yes.
11:13  7        Q.    And to the extent that this case -- there's an
11:13  8   allegation of invalidity of some fashion, you aren't
11:13  9   here to tell us about invalidity because you haven't
11:13 10   read the patents, right?
11:13 11        A.    Yes.
11:13 12        Q.    And you don't know what the claims even say
11:13 13   because you don't know what parts of the patents are
11:13 14   claimed or you haven't read them?
11:13 15        A.    Yes.
11:13 16        Q.    Okay.  And you certainly haven't looked --
11:14 17   taken the patents and compared them to the ASUS
11:14 18   products, the ASUS group products in this case, right?
11:14 19        A.    Yes.
11:14 20        Q.    You haven't done that, correct?
11:14 21        A.    Yes.
11:14 22        Q.    And likewise, you haven't looked at -- taken
11:14 23   the patents and compared the claims of those patents to
11:14 24   the specifications of the PCI Express 3.0 or the USB
11:14 25   3 -- USB specifications, correct?

—782—

| | | |
|---|---|---|
| 11:14 | 1 | A.    Yes. |
| 11:14 | 2 | Q.    By the way, those specifications -- |
| 11:14 | 3 | MR. TAMKIN:  If we can pull up J-20, |
| | 4 | please. |
| | 5 | BY MR. TAMKIN: |
| 11:14 | 6 | Q.    I think you looked at J-20. |
| 11:15 | 7 | This was the -- I think the specification you |
| 11:15 | 8 | looked at, which is the PCI Express Base Specification |
| 11:15 | 9 | Revision 3.0, right? |
| 11:15 | 10 | A.    Yes. |
| 11:15 | 11 | Q.    I don't remember exactly, but I think you said |
| 11:15 | 12 | it was 860-some odd pages approximately? |
| 11:15 | 13 | A.    Somewhere like that. |
| 11:15 | 14 | Q.    It's a really detailed document, right? |
| 11:15 | 15 | A.    Yes. |
| 11:15 | 16 | Q.    And you made it detailed because you wanted to |
| 11:15 | 17 | be sure you explained how PCI Express was going to |
| 11:15 | 18 | work, correct? |
| 11:15 | 19 | A.    Yes. |
| 11:15 | 20 | Q.    You wanted -- I think you said you wanted |
| 11:15 | 21 | developers to be able to use this so they can just look |
| 11:15 | 22 | at the specification and develop from there, right? |
| 11:15 | 23 | A.    One correction, I didn't write this document. |
| 11:15 | 24 | Q.    Fair enough. |
| 11:15 | 25 | A.    So whatever writing there, I don't know.  But |

11:15  1  in general, the concept, it's true.

11:15  2      Q.    And I think you said you spent -- you wrote

11:15  3  the USB specification and maybe an earlier PCI Express

11:15  4  specification; is that right?

11:16  5      A.    That would be right.

11:16  6      Q.    And so your understanding at least of the USB

11:16  7  specification that you wrote, it was supposed to be

11:16  8  comprehensive, correct?

11:16  9      A.    Yes.

11:16  10     Q.    And certainly, the PCI Express base

11:16  11 specification that you wrote back in 2005 or whenever

11:16  12 it was, that was supposed to be very comprehensive,

11:16  13 right?

11:16  14     A.    Yes.

11:16  15     Q.    And it was meant to be relied upon by people

11:16  16 to help understand how PCI Express worked?

11:16  17     A.    Yes.

11:16  18     Q.    And you understand that that's what Exhibit

11:16  19 J-20, this PCI Express base specification, you

11:16  20 understand that's how it's supposed to work too?

11:16  21     A.    Say that again.  I'm sorry.  It was a

11:16  22 long-winded...

11:16  23     Q.    Not a problem.  It was.  I apologize.

11:16  24          You understand that the way that the PCI

11:16  25 Express Base Specification Revision 3.0 was supposed to

—784—

11:16  1   work is that it's supposed to be a detailed document to

11:16  2   help developers understand PCI Express?

11:16  3        A.   Yes.

11:16  4        Q.   Okay.  Now, you talked a lot in your testimony

11:17  5   about all the work you did to develop PCI Express, and

11:17  6   I think the starting point was you wanted something

11:17  7   new, right?

11:17  8        A.   Yes.

11:17  9        Q.   And that it was -- at least for -- PCI local

11:17  10  bus had kind of come to the end of its life.  It was

11:17  11  creating a bottleneck, was your words?

11:17  12       A.   Yes.

11:17  13       Q.   And by "bottleneck," was it slow?

11:17  14       A.   Actually, there were many more things than

11:17  15  just slow.

11:17  16       Q.   It was slow, though, correct?  Yes?

11:17  17       A.   One of many things.  Yes.

11:17  18       Q.   Had a lot of wires too, didn't it?

11:17  19       A.   Yes.

11:17  20       Q.   I think we looked at -- the jury looked at a

11:18  21  couple of --

11:18  22            MR. TAMKIN:  If I may, Your Honor.

11:18  23  BY MR. TAMKIN:

11:18  24       Q.   The jury looked at a couple of these, and one

11:18  25  was kind of -- it was pretty big.  One's a lot smaller,

11:18  1    right?

11:18  2        A.    Yes.

11:18  3        Q.    So size was important, right?  Reduction of --

11:18  4    or the size was something that was a -- strike that.

11:18  5            Size was an issue with PCI local bus, right?

11:18  6        A.    I wouldn't say it that way.  That was not the

11:18  7    motivation.

11:18  8        Q.    Number of wires.  There was a lot of wires,

11:18  9    weren't there?

11:18 10        A.    Yes.

11:18 11        Q.    So one of the motivations was to reduce number

11:18 12    of wires?

11:18 13        A.    Yes.

11:18 14        Q.    Okay.  And -- okay.

11:18 15            And you weren't the only one who was -- who

11:18 16    would have recognized in the late '90s that the PCI

11:18 17    local bus specification -- or excuse me -- the PCI

11:18 18    local bus was coming to the end of its life or was

11:19 19    creating a bottleneck, right?

11:19 20        A.    Perhaps not.

11:19 21        Q.    In other words, the problems with speed, other

11:19 22    people in the industry would have been experiencing as

11:19 23    well, right?

11:19 24        A.    Possibly.

11:19 25        Q.    And it's likewise other people would be

11:19  1    experiencing frustration with the number of wires as

11:19  2    we -- that you just recognized as an issue, right?

11:19  3         A.    If you say so.

11:19  4         Q.    And based on these frustrations, you decided

11:19  5    that we should come up with something to address these

11:19  6    frustrations; is that correct?

11:19  7         A.    Yes.  From my side, yes.

11:19  8         Q.    Yeah.  From your side.

11:19  9               And so when you're trying to come up with

11:20  10   those frustrations -- or excuse me -- the new product,

11:20  11   you identify some of the issues in the prior

11:20  12   technology -- or the current technology and try and

11:20  13   develop something improved on that technology, right?

11:20  14        A.    I wouldn't quite say it that way, but...

11:20  15        Q.    Okay.  You certainly want to create a new

11:20  16   technology that will address the problems that you're

11:20  17   dealing with, right, or experiencing?

11:20  18        A.    Yes.

11:20  19        Q.    Okay.  And so you created a new technology, at

11:20  20   least in -- both USB and PCI Express, that was an

11:20  21   improvement at least in terms of speed and in terms of

11:21  22   wires, right?

11:21  23        A.    I would say it differently, but my team and I.

11:21  24        Q.    Oh, I apologize.  That's fair.

11:21  25              And I think one of the things you said about

11:21  1    USB technology is that over time you came up with the

11:21  2    idea to -- maybe you didn't come up with the idea, but

11:21  3    it -- it sent signals differently than older

11:21  4    technologies; is that right?

11:21  5         A.    Yes.

11:21  6         Q.    It used differential signaling; is that right?

11:21  7         A.    You're not accurate on this one.  Differential

11:21  8    signaling was used all throughout.

11:21  9         Q.    Okay.  It -- it wasn't used -- differential

11:21  10   signal wasn't used in PCI local bus, right?

11:21  11        A.    Yes.

11:21  12        Q.    Rather, it was -- that was new to PCI Express?

11:21  13        A.    I wouldn't say it that way.

11:21  14        Q.    It was -- if you go from 2nd Generation local

11:22  15   bus, no differential signal, correct?

11:22  16        A.    Yes.

11:22  17        Q.    3rd Generation PCI Express, there was

11:22  18   differential signaling?

11:22  19        A.    I'm sorry.  No, no, no.  You're incorrect.

11:22  20        Q.    There's no differential signaling in PCI

11:22  21   Express?

11:22  22        A.    PCI Express was always differential signaling.

11:22  23        Q.    Okay.  I'm not sure what I said then.

11:22  24              2nd Generation --

11:22  25                   (Simultaneous conversation.)

11:22  1      A.    2nd Generation PCI Express, no differential

11:22  2  signaling.

11:22  3  BY MR. TAMKIN:

11:22  4      Q.    I'm sorry.

11:22  5            PCI Express 2nd Generation, PCI local bus 2nd

11:22  6  Generation, no differential signaling?

11:22  7      A.    Say that again.

11:22  8      Q.    PCI local bus was a 2nd generation, right?

11:22  9      A.    All versions of PCI local bus were

11:22  10 single-ended.

11:22  11     Q.    Were?  Excuse me?

11:22  12     A.    Single-ended.

11:22  13     Q.    Single-ended, no differential.

       14            (Simultaneous conversation.)

       15 BY MR. TAMKIN:

11:22  16     Q.    Whereas the PCI Express is differential

11:22  17 signaling?

11:22  18     A.    Yes.

11:23  19     Q.    And PCI Express, I think, is -- also it has

11:23  20 unidirectional -- unidirectional lines; is that right?

11:23  21     A.    Yes.

11:23  22     Q.    And --

11:23  23     A.    Two different directions.

11:23  24     Q.    Thank you.

11:23  25            Lines going each way, yes?

—789—

11:23    1        A.    Yes.

11:23    2        Q.    And likewise, PCI local bus had bidirectional

11:23    3    lines, correct?

11:23    4        A.    You could say it one way.  Yeah.

11:23    5        Q.    And by the way, USB 2.0 had bidirectional

11:23    6    lines, right?

11:23    7        A.    Same as PCI Express.

11:23    8        Q.    USB 2.0?

11:23    9        A.    USB 2.0 is not there.  It is --

11:23    10       Q.    Bidirectional?

11:23    11       A.    You say -- you can say it differently.

11:24    12       Q.    I'm saying USB 2.0 is bidirectional.  3.0 is

11:24    13   unidirectional?

11:24    14       A.    Fine.

11:24    15       Q.    Okay.  And one of the things we have been

11:24    16   talking about, just so we can follow this up, is, and

11:24    17   certainly the local wires in USB -- strike that.

11:24    18             Certainly with respect to PCI local bus, it

11:24    19   was a parallel interface, right?

11:24    20       A.    Yes.

11:24    21       Q.    And that's why it had so many lines, right?

11:24    22       A.    Yes.

11:24    23       Q.    And if you're trying to reduce the lines,

11:24    24   going to serial interface was a -- helped accomplish

11:24    25   that goal, fair?

                                                              790

11:24    1         A.    Yes.

11:24    2         Q.    Okay.  And PCI Express does have serial

11:24    3    communication, right?

11:24    4         A.    Yes.

11:24    5         Q.    Okay.  And as a result of these improvements

11:25    6    and others, it seems like PCI Express has gotten a lot

11:25    7    faster; is that right?

11:25    8         A.    Yes.

11:25    9         Q.    Now, since we're delving into the technology

11:25   10    here, in terms of the differences and similarities

11:25   11    between the two, I think you said that these two slots

11:25   12    and cards with -- one's a PCI Express, one's a PCI

11:25   13    local bus -- they do -- they perform the same function,

11:25   14    right?

11:25   15         A.    I don't know what you mean by --

11:25   16         Q.    Actually, I was going to ask you because

11:25   17    that's what you said.  Do you recall saying that, that

11:25   18    they can perform the same function?

11:25   19               One's much bigger; one's much smaller, right?

11:25   20         A.    I was communicating something different.  I

11:26   21    can explain if you want me to.

11:26   22         Q.    I don't need you to explain.  I just want you

11:26   23    to say -- you said that they performed the same

11:26   24    function, right?

11:26   25         A.    I was trying to -- okay.

11:26  1      Q.   Okay.  And because what you're trying to do is

11:26  2  you're trying to solve a problem, which is one has a

11:26  3  lot of lines, one has fewer lines.  I want them to

11:26  4  still be able to do some of the same things, right?

11:26  5      A.   Yes.

11:26  6      Q.   Okay.  And in the end, you want them to be

11:26  7  able to communicate information across those pathways

11:26  8  or lines, right?

11:26  9      A.   Yes.

11:26  10     Q.   Okay.  You talked about the similarities and

11:26  11  the differences, and the one similarity you said was

11:26  12  the software model.  And I want to understand that.

11:26  13          So you said you kept the software model; is

11:27  14  that right?

11:27  15     A.   Yes.

11:27  16     Q.   And that's the software -- no.

11:27  17          That's how the product -- that's how the

11:27  18  hardware pieces can talk to each other.  The model, it

11:27  19  helps --

11:27  20     A.   No.

11:27  21              MR. TAMKIN:  Okay.  Let's take a look at

11:27  22  Slide 31.

     23  BY MR. TAMKIN:

11:27  24     Q.   Okay.  This was part of -- at least what I had

11:27  25  on the screen when you were talking about that.

11:27  1      A.    Yes.

11:27  2      Q.    And you're saying that there's different

11:27  3  packets as opposed to the old way that the data was

11:27  4  transferred, but you were talking about the software

11:27  5  model as the same.  I had some questions about this

11:27  6  particular slide.

11:27  7          As I look at it, I think the little green box,

11:27  8  they're talking about the packets, right?

11:28  9      A.    Yes.

11:28  10     Q.    Those are little envelopes effectively, right?

11:28  11  It's a way to think about it?

11:28  12     A.    I have a simplified version.

11:28  13     Q.    You approved this, right?

11:28  14     A.    Right.

11:28  15     Q.    Okay.  An envelope has an address on it,

11:28  16  right, on this envelope here?

11:28  17     A.    Yes.

11:28  18     Q.    And inside that envelope is some data, right?

11:28  19     A.    Yes.

11:28  20     Q.    Okay.  And so let's -- okay.  So I want to

11:28  21  talk a little bit about the process of forming --

11:28  22              MR. TAMKIN:  We can take this one down.

11:28  23  BY MR. TAMKIN:

11:28  24     Q.    The process of doing all the work you did with

11:28  25  that group.  I think you said with PCI Express, you got

```
11:28   1   a -- well, with USB, you got a bunch of industry

11:29   2   players together and everybody decided to get together

11:29   3   and make USB happen, right?

11:29   4       A.   Yes.

11:29   5       Q.   The same thing happened with PCI Express,

11:29   6   right?

11:29   7       A.   Yes.

11:29   8       Q.   You used that kind of same model?

11:29   9       A.   Yes.

11:29  10       Q.   And I think what they were called was the

11:29  11   Arapahoe working group or Arapahoe group?

11:29  12       A.   Yes.

11:29  13       Q.   Who came up with that name?

11:29  14       A.   Some marketing person.

11:29  15       Q.   Okay.  Again, you're talking about the -- you

11:29  16   told counsel that engineers aren't very good at coming

11:29  17   up with names, but I like that one, so...

11:29  18            In any event, at that group, they -- you all

11:29  19   talked about the problems that you were going to try to

11:29  20   solve, right?

11:29  21       A.   Yes.

11:29  22       Q.   And you would talk about speed or wires or all

11:29  23   the other issues, right?

11:29  24       A.   Yes.

11:29  25       Q.   And when you're talking about those other
```

| | | |
|---|---|---|
| 11:29 | 1 | issues, you invited people like from Intel, right? |
| 11:30 | 2 | Yes? |
| 11:30 | 3 | A.    Yeah. |
| 11:30 | 4 | Q.    There's many more people from Intel than you, |
| 11:30 | 5 | right? |
| 11:30 | 6 | A.    Yes. |
| 11:30 | 7 | Q.    And I think you also invited to be on that |
| 11:30 | 8 | original steering committee people from Microsoft; is |
| 11:30 | 9 | that right? |
| 11:30 | 10 | A.    Yes. |
| 11:30 | 11 | Q.    Compaq; is that right? |
| 11:30 | 12 | A.    Yes. |
| 11:30 | 13 | Q.    Compaq became part of HP, didn't it? |
| 11:30 | 14 | A.    Yes. |
| 11:30 | 15 | Q.    Okay.  You invited -- did you invite people |
| 11:30 | 16 | from HP as well? |
| 11:30 | 17 | A.    Yes. |
| 11:30 | 18 | Q.    Okay.  And Dell; is that right? |
| 11:30 | 19 | A.    Yes. |
| 11:30 | 20 | Q.    And IBM, right? |
| 11:30 | 21 | A.    Yes. |
| 11:30 | 22 | Q.    These were all big industry players, right? |
| 11:30 | 23 | And you said you all decided to create an open |
| 11:30 | 24 | standard, right? |
| 11:30 | 25 | A.    Yes. |

795

11:30  1    Q.    Now, all of those companies, other than Intel,

11:30  2    manufacture computers, servers, products like that,

11:30  3    right?

11:30  4    A.    Yeah.

11:30  5    Q.    And they did at the time, right?

11:30  6    A.    Yes.

11:30  7    Q.    And Intel makes the products that go inside

11:30  8    those computers, servers, et cetera, right?

11:31  9    A.    Yes.

11:31  10   Q.    Okay.  So those companies were there creating

11:31  11   what you call is an open standard, but all of those

11:31  12   companies were intending to use that standard, right?

11:31  13   A.    Yes.

11:31  14   Q.    And all of those companies were going to sell

11:31  15   their products based on that standard, right?

11:31  16   A.    Yes.

11:31  17   Q.    And all of those companies were going to make

11:31  18   money presumably selling their products, right?

11:31  19   A.    I would hope so.

11:31  20   Q.    That's how it works, right?

11:31  21         And do you know that Microsoft has taken a

11:31  22   license to the ACQIS patents?

11:31  23   A.    No.

11:31  24   Q.    Do you know that HP has taken a license to the

11:31  25   ACQIS patents?

11:31    1        A.    I don't.

11:31    2        Q.    Do you know that Dell has taken a license to

11:31    3    the ACQIS patents?

11:31    4        A.    I don't.

11:31    5        Q.    Do you know that IBM has taken a license to

11:31    6    the ACQIS patents?

11:31    7        A.    No.

11:31    8        Q.    Those companies, I think you said they have --

11:32    9    well, I think you said from Intel you got the best of

11:32   10    the best, right?

11:32   11        A.    Yes.

11:32   12        Q.    Those companies also, you thought, had the

11:32   13    best of the best engineers, didn't they?

11:32   14        A.    Yes.

11:32   15        Q.    They have really good engineers, HP and

11:32   16    Microsoft and Dell, right?  Or at least they did at the

11:32   17    time, right?

11:32   18              And those engineers also know how to read

11:32   19    patents, don't they?

11:32   20        A.    I have no opinion on that.

11:32   21        Q.    Those engineers write patents, don't they?

11:32   22        A.    I don't know which engineers you're talking

11:32   23    about.

11:32   24        Q.    Fair enough.

11:32   25              You certainly are aware that Microsoft

—797—

| | | |
|---|---|---|
| 11:32 | 1 | engineers, HP engineers, Dell engineers have the |
| 11:32 | 2 | opportunity to write patents just like you? |
| 11:32 | 3 | A.    If you say so. |
| 11:32 | 4 | Q.    Those people who were at those meetings, some |
| 11:32 | 5 | of them wrote patents, didn't they? |
| 11:32 | 6 | A.    Yes. |
| 11:32 | 7 | Q.    And they got patents on things -- aspects of |
| 11:33 | 8 | USB or aspects of PCI Express, right? |
| 11:33 | 9 | A.    Yes. |
| 11:33 | 10 | Q.    Now, you said you were here because you wanted |
| 11:33 | 11 | to explain information that was new or that only you |
| 11:33 | 12 | knew about the development process, right? |
| 11:33 | 13 | A.    Yes. |
| 11:33 | 14 | Q.    Have you been told that anyone's trying to |
| 11:33 | 15 | take credit for your inventions? |
| 11:33 | 16 | A.    I don't -- nobody's -- in this case? |
| 11:33 | 17 | Q.    Yes. |
| 11:33 | 18 | A.    No. |
| 11:33 | 19 | Q.    Okay.  And you understand that people like |
| 11:34 | 20 | yourself, other engineers, other people in the industry |
| 11:34 | 21 | in the 1990s are capable of coming up with ideas to |
| 11:34 | 22 | come up with new buses or solve problems that they |
| 11:34 | 23 | experience with PCI local bus, right? |
| 11:34 | 24 | A.    It may have happened. |
| 11:34 | 25 | Q.    Sure.  And you're not saying that somebody |

—798—

| | | |
|---|---|---|
| 11:34 | 1 | can't come up -- couldn't have come up with an idea |
| 11:34 | 2 | that incorporated aspects of PCI Express or USB 3.0 or |
| 11:34 | 3 | any of the future technology before you did, correct? |
| 11:34 | 4 | A.    Please repeat your question. |
| 11:34 | 5 | Q.    You're not here to tell this jury that it was |
| 11:34 | 6 | impossible for Mr. Chu to come up with aspects of PCI |
| 11:34 | 7 | Express before you did, correct? |
| 11:34 | 8 | A.    No.  I'm not here -- |
| 11:35 | 9 | Q.    And you're also not here to -- since you |
| 11:35 | 10 | haven't read the patents, you're not here to say that |
| 11:35 | 11 | Mr. Chu's patents cover every aspect of PCI Express, |
| 11:35 | 12 | right? |
| 11:35 | 13 | A.    No. |
| 11:35 | 14 | Q.    And frankly, it would be impossible for them |
| 11:35 | 15 | to cover every aspect of an 800-page document, right, |
| 11:35 | 16 | in the patent? |
| 11:35 | 17 | A.    I don't know whether it's possible -- |
| 11:35 | 18 | Q.    Let me ask you it this way:  You've |
| 11:35 | 19 | written patent -- you've seen your patents and your |
| 11:35 | 20 | patents don't cover every aspect of PCI Express, right? |
| 11:35 | 21 | A.    I don't know how to -- |
| 11:35 | 22 | Q.    They cover -- |
| | 23 | (Simultaneous speakers.) |
| 11:35 | 24 | Q.    Let me ask it this way:  Your patents only |
| 11:35 | 25 | cover various aspects of PCI Express, right? |

—799—

| 11:35 | 1 | A.    Yes. |

11:35  1       A.    Yes.

11:35  2       Q.    And likewise, you understand that generally

11:35  3  patents cover -- well, strike that.

11:35  4             Let me just look over my notes here.

11:36  5             Now, I appreciate your coming here.  I

11:36  6  appreciate your talking to the jury here today, and I

11:36  7  appreciate your answering my questions.

11:36  8             Counsel did ask you that your -- about your

11:36  9  compensation for this case, right?

11:36  10      A.    Yes.

11:36  11      Q.    She didn't ask you how much you're making, did

11:36  12  she?

11:36  13      A.    No.

11:36  14      Q.    You're charging $1,200 an hour for your

11:36  15  appearance and work on this case; isn't that right?

11:36  16      A.    Yes.  Yes.

11:36  17      Q.    $20 a minute, right?

11:36  18      A.    If that's the math.

11:36  19      Q.    You can do that math, right?

11:36  20             MR. TAMKIN:  I have nothing further.

11:36  21                  REDIRECT EXAMINATION

11:36  22  BY MS. MARRIOTT:

11:37  23      Q.    Mr. Bhatt --

11:37  24      A.    Yes.

11:37  25      Q.    -- you were asked by Mr. Tamkin whether the

11:37 1    PCI local bus slot and card perform the same function

11:37 2    as the PCI Express slot and card.

11:37 3            Do you recall that?

11:37 4    A.    Yes.

11:37 5    Q.    And it sounded like you wanted to give an

11:37 6    explanation, so I wanted to give you that opportunity.

11:37 7            And I guess the question is:  Do these two

11:37 8    different slots and cards perform the same function?

11:37 9    A.    Well, the one that is bigger one performs PCI

11:37 10   local bus transactions.  The smaller one does PCI

11:37 11   Express transactions.

11:37 12           Where they're similar is in one case, it's a

11:37 13   local area network card, which is bigger, that is

11:37 14   compliant with PCI local bus.  The other one is PCI

11:37 15   Express-compliant local area network card.

11:38 16           So where they're similar is it's a local area

11:38 17   network card.  They're different because they have

11:38 18   different protocols and signaling.

11:38 19   Q.    Now, you were also asked about the

11:38 20   compensation that you're receiving in this case.

11:38 21           Do you recall that?

11:38 22   A.    Yes.

11:38 23   Q.    Do you have any plans for that money?

11:38 24   A.    You know, I'm not going to keep a cent of that

11:38 25   money.  I never wanted to get involved in any lawsuit.

—801—

11:38  1    But I -- once I got involved, I want to make sure they

11:38  2    don't abuse my time, because I'm retired.  I'm looking

11:38  3    after my mom.  I didn't want to spend any extra time on

11:38  4    anything else.

11:38  5         I don't need the money.  This is not about the

11:38  6    money.  Some capable kid will benefit from this

11:38  7    scholarship.  So it's never been about the money.  It's

11:38  8    always been about the principle.

11:38  9    Q.    Thank you.

11:38  10   A.    So that settles that.  I hope.

11:39  11              MS. MARRIOTT:  I'll pass the witness.

11:39  12              MR. TAMKIN:  Nothing further, Your Honor.

11:39  13              THE COURT:  Thank you for being here,

11:39  14   sir.  You're welcome to stay in the courtroom.

11:39  15              He's excused, correct?

11:39  16              MR. TAMKIN:  He is.

11:39  17              THE COURT:  You're welcome to stay in the

11:39  18   courtroom for the rest of the trial, or you're welcome

11:39  19   to go home, whichever you prefer.

11:39  20              THE WITNESS:  Thank you so much for

11:39  21   having me.

11:39  22              THE COURT:  Who's your next witness?

11:39  23              MR. COLLARD:  Your Honor, just briefly,

11:39  24   we have a proposed instruction for the next witness

11:39  25   that we had talked about.

| | | |
|---|---|---|
| 11:39 | 1 | THE COURT:  Okay. |
| 11:39 | 2 | MR. BURESH:  Your Honor, may I approach? |
| 11:39 | 3 | THE COURT:  Of course. |
| 11:39 | 4 | MR. BURESH:  Or we? |
| 11:39 | 5 | (Bench conference.) |
| 11:39 | 6 | MR. BURESH:  I believe my revised slides |

11:39    7    and outline just arrived, so I can proceed.  30 seconds

11:40    8    ago, I wouldn't have thought I was going to be able to.

11:40    9                    THE COURT:  Okay.

11:40    10                    MR. COLLARD:  You're going to proceed

11:40    11    with Dr. Edwards?

11:40    12                    THE COURT:  Do you guys agree on this

11:40    13    instruction?

11:40    14                    MR. COLLARD:  Your Honor, if there's

11:40    15    something else you want to say --

11:40    16                    THE COURT:  I mean, have you seen the

11:40    17    instruction that he's proposing?

11:40    18                    MR. BURESH:  I haven't personally seen

11:40    19    it.

11:40    20                    Did my team approve it?

11:40    21                    MR. COLLARD:  Travis and -- yes.  They

11:40    22    said yes.

11:40    23                    THE COURT:  It looks very innocuous to

11:40    24    me.

11:40    25                    MR. BURESH:  Great.

11:40  1          THE COURT:  So your damages person is

11:40  2    ready to go?

11:40  3          MR. BURESH:  No.  We're going to do our

11:40  4    technical expert now.

11:40  5          THE COURT:  So do you want me to -- why

11:40  6    don't I wait for the damages?

11:40  7          MR. BURESH:  It makes more sense for me,

11:40  8    because I've got -- there's, you know, patents that are

11:40  9    disappearing out of both, so I would agree to that

11:40  10   before the next witness.

11:40  11         MR. COLLARD:  That actually makes sense

11:40  12   to us so they're not wondering why they're not --

11:40  13         MR. BURESH:  Your Honor, does it make

11:40  14   sense to -- do we want to just get started and -- or do

11:40  15   you want to take an early lunch?

11:40  16         THE COURT:  What I would do is I'll read

11:40  17   this, you can put him on and prove him up, and then

11:40  18   we'll break for lunch.

11:40  19         MR. BURESH:  Okay.  Sounds good.

       20         THE COURT:  Does that work?

11:40  21         MR. COLLARD:  Yeah.

11:40  22         (Bench conference concludes.)

11:41  23         THE COURT:  Okay.  Ladies and gentlemen,

11:41  24   I'm going to read you an instruction.

11:41  25         As you knew, you all got here this

11:41  1    morning at 8:30 and we didn't get started for a little

11:41  2    while because we were taking up an issue.

11:41  3                During that -- the hearing I conducted

11:41  4    outside of your presence, I made a ruling regarding the

11:41  5    plaintiff's allegations regarding the infringement of

11:41  6    certain method claims.

11:41  7                The patents are the '797 patent, the

11:41  8    '140, the '654, and they are no longer a part of the

11:41  9    case.

11:41  10               The plaintiff will now be seeking

11:41  11   $17,970,582 in damages for the claims that remain for

11:41  12   you to consider with respect to infringement and

11:41  13   validity.

11:41  14               The parties will no longer be discussing

11:41  15   the method claims or patents.  I tell you that because

11:42  16   we're about to hear from the defendants' expert with

11:42  17   respect to infringement or noninfringement, and I

11:42  18   didn't want you to wonder why he wasn't going to be

11:42  19   discussing those issues.

11:42  20               You should not allow my decision with

11:42  21   respect to the method patents to have any impact on you

11:42  22   with respect to any other issue in this case.  That was

11:42  23   something I determined as a matter of law and

11:42  24   determined that there were no fact issues.

11:42  25               We have plenty of fact issues remaining,

```
11:42   1   and that's why you all are here is to be the judge
11:42   2   considering those fact issues.
11:42   3              So don't speculate why they are -- the
11:42   4   other claims are or are not in the case.
11:42   5              Counsel, you have a next witness?
11:42   6              MR. BURESH:  Your Honor, we call
11:42   7   Dr. Stephen Edwards.
11:43   8              MR. TAMKIN:  Your Honor, before we do, we
11:43   9   do have an issue with some of the demonstratives.
11:43  10              THE COURT:  You won't before lunch.
11:43  11              MR. TAMKIN:  Fair enough.
11:43  12              THE COURT:  Okay.
11:43  13              (The witness was sworn.)
11:43  14                   DIRECT EXAMINATION
11:43  15   BY MR. BURESH:
11:43  16      Q.    All right.  Are you situated, Dr. Edwards?
11:43  17      A.    I believe so.  Can you hear me clearly?
11:43  18      Q.    Yes.  Thank you.
11:43  19              Dr. Edwards, can you please state your full
11:43  20   name for the record?
11:43  21      A.    Yes.  I'm Stephen Edwards.
11:43  22      Q.    And where do you currently reside?
11:43  23      A.    In New York City.
11:44  24      Q.    Okay.  Can you tell us a little bit -- I think
11:44  25   you've been sitting in the courtroom for most of the
```

806

11:44  1    case, correct?

11:44  2        A.    That's correct.

11:44  3        Q.    And we all talk about our families and all

11:44  4    that when we introduce ourselves?

11:44  5        A.    Right.

11:44  6        Q.    Could you go ahead and do that for the jury?

11:44  7        A.    Sure.  Sure.  So I grew up in Minnesota, went

11:44  8    to California for school.  Was, what, six years, eight

11:44  9    years after that, I met Nina.  A few years later, in

11:44  10   1999 -- well, yeah.  Exactly 25 years and two weeks

11:44  11   ago, we were married.

11:44  12       In 2001, we moved to New York City.  And we

11:44  13   now have two children:  A son, he's 20; and a daughter,

11:44  14   she's 14.

11:44  15       Q.    What are their names?

11:44  16       A.    Kyle and Lauren.

11:44  17       Q.    Okay.  Let's talk a little bit about your

11:44  18   educational background.

11:44  19       Could you start us in high school but college

11:44  20   forward?

11:44  21       A.    Absolutely.  So in 1988, like I said, I went

11:44  22   to California.  I went to California Institute of

11:45  23   Technology and graduated with a B.S. in electrical

11:45  24   engineering in 1992.

11:45  25       Q.    Okay.  After you got your bachelor of science

—807—

11:45  1    in electrical engineering, where did you go next for

11:45  2    your education?

11:45  3         A.    I went up to Berkeley, California to the

11:45  4    University of California Berkeley.

11:45  5         Q.    What degrees did you secure from Berkeley?

11:45  6         A.    So in a few years, in 1994, I got my master's,

11:45  7    also in electrical engineering.  And in 1997, I got my

11:45  8    Ph.D., also in electrical engineering.

11:45  9         Q.    And both of those were from Berkeley?

11:45  10        A.    That's correct.

11:45  11        Q.    What did you do after you obtained your

11:45  12   Ph.D. in 1997?

11:45  13        A.    So I worked in Silicon Valley for a few years.

11:45  14   I worked for a couple of software companies that were

11:45  15   developing software that would enable engineers to

11:45  16   design computers.

11:45  17        Q.    Okay.  And the time frame that we've been

11:46  18   talking about in this case, the 1998 to 2000 window,

11:46  19   what were you doing in that time frame?

11:46  20        A.    Yeah.  So I was working for those companies,

11:46  21   observing the computer industry, but developing

11:46  22   software that would help engineers to develop

11:46  23   computers.

11:46  24        Q.    Okay.  And after you worked for these various

11:46  25   companies you've described, what was the next step in

| | | |
|---|---|---|
| 11:46 | 1 | your journey? |
| 11:46 | 2 | A. Yeah. So in 2001, my wife and I moved across |
| 11:46 | 3 | the country, and I took a job at Columbia University |
| 11:46 | 4 | teaching in the computer science department. |
| 11:46 | 5 | Q. I'm not going to do the math. How long have |
| 11:46 | 6 | you been at Columbia University? |
| 11:46 | 7 | A. Let's see. That's 23 years now. |
| 11:46 | 8 | Q. 23 years. Okay. |
| 11:46 | 9 | And are you an actual classroom professor? |
| 11:46 | 10 | A. Absolutely. |
| 11:46 | 11 | Q. Like in the classroom teaching is what I mean |
| 11:46 | 12 | by that. |
| 11:46 | 13 | A. Absolutely. No. I really enjoy teaching. |
| 11:46 | 14 | There's a variety of classes that I teach. |
| 11:46 | 15 | Q. Tell us about some of those. |
| 11:46 | 16 | A. So the most interesting one and the one that's |
| 11:47 | 17 | actually going on at the moment, I teach -- I call it |
| 11:47 | 18 | embedded system design. So what we do is build little |
| 11:47 | 19 | computer systems but then make them -- make them do |
| 11:47 | 20 | applications. |
| 11:47 | 21 | So in fact, I teach the students how to build |
| 11:47 | 22 | 1980s video games and that's fun. They do both the |
| 11:47 | 23 | software for the game logic, but then I also have them |
| 11:47 | 24 | do the hardware that does the fancy graphics, and I |
| 11:47 | 25 | also have them -- typical thing is connect up a |

11:47    1    joystick through USB.

11:47    2    Q.    At a high level, tell the jury about some

11:47    3    experiences you've had with computer system design.

11:47    4    A.    Oh, my.  I've been doing this for a very long

11:47    5    time.  Let's see.  I started programming in, what,

11:47    6    1982.  Actually got -- managed to get a statewide award

11:48    7    for doing it in 1983.

11:48    8          Let's see.  About 1986, I designed the

11:48    9    first -- I designed a -- this was the first card that I

11:48    10    designed that would slot into a computer.  It wasn't an

11:48    11    IBM PC.  It was an Apple II at that point.

11:48    12          Continued that.  Built a number of projects

11:48    13    like that when I was at Caltech.  Went on to Berkeley.

11:48    14    Continued to build things.  I've been working with the

11:48    15    stuff for a long time.

11:48    16    Q.    So you were building computers since high

11:48    17    school?

11:48    18    A.    I was building computers since high school.

11:48    19    Q.    And that would have been the mid '80s?

11:48    20    A.    Yeah.  Late '80s.

11:48    21    Q.    What about communication buses?

11:48    22    A.    So as I mentioned, that high school project

11:48    23    was actually for a physics class.  I built a sound

11:48    24    card, and that went into the bus that was being used.

11:49    25          The Apple II wasn't an ISA bus or PCI bus or

11:49    1    anything like that.  It was quite a bit more primitive.

11:49    2    But to do that, I had to understand the bus protocols

11:49    3    and the rules about that.

11:49    4        Q.    What about more recently?  Have you taught

11:49    5    classes on -- that would cover communication buses?

11:49    6        A.    Absolutely.  So one of the key ideas I tried

11:49    7    to get across to my students in this embedded systems

11:49    8    class is how you get hardware and software to

11:49    9    communicate.

11:49    10            And the answer is you do that through a bus.

11:49    11   So I go through the history of buses, and I teach them

11:49    12   a very specific bus.  And they go off and actually

11:49    13   build things that connect up to that bus.

11:49    14       Q.    Now, how does the experiences and the

11:49    15   education that you've just described inform the

11:49    16   testimony that you'll -- you want to provide to the

11:49    17   jury here today?

11:49    18       A.    Well, so I've dealt with this technology in

11:49    19   one form or another for decades now.  And I actively

11:50    20   teach it.  And I'm looking forward to teaching you a

11:50    21   bit of it too.

11:50    22       Q.    Do you believe you're qualified to offer

11:50    23   opinions in this case to a reasonable degree of

11:50    24   engineering certainty in light of your background and

11:50    25   experience?

811

11:50  1           A.    Absolutely.

11:50  2                     MR. BURESH:  Your Honor, I tender

11:50  3  Dr. Edwards as an expert in computer system design and

11:50  4  computer peripheral communications.

11:50  5                     MR. HALES:  No objection, Your Honor.

11:50  6                     THE COURT:  He'll be admitted as an

11:50  7  expert.

11:50  8                     Ladies and gentlemen of the jury, we're

11:50  9  going to go ahead and take our lunch recess now.  If

11:50 10  you all would be back, we will begin at 1:15.  Please

11:50 11  remember my instructions.

11:50 12                     THE BAILIFF:  All rise.

11:50 13                     (Jury exited the courtroom.)

11:50 14                     THE COURT:  You may be seated.

11:51 15                     Doctor, you may step down.

11:51 16                     Okay.  I'm happy to take up any slides we

11:51 17  need to with regard to that.

11:51 18                     MR. HALES:  Your Honor, the issue's

11:51 19  pretty discrete.  There are two slides with a similar

11:51 20  approach.  The slide which we'll present to you here is

11:51 21  one of the claims that has been scratched out in red

11:51 22  marker to show names of the accused standards.  We

11:51 23  believe it's a violation of MIL 7, intimating that --

11:51 24                     THE COURT:  I have to -- if I could see

11:51 25  the slides.

—812—

| | | |
|---|---|---|
| 11:51 | 1 | MR. HALES:  Yeah.  We'll bring it up for |
| 11:51 | 2 | you here. |
| | 3 | THE COURT:  Okay. |
| 11:52 | 4 | MR. HALES:  We feel this is an intimation |
| 11:52 | 5 | that we've attempted to capture standards with our |
| 11:52 | 6 | patent claims and that that's not allowed under MIL 7. |
| 11:52 | 7 | THE COURT:  There we go.  Great.  Okay. |
| 11:53 | 8 | I'm with you.  Thank you. |
| 11:53 | 9 | So this is the -- Slide 73 is a slide |
| 11:53 | 10 | they want to show. |
| 11:53 | 11 | MR. HALES:  Yeah.  On our last count, |
| 11:53 | 12 | there were two such slides. |
| | 13 | THE COURT:  Okay. |
| 11:53 | 14 | MR. HALES:  It's moved around in view of |
| 11:53 | 15 | the Court's ruling. |
| 11:54 | 16 | THE COURT:  Okay.  So when they were -- |
| 11:54 | 17 | when this gentleman gave you the expert report, did he |
| 11:54 | 18 | do something like this?  Did he replace the words -- |
| 11:54 | 19 | first low voltage differential signal channel with |
| 11:54 | 20 | PCI -- did he explain to you this was what he intended |
| 11:54 | 21 | to say?  Or something analogous? |
| 11:54 | 22 | MR. HALES:  The theory in the report is |
| 11:54 | 23 | if you read these limitations as being in these |
| 11:54 | 24 | standards, you need to enable the entirety of these |
| 11:54 | 25 | standards.  You need to have written description for |

| | | |
|---|---|---|
| 11:54 | 1 | the entirety of these standards, which we think is |
| 11:54 | 2 | wrong as a matter of law. |
| 11:54 | 3 | But also under the Court's MIL, we're |
| 11:54 | 4 | worried that the thing that the jury will take away is |
| 11:54 | 5 | that we are attempting to capture these standards and |
| 11:54 | 6 | that the requirement then is that we enabled the |
| 11:55 | 7 | entirety of those standards through our simple |
| 11:55 | 8 | limitation that's being scratched out. |
| 11:55 | 9 | In other words, they're really just |
| 11:55 | 10 | multiplying the burden by taking out the actual claim |
| 11:55 | 11 | language and putting in something that is far broader |
| 11:55 | 12 | than the claim language itself. |
| 11:55 | 13 | THE COURT:  Okay.  A response? |
| 11:55 | 14 | MR. BURESH:  Your Honor, this is |
| 11:55 | 15 | precisely the -- |
| 11:55 | 16 | THE COURT:  Why don't you -- if you'll |
| 11:55 | 17 | come up. |
| 11:55 | 18 | MR. BURESH:  This is precisely the |
| 11:55 | 19 | written description theory that we disclosed to them, |
| 11:55 | 20 | which is that if these claims -- the full scope of the |
| 11:55 | 21 | claims encompass PCI Express or USB 3 as is the |
| 11:55 | 22 | allegations in this case, then the full scope exceeds |
| 11:55 | 23 | the scope of the disclosure. |
| 11:55 | 24 | That is exactly the theory we disclosed |
| 11:55 | 25 | to them, and that's what we're depicting here.  And |

—814—

| | |
|---|---|
| 11:55 | 1 | candidly, it has absolutely nothing to do with MIL 7.
| 11:55 | 2 | This is -- this is not suggesting there's
| 11:55 | 3 | anything improper about getting the claims that they
| 11:55 | 4 | got.  We're saying as they come into court and make
| 11:55 | 5 | these allegations of PCI Express satisfying the LVDS
| 11:56 | 6 | limitations, that that exceeds the full scope of the --
| 11:56 | 7 | the scope of what was enabled and described in the
| 11:56 | 8 | patents.
| 11:56 | 9 | THE COURT:  Because your expert is then
| 11:56 | 10 | going to go on and say if you look at the written
| 11:56 | 11 | description, it doesn't sufficiently enable this?  He's
| 11:56 | 12 | going to tie this together?
| 11:56 | 13 | MR. BURESH:  Correct.  That the -- the
| 11:56 | 14 | inventor, through the four corners of the documents,
| 11:56 | 15 | was not in possession of the full scope of this
| 11:56 | 16 | invention and that the full scope is not enabled.
| 11:56 | 17 | THE COURT:  And I take it and the same
| 11:56 | 18 | will be true with the other -- the reference to the
| 11:56 | 19 | interface?
| 11:56 | 20 | MR. BURESH:  Correct, Your Honor.
| 11:56 | 21 | THE COURT:  And in your -- in his expert
| 11:56 | 22 | report, when he's discussing this, he explained -- he
| 11:56 | 23 | explained this was his theory?
| 11:56 | 24 | MR. BURESH:  That you cannot substitute
| 11:56 | 25 | the one for the other and still satisfy the written

815

11:56  1    description and enablement requirements.

11:56  2                    THE COURT:  Okay.  A response?

11:56  3                    MR. HALES:  Our response is that there's

11:57  4    just no testimony, and there's no ruling of the Court

11:57  5    that would allow for reading a low voltage differential

11:57  6    signal channel to require disclosure of an entire suite

11:57  7    of technologies as exists in PCI Express and USB 3.

11:57  8                    If a metaphor would help, Your Honor.  If

11:57  9    our claim is on a tire and we say Ford vehicles have

11:57  10   tires, we don't need to enable the -- the vehicle

11:57  11   itself.  And allowing this graphic in front of the jury

11:57  12   would present to them a legal theory that is just at

11:57  13   its core unsupportable.

11:57  14                    THE COURT:  Well, as I understand it --

11:57  15   I mean, I understand the legal theory, and I don't

11:57  16   think there's a problem with it.  It seems to me if the

11:57  17   defendant puts this on, then -- and you had it in his

11:57  18   report, then your expert will be able to explain to the

11:57  19   jury why he's wrong.

11:57  20                    MR. HALES:  And he intends to, Your

11:57  21   Honor.

11:57  22                    THE COURT:  Well, then that's how we'll

11:57  23   deal with it.  I mean, and the jury can decide which --

11:58  24   who they believe.

11:58  25                    Is there anything -- so I'll overrule the

—816—

11:58  1   objection with regard to those slides having that.

11:58  2              Now, I will say that the defendant needs

11:58  3   to make clear that it's the expert who is overriding

11:58  4   this.  I mean, I don't know how graphically you plan to

11:58  5   do that.  Certainly you need to make clear that --

11:58  6              MR. BURESH:  That's his graphic.

11:58  7              THE COURT:  The graphic cannot intimate,

11:58  8   for example, that I think it's the same or that

11:58  9   that's -- I'll be listening to how you put it on.

11:58  10             But you have to make clear that this is

11:58  11  your expert's opinion.  And I hope he's in here and

11:58  12  he's hearing me saying this.

11:58  13             This is his opinion of what they are

11:58  14  saying, and if they are saying this, then it's not

11:58  15  enabled.

11:58  16             And if you do that, then when their

11:58  17  expert -- when the plaintiff's expert gets on, he can

11:58  18  say "nuh-uh" and explain why you're wrong.

11:59  19             MR. BURESH:  Fair enough, Your Honor.

11:59  20  Thank you.

11:59  21             MR. HALES:  I may not use that language,

11:59  22  but yes.  We'll do so.

11:59  23             THE COURT:  Whatever language you choose

11:59  24  to use will be fine with me.

11:59  25             Is there anything else we need to take

—817—

| | | |
|---|---|---|
| 11:59 | 1 | up? |
| 11:59 | 2 | MR. BURESH:  No, Your Honor. |
| 11:59 | 3 | MR. HALES:  No, Your Honor. |
| 11:59 | 4 | THE COURT:  Okay.  So we're off the |
| 11:59 | 5 | record. |
| 11:59 | 6 | (Off-the-record discussion.) |
| 12:00 | 7 | THE BAILIFF:  All rise. |
| 12:00 | 8 | (Recess taken.) |
| 01:22 | 9 | THE BAILIFF:  All rise. |
| 01:22 | 10 | THE COURT:  Please remain standing for |
| 01:22 | 11 | the jury. |
| 01:22 | 12 | (Jury entered the courtroom.) |
| 01:23 | 13 | THE COURT:  Thank you.  You may be |
| 01:23 | 14 | seated. |
| 01:23 | 15 | If the witness could return to the |
| 01:23 | 16 | witness box, please. |
| 01:23 | 17 | BY MR. BURESH: |
| 01:23 | 18 | Q.    Welcome back, Dr. Edwards. |
| 01:23 | 19 | A.    Thank you. |
| 01:23 | 20 | Q.    Let me start here. |
| 01:23 | 21 | Did -- outside of the context of the |
| 01:23 | 22 | litigation we're here on, the ACQIS litigation, had you |
| 01:23 | 23 | ever heard of Dr. Chu before? |
| 01:24 | 24 | A.    No.  I've never heard of him. |
| 01:24 | 25 | Q.    Outside the context of the ACQIS litigation, |

818

01:24  1    have you ever heard of the company ACQIS?

01:24  2        A.    No.

01:24  3        Q.    Have you ever had any knowledge of Dr. Chu's

01:24  4    Interputer?

01:24  5        A.    No.  Never heard of it.

01:24  6        Q.    Or iMod?

01:24  7        A.    No.

01:24  8        Q.    Now, in addition to the teaching you described

01:24  9    to us before lunch at Columbia, you also do some

01:24  10   consulting work; is that correct?

01:24  11       A.    That's correct.

01:24  12       Q.    That's the type of work you're doing here?

01:24  13       A.    Exactly.

01:24  14       Q.    How often do you do this type of consulting

01:24  15   work?

01:24  16       A.    One, maybe two a year, or something like that.

01:24  17       Q.    Like, how much of your time do you spend on

01:24  18   it?

01:24  19       A.    Try to keep it around 10 percent.

01:24  20       Q.    Why don't you do more of this type of work?

01:24  21       A.    Mostly love teaching.  I love being in the

01:24  22   university.  This is interesting too, but that's my

01:24  23   home.

01:24  24       Q.    Now, before this case, I had asked you about

01:25  25   the ACQIS parties.

819

01:25  1          Have you ever heard -- or let me ask it this

01:25  2   way:  Had you ever worked with ASUSTeK?

01:25  3      A.    No.  I have not.

01:25  4      Q.    You'd heard of their products before, though?

01:25  5      A.    Yes.  I have.

01:25  6      Q.    Have you ever worked with me or my firm

01:25  7   before?

01:25  8      A.    No.

01:25  9      Q.    Now, as a consultant doing what you're doing

01:25  10  here today, are you paid for your time?

01:25  11     A.    I am.

01:25  12     Q.    How are you paid?  On what basis?

01:25  13     A.    By the hour.

01:25  14     Q.    Does the fact that you're paid hourly for your

01:25  15  work, does that impact the analysis you conduct or the

01:25  16  conclusions you've reached?

01:25  17     A.    Not at all.

01:25  18     Q.    Does your compensation depend on the outcome

01:25  19  of this case in any way?

01:25  20     A.    It does not.

01:25  21          MR. BURESH:  If we go ahead and publish

01:25  22  the slides, Ms. Clark.

01:25  23          Thank you.

       24  BY MR. BURESH:

01:25  25     Q.    Did you prepare a set of slides to assist you

820

01:25  1    in your testimony here today?

01:25  2        A.    Yes.

01:25  3        Q.    And are they on the screen in front of you as

01:26  4    well as the jury?

01:26  5        A.    Can't speak for the jury, but they're

01:26  6    definitely in front of me.

01:26  7        Q.    Fair enough.

01:26  8              All right.  At this point, how many patents

01:26  9    are at issue in this case?

01:26  10       A.    I believe we're at two.

01:26  11             MR. BURESH:  If we could go to the next

    12    slide, please.

    13    BY MR. BURESH:

01:26  14       Q.    Could you describe for the jury what it -- the

01:26  15    concept, let's start there, of a person of ordinary

01:26  16    skill in the art?  What's that about?

01:26  17       A.    Yeah.  So in patent law, the idea is that

01:26  18    you've got a person who should be able to understand

01:26  19    and implement the patent.  And they call this a person

01:26  20    of ordinary skill in the art.

01:26  21             And so in each case, we're asked to come up

01:26  22    with, okay.  What kind of background would that person

01:26  23    be -- have?

01:26  24       Q.    Okay.  And what time frame is important from

01:26  25    the perspective of a person of ordinary skill in the

821

01:26    1    art?

01:26    2        A.    So it's when the original invention was

01:26    3    performed.

01:27    4        Q.    And in that case, what time frame is that?  In

01:27    5    this case, what time frame is that?

01:27    6        A.    In this particular case, 1998/1999/2000 time

01:27    7    frame.

01:27    8        Q.    Why is the perspective in that time frame

01:27    9    important in a case like this?

01:27   10        A.    Well, there's two things.  One is the law

01:27   11    tells us, but I think you'd mentioned earlier -- well,

01:27   12    so there are people years, there are dog years, and

01:27   13    then there are computer years.

01:27   14               Three computer years is like 30 human being

01:27   15    years.  So I've seen I don't know how many lifetimes in

01:27   16    that period of time.  Things change really quickly.

01:27   17               And to understand this invention, you really

01:27   18    need to think about, well, what did it mean in

01:27   19    1998/1999?  Because the landscape's changed completely

01:27   20    in that time.

01:27   21        Q.    Okay.  We've talked about the time frame.

01:27   22    What is the level of training or experience that you

01:27   23    would think a person of ordinary skill in the art has

01:27   24    for this case?

01:27   25        A.    Yeah.  So a reasonably junior electrical

822

01:28  1    engineer.  So concretely somebody who has a master of

01:28  2    science degree in electrical engineering, computer

01:28  3    science, or a related topic, or somebody who just

01:28  4    graduated college with a bachelor of science but then

01:28  5    worked in industry doing something like that for three

01:28  6    years.

01:28  7        Q.    Were you a person of ordinary skill in the art

01:28  8    in 1999/2000?

01:28  9        A.    I was.

01:28  10       Q.    Did you perform the analysis that you've

01:28  11   performed in this case from that perspective?

01:28  12       A.    Absolutely.  It's very important to do so.

01:28  13       Q.    Could you summarize for the jury the primary

01:28  14   questions you were asked to analyze in this case?

01:28  15       A.    Certainly.  So there are three of them.  First

01:28  16   one is:  Does ASUSTeK use what Dr. Chu is claiming is

01:28  17   his technology?

01:28  18            Second question is:  What did he actually

01:29  19   possess in 1999/2000?  What -- the patent says

01:29  20   something.  What does that patent actually say?

01:29  21            Now, the third question is:  Could a person of

01:29  22   ordinary skill in the art pick up Dr. Chu's patents and

01:29  23   make it, build the invention that he was describing?

01:29  24   Is there enough information there?

01:29  25       Q.    Now, the second two questions are a little

823

01:29  1   more involved in their answer, but as to the first one:

01:29  2   Just summarily, what did you find in this case?

01:29  3       A.   Right.  So ASUSTeK does not use what Dr. Chu

01:29  4   is claiming.

01:29  5            What invention did he possess?  That's a

01:29  6   detailed one.

01:29  7            For the third one, well, we saw something

01:29  8   earlier and it's much closer to that.  And in

01:29  9   particular, it's not the stuff that ASUSTeK is

01:29  10  practicing for the third point.

01:30  11           MR. BURESH:  If you'd go to the next

01:30  12  slide, please.  Slide 5, please.

01:30  13  BY MR. BURESH:

01:30  14      Q.   Now, in the process of conducting your

01:30  15  analysis in this case, briefly describe to the jury the

01:30  16  types of materials that you considered.

01:30  17      A.   Yeah.  So there are a lot of them.  I won't

01:30  18  rattle them all off, but a lot of stuff from ACQIS,

01:30  19  patents, the records for the Patent Office.  I've read

01:30  20  a number of Dr. Chu's depositions, documents about

01:30  21  National Semiconductor's LVDS.  We've seen some of

01:30  22  those already.  Looked at the reports of Dr. Sarhan and

01:30  23  some of the stuff he relied on.

01:30  24           Then the other column here is sort of, you

01:30  25  know, outside, these are the local -- the PCI local bus

824

01:30    1    standard, the PCI Express standard, all of these things

01:30    2    we've seen before -- you've seen before.

01:30    3         Some documents from Intel.  I spoke with

01:31    4    Mr. Bhatt, who you saw this morning, and I've examined

01:31    5    the accused technology itself.

01:31    6    Q.    Okay.

01:31    7         MR. BURESH:  Next slide, please.

01:31    8    BY MR. BURESH:

01:31    9    Q.    When were the asserted patents -- the two

01:31    10   asserted patents that are here, when were they filed in

01:31    11   this case?

01:31    12   A.    Right.  So the asserted patents are way the

01:31    13   heck over on the right here.  So 2013, 2014.

01:31    14   Q.    Okay.  And what was the -- going back to the

01:31    15   beginning like we've talked about, where do we need to

01:31    16   go for that?

01:31    17   A.    Right.  So the parent of all of these was back

01:31    18   in 2000.  And that includes this provisional

01:31    19   application I think's been spoken about a little bit

01:31    20   from 1998.  So 1998 and 2000 are the -- when it

01:31    21   started.

01:31    22   Q.    Okay.  And again, for your analysis, why is it

01:31    23   important to go back to these earlier documents and

01:31    24   take a look at those?

01:32    25   A.    Well, like I say, what these patents mean

01:32   1    today versus what they meant then, it's very, very

01:32   2    different.  And the question is:  Well, what did they

01:32   3    mean then?  What did he actually invent?  What should

01:32   4    he get credit for?

01:32   5        Q.    This is a previously admitted Exhibit J-35.

01:32   6              Can you tell the jury what this is?

01:32   7        A.    Yeah.  So this is that provisional patent.  So

01:32   8    that was the thing on the far left of the -- far left

01:32   9    of the timeline.

01:32   10       Q.    Okay.  And what does it mean to be a

01:32   11   provisional patent application?

01:32   12       A.    So I think of it as sort of a foot in the

01:32   13   door.  You're notifying the Patent Office what it is

01:32   14   you're planning to invent, but you haven't -- you know,

01:32   15   going back to the post analogy, you haven't put the

01:32   16   posts in the ground yet.  You just applied for a

01:32   17   construction permit.

01:32   18             But you've got to say what it is you're going

01:32   19   to build, what your invention is.

01:33   20       Q.    Okay.

01:33   21             MR. BURESH:  Back one, please.

01:33   22             Thank you.

01:33   23   BY MR. BURESH:

01:33   24       Q.    Looking at the title of the provisional patent

01:33   25   application, what's the title describing?

826

01:33    1    A.    So you can see it there at the top, Computer

01:33    2    Console with a Universal Attached Computer Module.  So

01:33    3    that's what we've been talking about the whole time

01:33    4    here, and we saw it a couple days ago.

01:33    5         It's this business console.  You plug this

01:33    6    attached computer module into it, and then you got a

01:33    7    computer system.

01:33    8              MR. BURESH:  Next slide, please.

01:33    9    BY MR. BURESH:

01:33   10    Q.    And again, at a high level, what was Dr. Chu

01:33   11    describing as his invention in the provisional patent

01:33   12    application?

01:33   13    A.    So it's consistent with the title.  So it's

01:33   14    this modular computer system.  You do things like take

01:33   15    an ACM, plug it into the console.  That's this big

01:33   16    green thing.  And there's this bay that I'm going to

01:33   17    mark in yellow going forward.

01:33   18         And you could do that with a desktop machine,

01:34   19    something that would sit on your lap, you know, same

01:34   20    configuration over here.

01:34   21    Q.    Okay.  What was the point -- we heard some --

01:34   22    I believe we had it up here earlier in the case.

01:34   23         And what was the point of the overall

01:34   24    invention?  What was the purpose?

01:34   25    A.    Yeah.  Yeah.  So yeah.  I think this has been

827

01:34  1    mentioned a number of times now.  This was back when

01:34  2    you -- networking was difficult and all the rest of it.

01:34  3           The idea was that if you wanted to bring work

01:34  4    home with you, you would take the attached computer

01:34  5    module out, carry it home, and then plug it into your

01:34  6    home machine and continue working there.

01:34  7           And then the next morning, you'd unplug it,

01:34  8    bring it with you to work, and plug it back in.

01:34  9      Q.    Now, are these devices, these modular devices

01:34  10   that Dr. Chu described in this provisional application,

01:34  11   are they the same thing as what ASUSTeK is selling

01:34  12   today, the accused products?

01:35  13      A.    Not at all.

01:35  14      Q.    How are they different?

01:35  15      A.    They're not modular computers, right?  If you

01:35  16   want to bring your computer home, you can pick it up

01:35  17   and carry it with you.  Laptops are really light.

01:35  18               MR. BURESH:  You can go to the next

01:35  19   slide, please.

01:35  20   BY MR. BURESH:

01:35  21      Q.    What was Dr. Chu's idea for the interface

01:35  22   between his ACM, attached computer module, and his

01:35  23   peripheral console?

01:35  24      A.    Right.  So that's this XIS Bus.  That's the

01:35  25   yellow thing in between.  So that matches up with the

—828—

01:35   1    colors I'm using here.

01:35   2            So the yellow bit is the slot for the computer

01:35   3    that's on the left, and it goes on the console.  That's

01:35   4    the green thing on the right.

01:35   5        Q.    Okay.  Now, what part of the XIS Bus are we

01:35   6    primarily focused on in this case?

01:35   7        A.    So we -- I'm sure you've heard this many times

01:35   8    now.  This is this XP Bus that's part of the XIS Bus,

01:36   9    the thing drawn at the bottom.

01:36   10            MR. BURESH:  If you can go to the next

        11    slide, please.

        12    BY MR. BURESH:

01:36   13       Q.    I want to focus in on the ACM on the left-hand

01:36   14    side.

01:36   15            Do you see that in front of you?

01:36   16       A.    Yes.

01:36   17       Q.    What components of a typical 1998 computer

01:36   18    system would be contained in the attached computer

01:36   19    module?

01:36   20       A.    Yeah.  So main things, the CPU, so I've heard

01:36   21    this called the brains of the computer.  It's where the

01:36   22    arithmetic is done, where the program is executed.

01:36   23    It's the most important part.

01:36   24            We heard about the north bridge and the south

01:36   25    bridge from Dr. -- from Mr. Bhatt this morning.  These

01:36  1    are things that facilitate communication within this

01:36  2    attached computer module.

01:36  3            Another phenomenally important thing is the

01:36  4    memory.  This is where you store the programs and all

01:36  5    the data.  And this -- here it's drawing integrated

01:36  6    graphics.  So it has a way of displaying cool stuff.

01:37  7        Q.    If we move to the right-hand side of this

01:37  8    figure.

01:37  9            What was the purpose of the peripheral console

01:37  10   in Dr. Chu's disclosure?

01:37  11       A.    Well, the title is a dead giveaway.  It's the

01:37  12   peripheral console.  And so what it does is provide you

01:37  13   a way to connect up peripherals to your computer.  So

01:37  14   this would be a keyboard, mouse, display, other hard

01:37  15   drive.  Here, it's drawing a CD-ROM.  These things.

01:37  16           And the point is, is that you would not have

01:37  17   to drag these to work and home each day.  You would

01:37  18   just drag the attached computer module.

01:37  19       Q.    Let's use the mouse and the keyboard and the

01:37  20   monitor as an example.

01:37  21           Where do you connect those into the system

01:37  22   disclosed in Dr. Chu's provisional application?

01:37  23       A.    Right.  So back in 1998, mice and keyboard

01:37  24   used an early form of the USB that we were talking

01:37  25   about this morning.  And so you can see them plugged in

830

01:38   1    over here to the peripheral console.

01:38   2        Q.    What about an external hard drive?  Where

01:38   3    would that plug in?

01:38   4        A.    Let's see.  So you might put it on USB.  If

01:38   5    you have a really fancy external hard drive, you might

01:38   6    plug it into the 1394 port or maybe you'd put it onto

01:38   7    the PCI bus that was in the peripheral console.

01:38   8        Q.    Okay.  Going to the next slide, how did

01:38   9    Dr. Chu in his provisional patent application describe

01:38   10   the XP Bus?

01:38   11       A.    Right.  So throughout -- and let's see.  I've

01:38   12   already got it highlighted two ways here, but it's a

01:38   13   way -- it's worth doing more.

01:38   14             He described it as a peripheral bridge bus.

01:39   15   So an XP Bus actually has that enshrined in it.  Cross

01:39   16   peripheral bus.  That's what the name means.  And he,

01:39   17   you know, uses this expression "peripheral bridge bus"

01:39   18   repeatedly because that's what it is.

01:39   19       Q.    Why is it called a peripheral bridge bus?

01:39   20       A.    So if you look at the bottom here, we've got

01:39   21   the XP Bus in the middle.  What it is doing is bridging

01:39   22   these buses in the ACM and these buses over on the

01:39   23   peripheral console.

01:39   24       Q.    Okay.  Now, those lines you circled there on

01:39   25   the left and the right, the PCI 1394 and USB and

01:40   1    et cetera, you see those?

01:40   2        A.    Yes.

01:40   3        Q.    What are those called?

01:40   4        A.    So those are the peripheral buses or buses.

01:40   5        Q.    Why are there so many of them in a figure like

01:40   6    this?

01:40   7        A.    Well, they have different buses for different

01:40   8    purposes.  So PCI, you've -- you've held in your hand

01:40   9    earlier.  Again, this was 1998.  So this is PCI local

01:40  10    bus we're talking about.  Those are where you plug in

01:40  11    cards like the one you held earlier.

01:40  12            USB, this was an earlier version of USB at the

01:40  13    time.  This was more suited to plugging in keyboards

01:40  14    and mice.  And it didn't make sense.  You don't plug a

01:40  15    mouse into a computer with a big slot like that.  You

01:40  16    want something tiny.

01:40  17            1394 was a high-speed bus usually used for

01:40  18    video at the time.  It was sort of barely able to

01:40  19    handle that.  And the rest each had different purposes.

01:40  20        Q.    Okay.  When you see PCI at the top, what does

01:40  21    that stand for?

01:40  22        A.    You're referring to the PCI at the top of the

01:41  23    red?

01:41  24        Q.    Yes.

01:41  25        A.    Yeah.  So peripheral component interconnect.

832

01:41  1   And as of 1998, 1999, this was specifically the PCI

01:41  2   local bus that Mr. Bhatt was talking about this

01:41  3   morning.

01:41  4        Q.    Okay.  Focusing in on the host interface

01:41  5   controller on the ACM, Dr. Edwards, what is that doing?

01:41  6        A.    So let me take this moment to reinforce the

01:41  7   bridge analogy.

01:41  8             So in computer engineering, these things --

01:41  9   this is referred to as a bridge bus.  We talked about

01:41  10  that.

01:41  11            Well, sort of interesting.  I sort of look at

01:41  12  it as, you know, here are two piers.  We've got the

01:41  13  bridge deck, and there's something in between.  Right?

01:41  14            I realized, as I was walking over the Waco

01:41  15  Suspension Bridge a couple days ago, this is exactly

01:41  16  what we have.  This is what we have here.

01:42  17            So what is the host interface controller?

01:42  18  Well, it's taking these buses here -- think of them as

01:42  19  the local streets of Waco here -- and converting them

01:42  20  so you could walk over that bus -- excuse me -- walk

01:42  21  over that bridge.

01:42  22            And, you know, technically, if you want to

01:42  23  talk in more detail, it's taking the PCI transactions,

01:42  24  the details of that, and converting it into something

01:42  25  that can walk over the -- you know, walk over the XP

833

01:42  1   bridge bus.

01:42  2       Q.   Would the host interface controller be doing

01:42  3   the same thing for USB, converting it and putting it

01:42  4   onto the XP Bus?

01:42  5       A.   Exactly.  So the purpose of all of this is

01:42  6   each one of these gets converted somehow, sent over the

01:42  7   XP Bus, and then reproduced on the other side.

01:43  8       Q.   Okay.  And moving to the right-hand side, the

01:43  9   peripheral console, what is the bay interface

01:43  10  controller doing?

01:43  11      A.   So it's doing exactly the opposite of the host

01:43  12  interface controller.  If something starts off on the

01:43  13  left, the purpose of these two things, the bay

01:43  14  interface controller's taking the people walking across

01:43  15  the XP Bus, if you want, and turning them back into

01:43  16  these various buses on the far side.  So, you know,

01:43  17  PCI -- PCI, 1394, that lot.

01:43  18      Q.   Okay.  So just to summarize, can you explain

01:43  19  one more time why the XP Bus is operating as a bridge

01:43  20  bus?

01:43  21      A.   So like I say, the Waco Suspension Bridge is a

01:43  22  wonderful model for this.  I went down there.  There's

01:43  23  this plaque that says 150 years ago, it carried people,

01:43  24  wagons, and cattle.  And I looked at it.

01:43  25           Well, okay.  We don't have people, but we have

834

01:44  1    PCI.  Let's see.  Wagons, yeah, 1394 is close to that.

01:44  2    USB, maybe that's a little bit more like cattle.

01:44  3         It's taking all of those things, transforming

01:44  4    them, moving them across a river -- this would be the

01:44  5    river, the middle -- and then letting them get out on

01:44  6    the other side.

01:44  7    Q.    Bringing you back into the context of

01:44  8    technology if we can, let's say I have --

01:44  9         MR. BURESH:  Go to the next slide,

01:44  10   please.

01:44  11   BY MR. BURESH:

01:44  12   Q.    -- a mouse connected to the peripheral

01:44  13   console.

01:44  14        Do you see that?

01:44  15   A.    Yes.

01:44  16   Q.    How would the mouse and the CPU on the

01:44  17   attached computer module, how would they talk?

01:44  18   A.    Okay.  Okay.  So here we go.  This is computer

01:44  19   architecture 101.  So --

01:44  20        Let's see.  Is this working today?  It is not.

01:44  21   Ah, there it is.

01:44  22        Okay.  So that starts with the CPU -- some

01:44  23   software in the CPU saying, oh.  I'd like to find out

01:45  24   whether the mouse has been clicked.

01:45  25        That turns into a request to, you know, hey.

01:45    1    Send me some information.  That goes into this north

01:45    2    bridge chip that you heard Mr. Bhatt talking about

01:45    3    earlier.

01:45    4         That north bridge sends that request down to

01:45    5    the south bridge.  The south bridge looks at that and

01:45    6    says, hey.  The software wants to talk to the USB -- to

01:45    7    the mouse on the USB bus.

01:45    8         So it figures out how to speak USB, sends that

01:45    9    over, this little segment of the USB to the host

01:45   10    interface controller.

01:45   11         Now, the host interface controller picks up

01:45   12    that request in USB format, converts it to its own

01:45   13    style of transmission, sends that across the XP Bus.

01:46   14    That reaches this bay interface controller in the

01:46   15    peripheral console.

01:46   16         It undoes that compression and various other

01:46   17    things that it had to do, turns it back into something

01:46   18    the USB can understand, and then that makes its way to

01:46   19    the mouse.

01:46   20         It says, oh.  Right.  Oh, you want to know

01:46   21    about the click?  It's not clicked yet.  Boy, that was

01:46   22    a lot of work.

01:46   23    Q.    Now, is the XP Bus a USB interface in that

01:46   24    scenario?

01:46   25    A.    Absolutely not.  And one way to tell is if I

—836—

01:46  1  took this mouse and tried to plug it into the XP Bus,

01:46  2  it would not work.  They're speaking a different

01:46  3  language.

01:46  4      Q.    Now, as a person of ordinary skill in the art

01:46  5  in the 1999/2000 time frame, would you have considered

01:46  6  what Dr. Chu was trying to do to be a technologically

01:46  7  good idea?

01:46  8      A.    Not especially.

01:46  9      Q.    Why not?

01:46  10     A.    So if you want to get from Point A to Point B,

01:47  11  do you want to cross a bridge, or would you like to not

01:47  12  bother crossing a bridge?  Well, I'd rather not cross a

01:47  13  bridge, as beautiful as it is.

01:47  14         This one is no different.  All this conversion

01:47  15  stuff that happens both in the host interface

01:47  16  controller and the bay interface controller takes time,

01:47  17  and time -- you don't want to waste time when you're

01:47  18  computing -- when you're using a computer.  So all of

01:47  19  this just slows things down.  It doesn't help.

01:47  20         You'd much rather be able to, you know, talk

01:47  21  directly from USB over to the mouse.  That's a lot

01:47  22  quicker.  But Dr. Chu didn't -- had introduced a --

01:47  23  I'll call it a river down the center.  It slowed

01:47  24  everything down.

01:47  25     Q.    What technology did Dr. Chu describe for his

837

01:47  1    XP Bus?

01:48  2        A.    So this is implemented using a technology

01:48  3    called LVDS that we've heard about a number of times

01:48  4    now.

01:48  5                    MR. BURESH:  If we could pull up

01:48  6    Defendants' Exhibit 950.  It's previously admitted.

01:48  7    BY MR. BURESH:

01:48  8        Q.    What is the -- what is Defendants'

01:48  9    Exhibit 950, Dr. Edwards?

01:48  10       A.    So like it says on the front, this is the LVDS

01:48  11   owner's manual, and it's published by a chip company

01:48  12   called National Semiconductor.  And you'll notice the

01:48  13   publication date here, spring 1997.

01:48  14       Q.    Did you hear Dr. Chu testify that he

01:48  15   principally gained his knowledge of LVDS from this

01:48  16   document?

01:48  17       A.    Yes.  I recall hearing that.

01:48  18       Q.    What is the LVDS owner's manual?

01:48  19       A.    So National Semiconductor is a chip company.

01:48  20   They sell integrated circuits.  The way that works is

01:49  21   they want to encourage engineers to use their chips.

01:49  22   So they'll go and buy a bunch.

01:49  23               And the way you do that and the way you did

01:49  24   that at the time is you put out books and data sheets

01:49  25   like this, essentially instructions on how to use their

838

01:49    1    product.  So what this contains in it is detailed

01:49    2    description and instructions on how to use LVDS.

01:49    3        Q.    Was LVDS off-the-shelf technology by the

01:49    4    spring of 1997?

01:49    5        A.    Oh, yeah.  It had been for quite a while, in

01:49    6    fact.  This whole book is going to use these chips that

01:49    7    we've been selling for a while, we know work quite

01:49    8    well.  Here are all the wonderful advantages of them.

01:49    9            MR. BURESH:  Now, if we could blow up

01:49    10    the -- thank you -- the image.

01:49    11    BY MR. BURESH:

01:49    12        Q.    In the context of what Dr. Chu was disclosing

01:49    13    in his provisional patent application, why would the

01:49    14    technology -- the LVDS technology from National

01:50    15    Semiconductor be of interest in that context?

01:50    16        A.    Oh, well, it's really simple.  Everybody see

01:50    17    the bridge?  It's right here.

01:50    18            This diagram at the bottom, we're looking down

01:50    19    at it from the top, right?

01:50    20            We've got our people and wagons and cattle or

01:50    21    whatever.  They get converted through the National chip

01:50    22    into LVDS.  And this is great.  They even drew -- they

01:50    23    even drew the river in blue, right?

01:50    24            This is exactly the kind of bridge stuff we

01:50    25    were just talking about, where it picks it up for one

—839—

01:50  1    chip, sends it over this LVDS channel, and then

01:50  2    converts it on the other side.

01:50  3          And you can see on the other side, you know,

01:50  4    all the various things crossing the bridge come back

01:50  5    out.

01:50  6          So here, we have on the cover of this book by

01:51  7    a company called National Semiconductor the LVDS

01:51  8    bridge.

01:51  9          MR. BURESH:  If we could go to Page 6 or

01:51  10   to the next slide that has Page 6 already on it.

01:51  11   BY MR. BURESH:

01:51  12   Q.    What are we seeing here, Dr. Edwards?

01:51  13   A.    Yeah.  So this is a figure inside the owner's

01:51  14   manual on the right.  And it's depicting the same thing

01:51  15   as this more fanciful drawing on the -- on the left.

01:51  16          But it's just saying the same thing.  It's

01:51  17   pointing out LVDS, it goes down to four or five

01:51  18   channels.  The TTL is, you know, 21 or 28 on either

01:51  19   side.  And it's communicating in one direction.

01:51  20          And again, this -- when I was walking across

01:51  21   the Waco Suspension Bridge, this reminded me of it

01:51  22   again.  It's a fairly narrow bridge, right?  You

01:51  23   couldn't drive like two modern semi trucks across it or

01:52  24   something like that.  Must have been challenging to

01:52  25   move the cattle.

840

01:52  1        Q.    All right.  This depiction from Slide 6, if we

01:52  2   compare that to the depiction in Figure 11 of the

01:52  3   provisional patent application, how do they compare?

01:52  4        A.    They match perfectly.  So PCI here is -- PCI

01:52  5   here, we heard talking of a parallel bus this morning.

01:52  6   Well, that's exactly what goes in, you know, 21 or 28

01:52  7   channels.  You need a few more to do PCI, but similar.

01:52  8             Serialized, that's what the host interface

01:52  9   controller is doing.  We have the XP Bus implemented

01:52  10  using LVDS, four or five channels.  Again, narrow

01:52  11  bridge.

01:52  12            And then the receiver at the other side

01:53  13  recovers that data that came in on the left, say, in

01:53  14  the form of PCI.

01:53  15       Q.    Now, this figure from Page 6 of the LVDS

01:53  16  owner's manual, the arrow's only going in one

01:53  17  direction, from left to right, correct?

01:53  18       A.    That's correct.

01:53  19       Q.    If you wanted to send data in both directions,

01:53  20  this unidirectional and opposite directions, that

01:53  21  concept, how would you do that?

01:53  22       A.    Yeah.  So all of you know if you've ever

01:53  23  driven, right, the thing on the top, it's a one-way

01:53  24  street.  How do you go the other direction?  You go to

01:53  25  the next street over, which may be one way the other

01:53    1    direction.  It's the same thing.

01:53    2            National says, oh, go buy another couple of

01:53    3    chips, replace -- put the transmitter on this side and

01:53    4    the receiver on this side, and you've got stuff going

01:53    5    both directions.

01:53    6            MR. BURESH:  If we could go to the next

01:53    7    slide, please.

01:54    8    BY MR. BURESH:

01:54    9      Q.    Actually, before I go there, do you remember

01:54   10    the list of -- from -- let me see if I --

01:54   11            MR. BURESH:  Could we pull up plaintiff's

01:54   12    PDX-3, Slide 32, please?

01:54   13    BY MR. BURESH:

        14      Q.    Do you remember seeing these during Dr. Chu's

01:54   15    testimony, the benefits of the patented LVDS approach?

01:54   16      A.    Yes.  And I found them remarkably familiar.

01:54   17      Q.    What provides these benefits?

01:54   18      A.    Well, the National Semiconductor chips said

01:54   19    they provided exactly that.

01:54   20            MR. BURESH:  Could you pull up 950,

01:54   21    DX-950, Page 5, and put them side-by-side with this

01:55   22    slide, if you can?

01:55   23    BY MR. BURESH:

01:55   24      Q.    Now, this is coming out of the LVDS owner's

01:55   25    manual on the right, correct?

01:55   1       A.    Yes.

01:55   2       Q.    Okay.  There we go.

01:55   3                  MR. BURESH:  Thank you.  Page 5.

        4   BY MR. BURESH:

01:55   5       Q.    In this section down below --

01:55   6                  MR. BURESH:  Derek:  Saves money too.

01:55   7                  Thank you.

01:55   8       A.    Yeah.  There we go.

01:55   9   BY MR. BURESH:

01:55  10       Q.    Do we see the same benefits being provided by

01:55  11   National's LVDS owner's manual or described in

01:55  12   National's LVDS owner's manual?

01:55  13       A.    Yep.  Absolutely.

01:55  14                  THE WITNESS:  So, in fact, Derek, let me

01:55  15   draw.

01:55  16       A.    So smaller connector, you know, less

01:56  17   expensive.  Okay.

01:56  18            Let's see.  Using low cost, off-the-shelf, so

01:56  19   those are -- that's close.

01:56  20            Low noise producing, noise-tolerant

01:56  21   technology.  That's a complicated way of saying fewer

01:56  22   errors.

01:56  23            Faster operation, it's mentioning it down

01:56  24   here.

01:56  25            Here, it's saying:  Reducing board connector

843

01:56  1    and cable costs, that's smaller connector.

01:56  2              Longer battery life.  LVDS consumes very

01:56  3    little power, so power supplies, fans, and batteries

01:56  4    can be reduced or eliminated.

01:56  5              They're saying the same thing.

01:56  6    BY MR. BURESH:

01:56  7    Q.    So the value that Dr. Chu described in his

01:56  8    patent of his invention is the same value that was

01:56  9    already provided and discussed in the LVDS owner's

01:56  10   manual; is that correct?

01:56  11   A.    That's correct.

01:56  12             MR. BURESH:  If we can go to the next

01:56  13   slide, please.

01:56  14   BY MR. BURESH:

01:57  15   Q.    This is back from the May 1998 provisional

01:57  16   patent application, correct?

01:57  17   A.    Correct.

01:57  18   Q.    What is being shown in Figure 8 of the

01:57  19   provisional application?

01:57  20   A.    Let's see.  So this is a particular

01:57  21   embodiment, so this is one way Dr. Chu is proposing you

01:57  22   could implement his patent.

01:57  23             And it lays it out down here.  It's describing

01:57  24   an "Attached Computer Module with Integrated

01:57  25   CPU/NB/Graphics and Integrated HIC/SB."

—844—

01:57  1          Q.    What does it mean to integrate components?

01:57  2          A.    So integration is one of these things that I

01:57  3     would say all electrical engineers love.  And it's

01:57  4     really funny.  You know, it sounds like it's really a

01:57  5     complicated thing, and Intel's made an enormous amount

01:57  6     of money about it.  But you already know what it is.

01:57  7          So I don't know about you, but I like ordering

01:58  8     things from Amazon.  Unfortunately, I order probably

01:58  9     too many things from Amazon.

01:58  10         Now, if you order a bunch of things from

01:58  11     Amazon, there's a couple of things that can happen.

01:58  12     One is they ship each box to you one at a time.  The

01:58  13     other thing is they realize, oh, Stephen's ordering a

01:58  14     bunch of these.  They get a bigger box.  They put the

01:58  15     smaller boxes in it, and they ship the bigger box.

01:58  16         The bigger box is integration.  That's all it

01:58  17     is.

01:58  18         The computing industry, the electronics

01:58  19     industry's been doing that for over 50 years.  And what

01:58  20     it does, it's giving you bigger boxes, you can put more

01:58  21     things in them.  But it turns out that when you do

01:58  22     that, it gets cheaper, just as it's usually cheaper to

01:58  23     ship one big box than two small ones.

01:58  24         So it's as simple as that.  Integration just

01:58  25     means putting two boxes together or multiple boxes

845

01:58    1    together.

01:58    2        Q.    Now, in Figure 8, for example, there is the

01:58    3    south bridge and the host interface controller that

01:59    4    have been put into the same box, correct?

01:59    5        A.    Yeah.  This -- that's this box here.

01:59    6        Q.    Does that change the operation that we've

01:59    7    looked at previously?

01:59    8        A.    No.  When Amazon ships you two things in a

01:59    9    box, you really hope they don't break what's going into

01:59   10    those two boxes, right?  It's just a bigger box.  So

01:59   11    nothing changes.

01:59   12        Q.    Other than this caption, is there any other

01:59   13    discussion in this provisional patent application for

01:59   14    any changes that might be depicted in this diagram?

01:59   15        A.    Not at all.

01:59   16            MR. BURESH:  You can go to the next

01:59   17    slide, please.

01:59   18    BY MR. BURESH:

01:59   19        Q.    Now, here we have -- we've moved Figure 8 to

01:59   20    the right.  And now we're looking at -- in comparison

01:59   21    to Figure 11 that we looked at originally, correct?

01:59   22        A.    Correct.

01:59   23        Q.    How does the figure on the right compare to

01:59   24    what we originally looked at with Figure 11?

01:59   25        A.    So this is a different level of integration.

02:00    1    So before, we were looking at this Figure 11.

02:00    2    Remember, all the funky colored buses.

02:00    3             Well, to get to Figure 8, we're just

02:00    4    integrating all of the green things here and marked

02:00    5    them -- marking them with the dotted.  That just goes

02:00    6    right over here.  That's the integrated south bridge

02:00    7    host.

02:00    8             But similarly, this blue box on the right,

02:00    9    integrated CPU or CPU module, north bridge, and

02:00   10    graphics accelerator, well, that's just turning these

02:00   11    three boxes into a single box.

02:00   12    Q.    Does that change the operation of what's

02:00   13    depicted at all?

02:00   14    A.    No.

02:00   15    Q.    Now we have Figure 9 from the provisional

02:00   16    application on the screen in front of you, correct?

02:00   17    A.    Correct.

02:00   18    Q.    What's being shown here?

02:00   19    A.    We made the box bigger again.  We took the two

02:01   20    boxes from the last slide, these two, and merged them

02:01   21    all into this one big box.

02:01   22    Q.    Does that change the operation of what's

02:01   23    depicted in any way?

02:01   24    A.    Again, no.

02:01   25    Q.    And again, is there any discussion in the

02:01    1    provisional of this figure other than the caption?

02:01    2        A.    No.

02:01    3            MR. BURESH:  Next slide, please.

02:01    4    BY MR. BURESH:

02:01    5        Q.    Going to do the same exercise briefly because

02:01    6    I think we're covering this well.

02:01    7            But Figure 11 on the left, Figure 9 on right.

02:01    8    How do they compare?

02:01    9        A.    Yeah.  Again, it's just -- we're talking about

02:01   10    putting things in boxes.  So what's drawn here on the

02:01   11    left is what we saw earlier with all the bits and

02:01   12    pieces, Version -- Figure 9 here is just saying, okay.

02:02   13    Take all this stuff in the blue dashed box, turn it

02:02   14    into one big box.

02:02   15        Q.    And focusing our attention on Figure 9 on the

02:02   16    right, what is the XP Bus bridging in this depiction?

02:02   17        A.    So in this depiction, we could assume that

02:02   18    there's the host interface controller still, right?

02:02   19    It's in the box.  It was in the box over here.  It just

02:02   20    got moved.

02:02   21            But when they drew the picture on the right,

02:02   22    they didn't bother putting in the contents of the box.

02:02   23    That's the point of drawing a bigger box.

02:02   24            So it's bridging the PCI bus that that host

02:02   25    interface controller needs to be connected up to with

02:02  1    the peripheral bus.

02:02  2                    MR. BURESH:  If we could go to the next

02:02  3    slide, please.

02:02  4    BY MR. BURESH:

02:02  5        Q.    Now, in Figure 9, is the peripheral bus -- I'm

02:03  6    sorry -- the XP Bus, is it still going to a peripheral

02:03  7    console?

02:03  8        A.    Yes.  It is.

02:03  9        Q.    Even though it's not depicted?

02:03  10       A.    Yeah.

02:03  11       Q.    How do you know that?

02:03  12       A.    Well, what's great is, again, all we have to

02:03  13   do is look at the name, right?  Remember, it's ACM.

02:03  14   What's the A for?  Attached.  What is it attached to?

02:03  15   Console.

02:03  16             That's what -- that's what the XP Bus is for.

02:03  17   It's for attaching to a console.  So we can be assured,

02:03  18   even though it's not on this diagram, we've got a

02:03  19   console over here.

02:03  20                    MR. BURESH:  If we go to the next slide.

02:03  21   BY MR. BURESH:

02:03  22       Q.    Now, the colored buses, PCI, USB, that we see

02:03  23   in Figure 11 --

02:03  24       A.    Yes.

02:03  25       Q.    -- we can't see those in Figure 9; is that

849

02:03  1    fair?

02:03  2        A.    That's correct.

02:03  3        Q.    Are they still there?

02:03  4        A.    Yes.

02:03  5        Q.    How do you know?

02:03  6        A.    We just had this discussion.  When we go from

02:04  7    the detail boxes, when we integrate these boxes on the

02:04  8    left to the right, we don't change what's in there.  We

02:04  9    just put -- we just put multiple boxes on the same

02:04  10   chip.

02:04  11       Q.    Okay.  And we discussed that the captions are

02:04  12   the only discussion of Figures 8 and 9, correct?

02:04  13       A.    That's correct.

02:04  14       Q.    Why is that important?

02:04  15       A.    Well, so if somebody was packing a box with

02:04  16   boxes, they could choose to break each of those boxes

02:04  17   or change them as they put them into the larger box,

02:04  18   but you generally don't do that unless somebody tells

02:04  19   you specifically to do that.  Dr. Chu's not telling us

02:04  20   to do that.

02:04  21       Q.    In the May 1998 provisional, J-35, does

02:04  22   Dr. Chu describe his X bus as being anything other than

02:04  23   a peripheral bus bridge?

02:04  24       A.    No.  He's very consistent starting just with a

02:04  25   name, peripheral bridge bus.  Peripheral bridge bus.

850

02:05  1    And you'll find that throughout that document.  XP Bus,

02:05  2    cross peripheral bus, that's what it is.

02:05  3        Q.    Did Dr. Chu ever describe using his XP Bus to

02:05  4    connect directly to, like, the mouse we were looking at

02:05  5    previously?

02:05  6        A.    No.  That wouldn't make any sense.

02:05  7        Q.    Why not?

02:05  8        A.    The mouse wouldn't know how to understand the

02:05  9    XP Bus.  The mouse was expecting USB, which is

02:05  10   something else.  Even if you could physically connect

02:05  11   them up -- I doubt you could -- the mouse would say,

02:05  12   what is this?  I don't know what's going on.  The XP

02:05  13   Bus would say, I don't understand what's being said.

02:05  14       Q.    Now, the buses on the left, PCI, 1394, USB,

02:05  15   did Dr. Chu ever describe using his XP Bus to replace

02:05  16   any of those buses?

02:05  17       A.    Never to replace.

02:05  18       Q.    What's the difference between a bus like USB

02:06  19   and a bridge bus?

02:06  20       A.    Sure.  A bus, like PCI local bus as of 1998,

02:06  21   the USB, these connect peripherals to a computer.

02:06  22   Mice, keyboard, hard drives.  Stuff like that.

02:06  23            A bridge bus, just like a bridge, connects two

02:06  24   buses.  Right?  If you've -- if you run across a bridge

02:06  25   in real life, it's not a normal road.  It's connecting

851

02:06    1    two banks of something.  It's you're crossing over

02:06    2    something.  That is exactly what a bridge bus is, and

02:06    3    that's exactly what the XP Bus is.

02:06    4                   MR. BURESH:  I want to look at another

02:06    5    figure now.  If we go to the next slide, this is

02:06    6    Figure 15 from the provisional application.

         7    BY MR. BURESH:

02:06    8    Q.    When Dr. Chu wanted to connect his computer to

02:06    9    a USB device, like a keyboard or mouse, what type of

02:07   10    connection did he use?

02:07   11    A.    Yeah.  So this is unusual because there's no

02:07   12    console in this.  But he's saying, okay.  This is a USB

02:07   13    port, which means this is -- almost in -- with this.

02:07   14    This is a USB cable.  And that should say "cable" not

02:07   15    "gable."  But okay.  You get the idea.

02:07   16                   Anyway, it's a USB port.  What do you plug

02:07   17    into USB ports?  USB cables.

02:07   18    Q.    When Dr. Chu's patent disclosures use the term

02:07   19    "USB," do they ever call it an LVDS channel?

02:07   20    A.    No.  That would have been crazy.

02:07   21    Q.    Describing his LVDS channels, do Dr. Chu's

02:07   22    patent disclosures ever call them a USB link?

02:07   23    A.    No.  Not at all.

02:07   24    Q.    What does this image indicate to you with

02:08   25    respect to the comparison between a USB link and

852

```
02:08   1   Dr. Chu's LVDS channels?
02:08   2       A.    Well, like I said, these LVDS channels, they
02:08   3   were being used as a bridge bus.  Dr. Chu knew that.
02:08   4   He knows what a bridge bus is.
02:08   5           Here, USB is being used to connect peripherals
02:08   6   to the computer, the keyboard and mouse being connected
02:08   7   up.  XP Bus never did that.  He never connected to a
02:08   8   peripheral.
02:08   9           MR. BURESH:  If we go back to the
02:08  10   timeline now.
       11   BY MR. BURESH:
02:08  12       Q.    What's the next important point or date on the
02:08  13   timeline?
02:08  14       A.    So that would be when the patents at issue in
02:08  15   this case were filed.
02:08  16       Q.    And specifically, the parent patent.  When was
02:08  17   it filed?
02:08  18       A.    Oh, I'm sorry.  Yeah.  Okay.  Yeah.  The
02:08  19   parent patent.
02:08  20           So we were talking about the provisional here
02:08  21   in May 1998.  Two years later, Dr. Chu filed this
02:09  22   parent patent that will eventually -- that eventually
02:09  23   turned into the patents at issue in this case.
02:09  24           MR. BURESH:  Your Honor, I move to admit
02:09  25   J-58, please.
```

853

02:09  1                    MR. HALES:  Can you further explain what

02:09  2  J-58 is?  I didn't catch it.

02:09  3                    MR. BURESH:  Sure.  It's the May 2000

02:09  4  parent patent.

02:09  5                    MR. HALES:  No objection.

02:09  6                    THE COURT:  Admitted.

02:09  7  BY MR. BURESH:

02:09  8       Q.   Looking at the May 2000 patent filing, what is

02:09  9  the subject matter of that parent patent?

02:09  10      A.   So easiest thing to do is look at the title of

02:09  11  the patent here, which I've blown out.  And it's this

02:09  12  modular computer system that we've been talking about

02:10  13  the whole time.  So a computer system and method,

02:10  14  including console housing multiple computer modules.

02:10  15      Q.   Okay.  And how did Dr. Chu depict that concept

02:10  16  in this patent?

02:10  17      A.   So very similar to what we've seen before,

02:10  18  we've got the console here in green in the middle.  And

02:10  19  the only difference here from what we've been talking

02:10  20  about before is now we have two ACMs plugging into the

02:10  21  console instead of just one.  And you can see there,

02:10  22  there's a pair of yellow -- yellow bays where it would

02:10  23  plug in.

02:10  24      Q.   Okay.  So this parent patent was still dealing

02:10  25  with an attached computer module, or actually two of

854

02:10    1    them, and a peripheral console that could receive

02:10    2    those?

02:10    3        A.    That's correct.

02:10    4                MR. BURESH:    We could go to the next

02:10    5    slide, please.

02:10    6    BY MR. BURESH:

02:10    7        Q.    Now, we've been looking at a series of figures

02:11    8    from the provisional application, fair?

02:11    9        A.    Yes.

02:11   10        Q.    Are those figures in this parent application?

02:11   11        A.    So in a manner of speaking, so if you go

02:11   12    looking at the physical document, you won't find them.

02:11   13    Instead what you will find in the text of the patent is

02:11   14    this expression "incorporated by reference for all

02:11   15    purposes."

02:11   16        Q.    And what does "incorporated by reference"

02:11   17    mean?

02:11   18        A.    So what it means is if you're going to read

02:11   19    this patent, what you should do is go and get this

02:11   20    other document and staple it to the back of your patent

02:11   21    and read the whole thing.

02:11   22        Q.    So it's like it's there even though it's not

02:11   23    on the face of it?

02:11   24        A.    It's telling you, you need to go to this extra

02:11   25    effort to understand what this patent actually is.  Go

855

02:11  1    and get this other document, staple it in the back.

02:11  2                    MR. BURESH:  If we can go to the next

02:11  3    slide, please?

02:11  4    BY MR. BURESH:

02:11  5       Q.    Coming back to the timeline, let's move up to

02:11  6    the asserted patents.

02:11  7             I believe Dr. Sarhan focused on the '768

02:12  8    patent.  So I'm going to ask you to do the same.

02:12  9             When was that filed?

02:12  10      A.    Yeah.  So that's this one over here that was

02:12  11   filed March 13th, 2014.  It's the '768.

02:12  12      Q.    And it relates back to the May 2000 parent,

02:12  13   correct?

02:12  14      A.    Yes.  Yeah.  Both of these trace their lineage

02:12  15   all the way back to that May 2000 patent.

02:12  16      Q.    Okay.  Now, the jurors have the asserted

02:12  17   patents in their binders.

02:12  18             Do you have a binder with patents in front of

02:12  19   you?

02:12  20      A.    Yes.  Yeah.  I have what I believe to be

02:12  21   similar to the juror notebook that you have in front of

02:12  22   you.

02:12  23      Q.    Is there Exhibit J-1, the '768 patent in

02:12  24   there?

02:12  25      A.    Yeah.  That's -- I believe that's the first

856

02:12   1   patent in the collection.  I don't know if this one got

02:12   2   shuffled, but you can see it pretty easily.

02:12   3       Q.   Okay.  Why don't you pull that out of your

02:12   4   binder?

02:13   5            MR. BURESH:  And I would invite the jury

02:13   6   to follow along, if you want to.

02:13   7       A.   Yeah.  Absolutely.  A little show and tell

02:13   8   here.

        9   BY MR. BURESH:

02:13  10       Q.   Okay.  So, Dr. Edwards, I just want to walk

02:13  11   the jury through the parts of a patent so we can kind

02:13  12   of finally see what we've been talking about for three

02:13  13   days now.

02:13  14       A.   Absolutely.

02:13  15       Q.   All right.  Let's start with an easy one.

02:13  16            Where are we going to find the patent number?

02:13  17       A.   So the patent number, if you look here -- and

02:13  18   he's got it highlighted as well -- upper right-hand

02:13  19   corner of the page.  And you can see it actually says

02:13  20   "Patent No."  And it starts U.S. 9,529, and then 768.

02:13  21            There are too many digits in most patent

02:13  22   numbers.  So we usually abbreviate using the last three

02:14  23   digits.  So this is indeed the '768 that we've been

02:14  24   talking about.

02:14  25       Q.   And where would we find the title of the

857

02:14    1    patent?

02:14    2        A.    So that's on the left.  And it's immediately

02:14    3    under the inventor's name, Chu, and it's this little

02:14    4    thing marked 54 that starts:  Computer system including

02:14    5    CPU or peripheral bridge.

02:14    6        Q.    And while we're on the title, it's referring

02:14    7    to a bridge, correct?

02:14    8        A.    It is.

02:14    9        Q.    Is that the bus bridge concept?

02:14   10        A.    Absolutely.

02:14   11        Q.    Okay.  How about the figures?  We've looked at

02:14   12    figures in a variety of documents.  I'm going to have

02:14   13    to pull out the rest of the patent, but can you show

02:14   14    the jury where they'll find the figures?

02:14   15        A.    Certainly.  So on the front of most patents,

02:14   16    there's one figure.  But that's just the beginning.  If

02:14   17    you go in -- let's see.  Oh, this one does have page

02:14   18    numbers on it.

02:14   19              So it starts at the page labeled J-1-15 at the

02:14   20    bottom.  And at the top you can see Sheet 1 of 35.  And

02:15   21    this is where the figures begin.  So there's a -- like

02:15   22    it says, there's 35 sheets of figures one after the

02:15   23    other here.  And many of these should be familiar to

02:15   24    you by now.

02:15   25        Q.    So that's the figures.

858

02:15  1          What about the written description or the
02:15  2    words describing the invention?
02:15  3      A.    Right.  So every patent is -- that I've ever
02:15  4    seen is structured like this.  You've got the face with
02:15  5    the title.  You've got a fair number of figures,
02:15  6    usually.  And then the written description begins.  So
02:15  7    it's after the figures.  So with this one, it's labeled
02:15  8    J-1-50 at the bottom.
02:15  9      Q.    Okay.  Now, I see that there's -- in the
02:15  10   written description, there's numbers above the left
02:15  11   column and the right column.
02:15  12     A.    Yeah.
02:15  13     Q.    And then there's a series of numbers down the
02:15  14   middle, right?
02:15  15     A.    Yeah.
02:15  16     Q.    Describe to the jury how those numbers work to
02:16  17   help us locate content within the patents.
02:16  18     A.    Right.  So here we're kind of lucky in that we
02:16  19   actually have page numbers at the bottom.  Those
02:16  20   usually aren't there.
02:16  21          Instead, to talk about the location of
02:16  22   something within a written description, basically, you
02:16  23   know, some word or sentence or paragraph, something
02:16  24   like that, the numbers at the top indicate the columns.
02:16  25          So on J-1-50 at top, you see 1, 2.  And then

02:16  1    you turn to the next page, 3, 4, and so forth.  That

02:16  2    tells you what column you're in.

02:16  3         The little numbers between the columns tell

02:16  4    you what line is each one.  So there's no 1.  But if

02:16  5    you look at 5, that is, in fact, the fifth line from

02:16  6    the top.  There's a 10, and that's the tenth line from

02:16  7    the top, and so forth.

02:16  8         So we might say something like, oh, Column 2,

02:16  9    Line 14, that's where another paragraph starts.

02:16  10   Q.    Okay.  Now, let's do a little exercise with

02:16  11   that.  Back to the patent, please.

02:17  12        Let's say there's some disclosure that we want

02:17  13   to look at -- and we've actually looked at this

02:17  14   previously in the case.  But just so we can all do the

02:17  15   exercise together, if we want.

02:17  16        Let's go to Column 5.

02:17  17   A.    Yep.  Oh, I'm not supposed to do this, so I'll

02:17  18   help you cheat.  It's labeled J-1-52 at the bottom.

02:17  19   Q.    Now, if we want to look at disclosure that

02:17  20   starts at Line 19, give ourselves a second and then how

02:17  21   does that start?

02:17  22   A.    Right.  So Column 5, Line 19?

02:17  23   Q.    Uh-huh.

02:17  24   A.    Right.  So Column 5 was on the left side of

02:17  25   that page.  And you look down -- well, there's no 19,

02:17  1    but of course there's a 20.

02:17  2        Q.    Need to back up from the mic just a little

02:17  3    bit.

02:17  4        A.    And so it looks like Line 19, just above 20,

02:17  5    is a paragraph that starts with:  The present invention

02:18  6    encompasses an apparatus for bridging a first computer

02:18  7    interface bus and a second computer interface bus.

02:18  8        Q.    Okay.  Now, is that paragraph that we've just

02:18  9    done this exercise with, what is that saying about the

02:18  10   invention that's disclosed in the '768 patent?

02:18  11       A.    Well, there's our bridge.  It's saying present

02:18  12   invention, that's everything.  That is the patent

02:18  13   saying, hey.  This is what I invented.  It's an

02:18  14   apparatus for bridging a first computer interface bus

02:18  15   and a second interface bus.

02:18  16            So you remember that picture we were looking

02:18  17   at awhile ago and I said it looked like the suspension

02:18  18   bridge?  Well, PCI -- XP Bus/PCI, that's what this text

02:18  19   is telling us is the invention.

02:19  20       Q.    Okay.  And again, that apparatus, just to be

02:19  21   clear, it's also referred to as an interface channel in

02:19  22   this paragraph, correct, on Line 25?

02:19  23       A.    Yes.  See, that's the advantage of these

02:19  24   coordinates, right?  If you look on Line 25, it starts:

02:19  25   The apparatus comprises an interface channel having a

02:19　1　clock line and plurality of bit lines for transmitting

02:19　2　bits.

02:19　3　　　　　So yes.

02:19　4　　　Q.　And what is the interface channel in this

02:19　5　patent?

02:19　6　　　A.　It's referring to the XP Bus.

02:19　7　　　Q.　Now, let's complete our patent walk-through.

02:19　8　　　　　If the jury wants to look at the claims of the

02:19　9　patent, go past the written description.  Where are

02:19　10　they going to find the claims?

02:19　11　　　A.　Right.  So the claims are where the inventor

02:19　12　lays out a little bit more precisely what he thinks his

02:19　13　invention is.  There's some technicalities I'm leaving

02:20　14　out here, but it's always right at the end of a patent.

02:20　15　　　　　So this patent ends J-1-72.  And let's see.

02:20　16　You can see the claims ending there.  The claims

02:20　17　themselves start in Column 40.  This is J-1-69.  And

02:20　18　what is that?  Line 36.

02:20　19　　　　　It's this numbered list that starts:  What is

02:20　20　claimed is...

02:20　21　　　　　And then we've got a bunch of numbered claims

02:20　22　one after the other.

02:20　23　　　Q.　And now we can all say we've looked through

02:20　24　the parts of at least one patent, correct?

02:20　25　　　A.　Quite.  Full credit.

862

02:20  1        Q.    All right.  Now, Dr. Edwards, you've looked at

02:20  2   these asserted patents, correct?

02:20  3        A.    Correct.

02:20  4        Q.    Is there any disclosure in any of Dr. Chu's

02:20  5   patent filings of LVDS channels that are anything other

02:21  6   than the channels of a bus bridge?

02:21  7        A.    No.

02:21  8        Q.    The figures from the provisional application

02:21  9   that we've looked at, are those incorporated by

02:21  10  reference into the asserted patents?

02:21  11       A.    Yes.  They are.

02:21  12       Q.    And that means that the jury won't necessarily

02:21  13  find them when they're flipping through the '768

02:21  14  patent.  They would need to look at the provisional

02:21  15  application?

02:21  16       A.    Yeah.  That's correct.  It's unfortunate that

02:21  17  when these binders were put together, they didn't do

02:21  18  all that stapling they told you to.

02:21  19             But you can go and find the "as was

02:21  20  incorporated by reference" and it's a long chain, but

02:21  21  what that's telling us is that, yes, these figures that

02:21  22  we've been showing you from the provisional are

02:21  23  supposed to be there.

02:21  24       Q.    And the provisional is J-35, correct?

02:21  25       A.    That's correct.

02:21  1      Q.    Have you ever done an analysis before this

02:21  2  case as to whether particular products infringe a

02:22  3  particular patent claim?

02:22  4      A.    Yes.  A number of times.

02:22  5      Q.    If we could --

02:22  6                MR. HALES:  Your Honor, can we sidebar?

02:22  7                THE COURT:  Of course.

02:22  8                (Bench conference.)

02:22  9                MR. HALES:  So I've been pretty patient

02:22  10  allowing him to discuss the background of this -- the

02:22  11  asserted patent and the patents leading up to it.

02:22  12                I don't know that I've seen in his

02:22  13  noninfringement or invalidity reports what I believe to

02:22  14  be the next shoe that will drop, which is:  There's no

02:22  15  disclosure -- I'm sorry -- to infringe you have to be

02:22  16  an LVDS that acts as a bridge or that there's not

02:22  17  sufficient written description to lay support for LVDS

02:22  18  in any context except for a bridge.

02:22  19                THE COURT:  You're saying that's not in

02:22  20  his report, right?

02:22  21                MR. HALES:  His report is --

02:22  22                THE COURT:  Here's what we're going to

02:22  23  do.  He's going to ask the question.  And if you think

02:22  24  it's not in his report, you're going to stand up and

02:22  25  say, it's not in his report.  And then my

02:22  1    instructions -- he has a key next to his question and

02:23  2    says, here it is in his report.  And he's going to tell

02:23  3    you where it is in his report.

02:23  4                    MR. HALES:  Works for me.

02:23  5                    THE COURT:  I can't --

02:23  6                    MR. BURESH:  Do you have a copy of his

02:23  7    report, or you want me to bring you up one?

02:23  8                    THE COURT:  No, no.  If you represent to

02:23  9    me that it's at page and paragraph, then I'm going to

02:23  10   believe you.

02:23  11                   MR. BURESH:  Thank you, Your Honor.

02:23  12                   THE COURT:  You just need to do that.

02:23  13   Now, it doesn't have to be the exact same quote.

02:23  14                   MR. BURESH:  Oh, I understand.

02:23  15                   THE COURT:  And so what I -- what -- this

02:23  16   is the test.  What -- when I look at it, would I feel

02:23  17   that he has prepared -- the other side has prepared for

02:23  18   the jury to hear what this man's about to say.  That's

02:23  19   the big picture stuff.

02:23  20                   And if he says it's not in the report and

02:23  21   you say, look at Page 69 of Paragraph 8, I'm going to

02:23  22   say, overruled.

02:23  23                   Because -- now, if he were to look at

02:23  24   that and after a number of times think you're not being

02:23  25   straight with me, we'll have another discussion up

02:23    1    here.

02:23    2              But for practical purposes, as long as

02:24    3    you can tether in the record where you believe it's

02:24    4    found, I'm going to overrule the objection.

02:24    5              MR. HALES:  Thank you, Your Honor.

02:24    6              (Bench conference concludes.)

02:24    7              MR. BURESH:  If we can go to the next

02:24    8    slide, please.

02:24    9    BY MR. BURESH:

02:24   10    Q.    Describe for the jury, please, using the

02:24   11    analogy on the screen in front of us how an

02:24   12    infringement analysis works.

02:24   13    A.    Right.  So we were just looking at claims of

02:24   14    that patent.  So one of the questions you have is:

02:24   15    Does something practice a claim?  You know, is it doing

02:24   16    what the invention says you have to do if you're doing

02:24   17    that invention?

02:24   18              So imagine we had a claim that started off

02:24   19    with a ball that was made of leather, stitched

02:25   20    together, filled with air, and spherical in shape.

02:25   21              Now, you know, the claims we were looking at,

02:25   22    none of them have anything to do with leather, but this

02:25   23    way of structuring claims as a sequence of parts, it's

02:25   24    a series of parts, is very common and present in the

02:25   25    patents you're looking at as well.

02:25  1        And the rule is to infringe, every single one

02:25  2   of those parts needs to be there.  So, for example,

02:25  3   with these claims, a ball made of leather, stitched

02:25  4   together, filled with air, spherical in shape, soccer

02:25  5   ball practices that.  Other balls may too, but we're

02:25  6   just doing the analysis for the soccer ball.

02:25  7        But consider a football.  Well, football is

02:25  8   made of leather, stitched together, it is filled with

02:25  9   air, but it's not spherical in shape.  It's some weird

02:25  10  oblong thing.  So the result is, is that a football

02:26  11  would not practice this claim because of this one

02:26  12  missing part.

02:26  13     Q.    Okay.  So if even one claim element is

02:26  14  missing, there's no infringement?

02:26  15     A.    That's correct.

02:26  16     Q.    And if there's multiple claim elements

02:26  17  missing, there's even more noninfringement?

02:26  18     A.    I don't think you can become more

02:26  19  noninfringing, right?  As soon as you have one, that's

02:26  20  all it takes.

02:26  21     Q.    Okay.

02:26  22     A.    Doesn't matter how many more don't match up.

02:26  23     Q.    Now, we've also heard about some of the

02:26  24  Court's definitions for certain claim terms, correct?

02:26  25     A.    That's correct.

—867—

02:26  1          MR. BURESH:  Mr. Palisoul, could you pull

02:26  2   up the Court's claim constructions?

02:26  3          And y'all can find this in your juror's

02:26  4   notebook as well.

02:26  5   BY MR. BURESH:

02:26  6   Q.    What is the role of the Court's claim

02:26  7   definitions in your analysis?

02:26  8   A.    Right.  So if you read a patent, you need to

02:27  9   understand what it's saying.  Now, most of the time,

02:27  10  it's just -- you look at the words on the page and, you

02:27  11  know, you go from there.

02:27  12         Many cases, and this one included, the Court

02:27  13  will provide explicit definitions for certain terms.

02:27  14  These are called claim constructions.  And we've got a

02:27  15  list of them -- you have this in your binder.  I think

02:27  16  we've even talked about this.

02:27  17         But peripheral component interconnect, PCI,

02:27  18  bus transaction is defined.  Console, there's a very

02:27  19  particular definition.  Then another one, encoded

02:27  20  serial bit stream of PCI interconnect bus transaction.

02:27  21         So the rule is when I read the patent and try

02:27  22  to understand infringement, if I come across one of

02:27  23  these terms, I follow the Court's definition.

02:28  24  Q.    Okay.  Now, there's a number of terms in the

02:28  25  claims that the Court doesn't provide a definition for,

868

02:28  1    fair?

02:28  2        A.    That's correct.

02:28  3        Q.    What do you do with those?

02:28  4        A.    So that's when you start talking about the

02:28  5    person of ordinary skill in the art.  Now, I was one of

02:28  6    these 20-some years ago, and I can imagine what that

02:28  7    person would think.

02:28  8            We're not expecting you to be, you know, a

02:28  9    person of ordinary skill in the art.  So a lot of the

02:28  10   terms are going to be, you know, what the heck is he

02:28  11   talking about, or it could be any of these things?

02:28  12           So the rule is:  What would a person of

02:28  13   ordinary skill in the art at the time reading the

02:28  14   patent understand that to mean?

02:28  15                   MR. BURESH:  Go to the next slide,

02:28  16   please.

02:28  17   BY MR. BURESH:

02:28  18       Q.    What are the accused representative products

02:28  19   in this case?

02:28  20       A.    So we've seen these before.  One of them is

02:28  21   this gaming laptop.  The other one is this desktop PC.

02:28  22       Q.    Okay.  And what technology in these accused

02:29  23   representative products is Dr. Sarhan asserting

02:29  24   infringes?

02:29  25       A.    So he's pointed to PCI Express, and he's

869

02:29  1  pointed to USB 3.

02:29  2      Q.   At a high level, what did you conclude with

02:29  3  respect to Dr. Sarhan's allegations?

02:29  4      A.   They don't hold water.  They don't -- they're

02:29  5  not correct.

02:29  6              MR. BURESH:  Okay.  Go to the next slide.

02:29  7  You're there already.  Thank you.

02:29  8  BY MR. BURESH:

02:29  9      Q.   This is Claim 19 from the '359 patent,

02:29  10  correct?

02:29  11      A.   Correct.

02:29  12      Q.   And if the jury wants to find that claim,

02:29  13  again, where would they flip to in their notebook?

02:29  14      A.   Right.  Okay.  So yes.  If you'd like to

02:29  15  follow along, find the '359 patent.  So that's the

02:29  16  second one.  That's J-2.

02:29  17              And then we're looking at Claim 19.  So go to

02:29  18  the very end.  And it's actually on the very last page.

02:30  19  It starts on Column 39 and continues onto Column 40.

02:30  20  So technically speaking, you can find 19, a computer

02:30  21  comprising, on Column 39, starting at Line 60.

02:30  22      Q.   Okay.  Now, in Claim 19 of the '359 patent, if

02:30  23  we look about halfway down, we're going to see a

02:30  24  connector that can couple to a console.

02:30  25              Do you see that?

870

02:30  1      A.    Yes.

02:30  2      Q.    How has the Court defined the term "console"

02:30  3  in this case?

02:30  4      A.    Yeah.  So we saw it a moment ago.

02:30  5            MR. BURESH:  If we can go to the next

6  slide, please.

02:30  7            Thank you.

02:30  8      A.    Yeah.  Thank you.

02:30  9            And I've reproduced it here.  So if the Court

02:30 10  has said a console -- when we're reading these claims

02:30 11  in the patent -- means a chassis or enclosure housing

02:30 12  one or more coupling sites that connects components of

02:31 13  a computer system.

02:31 14            And so one of the things you ought to ask

02:31 15  yourselves is -- you know, does that make sense?  And

02:31 16  yeah.  That fits nicely with what we've seen in the

02:31 17  patents and, you know, the gray box and so forth that

02:31 18  was shown earlier.  So this just seems like a

02:31 19  reasonable construction, a reasonable definition for

02:31 20  console here.

02:31 21  BY MR. BURESH:

02:31 22      Q.    And in fact, it is the definition, right?

02:31 23      A.    It is absolutely the definition.

02:31 24            MR. BURESH:  Now, if we could go to the

02:31 25  next slide.

871

02:31  1    BY MR. BURESH:

02:31  2         Q.    What is Dr. Sarhan contending meets that

02:31  3    console requirement in the representative accused

02:31  4    products?

02:31  5         A.    So it seems to be peripherals.  So he's

02:31  6    identified things like a printer and external hard

02:31  7    drive and a monitor as consoles.

02:31  8         Q.    Do you agree with that?

02:31  9         A.    No.  That doesn't seem to match up.

02:31  10        Q.    Why not?

02:31  11        A.    Well, they're peripherals, not consoles.

02:31  12   Peripherals are the things that connect to the console.

02:31  13   How can something that you're supposed to connect --

02:32  14   are you connecting it to itself or -- I can't

02:32  15   understand it.  They're peripherals that he's

02:32  16   identifying, not the console.

       17        Q.    If we go back to the --

02:32  18              MR. BURESH:  Next slide, please.

02:32  19   BY MR. BURESH:

02:32  20        Q.    If we go back to the claim language, what is

02:32  21   your conclusion about whether Dr. Sarhan and ACQIS have

02:32  22   established that the console limitations are satisfied

02:32  23   in the asserted claims?

02:32  24        A.    Right.  So I look at what Dr. Sarhan is

02:32  25   pointing to as a console and I say, that's not a

—872—

02:32  1  console.  That doesn't meet the Court's definition.

02:32  2          So this part of the patent claim is not being

02:32  3  practiced by -- in the -- in the ASUSTeK products.

02:32  4                  MR. BURESH:  Okay.  If we could go to the

02:32  5  next slide.

02:32  6  BY MR. BURESH:

02:32  7      Q.    And here we've highlighted the first and

02:32  8  second LVDS channels?

02:32  9      A.    Correct.

02:32  10     Q.    From Claim 19, correct?

02:32  11     A.    Yes.

02:32  12     Q.    Has the Court construed the term "LVDS

02:33  13  channel" in this case?

02:33  14     A.    It has not.

02:33  15     Q.    In view of Dr. Chu's original patent

02:33  16  disclosures that we've looked at, as a person of

02:33  17  ordinary skill in the art in 1999 and 2000, what is

02:33  18  your understanding of an LVDS channel?

02:33  19     A.    Well, we saw it on the cover of that National

02:33  20  Semiconductor book which Dr. Chu used.  It's for

02:33  21  bridging buses.  It's this technology for taking a

02:33  22  bunch of parallel stuff --

02:33  23                  MR. HALES:  Objection, Your Honor.

02:33  24     A.    -- sending it over and putting it over.

02:33  25                  MR. HALES:  This is a new opinion.

—873—

02:33  1              MR. BURESH:  This opinion was disclosed

02:33  2    in at least Paragraphs 184 through 224 of Dr. Edwards'

02:33  3    report.

02:33  4              THE COURT:  And just to be clear, did he

02:33  5    do just one report or is there --

02:33  6              MR. BURESH:  He did two reports.  This

02:33  7    would be his noninfringement analysis.

02:33  8              THE COURT:  Okay.  Thank you, sir.

02:33  9              MR. HALES:  Your Honor, if I can respond.

02:34  10             THE COURT:  Sure.

02:34  11             MR. HALES:  184 begins discussion about

02:34  12   the USB limitations.  This is being rendered in

02:34  13   response to the first LVDS channel, which in every

02:34  14   instance is a PCI Express channel.  Therefore, this is

02:34  15   new opinion, at least as to that first LVDS limitation.

02:34  16             MR. BURESH:  And, Your Honor, if we can

02:34  17   go on past 284 to 285 and following, there is the same

02:34  18   section on PCI Express which refers back to the

02:34  19   analysis on USB not constituting LVDS channels.

02:34  20             THE COURT:  Why don't we do this:  Why

02:34  21   don't you have him turn to that part of the -- his

02:34  22   report and explain where the opinion you're now asking

02:34  23   him for is in his report?

02:34  24             MR. HALES:  And the objection is

02:34  25   particularly with regard to being a bridge bus or a

02:34    1    bridge channel.  That is new opinion.

02:34    2                   MR. BURESH:  Your Honor, may we approach?

02:34    3                   THE COURT:  Sure.

02:34    4                   (Bench conference.)

02:35    5                   MR. BURESH:  I'm sorry.  You want me to

02:35    6    do what?

02:35    7                   THE COURT:  He's saying that what you're

02:35    8    asking this expert --

02:35    9                   MR. BURESH:  I understand.

         10                   (Simultaneous conversation.)

02:35   11                   MR. BURESH:  You want me to have the

02:35   12    expert --

02:35   13                   THE COURT:  Turn to the report and say,

02:35   14    he's just challenged you to say this specific issue's

02:35   15    not in the report.  Would you explain to the jury where

02:35   16    it is in your report?

02:35   17                   MR. BURESH:  Okay.  Thank you.

02:35   18                   MR. HALES:  And I'm going to be very

02:35   19    closely watching the issue of LVDS can't be used as a

02:35   20    bridge.

02:35   21                   THE COURT:  Counsel, I just ruled.

02:35   22                   MR. HALES:  Got it.

02:35   23                   (Bench conference concludes.)

02:35   24    BY MR. BURESH:

02:36   25        Q.    Okay.  Dr. Edwards, you have a copy of your

875

02:36    1    report in front of you.

02:36    2        A.    I do.

02:36    3        Q.    I'm going to ask you to turn to Paragraph 185.

02:36    4    Okay.

02:36    5              In this paragraph, are you beginning to

02:36    6    discuss the analysis that you conducted showing that

02:36    7    USB 3 and later channels are not LVDS channels?

02:36    8        A.    Yes.

02:36    9        Q.    Okay.  Are you concluding that such claims

02:36    10   by -- as Dr. Sarhan has made are inconsistent with the

02:36    11   disclosure of the asserted patents and are simply wrong

02:36    12   at the bottom of Paragraph 185?

02:36    13       A.    Yes.

02:36    14       Q.    If we go to Paragraph 187, do you express the

02:37    15   opinion that a USB channel not being an LVDS channel

02:37    16   applies equally to any claim where Dr. Sarhan has

02:37    17   pointed to USB as an LVDS channel?

02:37    18       A.    Yes.

02:37    19       Q.    Okay.  If we go to Paragraph 191, Dr. Edwards.

02:37    20       A.    I'm there.

02:37    21       Q.    If you could review that paragraph and

02:37    22   describe to the jury the opinion that you are

02:37    23   articulating in that paragraph.

02:37    24       A.    This is 191?

02:37    25       Q.    Correct.

876

| | | |
|---|---|---|
| 02:37 | 1 | A.    Okay.  So this is discussion primarily just -- |
| 02:38 | 2 | let's see. |
| 02:38 | 3 | So it's talking about how USB transactions |
| 02:38 | 4 | would be carried over one of these LVDS channels.  And |
| 02:38 | 5 | then I write:  But by suggesting that both USB data and |
| 02:38 | 6 | other data such as PCI data types to be carried over |
| 02:38 | 7 | the same channel, these disclosures are counter to |
| 02:38 | 8 | Dr. Sarhan's interpretation -- |
| 02:38 | 9 | THE COURT:  Slow down just a little bit. |
| 02:38 | 10 | THE WITNESS:  Sorry, Your Honor. |
| 02:38 | 11 | THE COURT:  No.  It's okay.  I have a new |
| 02:38 | 12 | court reporter. |
| 02:38 | 13 | THE WITNESS:  I feel -- |
| 02:38 | 14 | THE COURT:  She's not. |
| 02:38 | 15 | THE WITNESS:  I feel for her. |
| 02:38 | 16 | A.    -- of the USB protocol claims. |
| 02:38 | 17 | BY MR. BURESH: |
| 02:38 | 18 | Q.    In other words, what do you reach as a |
| 02:38 | 19 | conclusion in the last sentence of that paragraph? |
| 02:38 | 20 | A.    Yeah.  Well, then I write:  These disclosures |
| 02:38 | 21 | do not support Dr. Sarhan's suggestion that the USB |
| 02:39 | 22 | protocol claims are simply referring to transferring |
| 02:39 | 23 | USB data over a USB channel, such as a USB 3.0 channel. |
| 02:39 | 24 | Q.    And in the next paragraph, are you indicating |
| 02:39 | 25 | that -- |

—877—

02:39    1          THE COURT:  I'm good.  I'm overruling the

02:39    2    objection.

02:39    3          MR. BURESH:  Okay.  Thank you, Your

02:39    4    Honor.

02:39    5          THE COURT:  Unless you just want him to

02:39    6    read the next --

02:39    7          MR. BURESH:  But this is kind of fun.  We

02:39    8    could do this.  I'm sure everybody enjoys it.

02:39    9          (Laughter.)

02:39   10          MR. BURESH:  But I'd probably go back to

02:39   11    my slides, if that's okay with Your Honor?

02:39   12          THE COURT:  That's fine with me.

02:39   13    BY MR. BURESH:

02:39   14    Q.    Okay.  If we could back up a step now to get

02:39   15    ourselves back on track.

02:39   16          In view of your analysis of the patents and

02:39   17    going back to the original disclosures, what is your

02:39   18    understanding of what an LVDS channel is based on?

02:39   19    A.    So the patent is -- or the patents -- all of

02:40   20    the patents and all the documents stapled to them are

02:40   21    very consistent.  LVDS channel is being used to bridge

02:40   22    things from place to place.

02:40   23          The National data book that Dr. Chu cites and

02:40   24    relied on is telling -- saying LVDS is used to bridge.

02:40   25          I'm relying on all of this.

—878—

02:40  1      Q.    Okay.  And again, is there any disclosure in

02:40  2   any of the patent documents where LVDS channels are

02:40  3   used for something other than bridging the two buses?

02:40  4      A.    No.  Dr. Chu is always saying use LVDS to

02:40  5   bridge.

02:40  6      Q.    Now, I want to look at Dr. Sarhan's analysis a

02:40  7   little bit that we saw from yesterday.

02:40  8           MR. BURESH:  If we could pull up PDX-03

02:40  9   at Slide 117, please.

02:40  10  BY MR. BURESH:

02:41  11     Q.    Dr. Edwards, what does Dr. Sarhan contend is

02:41  12  the first LVDS channel of Claim 19?

02:41  13     A.    Let's see.  I think he was pointing to this

02:41  14  PCI Express channel coming off the processor on the top

02:41  15  left.

02:41  16     Q.    Okay.  And what did Dr. Sarhan contend was the

02:41  17  second LVDS channel of Claim 19?

02:41  18     A.    He was pointing to the USB 3 ports off of the

02:41  19  PCH.  That's this green -- green box in the bottom.

02:41  20     Q.    So one on the left and one on the right?

02:41  21     A.    Correct.

02:41  22     Q.    Is PCI Express a bus bridge like the XP Bus?

02:41  23     A.    No.  PCI Express is a bus.

02:41  24     Q.    How about USB 3?  Is it a bus bridge?

02:41  25     A.    No.  It's right there in the name.  It's the

02:42   1    universal serial bus.

02:42   2        Q.    So it's not the XP Bus?

02:42   3        A.    It's not like the XP Bus.  This isn't the

02:42   4    USB-B.

02:42   5              MR. BURESH:  Could we pull up Joint

02:42   6    Exhibit 20, the PCI Express Version -- Revision 3?

02:42   7    BY MR. BURESH:

02:42   8        Q.    Are you familiar with this document,

02:42   9    Dr. Edwards?

02:42   10       A.    Yes.

02:42   11       Q.    Does the phrase "LVDS" appear anywhere in the

02:42   12   specification?

02:42   13       A.    No.

02:42   14             MR. BURESH:  Mr. Palisoul, can you do a

02:42   15   search on this document for the name "LVDS"?

02:42   16   BY MR. BURESH:

02:42   17       Q.    Dr. Edwards, are you seeing any results from

02:42   18   that search?

02:42   19       A.    No.  It says no matches were found.

02:42   20       Q.    And why doesn't the term "LVDS" appear in the

02:43   21   PCI Express specification?

02:43   22       A.    Well, I can't read the minds of the people who

02:43   23   wrote it, but they knew it wasn't LVDS.  They didn't

02:43   24   think of it that way.

02:43   25       Q.    Okay.

880

02:43   1                    MR. BURESH:  Let's bring up Joint

02:43   2   Exhibit 47, please.

        3   BY MR. BURESH:

02:43   4        Q.    This is the USB 3 specification.  Correct?

02:43   5        A.    Correct.

02:43   6        Q.    Are you familiar with this specification?

02:43   7        A.    I am.

02:43   8        Q.    And does the name "LVDS" appear in this

02:43   9   specification?

02:43   10        A.    It does not.

02:43   11                    MR. BURESH:  Mr. Palisoul, could you run

02:43   12   a search on this document?

02:43   13   BY MR. BURESH:

02:43   14        Q.    Dr. Edwards, do you see any matches?

02:43   15        A.    Again, it says no matches were found.

02:43   16        Q.    Why doesn't the term "LVDS" appear in the USB

02:43   17   3 specification?

02:43   18        A.    Well, I conjecture the people writing it

02:44   19   didn't think it was LVDS.

02:44   20        Q.    Would it even make sense to use a bus bridge

02:44   21   like Dr. Chu's XP Bus in the context of the

02:44   22   interconnections that were pointed to by Dr. Sarhan?

02:44   23        A.    No.  It would slow things down.  One of them's

02:44   24   connecting to a PCIe device, and that wants to speak to

02:44   25   PCIe protocol.  Why would you put a bridge in there if

02:44   1   you just wanted to go straight there?  That would just

02:44   2   slow things down.

02:44   3           And then, similarly, for USB, why build a

02:44   4   bridge if there's no river to cross?

02:44   5                 MR. BURESH:  If we could go back to the

02:44   6   slide, please.  Back one.

02:45   7                 Mr. Palisoul, can you get me to the one

02:45   8   with the -- Dr. Sarhan's.  That's the one I'm looking

02:45   9   for, Dr. Sarhan's slide.

02:45   10  BY MR. BURESH:

02:45   11      Q.    Okay.  And, Dr. Edwards, just so we can talk

02:45   12  about this for a minute more, can you circle the two

02:45   13  that Dr. Sarhan is accusing again?

02:45   14      A.    Sure.

02:45   15      Q.    And explain one more time, looking at this

02:45   16  picture now, would it make sense to have a bridge bus

02:45   17  for either of these buses, PCI Express or USB?

02:45   18      A.    Yeah.  Not at all.  That would be something

02:45   19  like, you know, let's add something that slows things

02:45   20  down in the middle of these along the way.

02:45   21           You know, again, if you want to get somewhere

02:46   22  and you can get there without crossing a bridge, why

02:46   23  spend the time?

02:46   24      Q.    Okay.  In Dr. Chu's disclosures, is there ever

02:46   25  any more than one XP Bus?

882

02:46  1      A.    No.  Every single time, it's one attached

02:46  2  computer module, one XP Bus.

02:46  3      Q.    Did any -- in any of his patent disclosures,

02:46  4  did you see anything looking like two separate XP Buses

02:46  5  going off in different directions?

02:46  6      A.    No.

02:46  7      Q.    In his disclosures, did you see anything that

02:46  8  looked like an XP Bus that was spread over different

02:46  9  places?

02:46  10     A.    No.  It was always one ACM, one XP Bus.

02:46  11               MR. BURESH:  If we could go back to our

02:46  12  slides now.

02:46  13               Next slide, please.

02:46  14  BY MR. BURESH:

02:46  15     Q.    Have you reached a conclusion with respect to

02:46  16  whether the first and second LVDS channel limitations

02:46  17  of Claim 19 are satisfied in the accused products?

02:47  18     A.    Right.  Not -- I don't agree with Dr. Sarhan's

02:47  19  conclusions.  So these two parts are not being

02:47  20  practiced.

02:47  21     Q.    If we could move to the adapted to transmit

02:47  22  limitation at the bottom.

02:47  23               Do you see that, Dr. Edwards?

02:47  24     A.    Yes.

02:47  25     Q.    Can you explain to the jury what it means to

02:47  1    adapt a channel to transmit USB data over Dr. Chu's

02:47  2    LVDS channels?

02:47  3        A.    Right.  Well, to adapt something means you got

02:47  4    to do something to change it to make it actually work.

02:47  5    So in Dr. Chu's invention, that adaptation is something

02:47  6    like you take the USB data and you change it and you

02:47  7    encode it so that it works on the XP Bus, and then

02:48  8    you -- so that you can do something at the other end.

02:48  9        Q.    Okay.

02:48  10       A.    If you don't have to change it, I don't see

02:48  11   how it gets adapted.

02:48  12       Q.    Do you have to adapt a USB 3 link in order to

02:48  13   transmit USB 3 data?

02:48  14       A.    No.  That's exactly what a USB 3 link does.

02:48  15       Q.    Do Dr. Chu's patent disclosures ever call his

02:48  16   LVDS channels a USB channel?

02:48  17       A.    No.

02:48  18       Q.    Do they ever call a USB channel an LVDS

02:48  19   channel?

02:48  20       A.    No.

02:48  21       Q.    They treat them as distinct, don't they?

02:48  22       A.    Yes.  They -- he understands the distinction.

02:48  23       Q.    Okay.  With respect to the final limitation of

02:48  24   Claim 19 that we're looking at on Slide 47, what is

02:48  25   your conclusion with respect to whether that limitation

884

02:48  1    is satisfied in the accused products?

02:48  2         A.    Yes.   Again, I find that it's not satisfied.

02:48  3         Q.    We have four elements of this claim that are

02:49  4    not satisfied.

02:49  5              What does that mean with respect to your

02:49  6    overall opinion regarding Claim 19 of the '359 patent?

02:49  7         A.    Well, remember, it only takes one red X.   We

02:49  8    have four red Xs here.   This claim is not satisfied.

02:49  9    Not infringed.

02:49  10        Q.    All right.

02:49  11              MR. BURESH:   If we can go to the next

02:49  12   slide.

02:49  13   BY MR. BURESH:

02:49  14        Q.    What claim do we have on Slide 50,

02:49  15   Dr. Edwards?

02:49  16        A.    So this is the '768 patent, Claim 13.

02:49  17        Q.    And how does Claim 13 of the '768 patent

02:49  18   compare to Claim 19 of the '354 -- '359 that we just

02:49  19   looked at?

02:49  20        A.    So in particular, I've written it out here in

02:49  21   bold, we have this LVDS channel constraint as well

02:49  22   being identified.

02:49  23        Q.    And is your understanding of an LVDS channel

02:49  24   in this claim any different than the LVDS channels that

02:49  25   we just looked at in the previous claim?

885

02:49  1        A.    No.  All the LVDS channels in the claims and

02:50  2   the patent and so forth are the same.

02:50  3        Q.    What does Dr. Sarhan contend is the LVDS

02:50  4   channel of Claim 13 of the '768 patent?

02:50  5        A.    He's pointing again to the PCI Express link.

02:50  6        Q.    And is -- is an PCI Express link an LVDS

02:50  7   channel in the context of Claim 13?

02:50  8        A.    No.

02:50  9        Q.    In addition, this middle limitation has the

02:50  10  requirement of:  Conveying address and data bits of a

02:50  11  peripheral component interconnect PCI bus transaction.

02:50  12        Do you see that?

02:50  13        A.    That's correct.

02:50  14        Q.    At a high level, what does that limitation

02:50  15  require?

02:50  16        A.    Well, so there's a bunch of words here.  I

02:51  17  apologize to the jury, but the -- it's talking about

02:51  18  something that's part of a peripheral component

02:51  19  interconnect bus transaction.

02:51  20        So what the heck is a peripheral component

02:51  21  interconnect?

02:51  22        Well, the first thing, this is back in

02:51  23  1998/1999.  This is PCI local bus.

02:51  24        Okay.  Well, what is a bus transaction, and

02:51  25  what are the address and data bits of that?  Well, the

—886—

02:51  1    Court's provided us guidance on how to interpret all of

02:51  2    this.

02:51  3                    MR. BURESH:  If we can go to the next

02:51  4    slide.

02:51  5    BY MR. BURESH:

02:51  6    Q.    What is the Court's definition of a PCI bus

02:51  7    transaction?

02:51  8    A.    So appropriately, it talks about PCI local --

02:51  9    it says:  A transaction in accordance with the industry

02:51  10   standard PCI local bus specification for communication

02:51  11   with an interconnected peripheral component.

02:52  12            And it further explains that:  "In accordance

02:52  13   with" includes backwards compatibility.

02:52  14            So it's telling us, let's go look at the spec.

02:52  15   Q.    Okay.  Now, the focus or the subject of this

02:52  16   definition is the transaction, correct?

02:52  17   A.    That's correct.

02:52  18   Q.    And the Court's telling us to look to the PCI

02:52  19   local bus specification?

02:52  20   A.    That's correct.

02:52  21                    MR. BURESH:  If we could pull up Joint

02:52  22   Exhibit 65.

02:52  23   BY MR. BURESH:

02:52  24   Q.    On the right-hand side of your screen, what is

02:52  25   Joint Exhibit 65?

—887—

02:52  1      A.    So this is this PCI local bus specification

02:52  2  document.  I think we saw this version earlier today

02:52  3  and, if not, earlier in the -- earlier in the trial.

02:52  4          This is the document that says this is what

02:52  5  PCI local bus devices need to do.  If you follow this

02:52  6  document, you're a PCI local bus device; if you don't,

02:53  7  you're something else.

02:53  8      Q.    Does this PCI local bus specification describe

02:53  9  what it is to be a PCI bus transaction?

02:53  10     A.    Absolutely.  Lays it out in gory detail.

02:53  11          MR. BURESH:  If we could go to the next

02:53  12  slide, please.

02:53  13  BY MR. BURESH:

02:53  14     Q.    I don't want to get to the level of gory

02:53  15  detail, please.

02:53  16          And we've looked at this with Mr. Bhatt

02:53  17  before, correct?

02:53  18     A.    Correct.

02:53  19     Q.    Briefly, what are we seeing here out of the

02:53  20  PCI local bus specification?

02:53  21     A.    So on the right, this big block diagram.  If

02:53  22  you remember, it's talking about the pins that need to

02:53  23  be part of the PCI local bus and what they mean.

02:53  24     Q.    Now, in order to have a transaction that is in

02:53  25  accordance with or compliant with PCI local bus

02:53  1    specification, can you remind us how many pins and

02:53  2    wires are required?

02:53  3        A.    Yeah.  It spells it out right at the

02:53  4    beginning.  It says you got to have 47 pins.  That's

02:54  5    this collection on the left.

02:54  6        Q.    And how many of those pins in the PCI local

02:54  7    bus specification are address and data pins?

02:54  8        A.    You can see those marked here.  The number

02:54  9    Dr. Sarhan used, and I'll use that too, is 36.  So 32

02:54  10   of the actual address and data, and then another four

02:54  11   of, what is it, command byte enabled.

02:54  12                   MR. BURESH:  If we can go to the next

02:54  13   slide.

02:54  14   BY MR. BURESH:

02:54  15       Q.    What does it mean to be a PCI local bus

02:54  16   transaction?

02:54  17       A.    Okay.  So I'll try to -- I'll try to skip the

02:54  18   gore, but you can see on the left side here it's

02:54  19   defining the write transaction.  So there's a variety

02:54  20   of transactions, and these transactions are just like,

02:54  21   you know, if you go to a bank and do something like

02:54  22   that.  There's a series of rules for how information is

02:54  23   exchanged.  Well, that's what's being shown here on the

02:54  24   left.

02:55  25                   Now, this is an engineering diagram.  This is

02:55  1  something I'd actually show to my students.  It's

02:55  2  telling us -- time goes from left to right on this

02:55  3  diagram.  And it's telling us what groups of pins or

02:55  4  individual pins, what voltages need to be on those at

02:55  5  each point in time.  So this is a pretty technical

02:55  6  thing.  I'm sorry.  That may be too gory.

02:55  7       Q.    You're doing the best you can.

02:55  8            MR. BURESH:  If we could advance a slide.

02:55  9  BY MR. BURESH:

02:55  10      Q.    Which portion of the transaction that we're

02:55  11  looking at are address and data?

02:55  12      A.    Right.  So they're marked over here.  On the

02:55  13  right, we've got the figure from the -- earlier in the

02:55  14  spec.  And we've got the A/D lines.  So those are

02:55  15  exactly this bunch.

02:55  16            And then we've got the command and

02:55  17  byte-enabled lines.  So that's the next row in the

02:55  18  write transaction diagram.

02:55  19      Q.    So in order to have address and data bits of a

02:55  20  PCI bus transaction, what do you need?

02:56  21      A.    The stuff on the left.

02:56  22      Q.    Anything like that in PCI Express?

02:56  23      A.    No.

02:56  24      Q.    Anything even close?

02:56  25      A.    Not even close.

02:56  1     Q.    We've heard that the -- from multiple

02:56  2  witnesses now that the PCI local bus or anything

02:56  3  associated with it doesn't appear in the accused

02:56  4  products.

02:56  5         Have you heard that?

02:56  6     A.    Yes.

02:56  7     Q.    How would it be possible for the accused

02:56  8  representative products to convey any part of a PCI

02:56  9  local bus transaction if there isn't any PCI local bus?

02:56  10    A.    I've never been able to figure that out.

02:56  11  That's like if you bring to me the peel of an orange

02:56  12  and say, oh.  This is an orange peel.

02:56  13         And I'd say, well, where's the orange?  Did

02:56  14  you ever have an orange?

02:56  15         You say, oh.  I never did.

02:57  16         Doesn't make any sense.  If you claim that you

02:57  17  have part of something, then the bigger thing must have

02:57  18  been around at some point.

02:57  19    Q.    Can you have a PCI local bus transaction

02:57  20  without a PCI local bus?

02:57  21    A.    No.  You cannot.

02:57  22    Q.    When the accused products use PCI Express, are

02:57  23  they ever conveying address and data bits of a

02:57  24  transaction that's in accordance with the PCI local bus

02:57  25  specification?

—891—

02:57  1      A.    No.  From this diagram, these transactions

02:57  2   are -- what's drawn on the left, very, very specific.

02:57  3   The accused products never have this.  Never do this

02:57  4   anywhere in them.

02:57  5      Q.    Okay.

02:57  6      A.    You don't have the address and data bits of a

02:57  7   PCI local bus transaction.

02:57  8            MR. BURESH:  Mr. Palisoul, could you pull

02:57  9   up the Court's claim constructions again?  And focus in

02:57  10  on PCI bus transaction.

02:57  11  BY MR. BURESH:

02:58  12     Q.    The Court's told us that "in accordance with"

02:58  13  includes backwards compatibility.

02:58  14            Do you see that?

02:58  15     A.    Yes.

02:58  16     Q.    What does it mean to be backwards compatible?

02:58  17     A.    So it means the new stuff works with the old

02:58  18  and vice versa.

02:58  19     Q.    Is there a good example that the jury's

02:58  20  already heard about of how backwards compatibility

02:58  21  works?

02:58  22     A.    Yeah.  Yeah.  They saw it this morning with

02:58  23  the USB.

02:58  24     Q.    Can you tell us about that?

02:58  25     A.    Certainly.  Back in 1998, shortly after I was

—892—

02:58  1  married, my wife -- we bought a Macintosh computer, and

02:58  2  it had a USB keyboard on it.  This was one of the first

02:58  3  USB keyboards I ever owned.

02:58  4          Now, that computer is long gone.  The

02:58  5  monitor's long gone.  Wife is still there.  The

02:59  6  keyboard still works fine with my modern computers.

02:59  7          I also have a bunch of old computers back from

02:59  8  the '90s, and I routinely plug in brand-new USB

02:59  9  keyboards to them.  So it works both ways.  Computer or

02:59 10  the keyboard could be old or new.  And all of those

02:59 11  combinations work.  That's backwards compatibility to

02:59 12  me.

02:59 13     Q.    And today, I believe Ms. Marriott, she had a

02:59 14  USB 3 port on the accused laptop, correct?

02:59 15     A.    Correct.

02:59 16     Q.    And then she had a mouse with a USB 2 core?

02:59 17     A.    Correct.

02:59 18     Q.    That'd be the old stuff?

02:59 19     A.    That's correct.  The mouse -- the mice haven't

02:59 20  had to change, right?  You know, our hands don't move

02:59 21  any faster.  The mice are unchanged.

02:59 22          The USB ports have gotten faster and faster

02:59 23  for hard drives and things like that.  But it's exactly

02:59 24  that.  It's you can take a mouse of any age, provided

02:59 25  it has USB, and it will work with any generation of USB

893

03:00   1   that's there.

03:00   2       Q.    And looking on the screen in front of you,

03:00   3   briefly explain why that works.

03:00   4       A.    Right.  So over here on the left, you got a

03:00   5   USB 2 connector, and it has these four pins in it.

03:00   6   Well, it's actually really simple.  If this is your

03:00   7   mouse, USB 2 mouse, and you plug it into the USB 3 port

03:00   8   on the right, like what's on the accused product, well,

03:00   9   we have right here those same four pins doing exactly

03:00   10  the same thing they've been doing since the mid 1990s.

03:00   11       And so backwards compatibility is

03:00   12  straightforward.  You make the things connect, and then

03:00   13  you make it behave like the old stuff too.  And the

03:01   14  trick is, you know, how do you add the new stuff?

03:01   15       Well, you add them separately in a way that

03:01   16  the old stuff can ignore it.  These are these five new

03:01   17  pins that you heard Mr. Bhatt talk about.

03:01   18       And if you look, those aren't there on the USB

03:01   19  2 connector.  They haven't been invented yet.  Plug

03:01   20  this thing in, the USB 2 connector doesn't notice those

03:01   21  new pins.  Doesn't try to connect to them.

03:01   22       Q.    So to summarize, if I plug the USB 2 mouse

03:01   23  into the USB 3 port, my old stuff will still work with

03:01   24  my new stuff?

03:01   25       A.    Exactly.

894

03:01    1        Q.    And that makes it -- that means it's backwards

03:01    2    compatible?

03:01    3        A.    That's backwards compatible.  Anything less,

03:01    4    don't trust it.

03:01    5              MR. BURESH:  May I approach, Your Honor?

03:01    6              THE COURT:  Yes, sir.

03:01    7    BY MR. BURESH:

03:02    8        Q.    What have I just handed you, Dr. Edwards?

03:02    9        A.    Yeah.  So this is what Mr. Bhatt saw this

03:02   10    morning.  So we have a PCI local bus card.  You can

03:02   11    just tell there's, you know, a long gold connector on

03:02   12    it and a PCI local bus slot.  And not surprisingly,

03:02   13    they go together very nicely.  They're designed to do

03:02   14    exactly that.

03:02   15              Similarly, I've got a PCI Express slot, much

03:02   16    smaller, and a PCI Express card.  And not surprisingly,

03:02   17    those two go together really nicely.

03:02   18              However, if you go mixing and matching, not

03:02   19    surprisingly, the big one doesn't fit in the small one.

03:03   20    Furthermore, the newer small one, while you might be

03:03   21    able to cram it into the old one, if you ever turned it

03:03   22    on, you'd get smoke.

03:03   23              In practice, what's going on is this is near

03:03   24    the edge of the computer.  And if you try to plug it

03:03   25    in, there's actually this extra little bump that seems

895

03:03   1   not to do anything, and what that's doing is it's

03:03   2   making sure that you can't actually shove this thing

03:03   3   into a PCI local bus thing.

03:03   4        Now, this is not an accident.  When they

03:03   5   designed this, they knew that they didn't want you to

03:03   6   mix and match because it would cause smoke.  And so the

03:03   7   physical design of it, just the fact that they're

03:03   8   different shapes, they did that intentionally to make

03:03   9   sure that you didn't connect up some random electrical

03:04   10  thing that would cause your computer to break into

03:04   11  smoke or sparks or anything like that.

03:04   12       So this is -- this is not an accident.  Right?

03:04   13  There are a couple of times where people have built

03:04   14  things differently.  But not this one.  This one was

03:04   15  the old one doesn't work with the new one.

03:04   16       Q.    Okay.  So if I have a PCI local bus on an old

03:04   17  computer --

03:04   18       A.    Such as this.

03:04   19       Q.    That one.  And PCI Express is out.  I go to

03:04   20  the store and buy a PCI Express card --

03:04   21       A.    Yep.

03:04   22       Q.    -- is it going to work with my old stuff?

03:04   23       A.    You're out of luck.  It will not work.  You'll

03:04   24  come home.  You'll try to plug it in.  You won't

03:04   25  succeed.  You'll take it back to the store and say, no,

03:04  1    no, no.  I need a PCI local bus card.  It doesn't work.

03:04  2        Q.    Is PCI Express backwards compatible with PCI

03:04  3    local bus specification?

03:04  4        A.    No.

03:04  5        Q.    What would you need to see for an interconnect

03:05  6    that conveyed address and data bits of a PCI local bus

03:05  7    transaction to be backwards compatible with the PCI

03:05  8    local bus specification?

03:05  9        A.    Well, to be compatible with the PCI local bus

03:05  10   specification like we saw, I'd want to see a connector

03:05  11   like this.  Right?

03:05  12        The specification that we were looking at

03:05  13   specifically says, hey.  You've got this connector.

03:05  14   There's these 47 pins that have very particular timing

03:05  15   and meaning and all the rest of it.

03:05  16        And if you don't have that, the card's going

03:05  17   to say, what the heck is going on?  I don't know.  I'm

03:05  18   expecting that protocol.  I'm expecting that connector.

03:05  19        Now, we see that with USB 2 going to 3.  They

03:05  20   made it backwards compatible.  They did it.  They were

03:05  21   very careful.  They kept the old one around, the USB --

03:05  22   the four USB 2 pins.  And that's present right there in

03:05  23   the USB 3 port.  That's how you do backwards

03:06  24   compatibility.

03:06  25        That's not how PCI Express did -- attempted to

03:06    1    do backwards compatibility.  They didn't do it at all.

03:06    2                    MR. BURESH:  If we can go to the next

03:06    3    slide, please.

03:06    4    BY MR. BURESH:

03:06    5        Q.    Do the PCI Express interconnects as

03:06    6    implemented in the accused products convey any part of

03:06    7    the transaction that's backwards compatible with the

03:06    8    PCI local bus specification?

03:06    9        A.    No.

03:06   10        Q.    Now, from Dr. Sarhan we heard a fair amount

03:06   11    about software models.

03:06   12              Do you recall that?

03:06   13        A.    Yeah.  I remember that.

03:06   14        Q.    And configuration space?

03:06   15        A.    Yes.

03:06   16        Q.    Do you recall that?

03:06   17              Does this construction from the Court say

03:06   18    anything about software backwards compatibility?

03:06   19        A.    No.  And one way to tell, look at the

03:06   20    construction.  Look at the words.  It is a transaction.

03:07   21    If you look in the PCI spec, the PCI local bus spec

03:07   22    like I have, you will find that transaction is defined

03:07   23    in -- across a few chapters.

03:07   24              And the software stuff, the configuration

03:07   25    stuff that they were talking about, that's something

898

03:07    1    else.  It doesn't have anything to do with the

03:07    2    transaction.

03:07    3        Q.    Is a transaction generated -- is a PCI local

03:07    4    bus transaction generated by software?

03:07    5        A.    No.

03:07    6        Q.    Is it generated by the CPU?

03:07    7        A.    No.

03:07    8        Q.    In a PCI local bus specification, are there

03:07    9    sections discussing what it means to be a transaction

03:07   10    like we've looked at?

03:07   11        A.    Yeah.  Yeah.  Exactly those timing -- that

03:07   12    timing diagram that I showed you.

03:07   13        Q.    And are there separate portions of the

03:07   14    specification that would discuss, for example,

03:07   15    configuration space?

03:07   16        A.    Right.  And it never even mentions

03:08   17    transactions in that chapter.

03:08   18        Q.    Because those are totally different concepts,

03:08   19    aren't they?

03:08   20        A.    It's a whole 'nother level of worrying about

03:08   21    things.

03:08   22        Q.    So what is your opinion as to whether PCI

03:08   23    Express transactions are backwards compatible with the

03:08   24    PCI local bus specification?

03:08   25        A.    They aren't.  They're not backwards

03:08  1   compatible.

03:08  2       Q.   Okay.  If we look at Claim 13 again, have you

03:08  3   reached a conclusion with respect to whether the second

03:08  4   limitation that begins "a first low voltage

03:08  5   differential signal" and includes "a peripheral

03:08  6   component interconnect bus transaction or address and

03:08  7   data bits of that transaction?

03:08  8            What is your conclusion with respect to

03:08  9   whether that limitation is satisfied in the accused

03:08  10  products?

03:08  11      A.   In the accused products, that limitation is

03:08  12  not infringed, both for the LVDS stuff we mentioned

03:08  13  earlier and the PCI address and data bits stuff that we

03:08  14  were just talking about.

03:09  15            MR. BURESH:  Okay.  Could we pull up the

03:09  16  '768 patent?  And Figure 8B, please.

03:09  17  BY MR. BURESH:

03:09  18      Q.   We've looked at two claims now, correct,

03:09  19  Dr. Edwards?

03:09  20      A.   Yes.

03:09  21      Q.   Do the claims that we've just looked at

03:09  22  correspond to this architecture in Figure 8B?

03:09  23      A.   Yeah.  It's talking about this big integrated

03:09  24  CPU with essentially everything that -- including the

03:09  25  interface controller that generates the XP Bus.

900

03:09  1      Q.    Okay.

03:09  2                  MR. BURESH:  If we go to the next claim

03:09  3    in our slides.

03:09  4    BY MR. BURESH:

03:09  5      Q.    Claim 10 of the '768 patent.  Do you see that

03:09  6    on the right?

03:09  7      A.    Yes.

03:09  8      Q.    How does that claim compare to the claims that

03:10  9    we've looked at so far?

03:10  10     A.    Very similar.

03:10  11     Q.    Okay.  We also see a LVDS channel limitation;

03:10  12   is that correct?

03:10  13     A.    That's correct.

03:10  14     Q.    And what is your conclusion about whether that

03:10  15   LVDS channel limitation is satisfied in the ASUS

03:10  16   accused products by the use of PCI Express?

03:10  17     A.    This part of the '768 Patent, Claim 10,

03:10  18   doesn't infringe for the same reasons we've just been

03:10  19   discussing for the Claim 13 of that patent.

03:10  20     Q.    And what are those reasons?

03:10  21     A.    There is not the LVDS channel of the patent,

03:10  22   and we don't have the address and data bits of a PCI

03:10  23   bus transaction.

03:10  24     Q.    Okay.  I want to look at the first limitation

03:10  25   briefly.

901

03:10  1        We have:  A peripheral bridge directly coupled

03:10  2   to the central processing unit without any intervening

03:10  3   peripheral component interconnect bus.

03:10  4        Do you see that?

03:11  5   A.    Yes.  I see that.

03:11  6              MR. BURESH:  If we could pull up

03:11  7   Figure 8A of the '768 patent.

      8   BY MR. BURESH:

03:11  9   Q.    How does the architecture that we see in

03:11  10  Figure 8A relate to the no intervening PCI local bus

03:11  11  limitation that we just saw?

03:11  12  A.    Right.  Well, what that claim of the patent is

03:11  13  talking about was this connection here marked

03:11  14  peripheral bus, and it's just observing that that is

03:11  15  not a PCI bus.  That's something else.  It's marked

03:11  16  peripheral bus.  That claim is just saying that can't

03:11  17  be a PCI bus.

03:11  18  Q.    Do you recall Dr. Sarhan pointing to that

03:11  19  claim limitation and these figures that we're looking

03:11  20  at and saying, there's no PCI local bus anywhere in the

03:11  21  system?

03:11  22  A.    Yes.  And that puzzled me.

03:11  23  Q.    Do you agree with him?

03:11  24  A.    I do not agree with that.

03:11  25  Q.    Why not?

902

03:12  1      A.    Well, remember our discussion about the boxes

03:12  2   and the Amazon stuff?  Well, what's going on here?

03:12  3         These two things are just integrated, and it's

03:12  4   listing all of these things.  So this Box 820,

03:12  5   integrated south bridge and host interface controller,

03:12  6   well, we saw a south bridge before.  It's the thing

03:12  7   that's pumping out all those buses, including PCI.  And

03:12  8   host interface controller, that's the thing that's

03:12  9   taking PCI and those other buses and transforming it

03:12  10  into the XP Bus.

03:12  11     Q.    Where is, then, the PCI local bus in this

03:12  12  Figure 8A architecture?

03:12  13     A.    Has to be hiding here -- sorry.  PCI local bus

03:12  14  would be hiding in here.  We've got the HIC in the

03:12  15  south bridge, or the two boxes inside that box somehow.

03:12  16     Q.    Now, do these various levels of integration

03:13  17  that have been depicted in the patents, do they change

03:13  18  your opinion with respect to the LVDS channels of the

03:13  19  XP Bus in any way?

03:13  20     A.    No.  The LVDS channels are always the same and

03:13  21  are being used the same way.

03:13  22     Q.    Okay.  Coming back to Claim 10 of the '768

03:13  23  patent, what is your conclusion as to whether the

03:13  24  accused products infringe this claim?

03:13  25     A.    They do not.

903

03:13  1                    MR. BURESH:  If we could pull up PDX-03

03:13  2    at Slide 140, please.

03:13  3    BY MR. BURESH:

03:13  4        Q.    This is a slide from Dr. Sarhan's

03:13  5    presentation, correct?

03:13  6        A.    Yes.

03:13  7        Q.    Okay.  And he's describing a doctrine of

03:13  8    equivalents opinion that he provided to the jury,

03:14  9    correct?

03:14  10       A.    Correct.

03:14  11       Q.    And I think he talked about the triple

03:14  12   identity test.

03:14  13             Do you recall that?

03:14  14       A.    Yes.

03:14  15       Q.    Function-way-result?

03:14  16             Looking at the way, No. 2, do you see the

03:14  17   second bullet point here, it says:  Transactions are

03:14  18   conducted in their own specified ways and these ways

03:14  19   are not substantially different?

03:14  20       A.    Yes.  I see that.

03:14  21       Q.    That was Dr. Sarhan's conclusion, correct?

03:14  22       A.    That's correct.

03:14  23       Q.    What do you think about that?

03:14  24       A.    I don't know how he gets not substantially

03:14  25   different for these two radically different

904

03:14  1    technologies.

03:14  2         Q.    In all the discussions we just went through of

03:14  3    the PCI local bus versus PCI Express, how would you

03:14  4    characterize the differences between those two?

03:14  5         A.    Well, they're numerous.  But, you know, this

03:14  6    is 1992 technology, the PCI local bus.  This is 2004

03:15  7    technology.  So it's, what, 12 years at least.

03:15  8              And what did Mr. Bhatt say?  There was some

03:15  9    enormous speed difference, you know, 100x or something

03:15  10   like that.  And it's just been getting more and more.

03:15  11             So, you know, I don't know about you, but

03:15  12   walking 100 feet versus flying an aircraft for

03:15  13   100 feet, that's pretty different.  I mean, yeah.

03:15  14   You're conveying yourself from one place to another,

03:15  15   but you're going so much faster.  I don't see how he

03:15  16   gets not substantially different from those two things.

03:15  17             There are a variety of other technical

03:15  18   reasons, but the speed is really the obvious one.

03:15  19        Q.    Do you recall the packets, the envelopes from

03:15  20   PCI Express?

03:15  21        A.    Absolutely.

03:15  22        Q.    Anything like that in PCI local bus?

03:15  23        A.    No, no.  You saw the pictures drawing the tiny

03:15  24   diagrams for the PCI local bus.  Packets are nowhere to

03:15  25   be seen.

03:15  1        Q.    What about the 47 pins in PCI local bus?

03:16  2   Anything like that in PCI Express?

03:16  3        A.    No.  PCI Express -- well, yeah.  There are far

03:16  4   fewer than 47 pins here.  There's no way you could have

03:16  5   that as part of a PCI Express bus.

03:16  6        Q.    What about the result?  Do you think the

03:16  7   result of PCI Express is substantially the same as the

03:16  8   result of PCI local bus?

03:16  9        A.    They changed a lot.  They made it so you could

03:16 10   move enormous amounts of data.  They changed the

03:16 11   protocol.  I also don't see how he gets substantially

03:16 12   the same result out of that.

03:16 13        Q.    What is your opinion with respect to whether a

03:16 14   PCI local bus transaction is equivalent to a PCI

03:16 15   Express transaction?

03:16 16        A.    I don't find them equivalent.

03:16 17             MR. BURESH:  Your Honor, I'm going to

03:17 18   transition now to invalidity if it would be an

03:17 19   appropriate time for a break.

03:17 20             THE COURT:  I think so.

03:17 21             Ladies and gentlemen of the jury, we are

03:17 22   going to take our afternoon recess for 10 or

03:17 23   15 minutes.

03:17 24             THE BAILIFF:  All rise.

03:17 25             (Jury exited the courtroom.)

906

03:17  1                    THE COURT:  You may step down.

03:17  2                    Is there anything we need to take up?

03:17  3                    MR. HALES:  Just a further statement on

4    the objection --

5                    (Clarification by Reporter.)

03:17  6                    MR. HALES:  I've searched the report,

03:17  7    Your Honor, Dr. Edwards' opinion that an LVDS should be

03:17  8    interpreted to require a bridging element or bridging

03:17  9    aspect to it appears nowhere in the report.

03:17  10                    THE COURT:  A response?

03:17  11                    MR. BURESH:  We can go through the report

03:18  12    in further detail if you want.  The opinions described

03:18  13    in there are that an LVDS channel is an XP Bus, that

03:18  14    the XP Bus operates as a bridge, and that the buses in

03:18  15    our systems are not like the XP Bus, the LVDS channels,

03:18  16    or the bridge in any way.

03:18  17                    That's what the opinions are.  I have

03:18  18    pages and pages on it.

03:18  19                    THE COURT:  Yes, sir.

03:18  20                    MR. HALES:  The opinion delivered is that

03:18  21    LVDS' plain and ordinary meaning includes a bridging

03:18  22    aspect to it.

03:18  23                    I've reviewed every instance of the word

03:18  24    "bridge" in the report, and that simply doesn't appear.

03:18  25    He hasn't disclosed this as his plain and ordinary

—907—

03:18  1    meaning of LVDS.

03:18  2                    MR. BURESH:  He literally read into the

03:18  3    record his opinion that the LVDS channels are talking

03:18  4    about the XP Bus, which he has entirely separate

03:18  5    sections describing the XP Bus in detail.

03:18  6                    THE COURT:  I'm good.  I'm going to

03:18  7    overrule the objection.

03:18  8                    We'll be back in ten minutes.

03:18  9                    (Recess taken.)

03:31 10                    THE BAILIFF:  All rise.

03:31 11                    THE COURT:  Please remain standing for

03:31 12    the jury.

03:31 13                    (Jury entered the courtroom.)

03:32 14                    THE COURT:  Thank you.  You may be

03:32 15    seated.

03:32 16                    Counsel?

03:32 17    BY MR. BURESH:

03:32 18      Q.    All right.  Dr. Edwards, continuing on now

03:32 19    with your Slide 68, there are two requirements listed

03:32 20    on this slide, correct?

03:32 21      A.    Correct.

03:32 22      Q.    What are they?

03:32 23      A.    So these were two more questions I was asked

03:32 24    to evaluate, and these are, you know, components of the

03:32 25    law.  One of them's this written description

908

03:32  1    requirement, basically:  Did he have the invention he

03:33  2    claimed back in 1999?

03:33  3            Now, there's an enablement requirement I

03:33  4    believe we'll speak about later.

03:33  5        Q.    Okay.  Focusing in on the written description

03:33  6    requirement, what were you looking for in this case?

03:33  7    How did you conduct your analysis?

03:33  8        A.    So I was specifically looking for what the

03:33  9    original documents, 1999/2000, disclosed.  And did the

03:33  10   inventor have the full scope about -- of what is

03:33  11   currently being claimed here?

03:33  12           So, in particular, I was looking at what

03:33  13   Dr. Sarhan thinks the scope of the invention was.

03:33  14               MR. BURESH:  If we can go to the next

03:33  15   slide.

03:33  16   BY MR. BURESH:

03:33  17       Q.    Can you remind the jury of which documents are

03:33  18   necessary to consider to determine the original scope

03:33  19   of the invention?

03:33  20       A.    Yes.  So these are exactly the two that we

03:33  21   talked about earlier.  The provisional and this

03:34  22   May 2000 patent that is the parent of the two patents

03:34  23   in the case.

03:34  24       Q.    Okay.  Why is the 1998 provisional application

03:34  25   important to this analysis?

909

03:34    1    A.    We talked about this earlier with the stapler.

03:34    2    It's incorporated by reference in the parent patent.

03:34    3                 MR. BURESH:  If we could go to the next

03:34    4    slide.

03:34    5    BY MR. BURESH:

03:34    6    Q.    Based on your analysis, what invention was

03:34    7    Dr. Chu in possession of as of the effective filing

03:34    8    date in 1999/2000, based on the disclosure from the

03:34    9    original patent filings?

03:34    10    A.    So a bridge bus, we can talk about this the

03:34    11    whole time.  He has something, takes a bunch of

03:34    12    peripheral buses, runs it through this host interface

03:34    13    controller, sends it over to the XP Bus, over the

03:34    14    peripheral console.

03:34    15                 And he suggests a number of different ways you

03:35    16    can integrate these boxes that are shown on the left,

03:35    17    but that's basically it.

03:35    18    Q.    Okay.  Are there any figures in these patents

03:35    19    or written disclosure describing the invention as

03:35    20    anything other than a peripheral bridge bus like the XP

03:35    21    Bus?

03:35    22    A.    No.

03:35    23    Q.    In contrast to an XP Bus with LVDS channels

03:35    24    carrying multiple types of data in a common form, the

03:35    25    bridging concept, what is the scope of the claims that

03:35  1    Dr. Sarhan is now alleging?

03:35  2        A.    So in this cartoon, he's alleging that this

03:35  3    PCI Express interconnect somehow uses one of these LVDS

03:35  4    channels, one of these bridges, and it doesn't.

03:35  5            Similarly, he's saying that, oh, in the USB 3

03:36  6    interfaces, well, those are -- those also involve these

03:36  7    LVDS channels.

03:36  8        Q.    Were you analyzing whether the whole PCI

      9    Express specification with all the bells and whistles,

03:36  10   are you saying that it needed to be described in the

03:36  11   original disclosures?

03:36  12       A.    No.  Not at all.  I was looking for these LVDS

03:36  13   channels.

03:36  14       Q.    Is there any part of Dr. Chu's disclosures

03:36  15   that suggest that his invention is directed toward the

03:36  16   buses rather than the XP Bus or the bus bridge?

03:36  17       A.    No.  His invention was this bus bridge that

03:36  18   would take PCI and some of the other buses, convey it

03:36  19   using this differential signaling technology, and then

03:36  20   reconstitute it the other side.  Exactly the bridge bus

03:36  21   that we've been talking about.

03:36  22       Q.    In the original patent disclosures, is

03:37  23   there -- is there any hint that Dr. Chu was in

03:37  24   possession of an invention that would go towards new

03:37  25   buses, new interconnects, as opposed to a bridge bus

03:37    1    like the XP Bus?

03:37    2        A.    No.  We saw that earlier.  It was saying the

03:37    3    invention is peripheral bridge bus.  And there's other

03:37    4    words there, but it's pretty clear that was -- that was

03:37    5    the thing.  It just talks about a bridge.

03:37    6        Q.    Now, we've seen in the documents and heard

03:37    7    some testimony about the XP Bus carrying multiple types

03:37    8    of data in a common way, correct?

03:37    9        A.    Correct.

03:37   10        Q.    So USB, PCI, 1391, they'd all be carried over

03:37   11    the XP Bus in a similar fashion?

03:37   12        A.    Correct.

03:37   13        Q.    Now, these PCI Express and USB 3 interconnects

03:37   14    that Dr. Sarhan's pointing to, are they like that?

03:37   15        A.    No.  The -- as the name would suggest, PCI

03:38   16    3 -- excuse me.  PCI Express interconnect, something

03:38   17    like this, carries PCI Express data.  That's the sole

03:38   18    purpose.

03:38   19            Similarly, you know, it's tautological.  But

03:38   20    if you have a USB link, it is for carrying USB data.

03:38   21    It doesn't -- it doesn't do this, oh, you can carry all

03:38   22    these different protocols.  No.  It -- USB cable is for

03:38   23    USB data.

03:38   24        Q.    Would you --

03:38   25        A.    PCI Express is for PCI Express.

912

03:38  1        Q.    Sorry to interrupt.

03:38  2              Would you transmit a USB 3 packet over a PCI

03:38  3   Express interconnect?

03:38  4        A.    No.  I don't see how you'd do that.  And

03:38  5   certainly if you did, the interconnect would come back

03:38  6   and say, what is this?  What did you just send to me?

03:38  7   I have no idea.

03:38  8        Q.    Would you ever transmit a PCI Express packet

03:38  9   on a USB 3 interconnect?

03:38  10       A.    No.  For the same reason.  You know, it'd be

03:39  11  like sending somebody a letter in a foreign language

03:39  12  that you can't read it.  It's like what is this?  Is

03:39  13  this even a letter?

03:39  14       Q.    How does the way that Dr. Sarhan is applying

03:39  15  these claims, which -- let me just ask you this:  He

03:39  16  used -- you called it a cartoon, correct, with the red

03:39  17  pen?

03:39  18       A.    Yeah.  Yeah.

03:39  19       Q.    And you're indicating what Dr. Sarhan is

03:39  20  pointing to with that red pen, correct?

03:39  21       A.    That's the idea here.  Yeah.

03:39  22       Q.    How does the manner in which Dr. Sarhan is

03:39  23  applying these claims to extend the scope to PCI

03:39  24  Express and USB 3 interfaces, how does that compare to

03:39  25  Dr. Chu's original patent disclosures?

913

03:39    1    A.    Dr. Chu's original patent disclosures talks

03:39    2    about bus bridge implemented in a particular way.

03:39    3        Dr. Sarhan is saying, oh, wait.  He didn't

03:39    4    invent a bus bridge.  He invented a new bus or

03:40    5    something that could turn into a new bus.  It isn't.

03:40    6    It's a bus bridge.

03:40    7    Q.    Now, if we consider this full scope as being

03:40    8    alleged by Dr. Sarhan, do you believe that in 1999 or

03:40    9    2000, Dr. Chu was in possession of that invention that

03:40    10   Dr. Sarhan is now pointing to?

03:40    11   A.    I do not believe Dr. Chu was in possession of

03:40    12   an invention of that scope.

03:40    13   Q.    What is the impact of your opinion?

03:40    14   A.    The read -- my conclusion, then, is this

03:40    15   patent claim is invalid.

03:40    16   Q.    Now, in this Claim 19, there's the LVDS

03:40    17   channels that Dr. Sarhan is pointing to as PCI Express

03:40    18   and USB 3.

03:40    19       We've seen that in the other claims, correct?

03:40    20   A.    That's correct.

03:40    21   Q.    And in each of those claims where Dr. Sarhan

03:40    22   is contending that the LVDS channel is either PCI

03:41    23   Express or USB 3, would you have the same opinion?

03:41    24   A.    Yes.  So again, Dr. Sarhan is claiming that in

03:41    25   PCI Express or in USB 3 resides one of these LVDS

914

03:41  1    channels.  And it doesn't.

03:41  2        Q.    So if we look at Claim 13 of the '768 patent,

03:41  3    what is your opinion with respect to that claim?

03:41  4        A.    It's invalid for the same reasons.

03:41  5                  MR. HALES:  Your Honor, can we sidebar?

03:41  6                  THE COURT:  Sure.

03:41  7                  (Bench conference.)

03:41  8                  MR. HALES:  This opinion is that Dr. Chu

03:41  9    was not in possession of an LVDS channel in any form

03:41  10   except for a bus bridge.  He hadn't figured out how to

03:41  11   use it in any other way.  The term "bus bridge" does

03:41  12   not appear in the invalidity report once, which is the

03:42  13   first of the two reports.

03:42  14                  One would imagine that this LVDS

03:42  15   understanding as a bus bridge would have been disclosed

03:42  16   in the initial report.  Bus bridge doesn't appear once.

03:42  17                  MR. BURESH:  I don't know that to be the

03:42  18   case.  But what we're talking about here is the XP Bus

03:42  19   of Dr. Chu's invention.  The --

03:42  20                  THE COURT:  If you can't tell me where

03:42  21   it's at in the report, then I'm going to strike it.

03:42  22                  MR. BURESH:  Oh, I have the opinions.

03:42  23                  THE COURT:  Just tell me.

03:42  24                  MR. BURESH:  I didn't know that's what he

03:42  25   was going to sidebar on.  If you want the paragraphs,

915

| | | |
|---|---|---|
| 03:42 | 1 | I'll go get them. |
| 03:42 | 2 | MR. HALES:  I'll wait, if the Judge is |
| 03:42 | 3 | all right with it. |
| 03:43 | 4 | MR. BURESH:  Your Honor -- |
| 03:43 | 5 | (Bench conference concludes.) |
| 03:43 | 6 | THE COURT:  Ladies and gentlemen, we're |
| 03:43 | 7 | going to take a short break.  We'll be back in just... |
| 03:43 | 8 | Please remember my instructions. |
| 03:43 | 9 | THE BAILIFF:  All rise. |
| 03:43 | 10 | (Jury exited the courtroom.) |
| 03:43 | 11 | THE COURT:  You may be seated. |
| 03:43 | 12 | I don't know what's going on between you |
| 03:43 | 13 | guys.  I don't know what the deal is about why y'all |
| 03:43 | 14 | can't get along.  But, you know, my sons when they were |
| 03:44 | 15 | in high school wouldn't act the way you guys are acting |
| 03:44 | 16 | up here. |
| 03:44 | 17 | Now, the only tool I have to deal with |
| 03:44 | 18 | this is in front of the jury.  I don't generally do |
| 03:44 | 19 | that, but if you guys can't even act like adults up |
| 03:44 | 20 | here at the bench, I will make it very clear to the |
| 03:44 | 21 | jury how I feel about it. |
| 03:44 | 22 | Is that going to be -- is that clear |
| 03:44 | 23 | going forward? |
| 03:44 | 24 | MR. BURESH:  It is, Your Honor. |
| 03:44 | 25 | MR. HALES:  Yes, Your Honor. |

916

03:44    1                    THE COURT:  Now, if you want to tell me

03:44    2    where it is in the report --

03:44    3                    You may be seated.

03:44    4                    MR. BURESH:  Yes, Your Honor.  We

03:44    5    described in detail the operation of the XP Bus

03:44    6    operating in a manner to bridge the peripheral buses at

03:44    7    Paragraphs 62 through 65.

03:45    8                    And then at Paragraphs 209 through 227,

03:45    9    we apply that understanding of the XP Bus in the

03:45   10    context of written description as applied to

03:45   11    Dr. Sarhan's scope of PCI Express and USB 3.

03:45   12                    THE COURT:  I'm going to overrule the

03:45   13    objection.

03:45   14                    Bob, would you bring the jury back in?

03:45   15                    THE BAILIFF:  Yes, sir.

03:48   16                    (Jury entered the courtroom.)

03:48   17                    THE COURT:  Thank you.  You may be

03:48   18    seated.

03:48   19                    Counsel, you may continue.

03:48   20                    MR. BURESH:  Thank you, Your Honor.

03:48   21    BY MR. BURESH:

03:48   22        Q.    Okay.  Dr. Edwards, I believe I skipped to

03:48   23    Claim 13.  If we could back up to Claim 10, does it

03:48   24    also have the LVDS limitations in it that we've been

03:49   25    looking at?

917

03:49   1        A.    It does.

03:49   2        Q.    And is Dr. Sarhan treating those as PCI

03:49   3   Express in the -- in Claim 10?

03:49   4        A.    Yeah.   He's treating them in a very similar

03:49   5   way.

03:49   6        Q.    What is your opinion with respect to that

03:49   7   claim and whether it satisfies the written description

03:49   8   requirement?

03:49   9        A.    So as I've said before, the LVDS channels

03:49   10  aren't present in PCI Express.   This claim is invalid.

03:49   11              MR. BURESH:   Okay.   If we could go to the

03:49   12  next slide, please.

03:49   13  BY MR. BURESH:

03:49   14       Q.    Looking at each of the asserted claims, that

03:49   15  is the '359 patent, Claim 19; the '768 patent, Claim 10

03:49   16  and Claim 13, what is your opinion with respect to the

03:49   17  validity of those claims based on the written

03:49   18  description requirement?

03:49   19       A.    So as I just discussed, the inventor did not

03:49   20  have the invention with the scope that's currently

03:49   21  being claimed for his -- you know, the posts weren't

03:50   22  there in that fence.   And my conclusion is that those

03:50   23  three claims are invalid.

03:50   24              MR. BURESH:   If we can go to the next

03:50   25  slide, please.

918

03:50  1    BY MR. BURESH:

03:50  2        Q.    Next up is the enablement requirement.

03:50  3             Dr. Edwards, could you describe for the jury

03:50  4    what analysis you conducted with respect to this

03:50  5    requirement?

03:50  6        A.    Yeah.  So this is asking the question:  Did

03:50  7    the inventor give out enough information for a person

03:50  8    of ordinary skill in the art back in 1989 (sic)/2000,

03:50  9    to build -- to practice the invention, to go and build

03:50  10   something according to his plans.

03:50  11            And the problem always is, oh, they kept too

03:50  12   much for themselves, they didn't explain something.  So

03:50  13   the question is, oh, is there enough there to actually

03:50  14   build the invention as claimed?

03:50  15       Q.    Okay.  What does it mean to make and use the

03:51  16   full scope of the claimed invention?  What does the

03:51  17   "make and use" mean?

03:51  18       A.    So be able to put it together.  Right?  So

03:51  19   what we're looking at is a bunch of claims about

03:51  20   computer systems and parts and how to build those

03:51  21   things and how to put them together.

03:51  22            The question is:  Could a person of ordinary

03:51  23   skill in the art follow those instructions and put

03:51  24   together one of these systems?

03:51  25                  MR. BURESH:  If we can go to the next

919

| | | |
|---|---|---|
| 03:51 | 1 | slide, please. |
| 03:51 | 2 | BY MR. BURESH: |
| 03:51 | 3 | Q. What did Dr. Chu's 1999/2000 patent |
| 03:51 | 4 | disclosures attempt to allow a person of ordinary skill |
| 03:51 | 5 | in the art to make and use? |
| 03:51 | 6 | A. So what we've been talking about the whole |
| 03:51 | 7 | time. This is a modular computer system, the XP Bus |
| 03:51 | 8 | bridge that could bridge PCI, 1394, things like that. |
| 03:51 | 9 | And it's described here. We've seen this many times. |
| 03:51 | 10 | Q. Do you recall Dr. Chu testifying that he |
| 03:52 | 11 | couldn't get the XP Bus of his invention to work? |
| 03:52 | 12 | A. That's correct. |
| 03:52 | 13 | Q. Did the '99/2000 patent descriptions allow a |
| 03:52 | 14 | person of ordinary skill in the art to actually make |
| 03:52 | 15 | and use the XP Bus? |
| 03:52 | 16 | A. No. I do not believe so. |
| 03:52 | 17 | MR. BURESH: If we could go to the next |
| 03:52 | 18 | slide. |
| 03:52 | 19 | BY MR. BURESH: |
| 03:52 | 20 | Q. In contrast to Dr. Chu's patent disclosures of |
| 03:52 | 21 | the XP Bus, how is ACQIS and Dr. Sarhan applying the |
| 03:52 | 22 | claims here in court this week? |
| 03:52 | 23 | A. Well, they're claiming that PCI Express and |
| 03:52 | 24 | USB 3, that somehow taking his invention and starting |
| 03:52 | 25 | from there, you could get to PCI Express or USB 3, |

920

03:52  1    something like that.

03:52  2           And so the question is:  Could a person of

03:52  3    ordinary skill in the art at the time build something

03:53  4    like that starting from that, starting from that point?

03:53  5    Q.    Okay.  What evidence is there in the patent

03:53  6    disclosures to even hint or suggest that Dr. Chu was

03:53  7    instructing a person of ordinary skill in the art how

03:53  8    to make and use anything other than an XP Bus or bus

03:53  9    bridge?

03:53  10   A.    Yeah.  That's the thing.  He isn't.  He was

03:53  11   always teaching us how to build a bus bridge.  And,

03:53  12   well, okay.  That -- he wasn't able to.  But in

03:53  13   particular, he never said anything about, oh, let's not

03:53  14   use this as a bus bridge.  Let's use this as a bus.

03:53  15          No.  It was always a bus.  Excuse me.  It was

03:53  16   always a bus bridge that he was teaching us.

03:53  17          So doing something like creating a whole new

03:53  18   bus standard, like PCI Express or USB 3, that just

03:53  19   wasn't ever part of the description.  It was never

03:54  20   described.

03:54  21   Q.    Did Dr. Chu's original patent descriptions in

03:54  22   1999 and 2000 allow a person of ordinary skill in the

03:54  23   art to make and use a brand-new bus like PCI Express or

03:54  24   USB?

03:54  25   A.    No.

03:54  1      Q.    USB 3.  Let me be more specific.

03:54  2      A.    USB 3, no.

03:54  3      Q.    If a person of ordinary skill wanted to make

03:54  4  and use a new interconnect, a bus, like PCI Express or

03:54  5  USB 3, what guidance did Dr. Chu's 1999/2000 patent

03:54  6  disclosures provide to that person of ordinary skill?

03:54  7      A.    Nothing.  He taught them to build a bus

03:54  8  bridge.

03:54  9      Q.    In light of that, with no assistance from the

03:54  10  patent disclosures, what would you expect a person of

03:54  11  ordinary skill in the art would need to do to get to a

03:55  12  new bus?

03:55  13      A.    Right.  Well, an enormous amount of work.  And

03:55  14  you heard this morning from Mr. Bhatt how much effort

03:55  15  goes into developing one of these industry-standard

03:55  16  buses.  So certainly a lot of engineering work.

03:55  17      Q.    What type of experimentation would you expect

03:55  18  to be involved?

03:55  19      A.    Well, a lot of engineers working for a long

03:55  20  time, thinking of -- you know, trying this, trying

03:55  21  that, coming up with different details, doing this

03:55  22  experiment, doing that experiment.

03:55  23      Q.    Now, the law gives us a set of factors to

03:55  24  consider in the context of undue experimentation; is

03:55  25  that correct?

03:55   1          A.    That's correct.

03:55   2          Q.    Okay.  Are those factors listed on Slide 80,

03:55   3    which is in front of you?

03:55   4          A.    Yeah.  This -- my understanding is that this

03:55   5    is a legal test.  And specifically for what does undue

03:55   6    experimentation take, it gives us this list to

03:55   7    consider.

03:55   8          Q.    Okay.  I'm going to walk through these in

03:56   9    turn, starting first with:  The nature of the invention

03:56   10   described in the disclosures.

03:56   11         A.    Right.  What's the nature of the invention?

03:56   12   The XP Bus, the cross-peripheral bus, a bus bridge.

03:56   13         Q.    And in the context of Dr. Sarhan -- excuse

03:56   14   me -- Dr. Sarhan's application of these claims here in

03:56   15   court this week, what is the breadth of the claims, the

03:56   16   full scope?

03:56   17         A.    Well, he's claiming that it extends outside a

03:56   18   bus bridge and goes all the way to, oh, let's build a

03:56   19   new bus.

03:56   20         Q.    How much direction or guidance is provided by

03:56   21   the original patent disclosures in terms of how to

03:56   22   build such a new interconnect as being pointed to by

03:56   23   Dr. Sarhan?

03:56   24         A.    None.

03:56   25         Q.    What about the number of working examples?

03:56  1    What evidence did you see of that?

03:56  2        A.    None.

03:57  3        Q.    The next one is relative skill of those in the

03:57  4    art.  I believe you previously testified that the level

03:57  5    of ordinary skill is a master's degree in electrical

03:57  6    engineering or a bachelor's plus three years of work

03:57  7    experience, correct?

03:57  8        A.    That's correct.

03:57  9        Q.    How does the level of skill factor impact your

03:57  10   analysis?

03:57  11       A.    So the question here is:  Compared to a person

03:57  12   of ordinary skill versus what you would expect somebody

03:57  13   to -- require to do something like that, well, you

03:57  14   heard from Mr. Bhatt, he got, you know, top people from

03:57  15   Intel and from other companies to work on these new

03:57  16   buses.

03:57  17            That's way beyond a person of ordinary skill

03:57  18   in the art as I defined it as someone with a master's

03:57  19   degree.

03:57  20       Q.    So the level of skill you've defined was based

03:57  21   upon what you were seeing in Dr. Chu's actual patent

03:58  22   documents, the XP Bus, for example?

03:58  23       A.    That's correct.

03:58  24       Q.    But to build a new bus would require a whole

03:58  25   'nother level?

924

03:58  1        A.    Much, much higher level.

03:58  2        Q.    Okay.  Next factor is:  State of the prior

03:58  3    art.

03:58  4              In the context of how Dr. Sarhan is applying

03:58  5    these claims here in court, what is the state of the

03:58  6    prior art?

03:58  7        A.    So not much.  We didn't have these, you know,

03:58  8    fancy packet-based, super high-speed buses back in

03:58  9    1998.  You know, we would've loved to have them, but it

03:58 10    was a while before they could figure out there weren't

03:58 11    examples there.

03:58 12        Q.    Okay.  And again, in the context of

03:58 13    Dr. Sarhan's application of these claims to the full

03:58 14    scope that he's claiming, what were your thoughts with

03:58 15    respect to the predictability or unpredictability

03:58 16    factor?

03:58 17        A.    Right.  So Mr. Bhatt almost made it sound

03:59 18    easy, right?  He went and got his minions from all

03:59 19    sorts of companies and, you know, whole bunch of them

03:59 20    worked together for a few years and they came out with

03:59 21    a new bus standard.

03:59 22              Well, the number of failed examples of that

03:59 23    kind of thing happening is pretty high.  It's really

03:59 24    hard to get these things just right.

03:59 25              And so as a result, you know, how predictable

03:59   1   is this?  No.  This is not something you just sit down

03:59   2   and build.  This is something you get very lucky with.

03:59   3   It's very predictable (sic).

03:59   4       Q.    The final factor is:  Quantity of

03:59   5   experimentation.

03:59   6           What was your analysis or opinion with respect

03:59   7   to that factor?

03:59   8       A.    Yeah.  So again, Mr. Bhatt provided some

03:59   9   examples there.  It takes a lot of work to bring one of

03:59   10  these things together.  It's not something you sit down

03:59   11  in a few weeks and say, oh, yeah.  Let's design a new

03:59   12  peripheral bus.

03:59   13          No.  There are a lot of -- there's a lot of

03:59   14  effort, which require a lot of people to work on for

04:00   15  quite a long time.  So quantity of experimentation

04:00   16  involved is quite high.

04:00   17              MR. BURESH:  If we could go to the next

04:00   18  slide.

04:00   19  BY MR. BURESH:

04:00   20      Q.    After considering all these factors,

04:00   21  Dr. Edwards, what is your opinion with respect to

04:00   22  whether Dr. Chu's written disclosures in the 1999/2000

04:00   23  time frame allowed a person of ordinary skill in the

04:00   24  art to make and use an invention that utilizes the full

04:00   25  scope that Dr. Sarhan is alleging here in case -- in

04:00  1    this case to include PCI Express and USB 3 without

04:00  2    undue experimentation?

04:00  3        A.    Broadly, no way.  This patent is invalid.

04:00  4    There's no way a person of ordinary skill in the art

04:00  5    could take Dr. Chu's invention at the time and

04:00  6    eventually turn it into even a core of PCI Express,

04:00  7    even the core of USB 3.

04:00  8        Q.    Okay.  And we are looking at '359 patent,

04:00  9    Claim 19; is that correct?

04:01  10        A.    That's correct.

04:01  11        Q.    What is your opinion with respect to the

04:01  12    validity of that claim based on the enablement

04:01  13    requirement?

04:01  14        A.    Yeah.  Again, it's invalid.

04:01  15        Q.    And the same LVDS channel limitations are in

04:01  16    each of the asserted claims, correct?

04:01  17        A.    Correct.

04:01  18        Q.    And they're being applied by Dr. Sarhan in the

04:01  19    same way?

04:01  20        A.    Yep.  Same way.  He's saying, oh, use my

04:01  21    bridge bus to design a new bus.  It's just -- I don't

04:01  22    buy it.

04:01  23        Q.    So how would the enablement opinion that

04:01  24    you've just expressed apply to Claim 10 and Claim 13 of

04:01  25    the '768 patent?

—927—

04:01  1      A.    My conclusion is the same as before.

04:01  2      Q.    Which is what?

04:01  3      A.    That these claims are invalid.

04:01  4      Q.    And that's based upon the enablement

04:01  5  requirement that you analyzed?

04:01  6      A.    That's correct.

04:01  7      Q.    Considering all the claims together, then,

04:01  8  that remain, the '359 patent, Claim 19, '768 patent,

04:02  9  Claim 10 and Claim 13, is the enablement requirement

04:02  10  satisfied by those claims based upon the full scope

04:02  11  that Dr. Sarhan is asserting in this case?

04:02  12      A.    Right.  My opinion is the requirement is not

04:02  13  met, and so as a result, these claims are invalid.

04:02  14              MR. BURESH:  I pass the witness, Your

04:02  15  Honor.

04:02  16                  CROSS-EXAMINATION

04:02  17  BY MR. HALES:

04:02  18      Q.    Dr. Edwards, it's good to see you this

04:02  19  afternoon.  How are you?

04:02  20      A.    Hello.

04:02  21      Q.    Today's not our first time speaking, right?

04:02  22      A.    I actually can't recall.  I guess you took one

04:02  23  of my depositions.  I honestly never remember who

04:02  24  deposed me.

04:02  25      Q.    It's often a blur for me as well.  So we're in

928

04:02  1    the same boat.

04:02  2              Well, I'll remind you then that I had the

04:03  3    pleasure of reading your noninfringement report and

04:03  4    then deposing you to ask questions about that report.

04:03  5         A.    Okay.

04:03  6         Q.    The noninfringement opinions you've shared

04:03  7    with the jury today are drawn from that report; is that

04:03  8    right?

04:03  9         A.    That's correct.

04:03  10        Q.    Okay.  Now, your noninfringement report, it's

04:03  11   fair to say, was a joint effort between you and ASUSTeK

04:03  12   counsel?

04:03  13        A.    Yes.

04:03  14        Q.    That's to say, you didn't draft that

04:03  15   noninfringement report on your own, right?

04:03  16        A.    No.  I wouldn't put it that way.

04:03  17              (Bench conference.)

04:03  18              THE COURT:  We're not getting into this.

04:03  19              MR. HALES:  Got it.

04:03  20              THE COURT:  Okay.

04:03  21              MR. HALES:  Thank you.

04:03  22              (Bench conference concludes.)

04:03  23   BY MR. HALES:

04:03  24        Q.    Dr. Edwards, I'd like to discuss your

04:03  25   noninfringement opinions, if I may?

929

| | | |
|---|---|---|
| 04:03 | 1 | A.    Okay. |
| 04:03 | 2 | Q.    Dr. Edwards, you would agree that you do not |
| 04:03 | 3 | know how to perform an infringement analysis, correct? |
| 04:03 | 4 | A.    I said something like that during my |
| 04:03 | 5 | deposition, but I think I gave you a few answers. |
| 04:03 | 6 | Q.    What was your answer at the deposition? |
| 04:04 | 7 | A.    I can't remember.  I think I said something |
| 04:04 | 8 | kind of snotty. |
| 04:04 | 9 | Q.    Tell me, do you know how to perform an |
| 04:04 | 10 | infringement analysis? |
| 04:04 | 11 | A.    I do. |
| 04:04 | 12 | Q.    Now, you remember at your deposition, you were |
| 04:04 | 13 | under oath? |
| 04:04 | 14 | A.    Yes. |
| 04:04 | 15 | Q.    Your lawyer in a typical deposition, even if |
| 04:04 | 16 | you can't remember this one specifically, would have |
| 04:04 | 17 | been there via video conference, right? |
| 04:04 | 18 | A.    That's correct. |
| 04:04 | 19 | Q.    And in that deposition, we had a video camera? |
| 04:04 | 20 | A.    That's correct. |
| 04:04 | 21 | Q.    And a court reporter? |
| 04:04 | 22 | A.    Yes. |
| 04:04 | 23 | Q.    They recorded everything that you said? |
| 04:04 | 24 | A.    Yes. |
| 04:04 | 25 | Q.    And you were under an oath to tell the truth, |

930

04:04  1    right?

04:04  2        A.    That's correct.

04:04  3        Q.    And you take that oath seriously?

04:04  4        A.    Yes.

04:04  5            MR. HALES:  Vicki, can you play clip

04:04  6    No. ES 2622?

04:04  7            MR. BURESH:  Your Honor, that is not

04:04  8    proper impeachment.  He needs to give me a chance to

04:04  9    see what he's doing before he --

04:04  10            MR. HALES:  I apologize.  I'll give the

04:04  11    cite.  It's 206:22 to 207:1 of Dr. Edwards'

04:05  12    infringement deposition.

04:05  13            MR. BURESH:  Can you say that again?

04:05  14            MR. HALES:  Yes.  206:22 to 207:1.

04:05  15            MR. BURESH:  Okay.  Go ahead.

04:05  16            (Video played.)

04:05  17        Q.    Dr. Edwards, do you know how to perform an

04:05  18    infringement analysis?

04:05  19        A.    Of course not.  I'm sure there are details

04:05  20    that I will get wrong.

04:06  21            (End video.)

04:06  22    BY MR. HALES:

04:06  23        Q.    Dr. Edwards, in the course of our

04:06  24    deposition -- well, let me rephrase that question.

04:06  25            Dr. Edwards, you would agree with me there are

04:06   1    significant aspects of your patent infringement

04:06   2    opinions that you got wrong in this case, correct?

04:06   3        A.    No.  I wouldn't put it that way.

04:06   4        Q.    Okay.  Let me be more specific.

04:06   5              Dr. Edwards, you would agree that patent

04:06   6    infringement analysis is a two-step inquiry, right?

04:06   7        A.    That's correct.

04:06   8        Q.    At the first step, we construe or define the

04:06   9    scope of the claim terms, right?

04:06   10       A.    Yes.

04:06   11       Q.    And to do that, we will apply the Court's

04:06   12   constructions and the plain and ordinary meaning of a

04:06   13   term?

04:06   14       A.    Yes.

04:06   15       Q.    You would agree, though, that in forming your

04:06   16   infringement opinions, you went beyond these two

04:06   17   sources of information, right?

04:06   18       A.    No.  I wouldn't say that.

04:06   19       Q.    You also considered how ACQIS seems to be

04:06   20   interpreting the claims, didn't you?

04:06   21       A.    Let's see.  Yes.  I was considering that.

04:06   22       Q.    And it's improper to consider this third

04:06   23   source of evidence when construing the claim terms for

04:06   24   purposes of infringement.

04:06   25              You'd agree with that statement?

| | | |
|---|---|---|
| 04:06 | 1 | A.    Let's see.  Yes. |
| 04:06 | 2 | Q.    You did this, though, because you were having |
| 04:07 | 3 | trouble understanding the Court's claim constructions; |
| 04:07 | 4 | is that right? |
| 04:07 | 5 | A.    I may have said that. |
| 04:07 | 6 | Q.    Is it true? |
| 04:07 | 7 | A.    I don't know. |
| 04:07 | 8 | Q.    Because you considered some of the -- well, |
| 04:07 | 9 | let me rephrase my question. |
| 04:07 | 10 | You considered some of the Court's |
| 04:07 | 11 | constructions somewhat vague and that's why you looked |
| 04:07 | 12 | how -- at how ACQIS seemed to be interpreting them to |
| 04:07 | 13 | help inform your opinion, correct? |
| 04:07 | 14 | A.    Yes. |
| 04:07 | 15 | Q.    And the way ACQIS presented its infringement |
| 04:07 | 16 | case influenced how you're interpreting the claims, |
| 04:07 | 17 | right? |
| 04:07 | 18 | A.    No.  I wouldn't put it that way. |
| 04:07 | 19 | MR. HALES:  Vicki, can you please pull up |
| 04:07 | 20 | the same deposition transcript at 238:4 to 16? |
| 04:08 | 21 | (Video played.) |
| 04:08 | 22 | Q.    So the way that ACQIS is presenting -- |
| 04:08 | 23 | (Video ends.) |
| 04:08 | 24 | MR. HALES:  I'm sorry.  Can you pull up |
| 04:08 | 25 | the actual transcript? |

04:08  1                      MR. BURESH:  Can you ask your prior

04:08  2  question again, counsel?

04:08  3                      MR. HALES:  Sure.

       4  BY MR. HALES:

04:08  5      Q.    Dr. Edwards, the way ACQIS presented its

04:08  6  infringement case influenced how you're interpreting

04:08  7  the claims, right?

04:08  8      A.    Let's see.  Not during the infringement

04:08  9  analysis.  I certainly considered how ACQIS was

04:08  10  interpreting the claims and the scope at other times.

04:08  11     Q.    In any event, you would agree with me that

04:08  12  it's inappropriate argument to consider a patent

04:08  13  infringer's allegations and informing the scope of a

04:08  14  claim for purposes of an infringement analysis,

04:08  15  correct?

04:08  16     A.    Yes.

04:08  17     Q.    What role did ACQIS' interpretations of the

04:09  18  claims play in your infringement analysis?

04:09  19     A.    I don't believe they did.

04:09  20                      MR. HALES:  Vicki, will you please pull

04:09  21  up 209:7 to 20?

04:09  22                      (Video played.)

04:09  23     Q.    What role does ACQIS' --

04:09  24                      (Video ends.)

04:09  25                      MR. HALES:  Again, will you please pull

934

04:09  1    up the deposition transcript itself?

04:09  2    BY MR. HALES:

04:09  3        Q.    Dr. Edwards, do you see where I asked you what

04:09  4    role does ACQIS' interpretations of the claims play in

04:10  5    your infringement analysis?

04:10  6        A.    Yes.

04:10  7        Q.    And you answer:  Let's see.  Because some of

04:10  8    the Court's constructions are somewhat vague, I looked

04:10  9    at how ACQIS seemed to be interpreting them as well to

04:10  10   help inform my opinion.

04:10  11            Do you see that?

04:10  12       A.    Yes.

04:10  13       Q.    Because you've done this in forming your

04:10  14   opinions, you would agree there's an obvious question

04:10  15   about whether when you performed your infringement

04:10  16   analysis, you did it improperly, right?

04:10  17       A.    I wouldn't put it like that.

04:10  18            MR. HALES:  Vicki, will you please pull

04:10  19   up 251:8 to 25 in transcript form?

        20   BY MR. HALES:

04:10  21       Q.    Dr. Edwards, if you can follow along on your

04:10  22   screen from Line 8.

04:10  23       A.    Yeah.

04:10  24       Q.    The improper analysis that you just discussed,

04:11  25   is that the manner in which you've conducted

04:11  1    infringement analysis until this point, until

04:11  2    Mr. Schmidt straightened you out?

04:11  3        Answer:  Well, let's see.  The conclusions are

04:11  4    still the same.  It's, you know, this worrying about

04:11  5    the full-scope enablement.  So I understand that that's

04:11  6    inappropriate.  That's an inappropriate argument now to

04:11  7    be making specifically in infringement analysis.

04:11  8        But when you gave me testimony saying that you

04:11  9    considered the full scope of the claim as clarified by

04:11  10   ACQIS' allegations, that was the true understanding you

04:11  11   had of how to perform the infringement analysis up

04:11  12   to --

04:11  13       MR. BURESH:  Your Honor, this is not

04:11  14   impeachment.  He hasn't asked a question, and he's just

04:11  15   reading multiple questions out of a transcript.  I

04:11  16   object.

04:11  17       MR. HALES:  The question I asked directly

04:11  18   tracks the answer on 23 to 25.

04:11  19       THE COURT:  Well, I'm having a hard time,

04:11  20   when you're reading it like that, following you.  But

04:11  21   why don't you go back and ask him the question again.

04:11  22   And you can -- you can use that again if you think you

04:11  23   need to.

04:11  24   BY MR. HALES:

04:12  25       Q.   Dr. Edwards, we established at times in

04:12   1    forming your infringement opinions, you considered

04:12   2    ACQIS' allegations to inform those opinions, correct?

04:12   3        A.    Let's see.  It looks like that's what it says

04:12   4    in the transcript.

04:12   5        Q.    Okay.  And in considering the full scope of

04:12   6    the claim as clarified by ACQIS' allegations, you would

04:12   7    agree there's an obvious question about whether, when

04:12   8    performing your analysis, you did so properly?

04:12   9        A.    No.  I wouldn't agree with you on that.

04:12   10               MR. HALES:  Can we bring that same

04:12   11   portion back up, Vicki, 251:8 to 25?

04:12   12   BY MR. HALES:

04:12   13       Q.    I'll start from Line 17:

04:12   14               But when you gave me testimony saying that you

04:12   15   considered the full scope of the claim as clarified by

04:12   16   ACQIS' allegations, that was the true understanding of

04:12   17   how -- you had of how to perform an infringement

04:12   18   analysis up to and until your counsel talked to you

04:12   19   during the bio break?

04:12   20               Answer:  Let's see.  So there's an obvious

04:12   21   question about whether when I was performing the

04:12   22   analysis, I did it improperly.

04:13   23               Do you see that?

04:13   24       A.    Yes.

04:13   25               MR. BURESH:  Your Honor, he needs to

937

04:13  1    complete his answer if he's going to impeach him with

04:13  2    half an answer.

04:13  3                    THE COURT:  Is that not the entire

04:13  4    answer?

04:13  5                    MR. BURESH:  That is not the entire

04:13  6    answer.

04:13  7                    THE COURT:  Yes.  You have to give the

04:13  8    entire answer.

04:13  9                    MR. HALES:  I'm happy to have you -- go

04:13  10   to the next page, Vicki.

04:13  11                   Claim construction and the scope and all

04:13  12   the rest of it should somehow all be consistent, but I

04:13  13   don't see that consistency to cross --

04:13  14                   MR. BURESH:  You're not reading from the

04:13  15   right place.

04:13  16                   MR. HALES:  Am I not?  I'm sorry.

04:13  17                   So certainly in the last few minutes,

04:13  18   it's likely that I was understanding and getting some

04:13  19   aspects of the law conflicted -- conflated.  But I'm

04:13  20   not aware that that confusion leaked into my report

04:13  21   per se.

04:13  22                   I mean, you've been asking me to point

04:13  23   out this or whatever.  You're asking me, you know, oh,

04:13  24   what am I looking at here, what do I understand now as

04:13  25   opposed to, oh, what did I say in my report?

938

```
           1    BY MR. HALES:
04:13      2        Q.   Did I read that accurately?
04:13      3        A.   Yes.
04:13      4        Q.   Okay.  I'd like to analyze whether you see
04:13      5    limitations in the claims that don't appear in the
04:14      6    claims.  Okay?
04:14      7             Dr. Edwards, do you know what the term
04:14      8    "hot-plugging" means?
04:14      9        A.   Yes.
04:14     10        Q.   Broadly speaking, you'd agree that
04:14     11    hot-plugging means that I can insert or remove
04:14     12    something from a computer system without having to turn
04:14     13    the computer system off first, right?
04:14     14        A.   That is fair.
04:14     15        Q.   And when you interpreted the claims, you
04:14     16    concluded that hot-plugging is necessary to cover the
04:14     17    full scope that ACQIS appears to be claiming?
04:14     18        A.   I can't recall.
04:14     19             MR. HALES:  Vicki, can you bring up the
04:14     20    transcript at 203:16 to 24?
04:14     21    BY MR. HALES:
04:14     22        Q.   Do you see at Line 16 where I asked:  Under
04:14     23    your interpretation of the asserted claims, do you
04:14     24    understand any limitation to relate to hot-plugging?
04:14     25             Your answer:  Let's see.  Under my
```

939

04:14   1   interpretation of the claims informed by what's going

04:14   2   on in the case, including your accusations, yes.  It

04:14   3   seems like hot-plugging is necessary to cover the full

04:14   4   scope that you appear to be claiming.

04:14   5         Do you see that?

04:14   6   A.   Yes.

04:14   7   Q.   Okay.  But you would agree that no patent

04:15   8   claim asserted in this case has any limitations

04:15   9   relating to hot or plug?

04:15   10   A.   Repeat your question again.

04:15   11   Q.   You would agree that no patent claim in this

04:15   12   case has any claim limitations reciting the words "hot"

04:15   13   or "plug"?

04:15   14   A.   That's correct.

04:15   15   Q.   Okay.  The Court hasn't delivered any

04:15   16   constructions about hot-plugging being within the

04:15   17   meaning of any of the claim terms?

04:15   18   A.   That's correct.

04:15   19   Q.   And you've chosen not to share any

04:15   20   noninfringement opinions with the jury today relating

04:15   21   to hot-plugging?

04:15   22   A.   That's correct.

04:15   23   Q.   Okay.  Dr. Edwards, are you familiar with the

04:15   24   term "clock" as used in computer engineering?

04:15   25   A.   Yes.

940

04:15    1        Q.    And a clock refers to a signal that regulates

04:15    2    the timing and speed of a certain unit, correct?

04:15    3        A.    That's a reasonable definition.

04:15    4        Q.    Okay.  And in forming your infringement

04:15    5    opinions in this case, you analyzed how ACQIS

04:15    6    interpreted the claims and concluded that a specific

04:15    7    type of clock was an inherent requirement of the patent

04:15    8    claims, correct?

04:15    9        A.    Let's see.  Yes.  I did.

04:16   10        Q.    Okay.  You haven't shared any opinions with

04:16   11    the jury today about a clock being a necessary

04:16   12    limitation of the claims?

04:16   13        A.    That's correct.

04:16   14        Q.    Dr. Edwards, you know what error correction

04:16   15    is, right?

04:16   16        A.    Yes.

04:16   17        Q.    An error correction, broadly speaking, is a

04:16   18    computer's ability to analyze information received over

04:16   19    a channel, detect any errors, and fix errors in that

04:16   20    information, right?

04:16   21        A.    Yes.

04:16   22        Q.    And because of the way ACQIS presented its

04:16   23    infringement case, you interpreted the PCI-related

04:16   24    limitations of the asserted claims to require some form

04:16   25    of error correction in an accused device for that

04:16  1    accused device to infringe, correct?

04:16  2        A.    Sorry.  What context are you...

04:16  3        Q.    In the context of the claims that have been

04:16  4    asserted in this case, have you determined that they

04:16  5    require error correction?

04:16  6        A.    Let's see.  I can't recall what I put in my

04:16  7    report.  I've not discussed them here.

04:16  8        Q.    I'm asking for your opinions in analyzing the

04:16  9    claims.

04:16  10        Have you concluded that they must require

04:17  11    error correction?

04:17  12        A.    Let's see.  Yeah.  I can't recall.  I don't

04:17  13    think I did.  Certainly not my opinion now.

04:17  14        Q.    Has your opinion changed over time,

04:17  15    Dr. Edwards?

04:17  16        A.    No.

04:17  17            MR. HALES:  Vicki, can you please bring

04:17  18    up 239:1 through 240:3?

04:17  19    BY MR. HALES:

04:17  20        Q.    Question:  Okay.  So because of the way ACQIS

04:17  21    is presenting its infringement case, you interpret the

04:17  22    PCI-related limitations of the asserted claims to

04:17  23    require some form of error correction in an accused

04:17  24    device for that accused device to infringe?

04:17  25            Answer:  Broadly, the claims are saying

04:17  1    "conveys," which I interpret to mean successfully

04:17  2    conveys.  And, as I've mentioned before, to

04:17  3    successfully convey something in a setting like this,

04:17  4    you need some sort of error correction mechanism.  So I

04:17  5    understand it to be necessary.

04:17  6              Do you see that?

04:18  7        A.    Yes.

04:18  8        Q.    Okay.  And you haven't chosen to share that

04:18  9    infringement opinion with the jury today?

04:18  10       A.    That's correct.

04:18  11       Q.    Okay.  Dr. Edwards, what -- I guess I'll ask

04:18  12   you a new question.

04:18  13             This interpretation of the claims, is this a

04:18  14   part of your full-scope analysis of claim terms?

04:18  15       A.    Part of my full-scope analysis of claim terms.

04:18  16   I'm not sure what you're referring to.

04:18  17       Q.    Do you remember the term "full scope"?

04:18  18       A.    I think -- well, I understand the term "full

04:18  19   scope."  Yes.

04:18  20       Q.    Have you applied the full-scope understanding

04:18  21   of the claim terms in arriving at your infringement

04:18  22   opinions?

04:18  23       A.    Yes.

04:18  24       Q.    You'd agree it's improper to apply the

04:18  25   full-scope understanding of a claim term in rendering

943

04:18  1    an infringement opinion, correct?

04:18  2        A.    Yes.

04:18  3        Q.    Dr. Edwards, you've shared the opinion that

04:19  4    the term "LVDS," as used in the asserted patent claims,

04:19  5    refers to a specific type of low-voltage differential

04:19  6    signaling; is that right?

04:19  7        A.    No.  I wouldn't put it that way.

04:19  8        Q.    Do you -- let me see if I've understood your

04:19  9    opinion then.

04:19  10        LVDS, as used in the claims, requires the

04:19  11   presence of a bus bridge?

04:19  12        A.    Let's see.  The LVDS channels refer to a bus

04:19  13   bridge, so that's not quite what you said.

04:19  14        Q.    I'm sorry.  Was that an affirmative answer to

04:19  15   my question?  LVDS channels do require a bus bridge?

04:19  16        A.    I guess I don't -- I wouldn't say it that way.

04:19  17        Q.    I'm trying to understand your LVDS opinions.

04:19  18        If a technology is described as low voltage

04:19  19   and differential signal, is that an LVDS technology?

04:19  20        A.    No.  I wouldn't say that.

04:19  21        Q.    What is required for something to be an LVDS

04:19  22   technology under the patent claim terms, sir?

04:20  23        A.    Oh, well, we've been discussing it at length.

04:20  24   So we look at it, Dr. Chu had the LVDS manual --

04:20  25        Q.    Is LVDS the technology in the LVDS manual,

944

04:20  1    Dr. Edwards?

04:20  2        A.    Sorry.   Which LVDS technology are you

04:20  3    referring to?

04:20  4        Q.    You've talked about the National Semiconductor

04:20  5    manual, 1997.

04:20  6        A.    Yes.

04:20  7        Q.    Is that the LVDS technology we should be

04:20  8    looking for in trying to investigate infringement?

04:20  9        A.    In part, that would be an example.

04:20  10       Q.    Provide a concise definition for me of LVDS.

04:20  11       A.    Well, you start with the National stuff,

04:20  12   because we know Dr. Chu refers to that.   Then --

04:20  13       Q.    Can you not provide a concise definition, sir?

04:20  14            THE COURT:   No, no, no.   You asked him to

04:20  15   explain it.   He gets to explain it.

04:21  16   BY MR. HALES:

04:21  17       Q.    Please proceed.

04:21  18       A.    Let's see -- so the short answer is:   No.   I

04:21  19   don't think I can provide a concise answer.

04:21  20            How I arrived at this is I started with the

04:21  21   National stuff and then looked at the disclosures in --

04:21  22   in the patents, the early stuff, and then applied what

04:21  23   I understood a person of ordinary skill in the art

04:21  24   would have understood at the time.

04:21  25       Q.    Dr. Edwards, you were present in the courtroom

04:21   1    when we reviewed the PCI Express manual?

04:21   2        A.    That's correct.

04:21   3        Q.    And the PCI Express manual describes its

04:21   4    fundamental link as low-voltage differential signal

04:21   5    pairs.

04:21   6              Do you remember seeing that disclosure?

04:21   7        A.    That's correct.

04:21   8        Q.    That's an LVDS channel, correct?

04:21   9        A.    I wouldn't put it that way.

04:21   10             MR. HALES:  Vicki, will you please bring

04:21   11   up Exhibit J-1, Page 51, Lines 14 to 16 of Column 4,

04:21   12   please?

04:21   13   BY MR. HALES:

04:21   14       Q.    Do you see this disclosure of the '768 patent?

04:22   15       A.    Yes.  I see that.

04:22   16       Q.    And here, the patentee says that:  The term

04:22   17   "LVDS" is used herein to generically refer to low

04:22   18   voltage differential signals.

04:22   19             Do you see that?

04:22   20       A.    Yes.

04:22   21       Q.    Do you see where the patentee says further:

04:22   22   And is not intended to be limited to any particular

04:22   23   type of LVDS technology?

04:22   24       A.    Yes.

04:22   25       Q.    So when the PCI Express standard describes

04:22  1   itself as low voltage differential signaling, should we

04:22  2   apply the patent's teachings here and consider that it

04:22  3   too is a LVDS technology?

04:22  4       A.    No.  I don't see why you would.  I'd be happy

04:22  5   to explain, though.

04:22  6       Q.    Would applying the term "LVDS" generically to

04:22  7   other low voltage differential signal technologies be a

04:22  8   faithful application of this teaching of the patent?

04:22  9       A.    Let's see.  Repeat your question, please.

04:22  10      Q.    Would applying the term "LVDS" to the low

04:22  11  voltage differential signaling of PCI Express be a

04:22  12  faithful application of this disclosure of the patent?

04:22  13      A.    No.

04:23  14      Q.    Does this patent say to start with the 1997

04:23  15  version of the LVDS manual that we've reviewed?

04:23  16      A.    Those words don't appear.  Is that what you

04:23  17  mean?

04:23  18      Q.    I'm asking if the patent has directed you to

04:23  19  perform the analysis you just described.  You said you

04:23  20  start with the 1997 LVDS manual and work out from

04:23  21  there.

04:23  22            Has that been said in this patent anywhere?

04:23  23      A.    It lists the manual.

04:23  24      Q.    Where does it list the manual?

04:23  25      A.    Sorry?

947

04:23  1        Q.    Where does it list the manual?

04:23  2        A.    I believe it's in the list of reference.  I

04:23  3   believe it's also mentioned in the incorporated by

04:23  4   reference documents.

04:23  5        Q.    Who adds the list of references to the patent?

04:23  6   Is that added by the patentee, or is that added by the

04:23  7   patent examiner?

04:23  8        A.    I actually don't know.

04:23  9        Q.    In any event, because it was in the list of

04:24  10  references cited, you would agree that the patent

04:24  11  examiner has reviewed that 1997 LVDS manual, correct?

04:24  12       A.    I would assume so.

04:24  13       Q.    And that the patent issued despite the patent

04:24  14  examiner reviewing the 1997 LVDS manual, correct?

04:24  15       A.    Yes.

04:24  16       Q.    So the patent examiner must have concluded

04:24  17  that this manual does not disclose the technology

04:24  18  claimed in Dr. Chu's patents.

04:24  19             Do you agree with that statement?

04:24  20       A.    I wouldn't put it that way.

04:24  21       Q.    You'd agree, Dr. Edwards, that no asserted

04:24  22  claim calls for the conveyance of a full PCI local bus

04:24  23  transaction, correct?

04:24  24       A.    Yes.

04:24  25       Q.    In fact, every claim with PCI limitations

948

04:24  1    calls only for address and data bits of a PCI local bus

04:24  2    transaction, correct?

04:24  3        A.    Correct.

04:24  4        Q.    Hardware in the computer context means

04:24  5    something physical, something you can touch?

04:24  6        A.    Yes.

04:24  7        Q.    Address and data bits are electrical signals,

04:25  8    correct?

04:25  9        A.    Correct.

04:25 10        Q.    Dr. Edwards, you would agree that each accused

04:25 11    product practices PCI Express standards, correct?

04:25 12        A.    Yes.

04:25 13        Q.    And you would further agree that PCI Express

04:25 14    standards were developed to be backwards software

04:25 15    compatible with PCI local bus specification, correct?

04:25 16        A.    No.  I wouldn't put it that way.

04:25 17              MR. HALES:  Vicki, will you please bring

04:25 18    up 115, Lines 16 to 23 of Dr. Edwards' deposition?

04:25 19    BY MR. HALES:

04:25 20        Q.    But you would agree that the PCI Express

04:25 21    standard was developed to be backward software

04:25 22    compatible with the local -- PCI local bus

04:25 23    specification?

04:25 24              I'm reading your words from Paragraph 101.

04:25 25              Answer:  Oh, yes.  As I described.  And

949

04:25  1    there's many more details to that.  But yes.  Your

04:25  2    reading of it is correct.

04:26  3         Did I read that correctly?

04:26  4    A.    You did.

04:26  5    Q.    Thank you.

04:26  6         Put simply, backwards software compatibility

04:26  7    means that legacy PCI local bus software could continue

04:26  8    to work in a PCI Express system, right?

04:26  9    A.    Say that again.

04:26  10   Q.    Put simply, backwards software compatibility

04:26  11   means that legacy PCI local bus software could continue

04:26  12   to work in a PCI Express system, correct?

04:26  13   A.    Correct.

04:26  14   Q.    You'd agree, Dr. Edwards, that a CPU may use

04:26  15   PCI local bus software to issue what is called a memory

04:26  16   write instruction, correct?

04:26  17   A.    Let's see.  That sounds like you're quoting.

04:26  18   That's not quite right.

04:26  19   Q.    Should I change the word "instruction" to

04:26  20   something else?

04:26  21   A.    Please ask the question again.

04:26  22   Q.    You would agree, Dr. Edwards, that a CPU may

04:26  23   use a PCI local bus software to issue what is called a

04:26  24   memory write instruction?

04:26  25   A.    No.  I wouldn't put it that way.

950

04:27  1       Q.    CPUs may use PCI local bus software to issue a
04:27  2  memory write, correct?
04:27  3       A.    To issue a memory write.  Yeah.  I still
04:27  4  wouldn't put it that way.
04:27  5       Q.    What if I use the word "operation"?
04:27  6       A.    Yeah.  Again, that's not consistent with my --
04:27  7  with how I would phrase it.
04:27  8       Q.    If a CPU uses PCI local bus software to issue
04:27  9  a memory write command, would that include both address
04:27  10  and data bits?
04:27  11       A.    Okay.  Please repeat the question.  You're
04:27  12  using words in a way I'm not familiar with.
04:27  13       Q.    Dr. Edwards, I'll move on for Rule 36.
04:28  14            I'd like to investigate your understanding of
04:28  15  the term "backward compatibility."
04:28  16       A.    Yes.
04:28  17       Q.    You don't include a definition for backward
04:28  18  compatibility in your report, do you, your infringement
04:28  19  report?
04:28  20       A.    I don't believe I do.
04:28  21       Q.    And weeks later when you were deposed, you
04:28  22  still hadn't come up with a definition for backward
04:28  23  compatibility; is that right?
04:28  24       A.    No.  I wouldn't say that.
04:28  25       Q.    So you came up with a definition for backward

04:28  1    compatibility after you wrote your report?

04:28  2        A.    No.

04:28  3        Q.    Did you include it in your report?

04:28  4        A.    I did not include a definition in my report.

04:28  5        Q.    And in that report, you delivered the opinion

04:28  6    that there is no backward compatibility between PCI

04:28  7    Express transactions and PCI local bus transactions?

04:28  8        A.    That sounds right.

04:28  9        Q.    Okay.  Whatever your definition for backward

04:28  10   compatibility, you agree that backward compatibility

04:28  11   should be informed by a study of the disclosures of the

04:29  12   asserted patents, right?

04:29  13       A.    I'm not understanding that question.  Can you

04:29  14   phrase it differently?

04:29  15       Q.    Sure.

04:29  16             If someone wants to understand what backward

04:29  17   compatibility means in the Court's construction, the

04:29  18   Court has told us that backward compatibility is a way

04:29  19   to be in accordance with the PCI local bus

04:29  20   specification.

04:29  21             You remember reviewing that at construction?

04:29  22       A.    Yes.

04:29  23       Q.    Okay.  That concept, backward compatibility,

04:29  24   that will be informed by the teachings of the asserted

04:29  25   patents, correct?

952

04:29  1    A.    Yes.

04:29  2              MR. HALES:  Vicki, will you please --

04:29  3    forget that, Vicki.

04:29  4    BY MR. HALES:

04:29  5    Q.    Dr. Edwards, do you remember putting up a

04:29  6    slide on the screen that had the PCI Express plug next

04:29  7    to the PCI local bus plug?

04:29  8    A.    Yes.

04:29  9    Q.    And I think the point you wanted to illustrate

04:29  10   there was that these two plugs cannot accept the same

04:29  11   connectors, right?

04:29  12   A.    Yes.

04:29  13   Q.    But you would agree that this is different

04:30  14   from the backward compatibility taught in the asserted

04:30  15   patents, right?

04:30  16   A.    Let's see.

04:30  17   Q.    I'll be more specific.

04:30  18         Did Dr. Chu criticize the PCI local bus for

04:30  19   having a bulky and cumbersome connector?

04:30  20   A.    Yes.

04:30  21   Q.    And he said it had too many pins?

04:30  22   A.    Yes.

04:30  23   Q.    And when he depicted his use of his XP Bus in

04:30  24   the figures, he didn't use a PCI local bus connector to

04:30  25   bridge the ACM and the console, did he?

953

04:30   1          A.    That's correct.

04:30   2          Q.    So he used a new type of connector, not the

04:30   3    old PCI local bus connector, right?

04:30   4          A.    That's correct.

04:30   5          Q.    But the XP Bus was taught to maintain

04:30   6    compatibility with PCI local bus and be able to convey

04:30   7    the address and data bits received from the PCI local

04:30   8    bus, right?

04:30   9          A.    Yeah.  That's not quite right.

04:30   10         Q.    Can the XP Bus, as disclosed in the patents,

04:30   11   accept address and data bits from a PCI local bus

04:31   12   transaction?

04:31   13         A.    They can.

04:31   14         Q.    And it would convey it over the XP Bus?

04:31   15         A.    Yes.

04:31   16         Q.    Notwithstanding that its connector is

04:31   17   different from the PCI local bus, correct?

04:31   18         A.    That's correct.

04:31   19         Q.    Okay.  Dr. Edwards, to find backward

04:31   20   compatibility, you would anticipate the same electrical

04:31   21   signals would be used in the old and new versions of

04:31   22   the technology, right?

04:31   23         A.    The beginning of your question was garbled.

04:31   24   Can you say it again?

04:31   25         Q.    To find backward compatibility, you would

954

04:31  1   anticipate that the same electrical signals would be

04:31  2   used in the old and new versions of the technology,

04:31  3   right?

04:31  4       A.    Generally, I would expect that.

04:31  5       Q.    But you would agree this is the opposite of

04:31  6   what the patent teaches, correct?

04:31  7       A.    No.  I wouldn't put it that way.

04:31  8       Q.    Doesn't Dr. Chu criticize the PCI local bus as

04:31  9   requiring a high voltage amount?

04:31  10      A.    Yes.

04:31  11      Q.    And he says it would be an advantage to

04:31  12  replace it with LVDS in which you could reduce the

04:31  13  amount of power consumed?

04:31  14      A.    Yes.

04:31  15      Q.    And that's, in fact, what he did with the XP

04:32  16  Bus, right, is he got rid of PCI local buses, the

04:32  17  bridge between his ACM and his console, right?

04:32  18      A.    So he proposed doing that.  Yes.

04:32  19      Q.    And out of his new connector to bridge these

04:32  20  two, he's now using the electrical requirements of

04:32  21  LVDS, not of PCI local bus, right?

04:32  22      A.    Yes.

04:32  23      Q.    So Dr. Chu's version of backward compatibility

04:32  24  is new connector, new electrical signaling?

04:32  25      A.    No.  I wouldn't put it that way.

955

04:32  1      Q.    We agree that he has a new connector, right?

04:32  2      A.    Yeah.

04:32  3      Q.    He's not using the PCI local bus connector?

04:32  4      A.    That's correct.

04:32  5      Q.    He has new signaling voltage levels, right?

04:32  6      A.    No.  I would not agree with that.

04:32  7      Q.    Does he not say that LVDS will consume less

04:32  8  power than PCI local bus?

04:32  9      A.    He does say that.

04:32  10     Q.    Okay.  Dr. Edwards, we don't disagree that PCI

04:32  11  Express remains software backward compatible with

04:33  12  PCI -- PCI Express remains software backward compatible

04:33  13  with PCI local bus, correct?

04:33  14     A.    We discussed that earlier.

04:33  15     Q.    Is that a yes?

04:33  16     A.    I don't remember exactly what I said then.

04:33  17     Q.    I'll ask you anew.

04:33  18           Is it software backwards compatible or not?

04:33  19     A.    I wouldn't phrase it exactly that way.

04:33  20     Q.    Dr. Edwards, the claims asserted in this -- in

04:33  21  this case just claimed generically USB protocol data or

04:33  22  USB protocol information.

04:33  23           Would you agree with that statement?

04:33  24     A.    Yes.

04:33  25     Q.    They don't refer to a specific generation of

04:33    1    USB?

04:33    2        A.    That's correct.

04:34    3        Q.    And the USB ports of the accused products,

04:34    4    you'd agree, are capable of conveying USB protocol

04:34    5    data?

04:34    6        A.    Yes.

04:34    7        Q.    And the USB ports of the accused products are

04:34    8    capable of conveying USB protocol information, correct?

04:34    9        A.    Yes.

04:34    10        Q.    And you don't dispute that the USB 3 ports of

04:34    11    the accused products use low voltage differential

04:34    12    signaling, do you?

04:34    13        A.    I wouldn't put it that way.

04:34    14        Q.    Specifically, the USB 3 protocol has the old

04:34    15    signal channels from USB 2.

04:34    16              You'd agree with that?

04:34    17        A.    Yes.

04:34    18        Q.    And two new channels called SuperSpeed

04:34    19    channels?

04:34    20        A.    Yes.

04:34    21        Q.    These are the low voltage differential

04:34    22    signaling channels, aren't they?

04:34    23        A.    No.  I would not say it that way.

04:34    24              MR. HALES:  Vicki, will you please bring

04:34    25    up D-204731, which is Paragraph 160 of Dr. Edwards'

| | | |
|---|---|---|
| 04:34 | 1 | invalidity report? |
| | 2 | BY MR. HALES: |
| 04:35 | 3 | Q.    Are we looking at your invalidity report, |
| 04:35 | 4 | Dr. Edwards? |
| 04:35 | 5 | A.    Yes. |
| 04:35 | 6 | Q.    Do you see where you say:  A USB 3.0 cable is |
| 04:35 | 7 | effectively a USB 2.0 cable with two additional |
| 04:35 | 8 | differential pairs that carry the SuperSpeed bus |
| 04:35 | 9 | signals.  The additional pairs use low voltage |
| 04:35 | 10 | differential signaling, one pair in each direction? |
| 04:35 | 11 | A.    Yes. |
| 04:35 | 12 | Q.    And if we were to abbreviate low voltage |
| 04:35 | 13 | differential signalling, that would abbreviate to LVDS? |
| 04:35 | 14 | A.    I wouldn't put it that way. |
| 04:35 | 15 | Q.    I'm asking it just as a matter of fact. |
| 04:35 | 16 | If we take the first letter of each of those |
| 04:35 | 17 | words, would it abbreviate to LVDS? |
| 04:35 | 18 | A.    It would. |
| 04:35 | 19 | Q.    Okay.  Dr. Edwards, I'd like to discuss your |
| 04:35 | 20 | invalidity opinions briefly. |
| 04:35 | 21 | The written description requirement, as you |
| 04:35 | 22 | understand it, does not require that the patentee prove |
| 04:35 | 23 | that he has already developed a physical version of |
| 04:36 | 24 | what he claims as his invention, correct? |
| 04:36 | 25 | A.    Correct. |

958

04:36   1       Q.    You would agree that the patentee does not

04:36   2  need to disclose information that is known and well

04:36   3  understood in a patent specification to satisfy the

04:36   4  written description requirement, correct?

04:36   5       A.    That's correct.

04:36   6       Q.    LVDS was known in 1997?

04:36   7       A.    Which one are you referring to?

04:36   8       Q.    You've shown me a manual for an LVDS

04:36   9  technology published by National Semiconductor.

04:36  10       A.    Yes.   That was certainly available.

04:36  11       Q.    I think you called this technology

04:36  12  "off-the-shelf technology"?

04:36  13       A.    That's correct.

04:36  14       Q.    Okay.   The test for written description is

04:36  15  whether the specification demonstrates to a person of

04:36  16  skill in the art that the patent applicant actually had

04:36  17  invented the subject matter claimed in the patent

04:36  18  claims, right?

04:36  19       A.    Correct.

04:36  20       Q.    We don't go and look at an accused product to

04:36  21  perform this analysis; we look at the patent claims,

04:36  22  right?

04:36  23       A.    To perform which analysis?  I lost you.

04:36  24       Q.    The written description analysis.

04:36  25       A.    The written description analysis.   Right.

04:36  1    That's correct.

04:36  2        Q.    Okay.  So the thing that needs support in the

04:37  3    written portion of the patent is what is actually

04:37  4    claimed in the claims, right?

04:37  5        A.    Yeah.

04:37  6        Q.    Okay.  So when you perform your analysis

04:37  7    toward the end of your slide deck and you scratch out

04:37  8    the claim terms and replace them with accused

04:37  9    technology, you would agree you're not looking for what

04:37  10   is actually found in the claims, correct?

04:37  11       A.    I wouldn't put it that way.

04:37  12       Q.    You depicted it that way in your slides,

04:37  13   didn't you?

04:37  14       A.    That's true.

04:37  15       Q.    The same is true of the enablement

04:37  16   requirement.  The only thing the patentee has to enable

04:37  17   others in the field to do is make and use what's

04:37  18   actually claimed without undue experimentation; is that

04:37  19   right?

04:37  20       A.    That's correct.

04:37  21       Q.    And LVDS was known in the field?

04:37  22       A.    Again, I don't know what antecedent.  The

04:37  23   National Semiconductor LVDS?

04:37  24       Q.    LVDS as a technology was known in the field in

04:38  25   1999?

960

04:38    1        A.    There were instances of LVDS known.

04:38    2        Q.    USB was widely known in the field at the time?

04:38    3        A.    That's true.

04:38    4        Q.    And USB was already a serial technology,

04:38    5    right?

04:38    6        A.    Yes.

04:38    7        Q.    The LVDS image you showed us, in fact, had a

04:38    8    serializer so it could even take in parallel data and

04:38    9    send it over the channel, right?

04:38   10        A.    Yes.

04:38   11        Q.    Okay.  Some amount of experimentation is okay

04:38   12    in the enablement requirement, right?

04:38   13        A.    Yes.

04:38   14        Q.    The test is whether it's undue

04:38   15    experimentation; is that right?

04:38   16        A.    That's my understanding.

04:38   17        Q.    One attempt at developing a chip is not undue

04:38   18    experimentation, correct?

04:38   19        A.    I'm not sure.

04:38   20        Q.    Okay.

04:38   21        A.    I've not done that analysis.

04:38   22        Q.    You haven't analyzed whether a single try at

04:38   23    developing a chip is too many tries?

04:38   24        A.    I'd have to think of that -- look at that test

04:38   25    carefully.  Undue experimentation, there's a specific

04:38  1    set of factors.  I've not done the analysis.

04:38  2        Q.    You haven't done the analysis of how many

04:39  3    tries to develop a chip would be too many under the

04:39  4    undue experimentation test of the enablement

04:39  5    requirement?

04:39  6        A.    That's correct.

04:39  7        Q.    But you've opined today that these patents are

04:39  8    invalid for lack of enablement, right?

04:39  9        A.    That's correct.

04:39  10       Q.    You would agree that a patentee has no

04:39  11   obligation to enable every aspect of an accused

04:39  12   product, correct?

04:39  13       A.    Correct.

04:39  14       Q.    None of the accused patent claims require the

04:39  15   entire PCI Express industry standard, do they?

04:39  16       A.    No.

04:39  17       Q.    They just recite an LVDS channel to convey

04:39  18   certain information, right?

04:39  19       A.    I believe that's the -- I believe that's the

04:39  20   language used.  Yes.

04:39  21       Q.    And the PCI local bus was well-known at the

04:39  22   time?

04:39  23       A.    That's correct.

04:39  24       Q.    USB was well-known at the time?

04:39  25       A.    Yes.

962

04:39  1      Q.    LVDS and serializers were known at the time?

04:39  2      A.    Yes.

04:39  3      Q.    Because the asserted claims do not claim every

04:39  4  feature of PCI Express, you would agree that the patent

04:40  5  does not have to have written description support for

04:40  6  every feature found in PCI Express, correct?

04:40  7      A.    That's correct.

04:40  8      Q.    Same question as to USB 3, would you provide

04:40  9  the same answer?

04:40  10     A.    Yes.

04:40  11     Q.    Okay.  The claims define the scope of

04:40  12  Dr. Chu's inventions, right?

04:40  13     A.    Certainly that's the beginning of the

04:40  14  statement.  Yes.

04:40  15     Q.    Do the patent claims define the scope of the

04:40  16  invention or don't they?

04:40  17     A.    I wouldn't put it just that way.

04:40  18     Q.    Okay.  In any event, you'll agree that the

04:40  19  '886 patent application from 1998 -- you remember

04:40  20  showing that in about 30 slides of your presentation?

04:40  21     A.    Yes.

04:40  22     Q.    Does that define the scope of Dr. Chu's

04:40  23  invention?

04:40  24     A.    Not exactly.

04:40  25     Q.    Okay.  So too with the May 1999 application, I

963

04:40  1    think we saw two different ACMs and a tower.

04:40  2          Do you remember displaying that to the jury?

04:40  3    A.    Yes.

04:40  4    Q.    Does this define the scope of Dr. Chu's

04:41  5    invention?

04:41  6    A.    Not in its entirety.

04:41  7    Q.    Okay.  You've opined that the thing that was

04:41  8    enabled, the thing that was described in these patents,

04:41  9    was a bus bridge, right?

04:41  10   A.    Yes.

04:41  11   Q.    Specifically, the XP Bus, which was an LVDS

04:41  12   bus bridge, correct?

04:41  13   A.    Correct.

04:41  14   Q.    I wrote down a couple of statements.

04:41  15         You're of the opinion that Dr. Chu was always

04:41  16   teaching how to use a bus bridge?

04:41  17   A.    He referenced -- yeah.

04:41  18   Q.    And he taught others how to use a bus bridge,

04:41  19   correct?

04:41  20   A.    Yes.

04:41  21         MR. HALES:  Okay.  Vicki, will you please

04:41  22   pull up Dr. Edwards' invalidity report?

04:42  23         (Off-the-record discussion.)

04:42  24         MR. HALES:  Do you think we'll manage it,

04:42  25   Vicki, or should I go to my next question?

964

04:42   1              I don't need a page.  I need you to do a

04:42   2   control-F search.

        3   BY MR. HALES:

04:43   4       Q.    While Vicki's pulling it up, I want to ask a

04:43   5   different question.

04:43   6              Dr. Edwards, you take issue with Dr. Sarhan's

04:43   7   interpretation of the term "console"; is that correct?

04:43   8       A.    Let's see.  I wouldn't phrase it exactly that

04:43   9   way.

04:43   10      Q.    You don't agree with Dr. Sarhan's conclusions

04:43   11  about satisfaction of the console limitation found in

04:43   12  the asserted claims, correct?

04:43   13      A.    Correct.

04:43   14      Q.    Specifically, you are searching for a device

04:43   15  that actually connects a bunch of different peripherals

04:43   16  to a computer system, correct, instead of the

04:43   17  peripherals themselves?

04:43   18      A.    Yes.

04:43   19      Q.    You're aware of consoles that exist that can

04:43   20  connect to the accused laptop product, correct?

04:43   21      A.    No.  I'm not.

04:43   22      Q.    Dr. Edwards, you would agree that the modern

04:43   23  analog to the console described in Dr. Chu's patents is

04:43   24  a laptop dock, correct?

04:43   25      A.    I haven't considered that.

965

04:44    1                     MR. HALES:  Vicki, will you please pull

04:44    2    up Paragraph 59 of Dr. Edwards' infringement analysis

04:44    3    or rather his noninfringement report?

04:44    4                     I actually need the invalidity report.

04:44    5    This is the noninfringement report.  I need the other

04:44    6    one.

04:44    7                     (Off-the-record discussion.)

04:44    8    BY MR. HALES:

04:45    9        Q.    Dr. Edwards, what am I holding right here?

04:45   10        A.    I can't see.

04:45   11        Q.    Would you like me to hand it to you?

04:45   12        A.    Yes, please.

04:45   13                     MR. HALES:  Your Honor, may I approach?

04:45   14                     THE COURT:  Of course.

04:45   15    BY MR. HALES:

04:45   16        Q.    Dr. Edwards, do you recognize that as a laptop

04:45   17    dock?

04:45   18        A.    Let's see.  So it's labeled here as a ThinkPad

04:45   19    Thunderbolt 4 Workstation Dock.  So yeah.  It would

04:45   20    probably be referred to as a laptop dock.

04:45   21        Q.    Would it be accurate to describe a laptop dock

04:45   22    as a modern analog to the console disclosed in

04:45   23    Dr. Chu's patents?

04:45   24        A.    Let's see.  Yeah.  In a manner of speaking.

04:46   25        Q.    And that device has a chassis?

966

04:46  1      A.    Yes.

04:46  2      Q.    It has ports for connecting to other computing

04:46  3   devices?

04:46  4      A.    Yes.

04:46  5      Q.    And specifically on the back, if you'll turn

04:46  6   it around so the jury can see, it has about ten

04:46  7   different types of ports; is that right?

04:46  8      A.    Yes.

04:46  9      Q.    It has a LAN port?

04:46  10      A.    Yes.

04:46  11      Q.    An HDMI port?

04:46  12      A.    Yes.

04:46  13      Q.    Two display ports?

04:46  14      A.    Yes.

04:46  15      Q.    And about three or four different USB 3 ports?

04:46  16      A.    Let's see.  Probably.

04:46  17      Q.    A user can attach a hard drive to that device

04:46  18   via those USB ports, correct?

04:46  19      A.    Yes.

04:46  20      Q.    And a monitor via the display outputs?

04:46  21      A.    Yes.

04:46  22      Q.    And a CD-ROM to the USB 3 port, correct?

04:46  23      A.    Yes.

04:46  24      Q.    And then when the user attaches their laptop

04:46  25   to this device, all of those attached devices will be

967

04:47    1    available to the laptop, correct?

04:47    2        A.    Correct.

04:47    3        Q.    And the laptop can display its screen onto the

04:47    4    attached monitors, right?

04:47    5        A.    Correct.

04:47    6        Q.    Dr. Edwards, is that a console?

04:47    7        A.    No.

04:47    8        Q.    Dr. Edwards, that has a chassis?

04:47    9        A.    It does.

04:47   10        Q.    That has ports for connecting to other

04:47   11    computing devices?

04:47   12        A.    Let's see.  Yes.

04:47   13        Q.    And that, just like the console in the

04:47   14    asserted patents, will allow for the connection of

04:47   15    peripherals that can be made available to a computing

04:47   16    device, correct?

04:47   17        A.    That's correct.

04:47   18        Q.    Okay.  And if we looked inside that chassis,

04:47   19    we're going to see components of computing systems,

04:47   20    correct?

04:47   21        A.    No.

04:47   22        Q.    Would we see a processor?

04:47   23        A.    I don't know.

04:47   24        Q.    What about USB 3 hardware?  Will we see that

04:47   25    in there?

968

04:47    1         A.    Yes.

04:47    2         Q.    HDMI hardware?

04:47    3         A.    Yes.

04:47    4         Q.    These are computer components, correct?

04:47    5                   MR. BURESH:  Your Honor, this isn't an

04:47    6    accused product.  Neither expert has analyzed this

04:48    7    thing.  I don't know why we're even talking about it.

04:48    8                   What is this relevant to?

04:48    9                   MR. HALES:  He's a professor of computer

04:48    10   systems, a Ph.D. in electrical engineering, and he's

04:48    11   opined in his noninfringement report that the closest

04:48    12   analog to a console modernly is a laptop dock.

04:48    13                   THE COURT:  Your objection's under 401?

04:48    14                   MR. BURESH:  Yes, Your Honor.

04:48    15                   THE COURT:  Sustained.

04:48    16                   MR. HALES:  I'll retrieve that dock, sir.

04:48    17                   I yield the witness.  Thank you.

04:48    18                       REDIRECT EXAMINATION

04:48    19   BY MR. BURESH:

04:49    20        Q.    Hello again, Dr. Edwards.

04:49    21        A.    Hello.

04:49    22        Q.    I'm going to try something.  Go off the leash

04:49    23   here a little bit and try a projector.

04:49    24             And, Dr. Edwards --

04:49    25                   MR. BURESH:  You can go ahead and publish

969

| 04:49 | 1 | this to the jury. |
| 04:49 | 2 | BY MR. BURESH: |
| 04:49 | 3 | Q.    My colleague played some videotape from your |
| 04:49 | 4 | deposition. |
| 04:49 | 5 | Do you recall that? |
| 04:49 | 6 | A.    Yes. |
| 04:49 | 7 | Q.    The piece he played, he had asked you, |
| 04:50 | 8 | Dr. Edwards, do you know how to perform an infringement |
| 04:50 | 9 | analysis? |
| 04:50 | 10 | Do you recall that? |
| 04:50 | 11 | A.    Yes. |
| 04:50 | 12 | Q.    And then on the video, you had said:  Of |
| 04:50 | 13 | course not.  I'm sure there are details that I will get |
| 04:50 | 14 | wrong. |
| 04:50 | 15 | You see that? |
| 04:50 | 16 | A.    Yes. |
| 04:50 | 17 | Q.    And then the video stopped.  Right? |
| 04:50 | 18 | A.    Correct. |
| 04:50 | 19 | Q.    Now, the next question was:  Do I understand |
| 04:50 | 20 | your answer correctly?  You do not know how to perform |
| 04:50 | 21 | an infringement analysis? |
| 04:50 | 22 | You see that? |
| 04:50 | 23 | A.    Yes. |
| 04:50 | 24 | Q.    And your answer was:  Of course you |
| 04:50 | 25 | misunderstood me. |

970

04:50  1      A.    Yes.

04:50  2      Q.    Right?

04:50  3      A.    Yes.

04:50  4      Q.    So what was played in front of the jury, it

04:50  5   wasn't the full story.  It wasn't your actual full

04:50  6   answer, right?

04:50  7      A.    That's correct.

04:50  8      Q.    Because you know how to do an infringement

04:50  9   analysis, don't you?

04:50 10      A.    Yes.  I said two different things there.

04:50 11      Q.    You gave him two answers, and he just played

04:50 12   the first one and cut off the second?

04:50 13      A.    That's correct.

04:50 14      Q.    Okay.  How many times have you done an

04:51 15   infringement analysis in your career as a consultant

04:51 16   that you do 10 percent of your time?

04:51 17      A.    I've lost count.  Probably tens of times at

04:51 18   least.

04:51 19      Q.    Now, the infringement analysis that you set

04:51 20   forth in your report, are you 100 percent confident

04:51 21   that you did that correctly?

04:51 22      A.    Yes.

04:51 23      Q.    Now, the infringement analysis that you

04:51 24   presented to this jury, are you 100 percent confident

04:51 25   that you did that correctly?

971

04:51  1          A.    Yes.

04:51  2          Q.    Now, there was some questions about

04:51  3     hot-plugging and error correction and whatever those

04:51  4     things are.

04:51  5               Do you recall that?

04:51  6          A.    Yes.  I remember.

04:51  7          Q.    And you put some opinions about some of that

04:51  8     stuff in your report, right?

04:51  9          A.    That's correct.

04:51  10         Q.    Now, is it fair to say that there's some

04:51  11    opinions in your report that weren't presented to the

04:51  12    jury?

04:51  13         A.    Very, very many little details.

04:51  14         Q.    Because there's a lot of very technical stuff,

04:51  15    right?

04:51  16         A.    I forget how many hundreds of pages long it

04:51  17    is.  But yes.  No.  I spared the jury from a lot of

04:52  18    that.

04:52  19         Q.    But you presented your key opinions to the

04:52  20    jury; is that correct?

04:52  21         A.    That's correct.

04:52  22         Q.    There were some questions about that device

04:52  23    that was slung at you there at the end.

04:52  24               Do you remember that?

04:52  25         A.    Yes.

972

04:52  1    Q.    Was that an accused product?

04:52  2    A.    No.

04:52  3    Q.    Was that anything that had come from ASUSTeK?

04:52  4    A.    No.  It was from Lenovo, one of their

04:52  5  competitors.

04:52  6    Q.    Okay.  Had Dr. Sarhan talked about that?

04:52  7    A.    I hadn't seen him do anything like that.

04:52  8    Q.    Now, you've read his report.

04:52  9          Did Dr. Sarhan talk about that product that

04:52  10  they tossed up to you?

04:52  11    A.    No.

04:52  12    Q.    You didn't get an opportunity to consider that

04:52  13  product in advance of today?

04:52  14    A.    I'd never seen that one before.

04:52  15    Q.    There was a series of questions about the XP

04:52  16  Bus being a new connector compared to PCI local bus.

04:53  17          Do you recall that?

04:53  18    A.    More or less.  Okay.

04:53  19    Q.    And something to the effect of, well,

04:53  20  backwards compatibility must not look for a connection

04:53  21  because you have XP Bus on one side and PCI local bus

04:53  22  on the other, right?

04:53  23    A.    That sounds about right.

04:53  24    Q.    And they would have different connectors?

04:53  25    A.    Yes.

973

04:53  1                MR. BURESH:  Let's pull up Figure 11 from

04:53  2   the May 1998 provisional application.  Well, actually,

04:53  3   I already have this up.  Let me just do it here.

04:53  4   BY MR. BURESH:

04:53  5        Q.    Okay.  Now, if we want to connect that PCI

04:53  6   local bus in Figure 11 or carry that data on to the XP

04:53  7   Bus, what do we have to have in between?

04:53  8        A.    A PCI local bus -- or I'm sorry.  Let me

04:53  9   understand exactly what you're pointing to.  Actually,

04:54  10  could you use a pen or something to show me?

04:54  11       Q.    Well, I'm not that technical.

       12       A.    Okay.

04:54  13       Q.    But it's the host interface controller that's

04:54  14  right in between them.

04:54  15       A.    Oh, between the PCI and the XP Bus.

04:54  16       Q.    And why does that host interface controller

04:54  17  need to be there?

04:54  18       A.    Oh, it's doing the conversion between the PCI

04:54  19  signaling and protocol and the XP Bus protocol

04:54  20  signaling wiring.

04:54  21       Q.    So it's not like you're taking an XP Bus and

04:54  22  just plugging it into a PCI local bus, is it?

04:54  23       A.    Hardly plugging.  You've got that chip in

04:54  24  there that's doing a lot of work.

04:54  25       Q.    Because you have to convert from one to the

04:54   1   other to get across that bridge, right?

04:54   2       A.    Correct.

04:54   3       Q.    Now, in PCI Express, is there any converter

04:54   4   that connects it in any way to a PCI local bus?

04:54   5       A.    Not in any of the accused products.

04:54   6       Q.    Because PCI local bus is obsolete.  There's no

04:54   7   reason to be doing that?

04:54   8       A.    Nobody -- nobody puts these in computers

04:54   9   anymore.  Certainly not ASUSTeK.

04:55   10                  MR. BURESH:  Could you pull up Defense

04:55   11  Exhibit 950, please?

04:55   12  BY MR. BURESH:

04:55   13      Q.    LVDS technology from the National

04:55   14  Semiconductor, correct?

04:55   15      A.    Correct.

04:55   16      Q.    That's a brand, isn't it?

04:55   17      A.    National Semiconductor is a brand.  LVDS is

04:55   18  one of their brand -- one of their brands.

04:55   19      Q.    Okay.  So when we're looking for LVDS, we're

04:55   20  talking about a specific thing, aren't we?

04:55   21      A.    Yes.

04:55   22      Q.    I'll try a little example.  I love -- this is

04:55   23  a guilty pleasure.  I love IHOP.  Okay.  The food's

04:55   24  affordable, and I can get lots of it, which when the

04:55   25  boys were growing up, it's a place we went to a lot.

975

04:56  1                Now, IHOP stands for what?  Do you know?

04:56  2      A.    It's an acronym for International House of

04:56  3  Pancakes, if I remember.

04:56  4      Q.    Okay.  So International House of Pancakes, if

04:56  5  we abbreviate it, it becomes IHOP?

04:56  6      A.    Correct.

04:56  7      Q.    Does that mean -- let me try this.  A

04:56  8  McDonald's, all right?  Now, there are McDonald's all

04:56  9  over the world.

04:56  10     A.    Yes.

04:56  11     Q.    So it's international?

04:56  12     A.    Absolutely.

04:56  13     Q.    Now, restaurants are often called houses.

04:56  14  Front of house, back of house?

04:56  15     A.    That's fair.

04:56  16     Q.    And McDonald's sells pancakes.  They're not

04:56  17  anywhere near as good, in my opinion, as IHOP, but

04:56  18  McDonald's sells pancakes?

04:56  19     A.    Absolutely.

04:56  20     Q.    Okay.  So McDonald's could be called an

04:56  21  international house of pancakes, right?

04:56  22     A.    Yes.

04:56  23     Q.    But would anybody think that McDonald's is an

04:56  24  IHOP?

04:56  25     A.    No.

04:56  1      Q.    Because it's not.  Because IHOP's a thing.

04:57  2   It's a brand, right?

04:57  3      A.    Yeah.  IHOP is a brand name.  People treat it

04:57  4   like it's a word even though it has a expansion as a --

04:57  5   as an acronym.

04:57  6      Q.    So just because some technology has

04:57  7   differential signaling that's been around for

04:57  8   50 years --

04:57  9      A.    Yes.

04:57 10      Q.    Are you with me?

04:57 11            -- and that uses, I guess, voltage that's

04:57 12   lower than something else, whatever low is?

04:57 13      A.    Yes.

04:57 14      Q.    Now, just because you could say that, that

04:57 15   doesn't mean it's LVDS, does it?

04:57 16      A.    Correct.  Not in this -- not in these patents.

04:57 17      Q.    Because in these patents, LVDS has a specific

04:57 18   connotation.  It's telling you in those patents what

04:57 19   it's talking about, right?

04:57 20      A.    Very explicitly.

04:57 21      Q.    And it's just like what LVDS is being put out

04:57 22   by National Semiconductor, isn't it?

04:57 23      A.    Yep.

04:57 24            MR. BURESH:  I pass the witness, Your

04:57 25   Honor.

977

| | | |
|---|---|---|
| 04:57 | 1 | MR. HALES:  Nothing from us, Your Honor. |
| 04:58 | 2 | THE COURT:  May he be excused? |
| 04:58 | 3 | MR. HALES:  Yes. |
| 04:58 | 4 | THE COURT:  Can I have one counsel up |
| 04:58 | 5 | here? |
| 04:58 | 6 | (Off-the-record bench conference.) |
| 05:00 | 7 | THE COURT:  I already used my joke about |
| 05:00 | 8 | staying late.  So what we're going to do is the |
| 05:00 | 9 | defendant is going to call their next witness.  We're |
| 05:00 | 10 | going to have him proven up as an expert, which |
| 05:00 | 11 | shouldn't take very long.  And then we'll be done for |
| 05:00 | 12 | the day. |
| 05:00 | 13 | MR. UNDERWOOD:  Your Honor, defendants |
| 05:00 | 14 | call Mike Newell to the stand. |
| 05:00 | 15 | (The witness was sworn.) |
| 05:00 | 16 | DIRECT EXAMINATION |
| 05:00 | 17 | BY MR. UNDERWOOD: |
| 05:00 | 18 | Q.    Good afternoon, Mr. Newell. |
| 05:01 | 19 | Could you please introduce yourself to the |
| 05:01 | 20 | ladies and gentlemen of the jury? |
| 05:01 | 21 | A.    Sure.  My name is Mike Newell. |
| 05:01 | 22 | Q.    And can you tell the jury a little bit about |
| 05:01 | 23 | yourself, please? |
| 05:01 | 24 | A.    Sure.  I'm an economic consultant.  I've |
| 05:01 | 25 | worked and lived in the Midwest for nearly 40 years. |

05:01   1    Married to my wife Christin for more than 30 years.

05:01   2    And we've managed to raise two beautiful daughters

05:01   3    together.

05:01   4        Q.    And why are you here to offer testimony today,

05:01   5    Mr. Newell?

05:01   6        A.    I was asked to evaluate and respond to the

05:01   7    opinions of Mr. Lewis, which is ACQIS' damages expert

05:01   8    in this case.

05:01   9        Q.    And were you retained by the two defendants,

05:01   10   my clients in this case?

05:01   11       A.    I was.  Yes.

05:01   12       Q.    Yes.  And did you also prepare a set of

05:01   13   PowerPoint slides for use in aid of your testimony?

05:01   14       A.    I did.  Yes.

05:01   15               MR. UNDERWOOD:  Can we go to the first

05:01   16   slide, please, Derek -- or the second slide, I guess.

05:01   17   BY MR. UNDERWOOD:

05:01   18       Q.    Where do you work, Mr. Newell?

05:01   19       A.    My firm is called Epsilon Economics.

05:01   20       Q.    What does Epsilon Economics do?  What kind of

05:01   21   business are they in?

05:01   22       A.    So it's economic consulting.  We do various

05:02   23   things, but a lot of what we do is similar to what I'm

05:02   24   doing today, which is calculating damages in patent

05:02   25   infringement cases such as this.

05:02  1    Q.    And what about you personally?  What is your
05:02  2  role at Epsilon Economics?
05:02  3    A.    Well, I'm managing director, and I put -- my
05:02  4  practice is primarily focused on economic consulting,
05:02  5  calculating damages in patent infringement cases like
05:02  6  this.
05:02  7    Q.    And how long have you been doing that type of
05:02  8  work?
05:02  9    A.    More than 20 years.
05:02  10    Q.    Would you tell the jury a little bit about
05:02  11  your educational background, please?
05:02  12    A.    Sure.  I've got another slide here, but I've
05:02  13  got a bachelor degree in mechanical engineering from
05:02  14  the University of Notre Dame.  I've also got a master's
05:02  15  in business administration from the University of
05:02  16  Chicago, Booth School of Business.
05:02  17    Q.    And what have you done professionally since
05:02  18  you completed your education?
05:02  19    A.    Let's see.  Right after undergraduate, I
05:02  20  worked for a few years as an engineer.  But I realized
05:03  21  my true passion was in finance and economics.  So I
05:03  22  went back to school and got an MBA from the University
05:03  23  of Chicago.
05:03  24    Q.    And since that time, what has your work
05:03  25  focused on?

05:03  1      A.    Since 2001, I've been focused primarily on

05:03  2   economic consulting, again, valuing patent infringement

05:03  3   damages in cases like this.

05:03  4      Q.    Do you hold any relevant licenses or

05:03  5   certifications, Mr. Newell?

05:03  6      A.    I do.  I've got two in particular I'd like to

05:03  7   point out.  I'm a certified licensing professional,

05:03  8   which is short for CL -- it's a CLP.

05:03  9          I'm also a chartered financial analyst.  And

05:03  10   both of those certifications require years of training

05:03  11   and education.  It also requires passing several

05:03  12   rigorous exams.

05:03  13      Q.    Mr. Newell, are you involved with any

05:03  14   organizations related to valuing patents or licensing

05:03  15   transactions?

05:03  16      A.    I am.  I am a member of the Licensing

05:04  17   Executive Society, which is a leading professional

05:04  18   organization related to the licensing and transactions.

05:04  19      Q.    And have you lectured or taught any courses

05:04  20   related to intellectual property damages?

05:04  21      A.    I have.  I've been a guest lecturer at the

05:04  22   University of Notre Dame on intellectual property

05:04  23   damages.  That was at their College of Business.

05:04  24          I've also been a guest lecturer on

05:04  25   intellectual property damages at the John Marshall Law

981

05:04  1    School in Chicago.

05:04  2         Q.    And do you have any experience with economic

05:04  3    analysis specifically in patent infringement cases like

05:04  4    this one?

05:04  5         A.    Yes.  Over the course of my career, I've

05:04  6    worked on over 100 patent infringement cases such as

05:04  7    this.

05:04  8              MR. UNDERWOOD:  Your Honor, defendants

05:04  9    offer Mr. Newell as an expert on the valuation of

05:04  10   intellectual property in the evaluation of patent

05:04  11   damages.

05:04  12             MS. HEPLER:  No objection.

05:04  13             THE COURT:  He'll be admitted as such.

05:04  14             Ladies and gentlemen of the jury, thank

05:04  15   you so much for your attention today.  If you'll be

05:04  16   here tomorrow and ready to go at 8:30.

05:04  17             So you'll know, here's what I'm

05:05  18   anticipating is going to happen tomorrow.  We have a

05:05  19   couple more witnesses to take up.  But tomorrow

05:05  20   afternoon you're going to -- this is what you want to

05:05  21   do your entire life.  You're going to get to listen to

05:05  22   me read a jury charge that takes about an hour.  People

05:05  23   drive from all over to come and get to listen to me

05:05  24   read.

       25             (Laughter.)

05:05  1                    THE COURT:  That's a lie.

05:05  2              So it will be one of the most painful

05:05  3     things that I do as a judge, but I have to do it, to

05:05  4     instruct you on the law.  You'll have copies of the

05:05  5     charge to read along with me, but I still have to read

05:05  6     it to you.

05:05  7              But then it is my favorite part of

05:05  8     trials, which is -- and we have very good lawyers, so

05:05  9     you'll get to hear the closing arguments in the case

05:05  10    tomorrow afternoon and then begin your deliberations.

05:05  11              I'll tell you in advance, the arguments

05:05  12    are just arguments of counsel, but they're very

05:05  13    important.  And hopefully they'll help you in your

05:05  14    deliberations.

05:05  15              So please remember my instructions

05:05  16    tonight.  Come tomorrow knowing that you'll begin your

05:06  17    deliberations at some point tomorrow afternoon.

05:06  18                    THE BAILIFF:  All rise.

05:06  19                    (Jury exited the courtroom.)

05:06  20                    THE COURT:  You may step down.

05:06  21              You may be seated.

05:06  22              It was a tossup there when you said you

05:06  23    went to Notre Dame, whether to qualify you or not,

05:06  24    but --

05:06  25                    (Laughter.)

05:06  1                        THE COURT:  -- I did it anyway.

05:06  2                        THE WITNESS:  Thank you, Your Honor.

05:06  3                        THE COURT:  So we're off the record.

05:06  4                        (Off-the-record discussion.)

05:07  5                        THE COURT:  Let's go back on the record.

05:07  6                        Is there anything we do need to take up,

05:07  7      though?  If there is, please let me know.

05:07  8                        MS. HEPLER:  Nothing from plaintiffs.

05:07  9                        MR. BURESH:  Nothing for defendants, Your

05:07  10     Honor.

05:07  11                       THE COURT:  Thank you.  I'll see you back

05:07  12     there, whoever's coming.

05:07  13                        (Hearing adjourned.)

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

984

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4

5                I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10                I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13                Certified to by me this 7th day of April

14   2024.

15

16                         /s/ Kristie M. Davis
                           KRISTIE M. DAVIS
17                         Official Court Reporter
                           800 Franklin Avenue
18                         Waco, Texas 76701
                           (254) 340-6114
19                         kmdaviscsr@yahoo.com

20

21

22

23

24

25

05:07

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*