1                IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
2                        WACO DIVISION

3    ACQIS LLC                    *
                                  *     March 21, 2024
4    VS.                          *
                                  * CIVIL ACTION NO. 6:20-CV-966
5    ASUSTEK COMPUTER, INC.   *
     ASUS GLOBAL PTE. LTD.    *
6
                BEFORE THE HONORABLE ALAN D ALBRIGHT
7                     JURY TRIAL PROCEEDINGS
                        Volume 4 of 5
8
     APPEARANCES:
9
     For the Plaintiff:   Case L. Collard, Esq.
10                        Gregory S. Tamkin, Esq.
                          Dorsey & Whitney LLP
11                        1400 Wewatta Street, Suite 400
                          Denver, CO 80202
12
                          Madeline Hepler, Esq.
13                        Dorsey & Whitney LLP
                          701 5th Ave, Suite 6100
14                        Seattle, WA 98104

15                        Elliot J. Hales, Esq.
                          Dorsey & Whitney LLP
16                        111 S. Main Street, Suite 2100
                          Salt Lake City, UT 84111
17
                          Paige Arnette Amstutz, Esq.
18                        Scott, Douglass & McConnico, LLP
                          303 Colorado Street, Suite 2400
19                        Austin, TX 78701

20   For the Defendants:  Eric A Buresh, Esq.
                          Mark C. Lang, Esq.
21                        Michelle L. Marriott, Esq.
                          Erise IP, PA
22                        7015 College Boulevard
                          Overland Park, KS 66211
23
                          James Travis Underwood, Esq.
24                        Gillam & Smith
                          102 N. College, Suite 800
25                        Tyler, TX 75702

986

1    Court Reporter:        Kristie M. Davis, CRR, RMR
                            PO Box 20994
2                           Waco, Texas 76702-0994
                            (254) 340-6114
3

4       Proceedings recorded by mechanical stenography,

5    transcript produced by computer-aided transcription.

6

7

8

08:26    9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08:36  1                    (Hearing begins.)

08:36  2                    THE BAILIFF:  All rise.

08:36  3                    THE COURT:  Please remain standing for

08:36  4  the jury.

08:36  5                    (Jury entered the courtroom.)

08:36  6                    THE COURT:  Thank you.  You may be

08:36  7  seated.

08:36  8                    Counsel?

08:36  9                    DIRECT EXAMINATION CONTINUED

08:36  10  BY MR. UNDERWOOD:

08:36  11     Q.    Good morning, Mr. Newell.

08:36  12     A.    Good morning.

08:36  13     Q.    Could you remind the jury why you're here to

08:36  14  offer testimony in this case?

08:36  15     A.    I'm here to evaluate and respond to the

08:36  16  opinions of Mr. Lewis, which is ACQIS' damages expert

08:36  17  in this case.

08:36  18                    MR. UNDERWOOD:  And can we get the next

08:36  19  slide, Mr. Palisoul?  Can we get the one after that?

08:36  20                    Thank you.

08:37  21  BY MR. UNDERWOOD:

08:37  22     Q.    I'll start with an easy question:  If the jury

08:37  23  finds that the patents were not infringed by the

08:37  24  defendants or the patents are invalid, what is the

08:37  25  appropriate amount of damages in this case?

988

08:37  1        A.    Well, in either of those scenarios, there

08:37  2   would be no damages.

08:37  3        Q.    Now, yesterday you said that you had been

08:37  4   retained by my clients; is that right?

08:37  5        A.    That's correct.

08:37  6        Q.    And does your firm get paid for the work that

08:37  7   you do in this case?

08:37  8        A.    They do.

08:37  9        Q.    And is your firm's compensation at all

08:37  10  dependent upon the opinions that you give or the

08:37  11  outcome of this case?

08:37  12       A.    It is not.

08:37  13       Q.    Do you have any financial interest in the

08:37  14  outcome of this case?

08:37  15       A.    No.  I do not.

08:37  16       Q.    You get paid no matter who wins or loses?

08:37  17       A.    That's correct.

08:37  18       Q.    Before your work on this case, were you

08:37  19  familiar with either the plaintiff, ACQIS, or the

08:37  20  inventor, Dr. Chu?

08:37  21       A.    I was not.

08:37  22       Q.    Before your work on this case, did you know

08:37  23  anyone at my clients, ASUSTeK or ASGL?

08:38  24       A.    No.  I did not.

08:38  25                 MR. UNDERWOOD:  Can we get the next

08:38  1    slide, please?

08:38  2    BY MR. UNDERWOOD:

08:38  3        Q.   What information did you review to prepare for

08:38  4    your testimony that you're giving here today?

08:38  5        A.   Well, I literally reviewed thousands of

08:38  6    documents in this case.  The documents that I

08:38  7    considered include the ACQIS documents that they

08:38  8    produced.  I also reviewed all the litigation

08:38  9    settlement agreements that ACQIS entered into.  I also

08:38  10   reviewed the patents-in-suit.

08:38  11            In the terms of ASUSTeK and ASGL, I reviewed

08:38  12   their documents, including their sales and financial

08:38  13   information as well as their license agreements.

08:38  14            I also looked at other information that was

08:38  15   relevant to this case, information related to PCI

08:38  16   Express and USB standards.  I reviewed the witness

08:38  17   testimony, and I also reviewed the expert reports of

08:38  18   Mr. Lewis as well as the other technical experts that

08:38  19   you've heard today -- this week.

08:38  20       Q.   So you've been present here during the course

08:38  21   of this trial?

08:38  22       A.   I have.

08:39  23       Q.   Sitting right back there?

08:39  24       A.   I have.

08:39  25       Q.   And have you heard all the testimony of the

990

08:39    1    witnesses?

08:39    2         A.    I have.  Yes.

08:39    3         Q.    Does that include the testimony of Mr. Lewis,

08:39    4    the plaintiff's damages expert?

08:39    5         A.    Yes.  It does.

08:39    6                    MR. UNDERWOOD:  Can we get the next

08:39    7    slide, please?

08:39    8    BY MR. UNDERWOOD:

08:39    9         Q.    What responses do you have to the testimony

08:39    10   that Mr. Lewis gave to the jury?

08:39    11        A.    So I have three primary responses.  The first

08:39    12   is that Mr. Lewis takes economic credit for work not

08:39    13   done by the plaintiff ACQIS in this case.

08:39    14             The second is that ACQIS' inventions do not

08:39    15   drive sales of ASUS products and computers.

08:39    16             And third, that Mr. Lewis ignores informative

08:39    17   agreements and instead relies on less informative

08:39    18   agreements in forming his opinion.

08:39    19                    MR. UNDERWOOD:  Can we get the next

08:39    20   slide, please?

08:39    21   BY MR. UNDERWOOD:

08:39    22        Q.    Let's take these one by one beginning with the

08:39    23   first.

08:39    24             Can you expand on your first response, please?

08:39    25        A.    Sure.  Mr. Lewis is asking for damages on

| 08:39 | 1 | technology and components that ACQIS did not invent. |
| 08:39 | 2 | MR. UNDERWOOD:  Next slide. |
| 08:39 | 3 | BY MR. UNDERWOOD: |
| 08:40 | 4 | Q.    How so? |
| 08:40 | 5 | A.    Well, Mr. Lewis' analysis, as part of that |
| 08:40 | 6 | analysis, he claims the hardware portion of the accused |
| 08:40 | 7 | products in this case.  And just to remind you, the |
| 08:40 | 8 | accused products in this case are desktop computers, |
| 08:40 | 9 | laptop computers, servers, and motherboards. |
| 08:40 | 10 | But we've heard throughout the trial that the |
| 08:40 | 11 | asserted patents cover only two technologies amongst |
| 08:40 | 12 | thousands of technologies that are in a computer.  What |
| 08:40 | 13 | Mr. Lewis did is give ACQIS credit for work that it did |
| 08:40 | 14 | not do.  As a result, his opinion is greatly |
| 08:40 | 15 | overstated. |
| 08:40 | 16 | Q.    And as a reminder, what two technologies does |
| 08:40 | 17 | the plaintiff allege that their patents cover? |
| 08:40 | 18 | A.    PCI Express and USB 3. |
| 08:40 | 19 | Q.    Do you agree with Mr. Lewis' decision to use |
| 08:40 | 20 | nearly the entire hardware portion of the accused |
| 08:40 | 21 | products? |
| 08:40 | 22 | A.    No.  I do not. |
| 08:40 | 23 | Q.    Can you give the jury an example of why you |
| 08:40 | 24 | think this approach is problematic? |
| 08:41 | 25 | A.    Sure.  Let's assume that in this case, the |

08:41   1   technology is a USB port and it's in your car, and

08:41   2   that's what the patent talks about.  The patent owner

08:41   3   is allowed to claim what we call "incremental value."

08:41   4   In this case it would be the value of that USB port,

08:41   5   not the car itself.

08:41   6           I mean, we all know that cars have been around

08:41   7   for 100 years.  They have literally thousands of

08:41   8   components:  an engine, transmission, suspension,

08:41   9   chassis, interior, four wheels, steering wheel.

08:41   10          But patent owners aren't allowed to claim

08:41   11  that.  They can only claim the incremental value, which

08:41   12  is, in this case, just the USB port.

08:41   13          But what Mr. Lewis has done is akin to

08:41   14  basically claiming the entire car as part of his

08:41   15  analysis.  As a result, his analysis is overstated.

08:41   16          MR. UNDERWOOD:  Can we get the next

08:41   17  slide, please?

08:41   18  BY MR. UNDERWOOD:

08:41   19  Q.    So even though the plaintiff alleges that the

08:41   20  patents relate to PCI Express and USB technologies, how

08:42   21  much of a computer does Mr. Lewis include in his

08:42   22  analysis?

08:42   23  A.    Well, on your screen here, I've actually taken

08:42   24  an excerpt from Mr. Lewis' report, and this is a table

08:42   25  that appears in that report.

08:42  1          I highlighted in yellow each of the components

08:42  2   that Mr. Lewis includes as part of his analysis.  And

08:42  3   those components I've listed here include the CPU,

08:42  4   which is the central processing unit; the GPU, which is

08:42  5   a graphics processing unit; RAM, which is memory; SSD,

08:42  6   which is like a hard drive; motherboard; battery; AC

08:42  7   adapter, that's the power supply cord; and the case --

08:42  8   the computer case itself.

08:42  9          And if you -- Mr. Lewis added up all these

08:42  10  components and that -- in his analysis, that adds up to

08:42  11  82 percent of the value of the entire computer.  And

08:42  12  that's what he used as part of his royalty base.

08:42  13     Q.    Mr. Newell, does this case involve patents on

08:43  14  a new type of computer case?

08:43  15     A.    No.  It does not.

08:43  16     Q.    Does it involve patents on a new type of AC

08:43  17  adapter, which is like the charger?

08:43  18     A.    No.

08:43  19     Q.    What about batteries?  Does this case involve

08:43  20  patents on new type of computer batteries?

08:43  21     A.    No.

08:43  22     Q.    Give me one moment.

08:43  23          Mr. Newell, have you seen this laptop

08:43  24  discussed during the course of this case?

08:43  25     A.    I have.  Yes.

08:43   1        Q.   You understand that this is one of the ASUS

08:43   2   accused products that the plaintiff alleges infringes

08:43   3   their patents?

08:43   4        A.   Yes.

08:43   5        Q.   Have you seen or heard any evidence at all

08:43   6   that the plaintiff invented 82 percent of this laptop?

08:43   7        A.   No.  I have not.

08:43   8             MR. UNDERWOOD:  Next slide, please.

08:43   9   BY MR. UNDERWOOD:

08:43   10       Q.   What did Dr. Chu himself have to say about

08:44   11   what ACQIS did and did not invent?

08:44   12       A.   Well, on Monday of this week, Dr. Chu

08:44   13   testified here in court that ACQIS did not invent each

08:44   14   of these components.  And I'll list them:  The CPU, the

08:44   15   GPU, the RAM, SSD or hard drive, circuit board,

08:44   16   battery, power supply, or the computer case.  None of

08:44   17   those were invented by ACQIS, according to Dr. Chu.

08:44   18       Q.   So even though they weren't invented by ACQIS

08:44   19   according to Dr. Chu, did Mr. Lewis, the plaintiff's

08:44   20   damages expert, include all of these components in his

08:44   21   analysis?

08:44   22       A.   He did.  And that's what adds up to 82 percent

08:44   23   of the cost of the entire computer that Mr. Lewis

08:44   24   relied on.

08:44   25       Q.   So Mr. Lewis is using 82 percent of the

08:44   1    desktop and laptops.

08:44   2           What about the other accused products in this

08:44   3    case, the servers and the motherboards?

08:44   4    A.   He actually relied on an even greater

08:44   5    percentage for those accused products.  For servers,

08:45   6    Mr. Lewis relied on 96 percent of the cost of the

08:45   7    servers and 100 percent of the cost of motherboards.

08:45   8    Q.   Did Mr. Lewis even try to value just PCI

08:45   9    Express or just USB 3 in the accused products?

08:45   10   A.   No.  He did not.

08:45   11   Q.   What is your next response to Mr. Lewis'

08:45   12   damages analysis?

08:45   13   A.   That ACQIS' inventions do not drive sales of

08:45   14   ASUS' computers and products.

08:45   15   Q.   Are the PCI Express and USB 3 standards widely

08:45   16   adopted, Mr. Newell?

08:45   17   A.   They are.  We've heard throughout this trial

08:45   18   that both of those standards are very common and

08:45   19   offered throughout the computer industry.  And it's one

08:45   20   of the reasons why ASUSTeK includes that in all of

08:45   21   their laptops and desktop computers, because they need

08:45   22   to do that to compete -- to be on level footing with

08:46   23   their competitors.

08:46   24   Q.   And did you see any evidence in this case that

08:46   25   the use of PCI Express or USB 3 technology contributed

08:46  1   to the success of ASUS laptops or desktops?

08:46  2       A.    No.   On the contrary, there's evidence to

08:46  3   suggest that there are other factors driving the sales

08:46  4   of those products, and it's not driven by those

08:46  5   standards.

08:46  6       Q.    What did Emma Ou, the ASGL corporate

08:46  7   representative, have to say about the features that

08:46  8   drive the success of the ASUS products?

08:46  9       A.    Well, as you heard in -- I think -- I believe

08:46  10  it was on Tuesday, Ms. Ou testified that the drivers of

08:46  11  demand for ASUS computers include several things.  She

08:46  12  talked about quality being a very important driver of

08:46  13  demand.  These, you know, ASUS products are known

08:46  14  for -- to be high quality.

08:46  15         She also talked about performance being

08:46  16  another driver of demand, and she cited things like CPU

08:47  17  speed, GPU, storage, and RAM as factors that customers

08:47  18  consider when purchasing a computer.

08:47  19         And she also talked about something called a

08:47  20  form factor, which is characteristics of the computer,

08:47  21  whether it's a small and compact laptop would be useful

08:47  22  for somebody who's commuting.  On the other hand, a

08:47  23  gamer would want something that has a fast graphics

08:47  24  processor and a large screen.

08:47  25         She also -- well, before we --

997

08:47  1       Q.    Yeah, yeah.  Go ahead.  Go ahead, Mr. Newell.

08:47  2       A.    And she also, and I've got here in red,

08:47  3   specifically said that PCI Express has never been

08:47  4   identified as a key feature by ASUS customers and that

08:47  5   USB is not a differentiator for any of their products.

08:47  6                    MR. UNDERWOOD:  Now we can go to the next

       7   slide.

       8   BY MR. UNDERWOOD:

08:47  9       Q.    Is there anything else indicating that the

08:47  10  alleged patented features do not drive demand?

08:47  11      A.    Yes.  We heard Mr. Bhatt testify about the PCI

08:48  12  Express and USB being great technologies that are

08:48  13  widely adopted, but Mr. Bhatt taught us that the reason

08:48  14  they're so widely adopted is that they've been offered

08:48  15  on a royalty-free basis.

08:48  16            The companies like Intel and ASUSTeK that have

08:48  17  developed technologies and contributed to these

08:48  18  standards offered it for free.  So customers like you

08:48  19  and I can enjoy these great technologies without having

08:48  20  to pay for it.

08:48  21            So -- but again, the value of these standards

08:48  22  is really the fact that they've been offered on a

08:48  23  royalty-free basis, so it's been widely adopted and we

08:48  24  can all enjoy the technology.

08:48  25      Q.    What is your third response to Mr. Lewis'

08:48  1    damages analysis?

08:48  2        A.    The third is that Mr. Lewis ignores

08:48  3    informative agreements and, instead, relies on less

08:48  4    informative agreements for his analysis.

08:48  5        Q.    And what do you mean by "informative" and

08:49  6    "less informative" agreements?

08:49  7        A.    Sure.  So let's assume you're in the market to

08:49  8    rent a house.  One of the first questions that you

08:49  9    might have is:  What's a fair price for that rent?

08:49  10        To do that, you might look at what we call

08:49  11   comparables, other properties that have similar

08:49  12   characteristics to the one you're looking at, whether

08:49  13   it be in the same neighborhood, might be in the same --

08:49  14   might have the same square footage, same number of

08:49  15   bedrooms and bathrooms, whether it's a new construction

08:49  16   or an old construction.  I mean, those are called comps

08:49  17   because it's short for comparable.

08:49  18        And we do the same thing in patent -- when

08:49  19   looking at patent licenses.  One should look for

08:49  20   agreements that are most similar to the ones that

08:49  21   you're trying to value.

08:49  22        Q.    During his testimony, did Mr. -- Mr. Lewis

08:49  23   discussed some ACQIS settlement agreements.

08:49  24        Do you remember that?

08:49  25        A.    I do.

08:49    1      Q.    In your opinion, were the settlement

08:50    2    agreements that Mr. Lewis relied upon, were they

08:50    3    comparable and relevant to this case?

08:50    4      A.    No.  They were not.

08:50    5      Q.    Why not?

08:50    6      A.    Well, I've listed several of the reasons here.

08:50    7    The agreements that Mr. Lewis found the most comparable

08:50    8    and the most relevant for his analysis are the six that

08:50    9    are listed in red on this slide, but most of these

08:50    10    agreements occurred years before the patents issued.

08:50    11         These agreements were for different asserted

08:50    12    patents than the patents in this case, and they covered

08:50    13    different accused products than the accused products in

08:50    14    this case.  So yeah.

08:50    15      Q.    Well, let's turn to that first reason.

08:50    16              MR. UNDERWOOD:  And if we can get the

08:50    17    next slide.

         18    BY MR. UNDERWOOD:

08:50    19      Q.    Why would it be an issue that the settlement

08:50    20    agreements that Mr. Lewis relied upon predated the

08:50    21    patents by years?

08:50    22      A.    Well, five of the six agreements that

08:50    23    Mr. Lewis relied on occurred years before either of the

08:50    24    two patents in this case even issued.  So those patents

08:50    25    could not have informed any of the financial terms of

-1000-

08:51  1    those settlement agreements.

08:51  2        Q.   Is it correct that none of the agreements that

08:51  3    Mr. Lewis used in his analysis included the patents

08:51  4    involved in this case?

08:51  5        A.   That's correct.  As a result, again, they are

08:51  6    not comparable and less informative for purposes of

08:51  7    establishing damages.

08:51  8        Q.   Now, you also said that the settlement

08:51  9    agreements that Mr. Lewis relied upon covered different

08:51  10   products.

08:51  11       Can you explain what you mean by that?

08:51  12       A.   Sure.  Each of the settlement agreements that

08:51  13   Mr. Lewis relied on covered modular computers.  I think

08:51  14   you've heard that term before during trial.

08:51  15       They're also called blade servers.  However,

08:51  16   the products at issue in this case are very different.

08:51  17   They're primarily laptops and desktop computers.

08:51  18       So the fact that the settlement agreements

08:51  19   that Mr. Lewis relied on are for different products

08:51  20   than what's at issue in this case also renders them not

08:52  21   comparable and less informative.

08:52  22       Q.   So you -- could you please summarize for the

08:52  23   jury why the settlement agreements that Mr. Lewis

08:52  24   relied upon are not informative to this case?

08:52  25       A.   Sure.  I've got a summary of each of the six

-1001-

08:52  1    agreements that Mr. Lewis found most informative.  And

08:52  2    in none of these cases -- none of these settlement

08:52  3    agreements were any of these licensees accused of

08:52  4    infringing the asserted patents in this case.  And in

08:52  5    none of these agreements were the accused products of a

08:52  6    licensee the same accused products that are in this

08:52  7    case.

       8                    MR. UNDERWOOD:  Can we get the next

       9    slide, please?

08:52  10   BY MR. UNDERWOOD:

08:52  11       Q.   How does Mr. Lewis' damages opinion stack up

08:52  12   against the settlement agreements that he relied upon?

08:52  13       A.   Well, you can see from this graph, his

08:52  14   analysis is out of step with the economic realities of

08:53  15   this case.

08:53  16            Mr. Lewis would have you believe in the

08:53  17   hypothetical negotiation that the two parties in this

08:53  18   case, ACQIS and ASUSTeK and ASGL, would have sat in a

08:53  19   room together.  They would have looked at these six

08:53  20   agreements that I have here listed at the bottom of the

08:53  21   screen, knowing that each of these agreements didn't

08:53  22   cover the accused products, didn't involve the accused

08:53  23   patents, and none of these agreements were for more

08:53  24   than ███████ .

08:53  25            Yet, Mr. Lewis would have you believe that the

-1002-

08:53  1   two parties would agree to a damages number or a

08:53  2   reasonable royalty of nearly $17.9 million.

08:53  3        Q.   Mr. Newell, does that make any economic sense?

08:53  4        A.   No.  It does not.

08:53  5        Q.   Thank you, Mr. Newell.

08:53  6             MR. UNDERWOOD:  Your Honor, I pass the

08:53  7   witness.

08:53  8                  CROSS-EXAMINATION

08:53  9   BY MS. HEPLER:

08:54  10        Q.   Good morning, Mr. Newell.

08:54  11        A.   Good morning.

08:54  12        Q.   It's nice to see you not through a Zoom

08:54  13   screen.

08:54  14        A.   You as well.

08:54  15        Q.   Mr. Newell, I believe you showed a couple of

08:54  16   different slides that talked about individual

08:54  17   components that ACQIS didn't invent and that Ms. Ou

08:54  18   said contributed to demand for the ASUS products.

08:54  19             Do you recall that?

08:54  20        A.   I do.

08:54  21        Q.   And that includes things like a processing

08:54  22   unit, memory, a graphics controller, and mass storage;

08:54  23   is that right?

08:54  24        A.   I don't remember if I used that word, but --

08:54  25        Q.   Storage.

1003

08:54  1    A.    -- storage.  I think I may have used that

08:54  2    word.  Yes.

08:54  3    Q.    Okay.  Now, if we talk about one of the

08:54  4    patents, say, the '359 patent -- and I'm going to read

08:54  5    from your expert report, Page 14, Paragraph 20 -- is it

08:55  6    correct that you:  Understand that the '359 patent

08:55  7    generally relates to a computer system for

08:55  8    multiprocessing purposes, which contains a console

08:55  9    comprising two coupling sites, each containing a

08:55  10   connector, and which also contains a plurality of

08:55  11   computer modules that are substantially similar in

08:55  12   design to each other, each of which is coupled to a

08:55  13   connector and consists of a processing unit, a main

08:55  14   memory coupled to the processing unit, a graphics

08:55  15   controller coupled to the processing unit, and a mass

08:55  16   storage device coupled to the processing unit...

08:55  17        And I'm still reading from your report.

08:55  18             MR. UNDERWOOD:  Your Honor, can he at

08:55  19   least be shown his report since she's reading from it?

08:55  20             MS. HEPLER:  Permission to approach?

08:56  21   A.    Thank you.

08:56  22   BY MS. HEPLER:

08:56  23   Q.    Are you with me so far?

08:56  24   A.    Yeah.  Okay.  Yes.

08:56  25   Q.    Do you agree with what I just read?

-1004-

```
08:56   1        A.    Could you remind me, is that Paragraph 20?

08:56   2        Q.    Paragraph 20.

08:56   3        A.    And you started -- I'm sorry.  Where did you

08:56   4   start?

08:56   5        Q.    "Understand that the '359 patent generally

08:56   6   relates to."  It's about halfway down the paragraph.

08:56   7        A.    Okay.  On Paragraph 20.

08:56   8        Q.    On Paragraph 20.

08:56   9        A.    Oh, yes.  I see that.  Sorry.  There's another

08:56  10   sentence that had "I understand."

08:56  11        Q.    Sure.

08:56  12              Did I read that first part correctly?

08:56  13        A.    I believe so.  I didn't have it in front of me

08:57  14   when you read it.

08:57  15        Q.    So moving on to the next part of that

08:57  16   paragraph, and I'm still reading --

08:57  17              THE COURT:  Counsel, ask him a question.

08:57  18   We don't read from the reports.  Ask him a question.

08:57  19   And if he says something here that's inconsistent with

08:57  20   what's in the report, you can use it for impeachment.

08:57  21              The report is not admissible.

08:57  22   BY MS. HEPLER:

08:57  23        Q.    Mr. Newell, do you agree that in your

08:57  24   understanding, the '359 patent is directed to a whole

08:57  25   system of these components that we just discussed?
```

08:57  1       A.    Well, I cite to the patent.  So -- and I was

08:57  2  quoting the patent.  So I merely was doing that.

08:57  3       Q.    Do you agree with the statement in your

08:57  4  report?

08:57  5       A.    Yeah.  I mean, it's a quotation from the

08:57  6  patent.

08:57  7       Q.    Mr. Newell, I understand you disagree with

08:57  8  Mr. Lewis' apportionment analysis, but you agree that

08:57  9  he did perform a calculation to reduce the portion of

08:57  10  product sales he includes in his royalty base, correct?

08:58  11       A.    That's -- yes.  That's my understanding.

08:58  12       Q.    And you agree he did that calculation to

08:58  13  reduce the royalty base prior to applying a

08:58  14  1.15 percent rate to further reduce the amount; is that

08:58  15  correct?

08:58  16       A.    I think that's what he said.

08:58  17       Q.    Now, Mr. Newell, I think you said you were in

08:58  18  the court this whole week and you've heard all the

08:58  19  testimony that's been given.

08:58  20             Were you here when the deposition of ASUSTeK

08:58  21  employee Mr. Wen-Bin Jian was read into the record?

08:58  22       A.    I did.  Yes.  I was there.

08:58  23                  MS. HEPLER:  Vicki, could you pull up

08:58  24  Mr. Lewis' Slide 35, please?

08:58  25  BY MS. HEPLER:

08:58  1      Q.    And, Mr. Newell, did you recall hearing when

08:58  2    Mr. Wen-Bin Jian was asked if a competitor laptop in a

08:58  3    similar price range uses PCI Express and has USB 3 --

08:58  4    thank you -- or later ports, would that lead you to

08:59  5    want to include the same technology for competitive

08:59  6    reasons?

08:59  7             Answer:  Yes.

08:59  8             Do you recall hearing that testimony?

08:59  9      A.    I do.  Yes.

08:59 10      Q.    Do you agree that ASUS' competitors like

08:59 11    Lenovo and Acer, who I believe you have previously

08:59 12    characterized as ASUSTeK's largest direct competitors

08:59 13    and are, in fact, ACQIS licensees, include PCIe and USB

08:59 14    3 in their products?

08:59 15      A.    I'm sorry.  Could you repeat the question?

08:59 16      Q.    Sure.

08:59 17             Do you agree that prior licensees like Lenovo

08:59 18    and Acer are competitors of ASUSTeK in the computer

08:59 19    industry?

08:59 20      A.    Yes.  That's my understanding.

08:59 21      Q.    And do you agree that they also include PCIe

08:59 22    and USB 3 in their products?

08:59 23      A.    I don't know that for sure, but I would assume

08:59 24    that they do.  Yes.

08:59 25      Q.    Would ASUSTeK include features or

―1007―

08:59    1    functionality in its computers if customers didn't want

08:59    2    those functionalities or features?

08:59    3        A.    I mean, I can't speak to all the reasons that

08:59    4    they include the features that they include.

09:00    5        Q.    Would it make common sense to include things

09:00    6    that customers don't want?

09:00    7        A.    You know what?  I -- generally, no.  I would

09:00    8    think that that doesn't make common sense.

09:00    9        Q.    Thank you.

09:00   10            Mr. Newell, you agree that the agreements that

09:00   11    Mr. Lewis found most comparable to the hypothetical

09:00   12    negotiation, such as Huawei and Alcatel-Lucent, include

09:00   13    rights to all of ACQIS' patents, including the

09:00   14    patents-in-suit?

09:00   15        A.    Sorry.  I -- could you repeat that question?

09:00   16    I want to make sure I'm following it word for word.

09:00   17        Q.    Sure.

09:00   18            So I believe in your slides, you talked about

09:00   19    Mr. Lewis' discussion of Huawei.  He also talked about

09:00   20    the Alcatel-Lucent license; is that correct?

09:00   21        A.    That's correct.

09:00   22        Q.    Okay.  And for those two licenses, is it your

09:00   23    understanding that they include rights to all of ACQIS'

09:00   24    patents, including the patents-in-suit?

09:00   25        A.    Yes.  That's my understanding.

-1008-

09:00  1      Q.    And you agree that in -- and do you have an

09:01  2   opinion on the appropriate rate that the parties would

09:01  3   agree to in the hypothetical negotiation?

09:01  4      A.    Not -- I have not presented that opinion.

09:01  5      Q.    Okay.  Do you have an opinion on what the

09:01  6   appropriate damages amount in this case is?

09:01  7      A.    I mean, I've got a lot of opinions that I've

09:01  8   detailed in my reports.

09:01  9      Q.    But none that you presented to the jury today?

09:01  10     A.    No.  I did present my opinions to the jury

09:01  11  today.

09:01  12     Q.    Did you present an amount that you think the

09:01  13  damages should be in this case to the jury today?

09:01  14     A.    No.  I did not.

09:01  15     Q.    Thank you.

09:01  16           MS. HEPLER:  Pass the witness.

09:01  17                 REDIRECT EXAMINATION

09:01  18  BY MR. UNDERWOOD:

09:01  19     Q.    Just a couple questions, Mr. Newell.

09:02  20           Did you prepare an expert report in this case?

09:02  21     A.    I did.  I actually prepared three.

09:02  22     Q.    And how many pages combined are those three

09:02  23  expert reports?

09:02  24     A.    More than 400 pages.

09:02  25     Q.    Were there a lot of opinions included in

| | | |
|---|---|---|
| 09:02 | 1 | those? |
| 09:02 | 2 | A.    There were. |
| 09:02 | 3 | Q.    A lot of analysis? |
| 09:02 | 4 | A.    Yes. |
| 09:02 | 5 | Q.    A lot of data? |
| 09:02 | 6 | A.    Lot of data, yes. |
| 09:02 | 7 | Q.    Did you present all of the stuff in those |
| 09:02 | 8 | reports to the jury today? |
| 09:02 | 9 | A.    No.  I mean, I'd like to do that.  Obviously |
| 09:02 | 10 | I'd love to talk about damages for hours, but this case |
| 09:02 | 11 | isn't about damages. |
| 09:02 | 12 | Q.    So why did you focus on Mr. Lewis' 82 percent |
| 09:02 | 13 | number, for example? |
| 09:02 | 14 | A.    Because I was asked to evaluate and respond to |
| 09:02 | 15 | Mr. Lewis' opinions and that's what I did. |
| 09:02 | 16 | Q.    Thank you, Mr. Newell. |
| 09:02 | 17 | MR. UNDERWOOD:  I have no further |
| 09:02 | 18 | questions. |
| 09:02 | 19 | THE COURT:  May he be dismissed? |
| 09:02 | 20 | MS. HEPLER:  He may. |
| 09:02 | 21 | THE COURT:  You may step down, sir. |
| 09:03 | 22 | Could I have counsel up here? |
| 09:03 | 23 | (Bench conference.) |
| 09:03 | 24 | THE COURT:  Are you done? |
| 09:03 | 25 | MR. BURESH:  We're done. |

```
09:03   1                    THE COURT:  Okay.  About how long will
09:03   2   your person take?
09:03   3                    MR. COLLARD:  I'm sorry?
09:03   4                    THE COURT:  About how long will you have
09:03   5   your person?
09:03   6                    MR. COLLARD:  I think he's 30 minutes or
09:03   7   less.  I mean, I'm also going to recall Dr. Chu for a
09:03   8   couple of things related to Mr. Bhatt.  And that's
09:03   9   15 minutes or less.
09:03   10                   THE COURT:  So are we -- the charge is
09:03   11  ready to go?
09:03   12                   MR. BURESH:  I think so.  That's -- my
09:03   13  understanding is we got that.
09:03   14                   THE COURT:  So let's do this.
09:03   15                   MR. COLLARD:  Oh, wait.  Sorry.  Ready to
09:03   16  go, like printed?  I don't know.  I think they were
09:03   17  supposed to be here by the morning break.
09:03   18                   THE COURT:  That's fine.
09:03   19                   So we're going to break.  We'll make our
09:03   20  motions.  Then we'll come back, put on a new witness,
09:03   21  then break.  And then if the charges are here, I will
09:04   22  read it this morning.  And then I'll give y'all a
09:04   23  couple of hours, and we'll do the closing arguments
09:04   24  after that.
09:04   25                   MR. BURESH:  However long is appropriate.
```

1011

| | | |
|---|---|---|
| 09:04 | 1 | THE COURT: Let's shoot for 1:30. |
| 09:04 | 2 | (Bench conference concludes.) |
| 09:04 | 3 | THE COURT: Ladies and gentlemen, we're |
| 09:04 | 4 | going to take a short recess. We'll be back in just a |
| 09:04 | 5 | few minutes. |
| 09:04 | 6 | THE BAILIFF: All rise. |
| 09:04 | 7 | (Jury exited the courtroom.) |
| 09:04 | 8 | THE COURT: You may be seated. |
| 09:04 | 9 | I'll start with the plaintiff. Does the |
| 09:04 | 10 | plaintiff have any motions? |
| 09:04 | 11 | MR. COLLARD: Your Honor, plaintiff moves |
| 09:04 | 12 | for a directed verdict on the ASUS invalidity defenses. |
| 09:05 | 13 | ASUS did not carry its burden because they did not |
| 09:05 | 14 | analyze the claims as written. They analyzed something |
| 09:05 | 15 | else. And since there's no analysis on the claims as |
| 09:05 | 16 | written, those defenses fail. |
| 09:05 | 17 | THE COURT: That's overruled. |
| 09:05 | 18 | Any motions from the defendant? |
| 09:05 | 19 | MR. BURESH: No motions, Your Honor. |
| 09:05 | 20 | THE COURT: Okay. |
| 09:05 | 21 | MR. COLLARD: One more item, Your Honor. |
| 09:05 | 22 | THE COURT: Uh-huh. |
| 09:05 | 23 | MR. COLLARD: Prior to our rebuttal |
| 09:05 | 24 | witness -- |
| 09:05 | 25 | THE COURT: Go ahead. |

―1012―

| | | |
|---|---|---|
| 09:05 | 1 | MR. COLLARD:  With deep respect, I would |
| 09:05 | 2 | like to renew our objection to the redaction of P-50, |
| 09:05 | 3 | the notice letter. |
| 09:05 | 4 | THE COURT:  With equally deep respect, it |
| 09:05 | 5 | is denied. |
| 09:05 | 6 | MR. COLLARD:  Thank you. |
| 09:05 | 7 | THE COURT:  So we can bring them back. |
| 09:05 | 8 | Is your witness ready to go? |
| 09:05 | 9 | MR. COLLARD:  Yes. |
| 09:05 | 10 | THE COURT:  Okay.  Very good. |
| 09:08 | 11 | (Jury entered the courtroom.) |
| 09:08 | 12 | THE COURT:  Thank you.  You may be |
| | 13 | seated. |
| 09:08 | 14 | Does the defendant have any more |
| 09:08 | 15 | witnesses? |
| 09:08 | 16 | MR. BURESH:  Your Honor, we have no |
| 09:08 | 17 | further witnesses, and we rest our case.  Thank you. |
| 09:08 | 18 | THE COURT:  Does the plaintiff have any |
| 09:08 | 19 | rebuttal witnesses? |
| 09:08 | 20 | MR. HALES:  Plaintiff calls Dr. Nabil |
| 09:08 | 21 | Sarhan. |
| 09:08 | 22 | THE COURT:  Doctor, you'll remember |
| 09:08 | 23 | you're under oath. |
| 09:08 | 24 | DIRECT EXAMINATION |
| 09:08 | 25 | BY MR. HALES: |

1013

| | | |
|---|---|---|
| 09:08 | 1 | Q. Good morning, Dr. Sarhan. How are you? |
| 09:08 | 2 | A. I'm good. Thank you. |
| 09:08 | 3 | Q. Good. |
| 09:08 | 4 | A. How about you? |
| 09:08 | 5 | Q. You know, I'm okay. |
| 09:08 | 6 | Were you in court yesterday to hear the |
| 09:08 | 7 | testimony of Mr. Bhatt and Dr. Edwards? |
| 09:08 | 8 | A. Yes. |
| 09:08 | 9 | Q. Did you hear Dr. Edwards share the opinion |
| 09:08 | 10 | that the term "LVDS" as it appears in the patents might |
| 09:08 | 11 | actually be a trademark referring to technology for |
| 09:08 | 12 | National Semiconductor? |
| 09:08 | 13 | A. Yes. |
| 09:08 | 14 | Q. Are you convinced by this testimony? |
| 09:08 | 15 | A. No. |
| 09:08 | 16 | Q. What do the asserted patents have to say about |
| 09:09 | 17 | this LVDS term? |
| 09:09 | 18 | A. Yeah. I have a slide about that with mine |
| 09:09 | 19 | from the patents itself. |
| 09:09 | 20 | Q. Can you speak into the microphone, Dr. Sarhan? |
| 09:09 | 21 | A. Yeah. Yeah. |
| 09:09 | 22 | So I have this slide from the '768 patent as |
| 09:09 | 23 | an example. So we see this is one of the patent. And |
| 09:09 | 24 | the patent says -- specifies the term clearly. |
| 09:09 | 25 | So it says that: The term LVDS is herein used |

—1014—

09:09  1    to generically refer to low voltage differential

09:09  2    signals and is not intended to be limited to any

09:09  3    particular type of LVDS technology.

09:09  4        Q.    In your opinion, does Dr. Edwards' testimony

09:09  5    faithfully apply this disclosure of the patent if he

09:09  6    uses LVDS as a trademark?

09:09  7        A.    It's actually the opposite.  He limited LVDS

09:09  8    to a specific LVDS technology which is a trademark for

09:09  9    a specific company.

09:09  10       Q.    Has Judge Albright defined the "LVDS" term as

09:09  11   technology from National Semiconductor?

09:09  12       A.    No.

09:09  13       Q.    Do you think Dr. Chu has used LVDS in the

09:10  14   patents as a trademark, kind of like the IHOP example

09:10  15   we heard yesterday?

09:10  16       A.    Of course not.

09:10  17       Q.    Why not?

09:10  18       A.    We can see, like, another slide from the

09:10  19   patent itself.

09:10  20            MR. HALES:  Slide 3, Vicki.

09:10  21       A.    So here, in this -- again, this is from the

09:10  22   '768 patent as an example.  It says:  TMDS stands for

09:10  23   transition minimized differential signaling and is a

09:10  24   trademark of Silicon Images and refers to their Panel

09:10  25   Link technology, which is in turn a trademark for their

09:10  1    LVDS technology.

09:10  2            So here we can see that according to the

09:10  3    patent here -- according to the patent specification,

09:10  4    TMDS is a type of LVDS technology.

09:10  5            However, TMDS is a trademark for another

09:10  6    company, so Silicon Images as we see here.  And by

09:11  7    examining the specifications of TMDS and LVDS,

09:11  8    according to National Semiconductors, we have

09:11  9    drastically different electrical characteristics and

09:11  10   voltage levels.

09:11  11   BY MR. HALES:

09:11  12       Q.    In your view, Dr. Sarhan, can we use LVDS as a

09:11  13   trademark term to refer to a second company's

09:11  14   technology which doesn't comply with National

09:11  15   Semiconductors' electrical standards?

09:11  16       A.    It does not make sense to me.

09:11  17       Q.    As a matter of fact, do PCI Express

09:11  18   transactions use low voltage differential signaling?

09:11  19       A.    Yes.

09:11  20       Q.    And how do we know this?

09:11  21       A.    From the specification itself, from the

09:11  22   specification for the standard.

09:11  23            MR. HALES:  Can we go to Slide 4, Vicki?

09:11  24   BY MR. HALES:

09:11  25       Q.    Dr. Sarhan, what are we looking at here?

                                                                    —1016—

09:11   1       A.    So again, this is the PCI Express Base

09:11   2   Specification.  This is that specification for the

09:11   3   standard.  And here it says clearly that PCI Express

09:11   4   uses low voltage differentially driven pairs and then

09:12   5   says in opposite directions.

09:12   6       Q.    Do you think that the PCI Express standard is

09:12   7   a reliable source to know what's in PCI Express

09:12   8   technology?

09:12   9       A.    It is the most authoritative source on PCI

09:12   10  Express.  If we want to learn anything about PCI

09:12   11  Express, this is the most authoritative document on PCI

09:12   12  Express.

09:12   13      Q.    Does PCI Express have LVDS as that term would

09:12   14  be understood in our patents?

09:12   15      A.    Yes.

09:12   16      Q.    Does USB 3 have LVDS as that term would be

09:12   17  understood in our patents?

09:12   18      A.    Yes.

09:12   19      Q.    Did you hear testimony yesterday from

09:12   20  Dr. Edwards that when we see this term "LVDS" in the

09:12   21  patent claims, we should think about a suspension

09:12   22  bridge and we should read that term to require some

09:12   23  kind of bus bridge aspect to it?  Did you hear --

        24      A.    Yes.

09:12   25      Q.    You heard that testimony?

—1017—

09:12  1        A.    Yes.

09:12  2        Q.    Do you agree with that testimony?

09:12  3        A.    I completely disagree.

09:12  4        Q.    Why do you completely disagree with that

09:12  5   testimony?

09:12  6        A.    As I explained to the jury on Monday, the

09:13  7   claim limitations -- the claims are what define the

09:13  8   inventions.  So the inventions are defined -- specified

09:13  9   by the claims.  And in the claims, and they are

09:13 10   certainly the claims that we discuss, we don't have

09:13 11   anything about a bus bridge or anything to that effect.

09:13 12        Q.    Dr. Edwards showed us a patent application

09:13 13   from 1998 and said that this should inform us about how

09:13 14   to read the patent claim terms at issue in this suit.

09:13 15   I think he also referenced a 1999 application.

09:13 16            Do you agree with this type of analysis?  Is

09:13 17   that how we should -- are those the tools we should use

09:13 18   to understand our patent terms?

09:13 19        A.    It does not make sense.  Again, the claims are

09:13 20   what define the inventions, and the inventions do not

09:13 21   have any language to that effect at all.

09:13 22        Q.    Do the patents say anything about LVDS

09:13 23   channels performing this bridging function that was

09:13 24   talked about so much yesterday?

09:13 25        A.    No.

1018

09:13  1    Q.    What do the patents say the LVDS channels will

09:13  2    do?

09:13  3    A.    Okay.  So if we look at the claim limitations

09:14  4    themselves, they specify LVDS as having or comprising

09:14  5    differential signal pairs in opposite directions that

09:14  6    transmit data serially.  Again, that transmit data.

09:14  7    This is the purpose of this LVDS channel, just to

09:14  8    transmit data, not to do any bridging functionality.

09:14  9    Q.    Dr. Edwards seems to believe that if we look

09:14  10   through some older patent applications and even the

09:14  11   patents asserted here, the only thing we will find the

09:14  12   XP Bus doing is performing this bridging function that

09:14  13   he says we should see every time we see the LVDS term.

09:14  14         Do you agree with him on this point?

09:14  15   A.    I disagree.

09:14  16   Q.    Do the patents disclose embodiments of

09:14  17   Dr. Chu's LVDS channels or his XP Bus where it's not

09:14  18   acting as a peripheral bus bridge?

09:14  19   A.    Yes.  And I showed the jury Monday -- Monday a

09:14  20   figure from the patent that does not have, like --

09:14  21         MR. HALES:  Can we bring up Slide 5,

09:14  22   Vicki?

09:14  23   BY MR. HALES:

09:14  24   Q.    Is this that figure you're talking about,

09:15  25   Dr. Sarhan?

09:15   1        A.    Yes.

09:15   2        Q.    Will you explain to the jury why you think

09:15   3   this supports your view that we don't need to see a

09:15   4   bridge bus or a bus bridge when we see the "LVDS" term?

09:15   5        A.    Yes.  So here we see -- this is, again, a

09:15   6   figure from the '768 patent, one of the asserted

09:15   7   patents.  And we can see here we have XP Bus, which

09:15   8   comprises LVDS channels.  And those channels extend

09:15   9   directly from this integrated chipset.

09:15  10            And here, we can see there is no PCI.  We

09:15  11   don't have any PCI local bus.  Although, I showed the

09:15  12   jury on Monday, I showed them that there are some

       13   figures in the patents that have PCI local bus.  And

09:15  14   they are clearly labeled as such.  Here, we do not see

09:15  15   a PCI local bus at all.

09:15  16        Q.    Do you remember Dr. Edwards concluding, well,

09:15  17   it must be in that yellow box somewhere?

       18        A.    Yes.

09:15  19        Q.    Do you agree with him on this point?

09:15  20        A.    I disagree.

09:15  21        Q.    Why do you disagree with him?

09:15  22        A.    So again, like, when we have the PCI local

09:15  23   bus, the patents themselves have figures that shows --

09:15  24   that show that it exists.

09:16  25            So they keep that very clear about it.

09:16   1    However, in this figure, it's totally absent.  And this

09:16   2    is intentional.

09:16   3              And also, another reason for this is that when

09:16   4    we integrate electronic chips together in one bigger

09:16   5    chip, we try to make things more efficient.

09:16   6         Q.    Let me jump in.

09:16   7              Would it make it more efficient to put a local

09:16   8    PCI bus in that yellow box?

09:16   9         A.    No.  And this is why I totally disagree with

09:16   10   the example that Dr. -- the analogy that Dr. Edwards

09:16   11   mentioned.

09:16   12             He said, you know, Amazon, they can combine

09:16   13   items, like, when you order items from Amazon, they

09:16   14   combine them and then put them in one package and ship

09:16   15   it to the customer.  Here, we're talking about

09:16   16   electronic chips, like, for the parts of the processor

09:16   17   and other units, we integrate them together, so we care

09:16   18   about efficiency in this case.

09:16   19        Q.    Is this patent figure consistent with

09:16   20   Dr. Edwards' testimony that we need to read the LVDS

09:16   21   limitations to require some kind of bus bridge?

09:17   22        A.    It's totally inconsistent.

09:17   23        Q.    Do you remember Dr. Edwards, yesterday,

09:17   24   proposed an analogy to the jury, when we're thinking

09:17   25   about address and data bits of a PCI bus transaction,

09:17   1    we need to think of an orange and a peel?

09:17   2        A.    Yeah.

09:17   3        Q.    Do you think this is an apt analogy that the

09:17   4    jury should use when evaluating the address and data

09:17   5    bits limitations of the claims?

09:17   6        A.    No.

09:17   7        Q.    Why not?

09:17   8        A.    Again, as I explained to the jury on Monday,

09:17   9    from the standard -- from the PCI Express standard, we

09:17   10   can tell clearly that PCI Express employs or utilizes a

09:17   11   PCI -- a PCI-compatible software model.

09:17   12           So when the CPU, which is the brain of the

09:17   13   computer, executing this software, which is again

09:17   14   PCI-compatible software, and it hits -- or it reaches a

09:17   15   memory write instruction, this memory write instruction

09:17   16   will, indeed, have address and data bits of a PCI

09:18   17   transaction because the whole software model is

09:18   18   intended for PCI and referred to as a PCI-compatible

09:18   19   software model.

09:18   20       Q.    So I'm not trying to put words in Dr. Edwards'

09:18   21   mouth, but I want to know if you understood his

09:18   22   testimony as I did yesterday.

09:18   23           He seems to believe you have to have those

09:18   24   address and data bits come out of the CPU, put them

09:18   25   into a local PCI bus transaction, then take them back

—1022—

09:18  1    out in order to find address and data bits of a PCI bus

09:18  2    transaction.

09:18  3         Did you understand his testimony in this

09:18  4    manner?

09:18  5         A.    Yes.

09:18  6         Q.    Do you agree with that reading of our patents

09:18  7    and claims?

09:18  8         A.    I totally disagree.

09:18  9         Q.    Why do you disagree?

09:18  10        A.    Again, if you look at the patent claims, the

09:18  11    actual claims, which specify the invention, they

09:18  12    clearly state that we don't have to have the full PCI

09:18  13    concept.

09:18  14        If we look at the claims, they say:  To convey

09:18  15    address and data bits, address and data bits of a PCI

09:19  16    transaction.

09:19  17        None of the asserted claims called for an

09:19  18    internal transaction.  It's only address and data bits

09:19  19    of a PCI transaction.

09:19  20        Also, by the Court construction, I'm

09:19  21    instructed to differentiate between a full transaction

09:19  22    and a partial transaction.

09:19  23        Q.    Are there any of the claims asserted in this

09:19  24    case that affirmatively prohibit the use of the old

09:19  25    local -- the PCI local bus hardware?

09:19  1          A.    Yes.

09:19  2                    MR. HALES:  Vicki, could we bring up J-1

09:19  3    at Claim 10, please?

       4    BY MR. HALES:

09:19  5          Q.    Is this that claim, Dr. Sarhan?

09:19  6          A.    Yes.  So this is one of the asserted claims in

09:19  7    this patent.  And here, it recites clearly without any

09:19  8    intervening peripheral component interconnect PCI bus.

09:19  9          Q.    Is this significant to your opinions on the

09:19  10   address and data bits claim limitation, Dr. Sarhan?

09:19  11         A.    Yes.

09:19  12         Q.    Why?

09:19  13         A.    So again, as I mentioned, that -- the

09:20  14   patents -- like, the claims don't call for a full PCI

09:20  15   transaction, only they say address and data bits of a

09:20  16   PCI transaction.  This is intentional.

09:20  17                    Also, we saw, like, in Figure 8B of the

09:20  18   patent -- of the patent, the '768 as an example, it

09:20  19   does not have a PCI local bus.  This is also

09:20  20   intentional.

09:20  21                    And this one also reenforces this concept,

09:20  22   because it says without any intervening peripheral

09:20  23   component interconnect, PCI, bus.  So the patentee is

09:20  24   actually aware of this, like, when to have a PCI local

09:20  25   bus and when not to have it.

09:20    1        Q.    Okay.  I want to touch very briefly on

09:20    2   backward compatibility before we leave the address and

09:20    3   data bits, and I know the jury's ears might be ringing

09:20    4   from how many times they've heard this term in this

09:20    5   case.

09:20    6        But how does backward compatibility of PCI

09:20    7   Express with the PCI local bus play into your opinion

09:20    8   related to this claim term?

09:20    9        A.    Yes.  So the -- again, like, yesterday, we

09:21   10   showed -- like, the defendants give the jury, like,

09:21   11   some adapters.  One of them is PCI local bus, and one

09:21   12   of them is PCI Express yet you cannot actually -- they

09:21   13   cannot work with each other.

09:21   14        And this is right.  And I believe that I

09:21   15   mentioned this in my report.  The patents themselves

09:21   16   actually tell us that, you know, the short limitations

09:21   17   of the PCI local bus, if you remember.  And they said,

09:21   18   you know, it uses parallel transmissions.  A

09:21   19   transmission has so many wires, so many conductive

09:21   20   lines, and it's not cable friendly.

09:21   21        So the patents themselves mention this

09:21   22   limitation, and they disclose solutions that will

09:21   23   address these limitations.  So it was never intended to

09:21   24   have something that's actually -- to have one slot that

09:21   25   would be compatible with the PCI local bus slot.

09:21  1          Q.    So thanks for that.

09:21  2                I guess I want to ask a question at a very

09:21  3    simple level.  We saw a lot of talk about clicking

09:21  4    together connectors and slots.

09:21  5                And did you hear related argument that unless

09:21  6    the connectors work across the old and new generations,

09:22  7    you don't have backward compatibility?  Did you hear

09:22  8    that testimony?

09:22  9          A.    Yes.

09:22  10         Q.    Is that view of things consistent with what

09:22  11   Dr. Chu explained he would do in trying to create his

09:22  12   LVDS backward-compatible bus?

09:22  13         A.    No.  This is not consistent with that, because

09:22  14   the patents, is (indiscernible) the communications with

09:22  15   the PCI local bus, and they explained how to address

09:22  16   these limitations while maintaining software

09:22  17   compatible -- compatible -- software compatible to the

09:22  18   operating systems and application software.  In other

09:22  19   words here, it's software compatibility.

09:22  20         Q.    And what were the limitations of the PCI local

09:22  21   bus connector?

09:22  22         A.    Say it again.

09:22  23         Q.    What were the described limitations of the PCI

09:22  24   local bus connector?

09:22  25         A.    I cannot understand the question.

1026

09:22  1      Q.    What were the limitations in the patents?

09:22  2      A.    Yeah.

09:22  3      Q.    I'm sorry.  I'm using "limitations."  I'm

09:22  4  going to fix that term.  Thank you.

09:22  5      A.    Yeah.

09:22  6      Q.    What were the drawbacks described in the

09:22  7  patent with regard to the PCI local bus connector?

09:22  8      A.    Yeah.  So among other things, like mentioned

09:22  9  it has parallel transmission, it uses too many wires,

09:23 10  47-plus wires as we discussed earlier.  It is not cable

09:23 11  friendly.  It has bigger connector and all these sort

09:23 12  of things.

09:23 13      Q.    And the backward compatibility disclosed in

09:23 14  the asserted patents, did that say we're going to keep

09:23 15  this plug to maintain compatibility or was something

09:23 16  else proposed?

09:23 17      A.    No.  Actually, it's the opposite.  They showed

09:23 18  that, you know, like -- or they intended to basically

09:23 19  have a smaller connector while maintaining

09:23 20  compatibility with the operating systems and

09:23 21  application software.

09:23 22      Q.    Dr. Sarhan, if we use the teachings of the

09:23 23  patents as our guide, do we need to have the same size

09:23 24  connector in order to have backward compatibility?

09:23 25      A.    No.

1027

09:23  1      Q.    Dr. Sarhan, I want to talk about the console

09:23  2  limitation.

09:23  3           Do you remember Dr. Edwards, or more

09:23  4  accurately their counsel, put up an image of you and

09:23  5  some computer peripherals and said, you know, you got

09:23  6  this term wrong?

09:23  7      A.    Yes.

09:23  8      Q.    Do you agree?  Did you make an error in

09:24  9  applying this term?

09:24  10     A.    Of course not.

09:24  11     Q.    Do you see on the screen here, on Slide 6, the

09:24  12  Court's construction for the term "console"?

09:24  13     A.    Yes.

09:24  14     Q.    Is this the same construction that the jury

09:24  15  should apply when they perform their infringement

09:24  16  decision?

09:24  17     A.    Yes.

09:24  18     Q.    Does this say anything about a peripheral

09:24  19  device need not apply, that that can't be a console?

09:24  20     A.    It's not there.

09:24  21     Q.    What does this analysis actually require?

09:24  22     A.    So here, this is again the Court construction.

09:24  23  And so it says -- for the console, it says:  A chassis

09:24  24  or enclosure housing one or more coupling sites that

09:24  25  connects components of a computer system.

1028

09:24  1          So actually, I'm applying the -- so I'm

09:24  2   actually applying the Court construction, but seems

09:24  3   that Dr. Edwards is adding a lot of things to it.

09:24  4      Q.   I'd like to go through this real quick one

09:24  5   time for the jury's benefit.

09:24  6          Will you name a device and we'll see if it

09:24  7   satisfies the Court's construction?

09:24  8      A.   Let's say a printer.

09:24  9      Q.   Okay.  Does a printer ordinarily have a

09:25  10  chassis or enclosure on its outside?

09:25  11     A.   Yes.

09:25  12     Q.   What would that be?

09:25  13     A.   I think it's obvious that that plastic

09:25  14  enclosure for the printer, this is a chassis or

09:25  15  housing.

09:25  16     Q.   And would this chassis house one or more

09:25  17  coupling sites?

09:25  18     A.   Yes.

09:25  19     Q.   What would the coupling site be?

09:25  20     A.   For example, we have a USB port in the

09:25  21  printer.

09:25  22     Q.   And would this chassis connect components of a

09:25  23  computer system?

09:25  24     A.   Yes.

09:25  25     Q.   What would those components be in the printer?

09:25    1          A.    So here in the printer, if you open up the

09:25    2    printer, we see all those mechanical aspects to print.

09:25    3    Right?  Yeah.  We have all these mechanical units to do

09:25    4    the printing.

09:25    5          And in addition to that, we have actually an

09:25    6    electronic board within the printer, which generally

09:25    7    includes a CPU, it includes memory and some other

09:25    8    elements, so to control the printing functionality.  It

09:25    9    also has network adapters, et cetera.

09:25    10         Q.    So if we look at this construction, does it

09:25    11   say "but not a peripheral"?

09:25    12         A.    No.  It does not.

09:25    13         Q.    Okay.  I want to talk about the written

09:26    14   description and enablement opinions that were expressed

09:26    15   yesterday.

09:26    16         Did you hear those?

09:26    17         A.    Yes.

09:26    18         Q.    And I want to set the table a little bit, if I

09:26    19   can.

09:26    20         The written description analysis, as you

09:26    21   understand it, is we're searching to see if we can

09:26    22   conclude based on the patent specification that the

09:26    23   inventor actually had and invented what he sets forth

09:26    24   in his claims; is that right?

09:26    25         A.    Yes.

09:26  1       Q.   And for enablement, we look at the patent to

09:26  2  see if other people in this field would be able to take

09:26  3  the patent, use it as a guide, and obtain these

09:26  4  inventions without undue experimentation.

09:26  5            Is that your understanding --

09:26  6       A.   Yes.

09:26  7       Q.   -- of the law?

09:26  8            Okay.  So on written description, did you hear

09:26  9  Dr. -- Dr. Edwards' opinion?  There's not enough

09:26  10  written description here to conclude that Dr. Chu

09:26  11  actually invented this stuff he claims?

09:26  12       A.   Yes.

09:26  13       Q.   Okay.  Do you agree with him on this point?

09:26  14       A.   No.

09:26  15       Q.   Okay.  I'm going to dig into why, but before I

09:26  16  do so, I want to ask, do you think Dr. Edwards

09:26  17  performed the right analysis?

09:26  18       A.   No.  He didn't perform the right analysis.

09:27  19       Q.   I want you to describe to the jury what the

09:27  20  correct analysis is according to your understanding,

09:27  21  and then we'll ask whether in your view Dr. Edwards did

09:27  22  this.  Okay?

09:27  23            What is the correct written description

09:27  24  analysis as you understand it?

09:27  25       A.   So again, the -- as I explained to the jury,

09:27  1    the actual invention is in the claim.  Right?  So to do

09:27  2    the proper analysis for written description, I would

09:27  3    actually look at the claims.

09:27  4         Q.    Is that what we're looking at here on Claim 7?

09:27  5         A.    Yes.  So first --

09:27  6         Q.    Can you describe to the jury what this graphic

09:27  7    shows?

09:27  8         A.    Yeah.  Sure.

09:27  9               So in order to see if the patents meet the

09:27  10   written description requirement, I have to go to the

09:27  11   inventions first, which are the claims.  So I have

09:27  12   first to examine the claims, look at all the claim

09:27  13   limitations.  And then after that, I go to the patent

09:27  14   specifications to see if there is support for these

09:27  15   claims or not.

09:27  16        Q.    Is this what you've done in your written

09:28  17   description --

09:28  18        A.    Exactly.

09:28  19        Q.    -- analysis?

09:28  20              Okay.  What do you believe Dr. Edwards did

09:28  21   when performing his analysis?

09:28  22        A.    So he did something different.  I think I have

09:28  23   a slide about that.

09:28  24              So what Dr. Edwards did is that he -- he

09:28  25   didn't go to the claims, as I did.  He went to the

09:28   1   accused products.  In this case PCI Express, USB 3,

09:28   2   these are the accused products.

09:28   3        So he went first to the accused products, and

09:28   4   then he went to the specifications -- patent

09:28   5   specification to see is there any support for USB 3?

09:28   6   Is there any support for PCI Express?  This is not the

09:28   7   right analysis.

09:28   8        Q.   On what basis do you believe this is what

09:28   9   Dr. Edwards has done?

09:28   10       A.   He actually showed the -- this one to the jury

09:28   11  yesterday, to all of us.

09:28   12            MR. HALES:  Vicki, can we see the next

09:28   13  slide?

       14  BY MR. HALES:

09:28   15       Q.   Why do you find this informative of the

09:28   16  analysis Dr. Edwards has performed, in your view?

09:28   17       A.   Yes.  So here, we see the claims.  These are

09:28   18  the claims.  For example, here, it shows the '768

09:28   19  patent, Claim 10.

09:28   20            And then -- so this is the actual invention.

09:29   21  Right?  And then he went to replace some elements in

09:29   22  the claim with some stuff that's related to the accused

09:29   23  products, right?

09:29   24            So -- and I find this one shocking, to say the

09:29   25  least, because, again, the inventions are described by

09:29  1    the claims.  So this is what we should look at.  We

09:29  2    should not, like, change with anything else.  We should

09:29  3    look at the claims themselves.

09:29  4        Q.    If we peel back this red ink and we look for

09:29  5    the actually claimed inventions, do you conclude that

09:29  6    Dr. Chu actually possessed and disclosed the inventions

09:29  7    claimed here?

09:29  8        A.    Yes.

09:29  9        Q.    Why do you hold this opinion?

09:29  10        A.    If you look -- do you mind like -- I see --

09:29  11    can I get the '768 patent, if you don't mind?

09:29  12                MR. HALES:  May I approach?

09:29  13                THE COURT:  Of course.

09:29  14        A.    So this is one of the patents asserted in this

09:29  15    case.  And you see like it's not really very hard.

09:30  16    Just looking at the patents, all the figures, and some

09:30  17    of these figures are referring -- because we have 30 --

09:30  18    I believe 31 or 32 figures in the '768 patent.  And

09:30  19    they give a lot of details.

09:30  20            I showed the jury some of these figures,

09:30  21    including so much detail.  There are 31 or 32 of these.

09:30  22    And extensive disclosure.  I believe the patents meet

09:30  23    that written description requirement.

09:30  24    BY MR. HALES:

09:30  25        Q.    How many columns of written description

09:30  1    disclosure are in that patent, sir?

09:30  2        A.    So here we have 46 columns.

09:30  3        Q.    Okay.  Is it your opinion that Dr. Chu has

09:30  4    written description support for the inventions claimed

09:30  5    in these patents?

09:30  6        A.    Yes.

09:30  7        Q.    I want to move on to the enablement analysis

09:30  8    that Dr. Edwards performed yesterday.

09:30  9              Do you remember he had a chart with six or

09:30  10   seven considerations and he made certain determinations

09:30  11   on those?

09:30  12       A.    Yes.

09:30  13       Q.    Do you agree with Dr. Edwards' conclusion that

09:30  14   there's not enough in these patents to enable others in

09:31  15   the art to do these technologies without undue

09:31  16   experimentation?

09:31  17       A.    I disagree.

09:31  18       Q.    I'd like to see why you disagree.  I think a

09:31  19   good exercise in that would be to go through this chart

09:31  20   and see if you agree with Dr. Edwards on these

09:31  21   considerations.  Okay?

09:31  22       A.    Yes.

09:31  23       Q.    Let's start with the top one.  Dr. Edwards

09:31  24   identifies the nature of the invention claimed in this

09:31  25   case as the XP Bus.

1035

```
09:31   1              Do you agree?
09:31   2      A.    I totally disagree.  Again, as I explained to
09:31   3   the jury, the claims themselves are what specify the
09:31   4   invention.  The claims, you will not see anything about
09:31   5   XP Bus.
09:31   6      Q.    What do the claims say?
09:31   7      A.    They talk about LVDS channel that convey
09:31   8   either address and data bits of PCI transaction or USB
09:31   9   data over LVDS channels.  This is what the claims
09:31  10   themselves say.  These are the inventions, not the XP
09:31  11   Bus.
09:31  12      Q.    Did Dr. Edwards get this first factor wrong?
09:31  13      A.    Yes.
09:31  14      Q.    Let's go on to the second, breadth of the
09:31  15   claims.  He concludes that the breadth of the claim is
09:32  16   no XP Bus.
09:32  17              Do you agree with this conclusion?
09:32  18      A.    Actually, I totally disagree, and I'm kind of,
09:32  19   like, surprised.  Now, when we talk about the breadth
09:32  20   of the claims, we are talking about the scope of the
09:32  21   claims.
09:32  22              And so here, like, he said that there's no XP
09:32  23   Bus.  So basically, he described the scope of the
09:32  24   claims by what the claims do not have.  So it's
09:32  25   actually the inverse.  So he described the breadth or
```

09:32   1   the scope of the claims by what the claims lack.

09:32   2       Q.    Is that the right analysis?

09:32   3       A.    Of course not.

09:32   4       Q.    Do you disagree with him on this point?

09:32   5       A.    Yes.

09:32   6       Q.    I think you've already discussed it.  What's

09:32   7   in our claims?

09:32   8       A.    I did.  The claims, they talk about LVDS

09:32   9   channels that carry or convey PCI -- address and data

09:32  10   bits of a PCI transaction or USB data or information

09:32  11   over LVDS channels.

09:33  12       Q.    That'll inform this next drill, Dr. Sarhan.

09:33  13             What amount of direction or guidance does this

09:33  14   patent provide for someone else trying to achieve a

09:33  15   LVDS channel to carry USB or PCI local bus data?

09:33  16       A.    I believe there's a lot of guidance, again,

09:33  17   like I showed the patent to the jury.

09:33  18       Q.    So he concluded there's no guidance.  How much

09:33  19   guidance would you say is in these patents?

09:33  20       A.    I think it's a lot.  And none -- like you say,

09:33  21   none, despite all this disclosure, is at least an

09:33  22   exaggeration.

09:33  23       Q.    Do you disagree with him on this third one?

09:33  24       A.    Yes.

09:33  25       Q.    I'd like to go to relative skill of those in

the art.

I think I heard testimony and saw a slide that an ordinary person in this field would have a bachelor's degree in electrical engineering and three years' experience or a master's degree in electrical engineering?

A.    Yes.

Q.    Is that a low-skilled laborer, Dr. Sarhan?

A.    I don't think so.  I think having a master's degree in electrical engineering or computer science or an electrical field is actually good enough.

Q.    Did Dr. Edwards get this consideration right, in your view?

A.    No.

Q.    What about the state of the prior art?  Do you agree that the technologies discussed in our claims, LVDS, PCI local bus, USB protocol, that these are undeveloped technologies?

A.    I disagree.

Q.    On what basis do you disagree?

A.    So the patent claims the combined different technologies in certain ways.  For example, LVDS technologies are very well established by the priority dates of the patents.

PCI local bus is very well specified in its

09:34   1    standards, and there's a lot of developments already,

09:34   2    like, actual PCI local bus implementations.

09:34   3            Also, USB is very well-known, and there's a

09:34   4    great -- there are different specification about USB.

09:34   5    And also, there are so many different USB

        6    implementations.

09:34   7            Also, in terms of, like, serializers, there

09:34   8    are a lot of serializers in literature.  And actually,

09:35   9    where -- there are (indiscernible) to implement these.

09:35   10   Q.    Did Dr. Edwards get this row right?

09:35   11   A.    No.

09:35   12   Q.    Unpredictability of the art.

09:35   13           Do you agree that in 1999 or 2000 electrical

09:35   14   engineering or computer science was an unpredictable

09:35   15   field?

09:35   16   A.    I totally disagree.  Electrical engineering,

09:35   17   computer engineering are hard sciences.  They are

09:35   18   concrete sciences.  I don't see, like, this one fits in

09:35   19   nicely.

09:35   20   Q.    Based on -- well, do you disagree here with

09:35   21   the second-to-last row?

09:35   22   A.    Yes.

09:35   23   Q.    So based on these considerations, Dr. Edwards

09:35   24   concluded if someone picked up the patents and tried to

09:35   25   achieve what's described in the claims, they'd have

09:35   1   to -- they'd have to engage in undue experimentation.

09:35   2        Do you agree?

09:35   3   A.   No.

09:35   4   Q.   Why not?

09:35   5   A.   So the -- again, the patents or the

09:35   6   inventions, they combine different technologies in

09:35   7   certain ways.  These technologies are well developed by

09:36   8   that time.  And they're not going to require any undue

09:36   9   experimentation.

09:36  10   Q.   Thank you.

09:36  11        MR. HALES:  Pass the witness, Your Honor.

09:36  12                   CROSS-EXAMINATION

09:36  13   BY MR. BURESH:

09:36  14   Q.   Good morning, Dr. Sarhan.

09:36  15   A.   Good morning.

09:36  16   Q.   Round two?

09:36  17   A.   Yes.  Looking forward to it.

09:36  18   Q.   I'm sure.

09:36  19        You disagree with a lot of things, huh?

09:36  20   A.   Unfortunately.

09:36  21   Q.   Disagree with virtually everything Dr. Edwards

09:36  22   said, right?

09:36  23   A.   I'm not sure if it's virtually everything, but

09:36  24   I disagreed with what I mentioned here.

09:36  25   Q.   Okay.  You disagreed with some of the things

09:36   1    Mr. Bhatt said too, correct?

09:37   2        A.    Actually, I would say that I agree with most

09:37   3    of the stuff that Mr. Bhatt agreed.  He showed the

09:37   4    differences between PCI Express and PCI local bus.  I

09:37   5    totally agree.  I mentioned those in my report

09:37   6    extensively.  I also showed those to the jury in my

09:37   7    presentation on Monday.

09:37   8            So I actually agree with most of the stuff

09:37   9    Mr. Bhatt mentioned.

09:37   10       Q.    Okay.  We might take a look at that a little

09:37   11   bit more here in a couple of minutes.

09:37   12           Now, I heard you talking about LVDS quite a

09:37   13   bit during this most recent bit of testimony.

09:37   14       A.    Yes.

09:37   15       Q.    Correct?

09:37   16           And you said it's really important to look at

09:37   17   the claims, and the claims don't suggest to you that

09:37   18   there's any sort of specific bridging technology being

09:37   19   described.

09:37   20           Is that your testimony?

09:37   21       A.    Yes.

09:37   22       Q.    Okay.  Now, the Court --

09:37   23       A.    Bridging functionality to be specific.  Yeah.

09:38   24       Q.    The Court hasn't construed the term "LVDS" as

09:38   25   it occurs in the claims, correct?

—1041—

```
09:38   1        A.    Yes.
09:38   2        Q.    So in that circumstance, it's really important
09:38   3   to look at context, isn't it?
09:38   4        A.    Yes.
09:38   5        Q.    The context is provided by the patent
09:38   6   specifications --
09:38   7        A.    Yes.
09:38   8        Q.    -- correct?
09:38   9              The context, that's provided by the
09:38  10   prosecution history, including the patents going back
09:38  11   in time, correct?
09:38  12        A.    Yes.
09:38  13        Q.    So when we're trying to understand what LVDS
09:38  14   channels are in the claims, we go look at the context.
09:38  15              We don't want to ignore the context, correct?
09:38  16        A.    Yes.
09:38  17              MR. BURESH:  If we could pull up
09:38  18   Dr. Sarhan's Slide No. 2 from the most recent deck.
09:38  19   BY MR. BURESH:
09:38  20        Q.    Now, you've shown the jury this particular
09:38  21   sentence before, correct?
09:38  22        A.    Yes.
09:38  23        Q.    Including Day 1, Monday?
09:39  24        A.    Yes.
09:39  25              MR. BURESH:  Mr. Palisoul, if we could
```

1042

| | | |
|---|---|---|
| 09:39 | 1 | pull up -- from the -- let's go to J-1, the '768 |
| 09:39 | 2 | patent. |
| 09:39 | 3 | I want to look at Column 3, Line 44, |
| 09:39 | 4 | through 4:16. |
| 09:39 | 5 | BY MR. BURESH: |
| 09:39 | 6 | Q.   And we looked at this before too.  You recall |
| 09:39 | 7 | from Day 1? |
| | 8 | Now, you're -- |
| | 9 | (Clarification by Reporter.) |
| 09:39 | 10 | A.   Can you say that question again? |
| 09:39 | 11 | BY MR. BURESH: |
| 09:39 | 12 | Q.   Yeah. |
| 09:39 | 13 | I said:  We have looked at this full context |
| 09:39 | 14 | before from Day 1, correct? |
| 09:39 | 15 | A.   Yeah.  I think so. |
| 09:39 | 16 | Q.   Yeah. |
| 09:39 | 17 | And you've cherry-picked that last sentence |
| 09:39 | 18 | down there in this paragraph, right?  That's your |
| 09:39 | 19 | highlighting? |
| 09:39 | 20 | A.   Yes. |
| 09:39 | 21 | Q.   Now, if we look at the full context of this |
| 09:39 | 22 | paragraph, what it's actually talking about -- in fact, |
| 09:39 | 23 | it says:  In the context of the computer system of the |
| 09:40 | 24 | present invention. |
| 09:40 | 25 | That's Dr. Chu's invention we're talking about |

09:40  1    here, correct?  Yes?

09:40  2        A.    Yes.

09:40  3        Q.    We have a cable-friendly interface that's

09:40  4    desired for interfacing an attached computer module and

09:40  5    a peripheral console for the present invention.

09:40  6              Do you see that?

09:40  7        A.    Yes.

09:40  8        Q.    And that interface is described as bridging

09:40  9    the ACM and the peripheral console throughout these

09:40  10   patents; isn't that correct?

09:40  11       A.    Yes.  Here.  Yeah.

09:40  12       Q.    So that's the context?

09:40  13       A.    Yeah.  In this instance.

09:40  14       Q.    The context that twice now you have omitted

09:40  15   from your discussion with the jury so that you could go

09:40  16   to a cherry-picked one sentence out of this patent;

09:40  17   isn't that correct?

09:40  18       A.    I didn't -- I didn't cherry-pick.  I will be

09:40  19   happy to discuss this in detail if you allow me.

09:40  20       Q.    We just did.

09:40  21       A.    Okay.

09:40  22              MR. BURESH:  Let's go to Slide 3, please.

09:40  23   BY MR. BURESH:

09:41  24       Q.    Now, here, you've talked about a term we

09:41  25   haven't heard in this case at all until this morning,

09:41  1    right, TMDS?

09:41  2    A.    What do you mean we didn't hear about --

09:41  3    Q.    You didn't mention the phrase "TMDS" during

09:41  4    the over two hours of testimony you provided on Monday;

09:41  5    isn't that correct?

09:41  6    A.    Yes.

09:41  7    Q.    You didn't mention the phrase -- or the

09:41  8    company Silicon Images during your over two hours of

09:41  9    direct on Monday, correct?

09:41  10    A.    Not in the presentation, but I talk about them

09:41  11    extensively in the report.

09:41  12    Q.    I'm not asking about your report.  I'm talking

09:41  13    about what we've talked about here in court.

09:41  14          You didn't talk about TMDS.  You didn't talk

09:41  15    about Silicon Images, did you?

09:41  16    A.    No.

09:41  17    Q.    The jury doesn't have any idea what TMDS is,

09:41  18    do they?

09:41  19    A.    I explained it just now for them.

09:41  20    Q.    Prior to your few minutes of discussion today,

09:41  21    you did not touch in any way on Monday on TMDS?

09:41  22    A.    I had 150 slides, so many things to go through

09:42  23    and LVDS --

09:42  24    Q.    Is the answer yes or no?

09:42  25    A.    Say the question again.

1045

09:42    1        Q.    You did not touch on, describe, or in any way

09:42    2    talk to the jury about TMDS during your over two hours

09:42    3    of direct on Monday; isn't that correct?

09:42    4        A.    Yeah.  In the presentation, I did not.

09:42    5              MR. BURESH:  If we could go to the next

09:42    6    slide, please.  It'll be Slide No. 4.

09:42    7    BY MR. BURESH:

09:42    8        Q.    On this slide, you have an excerpt from the

09:42    9    PCI Express Base Specification, Revision 1.0, correct?

09:42    10       A.    Yes.

09:42    11       Q.    And you're pointing out that in the

09:42    12   specification you found some words that say "low

09:42    13   voltage" and you found some words that say

09:42    14   "differential signal," correct?

09:42    15       A.    Yes.

09:42    16       Q.    Now, you can make me do the word search if you

09:43    17   want, we can pull it up, or you could just agree with

09:43    18   me that the term "LVDS" does not appear in this

09:43    19   specification, correct?

09:43    20       A.    As an acronym?  Are you saying --

09:43    21       Q.    LVDS.

09:43    22       A.    -- as an acronym?

09:43    23       Q.    Yes.

09:43    24       A.    Does not appear.

         25       Q.    Does not appear.

09:43  1          A.     As an acronym, yes.

09:43  2          Q.     Low voltage, those words.  Now, in the

09:43  3    computer world, if I've understood everybody's

09:43  4    testimony correctly, low voltage is a good thing,

09:43  5    right?

09:43  6          A.     In some cases.

09:43  7          Q.     Because if you have low voltage, you're going

09:43  8    to use less power; your battery won't drain as fast,

09:43  9    right?

09:43  10         A.     Yes.

09:43  11         Q.     Now, if I'm putting out a specification and I

09:43  12   want others in the computer industry to adopt my

09:43  13   specification like Mr. Bhatt was doing, it would

09:43  14   probably make sense to advertise that, hey, I think my

09:44  15   technology is going to use some low voltage, right?

09:44  16         A.     Yes.

09:44  17         Q.     Let's take it out of the computer context so

09:44  18   that folks like me can understand this a little better.

09:44  19                You ever been to a used car lot?

09:44  20         A.     Yeah.  Maybe once.

09:44  21         Q.     Just once?

09:44  22         A.     To what -- what did you say again?

09:44  23         Q.     A used car lot, where you buy a used car, you

09:44  24   ever been to one?

09:44  25         A.     Actually, yeah.  Only once.

1047

09:44    1          Q.    Wow.  Congratulations.  I've spent a lot of

09:44    2    time on used car lots myself.

09:44    3          A.    I use the car for forever, the same car.

09:44    4          Q.    So I'll help you out.  If you go to a used car

09:44    5    lot more frequently, you'll oftentimes find a car with

09:44    6    the windshield and it says "low price" written in big

09:44    7    letters.

09:44    8                You ever seen anything like that?

09:44    9          A.    Yes.  Yes.

09:44   10          Q.    Now, the car dealer, the used car dealer,

09:44   11    thinks he has a low price on his car.  He's advertising

09:44   12    a low price.

09:44   13                Are you with me?

09:44   14          A.    Yes.

09:44   15          Q.    Does that mean when I go onto that car lot,

09:44   16    that I'm going to agree with him that it's a low price,

09:45   17    or might it be possible that when he tells me what he's

09:45   18    offering the car for, I actually think that's a high

09:45   19    price?

09:45   20          A.    Yes.  In this case, yeah.  I may not agree,

09:45   21    but here we're talking about something different.

09:45   22          Q.    It's just talking what we all know about.

09:45   23    Okay?

09:45   24                "Low" is a relative term, correct?

09:45   25          A.    Yes.

09:45    1          Q.    If we say we have a record low temperature in

09:45    2    Waco, it's going to be a different thing than if we say

09:45    3    a record low temperature in Alaska, right?

09:45    4          A.    Yes.  In this case, yes.

09:45    5          Q.    Because it's relative.  And both use the word

09:45    6    "low," correct?

09:45    7          A.    Yes.

09:45    8          Q.    Now, in the case of my used car dealer, if I

09:45    9    want to know whether it's really a low price, is there

09:45   10    anything I can check to figure out whether it's a low

09:45   11    price or not?

09:45   12          A.    You ask for the price.

09:45   13          Q.    Well, what the dealer wants.  But then I can

09:45   14    go check something -- you ever hear of a Kelley Blue

09:46   15    Book?

09:46   16          A.    Yes.

09:46   17          Q.    It's kind of a standard, isn't it?

09:46   18          A.    Yeah.  It seems so.

09:46   19          Q.    It's an objective indicator of what the value

09:46   20    of that used car really should be, the Kelley Blue

09:46   21    Book?

09:46   22          A.    Yes.

09:46   23          Q.    Okay.  So if I can see "low price" on the

09:46   24    windshield, I don't have to accept that.  I can look at

09:46   25    the Kelley Blue Book, and then I can make a judgment

—1049—

09:46   1    whether it's low or not?

09:46   2        A.   Yeah.  Seems so.  I never used that book, but

09:46   3    I haven't bought it.

09:46   4                    MR. BURESH:  If we could pull up

09:46   5    Defendant's Exhibit 950.

09:46   6    BY MR. BURESH:

09:46   7        Q.   You've seen this a few times now, correct?

09:46   8        A.   Yes.  And before even.

        9        Q.   What?

09:46  10        A.   And before even.

09:46  11        Q.   Okay.  This is the spring 1997 LVDS owner's

09:46  12    manual from National Semiconductor, correct?

09:46  13        A.   Yes.

09:47  14                    MR. BURESH:  Could you take me to the

09:47  15    part that I want to go to?

09:47  16                    Thank you.

09:47  17    BY MR. BURESH:

09:47  18        Q.   What page is this?  Page No. 4 of the LVDS

09:47  19    owner's manual.  Okay?

09:47  20             Are you with me?

09:47  21        A.   Yes.

09:47  22        Q.   Now, in this LVDS owner's manual, there's a

09:47  23    LVDS standard listed.  Okay?  ANSI/TIA/EIA-644.

09:47  24             Now, here in this chart, we see some voltages

09:47  25    being discussed, a differential output voltage of 247

09:47  1   to 454 millivolts.

09:47  2          Do you see that?

09:47  3      A.   Yes.

09:47  4      Q.   Now, that gives us something to figure out

09:47  5   whether we have low voltage or not, doesn't it?  That

09:47  6   gives us a standard.  That's the Kelley Blue Book.

09:47  7      A.   I disagree.  This is a -- like this is a

09:48  8   standard for the specific type of LVDS technology.  So

09:48  9   I --

09:48  10     Q.   Yeah.  The LVDS is being discussed in the LVDS

09:48  11  owner's manual.

09:48  12     A.   Like, I -- when you mentioned the Kelley book,

09:48  13  there was only one book, right?  But here we're talking

09:48  14  about different standards.  This is --

09:48  15     Q.   Let me just ask it this way:  PCI Express, I

09:48  16  believe you've testified it runs at a voltage of --

09:48  17  like on average, 1 volt?

09:48  18     A.   Yeah.  I didn't even like the average.  It's

09:48  19  between .8 to 1.2 volt.  Peak to peak.

09:48  20     Q.   Are you done?

09:48  21     A.   Yes.  I'm sorry.

09:48  22     Q.   Me too.  Didn't mean to interrupt you.

09:48  23     A.   Yeah.

09:48  24     Q.   Now, I'm not what I would consider a

09:48  25  mathematics person, but I'm pretty confident that if

−1051−

09:48    1    we're running up around 1 volt, that's higher than

09:48    2    what's being described here in the LVDS owner's manual,

09:48    3    correct?

09:48    4        A.    But there's one mathematical thing I must --

09:48    5        Q.    I'm just asking yes or no, is 1 higher than

09:48    6    what we're seeing in this standard?

09:48    7        A.    They're not the same things.  You are

09:49    8    comparing different stuff.  So I cannot answer this

09:49    9    way.

09:49    10       Q.    You understand --

         11            (Simultaneous conversation.)

         12    BY MR. BURESH:

09:49    13       Q.    -- what the LVDS standard is for voltage,

09:49    14    correct?

09:49    15       A.    Perfectly.

09:49    16       Q.    Is it lower than what is run on PCI Express,

09:49    17    yes or no?

09:49    18       A.    But --

09:49    19       Q.    Yes or no?

09:49    20       A.    See, I'm under oath.  So I have to -- don't

09:49    21    want to be misleading to the jury.  So -- because you

09:49    22    are comparing two things that are different.  So if you

09:49    23    allow me just --

09:49    24            THE COURT:  You need to answer his

09:49    25    question.  Ask him to rephrase it or just the tell the

09:49  1    jury you can't answer his question.  He gets to ask you

09:49  2    questions, and the jury is entitled to hear an answer

09:49  3    to his question.

09:49  4                    THE WITNESS:  Thank you.

09:49  5    BY MR. BURESH:

09:49  6        Q.    You know the voltage level that LVDS is

09:49  7    described by National runs at, do you not?

09:49  8        A.    Yes.

09:49  9        Q.    And that voltage level is lower than PCI

09:49  10   Express voltage, correct?

09:49  11       A.    It will be a bit lower but for a different

09:49  12   reason.

09:49  13       Q.    It will be lower?

09:49  14       A.    A bit lower.  Right.

09:50  15       Q.    Now, we heard Dr. Bhatt talk about a big pipe

09:50  16   versus a small pipe, correct?

09:50  17       A.    Yeah.

09:50  18       Q.    Now, if you have a big pipe, let's think water

09:50  19   pressure.  You got to pump more water through that pipe

09:50  20   to keep the water flowing, right?

09:50  21       A.    Yes.

09:50  22       Q.    And if you have a big pipe like PCI Express,

09:50  23   you got to pump more voltage through it to keep it

09:50  24   flowing too, correct?

09:50  25       A.    Sort of.  Like voltage, I cannot view the

—1053—

09:50  1    voltage as current.  But as a whole -- like, generally,

09:50  2    as an approximation, like, okay.  But, like, what do we

09:50  3    actually pump is actually current, not voltage.  So

09:50  4    this is why.

09:50  5         Q.    Okay.  Well --

09:50  6         A.    I'm sorry.

09:50  7         Q.    Yeah.  Voltage and current are related, aren't

09:50  8    they?

09:50  9         A.    Yes.  But different.

09:50  10        Q.    So when someone uses the word "low voltage,"

09:50  11   it might mean one thing in one context, and it might

09:50  12   mean something completely different in another context,

09:50  13   correct, just like a temperature?

09:51  14        A.    It depends which context.  Are we talking

09:51  15   about -- like, there are so many different context.  So

09:51  16   I cannot really answer this question.  If you define

09:51  17   exactly the context, I'll be able to help you.

09:51  18        Q.    I think we're -- I think we're good.

09:51  19             MR. BURESH:  Okay.  Next slide, please.

09:51  20   5.

09:51  21   BY MR. BURESH:

09:51  22        Q.    Now, by my count, Dr. Sarhan, you pulled this

09:51  23   slide up, and you started talking about what was going

09:51  24   on inside of Box 825, whether there was a PCI local bus

09:51  25   there or not, right?

1054

09:51  1    A.    Yes.

09:51  2    Q.    And I started the timer on my watch.  You

09:51  3  testified about what was going on in that box for

09:51  4  nearly eight minutes, right?

09:52  5    A.    I didn't count.  Maybe.

09:52  6    Q.    I did.  It was nearly eight minutes.

09:52  7    A.    I trust you.

09:52  8    Q.    Now, in the patent, the only description of

09:52  9  what's going on inside that box is what we see on this

09:52  10  page, the caption to this one figure, right?

09:52  11    A.    There's one -- like, of course, like, they

09:52  12  mention the figures, and there's, like, the --

09:52  13  specified what the figure is at a high level.

09:52  14    Q.    The caption?

09:52  15    A.    Yeah.

09:52  16    Q.    And this caption is the only thing you're

09:52  17  going to find in the patents describing this figure and

09:52  18  what's going on inside of Box 825, correct?

09:52  19    A.    There is -- also in the same patent, there are

09:52  20  references to different levels of integration,

09:52  21  integration of the CPU with the front elements.

09:52  22    Q.    I'm just asking about this figure that you've

09:52  23  put in front of the jury, the only description of it is

09:52  24  the caption, correct?

09:52  25    A.    Yes.

09:52  1      Q.    And the rest of your testimony is you playing

09:53  2   fill in the blank, right?

09:53  3      A.    I wouldn't say "fill in the blank."

09:53  4                  MR. BURESH:  Let's go to the next slide,

09:53  5   Slide 6.

09:53  6   BY MR. BURESH:

09:53  7      Q.    You've shown the jury the construction for

09:53  8   the -- the Court's construction for the term "console,"

09:53  9   right?

09:53  10     A.    Yes.

09:53  11     Q.    And this is the first time you showed it to

09:53  12  the jury.  Because the last time you testified for two

09:53  13  hours, you didn't show it to the jury, right?

09:53  14     A.    I -- you mean during the presentation?

09:53  15     Q.    Your testimony.  Yes.  During your testimony.

09:53  16     A.    Yes.

09:53  17     Q.    Okay.  Now, I think you talked about a printer

09:53  18  today?

09:53  19     A.    Yes.

09:53  20     Q.    Let me see if I can do it this way.  I'm going

09:53  21  to give you two options, all right, and I want you to

09:53  22  tell us which one sounds more normal, okay?

09:53  23     A.    Okay.

09:53  24     Q.    I have a printer and I'm going to connect my

09:53  25  printer to my computer, okay.  That's Option No. 1.  Or

—1056—

09:54  1    Option No. 2, I have a printer and I'm using my printer

09:54  2    to connect my computer system together.

09:54  3              Which of those sounds more normal?

09:54  4        A.    Say it again.

09:54  5        Q.    Sure.

09:54  6              Your first option is:  I connect my printer to

09:54  7    the computer.

09:54  8              Does that sound more or less normal than I

09:54  9    connect my printer -- or I use my printer to connect my

09:54  10   computer system together?  Which of those sounds more

09:54  11   normal?

09:54  12       A.    In these sentences, the way you said them,

09:54  13   yeah.  The first one is more normal.

09:54  14       Q.    Because a printer is a peripheral device,

09:54  15   right?

09:54  16       A.    A printer, yes.

09:54  17       Q.    And peripheral devices connect to a computer,

09:54  18   correct?

09:54  19       A.    Yes.

09:54  20       Q.    Software compatibility, I believe you

09:55  21   testified that software compatibility was basically

09:55  22   what you are relying on to show backwards compatibility

09:55  23   between PCI Express and PCI local bus?

09:55  24       A.    Yes.

09:55  25       Q.    Correct.

—1057—

09:55  1          MR. BURESH:  Now, could we pull up Day 1

09:55  2    transcript?

09:55  3          Let me go to Page 139, starting at

09:55  4    Line 7.

       5    BY MR. BURESH:

09:55  6    Q.    And this is from the testimony of Dr. Chu.

09:55  7    A.    Whose testimony?  Dr. Chu?

09:55  8    Q.    Dr. Chu.

09:55  9    A.    Okay.  I just didn't hear.

09:55  10   Q.    Okay.  So starting at Line 10, we're talking

09:55  11   about the software here.

09:55  12         And he said:  Like in the laptop computer, we

09:55  13   do not include the display as part of the invention

09:55  14   because our invention relates to the computer itself.

09:56  15         Do you see that?

09:56  16   A.    Yes.

09:56  17   Q.    What about software?

09:56  18         Oh, no.  No software.

09:56  19         Okay.  No software.

09:56  20         Do you agree that software isn't part of this

09:56  21   invention at all?

09:56  22   A.    Can you be more specific, please?

09:56  23   Q.    Do you agree with Dr. Chu that software is not

09:56  24   part of his invention?

09:56  25   A.    He's talking about something different.

—1058—

09:56  1      Q.    Just asking a simple question.

09:56  2            Do you agree with Dr. Chu that software is not

09:56  3    part of his invention?

09:56  4      A.    Yes.  In this context, I agree.

09:56  5            MR. BURESH:  Let's go to Day 3.

09:56  6            And then go to Page 764, Lines 5

09:56  7    through 16, please.

       8    BY MR. BURESH:

09:56  9      Q.    Now, this is from the testimony of Mr. Bhatt.

09:56  10   Were you here yesterday for that?

09:56  11     A.    Yes.

09:56  12     Q.    He was asked a question:  Does software

09:56  13   compatibility mean that there is a PCI local bus

09:57  14   transaction in this PCI Express architecture?

09:57  15           Do you recall his answer?

09:57  16     A.    Yes.

09:57  17     Q.    It was no, correct?

09:57  18     A.    Uh-huh.

09:57  19     Q.    Now, he was asked:  Does the software

09:57  20   compatibility have anything to do at all with the type

09:57  21   of transaction that's being created in the system?

09:57  22           Do you recall his answer to that question?

09:57  23     A.    Yes.

09:57  24     Q.    Software doesn't know transactions, right?

09:57  25   Correct?

09:57  1        A.    So what's your question?

09:57  2        Q.    Software doesn't know anything about the

09:57  3   transactions that are being communicated; isn't that

09:57  4   correct?

09:57  5        A.    It's -- it initiates the transactions.

09:57  6        Q.    It makes a request, but the software doesn't

09:57  7   know anything about the transactions or the types that

09:57  8   are being communicated; isn't that correct?

09:58  9        A.    I don't agree entirely with this.  Based on

09:58  10  what you actually mentioned, it's a bit different.

09:58  11       Q.    Okay.  Let me be -- just really nail it down

09:58  12  here.

09:58  13             Software compatibility doesn't have anything

09:58  14  to do with the type of transaction that's being created

09:58  15  in the system; isn't that correct?

09:58  16       A.    So you ask me the same question for him --

09:58  17  that he was asked, is this -- I just want to

09:58  18  understand, like, what you want me to answer.

09:58  19             Can you just clarify?

09:58  20       Q.    Sure.

09:58  21             Software compatibility does not have anything

09:58  22  to do at all with the type of transaction that's being

09:58  23  created in the system.

09:58  24             Do you agree with that?

09:58  25       A.    It's -- it could be misleading in some cases.

| | | |
|---|---|---|
| 09:58 | 1 | Like, to answer at a high level, I would agree, but |
| 09:59 | 2 | there's some detail. |
| 09:59 | 3 | Q.    So you agree with Mr. Bhatt? |
| 09:59 | 4 | A.    At high level. |
| 09:59 | 5 | Q.    At a high level, you agree with Mr. Bhatt? |
| 09:59 | 6 | A.    Based on, like, what is intended -- |
| 09:59 | 7 | Q.    Yes or no, at a high level, you agree with |
| 09:59 | 8 | Mr. Bhatt? |
| 09:59 | 9 | A.    At high level, I agree. |
| 09:59 | 10 | Q.    Do you agree that software doesn't know |
| 09:59 | 11 | transactions at all? |
| 09:59 | 12 | A.    Not exactly. |
| 09:59 | 13 | Q.    So you disagree with Mr. Bhatt? |
| 09:59 | 14 | A.    In what he -- in this statement, if, like, you |
| 09:59 | 15 | take it literally like this, I disagree with him.  But |
| 09:59 | 16 | generally, like, I know what he intended, and I would |
| 09:59 | 17 | agree with what he intended.  But not -- |
| 09:59 | 18 | MR. BURESH:  Your Honor, I call to strike |
| 09:59 | 19 | that last answer. |
| 09:59 | 20 | THE COURT:  It'll be granted. |
| 09:59 | 21 | BY MR. BURESH: |
| 09:59 | 22 | Q.    Now, you -- at the time Mr. Bhatt was creating |
| 09:59 | 23 | PCI Express and creating how it interacts with the |
| 09:59 | 24 | software, going back to the start, you were still a |
| 09:59 | 25 | student at that time, correct? |

09:59  1        A.    I was a Ph.D. student.  Right.

10:00  2        Q.    You didn't have anything to do with this.  We

10:00  3   have heard from the person that actually created the

10:00  4   technology, and you're here to disagree with him,

10:00  5   right?

10:00  6        A.    I didn't say this.

10:00  7        Q.    What are you -- I asked Mr. Bhatt while he was

10:00  8   on the stand.  What are you getting paid for this case?

10:00  9        A.    Say it again.

10:00  10       Q.    What are you getting paid for this case?

10:00  11       A.    My salary?

10:00  12       Q.    Yes.

10:00  13       A.    350 -- 375 per hour, but it changes based on

10:00  14  the...

10:00  15       Q.    And you've been working with Dr. Chu for some

10:00  16  time now.  This isn't the only case, right?

10:00  17       A.    There's another case that I'm involved with --

       18                  (Simultaneous speakers.)

10:00  19  BY MR. BURESH:

10:00  20       Q.    So how much -- how much money have you made

10:00  21  doing this for Mr. Chu -- or Dr. Chu?

10:00  22       A.    How much money, like, in all the cases?

10:00  23       Q.    Yeah.  How much money have you been paid by

10:00  24  ACQIS or Dr. Chu?

10:00  25       A.    Yeah.  I don't know the exact number.

1062

| | | |
|---|---|---|
| 10:00 | 1 | Are you referring to this case or all cases |
| 10:00 | 2 | that I work on since two years -- |
| 10:00 | 3 | Q.   Do you know what ACQIS is? |
| 10:00 | 4 | A.   ACQIS -- say it again. |
| 10:01 | 5 | Q.   ACQIS, do you know what ACQIS is? |
| 10:01 | 6 | A.   Yes. |
| 10:01 | 7 | Q.   Have you been engaged by them? |
| 10:01 | 8 | A.   Yeah. |
| 10:01 | 9 | Q.   Okay.  How much money have you made as part of |
| 10:01 | 10 | that engagement? |
| 10:01 | 11 | A.   I don't know exactly.  Could be, like, maybe |
| 10:01 | 12 | more than 200,000 over -- |
| 10:01 | 13 | Q.   How high could it go? |
| 10:01 | 14 | A.   -- over the two years and something I work -- |
| 10:01 | 15 | Q.   How high could it go?  Are you giving me a low |
| 10:01 | 16 | ball, a low price like on a used car lot, or is that |
| 10:01 | 17 | accurate? |
| 10:01 | 18 | A.   I wouldn't do that.  So I never did that |
| 10:01 | 19 | calculation, but... |
| 10:01 | 20 | Q.   So you don't know how much money you've made? |
| 10:01 | 21 | A.   I never did the calculation. |
| 10:01 | 22 | Q.   It's not really a calculation.  It's just |
| 10:01 | 23 | what's in your bank account. |
| 10:01 | 24 | Do you know how much money you've made? |
| 10:01 | 25 | A.   Like, from the -- all these cases combined, |

1063

10:01  1   like, I never did the aggregation.  It could be, like,

10:01  2   around maybe, total, like, 300,000 probably, but I

10:01  3   don't know, like, exactly.

10:01  4       Q.   So a minute ago it was 200, now it's 300?

10:01  5       A.   So I said more than 200.  But it could be --

10:01  6   like, it could be up to 300,000, but I don't know the

10:02  7   exact number.

10:02  8       Q.   Okay.

10:02  9            MR. BURESH:  Your Honor, I pass this

10:02  10  witness.

10:02  11                REDIRECT EXAMINATION

10:02  12  BY MR. HALES:

10:02  13      Q.   Dr. Sarhan, have you provided any false

10:02  14  opinions in the interest of making more money?

10:02  15      A.   Of course not.  I would never do this.

10:02  16      Q.   You were having some trouble comparing the

10:02  17  voltage amounts in LVDS to the voltage amounts in PCI

10:02  18  Express.  You weren't given an opportunity to say why.

10:02  19           Would you like to say why?

10:02  20      A.   Yeah.  So the -- is it possible to have the

10:02  21  same slide again?

10:02  22      Q.   I don't know that we can, but I wrote down the

10:02  23  voltage amounts.  On the one hand, we had about 250

10:02  24  millivolts on the minimum.  And on the maximum, we had

10:02  25  about 450.

1    A.    Yes.

10:02    2    Q.    What would you have done with these numbers to

10:02    3    make it a fair comparison?

10:02    4    A.    So the -- this is why, like, I was hesitant,

10:02    5    like, to answer the way it was because it would be very

10:02    6    misleading to the jury.

10:02    7         The number that he showed is called VOD,

10:03    8    right?  So the number I showed the jury on Monday is

10:03    9    called peak-to-peak voltage, if you want to write it

10    down, peak-to-peak.

10:03    11         What does it mean?  What's the difference

10:03    12    between VOD and the peak-to-peak voltage?

10:03    13    Q.    I wish I would have asked that question.  Will

10:03    14    you tell us?

10:03    15    A.    Yes.  It's actually -- the peak-to-peak is

10:03    16    double the VOD.  So here, like, if we have, let's say,

10:03    17    up to .5, the .5 becomes what?  Becomes 1.

10:03    18         So if we do the comparison, we can't compare

10:03    19    VOD with the volt -- the peak-to-peak differential

10:03    20    output voltage.  It's not a fair comparison.

10:03    21    Q.    So if we double the minimum of 250 to 500 and

10:03    22    the maximum of 450 to 900, is that pretty close to PCI

10:03    23    Express?

10:03    24    A.    Yes.

10:03    25    Q.    Would they both be considered low voltage

1065

| | | |
|---|---|---|
| 10:03 | 1 | technologies? |
| 10:03 | 2 | A.    Yes. |
| 10:03 | 3 | Q.    Can there be more than one low voltage |
| 10:03 | 4 | differential signaling technology? |
| 10:03 | 5 | A.    Can there be -- |
| 10:03 | 6 | Q.    Can there be more than one type of low voltage |
| 10:03 | 7 | differential signaling? |
| 10:03 | 8 | A.    Definitely. |
| 10:03 | 9 | Q.    Okay.  We saw testimony from Dr. Chu put on |
| 10:04 | 10 | the screen where he said:  I exclude displays.  I |
| 10:04 | 11 | exclude software. |
| 10:04 | 12 | You talked about the context. |
| 10:04 | 13 | In what context did Dr. Chu deliver this |
| 10:04 | 14 | testimony? |
| 10:04 | 15 | A.    So he's talking about damages, I believe. |
| 10:04 | 16 | Like, he was talking about damages.  I'm not an expert |
| 10:04 | 17 | on damages, but this is a total different context. |
| 10:04 | 18 | Q.    But you did consult with Mr. Lewis and tell |
| 10:04 | 19 | him, hey.  You need to take the following things out of |
| 10:04 | 20 | your damages analysis, right? |
| 10:04 | 21 | A.    Yes. |
| 10:04 | 22 | Q.    Did you tell him, take the operating software |
| 10:04 | 23 | out of this analysis? |
| 10:04 | 24 | A.    Yeah.  Just like -- no.  I wouldn't tell him |
| 10:04 | 25 | that.  I -- like, he asked me question -- Mr. Lewis |

10:04  1   asked me certain questions.  I mean, I'm not an expert

10:04  2   on damages.  So he asked me, like, how -- like, what

10:04  3   are these tech names about?  What do they include?

10:04  4   Could this work with this?  Do we have everything

10:04  5   together, et cetera?

10:04  6            So I was answering technical questions that

10:04  7   helped him reach his conclusion.

10:04  8       Q.   Okay.  Do you agree, though, that these

10:04  9   patents don't reach display technology -- or rather,

10:05  10  I'll say the displays themselves?

10:05  11      A.   Yes.

10:05  12      Q.   Okay.  Do you agree that -- well, I guess you

10:05  13  said you don't know damages then.  So I won't make you

10:05  14  speculate.

10:05  15           Let me ask you this:  Dr. Chu said that

10:05  16  software doesn't know transactions, and you were having

10:05  17  trouble fully agreeing or disagreeing with that

10:05  18  statement.

10:05  19           Do you remember talking about that?

       20      A.   Yes.

10:05  21      Q.   Can you explain to the jury why you're having

10:05  22  a little bit of trouble kind of landing there?

10:05  23      A.   Yes.  So here -- thank you for this

10:05  24  opportunity.

10:05  25           The -- basically we will talk about the CPU.

1067

| | | |
|---|---|---|
| 10:05 | 1 | Again, we said PCI Express employs a PCI compatible |
| 10:05 | 2 | software model.  I'm not saying this.  This is in the |
| 10:05 | 3 | standards itself. |
| 10:05 | 4 | So PCI Express employs a PCI compatible |
| 10:05 | 5 | software model. |
| 10:05 | 6 | Q.    And why is that relevant, if at all, to |
| 10:05 | 7 | infringement in this case? |
| 10:05 | 8 | A.    Because it's actually the software that |
| 10:05 | 9 | generates transactions.  The software that initiates -- |
| 10:06 | 10 | to be more specific, it's the software that initiates |
| 10:06 | 11 | transactions. |
| 10:06 | 12 | For example, if we have the memory write |
| 10:06 | 13 | request, this would actually be writing to a certain |
| 10:06 | 14 | device.  So the CPU knows this is actually right. |
| 10:06 | 15 | So say like the CPU does not know at all about |
| 10:06 | 16 | the type of transaction, this is not really correct. |
| 10:06 | 17 | And I teach computer architecture.  This is a course I |
| 10:06 | 18 | have been teaching for over 20 years. |
| 10:06 | 19 | I have -- I teach the students how the CPU is |
| 10:06 | 20 | designed and what does it do, and I work in committee |
| 10:06 | 21 | with software and hardware.  So this is -- I spend a |
| 10:06 | 22 | lot of time on this, and I know what I'm talking about. |
| 10:06 | 23 | Q.    I'm trying to find an analogy that might help |
| 10:06 | 24 | the jury.  Tell me if I've landed in the right spot. |
| 10:06 | 25 | I'm not a technical expert. |

—1068—

10:06  1              Is it kind of like firing off an e-mail?  I
10:06  2    know that I've sent it, but I don't know how it gets to
10:06  3    its destination?
10:06  4        A.    That's right.  Because you are the one who
10:06  5    actually wrote, like, you know, like, the e-mail.  And
10:06  6    then you know, like, it's going to be sent somewhere,
10:06  7    but you do not know exactly how.
10:06  8        Q.    Would it be accurate to say that the CPU knows
10:06  9    it's using the software of a compatible PCI software
10:06  10   suite to generate the address and data, but then it
10:07  11   doesn't keep an eye on it after it sends it on?
10:07  12       A.    The CPU is executing PCI compatible software.
10:07  13       Q.    Okay.
10:07  14       A.    So this is what the CPU is actually doing.
10:07  15   When the CPU needs a memory write transaction, this is
10:07  16   actually a memory write.  But the CPU, like, is not,
10:07  17   like, as a human being will have this intelligence to
10:07  18   know, wow, this is intended to be, like, whatever.
10:07  19   Like, the CPU does not have that knowledge.
10:07  20              MR. HALES:  Okay.  That's all I have,
10:07  21   Your Honor.
10:07  22              MR. BURESH:  Nothing further, Your Honor.
10:07  23              THE COURT:  You may step down, sir.
10:07  24              THE WITNESS:  Thank you.
10:07  25              THE COURT:  Next witness, please.

10:07  1           MR. COLLARD:  Your Honor, plaintiffs call

10:07  2   Dr. Chu.

10:07  3                   DIRECT EXAMINATION

10:07  4   BY MR. COLLARD:

10:07  5       Q.    Good morning, Dr. Chu.

10:08  6       A.    Good morning.

10:08  7       Q.    Good to talk to you again.

10:08  8       A.    Yes.

10:08  9       Q.    I want to talk to you about some of the things

10:08  10  that came up while the defendants put on their case.

10:08  11           Would that be okay?

10:08  12      A.    Yeah.  Uh-huh.

10:08  13      Q.    I want to go back.  In the '80s and in the

10:08  14  '90s, you were working in the computer industry, right?

10:08  15      A.    Yes.  Uh-huh.

10:08  16      Q.    Did you hear Mr. Bhatt and Dr. Edwards talk

10:08  17  about the progression of some very old bus standards to

10:08  18  what was current in the '90s, they talked about ISA or

10:08  19  ISA bus, and they talked about USB 1 and 2 and the PCI

10:08  20  local bus.

10:08  21           Did you hear their testimony about that?

10:08  22      A.    Yes.  Uh-huh.

10:08  23      Q.    Were you, as a part of your work, following

10:08  24  along and paying attention to those bus technologies in

10:08  25  the '80s and '90s?

10:09  1      A.    Yes.  Because the graphics chips I was

10:09  2  developing are using those buses.

10:09  3      Q.    Okay.  So as a part of your work leading those

10:09  4  engineering teams of hundreds of engineers, did you

10:09  5  have to understand those older buses?

10:09  6      A.    Yes.

10:09  7      Q.    Were those standards -- those bus standards

10:09  8  were in wide use.  Did you, as a part of your role

10:09  9  leading those teams, did you have to think about how

10:09  10  those buses work and how they might be limited in some

10:09  11  ways?

10:09  12      A.    Yes.

10:09  13      Q.    What sort of problems or issues with those

10:09  14  buses and how they worked, did those create limitations

10:09  15  for trying to work on creating and improving computers?

10:09  16      A.    Yes.

10:09  17      Q.    Can you please describe the kind of

10:09  18  limitations that you were observing in the '80s and

10:09  19  '90s while you were working with those buses?

10:10  20      A.    As Mr. Bhatt was saying, they are reaching

10:10  21  their limit in terms of performance.  So if you don't

10:10  22  try to change it, your computer cannot go faster.

10:10  23      Q.    And do you feel like -- how -- how would you

10:10  24  compare the problems you saw with the problems that

10:10  25  Mr. Bhatt described?

1071

10:10  1       A.    I think I saw it earlier.

10:10  2       Q.    Did you see similar problems?

10:10  3       A.    Yeah.  Performance problems.  Yes.

10:10  4       Q.    How would you compare the solutions that you

10:10  5    proposed for those problems to the solutions that

10:10  6    Mr. Bhatt thought of and proposed for those problems?

10:10  7       A.    My solution, especially in my invention, was

10:10  8    that I decided to use unidirectional low voltage

10:10  9    differential signal to improve the performance.

10:11  10      Q.    How would you compare that to the solution

10:11  11   that Mr. Bhatt was trying to come up with at the same

10:11  12   time?

10:11  13      A.    Well, three years -- almost over three years

10:11  14   later, the PCI development group, these hundreds of

10:11  15   engineer, announced a standard and said they're using

10:11  16   the same technology.

10:11  17      Q.    I want to reframe just a little bit.

10:11  18            Were -- when you were working on this problem,

10:11  19   were you doing the same thing Mr. Bhatt was doing in

10:11  20   trying to propose and get a group together to create a

10:11  21   new industry standard?

10:11  22      A.    We're a tiny company.  Nobody will listen to

10:11  23   me.

10:11  24      Q.    I want to -- thank you.  I want to go to the

10:11  25   timing.

—1072—

```
10:11   1            And you heard him testify that he met with the
10:12   2   Intel CEO -- he was very explicit about this -- and
10:12   3   told him about his idea in December 2000, right?
10:12   4       A.    Yes.  Uh-huh.
10:12   5       Q.    When did you write down your ideas about how
10:12   6   to improve the PCI local bus technology with a new bus?
10:12   7       A.    Well, as the jury has heard, I wrote my
10:12   8   invention on the first -- in the first two weeks of
10:12   9   1998.
10:12  10       Q.    Do the ideas in your patents that we've been
10:12  11   looking at -- got one there; got one here -- do those
10:12  12   ideas in the claims of the patents, do they relate back
10:12  13   to -- do they relate back and date back to those white
10:12  14   papers that you wrote in January of 1998, almost three
10:12  15   years before Mr. Bhatt's meeting?
10:12  16       A.    Yes.  As I mentioned, the computer bus I was
10:12  17   trying to do was using this unidirectional low voltage
10:13  18   differential signal channel to send PCI and USB data
10:13  19   and stuff.
10:13  20       Q.    Thank you, Dr. Chu.
10:13  21            Do you claim -- have you ever claimed, do you
10:13  22   claim in this case, that your ideas cover everything in
10:13  23   the PCI Express standards?
10:13  24       A.    No.  It covers the most important parts, but
10:13  25   the standards, it's a huge standard.  I'm only talking
```

1073

| | | |
|---|---|---|
| 10:13 | 1 | about how to send the data and address. |
| 10:13 | 2 | Q.    Were you -- well, I think we already said |
| 10:13 | 3 | that.  You weren't trying to write an industry |
| 10:13 | 4 | standard, were you, sir? |
| 10:13 | 5 | A.    No.  I couldn't. |
| 10:13 | 6 | Q.    What about for USB?  Same thing?  Do your -- |
| 10:13 | 7 | do you claim that your ideas cover everything in the |
| 10:13 | 8 | USB 3.0 industry standard? |
| 10:13 | 9 | A.    No.  No. |
| 10:13 | 10 | Q.    What -- I just want to be clear for the jury. |
| 10:14 | 11 | What parts of those standards and the products |
| 10:14 | 12 | that use them, like ASUS' products, what parts do your |
| 10:14 | 13 | patents cover? |
| 10:14 | 14 | A.    I think it's one of the most fundamental part. |
| 10:14 | 15 | Without using the unidirectional low voltage |
| 10:14 | 16 | differential signal technology, those standards would |
| 10:14 | 17 | not work because it is because of that that they have |
| 10:14 | 18 | increased performance, just as I was trying to do. |
| 10:14 | 19 | Q.    Thank you, Dr. Chu. |
| 10:14 | 20 | I'm going to change gears just a little bit. |
| 10:14 | 21 | Your white papers you used to create patent |
| 10:14 | 22 | applications.  We talked about that on Monday. |
| 10:14 | 23 | A.    Yes. |
| 10:14 | 24 | Q.    Were your patent applications public? |
| 10:14 | 25 | A.    Yes.  After -- I think after a year or |

—1074—

10:14    1    something, the --

10:14    2      Q.    They publish?

10:14    3      A.    Yeah.   They publish.

10:14    4      Q.    Okay.   And when you get a patent, is the --

10:15    5    the patent's public of course, right?

10:15    6      A.    Yes.

10:15    7      Q.    Did ACQIS get a patent that -- not the ones in

10:15    8    this case, but did ACQIS get a patent that referenced

10:15    9    the public applications that were also available from

10:15   10    the Patent Office?

10:15   11      A.    Actually, most of the description of my

10:15   12    invention, the computer bus, the mother computer, they

10:15   13    were all introduced as information in the early patent.

10:15   14      Q.    So when was that first patent issued to ACQIS

10:15   15    that would have been public and would have contained a

10:15   16    lot of that information and would have mentioned the

10:15   17    patent applications?

10:15   18      A.    My first patent was issued in 2001.

10:15   19      Q.    2001?

10:15   20      A.    Yes.

10:15   21      Q.    And that was public.

10:15   22      Did anyone at Intel or anyone involved with

10:16   23    PCI Express or USB 3 ever reach out to you to see if

10:16   24    they could have permission to use some parts of your

10:16   25    invention when they updated the industry standard?

—1075—

| | | |
|---|---|---|
| 10:16 | 1 | A.    No. |
| 10:16 | 2 | Q.    Did you get invited to that Arapahoe group |
| 10:16 | 3 | that was the very first group that was going to talk |
| 10:16 | 4 | about the PCI Express, you know, the -- I think it was |
| 10:16 | 5 | then called 3GIO.  But whatever that new idea was, did |
| 10:16 | 6 | you get invited to that? |
| 10:16 | 7 | A.    We're a tiny company.  They won't invite us. |
| 10:16 | 8 | No. |
| 10:16 | 9 | Q.    But had you actually met Mr. Bhatt in the |
| 10:16 | 10 | '90s? |
| 10:16 | 11 | A.    I did meet him when I was at Cirrus Logic. |
| 10:16 | 12 | Yeah. |
| 10:16 | 13 | Q.    Did you hear anything during Mr. Bhatt's |
| 10:16 | 14 | testimony about a step in their process somewhere |
| 10:16 | 15 | towards the beginning where, before they started |
| 10:16 | 16 | building their standard, they did something to make |
| 10:16 | 17 | sure that the landscape was clear of any patents that |
| 10:17 | 18 | might be relevant to what they wanted to do? |
| 10:17 | 19 | A.    I don't think they do, but... |
| 10:17 | 20 | Q.    You didn't hear any testimony about that? |
| 10:17 | 21 | A.    No. |
| 10:17 | 22 | Q.    And nobody asked you? |
| 10:17 | 23 | A.    Nobody asked me about my patent.  No. |
| 10:17 | 24 | Q.    And did you hear Mr. Bhatt -- he talked a |
| 10:17 | 25 | little bit about patents.  He has a lot of patents. |

| | | |
|---|---|---|
| 10:17 | 1 | And he said that patents allow you, if you have one, to |
| 10:17 | 2 | decide how, if, and when to give something away, right? |
| 10:17 | 3 | Did you hear him say that? |
| 10:17 | 4 | A.    Yes. |
| 10:17 | 5 | Q.    Did anybody associated with PCI Express or USB |
| 10:17 | 6 | 3.0 or either of the ASUSTeK defendants give you a |
| 10:17 | 7 | chance to decide how, if, and when to allow your |
| 10:17 | 8 | patents to be used? |
| 10:17 | 9 | A.    No. |
| 10:17 | 10 | Q.    Mr. Bhatt was asked about your patents.  Did |
| 10:17 | 11 | he read them? |
| 10:18 | 12 | A.    No. |
| 10:18 | 13 | Q.    Did he know what was going in them even |
| 10:18 | 14 | sitting here just yesterday? |
| 10:18 | 15 | A.    No.  He didn't. |
| 10:18 | 16 | Q.    All right.  Just about one more, maybe two |
| 10:18 | 17 | more things I want to talk about with you, Dr. Chu. |
| 10:18 | 18 | Did you see just during that last examination |
| 10:18 | 19 | your testimony about saying that there was no software |
| 10:18 | 20 | in the invention? |
| 10:18 | 21 | A.    Yeah. |
| 10:18 | 22 | Q.    Can you explain for the jury what that -- what |
| 10:18 | 23 | you were talking about in that testimony? |
| 10:18 | 24 | A.    Well, we're talking about damages, so we |
| 10:18 | 25 | exclude the display.  And of course, I excluded the |

—1077—

10:18  1   operating system.  That's not something we did.  So

10:18  2   software means that.

10:18  3       Q.   If that's what software means in that context,

10:18  4   does software mean something different when you're

10:18  5   talking about PCI address and data bits?

10:18  6       A.   Yeah.  Of course it's different.

10:18  7       Q.   Can you explain that difference to the jury,

10:18  8   please?

10:18  9       A.   Maybe I would talk a little bit more lengthy

10:19 10   explanation.  So my invention is limited to what I put

10:19 11   in my claim.  That's what's granted by the U.S. Patent

10:19 12   Office.  So I'm the first to use unidirectional low

10:19 13   voltage differential signal to send address and data of

10:19 14   PCI bus transaction.

10:19 15            Now, such PCI bus transaction, it's actually

10:19 16   in accordance to the backwards software compatibility

10:19 17   between PCI local bus and PCI Express.

10:19 18                 MR. BURESH:  Your Honor, if I could

10:19 19   interrupt.  This is just more expert -- he's acting as

10:19 20   an expert at this point, rendering an opinion on what

10:19 21   PCI Express has in comparison to claim language.  He's

10:19 22   a fact witness.

10:19 23                 THE COURT:  And this is only invalidity.

10:19 24                 MR. BURESH:  I'm sorry.

10:20 25                 THE COURT:  This should only be about

1078

10:20  1    invalidity.

10:20  2              MR. BURESH:  The entire rebuttal case

10:20  3    should have been about that.  That's correct.

10:20  4              THE COURT:  Well, I haven't heard anyone

10:20  5    object, but that's what he's limited to.

10:20  6              MR. BURESH:  Okay.  Thank you, Your

10:20  7    Honor.

10:20  8              THE COURT:  I will sustain the objection.

10:20  9    BY MR. COLLARD:

10:20 10        Q.   Okay.  Let's look at one of Mr. Bhatt's

10:20 11    slides.

10:20 12              MR. COLLARD:  Let's look at Slide 28.

10:20 13    BY MR. COLLARD:

10:20 14        Q.   Were you in the courtroom when Mr. Bhatt put

10:20 15    up this slide?

10:20 16        A.   Yes.  Uh-huh.

10:20 17        Q.   Okay.

10:20 18              MR. BURESH:  Same objection, Your Honor.

10:20 19    This is more non-rebuttal.

10:20 20              THE COURT:  I don't understand how this

10:20 21    goes to invalidity.

10:20 22              MR. COLLARD:  That's fine, Your Honor.

10:20 23    I'll move on.

10:20 24    BY MR. COLLARD:

10:21 25        Q.   Dr. Chu, did you hear the questions and the

10:21    1    discussion with Dr. Edwards and then also with

10:21    2    Dr. Sarhan about whether or not you adequately

10:21    3    described your -- what you invented in the claims, did

10:21    4    you adequately describe that in your patents?

10:21    5        A.    Yes.

10:21    6        Q.    Do you agree with Dr. Edwards that you did not

10:21    7    adequately describe in your claims what was in -- that

10:21    8    you did not adequately describe in your patents what

10:21    9    you claimed for your invention?

10:21    10               MR. BURESH:  Your Honor, I object.  Calls

10:21    11    for expert testimony.

10:21    12               THE COURT:  I'll overrule those, but I'll

10:21    13    note that the plaintiff has almost no time left.

10:21    14               MR. COLLARD:  Understood, Your Honor.

10:21    15    I'll just ask a couple very short questions then.

10:21    16    BY MR. COLLARD:

10:21    17        Q.    Did you agree with -- do you agree with

10:21    18    Dr. Edwards that you did not describe adequately in

10:22    19    your patents what you ended up putting in your claims?

10:22    20        A.    I disagree.

10:22    21        Q.    All right.  Do you agree with Dr. Edwards that

10:22    22    you did not provide enough information in your patents

10:22    23    for a person of skill in the art to be able to make

10:22    24    your invention as it's described in the claim?

10:22    25        A.    I disagree.

10:22  1    Q.    Okay.

10:22  2              MR. COLLARD:  Nothing further, Your

10:22  3    Honor.

10:22  4              THE COURT:  Any questions for this

10:22  5    gentleman?

10:22  6              MR. BURESH:  Just briefly, Your Honor.

10:22  7                    CROSS-EXAMINATION

10:22  8    BY MR. BURESH:

10:22  9    Q.    Today I -- use my manners.  Good morning,

10:22  10   Dr. Chu.

10:22  11   A.    Good morning.

10:22  12   Q.    Today I heard you testify twice that your

10:22  13   invention was that:  I decided to use unidirectional

10:22  14   low voltage differential signaling to improve

10:22  15   performance, correct?

10:22  16   A.    Yes.  Uh-huh.

10:23  17   Q.    You used those exact words a couple of times,

10:23  18   correct?

10:23  19   A.    Yes.

10:23  20             MR. BURESH:  Could we pull up the Day 1

10:23  21   transcript at Page 142, Lines -- starting at Line 6.

10:23  22   BY MR. BURESH:

10:23  23   Q.    This is from your testimony on Day 1, Dr. Chu.

10:23  24             MR. COLLARD:  Your Honor, I object to

10:23  25   showing this to the jury.  If he wants to impeach him,

10:23   1    he can do so.

10:23   2                    THE COURT:  Overruled.

10:23   3    BY MR. BURESH:

10:23   4        Q.    In your testimony on Monday, you said:

10:23   5    Remember I said earlier, my invention and my only

10:23   6    invention in the computer bus is using this LVDS

10:23   7    channel, the unidirectional channel, to communicate

10:23   8    data.

10:23   9            Do you see that?

10:23  10        A.    Yeah.  Uh-huh.

10:23  11                    MR. BURESH:  Let's go to Day 1

10:23  12    Transcript, 132.

       13    BY MR. BURESH:

10:24  14        Q.    And this testimony:  All we're claiming is

10:24  15    that they're using LVDS signaling.

10:24  16            Do you see that?

10:24  17        A.    Yes.

10:24  18        Q.    So from Day 1, you're describing your

10:24  19    invention as LVDS, your claims include LVDS channels,

10:24  20    and today you're changing your language to just say low

10:24  21    voltage differential signaling; isn't that correct?

10:24  22        A.    That's not correct.

10:24  23                    MR. BURESH:  I have nothing further for

10:24  24    this witness.

10:24  25                    THE COURT:  Anything else, sir?

| | | |
|---|---|---|
| 10:24 | 1 | MR. COLLARD:  No, Your Honor. |
| 10:24 | 2 | THE COURT:  You may step down. |
| 10:24 | 3 | Any other witnesses? |
| 10:24 | 4 | MR. COLLARD:  No, Your Honor. |
| 10:24 | 5 | THE COURT:  Do you rest? |
| 10:24 | 6 | MR. COLLARD:  Yes. |

10:24    7          THE COURT:  Ladies and gentlemen of the
10:24    8    jury, we're going to take a short recess and get
10:24    9    organized, and then I'm going to read the jury charge
10:24   10    to you.

10:24   11          THE BAILIFF:  All rise.

10:24   12          (Jury exited the courtroom.)

10:24   13          THE COURT:  You may be seated.

10:25   14          I'll hear first from the defendant.

10:25   15          MR. LANG:  Your Honor, I think the only
10:25   16    objection is just preserving our objection on the
10:25   17    Court's construction of PCI bus transaction.

10:25   18          I understand Your Honor's ruling on that
10:25   19    but just to preserve it.

10:25   20          And then in the proposed instructions, we
10:25   21    also have plain and ordinary meaning in the
10:25   22    instructions, and I don't think that's necessary
10:25   23    because I think Your Honor's going to instruct them,
10:25   24    anything I didn't specifically construe will be
10:25   25    construed for its plain and ordinary meaning.

```
10:25   1                    THE COURT:  And those are your only
10:25   2    objections to the charge?
10:25   3                    MR. LANG:  Correct.
10:25   4                    THE COURT:  And do you have a motion with
10:25   5    respect -- any Rule 50 motion?
10:25   6                    MR. LANG:  No.
10:25   7                    THE COURT:  I'm sure y'all have a Rule 50
10:25   8    motion.
10:25   9                    MR. BURESH:  We will renew the --
10:26  10                    MR. LANG:  Oh, yeah.  Okay.  Sorry.
10:26  11                    THE COURT:  Okay.  And for -- does the
10:26  12    plaintiff have any -- thank you, sir.
10:26  13                    I'll overrule the objections to the
10:26  14    charge.
10:26  15                    Does the plaintiff have any objections to
10:26  16    the Court's jury charge?  If so, please put them on the
10:26  17    record.
10:26  18                    And also, if you have any motions to make
10:26  19    at this time, I'll hear those.
10:26  20                    MR. MEYER:  For the record, my name is
10:26  21    Ryan Meyer, and I'm an attorney representing ACQIS.
10:26  22                    Just a few short objections.
10:26  23                    Regarding Instruction No. 12, ACQIS
10:26  24    objects to the omission of its proposed additional
10:26  25    instruction stating that it is not legally improper to
```

10:26  1   file a patent application or write patent claims to

10:26  2   cover an adverse party's product.

10:26  3              THE COURT:  Let me interrupt you just to

10:26  4   say, I think we talked last night off the record, but

10:26  5   if you all want to formally submit your objections and

10:26  6   exchange with each other in the manner we talked about

10:26  7   last night where it's specifically what you wanted in

10:26  8   and I didn't put it in or vice versa, I'm happy to do

10:26  9   it that way as well as opposed to having you read them

10:27 10   here.

10:27 11              I'm happy to do it whatever way you all

10:27 12   best protect the record for yourselves.

10:27 13              MR. MEYER:  Okay.  And then next, ACQIS

10:27 14   also objects to the omission of its proposed

10:27 15   instruction on agency, which is one of ACQIS' theories,

10:27 16   and it's necessary to instruct the jury on appropriate

10:27 17   requirements of any agency relationship between

10:27 18   ASUSTeK, ASGL, and/or ACI.

10:27 19              THE COURT:  I'm confused.  I'm giving

10:27 20   your agency charge, I believe.  The defendant proposed

10:27 21   piercing the corporate veil.  I'm giving your charge.

10:27 22   I'm not sure what it is you're unhappy about.

10:27 23              MR. MEYER:  We did have a separate

10:27 24   agency.

10:27 25              THE COURT:  Oh, there was one page on

| | | |
|---|---|---|
| 10:27 | 1 | agency. |
| 10:27 | 2 | MR. MEYER:  Yes. |
| 10:27 | 3 | THE COURT:  Okay.  Yeah.  So that's fine. |
| 10:28 | 4 | But be sure to submit that for purposes of the record |
| 10:28 | 5 | so it's clear what -- and I'll put on the record I |
| 10:28 | 6 | think it was -- I think it's duplicative and that it |
| 10:28 | 7 | was submitted in the other charge that I've given. |
| 10:28 | 8 | But that's just -- you're certainly |
| 10:28 | 9 | welcome to make the objection and put it in the record. |
| 10:28 | 10 | Yes, ma'am. |
| 10:28 | 11 | MS. AMSTUTZ:  Your Honor, this morning we |
| 10:28 | 12 | filed the proposed jury instructions at Docket No. 314. |
| 10:28 | 13 | So those are on the record. |
| 10:28 | 14 | THE COURT:  Okay. |
| 10:28 | 15 | MR. MEYER:  And for the agency |
| 10:28 | 16 | instruction, that would be at Page 42 of Docket |
| 10:28 | 17 | No. 314. |
| 10:28 | 18 | Next, regarding Instruction 26, ACQIS |
| 10:28 | 19 | objects to the inclusion of the fourth paragraph which |
| 10:28 | 20 | starts with the word "enablement" because it is a |
| 10:28 | 21 | policy statement that does not provide meaningful |
| 10:28 | 22 | instructions to the jury for determining whether the |
| 10:28 | 23 | claims are enabled.  Appropriate instructions are |
| 10:28 | 24 | already included in the agreed parts of the |
| 10:28 | 25 | instruction. |

1086

| | | |
|---|---|---|
| 10:28 | 1 | See Docket No. 314 at Page 51. |
| 10:28 | 2 | And finally, regarding Instruction |
| 10:29 | 3 | No. 36, ACQIS objects to the omission of additional |
| 10:29 | 4 | language proposed by ACQIS regarding the scope of |
| 10:29 | 5 | authority of a parent corporation to receive notice on |
| 10:29 | 6 | behalf of its subsidiary as this is an accurate |
| 10:29 | 7 | statement of the law which would help the jury resolve |
| 10:29 | 8 | the notice of infringement issue. |
| 10:29 | 9 | Again, see Docket No. 314 at Page 63. |
| 10:29 | 10 | And no further objections. |
| 10:29 | 11 | THE COURT:  Those are overruled. |
| 10:29 | 12 | And do you have any motions to make? |
| 10:29 | 13 | MR. COLLARD:  Your Honor, we renew our |
| 10:29 | 14 | prior directed verdict motion. |
| 10:29 | 15 | THE COURT:  That will be overruled as |
| 10:29 | 16 | well. |
| 10:29 | 17 | So are the charges here? |
| 10:29 | 18 | Okay.  If you all would distribute those |
| 10:29 | 19 | to the -- put them on the jury's chairs.  And I'll be |
| 10:29 | 20 | back out in just five or ten minutes. |
| 10:29 | 21 | As far as I'm concerned, the lawyers who |
| 10:29 | 22 | are going to be doing the closing arguments, there's no |
| 10:29 | 23 | need for you to stay, if you want to go prepare for |
| 10:29 | 24 | closing arguments.  But I'm not asking you to leave |
| 10:29 | 25 | either.  I'm just telling you, you don't need to stay |

10:29  1    here to hear me read it.

10:29  2                      I never know how you all feel about being

10:30  3    here or not being here with the jury while I'm reading

10:30  4    it, but I'm telling you as far as I'm concerned, I

10:30  5    won't be offended if you all -- and I'm happy to -- if

10:30  6    you're not here, to tell the jury that you probably are

10:30  7    out preparing for your closing arguments as well.

10:30  8                      Just letting you know, you all do

10:30  9    whatever you want to do that you feel is best.

10:30  10                     So I'll just get organized back there,

10:30  11   and I'll come out and I'll read the jury charge.  And

10:30  12   then we'll do the closing arguments at 1:30.

10:30  13                     THE BAILIFF:  All rise.

10:30  14                     (Recess taken.)

10:43  15                     THE BAILIFF:  All rise.

10:43  16                     THE COURT:  Please remain standing for

10:43  17   the jury.

10:43  18                     (Jury entered the courtroom.)

10:44  19                     THE COURT:  You may be seated.

10:44  20                     Ladies and gentlemen of the jury, I don't

10:44  21   know that anyone else does this, but I find it's easier

10:44  22   for me to stand to read.  And Kristie likes it better,

10:44  23   and me keeping Kristie happy is important.  So...

10:44  24                     You all have the charge in front of you.

10:44  25   You're welcome to read along, not read along, whatever,

1088

10:44  1    just listen.  Whatever is the most effective way for

10:44  2    you to take in the information, you're welcome to do.

10:44  3              Members of the jury, it is my duty and

10:44  4    responsibility to instruct you on the law you are to

10:44  5    apply in the case.  The law contained in these

10:44  6    instructions is the only law you may follow.  It is

10:45  7    your duty to follow what I instruct you the law is

10:45  8    regardless of any opinion that you might have as to

10:45  9    what the law ought to be.

10:45 10              Each of you has your own printed copy of

10:45 11    these final jury instructions I'm giving you.  There's

10:45 12    no need for you to take notes unless you want to.

10:45 13              If I have given you the impression during

10:45 14    the trial that I favor either party, disregard that

10:45 15    impression.  If I've given you the impression during

10:45 16    the trial I have any opinion with respect to the facts

10:45 17    of the case, disregard that impression.

10:45 18              You are the sole judges of the facts of

10:45 19    the case.  Other than these -- my instructions to you

10:45 20    on the law, disregard anything I may have said or done

10:45 21    during the trial in arriving at your own verdict.

10:45 22              Consider all the instructions about the

10:45 23    law as a whole.  Regard each instruction in light of

10:45 24    the others without isolating any particular statement

10:45 25    or paragraph.

1089

10:45  1          The testimony of the witnesses and other

10:45  2   exhibits introduced by the parties constitute the

10:45  3   evidence.  The statements of counsel are not evidence.

10:46  4   They are only arguments.  It is important for you to

10:46  5   distinguish between arguments of counsel and the

10:46  6   evidence upon which those arguments rest.

10:46  7          What the lawyers say or do is not

10:46  8   evidence.  You may, however, consider their arguments

10:46  9   in light of the evidence that has been admitted and

10:46  10  determine whether the evidence admitted in this trial

10:46  11  supports their arguments.  You must determine the facts

10:46  12  from all the testimony you've heard and all the

10:46  13  evidence submitted.

10:46  14         You alone are the judges of the facts,

10:46  15  but in finding those facts, you must apply this law as

10:46  16  I instruct you.

10:46  17         You are required by law to decide the

10:46  18  case in a fair, impartial, and unbiased manner based

10:46  19  entirely and exclusively on the law and on evidence

10:46  20  presented to you here in this courtroom.

10:46  21         You may not be influenced by passion or

10:46  22  prejudice or sympathy you might have for either party

10:46  23  in arriving at your verdict.

10:46  24         When I allowed testimony or other

10:46  25  evidence to be introduced over the objection of an

10:47  1    attorney, I did not indicate any opinion as to the

10:47  2    weight or effect of such evidence except where I might

10:47  3    have provided a limiting instruction explaining to you

10:47  4    how a specific piece of evidence might be used.

10:47  5                    As stated before, you are the sole judges

10:47  6    of the credibility of all the witnesses and the weight

10:47  7    and effect, if any, to be given to all of the evidence.

10:47  8                    If I sustained an objection to a question

10:47  9    addressed to any witness, disregard the question

10:47  10   entirely.  Draw no inference from the wording or

10:47  11   speculate about what a witness would have said if he or

10:47  12   she had been permitted to answer.

10:47  13                   After the remainder of these

10:47  14   instructions, you will hear closing arguments.

10:47  15                   And to go off script for a second, we're

10:47  16   going to take up the closing arguments at 1:30.

10:47  17                   The attorneys will give closing

10:47  18   arguments.  Statements and arguments of the attorneys,

10:47  19   I remind you, are not evidence, and they are not my

10:47  20   instructions on the law.  They're intended only to

10:48  21   assist you, the jury, in understanding the evidence and

10:48  22   the contentions of the parties.

10:48  23                   A verdict form has been prepared for you.

10:48  24                   I'm going to fix this someday.  I've

10:48  25   given this a lot and it's wrong.

10:48  1          You are not going to take the verdict

10:48  2  form.  The verdict form is going to be waiting for you

10:48  3  in the jury room.

10:48  4          Once you have reached a unanimous

10:48  5  decision or agreement as to the verdict, your

10:48  6  foreperson will fill in the blanks in the verdict form.

10:48  7  He or she will date it and sign it.

10:48  8          Answer each question in the verdict form

10:48  9  from the facts as you find them to be.  Don't decide

10:48  10  who you think should win the case and answer questions

10:48  11  to reach any result.  Your answers and your verdict

10:48  12  must be unanimous.

10:48  13          Allow me to summarize the issues for you

10:48  14  to decide.  You must decide the following issues:

10:48  15          First, whether the plaintiff has proven

10:48  16  by a preponderance of the evidence that the defendant

10:48  17  ASUSTeK or ASGL infringes Claims 10 and 13 of the

10:48  18  United States Patent No. 9,529,768;

10:49  19          Whether plaintiff has proven by a

10:49  20  preponderance of the evidence that either ASUSTeK or

10:49  21  ASGL infringes Claim 19 of the 8,756,359 patent;

10:49  22          Whether plaintiff has proven by a

10:49  23  preponderance of the evidence that either ASUSTeK or

10:49  24  ASGL infringed any of the asserted claims and that the

10:49  25  infringement was willful;

1092

10:49  1              Whether ASUSTeK and ASGL have proven by

10:49  2    clear and convincing evidence that Claims 10 and 13 of

10:49  3    the 9,529,768 patent are invalid; and,

10:49  4              Whether they have proven by clear and

10:49  5    convincing evidence that Claim 19 of the 8,756,359

10:49  6    patent is invalid.

10:49  7              Patent infringement is determined on a

10:49  8    claim-by-claim basis.  You may find that one claim of a

10:49  9    patent is infringed while other claims of the same

10:50  10   patent are not infringed.  The same is true with

10:50  11   respect to validity or invalidity.

10:50  12             If you find that one or more claims is

10:50  13   infringed and also is not invalid, then you will need

10:50  14   to determine an amount -- what amount of damages, if

10:50  15   any, the plaintiffs have proven by a preponderance of

10:50  16   the evidence will compensate it for the infringement by

10:50  17   the defendants.

10:50  18             Let's talk about evidence.  These are my

10:50  19   instructions to you on how to consider the evidence in

10:50  20   the case.

10:50  21             The evidence you are to consider consists

10:50  22   of the testimony of witnesses, documents, and other

10:50  23   exhibits admitted into evidence, stipulations to which

10:50  24   lawyers agree, any fair inferences and reasonable

10:50  25   conclusions that you can draw from the facts and

| 10:50 | 1 | circumstances that have been proven.  Nothing else is |

10:50    1    circumstances that have been proven.  Nothing else is

10:50    2    evidence.

10:50    3         The fact that plaintiff filed a lawsuit

10:50    4    is not evidence that it is entitled to a judgment.

10:50    5         The act of making a claim in a lawsuit by

10:50    6    itself does not in any way tend to establish that

10:50    7    claim.  That claim itself is not evidence.

10:51    8         Likewise, the fact that any defendant has

10:51    9    raised arguments against the claim or claims asserted

10:51    10    by plaintiff is not evidence they have any entitlement

10:51    11    to a judgment in their favor on any claim.

10:51    12         The act of making defensive arguments by

10:51    13    themselves does not in any way tend to establish such

10:51    14    arguments have merit.  They are not evidence.

10:51    15         Statements, arguments, and any questions

10:51    16    by attorneys are not evidence.

10:51    17         Objections to questions are not evidence.

10:51    18    The attorneys that are seated in front of you may have

10:51    19    objected if they thought documents or testimony that

10:51    20    was offered into evidence was improper under the rules

10:51    21    of evidence.

10:51    22         My legal rulings as to those objections

10:51    23    was not evidence.  My comments and questions are not

10:51    24    evidence.  Notes taken by any of you are not evidence.

10:51    25         During the trial, I may not have allowed

10:51  1   you to hear the answers to some questions that a lawyer

10:51  2   asked.  I may have ruled that you could not see an

10:51  3   exhibit that a lawyer wanted you to see.  I may have

10:52  4   ordered you to disregard something you saw or heard or

10:52  5   stricken things from the record.

10:52  6            In each case you must follow my rulings

10:52  7   and completely ignore anything that I ordered stricken

10:52  8   or not allow.  Do not speculate as to what a witness

10:52  9   might have said or what an evidence -- exhibit might

10:52  10  have shown.  They're not evidence.

10:52  11           You are bound by your oath not to let

10:52  12  them influence your decision in any way.

10:52  13           Generally speaking, there are two types

10:52  14  of evidence.  One is direct, such as the testimony of

10:52  15  an eyewitness.  The other is indirect or

10:52  16  circumstantial, which is evidence that proves a fact

10:52  17  from which you can logically conclude another fact

10:52  18  exists.

10:52  19           As a general rule, the law makes no

10:52  20  distinction between either direct or circumstantial

10:52  21  evidence.  It simply requires you determine facts from

10:52  22  all the evidence you hear in a case, whether it be

10:52  23  direct, circumstantial, or some combination.

10:52  24           In judging the facts, you must consider

10:53  25  all of the evidence, direct and circumstantial, but

10:53    1    that does not mean that you have to accept or believe

10:53    2    all of the evidence.  That is why you're here as

10:53    3    judges.

10:53    4                It is entirely up to you to give the

10:53    5    evidence you received in this case the weight that you

10:53    6    individually believed it deserved.  It'll be up to you

10:53    7    to decide which witnesses that you believed or did not,

10:53    8    the weight you gave any testimony you heard, and how

10:53    9    much of any witness' testimony you might choose to

10:53   10    accept or reject.

10:53   11                Never be influenced by any ruling you

10:53   12    heard from an objection.  If I sustain an objection,

10:53   13    pretend the question was never asked.  If an answer was

10:53   14    given, ignore it.  If I overruled an objection, act

10:53   15    like it was never made.

10:53   16                If I gave you instructions that some item

10:53   17    of evidence was received for a limited purpose, follow

10:53   18    my instruction.  If I gave any limiting instruction,

10:53   19    you must follow it.  Any testimony I told you to

10:53   20    exclude or disregard is not evidence.  It may not be

10:53   21    considered.

10:53   22                You must not conduct any independent

10:54   23    research or investigation.  You must make your decision

10:54   24    based only on the evidence here and nothing else.

10:54   25                I don't recall anything being admitted

10:54    1    for a limited purpose here.

10:54    2                    Okay.

10:54    3                    MS. AMSTUTZ:  I don't either, Your Honor.

10:54    4                    THE COURT:  Okay.  Thank you.

10:54    5                    Certain charts and summaries have been

10:54    6    shown to you solely to help explain or summarize

10:54    7    testimony or the facts disclosed by the books, records,

10:54    8    and other documents that might have been introduced

10:54    9    into evidence.

10:54   10                    Charts and summaries are not evidence or

10:54   11    proof of any facts unless I specifically admitted a

10:54   12    chart or summary as an exhibit into evidence.

10:54   13                    Certain things were shown to you, perhaps

10:54   14    posters or models, which are illustrations of evidence

10:54   15    but not themselves evidence.

10:54   16                    We call those types of exhibits

10:54   17    demonstrative exhibits, which are a party's

10:54   18    description, picture, or model used to describe

10:54   19    something involved in the trial.  But they're not

10:54   20    evidence of any fact and of -- they are not evidence

10:55   21    themselves unless I specifically admitted them.

10:55   22                    While you must consider only the evidence

10:55   23    in the case, you are permitted, of course, to draw

10:55   24    whatever reasonable inferences from the testimony and

10:55   25    exhibits you feel are justified in light of your own

1097

10:55  1    personal common experience.

10:55  2                You may make deductions and reach

10:55  3    conclusions that your reason and common sense lead you

10:55  4    to draw from the facts that you believe have been

10:55  5    established by the testimony and the evidence in the

10:55  6    case.

10:55  7                However, you should not base your

10:55  8    decision on any evidence not presented by the parties

10:55  9    during the case, including your own personal experience

10:55  10   with any of the products at issue in the case.

10:55  11               Let's talk about witnesses.

10:55  12               You alone must determine the questions of

10:55  13   credibility or truthfulness of the witnesses you heard.

10:55  14   In weighing your testimony, consider their manner and

10:55  15   demeanor on the witness stand, any feelings about or

10:55  16   interest they might have in the case, prejudice or bias

10:56  17   they might have about the case, and the consistency or

10:56  18   inconsistency of any testimony considered in the light

10:56  19   of the circumstances.

10:56  20               For instance, has the witness been

10:56  21   contradicted by other credible evidence?  Did he or she

10:56  22   make statements at other times and places contrary to

10:56  23   the ones made here on the witness stand?

10:56  24               You must give the testimony of each

10:56  25   witness the credibility that each of you believe it

1098

10:56  1    deserves.  Even though a witness may be a party to the

10:56  2    action and obviously is interested in its outcome, the

10:56  3    testimony may still be accepted if it is not

10:56  4    contradicted by direct evidence or by any inference

10:56  5    that may be drawn from the evidence so long as you

10:56  6    believe the testimony.

10:56  7            You are not to decide this case by

10:56  8    counting the number of witnesses who have been -- who

10:56  9    have testified on each side.  Witness testimony is

10:56  10   weighed; witnesses are not counted.  The test is not

10:56  11   the relative number of witnesses but the relative

10:57  12   convincing force of their -- of the evidence and their

10:57  13   testimony.

10:57  14           The testimony, for example, of even a

10:57  15   single witness is sufficient to prove any fact even if

10:57  16   a greater number of witnesses testified to the contrary

10:57  17   if, after considering all of the evidence, you believe

10:57  18   the single witness.

10:57  19           In determining the weight to give to the

10:57  20   testimony of any particular witness, consider whether

10:57  21   there was evidence at some other time the witness said

10:57  22   or did something or failed to say or do something that

10:57  23   was different from the testimony provided by the

10:57  24   witness here at trial.

10:57  25           A simple mistake by a witness does not

10:57  1    necessarily mean that the person or witness was not

10:57  2    telling the truth as he or she remembered it.  People

10:57  3    forget things or remember things inaccurately.

10:57  4            If a witness made a misstatement,

10:57  5    consider whether it was an intentional falsehood or

10:57  6    simply an innocent mistake.  The significance of that

10:57  7    may depend on whether it has to do with an important

10:57  8    fact or with only an unimportant detail.

10:58  9            This instruction applies to the testimony

10:58  10   of all witnesses, whether they are fact or expert.

10:58  11           Certain testimony was presented to you in

10:58  12   the format of a deposition, which is a sworn recorded

10:58  13   answer to questions a witness was asked in advance of

10:58  14   trial.

10:58  15           If a witness cannot be present to testify

10:58  16   from the witness stand, the witness' testimony may be

10:58  17   presented under oath in the format of a deposition,

10:58  18   which means that sometime before this trial, attorneys

10:58  19   representing the parties in the case questioned the

10:58  20   witness and the witness was under oath.  There was a

10:58  21   court reporter present who recorded the testimony.

10:58  22           The questions and answers have been --

10:58  23   were read to you here.

10:58  24           The deposition testimony is entitled to

10:58  25   the same consideration, and it is to be weighed and

1100

10:58 1   otherwise considered by you in the same way as if that

10:58 2   witness actually had been present and had testified in

10:58 3   front of you from the witness stand in court.

10:58 4           I don't believe we had any video

10:58 5   depositions, did we?

10:59 6           MS. AMSTUTZ:  That's correct, Your Honor.

10:59 7           THE COURT:  Okay.  Let's turn to expert

10:59 8   testimony.

10:59 9           Expert testimony is the testimony from a

10:59 10  person who has special skill or knowledge in a science

10:59 11  or profession or business.  The skill or knowledge is

10:59 12  not common to the average person; rather, was acquired

10:59 13  by an expert through specialized study or perhaps

10:59 14  experience.

10:59 15          In weighing their testimony, you may

10:59 16  consider the expert's qualifications, the reason for

10:59 17  the opinions, the source and reliability of the

10:59 18  information supporting those opinions, as well as the

10:59 19  factors I have previously mentioned for weighing

10:59 20  testimony of any other witness.

10:59 21          Expert testimony receives whatever weight

10:59 22  and credit you believe appropriate given all of the

10:59 23  evidence in the case.  You are not required to accept

10:59 24  the opinion of an expert; rather, you are free to

10:59 25  accept or reject any part or all of the testimony of

-1101-

10:59  1    experts just as with any witness.

10:59  2            The fact that someone -- a person or

11:00  3    entity brought a lawsuit and is in court seeking

11:00  4    damages creates no inference that the person is

11:00  5    entitled to a judgment.  Anyone may make a claim;

11:00  6    anyone may file a lawsuit.  The act of making a claim

11:00  7    in a lawsuit, by itself, does not in any way tend to

11:00  8    establish the claim or claims.  It is not evidence.

11:00  9            Do not let bias, prejudice, or sympathy

11:00  10   play any part in your deliberations.  A corporation and

11:00  11   all persons are equal before the law and must be

11:00  12   treated as equal in a court of justice.

11:00  13           Let's turn to something that's very

11:00  14   important, which is the different burdens of proof in

11:00  15   this case.  We'll start with the burden of proof of

11:00  16   preponderance of the evidence.

11:00  17           In any legal action, facts must be proved

11:00  18   by a required amount of evidence known as the burden of

11:00  19   proof.  This case involves two different burdens of

11:00  20   proof.  The first is preponderance of the evidence, and

11:00  21   a separate and different one is clear and convincing

11:00  22   evidence.

11:01  23           The burden of proof in this case is on

11:01  24   the plaintiff for some issues; it is on the defendants

11:01  25   on others.

11:01  1                    Let's start with the plaintiff, who has

11:01  2      the burden of proving infringement and damages -- those

11:01  3      are two different things -- both infringement and

11:01  4      damages by a preponderance of the evidence.  The

11:01  5      plaintiff also has the burden of proving their

11:01  6      allegation of willful infringement by a preponderance

11:01  7      of the evidence.

11:01  8                    What does that mean?

11:01  9                    A preponderance of the evidence means

11:01  10     evidence that persuades you that a claim is more

11:01  11     probably true than not.  Sometimes we talk about this

11:01  12     as being the greater weight and degree of credible

11:01  13     testimony.

11:01  14                    For example, if you find that plaintiff

11:01  15     proved that it is more probable than not that the

11:01  16     defendants either -- both -- either one or the other,

11:01  17     or both, infringed any of the asserted claims for any

11:01  18     of the asserted patents, you must find them liable to

11:01  19     the plaintiff for patent infringement.

11:01  20                    If you find that the plaintiff failed to

11:01  21     prove any element of its claim of patent infringement

11:02  22     or damages by a preponderance of the evidence, then the

11:02  23     plaintiff does not recover on that allegation or claim.

11:02  24                    Plaintiff must -- may recover for

11:02  25     infringement even if willful infringement is not shown,

1103

11:02    1    but there can be no willful infringement if the

11:02    2    plaintiff does not prove direct or indirect

11:02    3    infringement by a preponderance of the evidence.

11:02    4                Plaintiff must also prove its contention

11:02    5    of willful infringement by the burden of proof of a

11:02    6    preponderance of the evidence.

11:02    7                Now, we'll return to the allegation or

11:02    8    contention of invalidity, which has a clear and

11:02    9    convincing evidence burden of proof.

11:02    10                The defendants contend that the asserted

11:02    11    patents in this case are invalid.  Therefore, they have

11:02    12    a proven -- burden of proving patent invalidity by the

11:02    13    burden of proof of clear and convincing evidence, which

11:02    14    is evidence that produces in your mind a firm belief or

11:02    15    conviction as to the truth of the matter that is sought

11:03    16    to be established.  You must be left with a clear

11:03    17    conviction that the claim or claims are invalid.

11:03    18                These standards -- this -- these -- this

11:03    19    standard -- it should be -- are different from what you

11:03    20    may -- oh, both standards.

11:03    21                Both the standard of a preponderance of

11:03    22    the evidence and the standards of clear and convincing

11:03    23    evidence are different from what you might have heard

11:03    24    in a different proceeding, criminal proceedings, where

11:03    25    the burden of proof is beyond a reasonable doubt.

1104

11:03  1            If one were to create a scale of the

11:03  2   various burdens of proof, you would start with

11:03  3   preponderance of the evidence, where proof need only be

11:03  4   sufficient to tip the scales in favor of a party

11:03  5   proving the fact, to the other end, which is beyond a

11:03  6   reasonable doubt, where the facts must be proven to a

11:03  7   very high degree of certainty.

11:03  8            Thus, with respect to clear and

11:03  9   convincing evidence, you may consider it as being

11:03  10  between the two ends of the spectrum of these different

11:03  11  standards for burdens of proof.

11:04  12            Defendants do not assert the -- do not

11:04  13  contend or assert that the asserted patents are invalid

11:04  14  for being anticipated by or rendered obvious by prior

11:04  15  art.  Accordingly, you should not consider whether the

11:04  16  invention claimed in the asserted patents is novel or

11:04  17  would not have been obvious to a person of ordinary

11:04  18  skill in the art.

11:04  19            As I did at the start of the case, allow

11:04  20  me to give you a summary as to what the contentions are

11:04  21  in it.

11:04  22            The plaintiff seeks money damages from

11:04  23  defendants for allegedly infringing Claims 10 and 13 of

11:04  24  the '768 patent and Claim 19 of the '359 patent by

11:04  25  making, using, selling, and/or offering for sale

1105

11:04  1    products the plaintiff argues are covered by the

11:04  2    asserted claims.

11:04  3                Defendants deny any infringement of the

11:04  4    asserted claims and contend, in addition, that those

11:04  5    claims are invalid.

11:04  6                It's your job to decide whether the

11:05  7    defendants infringe any of the asserted claims that

11:05  8    have been asserted against them and also whether or not

11:05  9    the asserted claims are invalid.

11:05  10               To simplify the issues in the case, the

11:05  11   parties have agreed and stipulated that certain

11:05  12   products are representative of the products in a group

11:05  13   for purposes of determining infringement, which were

11:05  14   referred to as "representative products."

11:05  15               The parties have agreed to treat the

11:05  16   accused desktop, S340MF (the "Desktop Representative

11:05  17   Accused Product"), as representative of all other

11:05  18   accused desktops, as well as accused servers and

11:05  19   motherboards.

11:05  20               The parties have also agreed to treat the

11:05  21   accused laptop, the ROG Strix Hero II GL504GV as --

11:05  22   (the "Laptop Representative Accused Product"), as

11:05  23   representative of all other accused laptops (the

11:05  24   "Laptop Represented Accused Product").

11:06  25               If you find that a representative product

—1106—

11:06   1    infringes an asserted claim and that the infringed

11:06   2    claims are not invalid, then you should find that all

11:06   3    products in the group represented by that product that

11:06   4    are accused of infringing the asserted claim also

11:06   5    infringe.

11:06   6              But if you find the main representative

11:06   7    product not to infringe an asserted claim, then you

11:06   8    should also find that each product in the group

11:06   9    represented by that product does not infringe the

11:06   10   claim.

11:06   11             For each asserted claim, you may find

11:06   12   infringement or noninfringement as to none, one, or

11:06   13   both of the main representative products.

11:06   14             If you decide that any claim of the

11:06   15   asserted patents has been infringed and is not invalid,

11:06   16   then you will need to decide money damages to be

11:06   17   awarded to the plaintiff, whatever they are, to

11:06   18   compensate it for the infringement.  You will also need

11:06   19   to make a finding as to whether any infringement was

11:07   20   willful.

11:07   21             If you decide that any of the

11:07   22   infringement was willful, that decision should not and

11:07   23   cannot affect any damage award that you make.  It's up

11:07   24   to me as the Court to take willfulness into account

11:07   25   later.

1107

11:07  1          Let's talk about patent claims.

11:07  2          Before you decide many of the issues in

11:07  3  the case, you need to understand the role of a patent

11:07  4  claim.  Patent claims are the numbered sentences at the

11:07  5  end of each of the patents in this case.

11:07  6          Claims are important because it is the

11:07  7  words of those claims that define what the patents

11:07  8  cover.  Figures and text in the rest of the patent

11:07  9  provide a description and/or examples of the invention,

11:07  10  and they provide a context for the claims, but it is

11:07  11  the claims alone that define the breadth of the

11:07  12  patent's coverage.

11:07  13          What a patent covers depends in turn on

11:08  14  what each claim covers.  A claim may be narrower or

11:08  15  broader than another claim by setting forth more or

11:08  16  fewer requirements.  The coverage of a patent is

11:08  17  assessed on a claim-by-claim basis.

11:08  18          You will first need to understand what

11:08  19  each claim covers in order to decide whether or not

11:08  20  there's infringement of the claim and to decide whether

11:08  21  or not the claim is invalid.

11:08  22          The first step is to understand the

11:08  23  meaning of the words used in the claim -- each claim.

11:08  24  By understanding the meaning of the words in a claim

11:08  25  and by understanding that the words in a claim set

11:08  1   forth the requirements that a product must meet in

11:08  2   order to be covered by that claim, you will then be

11:08  3   able to understand the scope of coverage for each

11:08  4   claim.

11:08  5           Once you understand what each claim

11:08  6   covers, then you are prepared to decide the issues you

11:08  7   are asked to decide here, infringement and invalidity.

11:08  8           The law says it is my role to define the

11:08  9   terms of the claim.  It is your role to take my

11:09  10  definitions to the issues and apply them to the issues

11:09  11  that you are asked to decide in this case.  I'll

11:09  12  provide those definitions to you shortly.

11:09  13          You must accept my definitions of these

11:09  14  words in the claim as being correct.  But there will be

11:09  15  claim terms I did not define.  If I did not define

11:09  16  them, you are then to use the plain and ordinary

11:09  17  meaning of the limitations as understood by one of

11:09  18  ordinary skill in the art, which is to say in the field

11:09  19  of technology of the patent at the time of the

11:09  20  invention.

11:09  21          That should be "at the time the invention

11:09  22  was filed."

11:09  23          It is your job to take the plain and

11:09  24  ordinary meaning of these terms and apply them to the

11:09  25  issues that you are deciding, including the issues of

11:09  1    infringement and invalidity.

11:09  2                    The meaning of the words of the patent

11:09  3    claim must be the same when deciding the issue of

11:09  4    validity as when you're deciding the issue of

11:09  5    infringement.

11:09  6                    Each claim sets forth requirements in a

11:10  7    single sentence.  The requirements of a claim are often

11:10  8    referred to as claim elements or claim limitations.

11:10  9    The coverage of a patent is assessed on a

11:10  10   claim-by-claim basis.

11:10  11                   When a thing such as a product meets all

11:10  12   the requirements of a claim, then the claims are said

11:10  13   to cover that thing and that that thing is said to fall

11:10  14   within the scope of the claim.  A claim covers a

11:10  15   product when each of the claim elements or limitations

11:10  16   is found to be present in a product.

11:10  17                   If a product is missing even just one

11:10  18   limitation or element of the claim, then the product is

11:10  19   not covered by it.  If a system is not covered by the

11:10  20   claim, there can be no infringement of it.

11:10  21                   The case has one independent claim.

11:10  22                   An independent claim sets forth all the

11:10  23   requirements that must be met in order to be covered by

11:10  24   it.  Thus, it is not necessary to look at any other

11:10  25   claim in the patent to determine whether -- I'm

1110

11:11  1    sorry -- to determine what an independent claim covers.

11:11  2                    In this case the following are

11:11  3    independent claims:

11:11  4                    With regard to '768 patent, Claims 10 and

11:11  5    13 are independent.

11:11  6                    I'm sorry.  I misread the first sentence.

11:11  7    I think I may have said "only one."

11:11  8                    This case involves only independent

11:11  9    claims.  There are no dependent claims.

11:11  10                   I apologize for my mistake.

11:11  11                   So with regard to the '768 patent, the

11:11  12   independent claims are Claims 10 and 13; the '359

11:11  13   patent, Claim 19.

11:11  14                   Let's talk about comprising claims.

11:11  15                   The preamble or beginning portion of the

11:11  16   claims in this case use the word "comprising," which

11:11  17   means "including the following but not excluding

11:11  18   others."

11:11  19                   A claim that includes the word

11:11  20   "comprising" is not limited to products having only the

11:11  21   elements recited in the claim but also covers products

11:11  22   that might add additional elements.

11:11  23                   Let me give you an example.

11:11  24                   Let's say a claim covers an invention of

11:11  25   a table that has a tabletop, four legs, and nails.  In

—1111—

11:12  1    this example, tabletop, four legs, and nails are each

11:12  2    separate limitations or elements of the claim.

11:12  3            If such an example claim recited

11:12  4    "comprising" in the preamble or beginning portion, then

11:12  5    a table having a tabletop, four legs, and nails but

11:12  6    which also had wheels would still be covered by the

11:12  7    example claim.

11:12  8            The use of the terms "a" or "an" in a

11:12  9    claim is a term of art which has a special meaning in

11:12 10    the context of a patent claim.  When used in a claim,

11:12 11    the terms "a" or "an" mean "one or more."

11:12 12            Allow me to explain to you the meaning of

11:12 13    some of the words of the claims in this case.  In doing

11:12 14    so, I will explain some of the requirements of the

11:12 15    claims.

11:12 16            You must accept my definition of these

11:12 17    words in the claims as correct.  For any other words in

11:12 18    the claim, apply the plain and ordinary meaning to one

11:13 19    of skill in the art at the time of the invention.

11:13 20            You should not take any definition of the

11:13 21    language of the claims as an indication that I have any

11:13 22    view whatsoever regarding how you decide any of the

11:13 23    issues you are being asked to decide, whether it be

11:13 24    infringement or invalidity.  It's why we have you here.

11:13 25    You are the judges of that issue.

11:13  1              The first claim term is "peripheral

11:13  2  component interconnect -- or PCI -- bus

11:13  3  transaction"/"PCI bus transaction."  The Court

11:13  4  construed this to be:  A transaction in accordance with

11:13  5  the industry standard PCI local bus specification for

11:13  6  communication with interconnected peripheral component,

11:13  7  and "in accordance with" includes "backward

11:13  8  compatibility."

11:13  9              Next, "encoded... serial bit stream of a

11:13  10  PCI bus transaction" to be:  A PCI bus transaction that

11:13  11  has been serialized from parallel form.

11:13  12              The next couple I read will all have

11:14  13  plain and ordinary meaning.

11:14  14              One is "universal serial bus, USB

11:14  15  protocol."  One is "universal serial bus (USB) protocol

11:14  16  data."  One is "universal serial bus (USB) protocol

11:14  17  information."  And the final one with a plain and

11:14  18  ordinary meaning is "single chip."

11:14  19              With respect to the claim term "console,"

11:14  20  I've defined it to be a class -- a chassis or enclosure

11:14  21  housing one or more coupling sites that connects

11:14  22  components of a computer system.

11:14  23              Now, let's turn to the first issue you'll

11:14  24  have to decide, which is infringement.

11:14  25              MS. AMSTUTZ:  Your Honor.

—1113—

 1                   THE COURT:  Yes, ma'am.

11:14  2                   MS. AMSTUTZ:  I believe you skipped the

11:14  3    construction of address and data bits.

11:14  4                   THE COURT:  I did -- I skipped which one?

11:14  5                   MS. AMSTUTZ:  Address and data bits.

11:14  6    Also plain and ordinary meaning.

11:14  7                   THE COURT:  I did -- I'm sorry.  Thank

11:14  8    you.

11:14  9                   I should have added with regard to plain

11:14  10   and ordinary meaning, the claim term "address and data

11:14  11   bits of a peripheral component interconnect (PCI) bus

11:15  12   transaction" and "address and data bits of a PCI bus

11:15  13   transaction" also has plain and ordinary meaning.

11:15  14                   Thank you.

11:15  15                   I will now instruct you how to decide

11:15  16   whether or not the plaintiff has proven infringement.

11:15  17                   Infringement is assessed on a

11:15  18   claim-by-claim basis.  There may be infringement as to

11:15  19   one claim but no infringement as to another.  You may

11:15  20   also find that none of the claims are infringed or that

11:15  21   all of the claims are infringed.

11:15  22                   A patent owner in the United States has

11:15  23   the right to prevent others from using, selling, or

11:15  24   offering to sell in the United States or importing into

11:15  25   the United States products that are covered by the

11:15    1    patent claims during the life of the patent.

11:15    2            If any person or entity has engaged in

11:15    3    those acts without the patent owner's permission, then

11:15    4    we say that that person or entity has infringed the

11:15    5    asserted patent.

11:15    6            In reaching your decision on

11:15    7    infringement, keep in mind that only the claims of the

11:15    8    patent may be infringed. Compare the asserted patent

11:15    9    claims to the accused products in determining whether

11:16   10    or not there is infringement.

11:16   11            You should not compare the accused

11:16   12    products with any specific example set out in the

11:16   13    specification of the patent in reaching your decision

11:16   14    on infringement. The only correct comparison is with

11:16   15    the language of the claims themselves.

11:16   16            Reach your decision as to each assertion

11:16   17    or infringement based only on and exclusively on the

11:16   18    meaning and the scope of the claims, the legal

11:16   19    requirements for infringement, and the evidence

11:16   20    presented in this courtroom to you by the parties.

11:16   21            Although I as the Court and the parties

11:16   22    may refer to the claims collectively, it is your job to

11:16   23    conduct your infringement analysis with respect to each

11:16   24    one of the asserted claims in the asserted patents.

11:16   25    Your infringement analysis must be conducted on a

1115

11:16  1    claim-by-claim basis.

11:16  2                There are two possible ways a claim might

11:16  3    be infringed.  They're called first, direct

11:17  4    infringement; and second, active inducement.  Active

11:17  5    inducement is referred to as indirect infringement.

11:17  6    There cannot be indirect infringement without someone

11:17  7    else engaging in direct infringement.

11:17  8                In this case, plaintiff has alleged that

11:17  9    defendants directly infringe the claims of the asserted

11:17  10   patents, but they also contend that United States

11:17  11   customers and end users directly infringe their patents

11:17  12   and that the defendants are liable for actively

11:17  13   inducing that direct infringement by the United States

11:17  14   customers and other end users.

11:17  15               To prove infringement, plaintiff must

11:17  16   prove that the requirements for one or more of these

11:17  17   types of infringement are met by a preponderance of the

11:17  18   evidence.  That is, that it is more likely than not

11:17  19   that all the requirements of one or more of each of

11:17  20   these types of infringement have been proved.

11:17  21               I will now explain to you what I mean by

11:17  22   these different forms of infringement.  Let's start

11:18  23   with direct infringement.

11:18  24               For the plaintiff to prove defendants

11:18  25   directly infringe any claim of any of the asserted

11:18  1    patents, there are two things which must be proven.

11:18  2              First, that the accused products must

11:18  3    meet the limitations of the asserted claims of the

11:18  4    asserted patents and also that defendants committed an

11:18  5    alleged act of infringement in the United States with

11:18  6    respect to those accused products.

11:18  7              First, the plaintiff contends that

11:18  8    defendants imported the accused products into the

11:18  9    United States and/or sold the accused products within

11:18  10   the United States.

11:18  11             The first issue related to this

11:18  12   contention that you will decide is whether sales of the

11:18  13   accused products by ASGL to ACI constituted a sale or

11:18  14   act of importation by ASUSTeK or ASGL in the United

11:18  15   States.

11:18  16             Anyone who sells, offers to sell, or

11:19  17   imports any imported -- any patented invention within

11:19  18   the United States without permission has infringed.

11:19  19             On this issue, the burden of proof is on

11:19  20   the plaintiff.  This means in order for you to answer

11:19  21   the issue "yes" in favor of plaintiff, they must prove

11:19  22   to you by the preponderance of the evidence that

11:19  23   defendants ASUSTeK and ASGL either imported the accused

11:19  24   products in the United States or that they sold the

11:19  25   accused products in the United States.

11:19   1                        To determine whether ASGL sold the

11:19   2    accused products in the United States, consider all the

11:19   3    circumstances, including:

11:19   4                        Location of the buyer and seller;

11:19   5                        Whether ASGL conducted essential

11:19   6    activities, such as negotiation, execution,

11:19   7    performance, and delivery in the United States;

11:19   8                        Where the products were shipped from and

11:19   9    where the products were shipped to;

11:19   10                       Whether physical transfer of tangible

11:19   11   property occurred;

11:19   12                       Whether ownership or title to the

11:19   13   products passed; and,

11:19   14                       Finally, the importer of record.

11:19   15                       To determine whether ASGL imported the

11:20   16   accused products in the United States, consider the

11:20   17   same circumstances.  The importation consists of

11:20   18   bringing the accused products into the United States

11:20   19   from outside the country.

11:20   20                       You should consider:

11:20   21                       Whether ASGL conducted essential

11:20   22   activities, such as negotiation, execution,

11:20   23   performance, and delivery in the United States;

11:20   24                       Where the products were shipped from and

11:20   25   shipped to;

—1118—

11:20  1          Whether the physical transfer of tangible

11:20  2  property occurred;

11:20  3          Whether ownership or title to the

11:20  4  products passed; and,

11:20  5          The importer of record.

11:20  6          Second, plaintiff contends that even if

11:20  7  defendants did not themselves import or sell the

11:20  8  accused products in the United States, that defendants

11:20  9  are liable for acts of importing, offering to sell, and

11:20  10  selling the accused product that were conducted by ACI

11:20  11  in the United States.

11:20  12          For plaintiff to prove direct literal

11:20  13  infringement under this theory, plaintiff must prove

11:20  14  that there is an agency relationship between, first,

11:20  15  ASUSTeK, second, ASGL, third, and/or ACI, or that ACI

11:21  16  is an alter ego of ASUSTeK and/or ASGL.

11:21  17          What do I mean by alter ego?

11:21  18          A legal entity, such as a corporation,

11:21  19  must maintain its formal existence sufficiently

11:21  20  separate and apart from other entities, such as other

11:21  21  corporations, or the two entities will be considered to

11:21  22  be "alter egos," "agents," or "instrumentalities" of

11:21  23  each other.

11:21  24          A subsidiary may be an alter ego, agent,

11:21  25  or instrumentality of its parent if its sole purpose in

11:21  1    founding the subsidiary corporation was to distribute

11:21  2    in the United States the parent's products, in which

11:21  3    case the parent is liable because the relevant decision

11:21  4    to import and distribute the allegedly patent

11:21  5    infringing products was ultimately controlled by the

11:21  6    parent.

11:21  7           If plaintiff can show that ASUSTeK and

11:21  8    its subsidiaries, ASGL and ACI, are so closely linked

11:22  9    that those subsidiaries had no separate mind, will, or

11:22  10   existence of their own and are business conduits of

11:22  11   ASUSTeK because of the domination of finance -- yeah --

11:22  12   domination of finances, policies, and practices that

11:22  13   ASUSTeK has over ASGL and ACI, then you may find that

11:22  14   ASUSTeK should be held personally liable for the

11:22  15   subsidiary corporations for purposes of determining

11:22  16   infringement liability and whether ASGL received

11:22  17   sufficient notice of infringement.

11:22  18           When a parent corporation and its

11:22  19   subsidiary corporation operate as separate entities and

11:22  20   observe corporate formalities, a heavy presumption

11:22  21   exists that the subsidiary is not an alter ego of the

11:22  22   parent corporation.

11:22  23           So in order for ASUSTeK to be held liable

11:22  24   for the product of either -- conduct of either ASGL or

11:22  25   ACI subsidiaries, the plaintiff bears a burden of

—1120—

11:23  1  proving alter ego or agency liability, and the standard

11:23  2  of proof is a preponderance of the evidence, which

11:23  3  we've already discussed.

11:23  4          To decide whether a parent corporation

11:23  5  and subsidiary corporation are effectively one and the

11:23  6  same, consider the following factors:

11:23  7          First, whether the parent and the

11:23  8  subsidiary have common directors or officers;

11:23  9          Whether the parent and subsidiary have

11:23  10  common business departments;

11:23  11          Whether they filed consolidated financial

11:23  12  statements;

11:23  13          Whether the parent finances the

11:23  14  subsidiary;

11:23  15          Whether the parent causes -- whether

11:23  16  the -- whether the parent caused the incorporation of

11:23  17  subsidiary -- of the subsidiary.

11:23  18          I think probably that's "caused."

11:23  19          6, whether the subsidiary receives no

11:23  20  business except that given to it by the parent;

11:23  21          7, whether the daily operations of the

11:23  22  two corporations are not kept separate;

11:23  23          Whether corporate formalities have been

11:23  24  disregarded; and,

11:24  25          Whether the subsidiary operates with

—1121—

11:24  1    inadequate capital.

11:24  2              You must make your decision after

11:24  3    considering these factors under the totality of the

11:24  4    circumstances and by a preponderance of the evidence.

11:24  5    Not all factors must be present.

11:24  6              Let's talk about infringement of the

11:24  7    apparatus patent claims.

11:24  8              If you find that ASGL itself sold or

11:24  9    imported the accused products in the United States or

11:24  10   that ASUSTeK and/or ASGL are vicariously liable for the

11:24  11   actions of ACI pursuant to an alter ego or agency

11:24  12   doctrine, then decide separately for each asserted

11:24  13   claim of the apparatus patent whether or not there is

11:24  14   infringement.

11:24  15             Plaintiff asserts liability under

11:24  16   Section 271(a) of the following claims of the asserted

11:24  17   patents:  Claim 19 of the '359 patent and Claims 10 and

11:24  18   13 of the '768 patent, the "Apparatus Patents."

11:24  19             There are two types of direct

11:25  20   infringement.  One's literal, and one is infringement

11:25  21   under the doctrine of equivalents.

11:25  22             In order to prove direct literal

11:25  23   infringement of a patent claim, plaintiff must prove by

11:25  24   a preponderance of the evidence that it is more likely

11:25  25   than not that the other party made, used, sold, offered

—1122—

11:25  1    for sale within the United States, or imported in the

11:25  2    United States a product or system that meets all the

11:25  3    requirements of a claim and did so without the patent

11:25  4    owner's permission.

11:25  5          You must compare the accused products

11:25  6    with each and every one of the requirements of a claim

11:25  7    to determine whether all of the requirements of that

11:25  8    claim are literally met.

11:25  9          If a company makes, uses, sells, offers

11:25  10   to sell within, or imports in the United States a

11:25  11   product that does not literally meet all of the

11:25  12   elements of a claim and thus does not literally

11:25  13   infringe that claim, there can still be direct

11:25  14   infringement so long as that product satisfies the

11:25  15   claim elements under the doctrine of equivalents.

11:26  16         What is the doctrine of equivalents?

11:26  17         It means that a product infringes a claim

11:26  18   if the accused product contains elements that literally

11:26  19   meet or are equivalent to each and every element of the

11:26  20   claim.

11:26  21         You may find an element is equivalent to

11:26  22   an element of a claim that is not met literally if a

11:26  23   person having ordinary skill in the field of the

11:26  24   technology of the patent would have considered the

11:26  25   differences between them to be insubstantial or would

—1123—

11:26  1    have found that the elements of the claim, one,

11:26  2    performed substantially the same function; and, two,

11:26  3    work in substantially the same way to achieve

11:26  4    substantially the same result of the element of the

11:26  5    claim.

11:26  6              To prove infringement by equivalents,

11:26  7    plaintiff must prove the equivalency of the structure

11:26  8    or action to the claim element by the burden of proof

11:26  9    of a preponderance of the evidence.

11:26  10             Each element of the claim must be met by

11:26  11   the accused product either literally or under the

11:27  12   doctrine of equivalents for you to find infringement.

11:27  13             Known interchangeability of the claim

11:27  14   element and the proposed equivalent is a factor that

11:27  15   can support a finding of infringement under the

11:27  16   doctrine of equivalents.

11:27  17             In order for this structure to be

11:27  18   considered interchangeable, the claim element must have

11:27  19   been known at the time of the alleged infringement to a

11:27  20   person having ordinary skill in the field of the

11:27  21   technology of the patent.  Interchangeability at the

11:27  22   present time would not be sufficient.

11:27  23             Let's talk about active inducement.

11:27  24             The plaintiff accuses the defendants for

11:27  25   infringement by actively inducing its customers,

11:27    1    including related entities, unrelated entities, or end

11:27    2    users, to directly infringe the asserted patents

11:27    3    literally or under the doctrine of equivalents.

11:27    4                As with direct infringement, determine

11:27    5    whether there's been active inducement on a

11:27    6    claim-by-claim basis.

11:27    7                Induced infringement requires knowledge

11:28    8    by the accused infringer that the induced acts

11:28    9    constitute patent infringement or at least willful

11:28   10    blindness to the likelihood of infringement.

11:28   11                A party is liable for active inducement

11:28   12    of a claim only if the patent owner proves by a

11:28   13    preponderance of the evidence the following:

11:28   14                That the acts are actually carried out by

11:28   15    the defendants' customers directly infringe that claim;

11:28   16                Second, that defendants took action

11:28   17    during the time the asserted patents were in force that

11:28   18    were intended to cause and did lead to the infringing

11:28   19    acts by its customers; and,

11:28   20                Third, defendants were aware of the

11:28   21    asserted patents and knew the acts, if taken, would

11:28   22    constitute infringement of any of the asserted patents,

11:28   23    or that defendants believed there was a high

11:28   24    probability that the acts by its customers infringed

11:28   25    the asserted patents and took deliberate steps to avoid

11:28   1   learning of the infringement, i.e., were willfully

11:28   2   blind -- willfully blinded itself to the infringing

11:29   3   nature of the direct infringer's acts.

11:29   4           If you find that ASUSTeK and/or ASGL were

11:29   5   aware of the patent but believed that the acts

11:29   6   encouraged did not infringe that patent, then both

11:29   7   cannot be found liable for inducement.

11:29   8           To establish active inducement of

11:29   9   infringement, it is not sufficient that ASUSTeK and/or

11:29   10  ASGL's customers themselves directly infringe the claim

11:29   11  or any claim.  It's not sufficient that either

11:29   12  defendant was aware of the acts by its customers to

11:29   13  allegedly constitute the direct infringement.

11:29   14          Rather, to find active inducement of

11:29   15  infringement, you must find either the defendants

11:29   16  specifically intended their customers to infringe the

11:29   17  asserted patents or that they believed there was a high

11:29   18  probability their customers would infringe the asserted

11:29   19  patents but deliberately avoided learning the

11:29   20  infringing nature of the acts.

11:30   21          There mere fact, if true, that either

11:30   22  defendant knew or should have known there was a

11:30   23  substantial risk that ASUSTeK and/or ASGL's customers'

11:30   24  acts would infringe the asserted patents would not, in

11:30   25  and of itself, be sufficient to support a finding of

—1126—

11:30  1    active inducement of infringement.

11:30  2                    Let's turn to plaintiff's allegation of

11:30  3    willful infringement.

11:30  4                    Plaintiff argues that defendants

11:30  5    willfully infringed the asserted patents.  If you

11:30  6    decide that defendants have infringed the claims of an

11:30  7    asserted patent, then you must go on and address the

11:30  8    additional issue of whether or not said infringement

11:30  9    was willful, which requires you to determine whether

11:30  10   plaintiff proved that it is more likely than not that

11:30  11   either or both defendants knew of the asserted patents

11:30  12   and that their infringement was intentional.

11:30  13                   You may not determine that the

11:30  14   infringement was willful just because they were aware

11:30  15   of the asserted patents and infringed one or more of

11:30  16   them.  Instead, you must also find that either or both

11:31  17   defendants deliberately infringed the at least one of

11:31  18   the asserted patents.

11:31  19                   You may find that an infringer willfully

11:31  20   infringed if you find that the infringer's behavior was

11:31  21   malicious, wanton, deliberately -- deliberate,

11:31  22   consciously wrongful, flagrant, or in bad faith.

11:31  23                   To determine whether both or either

11:31  24   defendant acted willfully, consider all facts and

11:31  25   assess whether their knowledge at the time -- consider

—1127—

11:31   1    all of their knowledge at the time of their challenged

11:31   2    conduct.

11:31   3                    You may consider the following facts but

11:31   4    you're not limited to them:

11:31   5                    Whether or not either defendant acted

11:31   6    consistently with the standards of behavior in the

11:31   7    industry;

11:31   8                    Whether either intentionally copied a

11:31   9    product of the plaintiff's that is covered by any of

11:31   10   the asserted patents;

11:31   11                   Whether or not either defendant

11:31   12   reasonably believed it did not infringe or that the

11:32   13   patents were invalid;

11:32   14                   Whether or not either defendant made a

11:32   15   good-faith effort to avoid infringing the asserted

11:32   16   patents, for example, whether they attempted to design

11:32   17   around the asserted patents; and,

11:32   18                   Whether or not either defendant tried to

11:32   19   cover up the infringement.

11:32   20                   Again, that's not an exhaustive list.

11:32   21   It's just instructive for you.

11:32   22                   Your determination of willfulness should

11:32   23   incorporate the totality of the circumstances based on

11:32   24   the evidence you received at trial.

11:32   25                   If you decide that any infringement was

—1128—

11:32  1    willful, that decision must not affect any damage award

11:32  2    you give.  The issue of willfulness is for me to

11:32  3    consider after the trial is over.

11:32  4                Let's talk about invalidity.

11:32  5                Here are the rules you must follow in

11:32  6    deciding whether or not either defendant has proven

11:32  7    that the asserted claims are invalid.

11:32  8                A patent is presumed valid based on the

11:32  9    presumption that the United States Patent Office acted

11:32  10   correctly in issuing the patent.  The burden of

11:33  11   establishing invalidity of a patent or any claim of

11:33  12   that patent rests solely with the party asserting

11:33  13   invalidity, in this case the defendants.

11:33  14               Claims are construed in the same way for

11:33  15   determining infringement as for determining validity or

11:33  16   invalidity.  You must apply the claim language

11:33  17   consistently and in the same manner for issues of

11:33  18   infringement and for issues of invalidity.  In making

11:33  19   your determination as to invalidity, you should

11:33  20   consider each claim separately.

11:33  21               It is your job as jurors to consider the

11:33  22   evidence presented by the defendants and determine

11:33  23   independently whether or not they have proven that the

11:33  24   asserted patents are invalid.  And the burden of proof

11:33  25   here is by clear and convincing evidence.

11:33  1                One of the contentions by defendant is

11:33  2    with respect to the written description requirement.

11:33  3                Patent law contains certain requirements

11:33  4    for the part of the patent called the specification.

11:34  5    The written description requirement is designed to

11:34  6    ensure that the inventor was in possession of the full

11:34  7    scope of the claimed invention at the time of the

11:34  8    patent's effective filing date.

11:34  9                The defendants contend that the asserted

11:34  10   claims of the asserted patents are invalid because the

11:34  11   specification of the asserted patents does not -- do

11:34  12   not contain an adequate written description of the

11:34  13   inventions claimed.

11:34  14               To succeed, defendants must show by clear

11:34  15   and convincing evidence a person having ordinary skill

11:34  16   in the field reading the asserted patents'

11:34  17   specification as of the effective filing dates of,

11:34  18   first, May 12th, 2000, for the '768 patent, and second,

11:34  19   for the '359 patent, would not have recognized that

11:34  20   they describe the full scope of the invention as they

11:34  21   are finally claimed in the asserted claims of the

11:34  22   asserted patents.

11:34  23               The specification must describe the

11:34  24   claimed invention in sufficient detail that one skilled

11:35  25   in the art would clearly recognize that the inventor

1130

11:35  1    invented the claimed invention.  If a patent claim

11:35  2    lacks adequate written description, it's invalid.

11:35  3            In deciding whether the patent satisfies

11:35  4    the written description requirement, you must consider

11:35  5    the description from the viewpoint of a person having

11:35  6    ordinary skill in the field of technology of the patent

11:35  7    as of the effective filing date.

11:35  8            The specification must describe the full

11:35  9    scope of the claimed invention, including each element

11:35  10   thereof, either expressly or inherently.

11:35  11           A claimed element is disclosed inherently

11:35  12   if a person having ordinary skill in the field of the

11:35  13   effective filing date -- as of the effective filing

11:35  14   date would have understood that the element was

11:35  15   necessarily present in what the specification

11:35  16   discloses.

11:35  17           It is not sufficient that the

11:35  18   specification discloses only enough to make the claimed

11:35  19   invention obvious to the person having ordinary skill.

11:35  20           The written description does not have to

11:35  21   be exact words of the claim.  The requirement may be

11:36  22   satisfied with words, structures, figures, diagrams,

11:36  23   formulas contained in the patent specification.

11:36  24           Adequate written description does not

11:36  25   require either examples or an actual reduction to

—1131—

11:36   1   practice of the claimed inventions.  However, a mere

11:36   2   wish or plan for obtaining the claimed invention is not

11:36   3   adequate written description.

11:36   4            Rather, the level of disclosure required

11:36   5   depends on a variety of factors, such as the existing

11:36   6   knowledge in a particular field, the extent and content

11:36   7   of the prior art, the maturity of the science or

11:36   8   technology, and other considerations appropriate to the

       9   subject matter.

11:36   10            Claims that are directed to an invention

11:36   11   that is distinct from those disclosed in the

11:36   12   specification do not satisfy the written description

11:36   13   requirement.  Accordingly, claims may be no broader

11:36   14   than the supporting disclosure that the inventor must

11:36   15   possess the full scope of the claimed subject matter to

11:36   16   satisfy the written description requirement.

11:36   17            The second -- or a second argument made

11:37   18   by defendant has to do with enablement.

11:37   19            With respect to enablement, it's a

11:37   20   requirement contained in patent law for the part of the

11:37   21   patent called the specification and it is the

11:37   22   enablement requirement.

11:37   23            The defendants contend that the asserted

11:37   24   claim or claims of the asserted patents are invalid

11:37   25   because the specification does not enable the full

11:37  1    scope of the claimed invention.

11:37  2                To succeed, the defendants must show by

11:37  3    the burden of proof of clear and convincing evidence

11:37  4    that the asserted patent specifications do not contain

11:37  5    sufficiently full, clear descriptions to allow a person

11:37  6    having ordinary skill in the field of the technology of

11:37  7    the patent to make and use the full scope of the

11:37  8    claimed inventions as of the effective filing date of

11:37  9    May 12th, 2000 for the '768 and '359 patents without

11:37  10   undue experimentation.

11:37  11               If a patent claim is not enabled, it is

11:37  12   invalid.

11:38  13               Enablement serves the dual function of

11:38  14   ensuring adequate disclosure of the claimed invention

11:38  15   and of preventing claims broader than what is disclosed

11:38  16   in the invention.  The enablement requirement prevents

11:38  17   both inadequate disclosure of an invention and

11:38  18   overbroad claiming that might otherwise attempt to

11:38  19   cover more than was actually invented.

11:38  20               The scope of the claims must be less than

11:38  21   or equal to the scope of the enablement to ensure that

11:38  22   public knowledge is enriched by the patent

11:38  23   specification to a degree at least commensurate with

11:38  24   the scope of what is claimed in the claims.  Claims are

11:38  25   invalid for lack of enablement if their broad scope is

11:38  1   not reasonably supported by the scope of enablement in

11:38  2   the specification.

11:38  3             The question of undue experimentation is

11:38  4   one of degree, and what is required is that the amount

11:38  5   of experimentation not be "unduly extensive."  Some

11:38  6   amount of experimentation to make and use an invention

11:38  7   is allowable.  In deciding whether a person having

11:38  8   ordinary skill would have to experiment unduly in order

11:39  9   to make and use the invention, consider the following:

11:39  10            The time and cost of any necessary

11:39  11  experimentation;

11:39  12            How routine any necessary experimentation

11:39  13  is in the fields of computer and computer system design

11:39  14  and computer peripheral communications;

11:39  15            Whether the patent discloses specific

11:39  16  working examples of the claimed invention;

11:39  17            The amount of guidance presented in the

11:39  18  patent;

11:39  19            The nature and predictability of the

11:39  20  fields of computer and computer system design and

11:39  21  computer peripheral communications;

11:39  22            The level of ordinary skill in the field

11:39  23  of computer and computer systems design and computer

11:39  24  peripheral communications; and,

11:39  25            The nature and scope of the claimed

1134

11:39   1    invention.

11:39   2          No one or more of these factors is

11:39   3    dispositive by itself.  Rather, make your decision

11:39   4    about whether or not the degree of experimentation

11:39   5    required is undue based on all of the evidence you

11:39   6    heard at trial.

11:39   7          Weigh these factors and determine whether

11:39   8    or not, in the context of this invention and the state

11:40   9    of art at the time of the effective filing date, a

11:40  10    person having ordinary skill would need to experiment

11:40  11    unduly to make and use the full scope of the claimed

11:40  12    invention.

11:40  13          We've heard a lot in this case about

11:40  14    someone having ordinary skill in the art.  You must

11:40  15    follow this instruction when determining that in this

11:40  16    case.

11:40  17          The question of invalidity of the patent

11:40  18    claim is determined from the perspective of a person of

11:40  19    ordinary skill in the art in the field of the asserted

11:40  20    invention as of the priority date of each asserted

11:40  21    patent.

11:40  22          A person of ordinary skill in the art is

11:40  23    a hypothetical person that is presumed to have known

11:40  24    all of the relevant prior art at the time of the

11:40  25    claimed invention.  In deciding the level of ordinary

1135

11:40  1    skill, you should consider all the evidence introduced

11:40  2    at trial, including:

11:40  3             The level of education and experience of

11:40  4    the inventor and other persons actively working in the

11:40  5    field;

11:40  6             The types of problems encountered in the

11:40  7    field;

11:40  8             Prior art solutions to those problems;

11:40  9             The rapidity with which innovations are

11:40 10    made; and

11:41 11             The sophistication of the technology.

11:41 12             A person of ordinary skill in the art (a

11:41 13    POSITA) as of the alleged priority date of the asserted

11:41 14    patents is a person who had at least a master's degree

11:41 15    in electrical engineering, computer science, or related

11:41 16    subject, or a bachelor's degree in electrical

11:41 17    engineering, computer science, or related subject and

11:41 18    at least three years of experience working with

11:41 19    computer architecture, computer buses, and related

11:41 20    technologies.

11:41 21             Now, the good news is we're doing the

11:41 22    damages.  Why is it good news?  Because it means we're

11:41 23    almost done.

11:41 24             So if you find that the defendants

11:41 25    infringed any valid claim of the asserted patents, you

1136

11:41  1    must then consider what amount of damages to award to

11:41  2    the plaintiff.

11:41  3              I'm now going to instruct you on how to

11:41  4    determine the measure of damages. But by instructing

11:41  5    you on damages, I'm not suggesting that either party

11:41  6    should win this case. I'm instructing you on damages

11:41  7    only in the event that you first find that the

11:42  8    plaintiff's proven infringement of a claim that is

11:42  9    valid.

11:42  10             If you find that both defendants have not

11:42  11   infringed any valid claim of the patent, then plaintiff

11:42  12   is not entitled to damages. But in the event you do

11:42  13   award damages, the damages you award must be adequate

11:42  14   to compensate plaintiff for the infringement. They are

11:42  15   not meant to punish the infringer.

11:42  16             The plaintiff has the burden to establish

11:42  17   what the amount of the damages is by a preponderance of

11:42  18   the evidence. In other words, you should award only

11:42  19   the damages that the plaintiff established are more

11:42  20   likely it suffered than not.

11:42  21             While plaintiff is not required to prove

11:42  22   the amount of its damages with mathematical precision,

11:42  23   it must prove them within a reasonable certainty. You

11:42  24   may not award damages that are speculative or only

11:42  25   possible or based on your guesswork.

—1137—

11:42  1                    These are -- there are different types of

11:42  2    damages that plaintiff may be entitled to recover, and

11:42  3    that's generally speaking.

11:43  4                    There are different types of damages that

11:43  5    any -- a party may be able to recover.  In this case,

11:43  6    the plaintiff is seeking what we call a reasonable

11:43  7    royalty, which is defined as the money amount that the

11:43  8    plaintiff, on the one hand, and defendants, on the

11:43  9    other hand, would have agreed upon as a fee for use of

11:43  10   the invention at the time just prior to when

11:43  11   infringement began.

11:43  12                   You must be careful to -- careful to

11:43  13   ensure that your award is no more and no less than the

11:43  14   value of the patented invention.  If you award damages,

11:43  15   the plaintiff is entitled to recover no less than a

11:43  16   reasonable royalty for each infringing sale.

11:43  17                   If you find that a patent claim is

11:43  18   infringed and not valid, plaintiff is entitled to at

11:43  19   least a reasonable royalty to compensate it for that

11:43  20   patent infringement.

11:43  21                   What is a reasonable royalty?

11:43  22                   It is a royalty that is a payment made to

11:43  23   a patentholder in exchange for the right to make, use,

11:44  24   or sell the claimed invention.

11:44  25                   It is the amount of royalty payment that

11:44  1   a patent holder, on the one hand, and the alleged

11:44  2   infringer, on the other, would have agreed to in a

11:44  3   hypothetical negotiation taking place at a time

11:44  4   immediately prior to when the infringement first began.

11:44  5          In considering this hypothetical

11:44  6   negotiation, focus on what the expectations of the

11:44  7   patentholder and the alleged infringer would have been

11:44  8   had they entered into an agreement at that time and if

11:44  9   they'd acted reasonably during their negotiations.

11:44  10         You must assume that both parties

11:44  11  believed the patent was valid, that it was infringed,

11:44  12  and both parties were willing to enter into this

11:44  13  agreement.  Your role, then, is to determine what the

11:44  14  result of that negotiation would have been.

11:44  15         The reasonable royalty you determine must

11:44  16  be a royalty that would have resulted from a

11:44  17  hypothetical negotiation and not simply the royalty

11:44  18  that either party would have preferred.

11:45  19         Evidence of things that happened after

11:45  20  the infringement first began can be considered in

11:45  21  evaluating the reasonable royalty but only to the

11:45  22  extent this evidence aids you in assessing what royalty

11:45  23  would have resulted from the hypothetical negotiation.

11:45  24         And again, that negotiation would have

11:45  25  taken place immediately before the first infringement.

―1139―

11:45    1    The parties agree that the date of the hypothetical

11:45    2    negotiation in this case is December 17th, 2013.

11:45    3              A reasonable royalty can be paid either

11:45    4    in the form of a one-time lump-sum payment or as a

11:45    5    running royalty.  Either method is designed to

11:45    6    compensate the patentholder based on the infringer's

11:45    7    use of the patented technology.

11:45    8              But it's up to you, based on the

11:45    9    evidence, to decide what type of royalty, if any, is

11:45    10    appropriate in our case.

11:45    11              A reasonable royalty award can take the

11:45    12    form of a lump-sum payment, which is equal to an amount

11:45    13    that the alleged infringer would have paid at the time

11:45    14    of the hypothetical negotiation to obtain a license

11:46    15    that covered all sales of the licensed product, both

11:46    16    past and future.

11:46    17              When a lump sum is paid, the infringer

11:46    18    pays a single price for a license covering both past

11:46    19    and future infringing sales.

11:46    20              Reasonable royalty awards may also take

11:46    21    the form of a running royalty based on the revenue from

11:46    22    or the volume of sales of licensed products.

11:46    23              A running royalty can be calculated, for

11:46    24    example, by multiplying the royalty base by a royalty

11:46    25    rate or by multiplying the number of infringing

—1140—

11:46  1    products or product units sold by a royalty amount per

11:46  2    unit.

11:46  3             Let's talk about apportionment.

11:46  4             The amount of damages that you award must

11:46  5    be based on the value attributable to the patented

11:46  6    invention as distinct from the unpatented features of

11:46  7    the accused product or other factors such as marketing

11:46  8    or advertising.

11:46  9             A royalty compensating plaintiff for

11:46  10   damages must reflect only the value attributable to the

11:47  11   invented feature of the accused product, no more.

11:47  12            The process of separating the value of

11:47  13   the allegedly infringing features of the accused

11:47  14   products or process from the value of all other

11:47  15   features not accused is called apportionment.

11:47  16            When the accused infringing products have

11:47  17   both patented and unpatented features, your award must

11:47  18   be apportioned so that it is based only on the value of

11:47  19   the patented feature, no more.

11:47  20            The process of separating the value of

11:47  21   the allegedly infringing features from the value of all

11:47  22   other features is called apportionment.

11:47  23            When the technology accused of

11:47  24   infringement has both patented and unpatented features,

11:47  25   your award must be apportioned so that it is based only

11:47  1   on the value of the patented features.

11:47  2                  Apportionment can be addressed in a

11:47  3   variety of ways, including by careful selection of your

11:47  4   royalty base to reflect the value added by the patented

11:47  5   feature or by adjustment of the royalty rate so as to

11:47  6   discount the value of the product's non-patented

11:47  7   features or by a combination thereof.

11:47  8                  In determining the appropriate royalty

11:48  9   base and the appropriate royalty rate, the ultimate

11:48  10  combination of both the royalty rate and royalty base

11:48  11  must reflect the valuable -- value attributable to the

11:48  12  patented technology.

11:48  13                  The royalty base must be closely tied to

11:48  14  the invention.  It is not sufficient to use a royalty

11:48  15  base that is too high and adjust the damages downward

11:48  16  by applying a lower royalty rate.

11:48  17                  It is also not appropriate to select a

11:48  18  royalty base that is too low and then adjust it up by

11:48  19  awarding -- or applying a higher royalty rate.

11:48  20                  You must determine an appropriate royalty

11:48  21  rate and an appropriate royalty base that reflect the

11:48  22  value attributable to the patented invention alone.

11:48  23                  You've heard -- I think the damage

11:48  24  experts provided this information to you, but I'll go

11:48  25  over it again with respect to what the reasonable

11:48  1    royalty factors are.

11:48  2                   In determining what a reasonable royalty

11:48  3    that would have resulted from the hypothetical

11:49  4    negotiation is, consider the following:

11:49  5                   The royalties received by the patentee

11:49  6    for licensing the asserted patents, proving or tending

11:49  7    to prove an established royalty;

11:49  8                   The rates paid by the licensee for the

11:49  9    use of other patents comparable to the asserted

10    patents;

11:49  11                   The nature and scope of the license, as

11:49  12    exclusive or nonexclusive, or as restricted or

11:49  13    non-restricted in terms of territory or with respect to

11:49  14    whom the manufactured product must be sold;

11:49  15                   The licensor's established policy

11:49  16    regarding either licensing or not licensing the

11:49  17    asserted patents;

11:49  18                   Commercial relationship between the

11:49  19    licensor and licensee, such as whether they're

11:49  20    competitors in the same territory in the same line of

11:49  21    business, or whether they are inventor and promoter;

11:49  22                   The effect of selling the patented

11:49  23    specialty in promoting sales of other products of the

11:49  24    licensee, the existing value of the invention to the

11:49  25    licensor as a generator of sales of his non-patented

1143

11:49 1  items, and the extent of such derivative or convoyed

11:50 2  sales;

11:50 3          The duration of the patent and the terms

11:50 4  of the license;

11:50 5          The established probability of the

11:50 6  product made under the patents and its commercial

11:50 7  success;

11:50 8          The utility and advantages of the

11:50 9  patented property over the old modes or devices;

11:50 10          The nature of the patented invention, the

11:50 11  character of the commercial embodiment of it as owned

11:50 12  and produced by the licensor, and the benefits to those

11:50 13  who have used the invention;

11:50 14          The extent to which the infringer has

11:50 15  made use of the invention and any evidence of the value

11:50 16  of said use;

11:50 17          The portion of the profit or of the

11:50 18  selling price that may be customary in the particular

11:50 19  business or in comparable businesses to allow for the

11:50 20  use of the invention or analogous inventions;

11:50 21          The portion of the realizable profit that

11:50 22  should be credited to the invention as distinguished

11:50 23  from non-patented elements, the manufacturing process,

11:50 24  business risks, or significant features or improvements

11:50 25  added by the infringer;

11:50   1           The opinion and testimony of qualified

11:50   2   experts;

11:50   3           The amount that a licensor, such as the

11:50   4   patentee, and a licensee, such as the infringer, would

11:50   5   have agreed upon at the time the agreement began if

11:51   6   both had been reasonably and voluntarily trying to

11:51   7   reach an agreement; that is, the amount which a prudent

11:51   8   licensee -- who desired, as a business proposition, to

11:51   9   obtain a license to manufacture and sell a particular

11:51   10  article embodying the patented invention -- would have

11:51   11  been willing to pay as a royalty and yet be able to

11:51   12  make a reasonable profit and which amount would have

11:51   13  been acceptable by a prudent patentee who was willing

11:51   14  to grant a license.

11:51   15          No one factor is dispositive.  You can

11:51   16  and should consider the evidence that has been

11:51   17  presented to you in the case on each of the factors.

11:51   18          You may also consider any other factors

11:51   19  which in your mind would have increased or decreased

11:51   20  the royalty the alleged infringer would have been

11:51   21  willing to pay and the patentholder would have been

11:51   22  willing to accept acting as normally prudent business

11:51   23  people.

11:51   24          The existence of any comparable patent

11:51   25  royalty agreement or other transaction may inform your

11:51    1    decision as to the proper amount and form of the

11:51    2    reasonable royalty award, similar to the way in which

11:52    3    the value of a house is determined relative to the

11:52    4    comparable houses sold in the same neighborhood.

11:52    5            Whether a particular agreement or other

11:52    6    transaction is comparable to the license under the

11:52    7    hypothetical license scenario depends on many factors,

11:52    8    such as whether they involve comparable technologies,

11:52    9    economic circumstances, structure, and scope.

11:52    10           If there are differences between a

11:52    11   license agreement and the hypothetical license, you

11:52    12   must take these into account as you make your

11:52    13   reasonable royalty determination.

11:52    14           While the parties to the hypothetical

11:52    15   negotiation assume a patent is valid and infringed, an

11:52    16   agreement may be comparable even if there's been no

11:52    17   such determination or assumption by the parties to the

11:52    18   agreement that the patent is valid and infringed.

11:52    19           The question is whether the agreement is

11:52    20   sufficiently comparable that it provides a reasonable

11:52    21   indication of how the parties to this hypothetical

11:52    22   negotiation would have negotiated a license to the

11:52    23   asserted patents.

11:52    24           If you choose to rely upon evidence from

11:52    25   any license agreement, you must account for any

1146

11:52  1    differences between those licenses and the

11:52  2    hypothetically negotiated license between the patent

11:52  3    owner and accused infringer in terms of the technology

11:53  4    and economic circumstances of the contracting parties

11:53  5    when you make your reasonable royalty determination.

11:53  6              The hypothetical license is deemed to be

11:53  7    voluntary.  When determining if a license agreement is

11:53  8    comparable to the hypothetical license, you may

11:53  9    consider whether the license agreement is between

11:53  10   parties to a lawsuit and whether the license agreement

11:53  11   was a settlement influenced by a desire to avoid

11:53  12   further litigation.

11:53  13             In determining a reasonable royalty, you

11:53  14   may also consider evidence concerning the availability

11:53  15   and cost of the noninfringing substitute to the

11:53  16   patented invention.  The alternative need -- the

11:53  17   alternative need not be an acceptable alternative but

11:53  18   can be the next-best available alternative.

11:53  19             An acceptable substitute must be a

11:53  20   product that does not infringe the patent, and as part

11:53  21   of plaintiff having the burden to prove its damages,

11:53  22   plaintiff has the responsibility to show that there

11:53  23   were no acceptable noninfringing substitutes.

11:54  24             Date of commencement of damages.

11:54  25             In determining the amount of damages, you

—1147—

11:54  1   must determine when damages began.

11:54  2              For apparatus claims, damages commence on

11:54  3   the date that defendants have both infringed and have

11:54  4   been notified of the alleged infringement of the '768

11:54  5   and '359 patent.

11:54  6              For apparatus claims, which are the only

11:54  7   claims that are at issue here, you must determine the

11:54  8   date ASUSTeK and/or ASGL received actual notice of the

11:54  9   '768 patent and '359 patent and of the specific

11:54  10  products alleged to infringe.

11:54  11             Actual notice means that plaintiff

11:54  12  communicated to ASUS a specific...

11:54  13             Is that ASUS or should be ASUSTeK?

11:54  14             MR. BURESH:  ASUSTeK.

11:54  15             THE COURT:  I think that should be

11:54  16  ASUSTeK.  I apologize.

11:54  17             So communicated to ASUSTeK a specific

11:54  18  charge of infringement of the '768 patent and the '359

11:54  19  patent by a specific accused product or device.

11:55  20             The filing of the complaint in a case may

11:55  21  qualify as actual notice so the damages period may

11:55  22  begin no later than the date the complaint was filed.

11:55  23             However, in this case, the '768 patent

11:55  24  and the '359 patent expired on May 12th, 2020, prior to

11:55  25  the filing of this case.  So no damages may be awarded

—1148—

11:55  1    after the date on which the '768 patent and the '359

11:55  2    patent expired.

11:55  3                Plaintiff claims to have provided actual

11:55  4    notice to the -- prior to the filing of the complaint

11:55  5    on May 15th, 2018, when it sent a letter to ASUSTeK

11:55  6    through international mail.  Plaintiff has the burden

11:55  7    of establishing it is more probable than not that

11:55  8    ASUSTeK and ASGL received notice of the two patents and

11:55  9    alleged infringement of the same on May 15th, 2018.

11:55  10               If you find that plaintiff has not met

11:55  11   its burden of proof on this question, then you must

11:55  12   find that plaintiff is not entitled to damages for any

11:56  13   alleged infringement of either patent.

11:56  14               If you find that plaintiff has met its

11:56  15   burden of proof on this question, then you must only

11:56  16   award damages for any alleged infringement of either

11:56  17   patent for the time period beginning May 15th, 2018 to

11:56  18   May 12th, 2020.

11:56  19               I'm going to reserve reading the last two

11:56  20   pages until after you hear the closing arguments of

11:56  21   counsel.  It'll make more sense that way.

11:56  22               So ladies and gentlemen, we're going to

11:56  23   take -- whoops.  We're going to take a lunch recess.

11:56  24   You have not yet begun deliberating, and so you can

11:56  25   continue -- just follow the instructions that I've

—1149—

| | | |
|---|---|---|
| 11:56 | 1 | given you in the past. |
| 11:56 | 2 | I believe we have lunch back there for |
| 11:56 | 3 | you.  And we'll begin at 1:30. |
| 11:56 | 4 | Once you begin deliberating, I'll give |
| 11:56 | 5 | you some other instructions on your conduct.  So we |
| 11:57 | 6 | will stand in recess with respect to the jurors until |
| 11:57 | 7 | 1:30. |
| 11:57 | 8 | THE BAILIFF:  All rise. |
| 11:57 | 9 | (Jury exited the courtroom.) |
| 11:57 | 10 | THE COURT:  You may be seated. |
| 11:57 | 11 | Is there anything we need to take up? |
| 11:57 | 12 | MR. BURESH:  Nothing for defendant. |
| 11:57 | 13 | MS. AMSTUTZ:  Your Honor, it occurred to |
| 11:57 | 14 | me that I need to hunt down the list of accused |
| 11:57 | 15 | products that we agreed or stipulated last night would |
| 11:57 | 16 | go in the juror notebooks.  I will do that over the |
| 11:57 | 17 | lunch break, if that's okay with the Court. |
| 11:57 | 18 | THE COURT:  Certainly fine with me.  And |
| 11:57 | 19 | I assume -- |
| 11:57 | 20 | MR. BURESH:  No objection. |
| 11:57 | 21 | THE COURT:  Very good. |
| 11:57 | 22 | So we will begin at 1:30, and each side |
| 11:57 | 23 | will have 30 minutes per side.  We will stand in recess |
| 11:58 | 24 | until then. |
| 11:58 | 25 | THE BAILIFF:  All rise. |

—1150—

| | | |
|---|---|---|
| 11:58 | 1 | (Recess taken.) |
| 01:30 | 2 | THE BAILIFF:  All rise. |
| 01:30 | 3 | THE COURT:  Please remain standing for |
| 01:30 | 4 | the jury. |
| 01:30 | 5 | (Jury entered the courtroom.) |
| 01:31 | 6 | THE COURT:  Thank you.  You may be |
| 01:31 | 7 | seated. |
| 01:31 | 8 | With just a very quick reminder, if you |
| 01:31 | 9 | didn't hear me say it enough times when I was reading, |
| 01:31 | 10 | what you're about to hear are closing arguments.  The |
| 01:31 | 11 | evidence is all in.  These are just arguments.  But I'm |
| 01:31 | 12 | very much looking forward to them. |
| 01:31 | 13 | Counsel? |
| 01:31 | 14 | (Off-the-record discussion.) |
| 01:31 | 15 | OPENING ARGUMENT ON BEHALF OF THE PLAINTIFF |
| 01:31 | 16 | MR. COLLARD:  Ladies and gentlemen of the |
| 01:32 | 17 | jury, I appreciate your attention this week.  We've |
| 01:32 | 18 | been through a lot of material in the last four days. |
| 01:32 | 19 | Some of the testimony has been complicated at times, |
| 01:32 | 20 | but we really appreciate your service. |
| 01:32 | 21 | Now it's time to decide.  And the |
| 01:32 | 22 | decisions that American juries make are pretty |
| 01:32 | 23 | straightforward.  Who's telling the truth?  Who's |
| 01:32 | 24 | focusing on the key issues?  Who do you believe?  Who's |
| 01:32 | 25 | right and who's wrong? |

—1151—

01:32    1              That's what our jury system is designed

01:32    2    to do as enshrined in the 7th Amendment, is let people

01:32    3    from our community decide our disputes, and it is a

01:33    4    really special thing.  And I told you in opening

01:33    5    statements that we would prove that Dr. Chu invented a

01:33    6    new computer bus, he got patents on it, he told ASUS

01:33    7    about it and that ASUS never got permission to use

01:33    8    Dr. Chu's intellectual property, and we've showed you

01:33    9    exactly that.

01:33    10             And how do you know I'm telling the truth

01:33    11   and that ACQIS was telling the truth?  Well, we have

01:33    12   the patents issued by the U.S. government after

01:33    13   examination by a specialist, person with skill in

01:33    14   computers.  We told ASUS; you've seen the notice letter

01:33    15   and the FedEx confirmations.

01:33    16             They ducked the notice letter, ignored

01:33    17   it, forced us to go to FedEx and get the evidence of

01:33    18   the delivery.  And we have the licenses that ACQIS has

01:33    19   with other computer companies that did it the right way

01:33    20   and paid for permission to use ACQIS' patents.

01:33    21             Now, the defendants tried the Fido

01:33    22   defense, with the dog that I used in opening.  They

01:34    23   claim not to operate in the U.S.  But they control ACI

01:34    24   and ASGL who ship and sell in the United States.  We

01:34    25   heard all about that.

1152

01:34  1          And the noninfringement approach, that

01:34  2  was rewriting what is in the claims to add limitations.

01:34  3  We're going to talk a lot about that.

01:34  4          And they utterly failed to prove their

01:34  5  invalidity case and here's why:  In that instance they

01:34  6  literally rewrote the claims with the red pen -- you

01:34  7  saw the graphic -- and then tried to invalidate those

01:34  8  rewritten claims.  They didn't come close to clearing

01:34  9  the high bar required to invalidate a patent claim

01:34  10  that's issued by the U.S. government.

01:34  11          And they didn't even suggest an approach

01:34  12  to damages.  They didn't even throw out a number.  Only

01:34  13  ACQIS did that.

01:34  14          The claims are valid and infringed.  The

01:35  15  only way to balance those scales is to hold ASUS

01:35  16  accountable.  And why is that?  It's because Dr. Chu

01:35  17  had an idea for an invention, and he struck the deal

01:35  18  that the Constitution offers.  He told the U.S. Patent

01:35  19  Office, the U.S. government, about his invention.  And

01:35  20  in return he got what it says in the Constitution, the

01:35  21  exclusive right to control it for the life of his

01:35  22  patent.

01:35  23          And the system won't work if companies

01:35  24  can use Dr. Chu's property without paying.  People

01:35  25  won't share their ideas if they don't get the bargain

1153

01:35  1    that's in the Constitution.

01:35  2            And you heard from people from both sides

01:35  3    of this case, Dr. Chu and Ajay Bhatt, say that they

01:35  4    came to the U.S. because it has the best universities

01:35  5    to study science and technology.  The U.S. is a leader

01:35  6    in innovation because it protects intellectual

01:35  7    property.

01:35  8            And you also heard that if a company

01:36  9    won't pay a license, the only way to enforce your

01:36  10   patent is to bring a lawsuit.

01:36  11           Very, very soon this case will be in your

01:36  12   hands, and you'll be able to send a message about how

01:36  13   business is done here in our American system under the

01:36  14   United States Constitution.

01:36  15           So we introduced the idea in opening

01:36  16   about the fence, and we referenced that throughout the

01:36  17   trial.  But now you guys know more about patent law

01:36  18   than about 99 percent of the population, and so I'm

01:36  19   going to add a little detail.

01:36  20           There are three claims that are protected

01:36  21   by the fence.  There's some common elements that define

01:36  22   the property:  unidirectional, low voltage differential

01:36  23   signal, and serial.

01:36  24           And you know from the -- back in the

01:36  25   video and now from your jury instructions that the

01:36    1    boundaries of the property are the claims.  And Dr. Chu

01:36    2    is accused of moving the fence posts, but he cannot and

01:37    3    he did not.  Because what he has coverage over is

01:37    4    simply what's in the claims.  And we're going to talk

01:37    5    quite a bit about that.  And we've explained how ASUS

01:37    6    came onto his property.

01:37    7                Now, every time you have an issue about

01:37    8    infringement or validity, whether you're hearing it

01:37    9    from me, from opposing counsel, or back in the jury

01:37    10    room, I want you to go back to the claims.  And I know

01:37    11    you all looked at the back of the patents-in-suit.  I

01:37    12    urge you to go look at the claims at issue.  We're

01:37    13    going to have the claims up quite a bit here, but it's

01:37    14    '768, Claim 10; '768, Claim 13; and '359, Claim 19.

01:37    15                Because the Judge told you in the

01:37    16    instructions that's what defines what the patents

01:37    17    cover.  The invention in this case is in the claims in

01:37    18    this case, not somewhere else.

01:37    19                It's not in the specification.  It's not

01:37    20    in other claims.  It's not in the drawings.  It's not

01:38    21    even in the patent applications.  It's certainly not in

01:38    22    the testimony of what people say, whether it's ACQIS

01:38    23    witnesses or ASUS witnesses.  And questions about

01:38    24    infringement or validity start with the claims.

01:38    25                Now, I'm going to show you instances

—1155—

01:38  1    where ASUS tried to add or change what was in the

01:38  2    claims so that they could make their arguments.  Don't

01:38  3    fall for that.

01:38  4                    Now, Dr. Chu invented a new bus because

01:38  5    he needed one to make his modular computer

01:38  6    future-proof.  That's why he did it.  We told that

01:38  7    story with Dr. Chu on the first day.

01:38  8                    But that doesn't mean that his new bus

01:38  9    only worked in a modular computer.  Look at his claims.

01:38  10   They don't claim a modular computer.

01:38  11                   What did Dr. Chu claim?

01:38  12                   Claim 10, at the top, it says:  A printed

01:38  13   circuit board.  Remember, you can flip to the end of

01:38  14   the patent and look at Claim 10.

01:38  15                   Claim 13 and 19 require a computer.

01:38  16                   What is inside?  What was Dr. Chu working

01:39  17   on back then?  What was inside the iMod?  A printed

01:39  18   circuit board.

01:39  19                   What's inside today's laptops, servers,

01:39  20   desktops?  A printed circuit board.

01:39  21                   What do you use a printed circuit board

01:39  22   to create?  A computer, just like in Claims 13 and 19.

01:39  23                   And now you know, you've heard all this

01:39  24   testimony, that Dr. Chu had dozens of patents, hundreds

01:39  25   of claims over the years, but we're here about three.

01:39  1    We're not here about modular computers, even though he

01:39  2    certainly invented that too, because that's not what's

01:39  3    in these claims.

01:39  4              Now, Dr. Chu did not claim that -- did

01:39  5    not claim in these claims all of PCI Express or all of

01:39  6    USB 3.0, doesn't say that there.  But there are some

01:39  7    parts used in PCI Express and used in USB that do

01:39  8    encroach on his claims.

01:40  9              His invention's a new bus that can

01:40  10   transmit the old data.  He thought of it first, and it

01:40  11   can be used in all types of computers.

01:40  12             The fact that PCI Express and USB 3.0

01:40  13   came later using the same foundational aspects that

01:40  14   were in his claims means that ASUS computers, using

01:40  15   those technologies, infringed.

01:40  16             That's why he identified those

01:40  17   technologies in his notice letter.  That's why we look

01:40  18   to those technologies when we're trying to prove

01:40  19   infringement.  And you don't get out of infringement

01:40  20   just because lots of people decided to use a standard

01:40  21   that causes infringement.

01:40  22             I want to talk a little bit about

01:40  23   Mr. Bhatt.  He certainly has a very impressive career.

01:40  24   And -- but I think what I heard is him actually

01:40  25   confirming a lot of Dr. Chu's story.  He talked about

—1157—

01:40  1    the sunset and the problems with the local PCI bus and

01:41  2    how replacing it would be a really big deal.

01:41  3              And -- but Mr. Bhatt didn't tell anyone

01:41  4    his thoughts about that or his ideas about that until

01:41  5    that meeting with the Intel CEO that he remembered so

01:41  6    clearly in December 2000.  Dr. Chu wrote down his ideas

01:41  7    three years before, January 1998.

01:41  8              Now, Mr. Bhatt hasn't read the patents.

01:41  9    So he has no idea -- when he gave all that testimony,

01:41  10   he has no idea, he's never read them -- you have them,

01:41  11   he doesn't -- if ACQIS' patents have anything to do

01:41  12   with PCI Express.  He doesn't know.

01:41  13             Why do you think ASUS didn't just ask

01:41  14   Mr. Bhatt to read the patents?

01:41  15             He has 132 of his own.  He's a smart

01:41  16   engineer.  He would have been able to understand the

01:41  17   patents.  It's because if he read the patents, he would

01:41  18   have to admit that Dr. Chu came up with some of the key

01:42  19   ideas first.

01:42  20             So why was he here?  He said he was here

01:42  21   on principle, but what principle?

01:42  22             He said no one has ever told him that

01:42  23   Dr. Chu is trying to take credit for his invention,

01:42  24   which is good because Dr. Chu is not trying to take

01:42  25   credit for all of PCI Express.  And he can't know the

01:42  1   truth about this case without reading the patents.

01:42  2              You also never heard Mr. Bhatt talk about

01:42  3   what his PCIe group, as they were starting their work,

01:42  4   what they did to check to make sure that they didn't

01:42  5   infringe on anybody else's property.

01:42  6              They thought because they had the whole

01:42  7   computer industry involved, maybe they didn't have to

01:42  8   check.  So they didn't check.  They didn't check to

01:42  9   make sure the landscape was clear of any patents that

01:42  10  might apply to the new standard that they were going to

01:42  11  build.

01:42  12             They want you to think that Dr. Chu could

01:43  13  not have come up with this on his own because it took

01:43  14  someone like Mr. Bhatt and a team of the best engineers

01:43  15  to come up with the PCI standard.

01:43  16             But the task isn't the exact same.

01:43  17  Dr. Chu wasn't creating a new industry standard.  He

01:43  18  was creating a bus for his new modular computer.  He

01:43  19  didn't need buy-in from the whole computer industry.

01:43  20  He was a visionary, and he did it first.  And just

01:43  21  because a giant team trampled on his property later

01:43  22  doesn't change that.

01:43  23             So a little more about infringement.  And

01:43  24  I told you to focus on the claims, and you saw

01:43  25  Dr. Sarhan build his checklist.

01:43    1    What information did he use to put his

01:43    2    check there?

01:43    3    He used the ASUS documents, ASUS

01:43    4    specifications for the products, their close partner

01:43    5    Intel, their documents, and he used the specifications.

01:43    6    That is the most reliable type of information you can

01:44    7    have.  There's nothing really better than that, than

01:44    8    getting the specs from ASUS and from Intel to find out

01:44    9    what's in those products.

01:44    10    And it was a very clean analysis.  If you

01:44    11    need a central processing unit, he would look at the

01:44    12    spec and say, here's the central processing unit.  He

01:44    13    closely followed the claims and the Court's

01:44    14    constructions.

01:44    15    Now, there's one part of the claims --

01:44    16    whoops.

01:44    17    There's one part of the claims that isn't

01:44    18    hardware, and that's these PCI address and data bits.

01:44    19    So hardware's something you can touch.

01:44    20    It's hardware.  Address and data bits are not something

01:44    21    you can touch.  They're signals that are sent on a

01:44    22    wire.  And it's different than software like an

01:44    23    operating system, but it's not hardware.

01:44    24    And that's all you need in these claims

01:44    25    is the address and data bits of a PCI transaction.  PCI

1160

01:44  1    bus transaction.  You don't need the full transaction,

01:45  2    even though you heard Dr. Edwards talk about that.

01:45  3    Look at the claims.  There's no full transaction.  They

01:45  4    all say address and data bits.

01:45  5              And that's the only part of this that has

01:45  6    to be backwards compatible between PCI local bus and

01:45  7    PCI Express.

01:45  8              And there was this slide that really

01:45  9    caught my eye from Ajay Bhatt in this testimony.

01:45  10   Address and data bits.  We actually had a slide, maybe

01:45  11   in our opening, that used a letter to show the address

01:45  12   on the outside and the data of the letter on the

01:45  13   inside.

01:45  14             That's the one part that PCI Express kept

01:45  15   was the address and data, because it has to be able to

01:45  16   send data, has to be able to send whatever the

01:45  17   information is, and it has to know where to send it.

01:45  18   That's it.

01:45  19             Mr. Bhatt said:  So that part is

01:45  20   identical.  Nothing has changed there.

01:45  21             The noninfringement arguments, I think

01:46  22   they're a bit of a trick.  You heard Dr. Edwards.  He

01:46  23   was combative.  There are questions about whether he

01:46  24   knows how to perform an infringement analysis that were

01:46  25   raised, and there are a lot of claims he seemed to --

01:46  1    things he seemed to add to the claims.

01:46  2                    This is the one that caught my ear the

01:46  3    most.  When he said it, I had to make a note.

01:46  4                    Do the claims define the scope of the

01:46  5    invention or don't they?

01:46  6                    I wouldn't put it just that way.

01:46  7                    You know who would put it just that way?

01:46  8    Your instructions.

01:46  9                    Does that sound like someone who knows

01:46  10   how to do an infringement analysis?

01:46  11                   Well, it makes sense when you look at his

01:46  12   analysis, because he was creating new requirements.

01:46  13   They talked so much about the modular computer.  The

01:46  14   claims don't require a modular computer.  He talked

01:46  15   about the bridge bus; definitely doesn't say bridge bus

01:47  16   in here.  That's -- I mean, we saw the picture of the

01:47  17   bridge quite a few times.  Definitely doesn't say that.

01:47  18                   He tried to say that, LVDS, well, that

01:47  19   means the bridge bus.  There's no bridge bus that --

01:47  20   Claim 10 says bridge bus requires the old bus and new

01:47  21   bus.  Claim 10 tells you the old bus isn't there

01:47  22   without an intervening PCI bus.  The claim itself, top

01:47  23   level item, where you have to start, says the old bus

01:47  24   isn't there.

01:47  25                   But he reads it back in and says, nope.

1162

01:47  1    LVDS is still a bridge bus.  You have to have the

01:47  2    bridge bus all the time.

01:47  3                He also wanted to require a full

01:47  4    transaction.  We talked about that.

01:47  5                He wants to say LVDS is some sort of

01:47  6    brand name, like IHOP -- you heard that testimony --

01:47  7    but that conflicts with the claim.

01:47  8                We talked about address and data bits.

01:47  9    The claim doesn't say LVDS as described in the -- you

01:48  10   know, this particular brand.  It doesn't even just say

01:48  11   LVDS.  It writes it out:  Low voltage different signal.

01:48  12                The patentee -- it's not just the claims.

01:48  13   So the claims contradict him, but it's not just that.

01:48  14   Because the patentee has this statement.  And, frankly,

01:48  15   I've hardly ever seen such a clear statement in a

01:48  16   patent about whether something relates to a brand name

01:48  17   or something relates to just a generic idea.

01:48  18                The patentee told you what they meant by

01:48  19   LVDS.  The examiner knew this too.  The examiner had

01:48  20   all this, had all those other LVDS specifications, and

01:48  21   issued these patents.

01:48  22                Now, there was a lot of dispute --

01:48  23   discussion about this picture.  This is the picture

01:48  24   that said -- is -- goes with that claim, Claim 10, that

01:48  25   says:  Without a PCI bus.

01:48  1          There's no PCI local bus in this claim.

01:49  2   He had to say -- he used the word "it's hidden."  It's

01:49  3   hidden in there.  So he admits it's not in there, but

01:49  4   he's reading it back in.

01:49  5          Then the last issue is the show about the

01:49  6   connectors and saying, oh, you can't put PCI Express

01:49  7   into PCI or vice versa, and we've got all those

01:49  8   connectors.

01:49  9          Dr. Chu specifically said, and you saw

01:49  10  the language a few times in the patents, that he hated

01:49  11  the connectors.  The connectors and the pins, that was

01:49  12  the problem.  He didn't want to keep using those.

01:49  13         But they're trying to say the connectors

01:49  14  had to be backwards compatible.  Don't be fooled by

01:49  15  that.  That isn't in the claims.  There's nothing about

01:49  16  connectors being compatible in these claims.

01:49  17         Now, I want to talk about the corporate

01:49  18  shell game to try to avoid liability.

01:49  19         They said, our company is ASUSTeK or

01:49  20  ASGL.  ASUS is just a brand.  That's not what ASUS says

01:50  21  about itself in its annual report.  They say the

01:50  22  company is ASUS, a multinational company with a global

01:50  23  workforce.

01:50  24         And Ms. Chen and Ms. Ou didn't testify --

01:50  25  oh, and when they talk about money, ASUS definitely --

—1164—

01:50   1   it says they're making money from sales in America.

01:50   2   Regions outside of Taiwan, making money in America.

01:50   3                Ms. Chen and Ms. Ou did not testify for

01:50   4   very long.  I know you were listening closely, and

01:50   5   there's a couple of things I want to point out.

01:50   6                When we were talking with Ms. Chen, she

01:50   7   said, yeah.  The U.S. is a pretty important market for

01:50   8   a tech company like ASUSTeK.  When they were asking her

01:50   9   questions, we don't do business in the United States.

01:50   10                And then, again, the money.  They said,

01:50   11   no.  We don't -- ASUSTeK doesn't control the operations

01:50   12   of ACI.  But they do.

01:50   13                This is from the annual report, and it

01:51   14   says that -- this is in -- like, this is in corporate

01:51   15   shell game speak, but what it is saying is that

01:51   16   ASUSTeK, the top company, the group, has the ability to

01:51   17   affect the returns -- returns are money -- affect the

01:51   18   returns through its power over its subsidiaries.

01:51   19                ASUSTeK decides how much money the

01:51   20   subsidiaries will make.  They own 100 percent of the

01:51   21   subsidiaries.  They have to list -- when it comes to

01:51   22   what you say publicly, they have to list that they

01:51   23   exercise significant influence over those subsidiaries.

01:51   24                And another place that they insist is

01:51   25   patents, just like what we're talking about here.

01:51  1  ASUSTeK is the right one to talk to about patents

01:51  2  because they insist -- do you remember the little

01:51  3  dispute over the word "insist"?  They insist that their

01:51  4  licenses cover all of their subsidiaries.

01:52  5          The same people are running the

01:52  6  companies.  ASUSTek's directors are the people that are

01:52  7  running ASGL.

01:52  8          These are not independent companies.

01:52  9  Their own documents tell you that they're more like

01:52  10  departments within a company.  ASUSTeK is the boardroom

01:52  11  and the design.  ASGL is shipping.  ACI is U.S. sales.

01:52  12  ACI is selling the infringing product in the U.S.

01:52  13  That's a question on the jury instructions, and you're

01:52  14  going to see that.

01:52  15          This game should not let them avoid

01:52  16  liability.  When they move product around, they just

01:52  17  push paper.  They don't even take possession of the

01:52  18  product.  They just say, okay.  Now it's yours.  Okay.

01:52  19  Now it's yours.  Okay.  Now it's yours.

01:52  20          They don't actually move the product from

01:52  21  one place to the other.  And the -- when they move

01:52  22  money, it's like moving money from one pocket to the

01:52  23  other.

01:52  24          And the name for this that you're going

01:52  25  to see, that you heard in the jury instructions, is

01:52    1    alter ego or agency.  And I'll show you the instruction

01:53    2    on that when we go through the verdict form.

01:53    3                   And there was a question in the opening:

01:53    4    Why didn't we sue ACI?  Because if you want to send a

01:53    5    message to a company, you go to the top.  Dr. Chu went

01:53    6    to Mr. Shen.  You tell the company that makes money

01:53    7    according to the financial statements, and they are the

01:53    8    ones who pay.

01:53    9                   Imagine a puppeteer and a puppet.  Do you

01:53    10   see the puppet or do you see the puppeteer?

01:53    11                  Now, let's talk about the notice.

01:53    12   Dr. Chu sends his notice letter.  ACQIS gave them the

01:53    13   e-mail confirmation, but that wasn't good enough.  Had

01:53    14   to go get the actual FedEx business record.

01:53    15                  I've never seen this, where FedEx

01:53    16   provides the image of the signature and a notarized

01:53    17   declaration that this came -- that they delivered.

01:53    18   FedEx apparently takes this pretty seriously.  This is

01:53    19   amazing proof.

01:53    20                  But everyone involved at ASUSTeK, they

01:53    21   left.  ASUSTeK didn't try to -- very hard to figure out

01:54    22   who Mr. Lee was.  And they ignored the letter.

01:54    23                  And Dr. Chu told ASUS everything they

01:54    24   needed to know that -- about that they infringed, that

01:54    25   this was a licensing opportunity, that it was -- what

01:54    1    the relevant technology was, that the patents had been

01:54    2    tested by the United States Patent and Trademark Office

01:54    3    and court system, that big companies had taken license,

01:54    4    all -- all of the potentially relevant patents,

01:54    5    including these two patents -- these are listed here --

01:54    6    the type of processor that might be relevant, and a

01:54    7    long list of the type of products.  Everything they

01:54    8    needed.

01:54    9             Why did Bill send this letter?  To give

01:54   10    them notice they were infringing.  He wasn't inviting

01:54   11    them to tea.  He put the patents and the products in to

01:54   12    give them notice they were infringing.

01:54   13             And whatever ASUS actually thought about

01:55   14    the letter, they put their head in the sand when they

01:55   15    got notice of infringement.  Their point -- the

01:55   16    infringement after this point was willful.  They knew

01:55   17    they were infringing, and they did it anyway.

01:55   18             Now, I want to talk briefly about

01:55   19    invalidity.

01:55   20             You've heard a few times in the last week

01:55   21    and again today about the heavy -- the presumption of

01:55   22    validity of the patents because they were examined and

01:55   23    issued by the Patent Office.  And what that means is

01:55   24    that the examiner who knows about computers thought

01:55   25    these patents were valid.  And that includes the

01:55  1   arguments they're making.

01:55  2            He thought they had enough written

01:55  3   description, and he thought that they told somebody

01:55  4   enough about how to make the product, or she.

01:55  5            And to find differently than the examiner

01:55  6   under this heavy standard, you have to have no

01:55  7   hesitation because that clear and convincing standard,

01:55  8   it's high.  It's higher than our standard to prove

01:55  9   infringement.  And if you hesitate, then that means the

01:55  10  patents are valid.

01:56  11            THE COURT:  Counsel, you have five

01:56  12  minutes.

01:56  13            MR. COLLARD:  Okay.

01:56  14            For these invalidity arguments, remember,

01:56  15  go to the claims.  That defines -- there's a clear and

01:56  16  convincing -- those still start at the claims.

01:56  17            But after you start at the claims, this

01:56  18  defines what needs to be described, what needs to be

01:56  19  enabled.  Then go look at the other evidence.  The

01:56  20  white papers, the specifications in these patents and

01:56  21  the drawings, all of those things are things that can

01:56  22  provide the written description and can show that the

01:56  23  patents are enabled.

01:56  24            But I want to be clear that their only

01:56  25  argument for invalidity -- this was for both enablement

—1169—

01:56  1   and written description -- is this red pen argument.

01:56  2   They -- this is their slide.  They crossed out the

01:56  3   limitations and analyzed something different.

01:56  4            What did he put in with his red pen?  He

01:56  5   put in the standards.  Dr. Chu never claims the entire

01:57  6   standards, and he's been consistent about that.

01:57  7            He also put in the nature of the

01:57  8   invention, the XP Bus.  He didn't describe what's in

01:57  9   the claims.  He's again refusing to stick to the

01:57  10  claims.

01:57  11           Why did they do this?  Because the claims

01:57  12  were valid when they left the Patent Office.  They had

01:57  13  no other argument.  So they had to throw a Hail Mary

01:57  14  and challenge the claims.

01:57  15           I want to talk to you briefly about

01:57  16  damages.  This is your only tool to do justice in this

01:57  17  case.  This is how our system works.  Juries can decide

01:57  18  facts and award damages.  And to protect Dr. Chu's

01:57  19  property, you must award him reasonable damages.

01:57  20           Now, we talked and saw quite a bit 920.

01:57  21  This is Exhibit 920.  This is the list of all the prior

01:57  22  ACQIS licenses.

01:57  23           What does your common sense tell you

01:57  24  about this?  That HP --

01:57  25           THE COURT:  Counsel, you have three

—1170—

01:57    1    minutes left.

01:57    2                    MR. COLLARD:  Thank you.  Is that for the

01:58    3    whole 30?

01:58    4                    THE COURT:  Yes.

01:58    5                    MR. COLLARD:  Okay.

01:58    6                    What does your common sense tell you?

01:58    7    That HP ███████████████; Samsung, ██; and Lenovo ████████

01:58    8    █████ just because they wanted to avoid litigation?

01:58    9    That's not how much litigation costs.

01:58    10                   ACQIS obviously tries to settle cases,

01:58    11    but ASUS has never even today made an offer to license

01:58    12    the patents and settle this case.  And our current

01:58    13    request for damages that will make ACQIS whole is this

01:58    14    number.

01:58    15                   And you remember the Judge's instruction.

01:58    16    And we considered this might happen.  So that's why we

01:58    17    gave you this alternative number, and that's the

01:58    18    damages that are owed.

01:58    19                   Mr. Lewis' analysis, the raw amount is in

01:58    20    line with other licenses.  The rate he used is in line

01:58    21    with other licenses.

01:58    22                   And the amount that Dr. Chu is trying to

01:58    23    claim is not 82 percent.  That is to get to that 1.5

01:59    24    number.  That's the 82 percent.  He's only asking for

01:59    25    1.15 percent of that reduced number.  ASUS wants to

01:59  1   give no credit.

01:59  2               Now, this is Dr. Chu's only chance at

01:59  3   justice.  You've been given the power of our justice

01:59  4   system, and you're the voice of this community.  Your

01:59  5   decision can hold the defendants accountable and send a

01:59  6   message about how business should be done here.

01:59  7               I'll reserve the rest of my time for

01:59  8   rebuttal.

01:59  9               THE COURT:  Counsel?

01:59  10      CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

01:59  11              MR. BURESH:  Well, ladies and gentlemen,

02:00  12   you're 30 minutes away from making it.  I know it's

02:00  13   been a journey.  This is quite a process, and you've

02:00  14   taken in a lot of information over the last four days.

02:00  15              And just speaking candidly from me to

02:00  16   you, I've watched how closely you guys have been paying

02:00  17   attention, and not a single one of you nodded off at

02:00  18   any point during the presentation of evidence.  I

02:00  19   haven't seen a jury as attentive as you guys have been

02:00  20   in quite some time, and it is very much appreciated.

02:00  21              These are important cases.  And like I

02:00  22   said at the beginning, when you step through the bar,

02:00  23   you enter a sacred place.

02:00  24              When I was a much younger lad, back

02:00  25   home -- remember I mentioned the Woolworth store?

—1172—

02:01  1    Another thing we had on the Main Street of my town was

02:01  2    Dad's Daylight Donuts.  You ever heard anything like

02:01  3    that?  It's just a little donut shop in a small town.

02:01  4              When I used to go in there on Saturday

02:01  5    mornings, I went like almost every Saturday morning to

02:01  6    get a donut at Dad's.  And there was this little group,

02:01  7    four or five guys.  It was a bunch of just country

02:01  8    lawyers that were meeting there for coffee on Saturday

02:01  9    morning to talk about their cases or whatever had gone

02:01  10   on the week before at the courthouse.

02:01  11             We were a county seat, so there was a

02:01  12   little courthouse in our town as well.

02:01  13             Two of these gentlemen, they didn't have

02:01  14   any grandkids.  So they kind of took me under their

02:01  15   wing.  We got to just bump into each other at this

02:01  16   donut shop.  And they would come watch me play baseball

02:01  17   over at the American Legion, and I would go watch them

02:01  18   when they were in court in our town.  And that's how I

02:01  19   got introduced to the law.

02:01  20             And candidly, it's why I'm standing

02:01  21   before you today, is because those two gentlemen, they

02:02  22   taught me about what they were doing.  They led me to

02:02  23   believe in it.  And one of them, in fact, helped me get

02:02  24   through law school.  So we were pretty close.

02:02  25             A couple of the things they taught me as

02:02  1    I was growing up with them, one thing was to trust the

02:02  2    jury.

02:02  3              We talked about common sense at the

02:02  4    beginning of this case.  And, you know, there's a lot

02:02  5    of companies, there's a lot of folks that are nervous

02:02  6    about turning over control to a jury because it's

02:02  7    turning over control.  You know, you're giving up your

02:02  8    decision-making and saying, you guys make a decision

02:02  9    for us.

02:02  10             That can be scary, but I learned to trust

02:02  11   this process because it's a good process.  And it's a

02:02  12   process that spins off of common sense.

02:02  13             The other thing they taught me is that

02:02  14   when I and my team steps inside that bar, we come to

02:02  15   tell the truth.

02:02  16             Now, we're going to advocate within the

02:02  17   bounds of the truth.  We're going to advocate for our

02:03  18   clients to the best of our abilities.  And I'm doing

02:03  19   that right now.  I'm advocating for my client.  But you

02:03  20   do it with honor and dignity.  You do it with

02:03  21   professionalism and integrity.

02:03  22             And I learned that from a very young lad.

02:03  23   And my two friends, they're passed on now.  But I do

02:03  24   believe that the case we presented to you, they would

02:03  25   be happy with.  Because we told you the truth, and we

```
02:03   1   will let the chips fall where they may with you.
02:03   2                    I'm not going to tell you today how to do
02:03   3   your job.  I'm going to give you some thoughts I have
02:03   4   had as we worked through the case, what I saw.  And
02:03   5   then you guys can take that for what it's worth, and
02:03   6   you go back and deliberate and you weigh the evidence.
02:03   7   Okay?
02:03   8                    We're trying to figure out who's telling
02:03   9   the truth.  That's the fundamental task.  Because you
02:03  10   got one guy saying one thing, another guy saying
02:03  11   another thing.  And they're polar opposites, right?  So
02:03  12   y'all have to figure out who's telling the truth.
02:04  13   That's the exercise.
02:04  14                    You remember the scales of justice when
02:04  15   we were down in the other courtroom doing jury
02:04  16   selection?  That's what we're doing.  And I think about
02:04  17   it physically.  Like, you know, little BBs that go in a
02:04  18   BB gun, if you saw a piece of evidence that you like,
02:04  19   you put a BB on one side of the scale.
02:04  20                    Whether it be for plaintiff or whether it
02:04  21   be for defendants, you place the BB on the scale.  At
02:04  22   the end of the day, who has the more BBs?  That's how I
02:04  23   think about it.  It's not that complicated from a idea
02:04  24   perspective.
02:04  25                    And when you all apply your common sense
```

—1175—

02:04  1   to that exercise, you're going to smell who was telling

02:04  2   you the truth.

02:04  3                    If we look at -- could we go ahead and

02:04  4   publish?

02:04  5                    Thank you.

02:04  6                    If we look at the jury instructions --

02:04  7   and y'all have a sea of jury instructions.  I mean, you

02:04  8   guys can swim in those for the next three days if you

02:05  9   want.  But I'm going to tell you the one that I think

02:05  10  is most helpful.  You'll find this in your jury

02:05  11  instructions.  It's talking about how to determine the

02:05  12  credibility or truthfulness of witnesses.

02:05  13                    It's going to tell you to look at things

02:05  14  like how they behaved themselves on the stand, the

02:05  15  demeanor on the witness stand, whether they have any

02:05  16  feelings or interest in the case, prejudice or bias,

02:05  17  consistencies and inconsistencies.

02:05  18                    Now, these jury instructions are just

02:05  19  reflective of common sense.  This is what we all know.

02:05  20  If somebody's all shifty, you kind of think maybe they

02:05  21  ain't telling you the whole truth.  If they have

02:05  22  inconsistencies with what they've said one time versus

02:05  23  another, they may not be telling you the whole truth.

02:05  24  That's the exercise.

02:05  25                    Now, when I go through trial, I have

—1176—

02:05  1   various notebooks that I use.  They all look like this,

02:05  2   but they're slightly different.  This one is the one

02:05  3   where -- when I listen to a witness, I take down

02:05  4   certain notes on what I thought was most impactful that

02:06  5   would go to this instruction, the person's credibility.

02:06  6   That's what I'm going to walk you through for the next

02:06  7   25 minutes or so, witness by witness.

02:06  8                 So let's start with Dr. Chu, who's

02:06  9   testified twice in front of you now.

02:06  10                When he was on the stand, whether it was

02:06  11  by me or by the Judge, he had to be instructed multiple

02:06  12  times to answer my questions.  He was fighting.  That's

02:06  13  demeanor on the stand.  You can consider that.

02:06  14                The content of his testimony, a few

02:06  15  things stood out to me.  You remember him when he

02:06  16  testified on direct, Dr. Chu.  And we were talking

02:06  17  about -- he was talking about why his XP Bus, which was

02:06  18  his invention, why it didn't work.

02:06  19                Do y'all remember his testimony?

02:06  20                I ran out of money, couldn't get more

02:06  21  investment.  I just stopped.

02:06  22                Do you remember that?

02:06  23                But then we pull up a document during his

02:07  24  cross-examination which was a contemporary document, in

02:07  25  other words, back in the day.  And here's what he was

—1177—

```
02:07   1    telling his board of directors in a shareholder
02:07   2    meeting, a formal setting, his chip that he used for
02:07   3    his XP Bus would delay the project.  It's inefficient
02:07   4    in power and performance.  It would cause delays, okay?
02:07   5              This is what he was saying back in the
02:07   6    day in a formal setting.  And what he told you was a
02:07   7    nice story about how he just ran out of money and
02:07   8    couldn't get it to work.
02:07   9              Why is he doing that?
02:07   10             Because if it was a bad idea, it doesn't
02:07   11   sound as good for him when he's here in court.  So he's
02:07   12   willing to bend history.  You can weigh that, okay?
02:07   13             Lots of questions on direct.  This is
02:08   14   when Mr. Collard was asking him questions, and Dr. Chu
02:08   15   was describing his invention.  I just got two excerpts
02:08   16   here from his testimony on direct.
02:08   17             My invention and my only invention in the
02:08   18   computer bus is using this LVDS channel, the
02:08   19   unidirectional LVDS channel, to communicate data.
02:08   20             That's one statement from him on direct.
02:08   21             Second statement:  All we're claiming is
02:08   22   that they're using LVDS signaling, which I used, and
02:08   23   the unidirectional approach.
02:08   24             That's on direct.
02:08   25             Now, what he didn't tell you on direct is
```

—1178—

02:08  1    that LVDS was being put out by another company.  Didn't
02:08  2    even mention that.  So he claims to have invented the
02:08  3    unidirectional LVDS, then on cross, I have to bring out
02:08  4    that that already exists.  It's all detailed.  All you
02:08  5    got to do is pick this up.
02:08  6            And you want to know who picked this
02:08  7    document up?  Dr. Chu.
02:09  8            On cross, he testified that he
02:09  9    principally gained his knowledge of LVDS from reading
02:09  10   someone else's work, okay?
02:09  11           Now, here's what happened on cross after
02:09  12   I confronted him with this document, confronted him
02:09  13   with his prior testimony about this document.  Now, I
02:09  14   ask him again what his invention is.
02:09  15           You didn't invent LVDS technology, did
02:09  16   you?
02:09  17           I did not.
02:09  18           This is in the course of 45 minutes of
02:09  19   testimony.  His answer has gone from "I invented LVDS"
02:09  20   to "I did not invent LVDS."
02:09  21           And just to be more precise, I asked him:
02:09  22   You're not the first to come up with the idea of using
02:09  23   what National called LVDS, having two unidirectional
02:09  24   data channels to transmit data in opposite directions?
02:09  25           So I got down to that unidirectional

—1179—

02:09  1   concept with him.

02:09  2              And:  No.  That's not my invention.

02:09  3              45 minutes we're flipping horses, okay?

02:10  4   Who knows what his invention is from his testimony,

02:10  5   because he's all over the place.  You have to weigh

02:10  6   that in terms of what you accept as true from Dr. Chu.

02:10  7              Another thing I heard and took a note on:

02:10  8   Why did you bring this lawsuit?

02:10  9              This was on redirect when Mr. Collard

02:10  10  asked him questions again.

02:10  11             Why did you bring this lawsuit to protect

02:10  12  your patent rights?

02:10  13             I owe it to my licensees.

02:10  14             I'm not asking for a show of hands here.

02:10  15  We're not in church.  But does anybody believe that

02:10  16  Dr. Chu gives one rip about his licensees?

02:10  17             He sued every single one of them.  If

02:10  18  that's the kind of care that Dr. Chu has for his

02:10  19  licensees, I don't want any of it, okay?

02:10  20             That's not believable.  That's another

02:10  21  spin, another piece of story to make you guys feel good

02:11  22  about who he is.  But it's not credible.

02:11  23             So when you're looking at the scales and

02:11  24  where to put your BBs, if Dr. Chu isn't credible, he's

02:11  25  one of their main witnesses.  That's no BBs for them,

1180

02:11 1  because his testimony isn't credible.

02:11 2           Let's move on.

02:11 3           Can we go next to Dr. Sarhan?  That was

02:11 4  the next witness for plaintiffs.

02:11 5           Now, when Dr. Sarhan was on the stand --

02:11 6  y'all remember Dr. Sarhan?  He's two rows back over

02:11 7  there.

02:11 8           Now, when he was on the stand, I mean, it

02:11 9  was like trying to wrangle a filly to get him to answer

02:11 10  questions.  Seriously.  I mean, between myself and His

02:11 11  Honor, we were constantly telling him to answer

02:11 12  questions, just give me a straight answer, just give me

02:11 13  a straight answer, to simple questions.

02:11 14           It was the whole cross-examination,

02:12 15  nonstop.  You got to weigh that demeanor on the stand.

02:12 16  Because I'll tell you one thing, if a person is

02:12 17  confident about the positions that they have, they can

02:12 18  let their yes be yes and they can let their no be no.

02:12 19  That's the sign of somebody that's speaking true.  They

02:12 20  let their yes be yes and their no be no.

02:12 21           My dad used to tell me -- when I was a

02:12 22  whippersnapper, I used to argue about everything.  I

02:12 23  mean, every little thing that'd come up, I'd want to

02:12 24  argue about it.  And when I'd argue, someone would say

02:12 25  a question, like, they'd try to pin me down with a

02:12  1   question.  And I would do what Dr. Sarhan was doing.

02:12  2   I'd say yes, but, but, but, but, but, but, and stammer

02:12  3   around and try to make my point in some way.

02:12  4             Here's the deal.  If you don't have any

02:12  5   holes in your bucket, you don't need to be plugging

02:12  6   them all the time.  Does that make sense?  You know

02:13  7   what I'm saying?

02:13  8             Like, if you're constantly trying to plug

02:13  9   holes here and plug holes there by not answering yes

02:13  10  and no, it's because you got all kinds of holes in your

02:13  11  bucket.  Your theories are full of holes.  So you're

02:13  12  constantly trying to pin them up, and you won't answer

02:13  13  questions in a straightforward manner.

02:13  14            That's what you all are seeing from

02:13  15  Dr. Sarhan.  Weigh that when you do your deliberations.

02:13  16  And again, if we're looking for evidence from

02:13  17  plaintiffs, if we're looking to put some BBs on the

02:13  18  scale for plaintiffs, that testimony's not credible.

02:13  19  That's no BBs.

02:13  20            Some of the content, okay.

02:13  21            Now I want to just quickly point out,

02:13  22  Mr. Collard flashed up Jury Instruction No. 12 two

02:13  23  times.  It said:  The claims define the invention.

02:13  24            Well, no kidding.  I mean, that's what

02:13  25  we're doing here.  The claims define the invention.

—1182—

02:13  1                   But read the very next sentence of that
02:13  2       instruction, okay?  It's going to tell you you need to
02:13  3       look at the context to understand the claims.  Look at
02:14  4       the specification.  Look at the figures.  You got to
02:14  5       understand what the claim's talking about in context.
02:14  6                   And that's what the plaintiffs have been
02:14  7       running away from this entire case, the entire case.
02:14  8       Let me ignore the context.  Let me ignore the context.
02:14  9                   We saw this from Dr. Sarhan.  They --
02:14  10      even in closing, they trot out this same sentence
02:14  11      cherry-picked out of the specification like it stands
02:14  12      alone.  It doesn't stand alone.  It's in the context of
02:14  13      a paragraph that is describing an interface for
02:14  14      interfacing an attached computer module and a
02:14  15      peripheral console, which, by the way, has disappeared.
02:14  16                  It was here in triumphant fashion on Day
02:14  17      1 of this trial, and it hasn't been here ever since.
02:14  18                  Why?  Because I started using it.
02:14  19      Because it shows that you have a computer over here, a
02:14  20      console over here, and a computer module up at the
02:14  21      witness stand.  There's a huge river between those two
02:14  22      things, and so you need a bridge to cross the river.
02:15  23      That was Dr. Chu's invention.
02:15  24                  And when I started making that point with
02:15  25      that peripheral console and that ACM, it disappeared.

02:15  1    They don't want you to see that anymore.

02:15  2                    That's the invention.  We'll talk about

02:15  3    that more in just a minute.

02:15  4                    But when you ignore the context, you lose

02:15  5    the work that Dr. Chu should actually get credit for

02:15  6    because the context is everything.

02:15  7                    Dr. Sarhan ignored the context.

02:15  8                    Another thing we saw from Dr. Sarhan,

02:15  9    which I thought was interesting.  I took a note on it.

02:15  10   These are the claim limitations.  This is one of his

02:15  11   slides that he summarized.

02:15  12                   And the first one is:  LVDS channel

02:15  13   conveying address and data bits of a PCI transaction.

02:15  14   I pointed this out on cross-examination.  The word

02:15  15   "bus" disappeared, PCI bus transaction.  When you look

02:15  16   at the claims, they're all going to talk about a PCI

02:15  17   bus transaction.

02:16  18                   Why does that disappear from Dr. Sarhan's

02:16  19   slides?  Because there's no PCI local bus in the

02:16  20   accused products.  There's no bus.  It's gone from the

02:16  21   accused products because it was obsolete about 12 years

02:16  22   ago at this point -- or 14 years ago at this point.

02:16  23   It's obsolete.

02:16  24                   So the bus is gone.  He says, well, my

02:16  25   slides are just a mistake.  If you were listening

02:16  1    closely during his testimony, there were multiple

02:16  2    instances of this same thing where he's talking about

02:16  3    PCI transactions in the abstract with no bus.  Just

02:16  4    erased the context, okay, right out of the claims too.

02:16  5                    Now, here's the deal:  If you're erasing

02:16  6    bus, if you're erasing the context, it's like taking

02:16  7    the rubber band off that airplane example I gave during

02:16  8    opening.  You're erasing a rubber band.  You're erasing

02:16  9    the toy.  And what you're left with is the F-35 stealth

02:17  10   fighter.  That's not what I invented in my example.

02:17  11                   And when Dr. Chu did his work, he didn't

02:17  12   invent PCI Express and USB 3.  He invented a bridge to

02:17  13   get between his ACM and the peripheral console.  That's

02:17  14   what he invented.

02:17  15                   One more thing on Dr. Sarhan, doctrine of

02:17  16   equivalents.  This theory, first of all, it's what we

02:17  17   call a backup theory.  If y'all don't think that they

02:17  18   infringe, then maybe you'll think that they infringe by

02:17  19   this doctrine of equivalents thing.

02:17  20                   This theory requires him to say that PCI

02:17  21   Express, the new one, is equivalent to PCI local bus,

02:17  22   the old one.

02:17  23                   So I just ask you:  Does it make any

02:17  24   sense at all that the thing that replaced the old thing

02:17  25   is equivalent to the old thing?  Why would you replace

‑1185‑

02:17   1    it if it was equivalent?

02:18   2                    Doesn't make any sense.  But Dr. Sarhan

02:18   3    is willing to say this to support the plaintiff's case

02:18   4    because that's his job.  His testimony's not credible.

02:18   5    It's no BBs for the plaintiffs.

02:18   6                    Mr. Lewis.  Yeah.  He's on the second row

02:18   7    too.  I actually don't have a ton to say about how he

02:18   8    was on the stand.  I thought he conducted himself

02:18   9    fairly on the stand in terms of answering questions.

02:18   10                   But here's the thing, the content of his

02:18   11   testimony, whew.  I mean, it's -- give you a couple

02:18   12   examples.

02:18   13                   I had asked Dr. Chu what he did not

02:18   14   invent that he would agree to.  Didn't invent a CPU,

02:18   15   didn't invent a battery, didn't invent the case.

02:18   16   There's a whole list of examples.

02:18   17                   And when I asked him:  So you shouldn't

02:18   18   get credit for that invention?

02:18   19                   He goes:  Well, that's up to the damages

02:18   20   expert.

02:18   21                   So Dr. Chu pointed back to Mr. Lewis.

02:19   22                   Now, when Mr. Lewis came up on the stand,

02:19   23   he was asked the same questions about why he was

02:19   24   including all those things in his base, the pool of

02:19   25   money that they get access to.  Mr. Lewis goes, well, I

1186

02:19  1   talked to Dr. Chu.

02:19  2              So Dr. Chu's pointing that way, and

02:19  3   Mr. Lewis is pointing that way.  Why?  Because they

02:19  4   want to get all the money into the pool that they can.

02:19  5              And what is the result of this?  The

02:19  6   result of this was that 82 percent of the laptop went

02:19  7   in the pool.  That's crazy.  Even if he was right that

02:19  8   he had some involvement or his technology was in some

02:19  9   way involved in PCI Express or USB 3, that's like a

02:19  10  tiny, tiny fraction of a computer.  There's not

02:19  11  82 percent.  That's crazy.

02:19  12             So the content of Mr. Lewis' testimony,

02:20  13  not very credible.  And that was the whole point we

02:20  14  wanted to point out with him.

02:20  15             Again, this case isn't about the dollars

02:20  16  for us.  This case is about who gets credit.  But you

02:20  17  should only get credit for the work that you actually

02:20  18  do, and we know for a fact that they're claiming

02:20  19  economic credit, dollars, for work that Dr. Chu

02:20  20  definitely didn't do.

02:20  21             That was plaintiff witnesses.  I didn't

02:20  22  see a lot of BBs on their side.

02:20  23             Ms. Chen, Emma Ou, long journey coming

02:20  24  here to speak the truth.  They flew from around the

02:20  25  world to tell you their story.  And when they got up on

02:20  1   the stand, they let their yes be yes and their no be no

02:20  2   and let the chips fall where they may.  Okay?  They

02:20  3   didn't try to hide the truth.  They testified credibly.

02:20  4   They did exactly what I asked them to do.

02:20  5              What did they say?  No PCI local bus on

02:20  6   our products.  We've been using PCI Express for a very

02:20  7   long time.  And they didn't know anything about the

02:21  8   patents until the lawsuit came.  They didn't deny that

02:21  9   the company might have gotten a letter somewhere in the

02:21  10  mailroom, but it never made it to the people that

02:21  11  needed to read it.  So they didn't respond to it.

02:21  12             That was their testimony.  They told the

02:21  13  truth.  Truth tellers get BBs on their side.  Because

02:21  14  we're weighing credibility.  And they told the truth.

02:21  15             The next witnesses that we -- were

02:21  16  presented was Ajay Bhatt.  Y'all remember him?  He was

02:21  17  the creator of the PCI Express, the creator of USB 3

02:21  18  that we're all using.  I told you I was looking forward

02:21  19  to his testimony when we started out.  And for me, he

02:21  20  delivered.  I really enjoyed listening to him.

02:21  21             He had an opportunity given to him.  He

02:21  22  took it.  In his words, he left the world, the

02:21  23  computing world, a better place.  We're all enjoying

02:22  24  work that he did.  Okay?

02:22  25             And he also told you that he gave his

—1188—

02:22  1    technology away for the benefit of all of us.  He also

02:22  2    told you, after he got crossed on how much money he was

02:22  3    making, that the money he earned for coming here

02:22  4    today -- or yesterday, he's giving that away too.

02:22  5            Why?  Because he's the real deal.  He's

02:22  6    the real deal.  Like he doesn't have any interest in

02:22  7    any of this.  He's not trying to spin any yarn.

02:22  8            And absolutely, he didn't talk about the

02:22  9    patents.  Why?  Because he was here to tell you his

02:22  10   story, that -- about the work that he actually did.

02:22  11   That's why he came, and that's all he did.  He told you

02:22  12   about his technology.  He told you about his story.

02:22  13   And he did it in a credible fashion.

02:22  14           When he was cross-examined, he let his

02:22  15   yes be yes and his no be no.  He answered the

02:22  16   questions.  Didn't require any instructions from

02:23  17   anybody.  Because he was telling the truth.  There were

02:23  18   no holes in his bucket.

02:23  19           What did he say?  He told us that PCI

02:23  20   Express is wildly different than PCI local bus.  He

02:23  21   told us that PCI Express and USB 3 are not bus bridges,

02:23  22   like what we're seeing in Dr. Chu's patents.  He told

02:23  23   us the software doesn't have anything to do with how

02:23  24   transactions are made.

02:23  25           Then today Dr. Sarhan disagreed with him.

02:23  1    He said software is where it all happens.

02:23  2              Who are you going to believe?  It's a key

02:23  3    fact.  Who are you going to believe?  Ajay Bhatt, who

02:23  4    has no interest in anything and has given away

02:23  5    everything?  Or Dr. Sarhan?  Your choice.

02:23  6              Dr. Edwards.  I thought he did a nice job

02:24  7    of finally teaching what was happening in these

02:24  8    patents.  He walked through it from the beginning back

02:24  9    to that provisional patent application all the way to

02:24  10   the current ones, and I think he did a nice job to the

02:24  11   best of his ability of teaching what these patents were

02:24  12   about.

02:24  13             And what are they about?  This is the

02:24  14   provisional patent application that's on the screen in

02:24  15   front of you.  Remember this?  Buses on the left.

02:24  16   Buses on the right.

02:24  17             And what's in the middle?  A bridge.

02:24  18   That's the XP Bus.  There isn't any other teaching in

02:24  19   these patents about what the XP Bus is.  Buses on the

02:24  20   left, buses on the right, bridge in the middle, like

02:24  21   the Waco Suspension Bridge.  That's your context.

02:24  22             And how do we know we're right?  Because

02:24  23   that's what the patent describes it as, a peripheral

02:24  24   bridge bus over and over again.  And it's not just the

02:24  25   old provisional patent application.

02:24  1      When we come up to the '768 patent, the

02:25  2  one in this case, one of these extra thick pieces of

02:25  3  reading, what are we going to find in it?  The present

02:25  4  invention is for bridging a first computer bus and a

02:25  5  second computer interface bus.  Bus on the left, bus on

02:25  6  the right, bridge in the middle.

02:25  7      THE COURT:  Counsel, five minutes left.

02:25  8      MR. BURESH:  Thank you, Your Honor.

02:25  9      But if we're the plaintiffs, we want to

02:25 10  say ignore that context.  When you see LVDS channel in

02:25 11  the claim, which the LVDS channel is only on the XP Bus

02:25 12  in these patents and the XP Bus is only the bridge,

02:25 13  ignore all that.  Don't look to any of that.  Okay?

02:25 14      That's what they want you to do.  They

02:25 15  want you to turn a toy airplane into an F-35.  Context

02:25 16  matters.  Otherwise, the fence posts are moving.  Got

02:25 17  to go back to the start, see what the context is.

02:26 18      The other thing about Dr. Edwards that I

02:26 19  noticed, I'll just mention this briefly.  When we

02:26 20  stepped back from his testimony and we think about

02:26 21  cross-examination of Dr. Edwards from ACQIS' lawyers,

02:26 22  there's a couple of things happening there.

02:26 23      You see answers read out of a deposition

02:26 24  transcript, and then I have to stand up and say, well,

02:26 25  read the rest of the answer.

1191

02:26  1          Remember that?

02:26  2          Another time one answer was read, but

02:26  3   they skipped the second one that clarified the first

02:26  4   one.  So I had to come up and do that on redirect.

02:26  5          That's not what you see from folks that

02:26  6   are seeking the truth.  They're not hiding half

02:26  7   answers.  They're not shaving one question off and

02:26  8   skipping the next one.  That's not truth seeking.

02:26  9   Okay?

02:26  10         When I was doing my direct of

02:26  11  Dr. Edwards, I was interrupted time after time after

02:27  12  time.  Why?  Because if you can break up a direct

02:27  13  examination, it makes it harder for you all to

02:27  14  understand it.  That's not the tactics that you see

02:27  15  from someone seeking the truth.

02:27  16         And that's something you can weigh as

02:27  17  well when you're back in the jury room.

02:27  18         Mr. Newell, he did exactly what I said he

02:27  19  would in opening.  He came up and he said that ACQIS'

02:27  20  calculations, the 82 percent and all that stuff, it's a

02:27  21  crock of beans.  It's not credible.  That was the whole

02:27  22  point of his testimony.  And when he was

02:27  23  cross-examined, he let his yes be yes and his no be no.

02:27  24  He was telling the truth.

02:27  25         So when Mr. Collard stands back up, he's

—1192—

02:27  1  going to show you this jury form, I imagine.  He's

02:27  2  going to ask you to check the boxes down the left,

02:28  3  which means he wins.  ACQIS wins.

02:28  4           Now, here's the deal.  I want you guys to

02:28  5  send a message too, that you only get credit for the

02:28  6  work that you actually do.  That's the message I want

02:28  7  you to send.  That you need to be honest about the work

02:28  8  you did, and you only get credit for that.

02:28  9           If you want to send that message, it's

02:28  10 the row down the right, no, no, no, no, no, on Page 2

02:28  11 of the verdict form.  That will signify that you do not

02:28  12 accept that Dr. Chu invented PCI Express and USB 3.  He

02:28  13 should only get credit for the work that he actually

02:28  14 does, and in this case that's zero.

02:28  15          You mark no down Page 2 and it's the end

02:28  16 of your job.  You guys go home.

02:28  17          Thank you for your attention as I've been

02:29  18 blathering at you for the last 30 minutes.  Thank you

02:29  19 for your attention this whole week.  As I said, it was

02:29  20 very impressive the way you guys have conducted

02:29  21 yourself.

02:29  22          Your Honor, thank you.

02:29  23          THE COURT:  Thank you, sir.

02:29  24    CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

02:29  25          MR. COLLARD:  We all watched the trial.

—1193—

02:29  1    We were all here.  Y'all watched the witnesses, the

02:29  2    lawyers, the Judge.

02:29  3             Mr. Buresh chose to spend his statement

02:29  4    telling you his opinion of the trial.  But he's an

02:30  5    advocate.  He's an advocate for ASUS.  And that's fine,

02:30  6    like he said.  But don't let his opinion substitute for

02:30  7    yours.

02:30  8             Now, I am going to go through the jury

02:30  9    form and I am -- I do want ACQIS to win.  And so I am

02:30  10   an advocate, and I am going to show you those yeses.

02:30  11            The reason I'm going through the form,

02:30  12   though, is because it can be a little confusing, and I

02:30  13   don't want to send you back there having never seen it.

02:30  14   Because it's not something that we see day-to-day.

02:30  15            Thank you.

02:31  16            And he's right.  On the first question of

02:31  17   direct infringement, the answer is yes.  ASGL and ACI,

02:31  18   this is the shipper that ships it to the U.S. and the

02:31  19   party that sells it in the U.S.  They directly

02:31  20   infringe.

02:31  21            Causing someone to infringe, that's

02:31  22   indirect infringement.  ASUSTeK and ASGL cause the

02:31  23   infringement in the United States.

02:31  24            Alter ego or agency, I told you we'd talk

02:31  25   about this one.  This is the question about do you

02:31  1    believe they're separate companies or not?  Yes is a

02:31  2    finding for ACQIS.  I want you to have seen that.

02:31  3                    Pre-suit notice of infringement.  This is

02:31  4    the notice letter that ACQIS sent.  Did ACQIS provide

02:31  5    notice of infringement?  The answer is yes.

02:32  6                    This one, this is the clear and

02:32  7    convincing.  This is the one that's ASUS' burden.  Did

02:32  8    they prove that these patents are invalid?  The answer

02:32  9    is no.

02:32  10                   Then finally, the damages question.  This

02:32  11   is the number that was in -- this was the number that

02:32  12   was presented in evidence for these two patent claims.

02:32  13   17,970,582.

02:32  14                   And then there's one more question.  Was

02:32  15   the infringement willful?  After they received the

02:32  16   notice letter, did they know what they were doing?

02:32  17                   We proved this week that ASUSTeK and ASGL

02:32  18   should be held accountable for their unauthorized use

02:32  19   of Bill Chu and ACQIS' intellectual property.  This is

02:32  20   a really special moment.  This is really it.  Now's the

02:32  21   time that you as citizens get to decide this dispute.

02:33  22                   And so I thank you for your service, and

02:33  23   we ask that you hold ASUS accountable.

02:33  24                   Thank you.

02:33  25                   THE COURT:  Thank you, sir.

1195

02:33    1              Ladies and gentlemen, I'm going to now

02:33    2    return to the final pages of my charge.

02:33    3              It is now your duty to deliberate and

02:33    4    conduct with one another in an effort -- and consult

02:33    5    with one another in an effort to reach a verdict.  Each

02:33    6    of you must decide the case for yourself but only after

02:33    7    an impartial consideration of the evidence with your

02:33    8    fellow jurors.

02:33    9              Throughout your deliberations, do not

02:33   10    hesitate to reexamine your own opinions and change your

02:33   11    mind if you're convinced you were wrong, but don't give

02:33   12    up your honest belief because the other jurors think

02:33   13    differently from you or just to finish the case.  As

02:33   14    I've told you throughout, you are the judges in this

02:33   15    case, the judges of the facts.

02:33   16              Now, some of you have taken notes.  Some

02:33   17    of you haven't.  Any notes that you took during the

02:34   18    trial are only aids to your memory.  If during your

02:34   19    deliberations your memory differs from your notes, rely

02:34   20    on your memory and not your notes.  Your notes are not

02:34   21    evidence.

02:34   22              If you did not take notes, rely on your

02:34   23    independent recollection of the evidence and don't be

02:34   24    unduly influenced by notes other jurors might have

02:34   25    taken.

02:34   1                   But whatever you do, remember, notes are

02:34   2    not entitled to greater weight than the recollection or

02:34   3    impression that each of you have about the testimony

02:34   4    and evidence that you saw.

02:34   5                   You can take your copy of the charge with

02:34   6    you.  I encourage you to do that.

02:34   7                   When you get back there, we will --

02:34   8    you'll have a television screen and that's the way

02:34   9    you'll get the exhibits.  You'll call the exhibits up

02:34  10    by their number and look at them.  There will not be

02:34  11    physical exhibits in this case.

02:35  12                   First thing -- I'm going to go off script

02:35  13    a little, just because it's easier.

02:35  14                   The first thing you need to do when you

02:35  15    go back to the jury room is select the jury foreperson.

02:35  16    What I advocate for is picking someone who has legible

02:35  17    handwriting.  Because when you -- the person signs it,

02:35  18    I need to know who signed it.  And if you write me a

02:35  19    note, I need to be able to read the note.

02:35  20                   I don't care who the foreperson is, of

02:35  21    course, but try to make it someone who can -- I can

02:35  22    read their writing.

02:35  23                   If you have -- the very first thing you

02:35  24    need to do is pick your foreperson.  The foreperson

02:35  25    needs to sign a note back there -- there's paper back

—1197—

02:35    1    there -- needs to date it and put the time.

02:35    2                    Now, this is the most important part.

02:35    3    You have to give it to William or someone sitting

02:35    4    outside or we won't know that you did that.  And we

02:35    5    need to know that you did that.

02:35    6                    So hand the note to William or whoever's

02:35    7    outside, and I'll let the folks out here know who the

02:36    8    foreperson is.

02:36    9                    After that, if you have any questions,

02:36    10   you write the questions down, you hand the note to

02:36    11   William or whoever's sitting outside, they'll bring

02:36    12   them in here, and I will write you a response.

02:36    13                   I think in the script it says I may come

02:36    14   back there and talk to you.  That is -- I've never done

02:36    15   that.  I don't think I would this time.  I will write a

02:36    16   note back to you.

02:36    17                   A couple of things I should tell you in

02:36    18   advance, though.  It's better than you writing me and

02:36    19   asking me.

02:36    20                   First, I will not provide you any section

02:36    21   of the testimony.  If you say, I'd like to hear --

02:36    22   Witness X said this.  We'd like to see that transcript.

02:36    23   I will say something like, no.  I may say it more

02:36    24   politely than that, but the answer will be no.

02:36    25                   If you say that you would like to see

02:36  1  something, certain individual that was shown, I will

02:36  2  again say no.

02:36  3          If you ask -- there's a very good chance

02:36  4  if there is an exhibit you're looking for and you can't

02:37  5  find it, it's because it was a demonstrative exhibit.

02:37  6  You may not have noted that when you were listening.

02:37  7  But if it was a demonstrative exhibit, it was not

02:37  8  evidence and you will not have it.

02:37  9          So that may -- if you're frustrated back

02:37  10 there because you can't find the exhibit you are

02:37  11 certain you saw, it's highly likely it was a

02:37  12 demonstrative exhibit and you're not going to get it.

02:37  13         So I've learned all these things from

02:37  14 experience.  Those are the -- 95 percent of the notes I

02:37  15 get I've just told you in advance of -- what I would

02:37  16 do.

02:37  17         On the next page, again, it's just easier

02:37  18 for me to tell you this than to read it.

02:37  19         This is very critical.  If you write a

02:37  20 note, Dear Judge, we would like to ask you X, Y, Z, do

02:37  21 not ever indicate to me where you are at in your

02:37  22 deliberations.  Four of us feel one way, three of us

02:37  23 feel another, or we have already decided this and we

02:38  24 need help on that.

02:38  25         Until we get a note from you signed by

02:38    1    the foreperson that says -- that fills out the entire

02:38    2    verdict form, we never want to know where you're at on

02:38    3    your deliberations.

02:38    4            When I release you after the trial, I'm

02:38    5    going to instruct you to never have any discussions

02:38    6    about what happened during your deliberations.

02:38    7    Whatever happens back there is going to remain

02:38    8    sacrosanct.

02:38    9            I'm not going to ask you, the lawyers

02:38    10   aren't going to ask you.  In fact, I'm not going to

02:38    11   permit you to tell the public what you talked about.

02:38    12   That's up to you all.

02:38    13           And finally, when you come back in, my

02:38    14   practice is:  I'll have the verdict, I will read the

02:38    15   verdict to the lawyers and their parties, and then I'll

02:38    16   ask every one of you who agreed with the verdict to

02:38    17   stand up.

02:39    18           Now, that means you all have to stand up,

02:39    19   because it's unanimous, but it's a way of putting on

02:39    20   the record confirming that it was a unanimous verdict.

02:39    21           So that is all we have.

02:39    22           And of course, you're not -- certainly

02:39    23   not permitted to talk to anyone outside of the jury

02:39    24   about what you're doing.

02:39    25           Not to embarrass anyone, do we have any

-1200-

02:39  1    smokers, people who need to smoke?

02:39  2                    Okay.  That's fine.

02:39  3                    If at some point you feel like you need

02:39  4    to smoke -- go outside and smoke, that's okay.  But we

02:39  5    have to have someone go with you and they're just going

02:39  6    to stand there and watch you smoke.  You can't talk.

02:39  7                    And then while she's gone, you all can't

02:39  8    talk or deliberate until she returns.  You have to have

02:39  9    all seven of you while you are deliberating.

02:39  10                   So with all that being said, you are free

02:39  11   to go.  And it's 2:40, if I'm correct.  You all have as

02:39  12   long as you take -- need to take.  If you'd like to

02:40  13   stay late, we'll bring dinner in for you and we'll keep

02:40  14   going.

02:40  15                   Of course, you can come back tomorrow

02:40  16   too, but I'm just telling you, I'm prepared to stay as

02:40  17   long as you all care to stay today to get this

02:40  18   resolved; or if you all tell me you all want to go

02:40  19   home, we'll all go home and we'll come back tomorrow.

02:40  20   The time you spend on your deliberations is entirely up

02:40  21   to you.

02:40  22                   So thank you very much.

02:40  23                   THE BAILIFF:  All rise.

02:40  24                   (Jury exited the courtroom.)

02:40  25                   THE COURT:  You may be seated.

1201

| | |
|---|---|
| 02:40 | 1 |
| 02:40 | 2 |
| 02:40 | 3 |
| 02:41 | 4 |
| 02:41 | 5 |

What I would like for everyone to do,
who's a lawyer, I would like everyone to remain in the
courtroom until we have our foreperson, and I will let
you know who the foreperson is.

Once that's done, I don't care whether
you stay in the courtroom or not, but I need you -- I
need someone to stay -- from each side to stay on this
floor so if we get a note with a question and, more
importantly, if we get a verdict, you all can get back
in here.

But I especially need someone who's
available, because if I get a note, as soon as I have a
lawyer from each side in here, I'm going to read the
note and tell you how I'm responding, write the
response, read it to you, give you a chance to object
to it, and then I'm going to send it back.  We're going
to keep things moving.

Generally speaking, what you can
anticipate if we get a juror note, regardless of what
it says, I will tell the jury to continue to
deliberate, and that will be -- it may be a little more
flowery than that, but it won't be any more
substantive.

And so if for some reason we need to say
something substantive, then I will coordinate with you

-1202-

02:42  1   all about what it ought to say, but that happens

02:42  2   extraordinarily rarely.

02:42  3                  Is there anything else we need to take

02:42  4   up?

02:42  5                  MR. BURESH:  Not for us, Your Honor.

02:42  6                  MR. COLLARD:  No, Your Honor.  Thank you.

02:42  7                  THE COURT:  As soon as I get the note on

02:42  8   the jury foreperson, I'll come out and let you know.

02:42  9   And then we'll wait for the jury.  And my plan is to

02:42  10  stay as long as they want to stay.  So if we can get it

02:42  11  done today, fine.  And if we can't, obviously, that's

02:42  12  fine as well.

02:42  13                 THE BAILIFF:  All rise.

02:42  14                 (Recess taken.)

02:50  15                 THE COURT:  We have Juror Note No. 1.

02:50  16  Catherine Rose Johnson, who is the second from the left

02:50  17  over there, is the jury foreperson.

02:51  18                 (Recess taken.)

04:20  19                 THE COURT:  I have Note No. 2, which

04:21  20  won't make anyone happy, but we'll go on the record.

04:21  21                 Jury Note No. 2, the jury plans to leave

04:21  22  today at 5:00.  No food will be requested tonight.

04:21  23  We'll plan to resume deliberations tomorrow.  Please

04:21  24  advise when to meet in the morning and instructions.

04:21  25                 I'll have them come back at 8:30.  They

—1203—

04:21  1    may want to -- if it's okay with you, I'll go and ask

04:21  2    them what time they'd like to come back, and whatever

04:21  3    they say will be fine with me.  So I will go ask them.

04:21  4    I'll come back and tell you what time to be here.

04:21  5                    MS. AMSTUTZ:  Thank you, Judge.

04:21  6                    (Pause in proceedings.)

04:23  7                    THE COURT:  Okay.  They said 9 o'clock.

04:23  8    We've got a woman --

04:23  9                    (Interruption.)

04:23  10                   THE COURT:  One of the young ladies who

04:23  11   drives 65 miles prefers to not get here till 9:00 so

04:23  12   she can drive in the light.

04:23  13                   I said, that's fine.

04:23  14                   And so I actually told them once

04:23  15   everyone's here, start deliberating.  Try and get here

04:23  16   by -- whenever you get here.  Once all seven of you are

04:23  17   here, then you can deliberate.  I will be here at 9:00.

04:24  18                   (Hearing adjourned.)

       19

       20

       21

       22

       23

       24

       25

-1204-

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS    )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10              I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13              Certified to by me this 7th day of April

14   2024.

15

16              /s/ Kristie M. Davis
                KRISTIE M. DAVIS
17              Official Court Reporter
                800 Franklin Avenue
18              Waco, Texas 76701
                (254) 340-6114
19              kmdaviscsr@yahoo.com

20

21

22

23

24

25